1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

William N. Lobel, SBN 93202
PACHULSKI STANG ZIEHL & JONES LLP
650 Town Center Drive, Suite 1500
Costa Mesa, CA 92626
Tel: 714 384-4740
Fax: 714 384-4741
E-mail: wlobel@pszjlaw.com

[Proposed] Attorneys for Ruby's Diner, Inc.,
a California corporation, *et al.,* Debtors and Debtors-in-
Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

In re:

RUBY'S DINERS, INC., a California corporation, *et al.,*[1]

      Debtors and Debtors-in-Possession,

Affects:

☒ All Debtors

☐ RUBY'S DINERS, INC., ONLY

☐ RUBY'S SOCAL DINERS, LLC, ONLY

☐ RUBY'S QUALITY DINERS, LLC, ONLY

☐ RUBY'S HUNTINGTON BEACH, LTD., ONLY

☐ RUBY'S LAGUNA HILLS, LTD. ONLY

☐ RUBY'S OCEANSIDE, LTD., ONLY

☐ RUBY'S PALM SPRINGS, LTD., ONLY

Case No. 8:18-bk-13311 CB

Chapter 11

(Jointly Administered With Case Nos.
8:18-bk-13197-CB; 8:18-bk-13198-CB; 8:18-bk-13199-CB; 8:18-bk-13200-CB; 8:18-bk-13201-CB; 8:18-bk-13202-CB)

**NOTICE OF EMERGENCY MOTION AND EMERGENCY MOTION BY DEBTOR FOR ORDER
(A) AUTHORIZING INTERIM USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION FOR USE OF PREPETITION COLLATERAL, AND (C) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

[Declaration of Douglas S. Cavanaugh in Support of First Day Motions filed concurrently herewith]

Date:        September 6, 2018
Time:        2:00 p.m.
Courtroom: 5A
Address:   411 West Fourth Street
           Santa Ana, CA 92701

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

[1] The last four digits of the Debtors' federal tax identification numbers are as follows: Ruby's Diners, Inc. (8143); Ruby's SoCal Diners, LLC (9782); Ruby's Quality Diners, LLC 1539); Ruby's Huntington Beach, Ltd. (1331); Ruby's Laguna Hills, Ltd. (6603); Ruby's Oceanside, Ltd. (9104); and Ruby Palm Springs, Ltd. (9627).

## Cases

First Federal Bank of California v. Weinstein (In re Weinstein),
    227 B.R. 284 (B.A.P. 9th Cir. 1998)...................................................................... 15

General Electric Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.),
    25 B.R. 987 (Bankr. D. Utah 1982)...................................................................... 15

In re 495 Cent. Park Ave. Corp.,
    136 B.R. 626 (Bankr. S.D.N.Y. 1992)................................................................. 16

In re Columbia Gas Sys., Inc.,
    146 B.R. 114 (Bankr. D. Del. 1992)..................................................................... 16

In re Deico Elecs., Inc.,
    139 B.R. 945 (B.A.P. 9th Cir. 1992).................................................................... 15

In re Dynaco,
    162 B.R. 389, 394-5 (Bankr. D.N.H. 1993)......................................................... 16

In re Immenhausen Corp.,
    164 B.R. 347, 352 (Bankr. M.D. Fla. 1994)........................................................ 16

In re Martin,
    761 F.2d 472 (8th Cir. 1985)................................................................................ 16

In re Mickler,
    9 B.R. 121 (Bankr. M.D. Fla. 1981)..................................................................... 13

In re Newark Airport/Hotel Ltd. Partnership,
    156 B.R. 444, 450 (Bankr. D.N.J. 1993).............................................................. 16

In re Shaw Indus., Inc.,
    300 B.R. 861 (Bankr. W.D. Pa. 2003).................................................................. 16

In re Stein,
    19 B.R. 458 (Bankr. E.D. Pa. 1982)..................................................................... 16

In re Swedeland Dev. Group, Inc.,
    16 F.3d 552 (3d Cir. 1994)................................................................................... 16

In re Triplett,
    87 B.R. 25 (Bankr. W.D. Tex. 1988).................................................................... 16

Matter of Pursuit Athletic Footwear, Inc.,
    193 B.R. 713 (Bankr. D. Del. 1996)..................................................................... 16

MBank Dallas, N.A. v. O'Connor (In re O'Connor),
    808 F.2d 1393 (10th Cir. 1987)............................................................................ 14

McCombs,
    88 B.R. at 266....................................................................................................... 16

O'Connor,
    808 F.2d at 1937.................................................................................................... 17

United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.,
    484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988)...................................... 15

## Statutes

11 U.S.C. § 1107(a) ..................................................................................................... 6, 13
11 U.S.C. § 1108 .............................................................................................................. 6
11 U.S.C. § 363(a) ..................................................................................................... 12, 13
11 U.S.C. § 363(c) ............................................................................................................ 2
11 U.S.C. § 363(c)(2) ..................................................................................................... 13
11 U.S.C. § 363(c)(2)(A) ................................................................................................ 13
11 U.S.C. § 363(c)(2)(B) ........................................................................................... 13, 14
11 U.S.C. § 363(c)(3) ..................................................................................................... 17
11 U.S.C. § 363(c)(l) ........................................................................................................ 6
11 U.S.C. § 363(e) ..................................................................................................... 14, 15
11 U.S.C. § 506(a) ......................................................................................................... 15
11 U.S.C. §§ 101-1530 ..................................................................................................... 2
28 U.S.C. § 157(b)(2) ....................................................................................................... 6
28 U.S.C. §§ 1334 ............................................................................................................. 6

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

28 U.S.C. §§ 1408 ........................................................................................................... 6
28 U.S.C. §§ 1409 ........................................................................................................... 6
28 U.S.C. §§ 157 ............................................................................................................. 6

**Rules**

F.R.B.P. 2081-1(9) ........................................................................................................... 2
F.R.B.P. 4001-2 ............................................................................................................... 2
L.B.R. 4001-2(a) ......................................................................................................... 3, 18
L.B.R. 4001-2(b) ............................................................................................................ 18
L.B.R. 9075-1 .................................................................................................................. 2
L.B.R.4001(b)(2) ........................................................................................................... 17

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

# TABLE OF CONTENTS

PAGE

I. STATEMENT OF FACTS ................................................................................................. 6

    (A) JURISDICTION AND VENUE ................................................................................ 6

    (B) BACKGROUND ..................................................................................................... 6

    (C) GENERAL DESCRIPTION OF THE DEBTOR ...................................................... 6

    (D) OVERVIEW OF THE DEBTOR AND ITS AFFILIATES' BUSINESS OPERATIONS ...... 6

    (E) THE DEBTOR AND ITS AFFILIATES' CORPORATE STRUCTURE ............................ 7

    (F) THE DEBTOR'S SECURED DEBT ......................................................................... 9

        1.   THE SECURED NOTEHOLDERS ................................................................. 9

        2.   INTERNAL REVENUE SERVICE ................................................................ 10

        3.   PILLSBURY WINTHROP SHAW PITTMAN LLP ....................................... 11

II. RELIEF REQUESTED ................................................................................................ 11

III. ARGUMENT ............................................................................................................. 12

IV. CONCLUSION ........................................................................................................... 18

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE 20 LARGEST UNSECURED CREDITORS, SECURED CREDITORS, AND OTHER PARTIES IN INTEREST:**

PLEASE TAKE NOTICE that Ruby's Diner, Inc., a California corporation ("RDI" or the "Debtor"), hereby moves the Court on an emergency basis for the entry of interim order authorizing the Debtor to use cash collateral and granting related relief (the "Motion"). By this Motion, the Debtor seeks an order (1) approving the use of cash collateral on an emergency interim basis, subject to its budget attached hereto as **Exhibit "A"** (the "Budget") and pending a final hearing, in such amounts necessary to enable the Debtor to operate its business and avoid immediate and irreparable harm; (2) granting adequate protection to its secured creditors with an interest in cash collateral (defined herein as the "Secured Creditors") on an interim basis; and (3) scheduling and establishing deadlines regarding a final hearing on the Debtor's use of cash collateral.[2]

PLEASE TAKE FURTHER NOTICE that this Motion is brought pursuant to section 363(c) of the Bankruptcy Code, 11 U.S.C. §§ 101-1530, as amended (the "Bankruptcy Code"), Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2081-1(9), 4001-2 and 9075-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California (the "Local Bankruptcy Rules").

PLEASE TAKE FURTHER NOTICE that the essential terms of the Debtor's proposed cash collateral use are as follows:

- The Motion does not request approval of any of the provisions set forth in the currently filed *Statement Regarding Cash Collateral or Debtor in Possession Financing* filed in accordance with Local Bankruptcy Rule 4001-2(a) (the "Statement").

---

[2] On August 28, 2018, the Debtor's affiliates, Ruby's SoCal Diners, LLC, a Delaware limited liability company ("SoCal Diners"); Ruby's Quality Diners, LLC, a Delaware limited liability company ("Quality"); Ruby's Huntington Beach, Ltd., a California limited partnership ("Ruby's Huntington Beach"); Ruby's Laguna Hills, Ltd., a California limited partnership ("Ruby's Laguna Hills"); Ruby's Oceanside, Ltd., a California limited partnership ("Ruby's Oceanside"); and Ruby's Palm Springs, Ltd., a California limited partnership ("Ruby's Palm Springs") (collectively, the "SoCal Debtors")., filed chapter 11 cases, which are pending in this Court. In connection with the filing of the SoCal Debtors' cases, the debtors therein requested authority to use cash collateral of their secured creditors, including Opus Bank, C & C Partnership and Pillsbury Winthrop Shaw Pittman LLP, which request was approved by the Court on an interim basis in accordance with a stipulation reached with Opus Bank.

- The Motion seeks authorization to use cash currently on hand in the estate and funds generated from the operation of the Debtor's business pursuant to the Budget appended hereto as **Exhibit "A"** on an interim basis through the final hearing on this Motion, and on a final basis through December 31, 2018.

- The Motion proposes to grant to (1) Credit Management Association ("CMA"), as collateral agent for the Debtor's Secured Noteholders (as defined herein), (2) the Internal Revenue Service (the "IRS"), and (3) Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") (collectively, the "Secured Creditors") replacement liens on their existing collateral and the proceeds thereof excluding avoidance causes of action, as adequate protection if and only to the extent that (a) their respective prepetition security interests are valid, enforceable, properly perfected and non-avoidable, and (b) the Debtor's use of cash collateral results in a diminution in cash collateral.

**PLEASE TAKE FURTHER NOTICE** that, within a few days of the filing of this case, the Debtor intends to file a motion for approval of debtor-in-possession financing (the "DIP Financing Motion"), pursuant to which the Debtor seeks approval of debtor-in-possession financing in the amount of Two Million Dollars ($2,000,000) (the "DIP Loan"). As with the proposed Cash Collateral use, the proceeds of the DIP Loan will also be utilized in accordance with the Budget. The security for the DIP Loan will be subject to the valid pre-existing liens of the Secured Creditors and any replacement liens granted by way of this Motion.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on the attached Memorandum of Points and Authorities, the *Declaration of Douglas S. Cavanaugh in Support of First Day Motions* (the "Cavanaugh Declaration"), the arguments of counsel, and other admissible evidence properly brought before the Court at or before the hearing on this Motion. In addition, the Debtor requests that the Court take judicial notice of all documents filed with the Court in this case.

**PLEASE TAKE FURTHER NOTICE** that any opposition or objection to the Motion must be filed with the Court and served on proposed counsel for the Debtor at the above address any time before the hearing or may be presented at the hearing on the Motion. Failure to timely object may be deemed by the Court to constitute consent to the relief requested herein.

**PLEASE TAKE FURTHER NOTICE** that the Debtor will serve this Notice and Motion and the attached Memorandum of Points and Authorities, and the Cavanaugh Declaration, on: (1) the Office of the United States Trustee; (2) the creditors appearing on the list filed in accordance with Fed. R. Bankr. P. 1007(d) by the Debtor unless and until an official committee of unsecured

creditors (the "Committee") is appointed, then in that event, to counsel to the Committee; (3) parties

that file with the Court and serve upon the Debtor request for notice of all matters in accordance with

Bankruptcy Rule 2002(i); (4) the United States of America; (5) the State of California, (6) CMA on

behalf of the Secured Noteholders; (7) the IRS; (8) Pillsbury; (9) the Steering Committee on behalf

of the Debtor's unsecured noteholders; and (10) counsel to the Debtor's postpetition lender.

   **PLEASE TAKE FURTHER NOTICE** that, to the extent necessary, the Debtor requests

that the Court waive compliance with Local Bankruptcy Rule 9075-1(a)(1) and approve service (in

addition to the means of service set forth in such Local Bankruptcy Rule) by overnight delivery or

email.  In the event that the Court grants the relief requested by the Motion, the Debtor shall provide

notice of the entry of the order granting such relief upon each of the foregoing parties and any other

parties in interest as the Court directs.  The Debtor submits that such notice is sufficient and that no

other or further notice be given.

   **WHEREFORE**, for all the foregoing reasons, and such additional reasons as may be

advanced at or prior to the hearing on the Motion, the Debtor respectfully requests that this Court

enter an order: (1) approving the use of cash collateral on an emergency interim basis, subject to the

Budget and pending a final hearing, in such amounts necessary to enable the Debtor to operate its

business and avoid immediate and irreparable harm, (2) granting adequate protection to the Secured

Creditors on an interim basis, (3) scheduling and establishing deadlines regarding a final hearing on

the Debtor's use of cash collateral, and (4) granting such other and further relief as is just and proper

under the circumstances.

Dated:    September 5, 2018          PACHULSKI STANG ZIEHL & JONES LLP


                               By:    */s/ William N. Lobel*
                                     William N. Lobel
                                     [Proposed] Attorneys for Ruby's Diner,
                                     Inc., a California corporation, *et al.,*
                                     Debtors and Debtors-in-Possession

4

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

**(A)    Jurisdiction and Venue**

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**(B)    Background**

On September 5, 2018 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor continues to operate its business and manage its affairs as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in this chapter 11 case (the "Case").

On August 29, 2018, the Debtor's affiliates, SoCal Diners, LLC ("SoCal Diners"), Ruby's Quality Diners, LLC ("Quality"), Ruby's Huntington Beach, Ltd. ("Ruby's Huntington Beach"), Ruby's Laguna Hills, Ltd. ("Ruby's Laguna Hills"), Ruby's Oceanside, Ltd. ("Ruby's Oceanside"), and Ruby Palm Springs, Ltd. ("Ruby's Palm Springs"), filed chapter 11 cases, which are pending in this Court (the "SoCal Debtors").  Concurrently with the filing of the Debtor's chapter 11 Case, another affiliate of the Debtor (through common ownership), Ruby's Franchise Systems, Inc., a California corporation ("RFS"), intends to file for relief under chapter 11.

**(C)    General Description of the Debtor**

A detailed description of the Debtor's background, structure, operations and recent financial history is detailed in the concurrently filed Declaration of Douglas S. Cavanaugh in Support of First Day Motions (the "Cavanaugh Declaration").

**(D)    Overview of the Debtor and Its Affiliates' Business Operations**

The Debtor owns varying percentages of and operates diners in Southern California through its subsidiaries, including through its wholly-owned subsidiary, SoCal Diners.  The Debtor and its affiliates (referred to from time to time herein as the "Company") own, operate and manage

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1  restaurants under the trade names "Ruby's®," "Ruby's® Diner," "The Ruby Restaurant Group,"

2  "Ruby's® Dinette" and "Ruby's® Shake Shop."  The Company has operated Ruby's® Diner

3  restaurants since its incorporation in 1985 and is known as a purveyor of very popular burgers, fries

4  and shakes.  The Debtor is owned 60% by Douglas Cavanaugh and 40% by Ralph Kosmides, the

5  founders of the Company (the "Company Founders").  The Debtor is the owner of the Ruby's®

6  trademarks, system and intellectual property (the "Marks and Intellectual Property") and is the

7  employer of the Company's more than 800 employees.

8  **(E)    The Debtor and Its Affiliates' Corporate Structure[3]**

9          The Debtor is the 100% owner and sole and managing member of SoCal Diners.  SoCal

10  Diners is the 100% owner and sole and managing member of Quality.  SoCal Diners is the general

11  partner and 50% owner, and Quality is the limited partner and 50% owner, of the following

12  California limited partnerships: (1) Ruby's Huntington Beach, which owns and operates a Ruby's®

13  restaurant on the pier in Huntington Beach, California and is one of the SoCal Debtors; (2) Ruby's

14  Oceanside, which owns and operates a Ruby's® restaurant in Oceanside, California and is one of the

15  SoCal Debtors; (3) Ruby's Palm Springs, which owns and operates a Ruby's® restaurant in Palm

16  Springs, California and is one of the SoCal Debtors; (4) Ruby's Laguna Hills, which owns and

17  operates a Ruby's® restaurant in the Laguna Hill Mall in Laguna Hills, California and is one of the

18  SoCal Debtors; [4] and (5) Ruby's Mission Valley, Ltd., which until a few months prior to the Petition

19  Date, owned and operated a Ruby's® restaurant in the Westfield Mission Valley Mall in San Diego,

20  California[5] (collectively, the "SoCal Entities" and the restaurants owned by the SoCal Entities, the

21  "SoCal Restaurants").

22          In addition, as of the Petition Date, the Debtor holds ownership interests in, and management

23  roles in connection with, the following joint venture entities:  (1) the Debtor is the managing

24  member and 70% owner of Ruby's Beach Ventures LLC, which owns and operates a Ruby's®

---

[3] A chart depicting the Company's corporate structure is attached to the Cavanaugh Declaration as Exhibit "1."

[4] The Debtor anticipates that, due to significant, continuing construction projects underway at the Laguna Hills Mall, the Laguna Hills restaurant will close following the Petition Date.

[5] The Mission Valley restaurant was closed prior to the Petition Date, in April 2018.  Ruby's Mission Valley, Ltd. is not a debtor entity.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

restaurant in Long Beach, California;[6] (2) the Debtor is the general partner and 50% owner of Ruby's Diner South Coast Plaza LP, which owns and operates a Ruby's® restaurant at South Coast Plaza Mall in Costa Mesa, California;[7] (3) the Debtor is the managing member and sole owner of Ruby's Woodbridge LLC, which owns and operates a Ruby's® restaurant in Woodbridge in Irvine, California; and (4) the Debtor is the managing member and 50% owner of Ruby's Spectrum LLC, which until a few months prior to the Petition Date, owned and operated a Ruby's® restaurant at the Irvine Spectrum in Irvine, California[8] (collectively, the "RDI Entities" and the restaurants owned by the RDI Entities, the "RDI Restaurants").  The RDI Entities have not filed chapter 11 cases.  The RDI Restaurants, together with the SoCal Restaurants, are referred to as the "Company Restaurants").

As of the Petition Date, there also were twenty-four (24) Ruby's® Diner franchises (or licensed units) located in Southern California, Pennsylvania, New Jersey, Nevada and Texas that were owned and, with certain limited exceptions, operated by independent third parties.  Ruby's Franchise Systems, Inc., a California corporation ("RFS"), an entity affiliated with the Debtor through common ownership and control which has commenced a separate chapter 11 proceeding concurrently with the Debtor's chapter 11 filing, currently serves as the franchisor to the Ruby's® franchisees/licensees (the "Franchisees"), and licenses the Marks and Intellectual Property from the Debtor as licensor.  Under RFS' agreements with the Franchisees (the "Franchise Agreements"), RFS (as franchisor) is entitled to a franchise royalty fee, which is generally the greater of a set dollar amount or four percent (4%) of "Gross Sales" (as such term is defined in the Franchise Agreements), and which has historically averaged approximately $2.4 million per annum.  As licensor of the Marks and Intellectual Property to RFS, pursuant to an Amended and Restated Trademark and Intellectual Property License Agreement, dated June 1, 1990 (the "RDI/RFS License Agreement"),

---

[6] The other 30% of Ruby's Beach Ventures LLC is held by various third-party investors.

[7] The other 50% of Ruby's Diner South Coast Plaza LP is owned by South Coast Plaza, a California general partnership, as the limited partner.

[8] The other 50% of Ruby's Spectrum LLC is held by William C. Taormina, Trustee of the Taormina Revocable Inter Vivos Trust u/d/t dated July 26, 1983.  The Irvine Spectrum restaurant was closed prior to the Petition Date, in April 2018.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

the Debtor is entitled to one percent (1%) of the "Gross Sales" generated by RFS and the Franchisees as a license fee, which fees have historically averaged approximately $600,000 per annum (the "RDI License Fee").

As described in further detail in the Cavanaugh Declaration, pursuant to a plan support agreement entered into between the Debtor, RFS, the Company Founders and Steve Craig (the "Plan Support Agreement"), a true and correct copy of which is attached to the Cavanaugh Declaration as Exhibit "2," the Debtor and RFS contemplate that they will propose a joint chapter 11 plan of reorganization in their chapter 11 cases, pursuant to which, among other things, the RDI/RFS License Agreement will be terminated and the surviving merged entity will assume the role of franchisor of the Ruby's® brand. The Plan Support Agreement further provides for the provision of Two Million Dollars ($2,000,000) in debtor-in-possession financing (the "DIP Financing") from Mr. Craig or his designee (the "DIP Lender"), the provision of plan funding by Mr. Craig by way of the retirement of the amounts due in connection with the DIP Financing, cancellation of a note in the face amount of One Million Dollars ($1,000,000) owed by RFS to Mr. Craig, new funds in the amount of One Million Dollars ($1,000,000), and a "new value" contribution by the Company Founders. As a result of the proposed implementation of the Plan Support Agreement, all of the assets of RDI and RFS will owned by a reorganized RDI and reorganized RDI will be owned 60% by Steve Craig, 24% by Douglas Cavanaugh and 16% by Ralph Kosmides.

The use of Cash Collateral and the proceeds of the DIP Financing are critical to the Company's ability to operate its restaurant business and maximize the value of the Debtor's estate for the benefit of all parties.

**(F)    The Debtor's Secured Debt**

1.    The Secured Noteholders

On or about February 10, 2012, the Debtor entered into a restructuring of its existing secured notes (in the aggregate face amount of approximately $2.9 million) (the "Original Secured Notes" and the holders thereof, the "Secured Noteholders"). The Original Secured Notes (and the Restructured Secured Notes issued in connection with the 2016 Restructuring Agreement (as defined hereinbelow) are secured by all or substantially all of the personal property of RDI (including cash

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

9

and accounts receivable, the Marks and Intellectual Property and RDI's interests in SoCal Diners,

Quality and the RDI Entities).  The Original Secured Notes were governed by the Credit Agreement,

the Collateral Agent and Intercreditor Agreement, the Security Agreement (Personal Property), dated

as of February 10, 2012, and related documentation, including the UCC-1 Financing Statement filed

in connection therewith (the "Original Secured Credit Documents").  Pursuant to the Original

Secured Credit Documents, Credit Management Association ("CMA") was designated as collateral

agent in connection with the Original Secured Notes (and continues to serve in this capacity in

connection with the Restructured Secured Notes).

On June 30, 2016, the Debtor completed a restructuring transaction whereby the Original

Secured Notes were amended and restated (the "Restructured Secured Notes").  The Restructured

Secured Notes, the First Amendment to Security Agreement, Credit Agreement (Secured), Collateral

Agent and Intercreditor Agreement (Secured), Credit Agreement (Unsecured), and Representative

and Intercreditor Agreement (Unsecured), and Agreement Regarding Restatement of Promissory

Notes, effective as of July 1, 2016 (the "Omnibus First Amendment"), the UCC-1 Financing

Statements filed in connection therewith, and any related documentation, are referred to as the "2016

Restructuring Agreement."

The Debtor made the required interest payments under the Restructured Secured Notes due

on June 30, 2017 and December 20, 2017, however, the Debtor was unable to make the June 30,

2018 interest payment.  As of the Petition Date, the Debtor owed a total of approximately $2.985

million to the Secured Noteholders under the 2016 Restructuring Agreement.

2.    Internal Revenue Service

On or about October 16, 2017, the Internal Revenue Service (the "IRS") recorded a tax lien

against the Debtor with the Secretary of State of California in the amount of $175,789.06.

Thereafter, the Debtor reached an agreement with the IRS regarding a payment plan and waiver of

certain late charges.  The Debtor has been making monthly payments to the IRS on account of this

tax obligation in the amount of approximately $12,000 per month, and such payments are

contemplated to continue postpetition, as set forth in the Budget.  The outstanding balance to the

IRS, as of the Petition Date, is approximately $91,000.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

3.    Pillsbury Winthrop Shaw Pittman LLP

On or about June 14, 2018, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") recorded a Notice of Judgment Lien (Filing No. 18-7654307617) against the Debtor with the Secretary of State of California in the amount of $617,452.74.[9]

Collectively, the Secured Noteholders, the IRS and Pillsbury are referred to herein as the "Secured Creditors" and the cash that serves as collateral for the obligations to the Secured Creditors, the "Cash Collateral."

The Debtor and its estate reserve all rights with respect to any challenge to the validity and/or scope of the prepetition claims and liens of the Secured Creditors, or the avoidability thereof. Nothing herein is intended to waive the rights of the Debtor (or any Committee appointed in the Debtor's case or other interested party) with respect to such issues.

## II.

## RELIEF REQUESTED

In order to address its working capital needs and fund its reorganization efforts, the Debtor requires the use of what may be the Cash Collateral of the Secured Creditors in accordance with the Budget attached herein as **Exhibit "A"** on an interim basis through the final hearing on this Motion, and on a final basis through December 31, 2018.  The use of Cash Collateral will provide the Debtor with the necessary funding with which to operate its business, pay its employees, vendors, insurance and other costs of operations, maximize value – including the value of the Secured Creditors' existing collateral – and pursue implementation of a chapter 11 plan of reorganization as contemplated by the Plan Support Agreement.[10]

The Debtor seeks to use Cash Collateral and to grant to the Secured Creditors, as adequate protection of their interests in the Cash Collateral and solely to the extent of any diminution in value

---

[9] The Pillsbury lien is also asserted against SoCal Diners and three (3) of the SoCal Entities: (a) Ruby's Huntington Beach, Ltd. (which owns and operates a Ruby's® restaurant on the pier in Huntington Beach, California); (b) Ruby's Oceanside, Ltd. (which owns and operates a Ruby's® restaurant in Oceanside, California); and (c) Ruby's Palm Springs, Ltd. (which owns and operates a Ruby's® restaurant in Palm Springs, California).

[10] The SoCal Debtors have obtained Court authorization to use cash collateral of their secured creditors in order to continue to reimburse the Debtor in the ordinary course for, among other things, management fees, insurance and employee-related costs allocated to each of the SoCal Debtors in accordance with the budget approved on an interim basis in the SoCal Debtors' chapter 11 cases.

of the Cash Collateral, replacement security interests in and liens upon their existing collateral and any proceeds thereof, as set forth below.

The Debtor has developed cashflow projections reflecting anticipated revenue and expenditures through the first 13 weeks of the Case, contained in the proposed budget (the "Budget") attached hereto as **Exhibit "A,"** provided that the Debtor seeks authority to exceed fifteen  percent (15%) of the aggregate of the weekly expenditures reflected on the Budget, measured on a four-week rolling basis.  The Budget sets forth the amount of cash necessary for the Debtor to operate its business postpetition.  The Budget takes into account the effect this bankruptcy filing may have on the Debtor's business and the expenses of the administration of this chapter 11 case.

As set forth in the Budget, the Debtor seeks authority to use cash on hand as of the Petition Date and funds generated from operation of its business and the receipt of funds from RFS.  Such cash and receipts allegedly constitute the Secured Creditors' "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code.  In addition, the Budget contains as a source of cash the proceeds of the DIP Financing in the principal amount of two million dollars ($2,000,000).

The Debtor requests that the Court conduct an interim hearing, pursuant to Bankruptcy Rule 4001(b), to consider the entry of an interim order: (1) approving the use of Cash Collateral on an emergency interim basis, pending a final hearing, in accordance with the Budget, to enable the Debtor to operate its business and avoid immediate and irreparable harm to the estate, (2) granting adequate protection to the Secured Creditors on an interim basis, and (3) scheduling and establishing deadlines regarding a final hearing on the Debtor's use of Cash Collateral.

### III.

### ARGUMENT

**A.    The Debtor Should Be Authorized to Use Cash Collateral to Operate,
Maintain and Preserve Its Business**

A debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section . . .
> 1108. . . of this title and unless the court orders otherwise, the trustee may
> enter into transactions, including the sale or lease of property of the estate,
> in the ordinary course of business, without notice or a hearing, and may

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

use property of the estate in the ordinary course of business without notice
or a hearing.

11 U.S.C. § 363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with

respect to property of the estate, including the right to use property of the estate in compliance with

Section 363.  *See* 11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities,

deposit accounts or other cash equivalents in which the estate and an entity other than the estate have

an interest. . . ."  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with

respect to "cash collateral," providing that the trustee or debtor in possession may use "cash

collateral" under subsection (c)(l) if:

> (A)  each entity that has an interest in such cash collateral consents; or

> (B)  the court, after notice and a hearing, authorizes such use, sale or lease
> in accordance with the provisions of this section.

*See* 11 U. S.C. § 363(c)(2)(A) and (B).

It is well settled that it is appropriate for a chapter 11 debtor to use cash collateral for the

purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-Vee,

8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614 (9th Cir.

B.A.P. 1991).   Where the debtor is operating a business, it is extremely important that the access to

cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11

is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business."

In re Dynaco Corp., 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting* In re Stein, 19 B.R. 458, 459

(Bankr. E.D. Pa. 1982).  Indeed, it is universally acknowledged that the debtor's cash "is the life

blood of the business."  In re Mickler, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981).

In this case, the Debtor has an immediate need for the use of Cash Collateral in order to

maintain its business operations.  The Debtor's expected use of Cash Collateral during the interim

and final periods is reflected in the Budget.  In addition, the Budget contemplates the use of the $2

million in proceeds from the DIP Financing in accordance with the terms thereof.  All payments

described in the Budget are necessary to maintain and continue the Debtor's operations and preserve

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

13

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1  its going-concern value for the benefit of the Debtor's creditors.  Specifically, the Debtor must have

2  access to Cash Collateral (and the DIP Financing) to pay its employees' wages and benefits,

3  insurance, rent, debt service, customer program-related expenses, costs related to the chapter 11, and

4  other pertinent, ordinary expenses of its business.  Failure to make payments in accordance with the

5  Budget would result in the cessation of the Debtor's business, causing immediate and irreparable

6  harm to the Debtor's estate and its creditors.  Put simply, the Debtor cannot continue operations

7  without the use of Cash Collateral and DIP Financing, and if the Debtor is unable to operate, all

8  parties will be harmed.

9  **B.    The Secured Creditors Are Adequately Protected By the Debtor's Use Of Cash
Collateral to Operate the Business and By the Granting of Replacement Liens
10       to the Extent of Any Diminution of Their Collateral**

11         To the extent that an entity has a valid security interest in the revenues generated by property,

12  those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy Code.  If a

13  secured creditor does not consent to the use of cash collateral,[11] the bankruptcy court can authorize

14  the debtor in possession to use said cash collateral under section 363(c)(2)(B) of the Bankruptcy

15  Code if the court determines that the debtor has provided "adequate protection" of the secured

16  creditor's interest in the cash collateral.  *See e.g.,* In re Mellor, 734 F.2d 1396, 1400 (9th Cir. 1984);

17  MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1397-98 (10th Cir. 1987), In re

18  McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

19         Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an

20  interest in property used ... or proposed to be used ... by [a debtor in possession], the court, with or

21  without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate

22  protection of such interest."  11 U.S.C. § 363(e).  Although the term "adequate protection" is not

23  explicitly defined by the Bankruptcy Code, section 361 of the Bankruptcy Code provides that when

24  adequate protection is required, it may be provided by:

25         (1) Requiring the trustee to make a cash payment or periodic cash
           payments to such entity, to the extent that the … use … under section
26

27  ───────────────────────
[11] The Debtor believes that it is likely that the Secured Creditors would consent to the proposed use of Cash Collateral.
However, because of the urgent nature of the relief sought and, in particular, the procedural requirements for obtaining
28  the consent of the Secured Noteholders, the Debtor did not have the opportunity to seek such consent in advance of the
filing of this Motion.

363 of this title … results in a decrease in the value of such entity's
interest in such property;

(2) providing to such entity an additional or replacement lien to the
extent that such … use … results in a decrease in the value of such
entity's interest in such property; or

(3) Granting such other relief … as will result in the realizing by such
entity of the indubitable equivalent in such entity's interest in such
property.

Neither section 361 nor any other provision of the Bankruptcy Code defines the nature and

extent of the "interest in property" of which a secured creditor is entitled to adequate protection

under section 361.  However, the statute plainly provides that a qualifying interest demands

protection only to the extent that the use of the creditor's collateral will result in a decrease in the

"value of such entity's interest in such property."  11 U.S.C. §§ 361, 363(e); *see* First Federal Bank

of California v. Weinstein (In re Weinstein), 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998); In re Deico

Elecs., Inc., 139 B.R. 945, 947 (B.A.P. 9th Cir. 1992); General Electric Mortgage Corp. v. South

Village, Inc. (In re South Village, Inc.), 25 B.R. 987, 989-90 n.4 (Bankr. D. Utah 1982).

The phrase "value of such entity's interest" was addressed by the Supreme Court in the

landmark decision, United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd., 484

U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988).  For the meaning of  "value of such entity's

interest," the Supreme Court was guided by section 506(a) of the Bankruptcy Code which defines a

secured creditor's claim – "The phrase 'value of such creditor's interest in § 506(a) means the value

of the collateral.'  We think the phrase 'value of such entity's interest' in § 361(1) and (2), when

applied to secured creditors means the same."  *Id.* at 630 (internal citations omitted).  Timbers

instructs that a secured creditor is entitled to adequate protection only against the diminution in the

value of the collateral securing the creditor's allowed secured claim.  Under Timbers, therefore,

where the value of the collateral is not diminishing by its use, sale, or lease, the creditor's interest is

adequately protected.  This conclusion flows from the notion that the "value of such entity's

interests" is the equivalent to "value of the collateral."

What constitutes adequate protection must be decided on a case-by-case basis.  *See* In re

Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994); O'Connor, 808 F.2d at 1396; In re

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

15

1   Martin, 761 F.2d 472 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa.

2   2003); In re Columbia Gas Sys., Inc., 146 B.R. 114 (Bankr. D. Del. 1992).  The focus of the

3   requirement is to protect a secured creditor from diminution in the value of its interest in the

4   particular collateral during the period of use.  *See* Swedeland, 16 F.3d at 564  ("[T]he whole purpose

5   of adequate protection for a creditor is to insure that the creditor receives the value for which he

6   bargained pre-bankruptcy.") (internal quotation omitted); In re 495 Cent. Park Ave. Corp., 136 B.R.

7   626, 636 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y.

8   1986)

9          Courts have determined that a debtor's continued business operations can constitute the

10   adequate protection of a secured creditor.  *See* Matter of Pursuit Athletic Footwear, Inc., 193 B.R.

11   713 (Bankr. D. Del. 1996); In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr.

12   D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); In re Immenhausen Corp.,

13   164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).  The preservation of the value of a secured creditor's

14   lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash

15   collateral.  In re Triplett, 87 B.R. 25 (Bankr. W.D. Tex. 1988). *See also* In re Stein, 19 B.R. 458

16   (Bankr. E.D. Pa. 1982) (the court determined that the use of cash collateral was necessary to the

17   continued operations of the debtor, and that the creditor's secured position could only be enhanced

18   by the continued operation of the debtor's business); McCombs, 88 B.R. at 266 (the court determined

19   that the debtor's use of cash collateral for needed repairs, renovations and operating expenses

20   eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would

21   more likely increase cash collateral).

22          In accordance with the foregoing authorities, and as described herein and in the Cavanaugh

23   Declaration, the Debtor's continued operation, including the necessity of paying payroll and the

24   other necessary and appropriate expenses set forth in the Budget, will adequately protect the Secured

25   Creditors as the Debtor will continue to generate revenue and preserve its business.  In addition, the

26   Secured Creditors are adequately protected by the proposed replacement liens to the extent of any

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1   diminution that have the same extent, validity, scope, and priority as the prepetition liens held by the

2   respective Secured Creditors.[12]

3          Additionally, in determining adequate protection, Courts have stressed the importance of

4   promoting a debtor's reorganization.  As set forth by the Tenth Circuit in O'Connor:

> In this case, Debtors, in the midst of a Chapter 11 proceeding, have
> proposed to deal with cash collateral for the purpose of enhancing the
> prospects of reorganization.  This quest is the ultimate goal of Chapter
> 11.  Hence,  the Debtor's efforts are not only to be encouraged, but also
> their efforts during the administration of the proceeding are to be
> measured in light of that quest.  Because the ultimate benefit to be
> achieved by a successful reorganization inures to all the creditors of the
> estate, a fair opportunity must be given to the Debtors to achieve that end.
> Thus, while interests of the secured creditor whose property rights are of
> concern to the court, the interests of all other creditors also have bearing
> upon the question of whether use of cash collateral shall be permitted
> during the early stages of administration.

O'Connor, 808 F.2d at 1937.

          Likewise, the use of Cash Collateral in this case is critical to the Debtor's ability to

implement an effective reorganization strategy for the benefit of all creditors, and should be

approved.

**C.     Emergency Relief and Interim Approval of the Debtor's Use of Cash
        Collateral Should Be Granted Pending a Final Hearing**

          The authorization to use Cash Collateral pending a final hearing will preserve the value of

the Debtor's business only if authorization is granted immediately.  Section 363(c)(3) of the

Bankruptcy Code and Bankruptcy Rule 4001(b)(2) require the Court to schedule a cash collateral

hearing in accordance with the needs of the debtor and conduct a preliminary hearing for the purpose

of authorizing the use of cash collateral to avoid irreparable harm.

          In the present case, emergency use of Cash Collateral by the Debtor, pending a final hearing,

is necessary to prevent irreparable harm to the Debtor.  If there is any interruption in the Debtor's

operations, the value of its business will be significantly impaired to the serious detriment of the

Debtor, its creditors, employees and customers.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

[12] The IRS is further protected by the monthly payments on account of its Secured Claim, as reflected in the Budget, in accordance with the payment plan established prior to the Petition Date.

1  On the other hand, the Secured Creditors will suffer little, if any, harm if interim relief is

2  granted.  To the extent that a Secured Creditor has an interest in property of this estate which is

3  entitled to adequate protection, that interest is adequately protected by the preservation of the value

4  of their collateral through the Debtor's continued business operations, the proposed replacement

5  liens and, in the case of the IRS, the monthly payments.

6  The Motion and proposed Order thereon seek none of the provisions identified in the

7  Statement filed concurrently herewith in accordance with Local Bankruptcy Rule 4001-2(a).

8  **IV.**

9  **<u>CONCLUSION</u>**

10  **WHEREFORE**, for all the foregoing reasons, and such additional reasons as may be

11  addressed at the hearing on this Motion, the Debtor respectfully requests that this Court enter an

12  order: (a) granting interim approval of the use of Cash Collateral on an emergency basis, pending a

13  final hearing, in accordance with the Budget; (b) granting adequate protection to the Secured

14  Creditors on an interim basis in the form of replacement liens to the extent necessary to protect the

15  Secured Creditors from a diminution in value of their collateral; (c) scheduling and establishing

16  deadlines regarding a final hearing on the Debtor's use of Cash Collateral, and (d) granting such

17  other and further relief as is just and proper under the circumstances.

18

19  Dated:     September 5,  2018          PACHULSKI STANG ZIEHL & JONES LLP

20

21  By:     */s/ William N. Lobel*

22  William N. Lobel
   [Proposed] Attorneys for Ruby's Diner,
   Inc., a California corporation, *et al.,*

23  Debtors and Debtors-in-Possession

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

EXHIBIT "A"

Ruby's Diner Inc.
Weekly Cash Flow Budget

| | Fiscal Period RK Total | RDI | RFS | Period 8 | | | | | | Period 9 | | | | Period 10 | | | | Period 11 | | | | Period 12 | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Post-Petition Accounting Week | | | | | | | | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | | |
| Week Ending Date | | | | 7/22/2018 | 7/29/2018 | 8/5/2018 | 8/12/2018 | 8/19/2018 | 8/26/2018 | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 11/11/2018 | 11/18/2018 | 11/25/2018 | 12/2/2018 | |
| **RECEIPTS** | | | | | | | | | | | | | | | | | | | | | | | | |
| [1,2] G&A Rent | 554,051 | 554,051 | | 32,552 | 33,050 | 32,036 | 30,876 | 27,898 | 24,484 | 24,504 | 22,958 | 20,736 | 20,902 | 18,082 | 21,918 | 24,184 | 23,059 | 21,132 | 18,563 | 21,038 | 18,560 | 23,150 | 16,777 | 271,058 |
| HOP Distribution to RDI | 125,226 | 125,226 | | 11,256 | 10,026 | 9,729 | 9,446 | 7,619 | 5,976 | 6,147 | 5,712 | 4,688 | 4,747 | 3,662 | 4,938 | 5,898 | 4,654 | 3,674 | 3,218 | 3,799 | 2,985 | 5,654 | 2,083 | 55,713 |
| License Fee from RFS | - | | 537,623 | | | | | 45,776 | | | 44,043 | 388,610 | | 33,596 | | | | | 36,571 | | | | | 502,820 |
| Workers Comp 2017 Audit Reimbursement | - | | | | | | | | | | | | 59,000 | | | | | | | | | | | |
| LP/LLC Distributions to RDI | 200,672 | 200,672 | | | | | | | | | | | | | | | | | | | | | | |
| **Total Receipts** | | | | 43,808 | 43,077 | 41,765 | 40,322 | 81,292 | 30,460 | 30,652 | 28,670 | 69,466 | 473,259 | 21,744 | 26,856 | 63,678 | 27,713 | 24,806 | 21,782 | 61,408 | 21,545 | 28,804 | 18,861 | 888,591 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | | | | | | | | | | | | | |
| [3,4] Salaries & Employee Related | 473,288 | 202,238 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 236,644 |
| Facility 1 rent | 38,769 | 32,308 | 6,461 | | 5,385 | | | 5,385 | | | 5,385 | | | 5,385 | | 5,385 | | | 5,385 | | | 5,385 | | 16,154 |
| [5] Other Operating Expenses | 226,375 | 90,359 | 195,918 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 63,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 108,944 |
| [4] Founders Medical | 60,000 | 60,000 | | | | 10,000 | | | | 10,000 | | | | 10,000 | | | | 10,000 | | | | 10,000 | | 30,000 |
| **Total Operating Expenses** | 325,144 | 655,955 | | 43,206 | 3,765 | 58,590 | 3,765 | 43,206 | 3,765 | 58,590 | 3,765 | 43,206 | 3,765 | 103,206 | 19,150 | 43,206 | 3,765 | 43,206 | 19,150 | 43,206 | 3,765 | 43,206 | 19,150 | 391,743 |
| Non-Operating Expenses | | | | | | | | | | | | | | | | | | | | | | | | |
| Interest and Debt Service | 136,593 | 42,909 | | | | | | | | | | | | 34,148 | | | | | 34,148 | | | | 34,148 | 102,445 |
| Facility 2 rent (HB 2018 % Rent) | 435,000 | | | | | | | | | | | | 170,000 | | | | | | | | | | 170,000 |
| Capital Improvements | 170,000 | | | | | | | | | | | | | | | | | | | | | | | |
| [5] FUTA Tax | 43,641 | | | | | | | | | | 6,651 | | | | 6,651 | | | | 6,651 | | | | 19,953 |
| [4] Costco Redemption Payments | 600,000 | | | | | | | | | | | 150,000 | | | | 120,000 | | | | 120,000 | | | 390,000 |
| Contingency | 100,000 | | | | | | | | | | | | | | | | | | | | | | | |
| Unsecured Noteholder Payment | 1,385,337 | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Non-Operating Expenses** | 2,435,571 | | | - | - | - | - | - | - | - | 6,651 | - | 320,000 | 34,148 | - | 6,651 | 120,000 | 34,148 | - | 6,651 | - | 120,000 | 34,148 | 682,398 |
| **Total Disbursements** | | | | 43,206 | 3,765 | 58,590 | 3,765 | 43,206 | 3,765 | 58,590 | 10,416 | 43,206 | 323,765 | 137,354 | 19,150 | 49,857 | 123,765 | 77,354 | 19,150 | 49,857 | 3,765 | 163,206 | 53,298 | 1,074,140 |
| **CASH FLOW FROM OPERATIONS** | | | | 602 | 39,312 | (16,825) | 36,557 | 38,087 | 26,695 | (27,939) | 18,254 | 26,261 | 149,494 | (115,610) | 7,706 | 13,821 | (96,052) | (52,548) | 2,632 | 11,551 | 17,780 | (134,402) | (34,437) | (185,549) |
| Restructuring Expenses | | | | | | | | | | | | | | | | | | | | | | | | |
| Financial Advisor | 100,000 | | | | | | | | | | | | | 25,000 | | | 25,000 | | | | 25,000 | | | 75,000 |
| Committee Professionals | 100,000 | | | | | | | | | | | | | 25,000 | | | 25,000 | | | | 25,000 | | | 75,000 |
| DIP Lender Legal | 100,000 | | | | | | | | | | | | | 25,000 | | | 25,000 | | | | 25,000 | | | 75,000 |
| Completion Incentive | 80,000 | | | | | | | | | | | | | 80,000 | | | | | | | | | | 80,000 |
| PSZJ | 450,000 | | | | | | | | | | | | | 112,500 | | | 112,500 | | | | 112,500 | | | 112,500 |
| US Trustee | 16,250 | | | | | | | | | | | | | | | | 6,500 | | | | | | | 6,500 |
| **Total Restructuring Expenses** | 846,250 | | | - | - | - | - | - | - | - | - | - | - | 267,500 | - | - | 194,000 | - | - | - | 187,500 | - | - | 649,000 |
| **NET CASH FLOW AFTER RESTRUCTURING EXPENSES** | (846,250) | | | 602 | 39,312 | (16,825) | 36,557 | 38,087 | 26,695 | (27,939) | 18,254 | 26,261 | 149,494 | (383,110) | 7,706 | 13,821 | (96,052) | (246,548) | 2,632 | 11,551 | 17,780 | (321,902) | (34,437) | (834,549) |
| Beginning Cash | | | | - | 602 | 39,914 | 23,089 | 59,645 | 97,732 | 124,427 | 118,254 | 144,515 | 294,009 | 500,899 | 508,605 | 502,426 | 496,375 | 499,827 | 502,459 | 504,010 | 501,790 | 499,888 | 100,000 |
| Plus / Less: Net Cash Flow | | | | 602 | 39,312 | (16,825) | 36,557 | 38,087 | 26,695 | (27,939) | 18,254 | 26,261 | 149,494 | (383,110) | 7,706 | 13,821 | (96,052) | (246,548) | 2,632 | 11,551 | 17,780 | (321,902) | (34,437) | (834,549) |
| Plus / Less: SLC Capital Contribution | | | | | | | | | | | | | | | | | | | | | | | | |
| Plus / Less: DIP Loan Facility Borrowing / (Paydown) | | | | | | | | | | | | | 590,000 | | | | (10,000) | 90,000 | 250,000 | | (10,000) | (20,000) | 320,000 | 40,000 | 1,240,000 |
| **ENDING CASH** | | | | 602 | 39,914 | 23,089 | 59,645 | 97,732 | 124,427 | 96,489 | 118,254 | 144,515 | 294,009 | 500,899 | 508,605 | 502,426 | 496,375 | 499,827 | 502,459 | 504,010 | 501,790 | 499,888 | 505,451 | 505,451 |
| DIP Loan Facility Availability | | | | | | | | | | | | | 1,600,000 | 1,010,000 | 1,010,000 | 1,030,000 | 940,000 | 690,000 | 690,000 | 700,000 | 720,000 | 400,000 | 1,600,000 |
| DIP (Draw) / Paydown | | | | | | | | | | | | | (590,000) | | | 20,000 | (90,000) | (250,000) | | 10,000 | 20,000 | (320,000) | (40,000) | (1,240,000) |
| **ENDING LIQUIDITY** | | | | | | 97,732 | 124,427 | 96,489 | 118,254 | 144,515 | 294,009 | 1,510,899 | 1,518,605 | 1,532,426 | 1,436,375 | 1,189,827 | 1,192,459 | 1,204,010 | 1,221,790 | 899,888 | 865,451 | 865,451 |
| **ENDING DIP LOAN BALANCE** | | | | | | | | | | | | | 590,000 | 590,000 | 570,000 | 660,000 | 910,000 | 910,000 | 900,000 | 880,000 | 1,200,000 | 1,240,000 | 1,240,000 |

Footnotes

[1] Restaurant revenues and, therefore, related expenses are impacted by seasonality and weather.

[2] RDI corporate office and Ruby's Irvine Woodbridge restaurant share bank accounts. The cash inflows and outflows from the Woodbridge restaurant operation are excluded from this projection.

[3] RDI advances payroll funds to a Payroll Processor for all managed restaurant locations, and is fully reimbursed. See Exhibit A.

[4] RDI advances funds for various insurance costs, including Group Health, General Liability, and Workers' Compensation, and is reimbursed by affiliates and employees for the non-covered portion. See Exhibit B.