1  William N. Lobel,SBN 93202
   PACHULSKI STANG ZIEHL & JONES LLP
2  650 Town Center Drive, Suite 1500
   Costa Mesa, CA  92626
3  Telephone: 714 384-4740
   Fax: 714 384-4741
4  E-mail: wlobel@pszjlaw.com

5  [Proposed] Attorneys for Ruby's Diner, Inc., a California
   corporation, *et al.,* Debtors and Debtors-in-Possession
6

7

8              **UNITED STATES BANKRUPTCY COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA SANTA ANA DIVISION**

| | |
|---|---|
| In re: | Case No. 8:18-bk-13311-CB |
| RUBY'S DINERS, INC., a California corporation, *et al.,*[1] | Chapter 11 |
| Debtors and Debtors-in-Possession, | (Jointly Administered With Case Nos. 8:18-bk-13197-CB; 8:18-bk-13198-CB; 8:18-bk-13199-CB; 8:18-bk-13200-CB; 8:18-bk-13201-CB; 8:18-bk-13202-CB) |
| Affects: | |
| ☒ All Debtors | **DECLARATION OF DOUGLAS S. CAVANAUGH IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS** |
| ☐ RUBY'S DINERS, INC., ONLY | Date:         September 6, 2018 |
| ☐ RUBY'S SOCAL DINERS, LLC, ONLY | Time:         2:00 p.m. |
| ☐ RUBY'S QUALITY DINERS, LLC, ONLY | Courtroom: 5A |
| ☐ RUBY'S HUNTINGTON BEACH, LTD., ONLY | Address:    411 West Fourth Street |
| ☐ RUBY'S LAGUNA HILLS, LTD. ONLY | Santa Ana, CA  92701 |
| ☐ RUBY'S OCEANSIDE, LTD., ONLY | |
| ☐ RUBY'S PALM SPRINGS, LTD., ONLY | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

---

[1] The last four digits of the Debtors' federal tax identification numbers are as follows: Ruby's Diners, Inc. (8143); Ruby's SoCal Diners, LLC (9782); Ruby's Quality Diners, LLC 1539); Ruby's Huntington Beach, Ltd. (1331); Ruby's Laguna Hills, Ltd. (6603); Ruby's Oceanside, Ltd. (9104); and Ruby Palm Springs, Ltd. (9627).

I, Douglas S. Cavanaugh, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.      I am a founder and the Chief Executive Officer ("CEO") of Ruby's Diners, Inc., a California corporation, the above-captioned debtor and debtor-in-possession ("RDI" or the "Debtor").  I have served in the capacity of CEO since the Debtor's incorporation in 1985.  I am also a 60% shareholder of the Debtor.

2.      I submit this declaration (the "Declaration") in support of the Debtor's chapter 11 petition and the "first day" motions and applications described further below (collectively, the "First Day Motions").[2]  Except as otherwise indicated, all statements in this Declaration are based upon my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, or my opinion based on my experience with the Debtor's operations and financial condition.  In making my statements based on my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my review of documents, information provided to me by the Debtor's employees or my opinion.  I am authorized to submit this Declaration on behalf of the Debtor.

3.      Based on my review of the Debtor's books, records and other information, I believe that the relief sought by the Debtor in the First Day Motions is necessary to enable the Debtor to continue to operate as a debtor in possession during the course of its chapter 11 case, to minimize the disruption attendant with a chapter 11 filing and to maximize the value of the Debtor's estate for the benefit of its creditors and parties in interest.

4.      Part I of this Declaration describes the business of the Debtor and its affiliates and the developments that led to the Debtor's filing for relief under chapter 11 of title 11 of the United States

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions, as applicable.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Code (the "<u>Bankruptcy Code</u>").  Part II of this Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith in support of this case.

**I.**

**PART I**

**A.**    <u>**Overview of the Debtor and Its Affiliates' Business Operations**</u>

5.    RDI was incorporated on February 13, 1985.  Its principal business address is 4100 MacArthur Blvd., Suite 310, Newport Beach, California 92660.  RDI owns varying percentages of and operates diners in Southern California through its subsidiaries, including through its wholly-owned subsidiary, Ruby's SoCal Diners, LLC, a Delaware limited liability company ("<u>SoCal Diners</u>").  The Debtor and its affiliates (referred to from time to time herein as the "<u>Company</u>") own, operate and manage restaurants under the trade names "Ruby's®," "Ruby's® Diner," "The Ruby Restaurant Group," "Ruby's® Dinette" and "Ruby's® Shake Shop."   The Company has operated Ruby's® restaurants since its incorporation and is known as a purveyor of very popular burgers, fries and shakes.  RDI is owned 60% by me and 40% by Ralph Kosmides, and we are the founders of the Company (the "<u>Company Founders</u>").  RDI is the owner of the Ruby's® trademarks, system and intellectual property (the "<u>Marks and Intellectual Property</u>") and is the employer of the Company's more than 800 employees.

**B.**    <u>**The Debtor and Its Affiliates' Corporate Structure**</u>[3]

6.    RDI is the 100% owner and sole and managing member of SoCal Diners.  SoCal Diners is the 100% owner and sole and managing member of Ruby's Quality Diners LLC ("<u>Quality</u>").  SoCal Diners is the general partner and 50% owner, and Quality is the limited partner and 50% owner, of the following California limited partnerships: (1) Ruby's Huntington Beach, Ltd., which owns and operates a Ruby's® restaurant on the pier in Huntington Beach, California; (2) Ruby's Oceanside, Ltd., which owns and operates a Ruby's® restaurant in Oceanside, California; (3) Ruby's Palm Springs, Ltd., which owns and operates a Ruby's® restaurant in Palm Springs,

---

[3] A chart depicting the Company's corporate structure is attached hereto as Exhibit "1."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

California; (4) Ruby's Mission Valley, Ltd., which until a few months prior to the Petition Date,

owned and operated a Ruby's® restaurant in the Westfield Mission Valley Mall in San Diego,

California;[4] and (5) Ruby's Laguna Hills, Ltd., which owns and operates a Ruby's® restaurant in the

Laguna Hill Mall in Laguna Hills, California[5] (collectively, the "SoCal Entities" and the restaurants

owned by the SoCal Entities, the "SoCal Restaurants").

7.    In addition, as of the Petition Date, RDI holds ownership interests in, and

management roles in connection with, the following joint venture entities:  (1) RDI is the managing

member and 70% owner of Ruby's Beach Ventures LLC, which owns and operates a Ruby's®

restaurant in Long Beach, California;[6] (2) RDI is the general partner and 50% owner of Ruby's

Diner South Coast Plaza LP, which owns and operates a Ruby's® restaurant at South Coast Plaza

Mall in Costa Mesa, California;[7] (3) RDI is the managing member and sole owner of Ruby's

Woodbridge LLC, which owns and operates a Ruby's® restaurant in Woodbridge in Irvine,

California; and (4) RDI is the managing member and 50% owner of Ruby's Spectrum LLC, which

until a few months prior to the Petition Date, owned and operated a Ruby's® restaurant at the Irvine

Spectrum in Irvine, California[8] (collectively, the "RDI Entities" and the restaurants owned by the

RDI Entities, the "RDI Restaurants").  The RDI Restaurants, together with the SoCal Restaurants,

are referred to as the "Company Restaurants").

8.    As of the Petition Date, there also were twenty-four (24) Ruby's® Diner franchises (or

licensed units) located in Southern California, Arizona, Pennsylvania, New Jersey, Nevada and

---

[4] The Mission Valley restaurant was closed prior to the Petition Date, in April 2018.

[5] RDI anticipates that, due to significant, continuing construction projects underway at the Laguna Hills Mall, the Laguna Hills restaurant will close following the Petition Date.

[6] The other 30% of Ruby's Beach Ventures LLC is held by various third-party investors.

[7] The other 50% of Ruby's Diner South Coast Plaza LP is owned by South Coast Plaza, a California general partnership, as the limited partner.

[8] The other 50% of Ruby's Spectrum LLC is held by William C. Taormina, Trustee of the Taormina Revocable Inter Vivos Trust u/d/t dated July 26, 1983 ("Taormina").  The Irvine Spectrum restaurant was closed prior to the Petition Date, in April 2018.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Texas that were owned and, with certain limited exceptions, operated by independent third parties.[9] Ruby's Franchise Systems, Inc., a California corporation ("RFS"), an entity affiliated with the Debtor through common ownership and control which has commenced a separate chapter 11 proceeding concurrently with RDI's chapter 11 filing, currently serves as the franchisor to the Ruby's® franchisees/licensees (the "Franchisees"), and licenses the Marks and Intellectual Property from RDI as licensor. Under RFS' agreements with the Franchisees (the "Franchise Agreements"), RFS (as franchisor) is entitled to a franchise royalty fee, which is generally the greater of a set dollar amount or four percent (4%) of "Gross Sales" (as such term is defined in the Franchise Agreements), and fee which historically averages at approximately $2.4 million per annum. As licensor of the Marks and Intellectual Property to RFS, pursuant to an Amended and Restated Trademark and Intellectual Property License Agreement, dated June 1, 1990 (the "RDI/RFS License Agreement"), RDI is entitled to one percent (1%) of the "Gross Sales" generated by RFS and the Franchisees as a license fee, which fees have historically averaged approximately $600,000 per annum (the "RDI License Fee").

9. Pursuant to a plan support agreement entered into between RDI, RFS, the Company's Founders and Steve Craig (the "Plan Support Agreement"), a true and correct copy of which is attached hereto as Exhibit "2," RDI and RFS contemplate that they will propose a joint chapter 11 plan of reorganization in their chapter 11 cases, pursuant to which, among other things, the RDI/RFS License Agreement will be terminated and the surviving merged entity will assume the role of franchisor of the Ruby's® brand. The Plan Support Agreement further provides for the provision of Two Million Dollars ($2,000,000) in debtor-in-possession financing (the "DIP Financing") from Mr. Craig or his designee (the "DIP Lender"), the provision of plan funding by Mr. Craig by way of the retirement of the amounts due in connection with the DIP Financing, cancellation of a note in the

---

[9] RFS (as defined herein), an affiliate of the Debtor owned 60% by me and 40% by Mr. Kosmides, the founders of the Company, provides management services to two (2) Ruby's® franchises located in Yorba Linda and Orange, California (Ruby's Yorba Linda, Ltd. and Ruby's Orange Depot, LLC). Ruby's Management, LLC ("RMLLC") (an entity owned by myself, Mr. Kosmides and Douglas Salisbury), provides management services for a Ruby's® restaurant located in Morongo, California (Ruby's Morongo) and has sub-contracted with the Debtor for those services. RMLLC owns 50% of Shake Shack, LLC (the other 50% is owned by three unrelated parties), which operates the Shake Shack in Laguna Beach, California. The Debtor does not provide management services in connection with the Shake Shack.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

face amount of One Million Dollars ($1,000,000) owed by RFS to Mr. Craig, new funds in the

amount of One Million Dollars ($1,000,000), and a "new value" contribution by the Company

Founders.

**C.    Overview of the Debtor's Debt Structure**

10.    As of the Petition Date, RDI had approximately $2.985 million in secured obligations

to the holders of Secured Notes (as defined herein), which obligations are secured against

substantially all of the personal property of RDI, including cash and accounts receivable, the Marks

and Intellectual Property and RDI's interests in SoCal Diners, Quality and the RDI Entities,

approximately $145,000 in secured tax obligations, and a judgment lien (UCC-1) in favor of

Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") asserted in the amount of approximately

$618,000 (the "Pillsbury Lien").[10]

11.    RDI also has $5.6 million in unsecured obligations to the Unsecured Noteholders (as

defined herein), a $127,000 unsecured note payable to William Taormina related to the closing of

the Irvine Spectrum restaurant, and approximately $1.2 million in pre-petition accounts payable

(which amount does not include vendor obligations at the Company Restaurant level that might also

be asserted against RDI nor any contingent obligations that could arise in connection with leases at

the Company Restaurant level, through a guaranty by RDI or otherwise).[11]  In addition, RDI has

obligations for employee wages and workers' compensation, obligations related to the Company's

advertising programs in the amount of approximately $532,000, and approximately $4.4 million in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

---

[10] The Pillsbury Lien is also asserted against SoCal Diners and three (3) of the SoCal Entities: (a) Ruby's Huntington Beach, Ltd. (which owns and operates a Ruby's® restaurant on the pier in Huntington Beach, California); (b) Ruby's Oceanside, Ltd. (which owns and operates a Ruby's® restaurant in Oceanside, California); and (c) Ruby's Palm Springs, Ltd. (which owns and operates a Ruby's® restaurant in Palm Springs, California).

[11] Of the Company Restaurants, RDI has guaranteed the lease obligations related to the Ruby's® restaurants located at or in the following locations: (1) Irvine Spectrum (RDI Restaurant) (which location closed prior to the Petition Date); (2) Long Beach, California (RDI Restaurant); (3) Woodbridge in Irvine, California (RDI Restaurant); (4) Laguna Hills, California (SoCal Restaurant); and (5) Palm Springs, California (SoCal Restaurant).

gross obligations related to the Company's gift card programs.[12]  As described herein, RDI is

seeking approval from the Court to honor and pay certain of these latter amounts, which amounts

(along with such other Court-approved amounts) will be funded through the use of cash collateral

and the proceeds of the DIP Facility (as herein defined).[13]

**D.**    **Overview of the Debtor's Revenue Sources and its Financial Difficulties**

12.    The Company's revenue generally comes directly from the operation of the SoCal

Restaurants (in the case of the SoCal Entities and SoCal Diners) and from management fees and

partnership distributions from the RDI Restaurants (in the case of the RDI Entities and RDI).  The

Company also receives revenue in connection with the sale of gift cards to its customers and, as

discussed above, RDI is entitled to the RDI License Fee.  The Company's annual revenue for

calendar year 2017 was approximately $24.9 million.  RDI, however, faced with an overleveraged

balance sheet and continuing operating losses, has been unable to adequately address its financial

difficulties outside of a chapter 11 filing and seeks to implement the provisions of the Plan Support

Agreement.

13.    Several factors contributed to the deterioration in the Company's financial condition,

which resulted in the commencement of the Debtor's bankruptcy case.

14.    In early 2012, after years of ongoing disputes, the Company entered into agreements

whereby it bought out the interests of two of its partners, Douglas Salisbury and Doug DeCinces.

Funding for the buy-outs was obtained through financing obtained from Steve Craig and Opus Bank.

---

[12] The Company's gift card programs are discussed in further detail herein.  These programs consist of gift cards issued directly by the Company to customers (defined herein as the "Company Gift Cards"), which program RDI intends to continue and which cards the Debtor intends to honor following the Petition Date, and gift cards sold through a third-party retailer, Costco Wholesale Corporation (defined herein as the "Costco Gift Cards"), which program has been terminated by the Debtor on a go-forward basis, but which outstanding obligations the Debtor intends to honor.  The face amount of the outstanding gift card obligations under these gift card programs is approximately $4.4 million; however, RDI believes, based on historical redemption rates and the aging of these obligations, that its gift card related obligations will total approximately $1.6 million.

The Debtor also has dining cards issued to the Unsecured Noteholders allowing them to dine at Ruby's® Restaurants free of charge up to certain amounts based on the face amount of their notes.  The Debtor does not intend to honor these cards following ten (10) days after the Petition Date and the Debtor does not intend to continue this program.]

[13] As of the Petition Date, RDI owes to RFS the amount of approximately $400,000 (after accounting for all intercompany obligations between them).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

The Company, however, ultimately did not otherwise have sufficient cash flow to meet the costs associated with the buy-outs in addition to the Company's other financial challenges and its ongoing operational needs, including with respect to the obligations to RDI's Secured Noteholders and Unsecured Noteholders.

15.    Accordingly, on or about February 10, 2012, RDI entered into a consensual restructuring of its secured notes (in the aggregate face amount of approximately $2.9 million) (the "Original Secured Notes") and, on or about July 16, 2012, of its unsecured notes (in the aggregate face amount of approximately $5.6 million) (the "Original Unsecured Notes" and, together with the Original Secured Notes, the "Original Notes" and the holders thereof, the "Secured Noteholders" and the "Unsecured Noteholders," respectively).  The Original Secured Notes (and the Restructured Secured Notes issued in connection with the 2016 Restructuring Agreement (as such terms are defined hereinbelow)) are secured by all or substantially all of the personal property of RDI (including cash and accounts receivable, the Marks and Intellectual Property and RDI's interests in SoCal Diners, Quality and the RDI Entities).  The Original Secured Notes were governed by the Credit Agreement, the Collateral Agent and Intercreditor Agreement, the Security Agreement (Personal Property), dated as of February 10, 2012, and related documentation, including the UCC-1 Financing Statement filed in connection therewith (the "Original Secured Credit Documents").  Pursuant to the Original Secured Credit Documents, Credit Management Association ("CMA") was designated as collateral agent in connection with the Original Secured Notes (and continues to serve in this capacity in connection with the Restructured Secured Notes).  The Original Unsecured Notes were governed by Credit Agreement and the Representative and Intercreditor Agreement, dated as of July 16, 2012 (the "Original Unsecured Credit Documents").  Pursuant to the Original Unsecured Credit Documents, a "steering committee" comprised of Unsecured Noteholders was designated as the representative with respect to the Original Unsecured Notes (the "Steering Committee") (and continues to serve in this capacity in connection with the Restructured Unsecured Notes).

16.    As noted above, around this time frame, the Company was faced with several legal challenges in connection with, among other things, the buy-out of its partners and disputes related to its Laguna Beach restaurant location, which not only unnecessarily diverted management's attention

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

away from the Company's operations, but also resulted in the incurrence of significant professional fees and litigation related expense exceeding $600,000. In addition, notwithstanding the Company's efforts to grow its brand through the development of new franchiseable models, Company-owned Ruby's® restaurants and the conversion of certain locations from a full-service restaurant to a "fast casual" restaurant concept, unfortunately, as a result of an industrywide slowdown in terms of growth and sales figures and high operational costs, the new locations and concepts did not perform as projected, and the Company was ultimately forced to close four (4) of its restaurants (Plaza Bonita in National City, California, Parkway Plaza in El Cajon, California, Whalers Village in Maui, Hawaii, and 17th Street in Costa Mesa, California), resulting in significant obligations associated with these closures. Around the same time, RFS' efforts at developing new franchises were otherwise hampered by the industry slowdown and a profitable Ruby's® franchise located at the Newark Airport was lost due to the airport's removal of all vendors at the terminal.

17. In addition, leading up to 2015, significant increased competition in the restaurant industry emerged, creating an array of dining options for consumers. This competition emergence impacted many key brands and, while the Ruby's® brand continued to see strong loyalty with its guests, the Company was impacted by these competitive forces, which adversely impacted the revenue generated by the Company stores, as well as the sales figures of the Ruby's® franchisees (and, thereby, the amount of the revenue generated by way of the RDI License Fee).

18. After several years of continuing losses and the closure of the four restaurants, in early 2015, RDI was forced to suspend interest payments on the Original Notes. In addition, SoCal Diners was in covenant violation of its loan agreement with Opus Bank (which holds liens on all or substantially all of the assets of SoCal Diners, Quality and the SoCal Restaurants and, at the time, was owed approximately $4 million).

19. The Company explored various business and restructuring alternatives over the course of 2015 and early 2016. In October 2016, SoCal Diners entered into a restructuring of the Opus Bank loan. Since that time, and until its December 2017 maturity, SoCal Diners was in material compliance with the restructured terms of the Opus Bank loan, which is currently in the amount of approximately $2.1 million.

20.     RDI also engaged the Steering Committee and CMA in an ongoing dialogue regarding the Company's financial situation and possible restructuring alternatives.  As a result, the parties reached a conceptual agreement regarding a revised business plan for the Company and a consensual proposal for the restructuring of the Original Notes.  The restructuring of the Original Notes was subject to the approval of the Noteholders, which required approval from an aggregate of at least 51% of the total amount loaned to RDI by each Secured Noteholder under the Original Secured Notes, as well as an aggregate of at least 66.7% of the total amount loaned to RDI by each Unsecured Noteholder under the Original Unsecured Notes.

21.     On June 30, 2016, with the requisite approval of the Noteholders and in accordance with RDI's Consent Solicitation Statement, dated May 19, 2016, RDI completed a restructuring transaction involving the Original Notes, whereby RDI amended and restated the Original Notes (the "Restructured Notes").  The Consent Solicitation Statement, the Restructured Notes, the First Amendment to Security Agreement, Credit Agreement (Secured), Collateral Agent and Intercreditor Agreement (Secured), Credit Agreement (Unsecured), and Representative and Intercreditor Agreement (Unsecured), and Agreement Regarding Restatement of Promissory Notes, effective as of July 1, 2016 (the "Omnibus First Amendment"), the UCC-1 Financing Statements filed in connection therewith, and any related documentation (including the Original Secured Credit Documents and Original Unsecured Credit Documents not amended by way of the Restructured Notes and Omnibus First Amendment), are referred to herein as the "2016 Restructuring Agreement."

22.     Pursuant to the 2016 Restructuring Agreement, among other things, the maturity of the Restructured Notes was extended until June 30, 2026, with interest in the amount of 2.23% to be paid on a semi-annual basis (in June and December) until maturity.

23.     As contemplated in connection with the 2016 Restructuring Agreement, the Company set out to implement its business plan to increase franchise unit sales and reduce Company-owned assets through the sale of multiple restaurant locations (by way of refranchising these restaurants to third parties).  Concurrently, through the reduction of Company-owned restaurants, the Company planned to be in a position to significantly reduce its corporate overhead and infrastructure

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

obligations related to the Company-owned restaurants.  In accordance with the Company's business plan, during the time period from October 2015 to June 2016, three (3) restaurants were sold and refranchised to third party franchisees (the Ruby's® locations in Corona del Mar, Laguna Beach and Mission Viejo, California), for total net sale proceeds of approximately $2.5 million.

24.      The Company also entered into negotiations for the sale of three (3) other restaurant locations, and received several offers in connection with these restaurants from various prospective purchasers.[14]  However, the offers ultimately proved insufficient, and the Company determined it could not proceed forward with these sales.  As a result of the required continued management of the Company-owned stores, however, notwithstanding the Company's efforts and corresponding reduction of expenses, the Company was not in a position to materially reduce much of its corporate overhead and infrastructure obligations at the pace outlined in the business plan, although the Company has substantially reduced its overhead in the past 12-months.

25.      In addition, 2017 restaurant sales were hampered by inclement weather in the first half of the year which severely degraded sales volumes over prior years and forecasts.  The weather also impacted commodity prices, increasing the Company's cost of goods.  Moreover, newly enacted governmental regulations and policies drove many expenses higher (including medical benefits, sick pay requirements and minimum wage increases), all of which increased costs at a time when the restaurant industry as a whole was experiencing declining same store sales.  Concurrently, grocery store prices decreased, which generally reduced the frequency of visitation by restaurant customers.  While the Company experienced a rebound in the second half of 2017, the Company's cash flow remained insufficient to meet its ongoing obligations.

26.      Another factor impacting the Company was the lower than forecasted income from the Company's third-party retailer gift card program.  Historically, the Company had engaged in gift card sales through Costco Wholesale Corporation (defined herein as the "Costco Gift Card Program") as a means by which to increase customer visitation to the Ruby's® restaurants.

---

[14] One of these prospective purchasers was Steve Craig.  Mr. Craig is a franchisee of the Ruby's® restaurants located at the Outlets at San Clemente, California, and at the Citadel Outlet Mall in Los Angeles, California.  Mr. Craig is also a part owner of a Ruby's® location in Carlsbad, California.  Mr. Craig also provided $1 million in funding to RFS in late December 2014, and is currently owed such amount by RFS.

Unfortunately, the Company was unable to reach sufficiently favorable terms with the Ruby's®

Franchisees whereby they would agree to assume a certain amount of the differential between the

costs of honoring the Costco Gift Cards and the reimbursement rate to the Company, leaving the

Company to reimburse the Franchisees accepting the Costco Gift Cards at an unfavorable rate, and

minimizing the benefits of the Costco Gift Card Program to the Company.[15]

27.      In light of these factors, while RDI was able to make the required interest payments

under the Restructured Notes due on June 30, 2017 and December 20, 2017, it was unable to make

the June 30, 2018 payment.

28.      In sum, the Debtor found itself in a position with an overleveraged balance sheet, and

without the cash flow to pay its operating costs, and its obligations to creditors, thereby necessitating

this bankruptcy filing in order to restructure its financial affairs.

29.      The Company, however, continues to see a bright future with franchising and sales

growth as the economy is continuing to show signs of strengthening.  In this regard, the Company

anticipates same store sales growth in 2018 and going forward, and stable and continued franchise

growth in the future, including with the development of its international franchising plan and its

recently developed Ruby's® Shake Shop concept, a small franchise prototype specifically designed

to compete in today's "on-the-go" market sphere.  The Shake Shop model has its first debut in

August of 2018 at a location in North Hollywood, California.  The concept features a reduced menu

of approximately 20 menu items as well as beverages and Ruby's® famous shakes.  The small

footprint is aimed at providing a model with reduced labor costs, yet strong sales potential.   The

Debtor believes that, with a restructuring of its financial affairs though the chapter 11 process, it will

be a viable and profitable enterprise, for the benefit of all parties.

30.      To this end, RDI has entered into the Plan Support Agreement (Exhibit "2" hereto),

pursuant to which it will implement a restructuring of its financial affairs.  The terms of the Plan

Support Agreement are intended to form the basis of a joint plan to be proposed by RDI and RFS.

---

[15] In light of these issues, as discussed below, prior to the Petition Date, the Debtor terminated the Costco Gift Card Program.  However, the Debtor intends to honor its outstanding gift card obligations thereunder (and has sought authority to do so).

31.    In the various First Day Motions, the Debtor seeks relief on an expedited basis that will help it restructure its business, maximize the value of its estate and permit it to conduct this chapter 11 case efficiently and economically as contemplated by the Plan Support Agreement.

## II.

## PART II

### A.    First Day Motions and Applications

32.    In order to enable the Debtor to minimize the adverse effects of the commencement of this case and maximize its restructuring opportunity, the Debtor has requested various types of relief in the First Day Motions filed concurrently with this Declaration.  A summary of the relief sought in each First Day Motion is set forth below.

33.    I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The type of relief sought in each of the First Day Motions:  (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its current business operations; and (b) is essential to maximizing the value of the Debtor's business for the benefit of its estate and creditors.

### B.    Motion of Debtor for an Order Under Federal Rules of Bankruptcy Procedure 2002(i), 2002(m), 4001, 6004, 6006, 6007, 9006, 9007, 9013, 9014, and 9019, authorizing the Debtor to Limit Notice of Limited Notice Matters

34.    The Debtor seeks an order authorizing the Debtor to limit notice of the Limited Notice Matters, as defined in the Motion (the "Limited Notice Motion") in this chapter 11 case (the "Case") to the following parties: (1) the Office of the United States Trustee, (2) the creditors appearing on the list filed in accordance with Fed. R. Bankr. P. 1007(d) by the Debtor unless and until an official committee of unsecured creditors (the "Committee") is appointed, then in that event, to counsel to the Committee, (3) parties that file with the Court and serve upon the Debtor request for notice of all matters in accordance with Bankruptcy Rule 2002(i), (4) the United States of America, (5) the State of California, (6) any party with a pecuniary interest in the subject matter of the particular Limited Notice Matter or its counsel, (7) the Steering Committee on behalf of the Debtor's unsecured noteholders, (8) Credit Managers Association on behalf of the Debtor's secured

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1    noteholders; (9) any other known secured creditors, and (10) counsel to the Debtor's postpetition

2    lender.

3        35.    There are approximately 1,500 parties on the mailing matrix.  The Debtor does not

4    have fax numbers or email addresses for many of these parties.  Serving the Motion by telephone,

5    messenger or personal delivery on each of the parties would clearly be cost and time prohibitive, if

6    not impossible.

7        36.    If the relief requested herein is granted, the burden, complication, delay and cost to

8    the Debtor's estate that is associated with administering the Case and providing notice of the

9    proceedings in this Case to hundreds of parties would be dramatically reduced.

10        37.    Accordingly, I believe that the relief requested in the Limited Notice Motion is both

11    necessary and in the best interest of the Debtor's estate and its creditors.

12
**C.    Motion of Debtor for an Order Under U.S.C. §§ 105, 363 and 503 Approving Incentive
13        Program for Certain Key Employees**

14        38.    The Debtor seeks an order authorizing the Debtor to pay certain amounts to certain

15    key employees the that form its corporate office team, including two members of senior

16    management, in order to give them an incentive to work productively, maximize the value of the

17    Debtor's estate through the filing, and confirmation, of a chapter 11 plan and to continue their

18    employment with the Debtor during this critical period as defined in the Motion (the "Incentive

19    Motion").

20        39.    It is critical that the Debtor preserve the going concern value of its operations and

21    assets in order to maximize the recovery to creditors and the estate.  Thus, it is also absolutely

22    critical that the Debtor retain its key corporate office employees during this process and incentivize

23    them to shepherd the Case through a successful chapter 11 process.  Accordingly, the Debtor seeks

24    authority to honor its obligations under the incentive program developed pre-petition by the Debtor,

25    as described in the Incentive Motion (the "Incentive Program").

26        40.    In my reasonable business judgment and under the facts and circumstances of the

27    Case, the Incentive Program is necessary to incentivize the Debtor's critical employees, and

28    represents fair and reasonable compensation for the eligible employees under the circumstances.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

The Incentive Plan was approved by the Debtor prior to the Petition Date, and provides for incentive payments to (a) eight (8) non-management employees in the Debtor's corporate office in the amount of $2,000 (in one (1) case) and $4,000 (in seven (7) cases) per employee, for a total of $30,000; and (b) two (2) key members of senior management – the Debtor's Executive Vice President of Operations and its interim Chief Financial Officer – in the amounts of $30,000 and $20,000, respectively, for a total of $50,000.

41.    Over the last two years, RDI has substantially reduced its corporate overhead by terminating employees and placing additional burdens on the remaining employees. The resulting work significantly increased the burden on the remaining staff members of RDI, including all of the employees who would be entitled to payment under the proposed Incentive Program.

42.    Those employees are willing to have the compensation under the Incentive Program be tied directly to RDI achieving certain milestones which will result in the formation of a plan of reorganization for RDI.

43.    Such payments are contingent upon the participating employees continuing to work for the Debtor through certain periods. Each eligible employee will receive his or her payment in three equal installments: (i) the first installment to be paid upon Court approval of this Motion, (ii) the second installment to be paid upon filing of a plan of reorganization by the Debtor, and (iii) the third installment to be paid upon plan confirmation. Assuming that these employees continue to work for the Debtor through the relevant periods, the aggregate amount of retention bonuses that the Debtor proposes to distribute under the Incentive Program is $80,000. These individuals and their bonuses are set forth in Exhibit "A" attached to the Incentive Motion.

44.    Accordingly, I believe that the relief requested in the Incentive Motion is both necessary and in the best interest of the Debtor's estate and its creditors.

**D.    Motion of Debtor for an Order Under U.S.C. §§ 105, 363, 1107, and 1108  Authorizing, but not Obligating the Debtor to Honor its Prepetition Obligations Under Certain Customer-Related Programs and to Maintain and Administer Certain Programs in the Ordinary Course of Business and in a Manner Consistent with Past Practice in the Debtor's Discretion**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

45.     The Debtor seeks an order authorizing, but not obligating, the Debtor to honor its prepetition obligations under certain customer related programs 9collectively, the Customer Programs") and to maintain and administer certain programs in the ordinary course of business and in a manner consistent with past practice in the Debtor's discretion as described in the Motion (the "Customer Programs Motion").

46.     Specifically, the Customer Programs generally relate to the Debtor's programs in which they offer gift cards, exchanges, and other promotional offers to its customers.  The Customer Programs are designed to allow the Debtor and the Restaurants to successfully compete in a highly competitive marketplace by ensuring customer satisfaction and generating loyalty and goodwill, thereby allowing the Debtor and the Restaurants to retain current customers, attract new ones, and ultimately enhance revenue and profitability.

47.     Honoring these Gift Cards is essential to the Debtor's business operations so that customer confidence and satisfaction is maintained – which in turn, maximizes its ability to successfully reorganize for the benefit of all parties in interest.  A failure to continue to honor the Debtor's prepetition obligations in connection with the Gift Cards would result in deterioration in relationships with the Debtor's customers and significantly harm the Debtor's standing in its competitive restaurant business, thereby causing a material reduction in sales and jeopardizing the Debtor's ability to reorganize its business.

48.     Accordingly, I believe that the relief requested in the Customer Programs Motion is both necessary and in the best interest of the Debtor's estate and its creditors.

**E.     Motion of Debtor for an Order Under 11 U.S.C. U.S.C. §§ 105(a), 362, 363, and 507(a), 1107(a) and 1108 and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure Authorizing, but not Directing, the Debtor to (i) Pay and/or Honor Prepetition Wages, Salaries, Employee Benefits, and Other Employee Compensation or Reimbursements; (ii) Remit Withholding Obligations; (iii) Maintain Employee Compensation and Benefit Programs and Pay Related Administrative Obligations; and (iv) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests.**

49.     The Debtor seeks an order authorizing, but not directing, the Debtor to (i) pay and/or honor prepetition wages, salaries, employee benefits, and other employee compensation or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

reimbursements; (ii) remit withholding obligations; (iii) maintain employee compensation and benefits programs and pay related administrative obligations; and (iv) have applicable banks and other financial institutions receive, process, honor, and pay certain checks presented for payment and honor certain fund transfer requests as described in the Motion (the "Wage Motion").

50.    The Debtor employs, at its corporate office and the Restaurants, approximately 800 employees, including 200 active full-time employees, 600 active part-time employees and 1 active temporary employee (collectively, the "Employees").

51.    The Employees are critical components to the success of this Case.  Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtor and its ability to maximize the value of its assets.  Satisfaction of the Unpaid Wages and Benefits, as described in the Wage Motion, is necessary to maintain the Employees' morale during the Case and to ensure continued, efficient operation in order to maximize value for all creditors.

52.    By the Wage Motion, the Debtor seeks authority, in its sole discretion, to:  (i) pay unpaid prepetition claims for wages, salaries, non-insider bonuses, and other compensation (collectively, the "Unpaid Wages") to the Employees (both those who have been or may be terminated and those who are being retained) up to $12,850 per employee; (ii) pay and remit the Withholding Obligations (defined in the Wages Motion) to the proper third parties; (iii) pay any prepetition fees and charges owed to the plan administrators ; (iv) honor and maintain certain Employee related benefits (as more fully set forth in the Wage Motion) offered by the Debtor (collectively, the "Benefits"); (v) reimburse certain unpaid business Expense Reimbursement Obligations (defined in the Wage Motion) incurred prepetition by Employees; and (vi) pay all costs incident to the foregoing as set forth in detail in the Wage Motion.

53.    Accordingly, I believe that the relief requested in the Wage Motion is both necessary and in the best interest of the Debtor's estate and its creditors.

**F.      Motion of Debtor for an Order Under 11 U.S.C. §§ 363, 101-1530, as amended, and Rule 4001(b) Federal Rules of Bankruptcy Procedure Authorizing (1) Interim Use of Cash Collateral; and (2) Granting Adequate Protection for Use of Prepetition Collateral**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

54.    The Debtor seeks the entry of interim order authorizing the Debtor to use cash collateral and granting related relief requested in the Motion (the "Cash Collateral Motion").   By the Cash Collateral Motion, the Debtor seeks an order (1) approving the use of cash collateral on an emergency interim basis, subject to its budget attached to the Cash Collateral Motion as **Exhibit "A"** (the "Budget") and pending a final hearing, in such amounts necessary to enable the Debtor to operate its business and avoid immediate and irreparable harm; (2) granting adequate protection to its secured creditors with an interest in cash collateral (defined herein as the "Secured Creditors") on an interim basis; and (3) scheduling and establishing deadlines regarding a final hearing on the Debtor's use of cash collateral.

55.    Within the next few days the Debtor will file a motion seeking approval of debtor-in-possession financing (the "DIP Financing Motion"), pursuant to which the Debtor will seek approval of debtor-in-possession financing in the amount of Two Million Dollars ($2,000,000) (the "DIP Loan").  As with the proposed Cash Collateral use, the proceeds of the DIP Loan will also be utilized in accordance with the Budget.  The security for the DIP Loan will be subject to the valid pre-existing liens of the Secured Creditors and any replacement liens granted by way of the Cash Collateral Motion.

56.    In order to address its working capital needs and fund its reorganization efforts, the Debtor requires the use of what may be the Cash Collateral of the Secured Creditors in accordance with the Budget on an interim basis through the final hearing on the Cash Collateral Motion, and on a final basis through December 31, 2018.  The use of Cash Collateral will provide the Debtor with the necessary funding with which to operate its business, pay its employees, maximize value – including the value of the Secured Creditors' existing collateral – and pursue implementation of a chapter 11 plan of reorganization as contemplated by the Plan Support Agreement.  The essential terms of the Debtor's proposed cash collateral use are as follows:

- The Cash Collateral Motion does not request approval of any of the provisions set forth in the *Statement Regarding Cash Collateral or Debtor in Possession Financing* concurrently filed with the Cash Collateral Motion in accordance with Local Bankruptcy Rule 4001-2(a) (the "Statement").

- The Motion seeks authorization to use cash currently on hand in the estate and funds generated from the operation of the Debtor's business pursuant to the Budget appended to the Cash Collateral Motion as **Exhibit "A"** on an interim basis through the final hearing on the Cash Collateral Motion, and thereafter on a final basis through December 31, 2018.

57.    The Cash Collateral Motion proposes to grant to (1) Credit Management Association ("CMA"), as collateral agent for the Debtor's Secured Noteholders (as defined herein), (2) the Internal Revenue Service (the "IRS"), and (3) Pillsbury Winthrop Shaw Pittman LLP adequate protection as set forth in the Cash Collateral Motion.

58.    The Debtor's continued operation, including the necessity of paying payroll and the other necessary and appropriate expenses set forth in the Budget, will adequately protect the Secured Creditors as the Debtor will continue to generate revenue and preserve its business.  In addition, the Secured Creditors are adequately protected by the proposed replacement liens to the extent of any diminution that have the same extent, validity, scope, and priority as the prepetition liens held by the respective Secured Creditors.

59.    In anticipation of this chapter 11 case, the Debtor developed cash flow projections reflecting anticipated revenue and expenditures through the first 13 weeks of the case, contained in the Budget, provided that the Debtor seeks authority to exceed fifteen percent 15%) of the aggregate of the weekly expenditures reflected on the Budget, measured on a four-week rolling basis.  The Budget sets forth the amount of cash necessary for the Debtor to operate its business postpetition.  The Budget takes into account the effect this bankruptcy filing may have on the Debtor's business and the expenses of the administration of this chapter 11 case.

60.    As set forth in the Budget, the Debtor seeks authority to use cash on hand as of the Petition Date and funds generated from operation of its business.

61.    Emergency use of Cash Collateral by the Debtor, pending a final hearing, is necessary to prevent irreparable harm to the Debtor.  If there is any interruption in the Debtor's operations, the value of its business will be significantly impaired to the serious detriment of the Debtor, its creditors, employees and customers.

1    Accordingly, I believe that the relief requested in the Cash Collateral Motion is both

2    necessary and in the best interest of the Debtor's estate and its creditors.

3    I declare under penalty of perjury pursuant to the laws of the United States of America that

4    the foregoing is true and correct.

5    Executed September 5, 2018, at *Newport Beach*, California.

6

7                                            Douglas S. Cavanaugh

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

EXHIBIT "A"





EXHIBIT "B"

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (this "Agreement") is dated as of August 30, 2018, and sets forth the agreement by and among Douglas S.  Cavanaugh ("Cavanaugh") and Ralph Kosmides (together, the "Founders"), Ruby's Diners, Inc., a California corporation ("RDI"), Ruby's Franchise Systems, Inc., a California corporation ("RFS"), and Steven L. Craig or assignee ("Craig") respecting the financial support of Craig for a chapter 11 plan or plans to be filed by RDI and RFS  in chapter 11 cases to be filed by RDI and RFS, in accordance with this terms of this Agreement.

In consideration of the promises and actions described herein, the parties hereto agree as follows:

1) RDI and RFS will in the near future be filing chapter 11 petitions.

2) During the chapter 11 cases, RDI and/or RFS will need debtor in possession financing in an aggregate amount not to exceed two million dollars ($2,000,000) (the "Debtor in Possession Financing").

3) Craig shall provide the Debtor in Possession Financing (the "DIP Loan") during the chapter 11 cases with an interest rate of 8% per annum and a maturity date of the earlier of the effective date of the Plan (as defined below) (the "Effective Date") or one year after the filing of the chapter 11 petition(s).  All of Craig's fees and costs, including attorneys' fees related to this transaction, and including this Agreement and the DIP Loan, and the chapter 11 cases, will be paid by the RDI and RFS from the proceeds of the DIP Loan.

4) The collateral for the DIP Loan will consist of a duly-perfected second priority security interest, second in priority only to the existing security interests of RDI's secured note holders, in the  assets of RDI and/or RFS that serve as collateral for RDI's secured noteholders, including without limitation, the  cash, intellectual property, trademarks and copyrights of RDI and RFS, as well as the ownership interests in any partnership or limited liability companies in which RDI or RFS have a direct or indirect interest (including, without limitation SoCal, Ruby's Beach Ventures LLC, Ruby's Spectrum LLC, Ruby's Diner South Coast Plaza LP

and Ruby's Woodbridge LLC).  In addition, the DIP Loan shall be secured by a duly-perfected security interest, subject only to any valid, pre-existing, duly perfected security interest of any third party, in SoCal's and Quality's ownership interests in any partnership or limited liability companies (including, without limitation, Ruby's Huntington Beach, Ltd., Ruby's Oceanside, Ltd., Ruby's Palm Springs, Ltd.,  and Ruby's Laguna Hills, Ltd.), and the assets thereof.

5)  RDI and RFS will propose chapter 11 plan(s) (collectively or alternatively, the "Plan") that will include (a) the injection of the New Funds (as defined below) by Craig, and (b) new value by the Founders in the form of allowing the merger of RFS into RDI as provided herein (collectively, the "New Value") in order to satisfy the requirements of the Bankruptcy Code.

6)  Craig agrees that he will provide new funds, through the conversion of the balance due on the DIP Loan and one million dollars ($1,000,000) in cash (the "New Funds").

7)  A further condition to Craig's obligation to fund the New Funds shall be that, on the Effective Date of the Plan, RDI, RFS and the Founders shall have, prior to or concurrently with the funding of the New Funds, consummated a transaction, through a merger of RDI and RFS, and through such other means as reasonably necessary or appropriate, pursuant to which:

   a.  The existing license agreement between RDI and RFS, pursuant to which RFS has a license to use certain trademarks and copyrights owned by the RDI (the "License Agreement"), as well as the Ruby's Retail Brand License Agreement, shall have been terminated as a matter of law or otherwise.

   b.  RFS shall have transferred, as a result of the merger or otherwise, to RDI all of its assets, including without limitation thereto, all of the rights of RFS under all franchise agreements between RFS and its franchisees (the "Franchise Agreements").  The Plan shall provide for the assignment of the Franchise Agreements to RDI requiring the franchisees to be bound by the Franchise Agreements and to recognize RDI as the franchisor, thereunder.

Plan Support Agreement
August 30, 2018
Page 3

c.  For a period of two (2) years following the Effective Date, the Founders will be entitled to the license fee as set forth in Section 3 of the License Agreement that RDI was entitled to prior to the termination of the License Agreement (the "License Fee") as provided in subsection (a) hereof, including any License Fee associated with any new franchise unit of RDI; thereafter, no further License Fee of any kind shall be paid to the Founders and RDI shall be entitled to 100% of the franchise fees under the Franchise Agreements.

d.  RDI shall have assumed all of the obligations of RFS to third parties, including, but not limited to, the repayment of the obligation owed by RFS to Craig in the principal amount of $1,000,000 (the "RFS Note").

e.  On the Effective Date of the Plan, in addition to providing the New Funds, Craig will convert the RFS Note, which will be an obligation of RDI, to equity in RDI.

f.  In return for the consideration given by the Founders pursuant to subparagraphs (a) and (b) above (*i.e.,* the New Value), RDI will have  (i) granted to the Founders the License Fee for a two (2) year period as provided in subjection (c) hereof, and (ii) the Founders will be entitled to retain 40% of the equity in RDI (to be split 60% to Cavanaugh and 40% to Kosmides).

g.  RDI shall assume (or formally create) the obligation to reimburse all franchisees with respect to gift card utilization, in the same manner that existed prior to the merger.

h.   The program whereby noteholders are entitled to receive free or discounted food at Ruby's restaurants referred to by Ruby's as the "Quality Assurance" program (the "Quality Assurance Program")  shall have been discontinued.

i.  Cavanaugh and Kosmides shall have entered into an indemnification agreement in favor of Craig with respect to: 1) all RFS obligations; and 2) any claim asserted by a franchisee regarding the Quality Assurance Program.

8)  A further condition of Craig's obligation to fund the New Funds and to make the DIP Loan is that the assets and debt structure of RDI must be such that upon the Effective Date of the Plan, RDI will  have a positive "Net Worth" of not less than

Plan Support Agreement
August 30, 2018
Page 4

$6.7 million . The term "Net Worth" shall mean (i) the total assets of RDI, after taking into account the New Funds and  the New Value; less (ii) the total liabilities of RDI, after taking into account any discounts given by Creditors in return for discounted payment, any claims of Creditors that are completely discharged by the Plan and treatment of claims pursuant to the confirmed Plan.  In addition, Craig shall have approved a budget for the Chapter 11 case(s) as well as the projected Effective Date balance sheet for RDI.

9) Pursuant to the Plan Craig will receive 60% of the equity of RDI as of the Effective Date (with the Founders retaining 40% of the equity as set forth above). Each of Craig and the Founders shall also be referred to herein as "Shareholders."

10) On the Effective Date, Craig will be the Chairman of the Board of RDI.  The initial President and Chief Executive Officer of RDI following the Effective Date will be Cavanaugh, with compensation being paid at the rate of $250,000 per year plus the continuation of the medical coverage which existed from RDI on the date the chapter 11 petition was filed (the "Pre-Petition Insurance Coverage"), so long as he is maintaining and exercising day to day operational control.   Mr. Cavanaugh's responsibilities will include the delegation of management and control of RDI's operations (including food and beverage development, menu design, restaurant design, branding, marketing, standards of service, and employee and guest relations).  The Secretary of RDI following the Effective Date will be  Lori Smith, with compensation of $1000_____ per year plus Pre-Petition Insurance Coverage, and Kosmides will be in charge of special projects with annual compensation in an amount to be agreed to by Craig and Kosmides plus Pre-Petition Insurance Coverage.   Nothing in the foregoing shall be construed as requiring perpetual employment or officer designation of any of the foregoing.

11) Craig agrees to use his reasonably diligent efforts to arrange for a transaction to allow the refinancing of the RFS debt (which will be owed by RDI to Opus Bank following the Effective Date) and the debt owed by RDI and SoCal (and certain affiliates) to the law firm of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury").

Plan Support Agreement
August 30, 2018
Page 5

Lending secured (if any) by Craig shall not require and Craig shall have no obligation whatsoever to guaranty said lending, or otherwise fund said lending. Any discount received from Opus Bank, Pillsbury or any other creditor will be included in calculating whether RDI will have satisfied the Net Worth requirement set forth above as of the Effective Date of the Plan.

12) The initial board of directors of RDI following the Effective Date shall have the following three members: Craig, Cavanaugh and Kosmides. Votes of the board members shall be weighted based on their ownership of equity in RDI. As of the Effective Date, the Founders and Craig shall enter into a shareholders' agreement with respect to RDI which shall include terms and conditions that are typical in privately held entities, including the delegation of management and control of RDI's operations (including menu, design and branding decisions) to Cavanaugh. All major decisions, and those customarily identified as such in operating and shareholder agreements typical to privately held entities, including without limitation, business decisions with respect to expansion of the business or any business decisions that might require the contribution or expenditure of new capital of RDI, will be made by majority vote of the equity holders based on their respective ownership interests.

13) With respect to capital calls, if a Shareholder fails to contribute the capital called with the necessary vote of the Shareholders in accordance with its respective ownership interest percentage as aforesaid within thirty (30) days after the capital call is made, the other Shareholders shall have the right, but not the obligation, to make a loan to RDI in the amount of the capital contribution that is not made, equal to their respective pro rata share (based on their respective percentage equity interest) of the defaulting Shareholder's share of the capital, or the entire amount of the capital call deficiency, if not made by the other non-defaulting Shareholder. Any such loan shall be treated as if RDI made a loan to the defaulting Shareholder and the non-defaulting Shareholder made a loan to RDI. Any such loan by RDI to a defaulting Shareholder ("RDI Default Loan") and any such loan from a nondefaulting Shareholder to RDI ("Shareholder Loan") shall

5446-000\1265268.1

Plan Support Agreement
August 30, 2018
Page 6

bear interest at a rate equal to the federal prime rate plus three percent (3%) per annum  and  shall be secured by a pledge of the defaulting Shareholder's equity interest in RDI. The defaulting Shareholder shall execute and deliver such documents as are reasonably necessary to create and perfect such security interest and the shareholder agreement for RDI shall provide for a power of attorney in favor of the non-defaulting Shareholders to effectuate such documents if the defaulting Shareholder fails to promptly execute and deliver same.  Any such RDI Default Loan and any such Shareholder Loan shall provide for payment of accrued interest monthly and for all principal and accrued and unpaid interest to be due and payable on or before the date that is (i) six (6) months following the date the RDI Default Loan and the Shareholder Loan are advanced if the RDI Default Loan and the Shareholder Loan are less than one million dollars ($1,000,000), or (ii) one year following the date the RDI Default Loan and the Shareholder Loan are advanced if the RDI Default Loan and the Shareholder Loan is one million dollars ($1,000,000) or more.  Failure to repay the RDI Default Loan and the Shareholder Loan on or before the applicable maturity date pursuant to the foregoing shall constitute a default under each of the RDI Default Loan and the Shareholder Loan.

At such time as any RDI Default Loan or Shareholder Loan is defaulted and not paid, and assuming one of the other Shareholders advances such amount in lieu of the defaulting Shareholder, the Percentage Interests of the Shareholders shall be recalculated, and the Percentage Interest of each Shareholder shall be adjusted such that each Shareholder shall have an interest determined by fraction, the numerator of which shall be equal to the aggregate capital contributed by that Shareholder, and the denominator of which shall be the aggregate capital contributed by all Shareholders, provided, however, that for purposes of the foregoing calculation only, each Shareholder shall be treated as having contributed its proportionate share (in accordance with its percentage interest in RDI) of the aggregate capital contributed by Craig as of the Effective Date of the Plan.

Plan Support Agreement
August 30, 2018
Page 7

The consequence of a Shareholder default shall be the dilution of the
Shareholder's equity in RDI, but a default will not result under any circumstances
in personal liability of the defaulting Shareholder.

For purposes of an example only, assume that Craig contributed a total of
$4,000,000 as of the Effective Date of the Plan, and that there are three
Shareholders, Craig at 60%, Shareholder A at 24% and Shareholder B at 16%.
Then assume that additional capital in the amount of $500,000 is required by RDI,
and that Craig contributes 60% of such amount ($300,000), Shareholder A
contributes 24% of such amount ($120,000) but Shareholder B does not
contribute any of such amount and that Craig advances to RDI the share otherwise
allocable to Shareholder B ($80,000). In such event, the denominator in the
dilution formula shall be $4,500,000 (the original Plan capital plus the current
capital call) and the percentage interests of the Shareholders shall be adjusted as
follows:

For Craig: $2,400,000 (allocable share of original Plan capital) + $300,000
(Craig share of current capital call) + $80,000 (Shareholder B capital call
advanced by Craig) = $2,780,000. $2,780,000/$4,500,000 = 61.78%.

For Shareholder A: $960,000 imputed original Plan capital + $120,000
(additional capital for current call) = $1,080,000. $1,080,000/$4,500,000 = 24%

For Shareholder B: $640,000 imputed original Plan capital + 0 (additional
capital for current call) = $640,000. $640,000/$4,500,000 = 14.22%.

14) A further condition to Craig's obligation to provide the New Funds, and the
Founders' obligation to provide the New Value, is that upon the Effective Date,
RDI shall have converted to a limited liability corporation pursuant to an "F" type
reorganization.The Founders agree to indemnify Craig from any financial
responsibility of Craig in any way related to the structuring of any of the
transactions described in this Agreement to the extent the liability of Craig is in
any way based on the structure of the transaction to minimize or eliminate the
personal income tax liability of the Founders, or either of them.  Except as

5446-000\1265268.1

Plan Support Agreement
August 30, 2018
Page 8

        provided in the foregoing, each party hereto shall be solely responsible for the tax

        consequences of the transactions contemplated hereby with respect to such party.

    If the foregoing is consistent with your understanding, please execute and return a copy

of this letter reflecting your agreement and acknowledgement of the foregoing.


Agreed and acknowledged:


_____
Steven L. Craig

Ruby's Diners, Inc., a
California corporation

By: _____
Name: DOUGLAS S. CAVANAUGH
Title: CEO


_____
Douglas S. Cavanaugh

Ruby's Franchise Systems, Inc.,
a California Corporation

_____
Ralph Kosmides

By: _____
Name: DOUGLAS S. CAVANAUGH
Title: CEO