1  William N. Lobel (CA Bar No. 93202)
   PACHULSKI STANG ZIEHL & JONES LLP
2  650 Town Center Drive, Suite 1500
   Costa Mesa, CA  92626
3  Telephone:  (714) 384-4740
   Facsimile:  (714) 384-4741
4  E-mail:     wlobel@pszjlaw.com

5  [Proposed] Attorneys for Ruby's Diner, Inc., *et al.,*
   Debtors and Debtors-in-Possession

6

7

8                  **UNITED STATES BANKRUPTCY COURT**

9       **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

10  In re:                                  Case No. 8:18-bk-13311-CB

11  RUBY'S DINER, INC., a California corporation, *et*   Chapter 11
    *al.,*[1]
12                                           (Jointly Administered With Case Nos.
            Debtors and Debtors-in-Possession,   8:18-bk-13197-CB; 8:18-bk-13198-CB; 8:18-
13                                           bk-13199-CB; 8:18-bk-13200-CB; 8:18-bk-
    Affects:                                 13201-CB; 8:18-bk-13202-CB)
14
    ☒  All Debtors
15                                           **CHAPTER 11 STATUS REPORT;**
    ☐  RUBY'S DINER, INC., ONLY             **DECLARATION OF DOUGLAS S.**
16                                           **CAVANAUGH IN SUPPORT THEREOF**
    ☐  RUBY'S SOCAL DINERS, LLC, ONLY
17                                           DATE:       September 24, 2018
    ☐  RUBY'S QUALITY DINERS, LLC, ONLY     TIME:       1:00 p.m.
18                                           CTRM:       5C
    ☐  RUBY'S HUNTINGTON BEACH, LTD., ONLY  PLACE:      411 West Fourth Street
19                                                       Santa Ana, CA 92701
    ☐  RUBY'S LAGUNA HILLS, LTD. ONLY
20
    ☐  RUBY'S OCEANSIDE, LTD., ONLY
21
    ☐  RUBY'S PALM SPRINGS, LTD., ONLY
22

23

24

25

26

27
    ─────────────────
28  [1] The last four digits of the Debtors' federal tax identification numbers are as follows: Ruby's Diner, Inc. (8143); Ruby's
    SoCal Diners, LLC (9782); Ruby's Quality Diners, LLC 1539); Ruby's Huntington Beach, Ltd. (1331); Ruby's Laguna
    Hills, Ltd. (6603); Ruby's Oceanside, Ltd. (9104); and Ruby Palm Springs, Ltd. (9627).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE 20 LARGEST UNSECURED CREDITORS, SECURED CREDITORS, AND OTHER PARTIES IN INTEREST:**

On August 28, 2018, Ruby's SoCal Diners, LLC, a Delaware limited liability company ("SoCal Diners"); Ruby's Quality Diners, LLC, a Delaware limited liability company ("Quality"); Ruby's Huntington Beach, Ltd., a California limited partnership ("Ruby's Huntington Beach"); Ruby's Laguna Hills, Ltd., a California limited partnership ("Ruby's Laguna Hills"); Ruby's Oceanside, Ltd., a California limited partnership ("Ruby's Oceanside"); and Ruby's Palm Springs, Ltd., a California limited partnership ("Ruby's Palm Springs") (collectively, the "SoCal Debtors"), filed chapter 11 cases.

On September 5, 2018, Ruby's Diner, Inc., a California corporation ("RDI") filed a related chapter 11 case.   RDI and the SoCal Debtors are referred to herein as the "Debtors."

On September 5, 2018, the Court entered an order jointly administering the Debtors' Cases, with RDI designated as the lead debtor.

No party has requested the appointment of a trustee or examiner and no committee has yet been appointed or designated in the Cases, although the Debtors anticipate that an official committee of unsecured creditors may be appointed.

The Debtors hereby submit their chapter 11 status report (the "Status Report") in connection with the September 24, 2018 Chapter 11 Case Status Conference.

**A.    A Brief Description of the Debtors' Business and Operations, if any, and the Principal Assets and Liabilities of the Estate.**

**1.    Overview of the Debtors' Business Operations**

The Debtors and their affiliates (referred to from time to time herein as the "Company") own, operate and manage restaurants under the trade names "Ruby's®," "Ruby's® Diner," "The Ruby Restaurant Group," "Ruby's® Dinette" and "Ruby's® Shake Shop."  The Company has operated Ruby's® Diner restaurants since 1985 and is known as a purveyor of very popular burgers, fries and shakes.   RDI is owned 60% by Douglas Cavanaugh and 40% by Ralph Kosmides, the founders of the Company (the "Company Founders").  RDI is the owner of the Ruby's® trademarks, system and

intellectual property (the "Marks and Intellectual Property") and is the employer of the Company's more than 800 employees.

## 2.    Overview of the Debtors' Assets

RDI is the 100% owner and sole and managing member of SoCal Diners. SoCal Diners is the 100% owner and sole and managing member of Quality. SoCal Diners is the general partner and 50% owner, and Quality is the limited partner and 50% owner, of the following California limited partnerships: (1) Ruby's Huntington Beach, which owns and operates a Ruby's® restaurant on the pier in Huntington Beach, California and is one of the SoCal Debtors; (2) Ruby's Oceanside, which owns and operates a Ruby's® restaurant in Oceanside, California and is one of the SoCal Debtors; (3) Ruby's Palm Springs, which owns and operates a Ruby's® restaurant in Palm Springs, California and is one of the SoCal Debtors; (4) Ruby's Laguna Hills, which owns and operates a Ruby's® restaurant in the Laguna Hill Mall in Laguna Hills, California and is one of the SoCal Debtors;[2] and (5) Ruby's Mission Valley, Ltd., which until a few months prior to the Petition Date, owned and operated a Ruby's® restaurant in the Westfield Mission Valley Mall in San Diego, California[3] (collectively, the "SoCal Entities" and the restaurants owned by the SoCal Entities, the "SoCal Restaurants").

In addition, RDI holds ownership interests in, and management roles in connection with, the following joint venture entities:  (1) RDI is the managing member and 70% owner of Ruby's Beach Ventures LLC, which owns and operates a Ruby's® restaurant in Long Beach, California;[4] (2) RDI is the general partner and 50% owner of Ruby's Diner South Coast Plaza LP, which owns and operates a Ruby's® restaurant at South Coast Plaza Mall in Costa Mesa, California;[5] (3) RDI  is the managing member and sole owner of Ruby's Woodbridge LLC, which owns and operates a Ruby's® restaurant

---

[2] RDI anticipates that, due to significant, continuing construction projects underway at the Laguna Hills Mall, the Laguna Hills restaurant will close following the Petition Date.

[3] The Mission Valley restaurant was closed prior to the Petition Date, in April 2018.  Ruby's Mission Valley, Ltd. is not a debtor entity.

[4] The other 30% of Ruby's Beach Ventures LLC is held by various third-party investors.

[5] The other 50% of Ruby's Diner South Coast Plaza LP is owned by South Coast Plaza, a California general partnership, as the limited partner.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

in Woodbridge in Irvine, California; and (4) RDI is the managing member and 50% owner of Ruby's

Spectrum LLC, which until a few months prior to the Petition Date, owned and operated a Ruby's®

restaurant at the Irvine Spectrum in Irvine, California[6] (collectively, the "RDI Entities" and the

restaurants owned by the RDI Entities, the "RDI Restaurants").  The RDI Entities have not filed

chapter 11 cases.  The RDI Restaurants, together with the SoCal Restaurants, are referred to as the

"Company Restaurants").

The Company's revenue generally comes directly from the operation of the SoCal

Restaurants (in the case of the SoCal Entities and SoCal Diners) and management fees and

partnership distributions from the RDI Restaurants (in the case of the RDI Entities and RDI), as well

as gift card sales and the RDI License Fee (described below).

As of the Petition Date, there also were twenty-four (24) Ruby's® Diner franchises (or

licensed units) located in Southern California, Arizona, Pennsylvania, New Jersey, Nevada and

Texas that were owned and, with certain limited exceptions, operated by independent third parties.[7]

Ruby's Franchise Systems, Inc., a California corporation ("RFS"), an entity affiliated with the

Debtor through common ownership and control which has commenced a separate chapter 11

proceeding concurrently with RDI's chapter 11 filing, currently serves as the franchisor to the

Ruby's® franchisees/licensees (the "Franchisees"), and licenses the Marks and Intellectual Property

from RDI as licensor.  Under RFS' agreements with the Franchisees (the "Franchise Agreements"),

RFS (as franchisor) is entitled to a franchise royalty fee, which is generally the greater of a set dollar

amount or four percent (4%) of "Gross Sales" (as such term is defined in the Franchise Agreements),

and fee which historically averages at approximately $2.4 million per annum.  As licensor of the

---

[6] The other 50% of Ruby's Spectrum LLC is held by William C. Taormina, Trustee of the Taormina Revocable Inter Vivos Trust u/d/t dated July 26, 1983.  The Irvine Spectrum restaurant was closed prior to the Petition Date, in April 2018.

[7] RFS (as defined herein), an affiliate of RDI owned 60% by Mr. Cavanaugh and 40% by Mr. Kosmides, the Company Founders, provides management services to the franchise located in Yorba Linda, California (Ruby's Yorba Linda, Ltd.). Ruby's Management, LLC ("RMLLC") (an entity owned by Mr. Cavanaugh, Mr. Kosmides and Douglas Salisbury), provides management services for a Ruby's® restaurant located in Morongo, California (Ruby's Morongo) and has sub-contracted with RDI for those services.  RMLLC owns 50% of Shake Shack, LLC (the other 50% is owned by three unrelated parties), which operates the Shake Shack in Laguna Beach, California.  RDI does not provide management services in connection with the Shake Shack.

Marks and Intellectual Property to RFS, pursuant to an Amended and Restated Trademark and Intellectual Property License Agreement, dated June 1, 1990 (the "RDI/RFS License Agreement"), RDI is entitled to one percent (1%) of the "Gross Sales" generated by RFS and the Franchisees as a license fee, which fees have historically averaged approximately $600,000 per annum (the "RDI License Fee").

### 3. Overview of the Debtors' Liabilities

#### a. RDI's Secured Debt

##### (1) The Secured Noteholders

On or about February 10, 2012, RDI entered into a restructuring of its existing secured notes (in the aggregate face amount of approximately $2.9 million) (the "Original Secured Notes" and the holders thereof, the "Secured Noteholders"). The Original Secured Notes (and the Restructured Secured Notes issued in connection with the 2016 Restructuring Agreement (as defined hereinbelow)) are secured by all or substantially all of the personal property of RDI (including cash and accounts receivable, the Marks and Intellectual Property and RDI's interests in SoCal Diners, Quality and the RDI Entities). The Original Secured Notes were governed by the Credit Agreement, the Collateral Agent and Intercreditor Agreement, the Security Agreement (Personal Property), dated as of February 10, 2012, and related documentation, including the UCC-1 Financing Statement filed in connection therewith (the "Original Secured Credit Documents"). Pursuant to the Original Secured Credit Documents, Credit Management Association ("CMA") was designated as collateral agent in connection with the Original Secured Notes (and continues to serve in this capacity in connection with the Restructured Secured Notes).

On June 30, 2016, the Debtor completed a restructuring transaction whereby the Original Secured Notes were amended and restated (the "Restructured Secured Notes"). The Restructured Secured Notes, the First Amendment to Security Agreement, Credit Agreement (Secured), Collateral Agent and Intercreditor Agreement (Secured), Credit Agreement (Unsecured), and Representative and Intercreditor Agreement (Unsecured), and Agreement Regarding Restatement of Promissory Notes, effective as of July 1, 2016 (the "Omnibus First Amendment"), the UCC-1 Financing

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Statements filed in connection therewith, and any related documentation, are referred to as the "2016 Restructuring Agreement."

RDI made the required interest payments under the Restructured Secured Notes due on June 30, 2017 and December 20, 2017, however, RDI was unable to make the June 30, 2018 interest payment.  As of the Petition Date, RDI owed a total of approximately $2.985 million to the Secured Noteholders under the 2016 Restructuring Agreement.

### (2)    Internal Revenue Service

On or about October 16, 2017, the Internal Revenue Service (the "IRS") recorded a tax lien against RDI with the Secretary of State of California in the amount of $175,789.06.  Thereafter, RDI reached an agreement with the IRS regarding a payment plan and waiver of certain late charges.  RDI has been making monthly payments to the IRS on account of this tax obligation in the amount of approximately $12,000 per month, and such payments are contemplated to continue postpetition.  The outstanding balance to the IRS, as of the Petition Date, is approximately $91,000.

### (3)    Pillsbury Winthrop Shaw Pittman LLP

On or about June 14, 2018, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") recorded a Notice of Judgment Lien (Filing No. 18-7654307617) against RDI with the Secretary of State of California in the amount of $617,452.74.[8]

### b.    RDI's Unsecured Debt

RDI also has $5.6 million in unsecured obligations to its unsecured noteholders (the "Unsecured Noteholders"), a $127,000 unsecured note payable to William Taormina related to the closing of the Irvine Spectrum restaurant, and approximately $1.2 million in pre-petition accounts payable (which amount does not include vendor obligations at the Company Restaurant level that might also be asserted against RDI nor any contingent obligations that could arise in connection with leases at the Company Restaurant level, through a guaranty by RDI or otherwise).[9]  In addition, RDI

---

[8] As noted below, the Pillsbury lien is also asserted against SoCal Diners and three (3) of the SoCal Entities: (a) Ruby's Huntington Beach; (b) Ruby's Oceanside; and (c) Ruby's Palm Springs.

[9] Of the Company Restaurants, RDI has guaranteed the lease obligations related to the Ruby's® restaurants located at or in the following locations: (1) Irvine Spectrum (RDI Restaurant) (which location closed prior to the Petition Date); (2) Long Beach, California (RDI Restaurant); (3) Woodbridge in Irvine, California (RDI Restaurant); (4) Laguna Hills, California (SoCal Restaurant); and (5) Palm Springs, California (SoCal Restaurant).

1    has obligations for employee wages and workers' compensation, obligations related to the

2    Company's advertising programs in the amount of approximately $532,000, and approximately $4.4

3    million in gross obligations related to the Company's gift card programs.[10]  By way of "first day

4    motions," RDI has sought and obtained approval to honor and pay certain of these latter amounts,

5    which amounts (along with such other Court-approved amounts) will be funded through the use of

6    cash collateral and the proceeds of the contemplated DIP Loan.[11]

7         c.    The SoCal Debtors' Secured Debt

8              *(1) Opus Bank*

9         On or about July 26, 2013, the SoCal Debtors and Opus Bank ("Opus") entered into a loan

10   agreement for a term loan in the original principal amount of $5,000,000, and a term loan in the

11   original principal amount of $300,000.  On or about April 8, 2014, the SoCal Debtors and Opus

12   entered into a business loan agreement in the original principal amount of $500,000.   On or about

13   November 14, 2014, the SoCal Debtors and Opus entered into a business loan agreement in the

14   original principal amount of $105,000.  Such loan agreements, and related notes and security

15   agreements, as amended on February 16, 2016, March 31, 2017 and July 31, 2017 or otherwise, are

16   referred to herein as the "Opus Loans").  The Opus Loans are secured by substantially all of the

17   SoCal Debtors' assets (including cash and a pledge of the assets of the SoCal Restaurants), as

18   reflected by the UCC Financing Statements filed with the Delaware Secretary of State on July 29,

19   2013 (Filing No. 20132935915) and California Secretary of State on October 19, 2016 (Filing No.

20

---

21

22   [10] The Company's gift card programs consist of gift cards issued directly by the Company to customers (defined herein as the "Company Gift Cards"), which program RDI intends to continue and which cards the Debtors intend to honor following the Petition Date, and gift cards sold through a third-party retailer, Costco Wholesale Corporation (defined herein as the "Costco Gift Cards"), which program has been terminated by RDI on a go-forward basis, but which outstanding obligations the Debtors intend to honor.  The face amount of the outstanding gift card obligations under these gift card programs is approximately $4.4 million; however, the Company believes, based on historical redemption rates and the aging of these obligations, that its gift card related obligations will total approximately $1.6 million.

25

26   RDI also has dining cards issued to the Secured Noteholders and Unsecured Noteholders allowing them to dine at Ruby's® Restaurants free of charge up to certain amounts based on the face amount of their notes.  The Debtors contemplated only honoring these cards following ten (10) days after the Petition Date, however, due to some logistical issues, the program was extended an additional five (5) days.  RDI does not intend to continue this program.

28   [11] As of the Petition Date, RDI owes to RFS the amount of approximately $400,000 (after accounting for all intercompany obligations between them).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

16-7551665002).  The Opus Loans, in the original principal amount of $5,905,000, were significantly paid down in October 2016.  The maturity date of the Opus Loans was December 31, 2017.  As of the Petition Date, the SoCal Debtors owed a total of approximately $2.2 million to Opus under the Opus Loans.

On or about April 2, 2018, Opus filed a Complaint for Breach of Loan Agreements in the Orange County Superior Court and thereafter sought the appointment of a receiver to take control of the assets serving as collateral for the Opus Loans.  Notwithstanding the SoCal Debtors' attempts to resolve the issues with Opus, Opus ultimately determined to move forward with its receivership proceeding, necessitating the filing of the SoCal Debtors' chapter 11 cases to preserve value for all parties.

### (2) C&C Partnership

On or about April 18, 2018, C&C Partnership ("C&C") entered into a secured promissory note and related security agreement, and recorded a UCC Financing Statement against SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs with the Secretary of State of California (Filing Nos. 187644361282, 187644368138, 187644368259 and 187644368370) in the amount of $250,000.

### (3) Pillsbury Winthrop Shaw Pittman LLP

As noted above, on or about June 14, 2018, Pillsbury recorded a Notice of Judgment Lien (Filing No. 18-7654307617) against SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs with the Secretary of State of California in the amount of $617,452.74.  This obligation is also asserted against RDI.

### (4) Plaza Bonita, LLC

On or about July 3, 2015, Plaza Bonita, LLC ("Plaza Bonita") recorded a Notice of Attachment Lien (Filing No. 15-7473297702) against SoCal Diners in connection with a lease guaranty settlement agreement.  As of the Petition Date, the amount owed to Plaza Bonita by SoCal Diners under the settlement agreement is $58,200.[12]

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

---

[12] The settlement agreement with Plaza Bonita provides for a settlement amount of $175,000 to be paid over time.  SoCal Diners made the payments to Plaza Bonita until May 2018.  The settlement agreement provides for a springing

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

*(5) Family Tree Produce - PACA Claimant*

Family Tree Produce, Inc. filed an objection to the Debtors' cash collateral motion, asserting PACA lien rights with respect to certain produce and other goods supplied to certain of the SoCal Debtors' prior to the commencement of the cases in the amount of approximately $47,666.

    d.    <u>SoCal Diners' Unsecured Debt</u>

SoCal Diners had approximately $1.6 million in accounts payable (which amount does not include vendor obligations at the SoCal Restaurant level that might also be asserted against SoCal Diners), and approximately $637,000 in other unsecured obligations (not including any contingent obligations that could arise in connection with leases at the Company Restaurant level, through a guaranty by SoCal Diners or otherwise).[13]  In addition, SoCal Diners has obligations related to the Company's advertising programs in the amount of approximately $532,000 and approximately $100,000 in sales tax obligations.

In addition to ordinary course accounts payable obligations of the SoCal Restaurants, Ruby's Huntington Beach is obligated for certain lease commitment charges and leasehold improvement obligations (related to the Ruby's® Huntington Beach pier location) in the amount of approximately $600,000.[14]  Ruby's Oceanside, Ltd. also has outstanding tax obligations of approximately $40,000

    B.    Answers to the Court's Questions Raised in the Status Conference Order:

    1.    <u>What Precipitated the Bankruptcy Filing?</u>

The Company's revenue generally comes directly from the operation of the SoCal Restaurants (in the case of the SoCal Entities and SoCal Diners) and from management fees and

---

obligation (in the amount of $244,902) upon default.  Therefore, this obligation could be asserted against SoCal Diners in a higher amount, less an offset for the payments made prior to default, which payments are in the amount of approximately $116,800.

[13] Of the Company Restaurants, SoCal Diners has guaranteed the lease obligations related to the Ruby's® restaurant located in the Westfield Mission Valley Mall in San Diego, California.  SoCal Diners also guaranteed the lease obligations related to closed locations located at Westfield Plaza Bonita in National City, California ("<u>Plaza Bonita</u>") and Parkway Plaza located in El Cajon, California ("<u>Parkway Plaza</u>").  SoCal Diners has entered into settlement agreements with the Plaza Bonita and Parkway Plaza landlords with respect to these guaranty claims.  As noted above, Plaza Bonita asserts a secured claim against SoCal Diners.

[14] While these lease related charges are a direct obligation of the Ruby's Huntington Beach, and neither SoCal Diners/Quality nor RDI have guaranteed the underlying lease, such amounts must be paid in order for Ruby's Huntington Beach.to continue to operate this profitable restaurant on the pier in Huntington Beach for the benefit of the Debtors  and their  creditors.

partnership distributions from the RDI Restaurants (in the case of the RDI Entities and RDI).  The Company also receives revenue in connection with the sale of gift cards to its customers and, as discussed above, RDI is entitled to the RDI License Fee.  The Company's annual revenue for calendar year 2017 was approximately $24.9 million.  RDI, however, faced with an overleveraged balance sheet and continuing operating losses, was unable to adequately address its financial difficulties outside of a chapter 11 filing and seeks to implement the provisions of the Plan Support Agreement (as discussed below).

Several factors contributed to the deterioration in the Company's financial condition, which resulted in the commencement of the Debtors' bankruptcy cases.

In early 2012, after years of ongoing disputes, the Company entered into agreements whereby it bought out the interests of two of its partners, Douglas Salisbury and Doug DeCinces. Funding for the buy-outs was obtained through financing obtained from Steve Craig and Opus Bank. The Company, however, ultimately did not have sufficient cash flow to meet the costs associated with the buy-outs in addition to the Company's other financial challenges and its ongoing operational needs, including with respect to the obligations to RDI's Secured Noteholders and Unsecured Noteholders.

Accordingly, on or about February 10, 2012, RDI entered into the consensual restructuring of the Secured Notes (in the aggregate face amount of approximately $2.9 million) and, on or about July 16, 2012, of the Unsecured Notes (in the aggregate face amount of approximately $5.6 million)).  Credit Management Association ("CMA") was designated as collateral agent in connection with the Secured Notes.  A "steering committee" comprised of Unsecured Noteholders was designated as the representative with respect to the Unsecured Notes (the "Steering Committee"), and two members of the Steering Committee were appointed to the Board of Directors of RDI.

As noted above, around this time frame, the Company was faced with several legal challenges in connection with, among other things, the buy-out of its partners and disputes related to its Laguna Beach restaurant location, which not only diverted management's attention away from the Company's operations, but also resulted in the incurrence of significant professional fees and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

litigation related expense exceeding $600,000. In addition, notwithstanding the Company's efforts to grow its brand through the development of new franchiseable models, Company-owned Ruby's® restaurants and the conversion of certain locations from a full-service restaurant to a "fast casual" restaurant concept, as a result of an industrywide slowdown in terms of growth and sales figures and high operational costs, the new locations and concepts did not perform as projected, and the Company was ultimately forced to close four (4) of its restaurants (Plaza Bonita in National City, California, Parkway Plaza in El Cajon, California, Whalers Village in Maui, Hawaii, and 17th Street in Costa Mesa, California), resulting in significant obligations associated with these closures. Around the same time, RFS' efforts at developing new franchises were otherwise hampered by the industry slowdown and a profitable Ruby's® franchise located at the Newark Airport was lost due to the airport's removal of all vendors at the terminal.

In addition, leading up to 2015, significant increased competition in the restaurant industry emerged, creating an array of dining options for consumers. This competition emergence impacted many key brands and, while the Ruby's® brand continued to see strong loyalty with its guests, the Company was impacted by these competitive forces, which adversely impacted the revenue generated by the Company stores, as well as the sales figures of the Ruby's® franchisees (and, thereby, the amount of the revenue generated by way of the RDI License Fee).

After several years of continuing losses and the closure of the four restaurants, in early 2015, RDI was forced to suspend interest payments on the Notes. In addition, SoCal Diners was in covenant violation of its loan agreement with Opus Bank (which holds liens on all or substantially all of the assets of SoCal Diners, Quality and the SoCal Restaurants and, at the time, was owed approximately $4 million).

The Company explored various business and restructuring alternatives over the course of 2015 and early 2016. In October 2016, SoCal Diners entered into a restructuring of the Opus Bank loan. Since that time, and until its December 2017 maturity, SoCal Diners was in material compliance with the restructured terms of the Opus Bank loan, which is currently in the amount of approximately $2.1 million.

CHAPTER 11 STATUS REPORT

RDI also engaged the Steering Committee and CMA in an ongoing dialogue regarding the Company's financial situation and possible restructuring alternatives. As a result, the parties reached a conceptual agreement regarding a revised business plan for the Company and a consensual proposal for the restructuring of the Notes. The restructuring of the Notes was subject to the approval of the Noteholders, which required approval from an aggregate of at least 51% of the total amount loaned to RDI by each Secured Noteholder, as well as an aggregate of at least 66.7% of the total amount loaned to RDI by each Unsecured Noteholder.

On June 30, 2016, with the requisite approval of the Noteholders and in accordance with RDI's Consent Solicitation Statement, dated May 19, 2016, RDI completed a restructuring transaction involving the Original Notes, whereby RDI amended and restated the Notes (the "2016 Restructuring Agreement").

Pursuant to the 2016 Restructuring Agreement, among other things, the maturity of the Restructured Notes was extended until June 30, 2026, with interest in the amount of 2.23% to be paid on a semi-annual basis (in June and December) until maturity.

As contemplated in connection with the 2016 Restructuring Agreement, the Company attempted to implement its business plan to increase franchise unit sales and reduce Company-owned assets through the sale of multiple restaurant locations (by way of refranchising these restaurants to third parties). Concurrently, through the reduction of Company-owned restaurants, the Company planned to be in a position to significantly reduce its corporate overhead and infrastructure obligations related to the Company-owned restaurants. In accordance with the Company's business plan, during the time period from October 2015 to June 2016, three (3) restaurants were sold and franchised to third party franchisees (the Ruby's® locations in Corona del Mar, Laguna Beach and Mission Viejo, California), for total net sale proceeds of approximately $2.5 million.

The Company also entered into negotiations for the sale of three (3) other restaurant locations, and received several offers in connection with these restaurants from various prospective purchasers.[15] However, the offers ultimately proved insufficient, and the Company determined it

---

[15] One of these prospective purchasers was Steve Craig. Mr. Craig is a franchisee of the Ruby's® restaurants located the Outlets at San Clemente, California, and at the Citadel Outlet Mall in Los Angeles, California. Mr. Craig is also a part

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

could not proceed with these sales.  As a result of the required continued management of the Company-owned stores, however, notwithstanding the Company's efforts and corresponding reduction of expenses, the Company was not in a position to materially reduce much of its corporate overhead and infrastructure obligations at the pace outlined in the business plan, although the Company has substantially reduced its overhead in the past 12-months.

In addition, 2017 restaurant sales were hampered by inclement weather in the first half of the year which severely reduced sales volumes over prior years and forecasts.  The weather also impacted commodity prices, increasing the Company's cost of goods.  In addition, newly enacted governmental regulations and policies drove many expenses higher (including medical benefits, sick pay requirements and minimum wage increases), all of which increased costs at a time when the restaurant industry as a whole was experiencing declining same store sales.  Concurrently, grocery store prices decreased, which generally reduced the frequency of visitation by restaurant customers.  While the Company experienced a rebound in the second half of 2017, the Company's cash flow remained insufficient to meet its ongoing obligations.

Another factor impacting the Company was the lower than forecasted income from the Company's third-party retailer gift card program.  Historically, the Company had engaged in gift card sales through Costco Wholesale Corporation (defined herein as the "Costco Gift Card Program") as a means by which to increase customer visitation to the Ruby's® restaurants.  Unfortunately, the Company was unable to reach sufficiently favorable terms with the Ruby's® Franchisees whereby they would agree to assume a certain amount of the differential between the costs of honoring the Costco Gift Cards and the reimbursement rate to the Company, leaving the Company to reimburse the Franchisees accepting the Costco Gift Cards at an unfavorable rate, and minimizing the benefits of the Costco Gift Card Program to the Company.[16]

---

owner of a Ruby's® location in Carlsbad, California.  Mr. Craig also provided $1 million in funding to RFS in late December 2014, and is currently owed such amount by RFS.

[16] In light of these issues, as discussed below, prior to the Petition Date, RDI terminated the Costco Gift Card Program. However, RDI intends to honor its outstanding gift card obligations thereunder (and has sought authority to do so).

CHAPTER 11 STATUS REPORT

1    In light of these factors, while RDI was able to make the required interest payments under the

2    Restructured Notes due on June 30, 2017 and December 20, 2017, it was unable to make the June

3    30, 2018 payment.

4    In sum, the Company found itself with an overleveraged balance sheet, and without the cash

5    flow to pay its operating costs, and its obligations to creditors, thereby necessitating the bankruptcy

6    filings in order to restructure the Company's financial affairs.

7    In addition, on or about April 2, 2018, Opus filed a Complaint for Breach of Loan

8    Agreements in the Orange County Superior Court and thereafter sought the appointment of a

9    receiver to take control of the assets serving as collateral for the Opus Loans.  Notwithstanding the

10   Company's attempts to resolve the issues with Opus, Opus ultimately determined to move forward

11   with its receivership proceeding, necessitating the filing of chapter 11 cases for the SoCal Debtors.

12   2.    What Do the Debtors Hope to Accomplish in these Chapter 11 Cases?

13   The Company continues to see a bright future with franchising and sales growth as the

14   economy is continuing to show signs of strengthening.  In this regard, the Company anticipates same

15   store sales growth in 2018 and going forward, and stable and continued franchise growth in the

16   future, including with the development of its international franchising plan and its recently

17   developed Ruby's® Shake Shop concept, a small franchise prototype specifically designed to

18   compete in today's "on-the-go" market sphere.  The Shake Shop model is scheduled to debut the

19   week of September 16, 2018 at a location in North Hollywood, California.[17]  The concept features a

20   reduced menu of approximately 20 menu items as well as beverages and Ruby's® famous shakes.

21   The small footprint is aimed at providing a model with reduced labor costs, yet strong sales

22   potential.  The Company believes that, with a restructuring of the Company's financial affairs

23   though the chapter 11 process, it will be a viable and profitable enterprise, for the benefit of all

24   parties.

25   In this regard, pursuant to a plan support agreement entered into between the Debtors, RFS,

26   the Company Founders and Steve Craig (the "Plan Support Agreement"), a true and correct copy of

27

28   [17] Shake Shop was previously scheduled to open in August 2018, however, due to construction delays the opening was
rescheduled for the week of September 2018.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

which is attached hereto as Exhibit "A," the Debtors and RFS contemplate that they will propose a joint chapter 11 plan of reorganization in their chapter 11 cases, pursuant to which, among other things, the RDI/RFS License Agreement will be terminated and the surviving merged entity will assume the role of franchisor of the Ruby's® brand. The Plan Support Agreement further provides for Two Million Dollars ($2,000,000) in debtor-in-possession financing (the "DIP Financing") from Mr. Craig or his designee (the "DIP Lender"), the provision of plan funding by Mr. Craig by way of contribution of the DIP Financing, contribution of a note in the face amount of One Million Dollars ($1,000,000) owed by RFS to Mr. Craig, and new funds in the amount of One Million Dollars ($1,000,000). In addition, the Company Founders will make "new value" contribution on the Effective Date of the Plan. As a result of the proposed implementation of the Plan Support Agreement, all of the assets of RDI and RFS will owned by a reorganized RDI and reorganized RDI will be owned 60% by Steve Craig, 24% by Douglas Cavanaugh and 16% by Ralph Kosmides.

3.     What are the Principal Disputes or Problems Likely to be Encountered During the Course of the Debtors' Reorganization Effort?

The Debtors may encounter objections by Opus Bank to the non-consensual restructuring of the debts owed by various Ruby's entities to Opus Bank. The Debtors will attempt to reach agreement with Opus Bank as to the terms of the restructured debts, but those negotiations have not yet begun.

The Plan to be proposed will pay certain unsecured creditors of RDI 25% of their allowed claims and other unsecured creditors will be paid 40% of their allowed clams. A creditors' committee has not yet been appointed. Thus, negotiations have not yet begun with respect to the treatment of unsecured creditors of RDI.

4.     How Do the Debtors Recommend That These Disputes be Resolved and Why?

The Debtors will attempt to negotiate with various creditor constituencies to obtain consent of various classes of creditors to the proposed Plan.

5.     Have the Debtors Complied with all of Their Duties Under 11 U.S.C. §§ 521, 1006 and 1107 and all Applicable Guidelines of the Office of the United States Trustee, and, if Not, Why Not?

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

The Debtors have submitted their *7 Day Packages* to the Office of the United States Trustee. On September 12 2018, the Debtors filed their motion for extension of time to file their *Schedules of Assets and Liabilities and Statements of Financial Affairs* ("Schedules and SOFAs"), which was approved by the Court.  The current deadline for filing the Debtors' Schedules and SOFAs is September 28, 2018.  As of the date of the filing of this Status Report, the Debtors have not yet closed all of their prepetition bank accounts.  The Debtors' banks will only honor the checks that are presented for payment in those categories for which the Court has approved payment by entered order on September 10, 2018 [Docket No. 31].  Once these payments have cleared, the Debtors will close the prepetition accounts.

6.    State Whether the Estates Have Any Potential Avoidance Actions as Described in 11 U.S.C. §§ 554-550.  If So, Describe them Briefly and State Whether Complaints Have Been Filed.  If Complaints Have Not Been Filed, Explain Why Not and When Will They Will Be Filed.

As these Cases are in their first weeks, the Debtors have not yet undertaken a review of potential avoidance actions.  No complaints have been filed at this juncture.  The Debtors intend to undertake a review of such matters and will file appropriate actions as warranted.

7.    Do Any Parties Claim an Interest in Cash Collateral of the Debtors?

As described in further detail above, and in the Debtors' Cash Collateral Motions (as discussed below), with respect to RDI, the following entities claim an interest in RDI's cash collateral:  (1) Credit Management Association, as collateral agent for RDI's noteholders; (2) the Internal Revenue Service ;and (3) Pillsbury Winthrop Shaw Pittman LLP.  In the SoCal Debtors' cases, the following entities assert an interest in some or all of the SoCal Debtors' cash collateral: (1) Opus Bank; (2) C&C Partnership; (3) Pillsbury Winthrop Shaw Pittman LLP; (4) Plaza Bonita, LLC; and (5) Family Tree Produce (PACA claimant).

8.    Are the Debtors Using Cash That Any Party Claims as its Cash Collateral and, if so, on What Date(s) did the Debtors Obtain an Order(s) Authorizing the Use of Such Cash or the Consent of Such Party?

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1    SoCal Debtors:  On August 30, 2018, the SoCal Debtors filed their Motion and Emergency

2    Motion by Debtors for Order (A) Authorizing Interim Use of Cash Collateral; (B) Granting

3    Adequate Protection for Use of Prepetition Collateral, and (C) Granting Related Relief (the "SoCal

4    Cash Collateral Motion") [Docket No. 13].  On August 30, 2018, Opus Bank filed its objection to

5    the SoCal Cash Collateral Motion [Docket No. 22].  On August 31, 2018, the Debtors and Opus

6    Bank entered into a Stipulation for Order (A) Authorizing Interim Use of Cash Collateral; (B)

7    Granting Adequate Protection for Use of Prepetition Collateral, and (C) Granting Related Relief (the

8    "Opus Cash Collateral Stipulation") [Docket No. 33], and on August 31, 2018, the Court entered its

9    interim order granting the Opus Cash Collateral Stipulation, and continued the hearing on the SoCal

10   Cash Collateral Motion to September 24, 2018 [Docket No. 31].

11   RDI:  On September 5, 2018, RDI filed its Motion and Emergency Motion by Debtors for

12   Order (A) Authorizing Interim Use of Cash Collateral; (B) Granting Adequate Protection for Use of

13   Prepetition Collateral, and (C) Granting Related Relief (the "RDI Cash Collateral Motion") [Docket

14   No. 7].  On September 6, 2018, Opus Bank filed its objection to the RDI Cash Collateral Motion

15   [Docket No. 19].  On September 6, 2018, the Court held a hearing on the RDI Cash Collateral

16   Motion, and on September 10, 2018, the Court entered its order granting the RDI Cash Collateral

17   Motion on an interim basis, and scheduled a final hearing on the RDI Cash Collateral Motion

18   September 24, 2018 [Docket No. 30].  On September 10, 2018, Family Tree Produce, Inc., a PACA

19   claimant, filed an objection to the RDI Cash Collateral Motion (the "FTP Objection") [Docket No.

20   36].  The Court scheduled September 24, 2018 for the hearing on the FTP Objection.

21       9.       Describe the Status of Debtors' Post-Petition Operations and Their Major Assets and

22                Liabilities:

23   Since the Petition Dates, the Debtors have continued to operate the Company's business in

24   the ordinary course without material change from their pre-petition operations.  The Debtors' major

25   assets and liabilities remain substantially the same as described hereinabove.

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1    10.    Describe the Status of the Debtors' Pre-Petition and Post-Petition Litigation:

2    Attached hereto as Exhibit "B" is a spreadsheet of the litigation pending against the Debtors

3    of which the Debtors are aware, and the current state of each litigation matter. The Debtors intend to

4    file notices of stay in these matters.

5    11.    Retention of Professionals:

6    At present, the Debtors anticipate retaining the following professionals, and will file

7    applications to employ said professionals in a timely manner: (1) Pachulski Stang Ziehl & Jones

8    LLP as insolvency counsel for the Debtors; (2) GlassRatner Advisory & Capital Group, LLC as

9    financial advisor for the Debtors; and (3) Donlin Recano & Company, Inc., as claims agent for the

10    Debtors.

11    12.    Projected Income for the First Six Months of the Cases:

12    Attached hereto as Exhibit "C" is the Debtors' projected income for the first three (3) months

13    of their Cases. The Debtors are in the process of preparing projections covering the six (6) month

14    period following the filings, which will be submitted prior to the Status Conference.

15    13.    Proposed Deadlines for the Filing of Claims and Objections to Claims:

16    The Debtors propose that a bar date for filing claims be set by the Court at the Status

17    Conference. The Debtors are reviewing claims filed against the Debtors for potential objections.

18    At this early stage of the Cases, the Debtors are not yet able to determine the extent of their claim

19    objections.

20    14.    Proposed Deadline for Filing Avoidance Actions:

21    The Debtors would like an opportunity to review any potential avoidance actions and would

22    not seek a deadline to file such actions at this early juncture of the Cases.

23    15.    Proposed Deadline for Filing a Plan and Disclosure Statement:

24    The Debtors will determine the appropriate timing for filing a plan and disclosure statement

25    within the exclusivity periods, but do not anticipate that these Cases will remain in chapter 11 longer

26    than necessary to implement a restructuring as contemplated by the Plan Support Agreement. The

27    Debtors tentatively anticipate filing a joint plan and disclosure statement in October 2018.

28    16.    Unexpired Leases and Executory Contracts:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

CHAPTER 11 STATUS REPORT

The Debtors would like an opportunity to review their unexpired leases and executory contracts and would not seek a deadline to assume or reject any such contracts at this early juncture of the Cases.

17.    <u>Small Business Case:</u>

The Cases are not small businesses within the meaning of 11 U.S.C. § 101(51D).

18.    <u>Single Asset Case:</u>

The Cases are not single asset real estate cases within the meaning of 11 U.S.C. § 101(51(B).

Dated:    September 17, 2018        PACHULSKI STANG ZIEHL & JONES LLP


By:    /s/ William N. Lobel
       _____
       William N. Lobel
       [Proposed] Attorneys for Ruby's Diner,
       Inc., *et al.,* Debtors and Debtors-in-
       Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

CHAPTER 11 STATUS REPORT

## DECLARATION OF DOUGLAS S. CAVANAUGH

I, Douglas S. Cavanaugh, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1.    I am a founder and the Chief Executive Officer ("CEO") of Ruby's Diner, Inc., a California corporation, the above-captioned debtor and debtor-in-possession ("RDI"). I have served in the capacity of CEO since RDI's incorporation in 1985. I am also a 60% shareholder of RDI.

2.    On August 28, 2018, Ruby's SoCal Diners, LLC, a Delaware limited liability company ("SoCal Diners"); Ruby's Quality Diners, LLC, a Delaware limited liability company ("Quality"); Ruby's Huntington Beach, Ltd., a California limited partnership ("Ruby's Huntington Beach"); Ruby's Laguna Hills, Ltd., a California limited partnership ("Ruby's Laguna Hills"); Ruby's Oceanside, Ltd., a California limited partnership ("Ruby's Oceanside"); and Ruby's Palm Springs, Ltd., a California limited partnership ("Ruby's Palm Springs") (collectively, the "SoCal Debtors"), filed chapter 11 cases.

3.    On September 5, 2018, RDI filed a related chapter 11 case. RDI and the SoCal Debtors are referred to herein as the "Debtors."

4.    On September 5, 2018, the Court entered an order jointly administering the Debtors' Cases, with RDI designated as the lead debtor.

5.    No party has requested the appointment of a trustee or examiner and no committee has yet been appointed or designated in the Cases, although the Debtors anticipate that an official committee of unsecured creditors may be appointed.

6.    I submit this declaration (the "Declaration") in support of the Debtors' chapter 11 status report (the "Status Report") to which this Declaration is appended.[18] Except as otherwise indicated, all statements in this Declaration are based upon my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, or my opinion based on my experience with the Debtors' operations and financial condition.

7.    The Debtors and their affiliates (referred to from time to time herein as the "Company") own, operate and manage restaurants under the trade names "Ruby's®," "Ruby's®

---

[18] Capitalized terms not defined herein have the meanings ascribed to them in the Status Report, as applicable.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

CHAPTER 11 STATUS REPORT

Diner," "The Ruby Restaurant Group," "Ruby's® Dinette" and "Ruby's® Shake Shop." The Company has operated Ruby's® Diner restaurants since 1985 and is known as a purveyor of very popular burgers, fries and shakes.   I own 60% of RDI, and the other 40% is owned by Ralph Kosmides.  Mr. Kosmides and I are the founders of the Company (the "Company Founders").  RDI is the owner of the Ruby's® trademarks, system and intellectual property (the "Marks and Intellectual Property") and is the employer of the Company's more than 800 employees.

8.      RDI is the 100% owner and sole and managing member of SoCal Diners.  SoCal Diners is the 100% owner and sole and managing member of Quality.  SoCal Diners is the general partner and 50% owner, and Quality is the limited partner and 50% owner, of the following California limited partnerships: (1) Ruby's Huntington Beach, which owns and operates a Ruby's® restaurant on the pier in Huntington Beach, California and is one of the SoCal Debtors; (2) Ruby's Oceanside, which owns and operates a Ruby's® restaurant in Oceanside, California and is one of the SoCal Debtors; (3) Ruby's Palm Springs, which owns and operates a Ruby's® restaurant in Palm Springs, California and is one of the SoCal Debtors; (4) Ruby's Laguna Hills, which owns and operates a Ruby's® restaurant in the Laguna Hill Mall in Laguna Hills, California and is one of the SoCal Debtors; [19] and (5) Ruby's Mission Valley, Ltd., which until a few months prior to the Petition Date, owned and operated a Ruby's® restaurant in the Westfield Mission Valley Mall in San Diego, California[20] (collectively, the "SoCal Entities" and the restaurants owned by the SoCal Entities, the "SoCal Restaurants").

9.      In addition, RDI holds ownership interests in, and management roles in connection with, the following joint venture entities:  (1) RDI is the managing member and 70% owner of Ruby's Beach Ventures LLC, which owns and operates a Ruby's® restaurant in Long Beach, California;[21] (2) RDI is the general partner and 50% owner of Ruby's Diner South Coast Plaza LP,

---

[19] RDI anticipates that, due to significant, continuing construction projects underway at the Laguna Hills Mall, the Laguna Hills restaurant will close following the Petition Date.

[20] The Mission Valley restaurant was closed prior to the Petition Date, in April 2018.  Ruby's Mission Valley, Ltd. is not a debtor entity.

[21] The other 30% of Ruby's Beach Ventures LLC is held by various third-party investors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

which owns and operates a Ruby's® restaurant at South Coast Plaza Mall in Costa Mesa, California;[22] (3) RDI  is the managing member and sole owner of Ruby's Woodbridge LLC, which owns and operates a Ruby's® restaurant in Woodbridge in Irvine, California; and (4) RDI is the managing member and 50% owner of Ruby's Spectrum LLC, which until a few months prior to the Petition Date, owned and operated a Ruby's® restaurant at the Irvine Spectrum in Irvine, California[23] (collectively, the "RDI Entities" and the restaurants owned by the RDI Entities, the "RDI Restaurants").  The RDI Entities have not filed chapter 11 cases.  The RDI Restaurants, together with the SoCal Restaurants, are referred to as the "Company Restaurants").

10.    The Company's revenue generally comes directly from the operation of the SoCal Restaurants (in the case of the SoCal Entities and SoCal Diners) and management fees and partnership distributions from the RDI Restaurants (in the case of the RDI Entities and RD), as well as gift cards sales and the RDI License Fee (described below).

11.    As of the Petition Date, there also were twenty-four (24) Ruby's® Diner franchises (or licensed units) located in Southern California, Arizona, Pennsylvania, New Jersey, Nevada and Texas that were owned and, with certain limited exceptions, operated by independent third parties.[24] Ruby's Franchise Systems, Inc., a California corporation ("RFS"), an entity affiliated with the Debtor through common ownership and control which has commenced a separate chapter 11 proceeding concurrently with RDI's chapter 11 filing, currently serves as the franchisor to the Ruby's® franchisees/licensees (the "Franchisees"), and licenses the Marks and Intellectual Property from RDI as licensor.  Under RFS' agreements with the Franchisees (the "Franchise Agreements"),

---

[22] The other 50% of Ruby's Diner South Coast Plaza LP is owned by South Coast Plaza, a California general partnership, as the limited partner.

[23] The other 50% of Ruby's Spectrum LLC is held by William C. Taormina, Trustee of the Taormina Revocable Inter Vivos Trust u/d/t dated July 26, 1983.  The Irvine Spectrum restaurant was closed prior to the Petition Date, in April 2018.

[24] RFS (as defined herein), an affiliate of RDI owned 60% me  and 40% by Mr. Kosmides, provides management services to the franchise located in Yorba Linda, California (Ruby's Yorba Linda, Ltd.).  Ruby's Management, LLC ("RMLLC") (an entity owned by, Mr. Kosmides and Douglas Salisbury and me), provides management services for a Ruby's® restaurant located in Morongo, California (Ruby's Morongo) and has sub-contracted with RDI for those services.  RMLLC owns 50% of Shake Shack, LLC (the other 50% is owned by three unrelated parties), which operates the Shake Shack in Laguna Beach, California.  RDI does not provide management services in connection with the Shake Shack.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

RFS (as franchisor) is entitled to a franchise royalty fee, which is generally the greater of a set dollar amount or four percent (4%) of "Gross Sales" (as such term is defined in the Franchise Agreements), and fee which historically averages at approximately $2.4 million per annum.  As licensor of the Marks and Intellectual Property to RFS, pursuant to an Amended and Restated Trademark and Intellectual Property License Agreement, dated June 1, 1990 (the "RDI/RFS License Agreement"), RDI is entitled to one percent (1%) of the "Gross Sales" generated by RFS and the Franchisees as a license fee, which fees have historically averaged approximately $600,000 per annum (the "RDI License Fee").

8.    On or about February 10, 2012, RDI entered into a restructuring of its existing secured notes (in the aggregate face amount of approximately $2.9 million) (the "Original Secured Notes" and the holders thereof, the "Secured Noteholders").  The Original Secured Notes (and the Restructured Secured Notes issued in connection with the 2016 Restructuring Agreement (as defined hereinbelow) are secured by all or substantially all of the personal property of RDI (including cash and accounts receivable, the Marks and Intellectual Property and RDI's interests in SoCal Diners, Quality and the RDI Entities).  The Original Secured Notes were governed by the Credit Agreement, the Collateral Agent and Intercreditor Agreement, the Security Agreement (Personal Property), dated as of February 10, 2012, and related documentation, including the UCC-1 Financing Statement filed in connection therewith (the "Original Secured Credit Documents").  Pursuant to the Original Secured Credit Documents, Credit Management Association ("CMA") was designated as collateral agent in connection with the Original Secured Notes (and continues to serve in this capacity in connection with the Restructured Secured Notes).

9.    On June 30, 2016, the Debtor completed a restructuring transaction whereby the Original Secured Notes were amended and restated (the "Restructured Secured Notes").  The Restructured Secured Notes, the First Amendment to Security Agreement, Credit Agreement (Secured), Collateral Agent and Intercreditor Agreement (Secured), Credit Agreement (Unsecured), and Representative and Intercreditor Agreement (Unsecured), and Agreement Regarding Restatement of Promissory Notes, effective as of July 1, 2016 (the "Omnibus First Amendment"),

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

the UCC-1 Financing Statements filed in connection therewith, and any related documentation, are referred to as the "2016 Restructuring Agreement."

10.    RDI made the required interest payments under the Restructured Secured Notes due on June 30, 2017 and December 20, 2017, however, RDI was unable to make the June 30, 2018 interest payment.  As of the Petition Date, RDI owed a total of approximately $2.985 million to the Secured Noteholders under the 2016 Restructuring Agreement.

11.    On or about October 16, 2017, the Internal Revenue Service (the "IRS") recorded a tax lien against RDI with the Secretary of State of California in the amount of $175,789.06. Thereafter, RDI reached an agreement with the IRS regarding a payment plan and waiver of certain late charges.  RDI has been making monthly payments to the IRS on account of this tax obligation in the amount of approximately $12,000 per month, and such payments are contemplated to continue postpetition.  The outstanding balance to the IRS, as of the Petition Date, is approximately $91,000.

12.    On or about June 14, 2018, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") recorded a Notice of Judgment Lien (Filing No. 18-7654307617) against RDI with the Secretary of State of California in the amount of $617,452.74.[25]

13.    RDI also has $5.6 million in unsecured obligations to its unsecured noteholders (the "Unsecured Noteholders"), a $127,000 unsecured note payable to William Taormina related to the closing of the Irvine Spectrum restaurant, and approximately $1.2 million in pre-petition accounts payable (which amount does not include vendor obligations at the Company Restaurant level that might also be asserted against RDI nor any contingent obligations that could arise in connection with leases at the Company Restaurant level, through a guaranty by RDI or otherwise).[26]  In addition, RDI has obligations for employee wages and workers' compensation, obligations related to the Company's advertising programs in the amount of approximately $532,000, and approximately $4.4

---

[25] As noted below, the Pillsbury lien is also asserted against SoCal Diners and three (3) of the SoCal Entities: (a) Ruby's Huntington Beach, Ltd.; (b) Ruby's Oceanside, Ltd; and (c) Ruby's Palm Springs, Ltd.

[26] Of the Company Restaurants, RDI has guaranteed the lease obligations related to the Ruby's® restaurants located at or in the following locations: (1) Irvine Spectrum (RDI Restaurant) (which location closed prior to the Petition Date); (2) Long Beach, California (RDI Restaurant); (3) Woodbridge in Irvine, California (RDI Restaurant); (4) Laguna Hills, California (SoCal Restaurant); and (5) Palm Springs, California (SoCal Restaurant).

million in gross obligations related to the Company's gift card programs.[27]  By way of "first day

motions," RDI has sought and obtained approval to honor and pay certain of these latter amounts,

which amounts (along with such other Court-approved amounts) will be funded through the use of

cash collateral and the proceeds of the contemplated DIP Loan.[28]

14.    On or about July 26, 2013, the SoCal Debtors and Opus Bank ("Opus") entered into a

loan agreement for a term loan in the original principal amount of $5,000,000, and a term loan in the

original principal amount of $300,000.  On or about April 8, 2014, the SoCal Debtors and Opus

entered into a business loan agreement in the original principal amount of $500,000.   On or about

November 14, 2014, the SoCal Debtors and Opus entered into a business loan agreement in the

original principal amount of $105,000.  Such loan agreements, and related notes and security

agreements, as amended on February 16, 2016, March 31, 2017 and July 31, 2017 or otherwise, are

referred to herein as the "Opus Loans").  The Opus Loans are secured by substantially all of the

SoCal Debtors' assets (including cash and a pledge of the assets of the SoCal Restaurants), as

reflected by the UCC Financing Statements filed with the Delaware Secretary of State on July 29,

2013 (Filing No. 20132935915) and California Secretary of State on October 19, 2016 (Filing No.

16-7551665002).  The Opus Loans, in the original principal amount of $5,905,000, were

significantly paid down in October 2016.  The maturity date of the Opus Loans was December 31,

2017.  As of the Petition Date, the SoCal Debtors owed a total of approximately $2.2 million to

Opus under the Opus Loans.

---

[27] The Company's gift card programs consist of gift cards issued directly by the Company to customers (defined herein as the "Company Gift Cards"), which program RDI intends to continue and which cards the Debtors intend  to honor following the Petition Date, and gift cards sold through a third-party retailer, Costco Wholesale Corporation (defined herein as the "Costco Gift Cards"), which program has been terminated by RDI on a go-forward basis, but which outstanding obligations the Debtors intend  to honor.  The face amount of the outstanding gift card obligations under these gift card programs is approximately $4.4 million; however, the Company believes, based on historical redemption rates and the aging of these obligations, that its gift card related obligations will total approximately $1.6 million.

RDI also has dining cards issued to the Secured Noteholders and Unsecured Noteholders allowing them to dine at Ruby's® Restaurants free of charge up to certain amounts based on the face amount of their notes.  The Debtors contemplated only honoring these cards following ten (10) days after the Petition Date, however, due to some logistical issues, the program was extended an additional five (5) days.  RDI does not intend to continue this program.

[28] As of the Petition Date, RDI owes to RFS the amount of approximately $400,000 (after accounting for all intercompany obligations between them).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

15.    On or about April 2, 2018, Opus filed a Complaint for Breach of Loan Agreements in the Orange County Superior Court and thereafter sought the appointment of a receiver to take control of the assets serving as collateral for the Opus Loans.  Notwithstanding the SoCal Debtors' attempts to resolve the issues with Opus, Opus ultimately determined to move forward with its receivership proceeding, necessitating the filing of the SoCal Debtors' chapter 11 cases to preserve value for all parties.

16.    On or about April 18, 2018, C&C Partnership ("C&C") entered into a secured promissory note and related security agreement, and recorded a UCC Financing Statement against SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs with the Secretary of State of California (Filing Nos. 187644361282, 187644368138, 187644368259 and 187644368370) in the amount of $250,000.

17.    As noted above, on or about June 14, 2018, Pillsbury recorded a Notice of Judgment Lien (Filing No. 18-7654307617) against SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs with the Secretary of State of California in the amount of $617,452.74.  This obligation is also asserted against RDI.

18.    On or about July 3, 2015, Plaza Bonita, LLC ("Plaza Bonita") recorded a Notice of Attachment Lien (Filing No. 15-7473297702) against SoCal Diners in connection with a lease guaranty settlement agreement.  As of the Petition Date, the amount owed to Plaza Bonita by SoCal Diners under the settlement agreement is $58,200.[29]

19.    Family Tree Produce, Inc. filed an objection to the Debtors' cash collateral motion, asserting PACA lien rights with respect to certain produce and other goods supplied to certain of the SoCal Debtors' prior to the commencement of the cases in the amount of approximately $47,666.

20.    SoCal Diners had approximately $1.6 million in accounts payable (which amount does not include vendor obligations at the SoCal Restaurant level that might also be asserted against SoCal Diners), and approximately $637,000 in other unsecured obligations (not including any

---

[29] The settlement agreement with Plaza Bonita provides for a settlement amount of $175,000 to be paid over time.  SoCal Diners made the payments to Plaza Bonita until May 2018.  The settlement agreement provides for a springing obligation (in the amount of $244,902) upon default.  Therefore, this obligation could be asserted against SoCal Diners in a higher amount, less an offset for the payments made prior to default, which payments are in the amount of approximately $116,800.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

CHAPTER 11 STATUS REPORT

contingent obligations that could arise in connection with leases at the Company Restaurant level, through a guaranty by SoCal Diners or otherwise).[30]  In addition, SoCal Diners has obligations related to the Company's advertising programs in the amount of approximately $532,000 and approximately $100,000 in sales tax obligations.

21.    In addition to ordinary course accounts payable obligations of the SoCal Restaurants, Ruby's Huntington Beach is obligated for certain lease commitment charges and leasehold improvement obligations (related to the Ruby's® Huntington Beach pier location) in the amount of approximately $600,000.[31]   Ruby's Oceanside, Ltd. also has outstanding tax obligations of approximately $40,000.

21.    The Company's revenue generally comes directly from the operation of the SoCal Restaurants (in the case of the SoCal Entities and SoCal Diners) and from management fees and partnership distributions from the RDI Restaurants (in the case of the RDI Entities and RDI).  The Company also receives revenue in connection with the sale of gift cards to its customers and, as discussed above, RDI is entitled to the RDI License Fee.  The Company's annual revenue for calendar year 2017 was approximately $24.9 million.  RDI, however, faced with an overleveraged balance sheet and continuing operating losses, was unable to adequately address its financial difficulties outside of a chapter 11 filing and seeks to implement the provisions of the Plan Support Agreement (as discussed below).

22.    Several factors contributed to the deterioration in the Company's financial condition, which resulted in the commencement of the Debtors' bankruptcy cases.

---

[30] Of the Company Restaurants, SoCal Diners has guaranteed the lease obligations related to the Ruby's® restaurant located in the Westfield Mission Valley Mall in San Diego, California.  SoCal Diners also guaranteed the lease obligations related to closed locations located at Westfield Plaza Bonita in National City, California ("Plaza Bonita") and Parkway Plaza located in El Cajon, California ("Parkway Plaza").  SoCal Diners has entered into settlement agreements with the Plaza Bonita and Parkway Plaza landlords with respect to these guaranty claims.  As noted above, Plaza Bonita asserts a secured claim against SoCal Diners.

[31] While these lease related charges are a direct obligation of the Ruby's Huntington Beach, and neither SoCal Diners/Quality nor RDI have guaranteed the underlying lease, such amounts must be paid in order for Ruby's Huntington Beach.to continue to operate this profitable restaurant on the pier in Huntington Beach for the benefit of the Debtors  and their  creditors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

23.    In early 2012, after years of ongoing disputes, the Company entered into agreements whereby it bought out the interests of two of its partners, Douglas Salisbury and Doug DeCinces. Funding for the buy-outs was obtained through financing obtained from Steve Craig and Opus Bank. The Company, however, ultimately did not have sufficient cash flow to meet the costs associated with the buy-outs in addition to the Company's other financial challenges and its ongoing operational needs, including with respect to the obligations to RDI's Secured Noteholders and Unsecured Noteholders.

24.    Accordingly, on or about February 10, 2012, RDI entered into the consensual restructuring of the Secured Notes (in the aggregate face amount of approximately $2.9 million) and, on or about July 16, 2012, of the Unsecured Notes (in the aggregate face amount of approximately $5.6 million)).  Credit Management Association ("CMA") was designated as collateral agent in connection with the Secured Notes.  A "steering committee" comprised of Unsecured Noteholders was designated as the representative with respect to the Unsecured Notes (the "Steering Committee"), and two members of the Steering Committee were appointed to the Board of Directors of RDI.

25.    As noted above, around this time frame, the Company was faced with several legal challenges in connection with, among other things, the buy-out of its partners and disputes related to its Laguna Beach restaurant location, which not only diverted management's attention away from the Company's operations, but also resulted in the incurrence of significant professional fees and litigation related expense exceeding $600,000.  In addition, notwithstanding the Company's efforts to grow its brand through the development of new franchiseable models, Company-owned Ruby's® restaurants and the conversion of certain locations from a full-service restaurant to a "fast casual" restaurant concept, as a result of an industrywide slowdown in terms of growth and sales figures and high operational costs, the new locations and concepts did not perform as projected, and the Company was ultimately forced to close four (4) of its restaurants (Plaza Bonita in National City, California, Parkway Plaza in El Cajon, California, Whalers Village in Maui, Hawaii, and 17th Street in Costa Mesa, California), resulting in significant obligations associated with these closures. Around the same time, RFS' efforts at developing new franchises were otherwise hampered by the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

CHAPTER 11 STATUS REPORT

industry slowdown and a profitable Ruby's® franchise located at the Newark Airport was lost due to the airport's removal of all vendors at the terminal.

26.    In addition, leading up to 2015, significant increased competition in the restaurant industry emerged, creating an array of dining options for consumers.  This competition emergence impacted many key brands and, while the Ruby's® brand continued to see strong loyalty with its guests, the Company was impacted by these competitive forces, which adversely impacted the revenue generated by the Company stores, as well as the sales figures of the Ruby's® franchisees (and, thereby, the amount of the revenue generated by way of the RDI License Fee).

27.    After several years of continuing losses and the closure of the four restaurants, in early 2015, RDI was forced to suspend interest payments on the Notes.  In addition, SoCal Diners was in covenant violation of its loan agreement with Opus Bank (which holds liens on all or substantially all of the assets of SoCal Diners, Quality and the SoCal Restaurants and, at the time, was owed approximately $4 million).

28.    The Company explored various business and restructuring alternatives over the course of 2015 and early 2016.  In October 2016, SoCal Diners entered into a restructuring of the Opus Bank loan.  Since that time, and until its December 2017 maturity, SoCal Diners has been in material compliance with the restructured terms of the Opus Bank loan, which is currently in the amount of approximately $2.1 million.

29.    RDI also engaged the Steering Committee and CMA in an ongoing dialogue regarding the Company's financial situation and possible restructuring alternatives.  As a result, the parties reached a conceptual agreement regarding a revised business plan for the Company and a consensual proposal for the restructuring of the Notes.  The restructuring of the Notes was subject to the approval of the Noteholders, which required approval from an aggregate of at least 51% of the total amount loaned to RDI by each Secured Noteholder, as well as an aggregate of at least 66.7% of the total amount loaned to RDI by each Unsecured Noteholder.

30.    On June 30, 2016, with the requisite approval of the Noteholders and in accordance with RDI's Consent Solicitation Statement, dated May 19, 2016, RDI completed a restructuring

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

transaction involving the Original Notes, whereby RDI amended and restated the Notes (the "2016 Restructuring Agreement").

31.    Pursuant to the 2016 Restructuring Agreement, among other things, the maturity of the Restructured Notes was extended until June 30, 2026, with interest in the amount of 2.23% to be paid on a semi-annual basis (in June and December) until maturity.

32.    As contemplated in connection with the 2016 Restructuring Agreement, the Company attempted to implement its business plan to increase franchise unit sales and reduce Company-owned assets through the sale of multiple restaurant locations (by way of refranchising these restaurants to third parties). Concurrently, through the reduction of Company-owned restaurants, the Company planned to be in a position to significantly reduce its corporate overhead and infrastructure obligations related to the Company-owned restaurants. In accordance with the Company's business plan, during the time period from October 2015 to June 2016, three (3) restaurants were sold and franchised to third party franchisees (the Ruby's® locations in Corona del Mar, Laguna Beach and Mission Viejo, California), for total net sale proceeds of approximately $2.5 million.

33.    The Company also entered into negotiations for the sale of three (3) other restaurant locations, and received several offers in connection with these restaurants from various prospective purchasers.[32] However, the offers ultimately proved insufficient, and the Company determined it could not proceed with these sales. As a result of the required continued management of the Company-owned stores, however, notwithstanding the Company's efforts and corresponding reduction of expenses, the Company was not in a position to materially reduce much of its corporate overhead and infrastructure obligations at the pace outlined in the business plan, although the Company has substantially reduced its overhead in the past 12-months.

34.    In addition, 2017 restaurant sales were hampered by inclement weather in the first half of the year which severely reduced sales volumes over prior years and forecasts. The weather also impacted commodity prices, increasing the Company's cost of goods. In addition, newly

---

[32] One of these prospective purchasers was Steve Craig. Mr. Craig is a franchisee of the Ruby's® restaurants located at the Outlets at San Clemente, California, and at the Citadel Outlet Mall in Los Angeles, California. Mr. Craig is also a part owner of a Ruby's® location in Carlsbad, California. Mr. Craig also provided $1 million in funding to RFS in late December 2014, and is currently owed such amount by RFS.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

enacted governmental regulations and policies drove many expenses higher (including medical benefits, sick pay requirements and minimum wage increases), all of which increased costs at a time when the restaurant industry as a whole was experiencing declining same store sales.  Concurrently, grocery store prices decreased, which generally reduced the frequency of visitation by restaurant customers.  While the Company experienced a rebound in the second half of 2017, the Company's cash flow remained insufficient to meet its ongoing obligations.

35.    Another factor impacting the Company was the lower than forecasted income from the Company's third-party retailer gift card program.  Historically, the Company had engaged in gift card sales through Costco Wholesale Corporation (defined herein as the "Costco Gift Card Program") as a means by which to increase customer visitation to the Ruby's® restaurants.  Unfortunately, the Company was unable to reach sufficiently favorable terms with the Ruby's® Franchisees whereby they would agree to assume a certain amount of the differential between the costs of honoring the Costco Gift Cards and the reimbursement rate to the Company, leaving the Company to reimburse the Franchisees accepting the Costco Gift Cards at an unfavorable rate, and minimizing the benefits of the Costco Gift Card Program to the Company.[33]

36.    In light of these factors, while RDI was able to make the required interest payments under the Restructured Notes due on June 30, 2017 and December 20, 2017, it was unable to make the June 30, 2018 payment.

37.    In sum, the Company found itself with an overleveraged balance sheet, and without the cash flow to pay its operating costs, and its obligations to creditors, thereby necessitating the bankruptcy filings in order to restructure the Company's financial affairs.

38.    In addition, on or about April 2, 2018, Opus filed a Complaint for Breach of Loan Agreements in the Orange County Superior Court and thereafter sought the appointment of a receiver to take control of the assets serving as collateral for the Opus Loans.  Notwithstanding the Company's attempts to resolve the issues with Opus, Opus ultimately determined to move forward with its receivership proceeding, necessitating the filing of chapter 11 cases for the SoCal Debtors.

---

[33] In light of these issues, as discussed below, prior to the Petition Date, RDI terminated the Costco Gift Card Program. However, RDI intends to honor its outstanding gift card obligations thereunder (and has sought authority to do so).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

31

39.    The Company continues to see a bright future with franchising and sales growth as the economy is continuing to show signs of strengthening.  In this regard, the Company anticipates same store sales growth in 2018 and going forward, and stable and continued franchise growth in the future, including with the development of its international franchising plan and its recently developed Ruby's® Shake Shop concept, a small franchise prototype specifically designed to compete in today's "on-the-go" market sphere.  The Shake Shop model is scheduled to debut the week of September 16, 2018 at a location in North Hollywood, California.[34]  The concept features a reduced menu of approximately 20 menu items as well as beverages and Ruby's® famous shakes.  The small footprint is aimed at providing a model with reduced labor costs, yet strong sales potential.  The Company believes that, with a restructuring of the Company's financial affairs though the chapter 11 process, it will be a viable and profitable enterprise, for the benefit of all parties.

40.    In this regard, pursuant to a plan support agreement entered into between the Debtors, RFS, the Company Founders and Steve Craig (the "Plan Support Agreement"), a true and correct copy of which is attached hereto as Exhibit "A," the Debtors and RFS contemplate that they will propose a joint chapter 11 plan of reorganization in their chapter 11 cases, pursuant to which, among other things, the RDI/RFS License Agreement will be terminated and the surviving merged entity will assume the role of franchisor of the Ruby's® brand.  The Plan Support Agreement further provides for Two Million Dollars ($2,000,000) in debtor-in-possession financing (the "DIP Financing") from Mr. Craig or his designee (the "DIP Lender"), the provision of plan funding by Mr. Craig by way of contribution of the DIP Financing, contribution of a note in the face amount of One Million Dollars ($1,000,000) owed by RFS to Mr. Craig, and new funds in the amount of One Million Dollars ($1,000,000).  In addition, the Company Founders will make "new value" contribution on the Effective Date of the Plan.  As a result of the proposed implementation of the Plan Support Agreement, all of the assets of RDI and RFS will owned by a reorganized RDI and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

---

[34] Shake Shop was previously scheduled to open in August 2018, however, due to construction delays the opening was rescheduled for the week of September 2018.

reorganized RDI will be owned 60% by Steve Craig, 24% by Douglas Cavanaugh and 16% by Ralph Kosmides.

41.    The Debtors believe they may encounter objections by Opus Bank to the non-consensual restructuring of the debts owed by various Ruby's entities to Opus Bank.  The Debtors will attempt to reach agreement with Opus Bank as to the terms of the restructured debts, but those negotiations have not yet begun.

42.    The Plan to be proposed will pay certain unsecured creditors of RDI 25% of their allowed claims and other unsecured creditors will be paid 40% of their allowed clams.  A creditors' committee has not yet been appointed.  Thus, negotiations have not yet begun with respect to the treatment of unsecured creditors of RDI.

43.    The Debtors will attempt to negotiate with various creditor constituencies to obtain consent of various classes of creditors to the proposed Plan.

44.    The Debtors have submitted their *7 Day Packages* to the Office of the United States Trustee.  As of the date of the filing of this Status Report, the Debtors have not yet closed all of their prepetition bank accounts.  The Debtors' banks will only honor the checks that are presented for payment in those categories for which the Court has approved payment by entered order on September 10, 2018.  Once these payments have cleared, the Debtors will close the prepetition accounts.

45.    As these Cases are in their first weeks, the Debtors have not yet undertaken a review of potential avoidance actions.  No complaints have been filed at this juncture.  The Debtors intend to undertake a review of such matters and will file appropriate actions as warranted.

**46.**    As described in further detail above, and in the Debtors' Cash Collateral Motions (as discussed below), with respect to RDI, the following entities claim an interest in RDI's cash collateral:  (1) Credit Management Association, as collateral agent for RDI's noteholders; (2) the Internal Revenue Service ;and (3) Pillsbury Winthrop Shaw Pittman LLP.  In the SoCal Debtors' cases, the following entities assert an interest in some or all of the SoCal Debtors' cash collateral: (1) Opus Bank; (2) C&C Partnership; (3) Pillsbury Winthrop Shaw Pittman LLP; (4) Plaza Bonita, LLC; and (5) Family Tree Produce (PACA claimant).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

47.    Since the Petition Dates, the Debtors have continued to operate the Company's business in the ordinary course without material change from their pre-petition operations.  The Debtors' major assets and liabilities remain substantially the same as described hereinabove.

48.    Attached hereto as Exhibit "B" is a spreadsheet of the litigation pending against the Debtors of which the Debtors are aware, and the current state of each litigation matter.  The Debtors intend to file notices of stay in these matters.

49.    At present, the Debtors anticipate retaining the following professionals, and will file applications to employ said professionals in a timely manner: (1) Pachulski Stang Ziehl & Jones LLP as insolvency counsel for the Debtors; (2) GlassRatner Advisory & Capital Group, LLC as financial advisor for the Debtors; and Donlin Recano & Company, Inc., as claims agent for the Debtors.

50.    Attached hereto as Exhibit "C" is the Debtors' projected income for the first three (3) months of their Cases.  The Debtors are in the process of preparing projections covering the six (6) month period following the filings, which will be submitted prior to the Status Conference.

51.    The Debtors propose that a bar date for filing claims be set by the Court at the Status Conference.  The Debtors are reviewing claims filed against the Debtors for potential objections. At this early stage of the Cases, the Debtors' are not yet able to determine the extent of their claim objections.

52.    The Debtors would like an opportunity to review any potential avoidance actions and would not seek a deadline to file such actions at this early juncture of the Cases.

53.    The Debtors will determine the appropriate timing for filing a plan and disclosure statement within the exclusivity periods, but do not anticipate that these Cases will remain in chapter 11 longer than necessary to implement a restructuring as contemplated by the Plan Support Agreement.  The Debtors' tentatively anticipate filing a joint plan and disclosure statement in October, 2018.

54.    The Debtors would like an opportunity to review their unexpired leases and executory contracts and would not seek a deadline to assume or reject any such contracts at this early juncture of the Cases.

1        I declare under penalty of perjury pursuant to the laws of the United States of America that

2    the foregoing is true and correct.

3        Executed September 17, 2018, at <u>Newport Beach</u> , California.

5                Douglas S. Cavanaugh

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

EXHIBIT "A"

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement (this "Agreement") is dated as of August 30, 2018, and sets forth the agreement by and among Douglas S. Cavanaugh ("Cavanaugh") and Ralph Kosmides (together, the "Founders"), Ruby's Diners, Inc., a California corporation ("RDI"), Ruby's Franchise Systems, Inc., a California corporation ("RFS"), and Steven L. Craig or assignee ("Craig") respecting the financial support of Craig for a chapter 11 plan or plans to be filed by RDI and RFS in chapter 11 cases to be filed by RDI and RFS, in accordance with this terms of this Agreement.

In consideration of the promises and actions described herein, the parties hereto agree as follows:

1) RDI and RFS will in the near future be filing chapter 11 petitions.

2) During the chapter 11 cases, RDI and/or RFS will need debtor in possession financing in an aggregate amount not to exceed two million dollars ($2,000,000) (the "Debtor in Possession Financing").

3) Craig shall provide the Debtor in Possession Financing (the "DIP Loan") during the chapter 11 cases with an interest rate of 8% per annum and a maturity date of the earlier of the effective date of the Plan (as defined below) (the "Effective Date") or one year after the filing of the chapter 11 petition(s). All of Craig's fees and costs, including attorneys' fees related to this transaction, and including this Agreement and the DIP Loan, and the chapter 11 cases, will be paid by the RDI and RFS from the proceeds of the DIP Loan.

4) The collateral for the DIP Loan will consist of a duly-perfected second priority security interest, second in priority only to the existing security interests of RDI's secured note holders, in the assets of RDI and/or RFS that serve as collateral for RDI's secured noteholders, including without limitation, the cash, intellectual property, trademarks and copyrights of RDI and RFS, as well as the ownership interests in any partnership or limited liability companies in which RDI or RFS have a direct or indirect interest (including, without limitation SoCal, Ruby's Beach Ventures LLC, Ruby's Spectrum LLC, Ruby's Diner South Coast Plaza LP

and Ruby's Woodbridge LLC).  In addition, the DIP Loan shall be secured by a duly-perfected security interest, subject only to any valid, pre-existing, duly perfected security interest of any third party, in SoCal's and Quality's ownership interests in any partnership or limited liability companies (including, without limitation, Ruby's Huntington Beach, Ltd., Ruby's Oceanside, Ltd., Ruby's Palm Springs, Ltd., and Ruby's Laguna Hills, Ltd.), and the assets thereof.

5) RDI and RFS will propose chapter 11 plan(s) (collectively or alternatively, the "Plan") that will include (a) the injection of the New Funds (as defined below) by Craig, and (b) new value by the Founders in the form of allowing the merger of RFS into RDI as provided herein (collectively, the "New Value") in order to satisfy the requirements of the Bankruptcy Code.

6) Craig agrees that he will provide new funds, through the conversion of the balance due on the DIP Loan and one million dollars ($1,000,000) in cash (the "New Funds").

7) A further condition to Craig's obligation to fund the New Funds shall be that, on the Effective Date of the Plan, RDI, RFS and the Founders shall have, prior to or concurrently with the funding of the New Funds, consummated a transaction, through a merger of RDI and RFS, and through such other means as reasonably necessary or appropriate, pursuant to which:

a. The existing license agreement between RDI and RFS, pursuant to which RFS has a license to use certain trademarks and copyrights owned by the RDI (the "License Agreement"), as well as the Ruby's Retail Brand License Agreement, shall have been terminated as a matter of law or otherwise.

b. RFS shall have transferred, as a result of the merger or otherwise, to RDI all of its assets, including without limitation thereto, all of the rights of RFS under all franchise agreements between RFS and its franchisees (the "Franchise Agreements").  The Plan shall provide for the assignment of the Franchise Agreements to RDI requiring the franchisees to be bound by the Franchise Agreements and to recognize RDI as the franchisor, thereunder.

    c. For a period of two (2) years following the Effective Date, the Founders will be entitled to the license fee as set forth in Section 3 of the License Agreement that RDI was entitled to prior to the termination of the License Agreement (the "License Fee") as provided in subsection (a) hereof, including any License Fee associated with any new franchise unit of RDI; thereafter, no further License Fee of any kind shall be paid to the Founders and RDI shall be entitled to 100% of the franchise fees under the Franchise Agreements.

    d. RDI shall have assumed all of the obligations of RFS to third parties, including, but not limited to, the repayment of the obligation owed by RFS to Craig in the principal amount of $1,000,000 (the "RFS Note").

    e. On the Effective Date of the Plan, in addition to providing the New Funds, Craig will convert the RFS Note, which will be an obligation of RDI, to equity in RDI.

    f. In return for the consideration given by the Founders pursuant to subparagraphs (a) and (b) above (*i.e.,* the New Value), RDI will have (i) granted to the Founders the License Fee for a two (2) year period as provided in subjection (c) hereof, and (ii) the Founders will be entitled to retain 40% of the equity in RDI (to be split 60% to Cavanaugh and 40% to Kosmides).

    g. RDI shall assume (or formally create) the obligation to reimburse all franchisees with respect to gift card utilization, in the same manner that existed prior to the merger.

    h. The program whereby noteholders are entitled to receive free or discounted food at Ruby's restaurants referred to by Ruby's as the "Quality Assurance" program (the "Quality Assurance Program") shall have been discontinued.

    i. Cavanaugh and Kosmides shall have entered into an indemnification agreement in favor of Craig with respect to: 1) all RFS obligations; and 2) any claim asserted by a franchisee regarding the Quality Assurance Program.

8) A further condition of Craig's obligation to fund the New Funds and to make the DIP Loan is that the assets and debt structure of RDI must be such that upon the Effective Date of the Plan, RDI will have a positive "Net Worth" of not less than

$6.7 million . The term "Net Worth" shall mean (i) the total assets of RDI, after taking into account the New Funds and the New Value; less (ii) the total liabilities of RDI, after taking into account any discounts given by Creditors in return for discounted payment, any claims of Creditors that are completely discharged by the Plan and treatment of claims pursuant to the confirmed Plan. In addition, Craig shall have approved a budget for the Chapter 11 case(s) as well as the projected Effective Date balance sheet for RDI.

9) Pursuant to the Plan Craig will receive 60% of the equity of RDI as of the Effective Date (with the Founders retaining 40% of the equity as set forth above). Each of Craig and the Founders shall also be referred to herein as "Shareholders."

10) On the Effective Date, Craig will be the Chairman of the Board of RDI. The initial President and Chief Executive Officer of RDI following the Effective Date will be Cavanaugh, with compensation being paid at the rate of $250,000 per year plus the continuation of the medical coverage which existed from RDI on the date the chapter 11 petition was filed (the "Pre-Petition Insurance Coverage"), so long as he is maintaining and exercising day to day operational control. Mr. Cavanaugh's responsibilities will include the delegation of management and control of RDI's operations (including food and beverage development, menu design, restaurant design, branding, marketing, standards of service, and employee and guest relations). The Secretary of RDI following the Effective Date will be Lori Smith, with compensation of $1000_____ per year plus Pre-Petition Insurance Coverage, and Kosmides will be in charge of special projects with annual compensation in an amount to be agreed to by Craig and Kosmides plus Pre-Petition Insurance Coverage. Nothing in the foregoing shall be construed as requiring perpetual employment or officer designation of any of the foregoing.

11) Craig agrees to use his reasonably diligent efforts to arrange for a transaction to allow the refinancing of the RFS debt (which will be owed by RDI to Opus Bank following the Effective Date) and the debt owed by RDI and SoCal (and certain affiliates) to the law firm of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury").

Lending secured (if any) by Craig shall not require and Craig shall have no obligation whatsoever to guaranty said lending, or otherwise fund said lending. Any discount received from Opus Bank, Pillsbury or any other creditor will be included in calculating whether RDI will have satisfied the Net Worth requirement set forth above as of the Effective Date of the Plan.

12) The initial board of directors of RDI following the Effective Date shall have the following three members: Craig, Cavanaugh and Kosmides. Votes of the board members shall be weighted based on their ownership of equity in RDI. As of the Effective Date, the Founders and Craig shall enter into a shareholders' agreement with respect to RDI which shall include terms and conditions that are typical in privately held entities, including the delegation of management and control of RDI's operations (including menu, design and branding decisions) to Cavanaugh. All major decisions, and those customarily identified as such in operating and shareholder agreements typical to privately held entities, including without limitation, business decisions with respect to expansion of the business or any business decisions that might require the contribution or expenditure of new capital of RDI, will be made by majority vote of the equity holders based on their respective ownership interests.

13) With respect to capital calls, if a Shareholder fails to contribute the capital called with the necessary vote of the Shareholders in accordance with its respective ownership interest percentage as aforesaid within thirty (30) days after the capital call is made, the other Shareholders shall have the right, but not the obligation, to make a loan to RDI in the amount of the capital contribution that is not made, equal to their respective pro rata share (based on their respective percentage equity interest) of the defaulting Shareholder's share of the capital, or the entire amount of the capital call deficiency, if not made by the other non-defaulting Shareholder. Any such loan shall be treated as if RDI made a loan to the defaulting Shareholder and the non-defaulting Shareholder made a loan to RDI. Any such loan by RDI to a defaulting Shareholder ("RDI Default Loan") and any such loan from a nondefaulting Shareholder to RDI ("Shareholder Loan") shall

bear interest at a rate equal to the federal prime rate plus three percent (3%) per annum and shall be secured by a pledge of the defaulting Shareholder's equity interest in RDI. The defaulting Shareholder shall execute and deliver such documents as are reasonably necessary to create and perfect such security interest and the shareholder agreement for RDI shall provide for a power of attorney in favor of the non-defaulting Shareholders to effectuate such documents if the defaulting Shareholder fails to promptly execute and deliver same. Any such RDI Default Loan and any such Shareholder Loan shall provide for payment of accrued interest monthly and for all principal and accrued and unpaid interest to be due and payable on or before the date that is (i) six (6) months following the date the RDI Default Loan and the Shareholder Loan are advanced if the RDI Default Loan and the Shareholder Loan are less than one million dollars ($1,000,000), or (ii) one year following the date the RDI Default Loan and the Shareholder Loan are advanced if the RDI Default Loan and the Shareholder Loan is one million dollars ($1,000,000) or more. Failure to repay the RDI Default Loan and the Shareholder Loan on or before the applicable maturity date pursuant to the foregoing shall constitute a default under each of the RDI Default Loan and the Shareholder Loan.

At such time as any RDI Default Loan or Shareholder Loan is defaulted and not paid, and assuming one of the other Shareholders advances such amount in lieu of the defaulting Shareholder, the Percentage Interests of the Shareholders shall be recalculated, and the Percentage Interest of each Shareholder shall be adjusted such that each Shareholder shall have an interest determined by fraction, the numerator of which shall be equal to the aggregate capital contributed by that Shareholder, and the denominator of which shall be the aggregate capital contributed by all Shareholders, provided, however, that for purposes of the foregoing calculation only, each Shareholder shall be treated as having contributed its proportionate share (in accordance with its percentage interest in RDI) of the aggregate capital contributed by Craig as of the Effective Date of the Plan.

The consequence of a Shareholder default shall be the dilution of the Shareholder's equity in RDI, but a default will not result under any circumstances in personal liability of the defaulting Shareholder.

For purposes of an example only, assume that Craig contributed a total of $4,000,000 as of the Effective Date of the Plan, and that there are three Shareholders, Craig at 60%, Shareholder A at 24% and Shareholder B at 16%. Then assume that additional capital in the amount of $500,000 is required by RDI, and that Craig contributes 60% of such amount ($300,000), Shareholder A contributes 24% of such amount ($120,000) but Shareholder B does not contribute any of such amount and that Craig advances to RDI the share otherwise allocable to Shareholder B ($80,000). In such event, the denominator in the dilution formula shall be $4,500,000 (the original Plan capital plus the current capital call) and the percentage interests of the Shareholders shall be adjusted as follows:

> For Craig: $2,400,000 (allocable share of original Plan capital) + $300,000 (Craig share of current capital call) + $80,000 (Shareholder B capital call advanced by Craig) = $2,780,000. $2,780,000/$4,500,000 = 61.78%.

> For Shareholder A: $960,000 imputed original Plan capital + $120,000 (additional capital for current call) = $1,080,000. $1,080,000/$4,500,000 = 24%

> For Shareholder B: $640,000 imputed original Plan capital + 0 (additional capital for current call) = $640,000. $640,000/$4,500,000 = 14.22%.

14) A further condition to Craig's obligation to provide the New Funds, and the Founders' obligation to provide the New Value, is that upon the Effective Date, RDI shall have converted to a limited liability corporation pursuant to an "F" type reorganization. The Founders agree to indemnify Craig from any financial responsibility of Craig in any way related to the structuring of any of the transactions described in this Agreement to the extent the liability of Craig is in any way based on the structure of the transaction to minimize or eliminate the personal income tax liability of the Founders, or either of them.  Except as

Plan Support Agreement
August 30, 2018
Page 8

provided in the foregoing, each party hereto shall be solely responsible for the tax consequences of the transactions contemplated hereby with respect to such party.

If the foregoing is consistent with your understanding, please execute and return a copy of this letter reflecting your agreement and acknowledgement of the foregoing.

Agreed and acknowledged:

_____
Steven L. Craig

Ruby's Diners, Inc., a
California corporation

By: _____
Name: DOUGLAS S. CAVANAUGH
Title: CEO

_____
Douglas S. Cavanaugh

Ruby's Franchise Systems, Inc.,
a California Corporation

_____
Ralph Kosmides

By: _____
Name: DOUGLAS S. CAVANAUGH
Title: CEO

5446-000\1265268.1

EXHIBIT "B"

| Plaintiff | Debtor Defendant(s) | Nature of Case | Court | Case # | Status of Case |
|---|---|---|---|---|---|
| Opus Bank | Ruby's Huntington Beach, Ltd., Ruby's SoCal Diners, Ltd., Ruby's Quality Diners, LLC; Ruby's Oceanside, Ltd., Ruby's Palm Springs, Ltd., Ruby's Laguna Hills, Ltd. | Breach of Contract/Warranty | Orange County Superior Court, Central Justice Center | 30-2018-00983314-CU-BC-CJC | Pending |
| Darryl Bentley | Ruby's Diner, Inc. | Personal Injury | Orange County Superior Court, Central Justice Center | 30-2018-01013352-CU-PO-CJC | Pending |
| Pillsbury Wintrhop Shaw Pittman LLP | Ruby's Diner, Inc., Ruby's SoCal Diners, LLC, Ruby's Palm Springs, Ltd., Ruby's Oceanside, Ltd., Ruby's huntington Beach, Ltd. | Enforcement | Orange County Superior Court, Central Justice Center | 30-2018-00986898-CU-EN0CJC | Abstract of Judgment Issued on 5/04/2018 |

<u>EXHIBIT "C"</u>

**Ruby's Diner Inc.**
**Weekly Cash Flow Budget**

| | RK Total | RDI | RFS | 7/22/18 | 7/29/18 | 8/5/18 | 8/12/18 | 8/19/18 | 8/26/18 | 9/2/18 | 9/9/18 | 9/16/18 | 9/23/18 | 9/30/18 | 10/7/18 | 10/14/18 | 10/21/18 | 10/28/18 | 11/4/18 | 11/11/18 | 11/18/18 | 11/25/18 | 12/2/18 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RECEIPTS** | | | | | | | | | | | | | | | | | | | | | | | | |
| G&A Fees [1,2] | 554,051 | 554,051 | | 32,552 | 33,050 | 32,036 | 30,876 | 27,898 | 24,484 | 24,504 | 22,958 | 20,736 | 20,902 | 18,082 | 21,918 | 24,184 | 23,059 | 21,132 | 18,563 | 21,038 | 18,560 | 23,150 | 16,777 | 271,058 |
| HOP Distribution to RDI | 125,226 | 125,226 | | 11,256 | 10,026 | 9,729 | 9,446 | 7,619 | 5,976 | 6,147 | 5,712 | 4,688 | 4,747 | 3,662 | 4,938 | 5,898 | 4,654 | 3,674 | 3,218 | 3,799 | 2,985 | 5,654 | 2,083 | 55,713 |
| License Fee from RFS | - | | 537,623 | | | | | 45,776 | | | | 44,043 | 388,610 | | | 33,596 | | | | 36,571 | | | | 502,820 |
| Workers Comp 2017 Audit Reimbursement | - | | | | | | | | | | | | 59,000 | | | | | | | | | | | |
| LP/LLC Distributions to RDI | 200,672 | 200,672 | | | | | | | | | | | | | | | | | | | | | | |
| **Total Receipts** | 200,672 | 200,672 | | 43,808 | 43,077 | 41,765 | 40,322 | 81,292 | 30,460 | 30,652 | 28,670 | 69,466 | 473,259 | 21,744 | 26,856 | 63,678 | 27,713 | 24,806 | 21,782 | 61,408 | 21,545 | 28,804 | 18,861 | 888,591 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | | | | | | | | | | |
| *Operating Expenses* | | | | | | | | | | | | | | | | | | | | | | | | |
| Salaries & Employee Related [3,4] | 473,288 | 202,238 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 39,441 | | 236,644 |
| Facility 1 rent | 38,769 | 32,308 | 6,461 | | | 5,385 | | | | 5,385 | | | | 5,385 | | | | | | | | | | 16,154 |
| Other Operating Expenses [4] | 226,375 | 90,359 | 195,918 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 63,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 3,765 | 108,944 |
| Founders Medical | 60,000 | 60,000 | | | | 10,000 | | | | 10,000 | | | | 10,000 | | | | | | | | | | 30,000 |
| **Total Operating Expenses** | 325,144 | 655,955 | | 43,206 | 3,765 | 58,590 | 3,765 | 43,206 | 3,765 | 58,590 | 3,765 | 43,206 | 3,765 | 63,206 | 19,150 | 43,206 | 3,765 | 43,206 | 19,150 | 43,206 | 3,765 | 43,206 | 19,150 | 391,743 |
| *Non-Operating Expenses* | | | | | | | | | | | | | | | | | | | | | | | | |
| Interest and Debt Service | 136,593 | 42,909 | | | | | | | | | | | | 34,148 | | | | 34,148 | | | | | 34,148 | 102,445 |
| Capital Improvements | 435,000 | | | | | | | | | | | | 170,000 | | | | | | | | | | | 170,000 |
| FUTA Tax [5] | 43,641 | | | | | | | | | | 6,651 | | | | | 6,651 | | | | 6,651 | | | | 19,953 |
| Costco Redemption Payments [6] | 600,000 | | | | | | | | | | | | 150,000 | | | | 120,000 | | | | | 120,000 | | 390,000 |
| Contingency | 100,000 | | | | | | | | | | | | | | | | | | | | | | | - |
| Unsecured Noteholder Payment | 1,385,337 | | | | | | | | | | | | | | | | | | | | | | | - |
| **Total Non-Operating Expenses** | 2,435,571 | | | - | - | - | - | - | - | - | 6,651 | - | 320,000 | 34,148 | - | 6,651 | 120,000 | 34,148 | - | 6,651 | - | 120,000 | 34,148 | 682,398 |
| **Total Disbursements** | | | | 43,206 | 3,765 | 58,590 | 3,765 | 43,206 | 3,765 | 58,590 | 10,416 | 43,206 | 323,765 | 137,354 | 19,150 | 49,857 | 123,765 | 77,354 | 19,150 | 49,857 | 3,765 | 163,206 | 53,298 | 1,074,140 |
| **CASH FLOW FROM OPERATIONS** | | | | 602 | 39,312 | (16,825) | 36,557 | 38,087 | 26,695 | (27,939) | 18,254 | 26,261 | 149,494 | (115,610) | 7,706 | 13,821 | (96,052) | (52,548) | 2,632 | 11,551 | 17,780 | (134,402) | (34,437) | (185,549) |
| *Restructuring Expenses [7]* | | | | | | | | | | | | | | | | | | | | | | | | |
| Financial Advisor | 100,000 | | | | | | | | | | | | | 25,000 | | | | 25,000 | | | | 25,000 | | 75,000 |
| Committee Professionals | 100,000 | | | | | | | | | | | | | 25,000 | | | | 25,000 | | | | 25,000 | | 75,000 |
| DIP Lender Legal | 100,000 | | | | | | | | | | | | | 25,000 | | | | 25,000 | | | | 25,000 | | 75,000 |
| Completion Incentive | 80,000 | | | | | | | | | | | | | 80,000 | | | | | | | | | | 80,000 |
| PSZJ | 450,000 | | | | | | | | | | | | | 112,500 | | | | 112,500 | | | | 112,500 | | 337,500 |
| US Trustee | 16,250 | | | | | | | | | | | | | | | | | 6,500 | | | | | | 6,500 |
| **Total Restructuring Expenses** | 846,250 | | | - | - | - | - | - | - | - | - | - | - | 267,500 | - | - | - | 194,000 | - | - | - | 187,500 | - | 649,000 |
| **NET CASH FLOW AFTER RESTRUCTURING EXPENSES** | (846,250) | | | 602 | 39,312 | (16,825) | 36,557 | 38,087 | 26,695 | (27,939) | 18,254 | 26,261 | 149,494 | (383,110) | 7,706 | 13,821 | (96,052) | (246,548) | 2,632 | 11,551 | 17,780 | (321,902) | (34,437) | (834,549) |
| Beginning Cash | | | | - | 602 | 39,914 | 23,089 | 59,645 | 97,732 | 124,427 | 96,489 | 118,254 | 144,515 | 294,009 | 500,899 | 508,605 | 502,426 | 496,375 | 499,827 | 502,459 | 504,010 | 501,790 | 499,888 | 100,000 |
| Plus / Less: Net Cash Flow | | | | 602 | 39,312 | (16,825) | 36,557 | 38,087 | 26,695 | (27,939) | 18,254 | 26,261 | 149,494 | (383,110) | 7,706 | 13,821 | (96,052) | (246,548) | 2,632 | 11,551 | 17,780 | (321,902) | (34,437) | (834,549) |
| Plus / Less: SLC Capital Contribution | | | | | | | | | | | | | | 590,000 | | | | | | | | | | 590,000 |
| Plus / Less: DIP Loan Facility Borrowing / (Paydown) | | | | | | | | | | | | | | | | (20,000) | 90,000 | 250,000 | | (10,000) | (20,000) | 320,000 | 40,000 | 1,240,000 |
| **ENDING CASH** | | | | 602 | 39,914 | 23,089 | 59,645 | 97,732 | 124,427 | 96,489 | 118,254 | 144,515 | 294,009 | 500,899 | 508,605 | 502,426 | 496,375 | 499,827 | 502,459 | 504,010 | 501,790 | 499,888 | 505,451 | 505,451 |
| DIP Loan Facility Availability | | | | | | | | | | | | | 1,600,000 | 1,010,000 | 1,010,000 | 1,030,000 | 940,000 | 690,000 | 690,000 | 700,000 | 720,000 | 400,000 | | 1,600,000 |
| DIP (Draw) / Paydown | | | | | | | | | | | | | | (590,000) | | 20,000 | (90,000) | (250,000) | | 10,000 | 20,000 | (320,000) | (40,000) | (1,240,000) |
| **ENDING LIQUIDITY** | | | | | | | | 97,732 | 124,427 | 96,489 | 118,254 | 144,515 | 294,009 | 1,510,899 | 1,518,605 | 1,532,426 | 1,436,375 | 1,189,827 | 1,192,459 | 1,204,010 | 1,221,790 | 899,888 | 865,451 | 865,451 |
| **ENDING DIP LOAN BALANCE** | | | | | | | | | | | | | | 590,000 | 590,000 | 570,000 | 660,000 | 910,000 | 910,000 | 900,000 | 880,000 | 1,200,000 | 1,240,000 | 1,240,000 |

Footnotes

[1] Restaurant revenues and, therefore, related expenses are impacted by seasonality and weather.

[2] RDI corporate office and Ruby's Irvine Woodbridge restaurant share bank accounts. The cash inflows and outflows from the Woodbridge restaurant operation are excluded from this projection.

[3] RDI advances payroll funds to a Payroll Processor for all managed restaurant locations, and is fully reimbursed. See Exhibit A.

[4] RDI advances funds for various insurance costs, including Group Health, General Liability, and Workers' Compensation, and is reimbursed by affiliates and employees for the non-covered portion. See Exhibit B.

Ruby's Huntington Beach LTD
Weekly Cash Flow Budget

| | Fiscal Period | Period 9 | | Period 10 | | | | Period 11 | | | | Period 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Post-Petition Accounting Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| | Week Ending Date | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 11/11/2018 | 11/18/2018 | 11/25/2018 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | | |
| [1] Restaurant Revenues | | 95,540 | 85,540 | 63,493 | 63,492 | 61,492 | 61,492 | 63,707 | 61,707 | 74,708 | 66,707 | 59,025 | 58,025 | 61,025 | 875,953 |
| Gift Card Reimbursement | | | | | | 7,500 | | | | 7,500 | | | | | 15,000 |
| | Total Receipts | 95,540 | 85,540 | 63,493 | 63,492 | 68,992 | 61,492 | 63,707 | 61,707 | 82,208 | 66,707 | 59,025 | 58,025 | 61,025 | 890,953 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | | | | |
| Cost of Goods Sold | | 25,031 | 22,411 | 16,635 | 16,635 | 18,076 | 16,111 | 16,691 | 16,167 | 21,538 | 17,477 | 15,465 | 15,203 | 15,989 | 233,430 |
| [2] Salaries & Employee Related | | 74,428 | | 58,976 | | 52,427 | | 49,545 | | 56,951 | | 49,755 | | 47,111 | 389,194 |
| Occupancy Cost | | 23,130 | | | | | 23,130 | | | | 23,130 | | | | 69,391 |
| Utility Deposits | | 6,670 | | | | | | | | | | | | | 6,670 |
| [3] Other Operating Expenses | | 15,485 | 13,864 | 10,291 | 10,291 | 11,182 | 9,966 | 10,325 | 10,001 | 13,324 | 10,812 | 9,567 | 9,405 | 9,891 | 144,403 |
| [6] G&A Fees | | 7,644 | 6,844 | 5,080 | 5,080 | 5,520 | 4,920 | 5,097 | 4,937 | 6,578 | 5,337 | 4,723 | 4,643 | 4,883 | 71,286 |
| | Total Operating Expenses | 152,389 | 43,120 | 90,982 | 32,006 | 87,205 | 54,128 | 81,658 | 31,106 | 98,391 | 56,757 | 79,509 | 29,250 | 77,873 | 914,374 |
| Non-Operating Expenses | | | | | | | | | | | | | | | |
| Capital Improvements | | | 170,000 | | | | | | | | | | | | 170,000 |
| FUTA Tax | | | 1,958 | | | | | 1,958 | | | | 1,958 | | | 5,874 |
| | Total Non-Operating Expenses | - | 171,958 | - | - | - | - | 1,958 | - | - | - | 1,958 | - | - | 175,874 |
| | Total Disbursements | 152,389 | 215,078 | 90,982 | 32,006 | 87,205 | 54,128 | 83,616 | 31,106 | 98,391 | 56,757 | 81,467 | 29,250 | 77,873 | 1,090,248 |
| **CASH FLOW FROM OPERATIONS** | | (56,849) | (129,538) | (27,489) | 31,486 | (18,213) | 7,364 | (19,909) | 30,601 | (16,183) | 9,950 | (22,442) | 28,775 | (16,848) | (199,295) |
| [5] Restructuring Expenses | | | | | | | | | | | | | | | |
| Committee Professionals | | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| PSZJ | | | | | | 25,000 | | | | 25,000 | | | | | 50,000 |
| US Trustee | | | | | | 4,875 | | | | | | | | | 4,875 |
| | Total Restructuring Expenses | | | | | 34,875 | | | | 30,000 | | | | | 64,875 |
| **NET CASH FLOW AFTER RESTRUCTURING EXPENSES** | | (56,849) | (129,538) | (27,489) | 31,486 | (53,088) | 7,364 | (19,909) | 30,601 | (46,183) | 9,950 | (22,442) | 28,775 | (16,848) | (264,170) |
| Beginning Cash | | 210,000 | 153,151 | 193,613 | 166,124 | 197,610 | 144,522 | 151,886 | 131,977 | 162,578 | 116,395 | 126,345 | 103,903 | 132,678 | 210,000 |
| Plus / Less: Net Cash Flow | | (56,849) | (129,538) | (27,489) | 31,486 | (53,088) | 7,364 | (19,909) | 30,601 | (46,183) | 9,950 | (22,442) | 28,775 | (16,848) | (264,170) |
| Plus / Less: DIP Loan Facility Borrowing / (Paydown) | | - | 170,000 | | | | | | | | | | | | 170,000 |
| **ENDING CASH** | | 153,151 | 193,613 | 166,124 | 197,610 | 144,522 | 151,886 | 131,977 | 162,578 | 116,395 | 126,345 | 103,903 | 132,678 | 115,830 | 115,830 |
| DIP Loan Facility Availability | | | 170,000 | - | - | - | - | - | - | - | - | - | - | - | 170,000 |
| DIP (Draw) / Paydown | | | (170,000) | - | - | - | - | - | - | - | - | - | - | - | (170,000) |
| **ENDING LIQUIDITY** | | 153,151 | 193,613 | 166,124 | 197,610 | 144,522 | 151,886 | 131,977 | 162,578 | 116,395 | 126,345 | 103,903 | 132,678 | 115,830 | 115,830 |
| **ENDING DIP LOAN BALANCE** | | | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 | 170,000 |

**Footnotes**

[1] Restaurant revenues and, therefore, related expenses are impacted by seasonality and weather.

[2] RDI advances payroll funds to a Payroll Processor for all managed restaurant locations, and is fully reimbursed.  See Exhibit A.

[3] RDI advances funds for various insurance costs, including Group Health, General Liability, and Workers' Compensation, and is reimbursed by affiliates and employees for the non-covered portion.  See Exhibit B.

[4] Percentage rent for 2018 is due January 30, 2019

[5] Restructuring Expenses represent Management's best estimate of costs related to bankruptcy filing - totals may not be all-inclusive.

[6] By Agreement, General and Adminstrative Fees are paid to RDI on a weekly basis.

Ruby's Laguna Hills LTD
Weekly Cash Flow Budget

| | Period 9 | | | Period 10 | | | Period 11 | | | | Period 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Post-Petition Accounting Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Week Ending Date | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 11/11/2018 | 11/18/2018 | 11/25/2018 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | |
| [1] Restaurant Revenues | 35,643 | 35,643 | 30,082 | 31,082 | 34,082 | 33,079 | 37,776 | 39,776 | 36,776 | 36,776 | 30,731 | 32,731 | 34,413 | 448,590 |
| Gift Card Reimbursement | | | | | 8,750 | | | | 8,750 | | | | | 17,500 |
| Total Receipts | 35,643 | 35,643 | 30,082 | 31,082 | 42,832 | 33,079 | 37,776 | 39,776 | 45,526 | 36,776 | 30,731 | 32,731 | 34,413 | 466,090 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | | | |
| Cost of Goods Sold | 9,878 | 9,878 | 8,337 | 8,614 | 11,870 | 9,167 | 10,469 | 11,023 | 12,617 | 10,192 | 8,516 | 9,071 | 9,537 | 129,166 |
| [2] Salaries & Employee Related | 30,129 | | 27,779 | | 31,240 | | 29,947 | | 36,053 | | 28,532 | | 28,379 | 212,059 |
| Occupancy Cost | 18,339 | | | | | 18,339 | | | | 18,339 | | | | 55,017 |
| Utility Deposits | 2,500 | | | | | | | | | | | | | 2,500 |
| [3] Other Operating Expenses | 5,317 | 5,317 | 4,487 | 4,636 | 6,389 | 4,934 | 5,635 | 5,933 | 6,791 | 5,486 | 4,584 | 4,882 | 5,133 | 69,526 |
| [5] G&A Fees | 3,079 | 3,079 | 2,598 | 2,685 | 3,700 | 2,857 | 3,263 | 3,436 | 3,932 | 3,177 | 2,654 | 2,827 | 2,973 | 40,260 |
| Total Operating Expenses | 69,241 | 18,273 | 43,201 | 15,935 | 53,199 | 35,298 | 49,314 | 20,392 | 59,393 | 37,193 | 44,287 | 16,780 | 46,021 | 508,528 |
| Non-Operating Expenses | | | | | | | | | | | | | | |
| FUTA Tax | | 886 | | | | | 886 | | | | 886 | | | 2,658 |
| Total Non-Operating Expenses | - | 886 | - | - | - | - | 886 | - | - | - | 886 | - | - | 2,658 |
| Total Disbursements | 69,241 | 19,159 | 43,201 | 15,935 | 53,199 | 35,298 | 50,200 | 20,392 | 59,393 | 37,193 | 45,173 | 16,780 | 46,021 | 511,186 |
| **CASH FLOW FROM OPERATIONS** | (33,598) | 16,484 | (13,119) | 15,147 | (10,367) | (2,219) | (12,424) | 19,384 | (13,867) | (417) | (14,442) | 15,951 | (11,608) | (45,096) |
| [4] Restructuring Expenses | | | | | | | | | | | | | | |
| Committee Professionals | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| PSZJ | | | | | 25,000 | | | | 25,000 | | | | | 50,000 |
| US Trustee | | | | | 1,950 | | | | | | | | | 1,950 |
| Total Restructuring Expenses | - | - | - | - | 31,950 | - | - | - | 30,000 | - | - | - | - | 61,950 |
| **NET CASH FLOW AFTER RESTRUCTURING EXPENSES** | (33,598) | 16,484 | (13,119) | 15,147 | (42,317) | (2,219) | (12,424) | 19,384 | (43,867) | (417) | (14,442) | 15,951 | (11,608) | (107,046) |
| Beginning Cash | 15,000 | (18,598) | (2,115) | (15,234) | (87) | (42,404) | (44,622) | (57,046) | (37,662) | (81,529) | (81,946) | (96,388) | (80,438) | 15,000 |
| Plus / Less: Net Cash Flow | (33,598) | 16,484 | (13,119) | 15,147 | (42,317) | (2,219) | (12,424) | 19,384 | (43,867) | (417) | (14,442) | 15,951 | (11,608) | (107,046) |
| Plus / Less: DIP Loan Facility Borrowing / (Paydown) | - | | | | | | | | | - | | | | - |
| **ENDING CASH** | (18,598) | (2,115) | (15,234) | (87) | (42,404) | (44,622) | (57,046) | (37,662) | (81,529) | (81,946) | (96,388) | (80,438) | (92,046) | (92,046) |
| DIP Loan Facility Availability | | | - | | - | | - | | - | | - | | - | - |
| DIP (Draw) / Paydown | | | - | | - | | - | | - | | - | | - | - |
| **ENDING LIQUIDITY** | (18,598) | (2,115) | (15,234) | (87) | (42,404) | (44,622) | (57,046) | (37,662) | (81,529) | (81,946) | (96,388) | (80,438) | (92,046) | (92,046) |
| **ENDING DIP LOAN BALANCE** | | | - | | - | | - | | - | | - | | - | - |

**Footnotes**

[1] Restaurant revenues and, therefore, related expenses are impacted by seasonality and weather.

[2] RDI advances payroll funds to a Payroll Processor for all managed restaurant locations, and is fully reimbursed.  See Exhibit A.

[3] RDI advances funds for various insurance costs, including Group Health, General Liability, and Workers' Compensation, and is reimbursed by affiliates and employees for the non-covered portion.  See Exhibit B.

[4] Restructuring Expenses represent Management's best estimate of costs related to bankruptcy filing - totals may not be all-inclusive.

[5] By Agreement, General and Adminstrative Fees are paid to RDI on a weekly basis.

Ruby's Oceanside LTD
Weekly Cash Flow Budget

| | Period 9 | | Period 10 | | | | Period 11 | | | | Period 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Post-Petition Accounting Week | | | | | | | | | | | | | | Total |
| Week Ending Date | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 11/11/2018 | 11/18/2018 | 11/25/2018 | |
| **RECEIPTS** | | | | | | | | | | | | | | |
| [1] Restaurant Revenues | 99,712 | 99,712 | 62,340 | 56,340 | 68,340 | 62,341 | 62,644 | 57,644 | 54,644 | 75,644 | 52,973 | 53,973 | 54,976 | 861,283 |
| Gift Card Reimbursement | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| Total Receipts | 99,712 | 99,712 | 62,340 | 56,340 | 73,340 | 62,341 | 62,644 | 57,644 | 59,644 | 75,644 | 52,973 | 53,973 | 54,976 | 871,283 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | | | |
| Cost of Goods Sold | 26,125 | 26,125 | 16,333 | 14,761 | 19,215 | 16,333 | 16,413 | 15,103 | 15,627 | 19,819 | 13,879 | 14,141 | 14,404 | 228,276 |
| [2] Salaries & Employee Related | 78,053 | | 63,426 | | 50,756 | | 48,918 | | 45,906 | | 50,340 | | 42,642 | 380,041 |
| Occupancy Cost | 16,553 | | | | | 16,553 | | | | 16,553 | | | | 49,660 |
| Utility Deposits | 11,000 | | | | | | | | | | | | | 11,000 |
| [3] Other Operating Expenses | 16,776 | 16,776 | 10,488 | 9,479 | 12,339 | 10,488 | 10,539 | 9,698 | 10,035 | 12,727 | 8,912 | 9,081 | 9,249 | 146,588 |
| [5] G&A Fees | 7,959 | 7,959 | 4,976 | 4,497 | 5,854 | 4,976 | 5,000 | 4,601 | 4,761 | 6,038 | 4,228 | 4,308 | 4,388 | 69,544 |
| Total Operating Expenses | 156,466 | 50,859 | 95,223 | 28,737 | 88,164 | 48,351 | 80,871 | 29,402 | 76,328 | 55,137 | 77,359 | 27,530 | 70,683 | 885,109 |
| Non-Operating Expenses | | | | | | | | | | | | | | |
| FUTA Tax | | 1,659 | | | | | 1,659 | | | | 1,659 | | | 4,977 |
| Total Non-Operating Expenses | - | 1,659 | - | - | - | - | 1,659 | - | - | - | 1,659 | - | - | 4,977 |
| Total Disbursements | 156,466 | 52,518 | 95,223 | 28,737 | 88,164 | 48,351 | 82,530 | 29,402 | 76,328 | 55,137 | 79,018 | 27,530 | 70,683 | 890,086 |
| **CASH FLOW FROM OPERATIONS** | (56,754) | 47,194 | (32,883) | 27,603 | (14,824) | 13,990 | (19,886) | 28,242 | (16,684) | 20,507 | (26,045) | 26,443 | (15,707) | (18,803) |
| [4] Restructuring Expenses | | | | | | | | | | | | | | |
| Committee Professionals | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| PSZJ | | | | | 25,000 | | | | 25,000 | | | | | 50,000 |
| US Trustee | | | | | 4,875 | | | | | | | | | 4,875 |
| Total Restructuring Expenses | - | - | - | - | 34,875 | - | - | - | 30,000 | - | - | - | - | 64,875 |
| **NET CASH FLOW AFTER RESTRUCTURING EXPENSES** | (56,754) | 47,194 | (32,883) | 27,603 | (49,699) | 13,990 | (19,886) | 28,242 | (46,684) | 20,507 | (26,045) | 26,443 | (15,707) | (83,678) |
| Beginning Cash | 72,000 | 15,246 | 62,440 | 29,557 | 57,160 | 7,461 | 21,451 | 1,565 | 29,807 | 8,123 | 28,631 | 2,585 | 29,029 | 72,000 |
| Plus / Less: Net Cash Flow | (56,754) | 47,194 | (32,883) | 27,603 | (49,699) | 13,990 | (19,886) | 28,242 | (46,684) | 20,507 | (26,045) | 26,443 | (15,707) | (83,678) |
| Plus / Less: DIP Loan Facility Borrowing / (Paydown) | - | - | - | - | - | - | - | - | 25,000 | - | - | - | - | 25,000 |
| **ENDING CASH** | 15,246 | 62,440 | 29,557 | 57,160 | 7,461 | 21,451 | 1,565 | 29,807 | 8,123 | 28,631 | 2,585 | 29,029 | 13,322 | 13,322 |
| DIP Loan Facility Availability | | | - | - | - | - | - | - | 25,000 | | | | | 25,000 |
| DIP (Draw) / Paydown | | | | | | | | | (25,000) | | | | | (25,000) |
| **ENDING LIQUIDITY** | 15,246 | 62,440 | 29,557 | 57,160 | 7,461 | 21,451 | 1,565 | 29,807 | 8,123 | 28,631 | 2,585 | 29,029 | 13,322 | 13,322 |
| **ENDING DIP LOAN BALANCE** | | | - | - | - | - | - | - | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |

**Footnotes**

[1] Restaurant revenues and, therefore, related expenses are impacted by seasonality and weather.

[2] RDI advances payroll funds to a Payroll Processor for all managed restaurant locations, and is fully reimbursed. See Exhibit A.

[3] RDI advances funds for various insurance costs, including Group Health, General Liability, and Workers' Compensation, and is reimbursed by affiliates and employees for the non-covered portion. See Exhibit B.

[4] Restructuring Expenses represent Management's best estimate of costs related to bankruptcy filing - totals may not be all-inclusive.

[5] By Agreement, General and Administrative Fees are paid to RDI on a weekly basis.

**Ruby's Palm Springs LTD**
**Weekly Cash Flow Budget**

| | Period 9 | | Period 10 | | | | Period 11 | | | | Period 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Period | | | | | | | | | | | | | | |
| Post-Petition Accounting Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| Week Ending Date | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 11/11/2018 | 11/18/2018 | 11/25/2018 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | |
| [1] Restaurant Revenues | 45,894 | 45,889 | 31,717 | 37,717 | 39,717 | 39,539 | 36,103 | 40,101 | 38,101 | 38,101 | 41,521 | 42,523 | 42,521 | 519,444 |
| Gift Card Reimbursement | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| Total Receipts | 45,894 | 45,889 | 31,717 | 37,717 | 44,717 | 39,539 | 36,103 | 40,101 | 43,101 | 38,101 | 41,521 | 42,523 | 42,521 | 529,444 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | | | |
| Cost of Goods Sold | 12,529 | 12,528 | 8,659 | 10,297 | 12,208 | 10,794 | 9,856 | 10,948 | 11,767 | 10,402 | 11,335 | 11,609 | 11,608 | 144,538 |
| [2] Salaries & Employee Related | 35,521 | | 30,033 | | 31,902 | | 29,273 | | 32,199 | | 30,813 | | 32,912 | 222,653 |
| Occupancy Cost | | | | 20,592 | | | | 20,592 | | | | | 20,592 | 61,776 |
| Utility Deposits | 3,770 | | | | | | | | | | | | | 3,770 |
| [3] Other Operating Expenses | 7,582 | 7,581 | 5,240 | 6,231 | 7,387 | 6,532 | 5,964 | 6,625 | 7,120 | 6,294 | 6,859 | 7,025 | 7,025 | 87,465 |
| [5] G&A Fees | 3,714 | 3,713 | 2,566 | 3,052 | 3,618 | 3,199 | 2,921 | 3,245 | 3,488 | 3,083 | 3,360 | 3,441 | 3,441 | 42,840 |
| Total Operating Expenses | 63,116 | 23,822 | 46,498 | 40,172 | 55,115 | 20,525 | 48,015 | 41,409 | 54,573 | 19,779 | 52,368 | 22,074 | 75,577 | 563,042 |
| Non-Operating Expenses | | | | | | | | | | | | | | |
| FUTA Tax | | 897 | | | | | 897 | | | | 897 | | | 2,691 |
| Total Non-Operating Expenses | - | 897 | - | - | - | - | 897 | - | - | - | 897 | - | - | 2,691 |
| Total Disbursements | 63,116 | 24,719 | 46,498 | 40,172 | 55,115 | 20,525 | 48,912 | 41,409 | 54,573 | 19,779 | 53,265 | 22,074 | 75,577 | 565,733 |
| **CASH FLOW FROM OPERATIONS** | (17,222) | 21,170 | (14,781) | (2,455) | (10,398) | 19,014 | (12,809) | (1,308) | (11,472) | 18,322 | (11,744) | 20,449 | (33,056) | (36,289) |
| [4] Restructuring Expenses | | | | | | | | | | | | | | |
| Committee Professionals | | | | | 5,000 | | | | 5,000 | | | | | 10,000 |
| PSZJ | | | | | 25,000 | | | | 25,000 | | | | | 50,000 |
| US Trustee | | | | | 1,950 | | | | | | | | | 1,950 |
| Total Restructuring Expenses | - | - | - | - | 31,950 | - | - | - | 30,000 | - | - | - | - | 61,950 |
| **NET CASH FLOW AFTER RESTRUCTURING EXPENSES** | (17,222) | 21,170 | (14,781) | (2,455) | (42,348) | 19,014 | (12,809) | (1,308) | (41,472) | 18,322 | (11,744) | 20,449 | (33,056) | (98,239) |
| Beginning Cash | 20,000 | 2,778 | 23,948 | 9,167 | 66,713 | 24,365 | 43,379 | 30,570 | 29,262 | 12,790 | 31,112 | 19,368 | 39,817 | 20,000 |
| Plus / Less: Net Cash Flow | (17,222) | 21,170 | (14,781) | (2,455) | (42,348) | 19,014 | (12,809) | (1,308) | (41,472) | 18,322 | (11,744) | 20,449 | (33,056) | (98,239) |
| Plus / Less: DIP Loan Facility Borrowing / (Paydown) | - | - | - | 60,000 | - | - | - | - | 25,000 | - | - | - | - | 85,000 |
| **ENDING CASH** | 2,778 | 23,948 | 9,167 | 66,713 | 24,365 | 43,379 | 30,570 | 29,262 | 12,790 | 31,112 | 19,368 | 39,817 | 6,761 | 6,761 |
| DIP Loan Facility Availability | | | 85,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | - | - | - | - | - | 85,000 |
| DIP (Draw) / Paydown | | - | | (60,000) | | | | | (25,000) | | | | | (85,000) |
| **ENDING LIQUIDITY** | 2,778 | 23,948 | 9,167 | 91,713 | 49,365 | 68,379 | 55,570 | 54,262 | 12,790 | 31,112 | 19,368 | 39,817 | 6,761 | 6,761 |
| **ENDING DIP LOAN BALANCE** | | - | - | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 |

**Footnotes**

[1]  Restaurant revenues and, therefore, related expenses are impacted by seasonality and weather.

[2]  RDI advances payroll funds to a Payroll Processor for all managed restaurant locations, and is fully reimbursed.  See Exhibit A.

[3]  RDI advances funds for various insurance costs, including Group Health, General Liability, and Workers' Compensation, and is reimbursed by affiliates and employees for the non-covered portion.  See Exhibit B.

[4]  Restructuring Expenses represent Management's best estimate of costs related to bankruptcy filing - totals may not be all-inclusive.

[5]  By Agreement, General and Adminstrative Fees are paid to RDI on a weekly basis.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 Town Center Drive, Suite 1500, Costa Mesa, CA  92626**

A true and correct copy of the foregoing document entitled **CHAPTER 11 STATUS REPORT; DECLARATION OF DOUGLAS S. CAVANAUGH IN SUPPORT THEREOF** will be served or was served (a) on the judge in chamber in the form and manner required by LBR 5005-2(d); and the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **0/17/2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On _____ I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **9/17/2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 9/17/2018 | Nancy Lockwood | /s/ Nancy Lockwood |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

1. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

- **George B Blackmar**    gblackmar@bpslaw.net
- **Aaron Davis**    aaron.davis@bryancave.com, kat.flaherty@bryancave.com
- **Alan J Friedman**    afriedman@shbllp.com, lgauthier@shbllp.com
- **Michael J Hauser**    michael.hauser@usdoj.gov
- **David S Kupetz**    dkupetz@sulmeyerlaw.com,
  dperez@sulmeyerlaw.com;dperez@ecf.inforuptcy.com;dkupetz@ecf.inforuptcy.com
- **William N Lobel**    wlobel@pszjlaw.com, nlockwood@pszjlaw.com;jokeefe@pszjlaw.com;banavim@pszjlaw.com
- **Robert S Marticello**    Rmarticello@swelawfirm.com,
  csheets@swelawfirm.com;gcruz@swelawfirm.com;jchung@swelawfirm.com
- **Jessica G McKinlay**    mckinlay.jessica@dorsey.com
- **Malcolm D Minnick**    dminnick@pillsburylaw.com, m.minnick@comcast.net
- **Valerie Smith**    claims@recoverycorp.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Matthew S Walker**    matthew.walker@pillsburylaw.com, candy.kleiner@pillsburylaw.com

2. <u>**SERVED BY OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL:**</u>

<u>Via Overnight Mail</u>:
The Honorable Erithe A. Smith, United States Bankruptcy Court,
Central District of California, Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5040 (courtesy bin)
Santa Ana, CA 92701-4593

The Honorable Catherine E. Bauer, United States Bankruptcy Court,
Central District of California, Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5165 (courtesy bin)
Santa Ana, CA 92701-4593

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:316873.1 76135/003

**F 9013-3.1.PROOF.SERVICE**