William N. Lobel, State Bar No. 93202
PACHULSKI STANG ZIEHL & JONES LLP
650 Town Center Drive, Suite 1500
Costa Mesa, California 92626
Telephone: (714) 384-4740
Facsimile: (714) 384-4741
E-mail: wlobel@pszjlaw.com

Attorneys for Ruby's Diner, Inc., a California corporation,
*et al.,* Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA

| | |
|---|---|
| RUBY'S DINER, INC., a California corporation, *et al.,*[1] | Chapter 11 |
| Debtors and Debtors in Possession. | Case No. 8:18-bk-13311-CB |
| Affects: | Jointly Administered With Case Nos. 8:18-bk-13197-CB; 8:18-bk-13198-CB; 8:18-bk-13199-CB; 8:18-bk-13200-CB; 8:18-bk-13201-CB; 8:18-bk-13202-CB |
| ☒ All Debtors | |
| ☐ RUBY'S DINER, INC., ONLY | |
| ☐ RUBY'S SOCAL DINERS, LLC, ONLY | **FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION** |
| ☐ RUBY'S QUALITY DINERS, LLC, ONLY | |
| ☐ RUBY'S HUNTINGTON BEACH, LTD., ONLY | **Plan Confirmation Hearing:** |
| ☐ RUBY'S LAGUNA HILLS, LTD. ONLY | DATE: [To Be Scheduled]<br>TIME:<br>CTRM: 5D |
| ☐ RUBY'S OCEANSIDE, LTD., ONLY | |
| ☐ RUBY'S PALM SPRINGS, LTD., ONLY | |

---

[1] The chapter 11 cases of Ruby's Diner, Inc., Ruby's SoCal Diners, LLC, Ruby's Quality Diners, LLC, Ruby's Huntington Beach, Ltd., Ruby's Laguna Hills, Ltd., Ruby's Oceanside, Ltd. and Ruby Palm Springs, Ltd. (referred to herein as the "RDI Debtors") are jointly-administered. The chapter 11 case of Ruby's Franchising System, Inc. ("RFS"), Case No. 8:18-bk-13324-CB, is not jointly-administered with the RDI Debtors' chapter 11 cases, but the Plan is jointly proposed by the RDI Debtors and RFS.

DOCS_LA:321448.6 76135/003

## **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ............................................................................................... 1

II. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND
      GOVERNING LAW........................................................................................ 4

    A.      Defined Terms .................................................................................. 4

    B.      Rules of Interpretation .................................................................... 5

    C.      Computation of Time ....................................................................... 5

    D.      Governing Law ................................................................................ 5

    E.      Reference to Monetary Figures........................................................ 6

III. GENERAL RULES OF CLASSIFICATION............................................................ 6

IV. TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS ........................................ 6

    A.      Administrative Claims ...................................................................... 6

          1.      Administrative Claims of Non-Professionals ............................... 7

          2.      Administrative Claims of Professionals........................................ 8

          3.      Administrative Personal Property Tax Claims ......................... 10

          4.      Administrative Bar Date for Filing of Administrative Claims ................. 10

    B.      Priority Tax Claims........................................................................ 11

V. TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS............................................ 11

    A.      Summary of Classification under the Plan........................................... 11

    B.      Classes of Secured Claims ................................................................ 12

          1.      Class 1:  Allowed Secured Claims of the Secured Noteholders (RDI)...... 13

    C.      Classes of Unsecured Claims................................................................ 21

          1.      Class 11(a):  Allowed Unsecured Claims Against RDI............................ 22

          2.      Class 11(b):  Gift Card Reimbursement Claims of Franchisees
                  Satisfied Though Pre-Petition Netdown Process ....................................... 22

          3.      Class 11(c):  General Unsecured Claims Against the SoCal Debtors ....... 23

4.      Class 11(d):  General Unsecured Claims Against RFS ............................ 24

D.      Interests ................................................................................................. 24

VI. MEANS OF EFFECTUATING THE PLAN ........................................................ 25

A.      Funding for the Plan............................................................................... 25

1.      Cash Needs on the Effective Date ............................................. 25

2.      Sources of Cash on the Effective Date ...................................... 26

B.      Plan Funding from Plan Sponsor ........................................................... 26

C.      Transfer of HOP Assets to New HOP Entities, Contribution of New HOP
Entities to RDI and Provision of the HOP Plan Funding and RDI Plan
Funding ................................................................................................... 27

D.      New Value Contribution ......................................................................... 27

E.      Reconciliation of Claims Between and Among the Debtors and the Founders..... 28

F.      Transfer of Interests in RFS to RDI; Post-Effective Date Ownership of RDI....... 28

G.      Pre-Petition Netdown Process................................................................. 28

H.      U.S. Foods Settlement............................................................................. 29

I.      Treatment of Intercompany Claims ........................................................ 30

J.      Lending and Borrowing of Monies Between Reorganized Debtors ..................... 30

K.      Corporate Structure and Governance ..................................................... 30

1.      Charter........................................................................................ 30

2.      Voting Rights and Shareholder Agreement ............................... 31

3.      Composition Of Reorganized Debtors' Board Of Directors And
Identity And Compensation Of Officers..................................... 33

L.      Estate Representative .............................................................................. 34

M.      Disputed Claims and Unclaimed Property.............................................. 35

N.      Claim Objection Bar Date....................................................................... 36

VII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................. 36

A.      Unexpired Leases and Executory Contracts to be Assumed ................. 36

B.      Unexpired Leases and Executory Contracts to Be Rejected...................................37

VIII. EFFECT OF CONFIRMATION OF PLAN .........................................................................37

A.      Binding Effect Of Confirmation .............................................................................37

B.      Vesting of Assets Free and Clear of Liens, Claims and Interests...........................38

C.      Good Faith, Exculpation and Release .....................................................................38

D.      The D&O/Affiliate Release .....................................................................................39

E.      No Limitations on Effect of Confirmation...............................................................40

F.      Discharge of Claims.................................................................................................40

G.      Injunction ................................................................................................................41

H.      Securities Laws .......................................................................................................43

IX. CONDITIONS TO EFFECTIVENESS OF THE PLAN ......................................................43

X. MISCELLANEOUS PLAN PROVISIONS ..........................................................................44

A.      Rounding of Amounts / De Minimis Amount .........................................................44

B.      Name and Address of Holder...................................................................................44

C.      Orders to Aid Consummation of Plan......................................................................44

D.      Severability .............................................................................................................45

E.      Headings of Articles and Sections ..........................................................................45

F.      Successors and Assigns............................................................................................45

G.      Changes in Rates Subject to Regulatory Commission Approval.............................45

H.      Services By And Fees For Professionals .................................................................45

        1.      Prior to the Effective Date ...........................................................................45

I.      Dissolution of Committee ........................................................................................46

J.      Litigation Trust ........................................................................................................46

K.      Amendment, Withdrawal or Revocation of the Plan ..............................................46

L.      Impact of Default Under Plan .................................................................................47

M.      Payment of Post-Confirmation Quarterly Fees.......................................................47

N.      Notices .......................................................................................................... 47

XI. RETENTION OF JURISDICTION...................................................................... 48

XII. CONFIRMATION REQUEST .......................................................................... 50

**TO THE HONORABLE CATHERINE E. BAUER, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, CREDITORS AND OTHER PARTIES IN INTEREST:**

## I.

## <u>INTRODUCTION</u>

Ruby's Diner, Inc., a California corporation ("<u>RDI</u>"), Ruby's SoCal Diners, LLC, a Delaware limited liability company ("<u>SoCal Diners</u>"), Ruby's Quality Diners, LLC, a Delaware limited liability company ("<u>Quality</u>"), Ruby's Huntington Beach, Ltd., a California limited partnership ("<u>Ruby's Huntington Beach</u>"), Ruby's Laguna Hills, Ltd., a California limited partnership ("<u>Ruby's Laguna Hills</u>"), Ruby's Oceanside, Ltd., a California limited partnership ("<u>Ruby's Oceanside</u>"), and Ruby's Palm Springs, Ltd., a California limited partnership ("<u>Ruby's Palm Springs</u>") (collectively, without RDI, the "<u>SoCal Debtors</u>" and, with RDI , the "<u>RDI Debtors</u>"), and Ruby's Franchise Systems, Inc., a California corporation ("<u>RFS</u>"), an entity affiliated with the RDI Debtors through common ownership and control, are debtors and debtors in possession in chapter 11 proceedings pending in front of this Court (collectively, the RDI Debtors and RFS are referred to as the "<u>Debtors</u>" or the "<u>Plan Proponents</u>"), and submit this *First Amended Joint Chapter 11 Plan of Reorganization* (the "<u>Plan</u>").  The Plan and appurtenant *First Amended Joint Disclosure Statement Describing First Amended Joint Chapter 11 Plan of Reorganization* (the "<u>Disclosure Statement</u>") contain a number of capitalized terms.  An appendix containing the definitions for these capitalized terms (the "<u>Definitions</u>") is contained in **<u>Exhibit 1</u>** annexed hereto.[2]

On August 29, 2018, the SoCal Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>").  On September 5, 2018, RDI filed a related Chapter 11 Case and, on September 6, 2018, RFS commenced a separate proceeding under chapter 11 of the Bankruptcy Code (respectively, the "<u>Petition Date(s)</u>")).  Following the Petition Dates, the United States Bankruptcy Court for the Central District of California (the "<u>Bankruptcy Court</u>") entered an order jointly administering the RDI Debtors' Chapter 11 Cases for procedural purposes.  The RFS Chapter 11 Case is not jointly

---

[2] Capitalized terms used and not otherwise defined herein shall have the same meanings as ascribed to them in the Definitions set forth in **<u>Exhibit 1</u>** annexed hereto.

administered with the RDI Debtors' Chapter 11 Cases.  The Plan is proposed jointly by the Plan

Proponents, and contemplates RFS becoming a wholly-owned subsidiary of RDI, but the Plan does

not provide for the substantive consolidation of the Plan Proponents' assets and liabilities.

Chapter 11 allows a debtor, and under some circumstances, creditors and others parties in

interest, to propose a plan of reorganization.  A plan may provide for the debtor to reorganize by

continuing to operate, to liquidate by selling assets of the bankruptcy estate, or a combination of

both.  The Plan Proponents (the RDI Debtors and RFS) are the parties proposing this Plan.

The Plan incorporates the terms of settlements reached with Opus Bank and U.S. Foods, two

of the major creditors in the Debtors' Chapter 11 Cases, and the Plan has their support.

The Plan provides for a restructuring of the Debtors' secured, priority and unsecured debt,

infusion of new funding, the continuation of the Ruby's® brand as a going concern under a new

equity structure, and a transfer of the ownership of RFS to RDI, with the license agreement between

them remaining in effect.  The Plan will be funded through a combination of Cash from operations,

as well as the conversion of debt and the provision of plan funding by Steven L. Craig (the "Plan

Sponsor") totaling Four Million Dollars ($4,000,000) (the "Plan Funding").[3]    In addition, Douglas

Cavanaugh and Ralph Kosmides, the founders of Ruby's (the "Founders") will make a "new value"

contribution on the Effective Date of the Plan in the form of a portion of the value of their

ownership Interests in RFS, which will be contributed to RDI as part of a reconciliation of amounts

due to and from the Founders and the Debtors as provided by the Plan.  The net New Value

Contribution by the Founders has been valued by RDI's financial advisor at approximately $5.5

million.

A portion of the Plan Funding from the Plan Sponsor will be utilized to fund the Plan as it

relates to RDI (defined herein as the "RDI Plan Funding").  The ownership of RDI will be

transferred to the Plan Sponsor in consideration of the RDI Plan Funding and the Founders in

consideration of the Founders' New Value Contribution.  Equity in RFS valued at approximately

$5.5 million will be contributed by the Founders to RDI as the New Value Contribution in return

---

[3] This amount may be subject to increase based upon whether or not there is to be a payment to the RDI Unsecured
Creditors of $2.5 million under the Plan.

for the Founders receiving a 40% interest in RDI.[4]  The assets (the "HOP Assets") owned by Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs (the "HOP Restaurant Entities") will be transferred to entities owned by the Plan Sponsor (the "New HOP Entities") in consideration of his contribution of a portion of the Plan Funding to fund the Plan as to the HOP Restaurant Entities (the "HOP Plan Funding").  The New HOP Entities will own the HOP Assets subject to the debt against the HOP Restaurant Entities and the HOP Assets, as restructured under the Plan.  The Plan Sponsor will then contribute his ownership of the New HOP Entities to RDI post-Effective Date, and the New HOP Entities will be wholly owned subsidiaries of RDI.  RFS will continue as the franchising arm of the business, as a wholly owned subsidiary of RDI.  As a result of the implementation of the terms of the Plan, following the Effective Date, RDI will be owned 60% by the Plan Sponsor, 24% by Cavanaugh and 16% by Kosmides, and RFS and the New HOP Entities will be solely owned by RDI (subject to adjustment based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan and the resolution of issues regarding the payment of Professional Fees and the source of payment thereof).

The Plan provides for the payment in full, over time, of all secured Creditors, and payment in full of all administrative and priority Creditors, except as otherwise agreed.  The Plan further provides for payment in full, over time, of the unsecured Creditors' claims of RFS.  The unsecured Creditors of each of the HOP Restaurant Entities will be paid, on the Effective Date of the Plan, their *pro rata* share from distribution funds totaling of $200,000, as follows:  $113,118.78 (Ruby's Huntington Beach), $62,397.43 (Ruby's Oceanside) and $24,413.78 (Ruby's Palm Springs).  The unsecured Creditors' claims of Ruby's Laguna Hills will not be entitled to a distribution as there is no residual value in the estate to make such payment.  The unsecured Creditors' claims of SoCal Diners and Quality (if any)[5] will be paid, on the fourth (4th) year anniversary of the Effective Date of the Plan, two and one-half percent (2.5%) of their allowed claims.  The unsecured Creditors' claims of RDI (classified in Class 11(a)) will be entitled to one of the following treatments:  (1)  Paid a total

---

[4] The balance of the equity in RFS, valued at $2.5 million, will be provided to RDI as consideration for the D&O/Affiliate Release.  The ownership percentages of the Plan Sponsor and the Founders may be subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

[5] The Debtors do not believe that Quality will have any allowed unsecured creditor claims.

of Two Million Five Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of  Six

Hundred and Twenty-Five Thousand Dollars ($625,000) on each of the second (2nd), third (3rd),

fourth (4th) and fifth (5th) anniversaries of the Effective Date, if there is a Bankruptcy Court approved

release of claims (defined herein as the "D&O/Affiliate Release") against the Debtors' directors and

officers (defined herein as the "D&Os") and their affiliated entities (defined herein as the  "D&O

Affiliated Entities"); or (2) if such D&O/Affiliate Release is not approved by the Bankruptcy Court,

a *pro rata* distribution from any proceeds ultimately recovered by a litigation trust formed pursuant

to the Plan (defined herein as the "Litigation Trust") that will have the right, following the Effective

Date, to investigate and, if appropriate, prosecute claims, if any, against the D&Os and D&O

Affiliated Entities; *provided, however*, that any distribution to the  RDI unsecured Creditors from

any recovery by the Litigation Trust shall be after payment of the fees and costs incurred by the

Litigation Trust incurred in connection with the prosecution of claims or otherwise.

The Effective Date of the proposed Plan is the later of: (a) the first (1st) Business Day of the

first month which begins at least fifteen (15) days following the Confirmation Date; and (2) the first

(1st) Business Day of the first (1st) month after such date under clause (a) on which there is not in

force any stay or injunction against the enforcement of the Plan or the Confirmation Order, provided

that the Effective Date will not occur until all Conditions to the Effective Date set forth in Section

VII of the Plan have been satisfied or waived by the Plan Proponents.


## II.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

**A.**     **Defined Terms**

Unless the content otherwise requires, the terms utilized in this Plan and the Disclosure

Statement, when used in capitalized form, shall have the meanings set forth in **Exhibit 1** annexed

hereto.

**B.    Rules of Interpretation**

For purposes of the Plan, (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (4) unless otherwise specified, all references herein to "Article __" and "Section __.__" are references to articles or sections hereof or hereto; (5) unless otherwise stated, the words "herein," "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

**C.    Computation of Time**

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**D.    Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of California, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not

incorporated or organized in California shall be governed by the laws of the jurisdiction of incorporation or organization of the applicable Debtor or Reorganized Debtor.

**E.**    **Reference to Monetary Figures**

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

**III.**

**GENERAL RULES OF CLASSIFICATION**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

**IV.**

**TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS**

As required by section 1123(a)(1) of the Bankruptcy Code, certain types of Claims are not placed into voting Classes; instead they are unclassified.  They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtors have <u>not</u> placed the following Claims in a Class.

**A.**    **Administrative Claims**

Administrative expenses are claims for costs or expenses of administering the Debtors' Chapter 11 Cases, which are Allowed under Bankruptcy Code section 507(a)(1) (the "<u>Administrative Claims</u>").  The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular Claimant agrees to a different treatment.  The following tables list the Debtors' section 507(a)(1) Administrative Claims and their treatment under

the Plan.

     1.    **Administrative Claims of Non-Professionals**

Other than those listed in Table 1 below, the Plan Proponents do not believe any amounts will be owed to parties who provide goods and services after the Petition Date (other than Professionals) except for current obligations (including Post-Petition, pre-Effective Date personal property taxes), which will be paid in the ordinary course of business.

**Table 1: Summary of Administrative Claims of Non-Professionals**

| Administrative Creditor | Relationship to Applicable Debtor | Estimate of Amount Owing (as of the Effective Date) | Treatment[6] |
|---|---|---|---|
| U.S. Foods | Supplier (RDI Debtors) | $0.00 | Any amounts owed to U.S. Foods will be paid in accordance with the terms of the U.S. Foods Settlement |
| City of Huntington Beach | Lessor (Huntington Beach restaurant) (SoCal Debtor Ruby's Huntington Beach) | $0.00 | Ruby's Huntington Beach expects that all amounts owing to City of Huntington Beach will be paid in full prior to the Effective Date as provided by the Huntington Beach Lease Stipulation. |
| MGP Fund X Laguna Hills, LLC | Lessor (Laguna Hills restaurant) (SoCal Debtor Ruby's Laguna Hills) | $36,000 | The outstanding amounts owing to MGP as of the Effective Date will be paid in accordance with the terms of the Laguna Hills Lease Assumption and Assignment Order. |
| City of Oceanside | Lessor (Oceanside restaurant) (SoCal Debtor Ruby's Oceanside) | $13,920 | The outstanding amounts owing to the City of Oceanside in connection with the assumption of the Oceanside Lease will be paid on the Effective Date as provided by the order approving the assumption of the Oceanside Lease. |
| Plaza Mercado | Lessor (Palm Springs restaurant) (SoCal Debtor Ruby's Palm Springs) | $21,286 | The outstanding amounts owing to Plaza Mercado in connection with the assumption of the Palm Springs Lease will be paid on the Effective Date as provided by the order approving the assumption of the Palm Springs Lease. |
| Donlin Recano & Company | Claims and Noticing Agent | $140,000 | The outstanding amounts owing to Donlin Recano will be paid on the Effective Date. |

---

[6] The payments on account of Administrative Claims of Non-Professionals will be paid by the applicable Debtor liable for such amounts.

| | | | |
|---|---|---|---|
| | (RDI Debtors) | | |
| DIP Lender | Administrative claims of counsel and tax advisors to the DIP Lender (RDI) | $325,000 | The amounts owing to counsel and tax advisors to the DIP Lender will be satisfied through a reduction of the cash component of the Plan Funding by the Plan Sponsor; to the extent applicable, in accordance with the procedures set forth in the RDI DIP Financing Order. |
| U.S. Trustee Fees | Quarterly Fees (All Debtors) | $0.00 | The quarterly payments to the U.S. Trustee will be paid as and when due. To the extent that any amounts are outstanding, such amounts will be paid in full on the Effective Date. The Plan Proponents shall continue to pay U.S. Trustee's fees after the Effective Date as provided by applicable law. |
| Administrative Personal Property Taxes | Taxing Authorities (All Debtors) | $0.00 | All accrued Administrative Personal Property Taxes will have been paid in full in the ordinary course of business by the Effective Date. These taxes are not yet due and payable and will be paid in the ordinary course of business by the applicable Debtor when due and payable under applicable state law. |
| Total | | $501,000 | |

2.      **Administrative Claims of Professionals**

With respect to Professionals, pursuant to Court order, the Debtors have not been paying Professionals on a current basis on account of their accruing fees and expenses. The Plan provides for the payment of Allowed Professional Claims on the later of the Effective Date, or allowance thereof, unless otherwise agreed. Those amounts are estimated in Table 2 below. The Plan is conditioned on an agreement by the Professionals, or other determination, as to the treatment of their Professional Fees under the Plan that will allow the Plan to become effective. If an agreement is not reached with respect to payment of professional fees that is acceptable to the Debtors and the Professionals, the Plan will not go effective.

**Table 2: Summary of Administrative Claims of Professionals**

| Administrative Creditor | Relationship to Debtors | Amount Estimated | Treatment |
|---|---|---|---|
| Pachulski Stang Ziehl & Jones LLP | Counsel to RDI and the SoCal Debtors | $2,900,000 (RDI) $540,000 (HOP Entities) | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| GlassRatner Advisory & Capital Group LLC | Financial Advisors to RDI | $700,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| Theodora Oringher PC | Counsel to RFS | $425,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| Armory Consulting | Financial Advisors to RFS | $30,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| The Verdon Law Group | Tax Advisor to RFS | $0.00 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| AFP Saddington | Tax Preparers to the Debtors | $25,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| Winthrop Couchot Golubow Hollander, LLP | Counsel to the Committee | $750,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| Force 10 Partner, LLC | Financial Advisors to the Committee | $400,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |

The Court will rule on all Professional Claims incurred after the Petition Date and any Administrative Claims asserted by private parties not paid in the ordinary course of business before such Claims will be owed. Only the amount of Administrative Claims allowed by the Court will be owed and required to be paid under the Plan. The Professionals listed above will file and serve a

1    properly noticed fee application and the Court will rule on the applications.

2        3.    **Administrative Personal Property Tax Claims**

3    Any personal property tax Claims arising for the period from the Petition Date to the

4    Effective Date (the "Administrative Personal Property Taxes") will be paid by the applicable Debtor

5    in the ordinary course of business as and when such taxes become due.

6        4.    **Administrative Bar Date for Filing of Administrative Claims**

7        a.    **Bar Date for Administrative Tax Claims**

8    All requests for payment of Administrative Tax Claims and for which no earlier Bar Date has

9    been or is established outside of this Plan, such as may be established by requesting an expedited

10   audit under Bankruptcy Code section 505, must be filed on or before the later of the forty-fifth (45th)

11   day following entry of the Confirmation Order or, if a tax return is required to be filed with respect

12   to such Administrative Tax Claim, one hundred twenty (120) days following the filing of the

13   applicable tax return.

14       b.    **Bar Date for All Other Administrative Claims**

15   Requests for payment of Administrative Claims must be filed and served on the Plan

16   Proponents' counsel and the Office of the United States Trustee no later than the thirtieth (30th) day

17   following the entry of the Confirmation Order.  Excluded from this requirement are Administrative

18   Tax Claims, Professional Claims (defined below), statutory fees and Administrative Claims

19   described in Table 1 and Table 2 above.  Any objection to any other Administrative Claim must be

20   filed within one hundred twenty (120) days from the date such Administrative Claim is filed.

21   Professionals or other entities requesting compensation or reimbursement of expenses

22   pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b) and 1103 for services rendered

23   prior to the Effective Date ("Professional Claims") must file and serve on all parties entitled to

24   notice thereof, an application for final allowance of compensation and reimbursement of expenses

25   no later than the sixtieth (60th) day following entry of the Confirmation Order (unless such deadline

26   is extended by agreement of the Professionals and the Reorganized Debtors or Court order).  All

27   such requests for payment of Administrative Claims and applications for final allowance of

28

compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

Holders of Administrative Claims (including, without limitation, Professional Claims) that do not file such requests by the applicable Bar Date will be forever barred from asserting such Claims against the Debtors, the Debtors' Estates, the Reorganized Debtors or their property.  Any objection to Administrative Claims of Professionals shall be filed on or before the date specified in the application for final compensation.

**B.**     **Priority Tax Claims**

Priority Tax Claims are certain unsecured income, employment and other taxes described by Bankruptcy Code section 507(a)(8).  The Bankruptcy Code requires that each Holder of such a section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred Cash payments, over a period not exceeding five (5) years from the date of the order for relief.  Attached to the Disclosure Statement as **Exhibit F** is a list of all Priority Tax Claims filed against the Estates.[7]

**Table 3: Summary of Priority Tax Claims**

| Claimant | Type of Tax Claim | Claim Amount | Proposed Treatment |
|---|---|---|---|
| All Priority Tax Claims Identified on **Exhibit F** to the Disclosure Statement | Various<br><br>*See* **Exhibit F** to the Disclosure Statement | Total of approximately $29,509 | Each Claimant identified on **Exhibit F** to the Disclosure Statement shall receive deferred payments on account of its Allowed Claim over a period not exceeding five (5) years from the Order for Relief. Each Claimant shall receive quarterly installments of principal and interest on the unpaid portion thereof at five percent (5%) per annum.  The first installment shall be due on first day of the first quarter following the thirtieth (30th) day after the Effective Date with each installment due each quarter thereafter. The Debtors may, without penalty, prepay the entire amount of a Priority Tax Claim at any time. |

**V.**

**TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

**A.**     **Summary of Classification under the Plan**

As is further described in this Subsection (C), the Plan Proponents have classified Claims and

---

[7] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Priority Tax Claims.

Interests under the Plan as follows:

## Table 4: Summary of Classification of Claims and Interests

Each of the below-referenced Classes (even if designated as a "sub-class"), if entitled to vote, will vote as a separate Class.

| Class | Claims / Interest and Holder(s) | Impaired/Not Impaired |
|---|---|---|
| 1 | Secured Claims of the Secured Noteholders - RDI | No |
| 2 | Secured Claim of Opus Bank – SoCal Debtors | Yes |
| 3 | Secured Claim of C&C Partnership – SoCal Debtors | Yes |
| 4 | Secured Claim of Pillsbury Winthrop Shaw Pittman LLP – HOP Restaurant Entities | Yes |
| 5 | Secured Claim of Plaza Bonita, LLC – SoCal Diners | Yes |
| 6 | Secured Claim of Opus Bank – RFS | Yes |
| 7 | Secured Claim of Craig – RFS | Yes |
| 8(a) | Secured Tax Claims – RDI | Yes |
| 8(b) | Secured Tax Claims – SoCal | Yes |
| 8(c) | Secured Tax Claims – RFS | Yes |
| 9 | PACA Claims – RDI and SoCal Debtors | No |
| 10(a) | Priority Non-Tax Claims – RDI | No |
| 10(b) | Priority Non-Tax Claims – SoCal Debtors | No |
| 10(c) | Priority Non-Tax Claims – RFS | No |
| 11(a) | Unsecured Claims – RDI | Yes |
| 11(b) | Gift Card Reimbursement Claims of Franchisees Satisfied Through Pre-Petition Netdown Process – RDI | No |
| 11(c) | Unsecured Claims – SoCal Debtors (Classified in separate voting subclasses 11(c)(i) – (vi)): | Yes |
| | Class 11(c)(i) – Ruby's Huntington Beach Unsecured Claims Class 11(c)(ii) – Ruby's Oceanside Unsecured Claims Class 11(c)(iii) – Ruby's Palm Springs Unsecured Claims Class 11(c)(iv) – Ruby's Laguna Hills Unsecured Claims Class 11(c)(v) – SoCal Diners Unsecured Claims Class 11(c)(vi) – Quality Unsecured Claims | |
| 11(d) | Unsecured Claims – RFS | Yes |
| 12(a) | Interests – Founders' Interests in RDI | Yes |
| 12(b) | Interests – Founders' Interests in RFS | Yes |

## B.    Classes of Secured Claims

Secured Claims are Claims secured by Liens on property of the Estates.  The following sets

forth all Classes containing the Debtors' Pre-Petition Secured Claims and their treatment under the Plan:

1.    **Class 1:  Allowed Secured Claims of the Secured Noteholders (RDI)**

Class 1 consists of the Allowed Secured Claims of the Secured Noteholders against RDI. Class 1 is impaired.  The Allowed Secured Claims of the Secured Noteholders are in the aggregate face amount of $2,984,923, as reflected in the Secured Notes.  Each Allowed Secured Claim of the Secured Noteholders shall be an obligation of RDI following the Effective Date and shall be treated as follows, which treatment renders the Class 1 Claimants unimpaired:

*Principal Amount*.  Each Allowed Secured Claim of the Secured Noteholders shall have a principal amount equal to the principal balance as set forth in **Exhibit G** to the Disclosure Statement.

*Payment of Accrued But Unpaid Interest*.  On the Effective Date, accrued but unpaid interest owing on account of the Secured Notes shall be paid.

*Term*.  In accordance with the 2016 Restructuring Agreement, the maturity of the Secured Notes shall be June 30, 2026, with the maturity subject to an additional five-year extension, at RDI's sole election, if RDI is current on its payments to the Class 1 Claimants as provided by the Plan.

*Interest*.  In accordance with the 2016 Restructuring Agreement, interest on the Secured Notes shall be paid in semi-annual installments at 2.17%.  Interest-only payments shall commence on June 30, 2020 and shall continue each December 30th and June 30th thereafter.

*Accelerated Principal Payments From Free Cash Flow From Operations*.  In accordance with the 2016 Restructuring Agreement, in addition to semi-annual interest payments, commencing on the first (1st) anniversary of the Effective Date, and on an annual basis thereafter, until paid in full, the Secured Noteholders shall be entitled to one hundred percent (100%) of  Free Cash Flow From Operations, if any, which shall be calculated in accordance with the definition of Free Cash Flow From Operations set forth in the 2016 Restructuring Agreement, to be paid on a *pro rata* basis based on the unpaid principal balance owed with respect to each of the Secured Notes.  For clarification purposes, Free Cash Flow From Operations shall be from RDI and RDI Subsidiaries, as defined in the 2016 Restructuring Agreement, as these entities existed pre-Effective Date (*i.e.,* RFS is not to be considered an RDI Subsidiary for the purposes of determining Free Cash Flow From Operations).

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the Allowed Secured Claims of the Secured Noteholders, in aggregate, may be prepaid, in whole or in part, in RDI's sole discretion, provided that such prepayment would not reasonably be expected to cause a default on RDI's other payment obligations under the Plan.

*Retention of Collateral*.  Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claims of the Secured Noteholders granted in connection with 2016 Restructuring Agreement shall remain in full

force and effect following the Effective Date to secure the payments to the Class 1 Claimants as provided by the Plan.

*Appointment of Successor Collateral Agent*.  The Confirmation Order shall name a successor Collateral Agent to be appointed with respect to the Allowed Secured Claims of the Secured Noteholders and shall succeed to the rights and duties previously held by CMA with respect to the Secured Notes.

*Other Rights In Full Force and Effect*.  All other terms of the 2016 Restructuring Agreement or any other documents governing the Secured Notes and/or Secured Claims of the Secured Noteholders shall remain in full force and effect.

**2.      Class 2: Allowed Secured Claim of Opus Bank (SoCal Debtors)**

Class 2 consists of the Allowed Secured Claim of Opus Bank against the SoCal Debtors.

Class 2 is impaired.  The Class 2 Claim shall be treated as follows:

*Effective Date Payment*.  On the Effective Date, Opus Bank shall be paid the adequate protection payments due and owing under the Fourth Cash Collateral Stipulation or any other cash collateral order entered in the RDI Debtors' Chapter 11 Cases (at the rate of $8,557.70 per month, and estimated to be approximately $128,365 as of the Effective Date).

*New Note*.  The New HOP Entities shall issue a new note to Opus Bank (the "New Opus Bank HOP Note").  The New Opus Bank HOP Note shall have a principal amount equal to the principal balance of the Allowed Class 2 Claim as of the Effective Date in the amount of $2,098,050.36, plus: i) interest in the amount of $303,539.75, assuming an Effective Date of January 26, 2020, and ii) fees (including attorneys' fees) and costs that have accrued on account of the Class 2 Claim through and including the Effective Date in the amount of $354,082.72.  The New Opus HOP Note shall include covenants and conditions customary to notes accepted by Opus Bank.

*Interest*.  Post-Effective Date interest shall accrue on the principal balance of the New Opus Bank HOP Note at a fixed rate of 5.5% per annum.

*Payments*.  The first monthly payment on account of the New Opus Bank HOP Note will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the New Opus Bank HOP Note from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the New Opus Bank HOP Note during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*.  The maturity date of the New Opus Bank HOP Note shall be five (5) years following the Effective Date.

*Lending and Borrowing of Monies Between Reorganized Debtors*.  The New Opus Bank HOP Note shall provide that, so long as there is no default thereunder or under the New Opus

Bank RFS Note (as defined herein), the obligors under the New Opus Bank HOP Note may lend to and borrow monies between themselves, RFS and RDI.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the New Opus Bank HOP Note may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtor obligors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtor obligors' other payment obligations under the Plan.

*Collateral*.  Except to the extent inconsistent with applicable law, the validity and priority of the security interests securing the New Opus Bank HOP Note shall be the same as provided by the Opus Bank/SoCal Debtors Loan and Security Documents.

**3.      Class 3: Allowed Secured Claim of C&C Partnership (SoCal Debtors)**

Class 3 consists of the Allowed Secured Claim of C&C Partnership against certain of the SoCal Debtors (SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs).  Class 3 is Impaired.  The Allowed Secured Claim of C&C Partnership, as of the Effective Date, is in the principal amount of $297,500.  The Allowed Secured Claim of C&C Partnership shall be treated as follows:

*Principal Amount*.  The Allowed Secured Claim of C&C Partnership shall have a principal amount equal to the principal balance as of the Petition Date, plus all amounts that have accrued on account of the Allowed Secured Claim of C&C Partnership through and including the Effective Date.

*Interest*.  Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of C&C Partnership at the non-default rate set forth in the C&C Partnership Loan and Security Documents.

*Payments*.  The first monthly payment on account of the Allowed Secured Claim of C&C Partnership will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of C&C Partnership from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of C&C Partnership during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*.  The maturity date of the Allowed Secured Claim of C&C Partnership shall be extended, and will be due and payable seven (7) years following the Effective Date.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of C&C Partnership may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably

be expected to cause a default on the applicable Reorganized Debtors' other payment obligations under this Plan.

*Retention of Collateral*.  Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of C&C Partnership shall remain in full force and effect following the Effective Date.

*Other Terms Unchanged*.  Except to the extent provided above, the legal, equitable and contractual rights of C&C Partnership, as Holder of an Allowed Class 3 Claim, shall remain unaltered under the Plan.

### 4.      Class 4: Allowed Secured Claim of Pillsbury Winthrop Shaw Pittman LLP (RDI and SoCal Debtors)

Class 4 consists of the Allowed Secured Claim of Pillsbury against the HOP Restaurant Entities.  Class 4 is impaired.  The Allowed Secured Claim of Pillsbury, if any, shall be treated as follows: [8]

*Principal Amount*.  The Allowed Secured Claim of Pillsbury shall be the amount of the Pillsbury Claim supported by collateral in accordance with Section 506 of the Bankruptcy Code.

*Interest*.  Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of Pillsbury at the rate of five percent (5%) per annum.

*Payments*.  The first monthly payment on account of the Allowed Secured Claim of Pillsbury will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of Pillsbury from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of Pillsbury during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*.  The maturity date of the Allowed Secured Claim of Pillsbury shall be extended, and will be due and payable seven (7) years following the Effective Date.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of Pillsbury may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably be

---

[8] The Debtors do not believe that there is collateral securing the Pillsbury Claim and, therefore believe that Pillsbury will be treated as an unsecured creditor in the RDI, SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs cases, and this is the treatment reflected in Cash Flow Projections..

expected to cause a default on the applicable Reorganized Debtors' other payment obligations under the Plan.

*Retention of Collateral*.  Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of Pillsbury shall remain in full force and effect following the Effective Date.

*Other Terms Unchanged*.  Except to the extent provided above, the legal, equitable and contractual rights of Pillsbury, as Holder of an Allowed Class 4 Claim, shall remain unaltered under the Plan; including any legal right that Pillsbury holds to enforce the Pillsbury Claim against non-debtor entities, which right shall not be curtailed by the Plan.  In addition, while Pillsbury shall be bound by the provisions of the Plan and Confirmation Order, Article X.C. of Plan does not require Pillsbury, as former counsel to certain of the Debtors, to aid the Debtors in consummating the Plan.

*Unsecured Claim*.  To the extent that the Pillsbury Claim is not an Allowed Secured Claim, the Allowed unsecured portion of the Pillsbury Claim shall be treated as an Unsecured Claim against the applicable Reorganized Debtors (RDI, SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs).

**5.      Class 5: Allowed Secured Claim of Plaza Bonita LLC (SoCal Diners)**

Class 5 consists of the Allowed Secured Claim of Plaza Bonita against SoCal Diners.  Class 5 is impaired.  The Allowed Secured Claim of Plaza Bonita, if any, shall be treated as follows: [9]

*Principal Amount*.  The Allowed Secured Claim of Plaza Bonita shall have a principal amount equal to the principal balance as of the Petition Date, plus all amounts that have accrued on account of the Allowed Secured Claim of Plaza Bonita through and including the Effective Date, to the extent the Claim is supported by collateral in accordance with Section 506 of the Bankruptcy Code.

*Interest*.  Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of Plaza Bonita at the rate of five percent (5%) per annum.

*Payments*.  The first monthly payment on account of the Allowed Secured Claim of Plaza Bonita will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of Plaza Bonita from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of Plaza Bonita during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

---

[9] The Debtors do not believe that there is collateral securing the Plaza Bonita claim and, therefore believe that Plaza Bonita will be treated as an unsecured creditor against SoCal Diners, and this is the treatment reflected in Cash Flow Projections.

*Maturity Date*.  The maturity date of the Allowed Secured Claim of Plaza Bonita shall be extended, and will be due and payable seven (7) years following the Effective Date.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of Plaza Bonita may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtors' other payment obligations under the Plan.

*Retention of Collateral*.  Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of Plaza Bonita shall remain in full force and effect following the Effective Date.

*Other Terms Unchanged*.  Except to the extent provided above, the legal, equitable and contractual rights of Plaza Bonita, as Holder of an Allowed Class 5 Claim, shall remain unaltered under the Plan.

*Unsecured Claim*.  To the extent that the Plaza Bonita Claim is not an Allowed Secured Claim, the Allowed unsecured portion of the Claim shall be treated as an Unsecured Claim against the SoCal Diners.

**6.      Class 6: Allowed Secured Claim of Opus Bank (RFS)**

Class 6 consists of the Allowed Secured Claim of Opus Bank against RFS.  Class 6 is impaired.  The Allowed Class 6 Claim shall be treated as follows:

*Effective Date Payment*.  On the Effective Date, RFS shall pay to Opus Bank the amount of $80,000.

*New Note*.  RFS shall issue a new note to Opus Bank (the "New Opus Bank RFS Note"). The New Opus Bank RFS Note shall have a principal amount equal to the principal balance of the Allowed Class 6 Claim as of the Effective Date in the amount of $1,091,755.94, plus: i) interest in the amount of $6,306.33, assuming an Effective Date of January 26, 2020, and ii) fees (including attorneys' fees) and costs that have accrued on account of the Class 6 Claim through and including the Effective Date, in the amount of $184,036.91. The New Opus HOP Note shall include covenants and conditions customary to notes accepted by Opus Bank.

*Interest*.  Post-Effective Date interest shall accrue on the principal balance of the New Opus Bank RFS Note at a fixed rate of 5.5% per annum.

*Payments*.  The first monthly payment on account of the New Opus Bank RFS Note will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the New Opus Bank RFS Note from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 4-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal

balance on account of the New Opus Bank RFS Note during the previous month, plus (b) an installment of principal calculated on the basis of a 4-year amortization schedule.

*Maturity Date*.  The maturity date of the New Opus Bank RFS Note shall be four (4) years following the Effective Date.

*Lending and Borrowing of Monies Between Reorganized Debtors*.  The New Opus Bank RFS Note shall provide that, so long as there is no default thereunder or under the New Opus Bank HOP Note (as defined herein), RFS may lend to and borrow monies between it, RDI and the New HOP Entities.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the New Opus Bank RFS Note may be prepaid, in whole or in part, in the sole discretion of RFS, provided that such prepayment would not reasonably be expected to cause a default on RFS' other payment obligations under the Plan.

*Collateral*.  Except to the extent inconsistent with the foregoing or applicable law, the validity and priority of the security interests securing the New Opus Bank RFS Note shall be the same as provided by the Opus Bank/RFS Loan and Security Documents.

**7.     Class 7: Allowed Claim of Steven L. Craig (RFS)**

Class 7 consists of the Allowed Claim of Craig against RFS based on the RFS Note.  Class 7 is impaired.  The Allowed Claim of Craig against RFS, as of the Petition Date, is in the principal amount of $1,000,000, plus accrued interest under the RFS Note.  Craig holds rights of offset of his obligations for Franchise Royalties as a Franchisee as against the RFS Note, but such offset rights have not been, and will not be, enforced with respect to the RFS Note.  Instead, the Plan provides that the principal amount of the Allowed Claim of Craig against RFS ($1,000,000) shall be converted into equity in RDI as of the Effective Date of the Plan.  Accrued interest on the RFS Note, in the amount of approximately $120,000, shall be paid on the Effective Date of the Plan.  The amounts owed by Craig for Franchise Royalties and Ad Fees, in the amount of $635,556, shall be paid by Craig on the Effective Date in accordance with the Netdown Process, as reflected in the Cash Flow Projections.

**8.     Class 8:  Secured Tax Claims – Class 8(a) (RDI), Class 8(b) (SoCal Debtors) and Class 8(c) (RFS)**

Class 8 consists of all of the Claims of taxing authorities secured by personal property owned by RDI (Class 8(a)), the SoCal Debtors (Class 8(b)) and RFS (Class 8(c)) (the "Secured Tax Claims").  Classes 8(a), (b) and (c) are Impaired.  Attached as **Exhibit H** to the Disclosure Statement

is a list of what the Debtors' records reflect as outstanding Pre-Petition Secured Tax Claims for RDI, the SoCal Debtors and RFS.[10]

**Table 5: Treatment of Secured Tax Claims**

| Classes | Claimant | Type of Tax Claim | Claim Amount | Proposed Treatment |
|---|---|---|---|---|
| 8(a), 8(b) and 8(c) | All Secured Tax Claims Identified on **Exhibit H** to the Disclosure Statement | Various *See* **Exhibit H** to the Disclosure Statement | Total of approximately $74,475.30 | Each Claimant identified on **Exhibit H** to the Disclosure Statement shall receive deferred payments on account of its Allowed Claim over a period not exceeding five (5) years from the Order for Relief.  Each Claimant shall receive quarterly installments of principal and interest on the unpaid portion thereof at five percent (5%) per annum.  The first installment shall be due on first day of the first quarter following the thirtieth (30th) day after the Effective Date with each installment due each quarter thereafter.  The Debtors may, without penalty, prepay the entire amount of a Secured Tax Claim at any time. |

9.      **Class 9: Allowed PACA Claims (RDI and Certain of the SoCal Debtors)**

Class 9 consists of any Allowed PACA Claims against RDI and certain of the SoCal Debtors (Ruby's Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs and Ruby's Laguna Hills). Class 9 is unimpaired.  The Allowed PACA Claims, if any, shall be paid in full on the Effective Date of the Plan.  The Debtors do not believe that there are any unpaid PACA Claims.

10.      **Class 10:  Priority Non-Tax Claims – Class 10(a) (RDI), Class 10(b) (SoCal Debtors) and Class 10(c) (RFS)**

Certain priority Claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in Classes (the "Priority Non-Tax Claims").  These types of Claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each Holder of such a Claim receive Cash on the Effective Date equal to the Allowed amount of such Claim. However, a class of Priority Non-Tax Claims may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claims.  Class 10 consists of all of the Priority Non-Tax Claims owed by RDI (Class 10(a)), the SoCal Debtors (Class 10(b)) and RFS

---

[10] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Secured Personal Property Tax Claims.

(Class 10(c)).  Classes 10(a), 10(b) and 10(c) are Unimpaired.  Following the Petition Date, RDI obtained authority from the Bankruptcy Court to pay certain Pre-Petition Claims of current employees.  RDI believes that all Priority Claims owing to its employees on account of wages and benefits have been paid.  Attached as **Exhibit I** to the Disclosure Statement is a list of Priority Non-Tax Claims, the treatment under the Plan of which is as follows:[11]

### Table 6: Treatment of Allowed Priority Non-Tax Claims

| Class | Claimant | Amount | Treatment |
|-------|----------|--------|-----------|
| 10(a), 10(b) and 10(c) | Priority Non-Tax Claims as listed on **Exhibit I** to the Disclosure Statement | $0.00 | Allowed Claims will be paid in full on the later of (1) the Effective Date; or (2) the date upon which the Claim becomes an Allowed Claim pursuant to a Final Order. |

## C.    Classes of Unsecured Claims

Unsecured Claims are unsecured Claims not entitled to priority under Bankruptcy Code section 507(a).  As is further described below, the Debtors' Unsecured Claims shall be classified as follows:[12]

### TABLE 7: SUMMARY OF CLASSIFICATION OF UNSECURED CLAIMS AND ESTIMATED AMOUNT OF CLAIMS[13]

| Class | Description |
|-------|-------------|
| 11(a) | Class 11 is comprised of all Allowed Unsecured Claims against RDI.  The estimated Allowed amount of the Class 11(a) Claims, in aggregate, is $10,176,824. <br><br>Class 11(a) is comprised of the following: <br><br>Unsecured Noteholder Claims against RDI as set forth in **Exhibit J** in the estimated amount of $5,540,528. <br><br>Other General Unsecured Claims against RDI (including RDI's Gift Card Obligations not satisfied by way of the Netdown Process) in the estimated amount of  $4,636,296. |
| 11(b) | Class 11(b) is comprised of the Gift Card Reimbursement Claims of Franchisees Satisfied Though Pre-Petition Netdown Process. |

---

[11] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Priority Non-Tax Claims.

[12] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Unsecured Claims.

[13] The estimates set forth herein are based on the Debtors' best estimate as to the ultimate allowability of the Claims following the Debtors' review and analysis of the Claims that have been asserted against the Debtors.  While the Debtors have used their best efforts to provide reasonable estimates, the actual allowed amount of the Claims could differ from the estimates set forth in this Disclosure Statement, and will in some cases depend on the resolution of objections to claims.  In such event, distributions to Claimants could differ from the estimated percentage distributions set forth in this Disclosure Statement.

| 11(c) | Class 11(c) (subclasses (i) – (vi)) is comprised of all Allowed Unsecured Claims against the SoCal Debtors. |
|---|---|
| | Class 11(c)(i) is comprised of all Allowed Unsecured Claims against Ruby's Huntington Beach. The Debtors estimate that Class 11(c)(iii) Claims total approximately $1,260,481. |
| | Class 11(c)(ii) is comprised of all Allowed Unsecured Claims against Ruby's Oceanside.  The Debtors estimate that Class 11(c)(iv) Claims total approximately $1,211,015. |
| | Class 11(c)(iii) is comprised of all Allowed Unsecured Claims against Ruby's Palm Springs.  The Debtors estimate that Class 11(c)(v) Claims total approximately $1,090,812. |
| | Class 11(c)(iv) is comprised of all Allowed Unsecured Claims against Ruby's Laguna Hills.  The Debtors estimate that Class 11(c)(vi) Claims total approximately $569,076. |
| | Class 11(c)(v) is comprised of all Allowed Unsecured Claims against SoCal Diners.  The Debtors estimate that Class 11(c)(i) Claims total approximately $1,331,567. |
| | Class 11(c)(vi) is comprised of all Allowed Unsecured Claims against Quality.  The Debtors estimate that Class 11(c)(ii) Claims total approximately $0.00. |
| 11(d) | Class 11(d) is comprised of all Allowed General Unsecured Claims against RFS.  The Debtors estimate that Class 11(d) Claims total approximately $430,329. |

1. **Class 11(a):  Allowed Unsecured Claims Against RDI**

Class 11(a) is impaired.  The Allowed Claims of the Unsecured Creditors against RDI shall be entitled to one of the following treatments, as follows:

Payment of a total of Two Million Five Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of  Six Hundred and Twenty-Five Thousand Dollars ($625,000) on each of the second (2nd), third (3rd), fourth (4th) and fifth (5th) anniversaries of the Effective Date, provided that the D&O/Affiliate Release is approved by the Bankruptcy Court.

If the D&O/Affiliate Release is not approved by the Bankruptcy Court, payment of a *pro rata* distribution from any proceeds ultimately recovered by the Litigation Trust that will have the right, following the Effective Date, to investigate and, if appropriate, prosecute claims, if any, against the D&Os and D&O Affiliated Entities; *provided, however*, that any distribution to the  RDI unsecured Creditors from any recovery by the Litigation Trust shall be after payment of the fees and costs incurred by the Litigation Trust incurred in connection with the prosecution of the D&O/Affiliate Claims or otherwise.

2. **Class 11(b):  Gift Card Reimbursement Claims of Franchisees Satisfied Though Pre-Petition Netdown Process**

Class 11(b) is unimpaired.  Class 11(b) Claims will be satisfied in full through the implementation of the Pre-Petition Netdown Process, pursuant to which such claims will be satisfied

in full.  To the extent any such Gift Card Reimbursement Claims of Franchisees are not satisfied by implementation of the Pre-Petition Netdown Process, such Claims shall be treated as Class 11(a) Claims.

### 3.    Class 11(c):  General Unsecured Claims Against the SoCal Debtors

Class 11(c) is impaired.  Class 11(c) has six (6) subclasses, as follows:  Class 11(c)(i) – Ruby's Huntington Beach; Class 11(c)(ii) – Ruby's Oceanside; Class 11(c)(iii) – Ruby's Palm Springs; Class 11(c)(iv) – Ruby's Laguna Hills; Class 11(c)(v) – SoCal Diners; and Class 11(c)(vi) – Quality.  Each subclass shall vote as a separate class.

**Class 11(c)(i)** - The Allowed General Unsecured Claims against Ruby's Huntington Beach are designated as Class 11(c)(i).  The Allowed General Unsecured Claims against Ruby's Huntington Beach shall be paid the total amount of $113,118.78 (the "Huntington Beach Unsecured Distribution Amount"), on a *pro rata* basis, on the Effective Date of the Plan.

Based on Ruby's Huntington Beach's estimate as to the ultimate allowability of the Class 11(c)(i) Claims, the percentage distribution to the holders of Allowed Class 11(c)(i) Claims is estimated to be approximately 9%.

**Class 11(c)(ii)** - The Allowed General Unsecured Claims against Ruby's Oceanside are designated as Class 11(c)(ii).  The Allowed General Unsecured Claims against Ruby's Oceanside shall be paid the total amount of $62,397.43 (the "Oceanside Unsecured Distribution Amount") on a *pro rata* basis, on the Effective Date of the Plan.

Based on Ruby's Oceanside's estimate as to the ultimate allowability of the Class 11(c)(ii) Claims, the percentage distribution to the holders of Allowed Class 11(c)(ii) Claims is estimated to be approximately 5.2%.

**Class 11(c)(iii)** - The Allowed General Unsecured Claims against Ruby's Palm Springs are designated as Class 11(c)(iii).  The Allowed General Unsecured Claims against Ruby's Palm Springs shall be paid the total amount of $24,413.78 (the "Palm Springs Unsecured Distribution Amount"), on a *pro rata* basis, on the Effective Date of the Plan.

Based on Ruby's Palm Spring's estimate as to the ultimate allowability of the Class 11(c)(iii) Claims, the percentage distribution to the holders of Allowed Class 11(c)(iii) Claims is estimated to

be approximately 2.2%.

**Class 11(c)(iv)** - The Allowed General Unsecured Claims against Ruby's Laguna Hills are designated as Class 11(c)(iv).  In March 2019, Ruby's Laguna Hills assigned the Laguna Hills Restaurant operations to an assignee, and ceased operating the Laguna Hills Restaurant.  The Holders of Allowed Unsecured Claims against Ruby's Laguna Hills shall not be entitled to a distribution as Ruby's Laguna Hills has no assets available to pay such claims.

**Classes 11(c)(v) and (vi)** - The Allowed General Unsecured Claims against SoCal Diners and Quality are designated as Classes 11(c)(v) and (vi), respectively.  Allowed Claims in Classes 11(c)(v) and (vi) shall be paid a total of two and one-half percent (2.5%) of their Allowed Claims (estimated to be a total distribution in the amount of $33,289), on the fourth (4th) year anniversary of the Effective Date of the Plan.  The Debtors do not believe that there are any claims against Quality.

4.    **Class 11(d):  General Unsecured Claims Against RFS**

Class 11(d) is impaired.  Allowed Claims in Class 11(d) shall be paid in full, over time, with post-Effective Date interest, as follows:  On the first (1st) anniversary of the Effective Date, and continuing on an annual basis until the fourth (4th) anniversary of the Effective Date, the Holders of Allowed Class 11(d) Claims shall be paid annual distributions of twenty-five percent (25%) of the Allowed Amount of their Class 11(d) Claims, plus interest at the rate of five percent (5%) per annum, for a total distribution on account of Class 11(d) Allowed Claims of one hundred percent (100%), plus interest.

**D.    Interests**

The Founders, Cavanaugh and Kosmides, respectively, hold 60% and 40% of the common stock of RDI and RFS.  RDI holds ownership interests in SoCal Diners and in the RDI Entities (Ruby's Beach Ventures, LLC, Ruby's Diner South Coast Plaza, LP, Ruby's Spectrum, LLC and Ruby's Woodbridge, LLC).  SoCal Diners and Quality own Interests in the SoCal Entities (Ruby's Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs, and Ruby's Laguna Hills).  The following chart identifies the Plan's treatment of the Interests:

| Class | Type of Interest | Treatment |
| --- | --- | --- |
| 12(a) | Founders' Interests in RDI | Founders' Interests in RDI shall be cancelled pursuant to the Plan.  Based upon the RDI Plan Funding and the New Value Contribution, respectively, the Plan Sponsor |

| | | and the Founders will own the equity in the post-Effective Date RDI |
|---|---|---|
| 12(b) | Founders' Interests in RFS | Founders' Interests in RFS shall be shall be cancelled pursuant to the Plan and the interests in RFS shall be transferred to RDI, and RFS will thereafter be a wholly-owned subsidiary of post-Effective Date RDI |
| 12(c) | RDI Debtors' Interests in Other Entities | RDI's ownership interests in the RDI Entities (non-debtor entities) shall continue to be held by post-Effective Date RDI, and the distributions to RDI from these entities will be used to fund the Plan. |
| | | RDI's ownership interests in the SoCal Entities shall continue to be held by post-Effective Date RDI. |
| | | Based upon the HOP Plan Funding, the New HOP Entities will own the HOP Assets. The New HOP Entities will be contributed by the Plan Sponsor to post-Effective Date RDI. |

Post-Effective Date of the Plan, the Plan Sponsor will own 60% of RDI in consideration of the RDI Plan Funding. The Founders will own 40% (24% by Cavanaugh and 16% by Kosmides) in consideration of the New Value Contribution to RDI (which consists of their equity Interests in RFS).[14] RFS will be a wholly-owned subsidiary of RDI, and will continue as the franchising arm of the business. The HOP Assets will be transferred to the New HOP Entities in consideration of the Plan Sponsor's contribution of the HOP Plan Funding. The Plan Sponsor will then contribute the New HOP Entities to RDI post-Effective Date. RDI's Interests in the RDI Entities (Ruby's Beach Ventures, LLC, Ruby's Diner South Coast Plaza, LP, Ruby's Spectrum, LLC and Ruby's Woodbridge, LLC) and the SoCal Entities shall continue to be held by post-Effective Date RDI.

## VI.

## MEANS OF EFFECTUATING THE PLAN

### A.    Funding for the Plan

1.    **Cash Needs on the Effective Date**

After taking into account all of the payments described in the Plan, the Debtors will have the following Cash needs on the Effective Date (which estimates exclude the amount of Administrative Claims of Professionals, the terms of payment of which shall be subject to agreement, or other

---

[14] The percentage interests of the Plan Sponsor and the Founders may be subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

determination, and the resolution of which are a condition to the effectiveness of the Plan).

| Type of Payment | Amount |
|---|---|
| Class 1 – Secured Noteholders Interest Payment | $129,546 |
| Opus Bank Effective Date Payments | $216,923 |
| HOP Effective Date Payments | $200,000 |
| Administrative Claims (Non-Professionals) | $501,000 |
| Other Effective Date Payments | $498,558 |
| **TOTAL** | $1,546,027 |

2.    **Sources of Cash on the Effective Date**

The Debtors will have the Cash needed to make payments required on the Effective Date from Cash on hand as of the Effective Date, implementation of the Netdown Process and Plan Funding from the Plan Sponsor, as set forth in the Cash Flow Projections (**Exhibit B**).[15]

**B.    Plan Funding from Plan Sponsor**

The Plan Funding from the Plan Sponsor shall be utilized, along with the Debtors' Cash and the proceeds from operations, to make (a) the payments required to be made on the Effective Date; and (b) the payments to Creditors following the Effective Date.

The Plan Funding from the Plan Sponsor consists of the following:  (a) the contribution of Two Million Seven Hundred Thousand  Dollars ($2,700,000) in Cash (less the amount that will be utilized to satisfy the fees of his counsel and tax advisors, in the amount of approximately $325,000); (b) the conversion of the amounts due to the Plan Sponsor (as DIP Lender) and counsel in connection with the RDI DIP Loan (in the amount of $300,000) into equity in RDI; and (c) the conversion of the amounts due to the Plan Sponsor (as lender) in connection with the RFS Note (in the principal amount of $1,000,000) into equity in RDI, for total consideration in the amount of Four Million Dollars ($4,000,000).[16]  The Plan Sponsor's obligation to make such Plan Funding is

---

[15] The Plan is conditioned on an agreement by the Professionals, or other determination, as to the treatment of their Professional Fees under the Plan that will allow the Plan to become effective.  If an agreement is not reached with respect to payment of professional fees that is acceptable to the Debtors and the Professionals, the Plan will not go effective.

[16] This amount may be subject to increase based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

conditioned on the transfer of the Interests in RFS to RDI, the provision to the Plan Sponsor of equity in RDI, the transfer of HOP Assets to the New HOP Entities (which New HOP Entities will be contributed by the Plan Sponsor to post-Effective Date RDI) and the other conditions as set forth in the Plan.  Under no circumstances shall the Plan Sponsor be personally responsible for any of the debt of the Debtors or Reorganized Debtors or the payment thereof.

In addition, and as condition a to the Plan Sponsor's funding of the Plan Funding, as of the Effective Date, RDI must have a "Going Concern Value" of not less than Six Million Sixty Six Hundred Sixty Thousand Sixty Seven Dollars ($6,666,667) (the "<u>Going Concern Value Requirement</u>").  "Going Concern Value" shall include (a) the total assets of RDI (including the value of its direct and indirect interests in RFS and the New HOP Entities), after taking into account the Plan Funding and the New Value Contribution, less (b) the total liabilities of RDI, as restructured under the Plan or as otherwise discounted, as set forth in **<u>Exhibit K</u>** to the Disclosure Statement.

**C.** **<u>Transfer of HOP Assets to New HOP Entities, Contribution of New HOP Entities to RDI and Provision of the HOP Plan Funding and RDI Plan Funding</u>**

As of the Effective Date, ownership of the HOP Assets (which will remain subject to the debt against them, as restructured under Plan) will be transferred to the New HOP Entities in consideration of the Plan Sponsor's provision of the HOP Plan Funding.  The Plan Sponsor will then contribute ownership of the New HOP Entities to post-Effective Date RDI.

The amount of the HOP Plan Funding is in the amount of $200,000 which will be utilized to make the payments to the unsecured creditors of the HOP Restaurant Entities as provided by the Plan.

The balance of the Plan Funding from the Plan Sponsor shall be utilized to fund the Plan as set forth in the Cash Flow Projections.

**D.** **<u>New Value Contribution</u>**

Under the Plan, the Founders will make a "new value" contribution on the Effective Date of the Plan in the form of a portion of the value of their ownership Interests in RFS, which will be contributed to RDI as provided by the Plan (the "<u>New Value Contribution</u>").  The New Value Contribution shall be a net amount based on the equity value of RFS adjusted by the Reconciliation.

The New Value Contribution by the Founders is valued at approximately $5.5 million, as set forth in **Exhibit A** to the Disclosure Statement.  The value of the New Value Contribution and the satisfaction of the requirements of the Bankruptcy Code with respect thereto will be determined in connection with Confirmation of the Plan.

### E.    Reconciliation of Claims Between and Among the Debtors and the Founders

Pursuant to the Plan, the claims between and among the Debtors and the Founders (and certain affiliates), as reflected in **Exhibit E** to the Disclosure Statement, will be reconciled and utilized to calculate the New Value Contribution by the Founders.  By way of the Reconciliation, the claims between and among the Debtors and the Founders and these affiliates will be eliminated. Any net amounts owed to or by the Founders or these affiliates with respect to any Debtor will be applied to the value of the New Value Contribution being made by the Founders.

### F.    Transfer of Interests in RFS to RDI; Post-Effective Date Ownership of RDI

As of the Effective Date, all of the Founders' Interests in RFS will be transferred to RDI. Post-Effective Date, RDI will be owned 60% by the Plan Sponsor, 24% by Cavanaugh and 16% by Kosmides.   These ownership percentages may be subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

### G.    Pre-Petition Netdown Process

On March 11, 2019, the Court entered its order approving the Netdown Process pursuant to which RDI, RFS and the Franchisees were authorized to honor their Post-Petition obligations among them.  Under the Plan, as of the Effective Date, the Netdown Process shall be implemented for the Pre-Petition period (the "Pre-Petition Netdown Process"), as follows:

Any amounts that RDI owes a particular Franchisee in connection with Pre-Petition Gift Card Reimbursement Obligations will first be reduced (as a non-cash journal entry) by any amounts that that Franchisee owes to RDI for any miscellaneous charges (the "Net Amount RDI Owes to the Franchisee").  The Net Amount RDI Owes to the Franchisee will be applied (as a non-cash journal entry) to the amount of Pre-Petition Franchise Royalties that the Franchisee owes to RFS, leaving a remaining balance (the "Remaining Balance Owed by the Franchisee").  The Franchisee will pay to RFS (in Cash) the Remaining Balance Owed by the Franchisee, as well as any Pre-Petition Ad

Funds Obligations it owes, and RFS will pay the RDI License Fee. Pursuant to the Pre-Petition

Netdown Process, the majority of the pre-petition claims of the Franchisees against RDI will be

satisfied in full. These claims are classified in Class 11(b) under the Plan and are unimpaired.

**H.    U.S. Foods Settlement**

In accordance with the US Foods Settlement, US Foods agrees to the following treatment

under the Plan, which treatment is set forth in the Cash Flow Projections:

1.    All proofs of claims filed by US Foods in the RDI Debtors' cases (Claim No.
85 (RDI), Claim No. 6 (Ruby's Huntington Beach), Claim No. 5 (Ruby's Oceanside), Claim
No. 7 (Ruby's Palm Springs) and Claim No. 4 (Ruby's Laguna Hills) (the "US Foods
POCs") shall be allowed in full in accordance with their asserted priorities, subject to
business discussions regarding minor discrepancies between the amounts set forth in the US
Foods POCs and the RDI Debtors' books and records (the "US Foods Claims").
Reconciliation regarding the unsecured portion of the US Foods Claims (the "US Foods
Unsecured Claims") will start immediately and must be completed by the Effective Date of
the Plan, or an amount shall be held in a Disputed Claims Reserve to ensure that US Foods is
not at risk of non-payment. The US Foods Unsecured Claims will be classified and treated
like other general unsecured claims against the respective Debtor obligors, and will be
entitled to and be paid their *pro rata* share of distributions in connection therewith as
provided by the Plan.

2.    The portion of the US Foods Claims subject to priority pursuant to Section
503(b)(9) of the Bankruptcy Code (the "US Foods 503(b)(9) Claims") against the RDI
Debtors shall be allowed as administrative claims, in the following amounts: $64,116.20
(Ruby's Huntington Beach), $51,486.60 (Ruby's Oceanside), $25,337.02 (Ruby's Palm
Springs) and $8,513.53 (Ruby's Laguna Hills). US Foods' 503(b)(9) Claims shall be paid in
twelve (12) equal monthly payments, commencing one (1) month following the Effective
Date of the Plan. The RDI Debtors agree to make the payments to US Foods on account of
the US Foods 503(b)(9) Claims through an "autopayment" mechanism acceptable to US
Foods.

3.    Except as set forth in the following paragraphs (4) and (5), US Foods' post-
petition administrative claims will be on forty-five (45) day terms through the Effective Date
of the Plan and will be paid in the ordinary course as they come due pursuant to the terms of
the existing supplier agreement between the parties (the "MDA"), which terms, except as
otherwise provided for in the Plan, will remain in full force and effect, and will be
incorporated into the Plan by reference.

4.    US Foods will agree that Debtors may defer payments for purchases made on
or after September 2, 2019, up to a total aggregate amount of $200,000 (the "Deferred
Amount"), with the Deferred Amount to be paid over twelve (12) months commencing on
the Effective Date of the Plan. RDI and US Foods will execute a mutually acceptable letter
agreement (the "Letter Agreement") for the payment of the amount of any such deferred

payments, which will be payable in twelve (12) monthly installments with a twelve percent (12%) interest rate.  The Letter Agreement, when executed, will be incorporated into the Plan by reference. The RDI Debtors agree to make the payments to US Foods on account of these amounts through an "autopayment" mechanism acceptable to US Foods.

5.     US Foods will restart shipments to the Irvine/Woodbridge restaurant, and will be paid each Wednesday for the prior week's orders/deliveries.  For the past due amount (approximately $43,000) owed by Irvine/Woodbridge for post-petition deliveries, US Foods agrees to payment in full in equal weekly installments for fifty-two (52) weeks commencing on the first week after deliveries have resumed, plus twelve percent (12%) annual interest.

6.     The Reorganized RDI Debtors agree to use US Foods as their primary supplier, and the Parties further agree that the termination date of the MDA is hereby extended to one year after the Effective Date of the Plan (or December 31, 2019 if no plan is confirmed prior to that date), during which time the parties will cooperate to negotiate an amended supplier agreement.

7.     Avoidance Actions against US Foods will be waived by all parties with standing to bring them, including the Debtors, their Estates and the Committee.

## I.    Treatment of Intercompany Claims

As of the Petition Date, after accounting for all intercompany obligations between them, RDI owes RFS the approximate amount of $400,000.  In addition, there will be an intercompany receivable on RDI's books in favor of RFS pursuant to the Netdown Process.

So long as RDI and RFS are in compliance with their obligations under the Plan, any intercompany receivable owed to RFS from RDI as a result of the Netdown Process and any other intercompany obligations between them will not be collected or paid, but will remain on the books as non-cash journal entries.

## J.    Lending and Borrowing of Monies Between Reorganized Debtors

So long as there is no default under the Plan, including with respect to the obligations to Opus Bank, following the Effective Date, the New HOP Entities, RFS and RDI may lend to and borrow monies between and among themselves.  Such intercompany obligations will not be collected or paid, but will remain on the books as non-cash journal entries.

## K.    Corporate Structure and Governance

### 1.    Charter

As of the Effective Date, and subject to such charter amendments as may be made pursuant

to the Plan, the articles of incorporation and bylaws of RDI will be the same as the articles of

incorporation and bylaws of RDI immediately before the Effective Date.  Effective as of the

Effective Date, the officers and directors of RDI will be the same as the officers and directors of RDI

immediately before the Effective Date, with the exceptions that Craig will be the Chairman of the

board of directors of RDI and Tad Belshe will no longer participate on the board (*i.e.,* the initial

board of directors of RDI will consist of Craig, Cavanaugh and Kosmides).  RDI will hold all of the

equity Interests in RFS, in the RDI Entities and, following the post-Effective Date contribution by

the Plan Sponsor, the equity Interests in the New HOP Entities.  Following the Effective Date and

satisfaction of their Plan obligations, SoCal Diners, Quality and Ruby's Laguna Hills will be

terminated as entities.  Charter amendments that may be made pursuant to the Plan include changes

as may be necessary or appropriate to (i) conform such documents to the terms of the Plan;

(ii) conform such documents to recent amendments to corporation statutes; and (iii) to include a

prohibition on the issuance of non-voting equity securities.

2.    **Voting Rights and Shareholder Agreement**

Voting shall be weighted based on the respective ownership interests in RDI held by Craig,

Cavanaugh and Kosmides.  As of the Effective Date, Craig, Cavanaugh and Kosmides shall enter

into a shareholders' agreement with respect to RDI which shall include terms and conditions that are

typical in privately held entities, including the delegation of management and control of RDI's

operations (including menu, design and branding decisions) to Cavanaugh.  All major decisions, and

those customarily identified as such in operating and shareholder agreements typical to privately

held entities, including without limitation, business decisions with respect to expansion of the

business or other business decisions that might require the contribution or expenditure of new capital

of RDI, will be made by majority vote of the equity holders based on their respective ownership

Interests.

With respect to capital calls, the shareholder agreement will provide that, if a shareholder

fails to contribute the capital called with the necessary vote of the shareholders in accordance with

his respective ownership Interest percentage as set forth above within thirty (30) days after the

capital call is made, the other shareholders shall have the right, but not the obligation, to make a loan

to RDI in the amount of the capital contribution that is not made, equal to his respective pro rata

share (based on his respective percentage equity interest) of the defaulting shareholder's share of the

capital, or the entire amount of the capital call deficiency, if not made by the other non-defaulting

shareholder.  Any such loan shall be treated as if RDI made a loan to the defaulting shareholder and

the non-defaulting shareholder made a loan to RDI.  Any such loan by RDI to a defaulting

shareholder (the "Default Loan") and any such loan from a non-defaulting shareholder to RDI (the

"Shareholder Loan") shall bear interest at a rate equal to the federal prime rate plus three percent

(3%) per annum and shall be secured by a pledge of the defaulting shareholder's equity interest in

RDI.   The defaulting shareholder shall execute and deliver such documents as are reasonably

necessary to create and perfect such security interest and the shareholder agreement for RDI shall

provide for a power of attorney in favor of the non-defaulting shareholders to effectuate such

documents if the defaulting shareholder fails to promptly execute and deliver same.  Any such

Default Loan and any such Shareholder Loan shall provide for the payment of accrued interest

monthly and for all principal and accrued and unpaid interest to be due and payable on or before the

date that is (i) six (6) months following the date the Default Loan and the Shareholder Loan are

advanced if the Default Loan and the Shareholder Loan are less than one million dollars

($1,000,000), or (ii) one year following the date the Default Loan and the Shareholder Loan are

advanced if the Default Loan and the Shareholder Loan is one million dollars  ($1,000,000) or more.

Failure to pay the Default Loan and the Shareholder Loan on or before the applicable maturity date

pursuant to the foregoing shall constitute a default under each of the Default Loan and the

Shareholder Loan.

At such time as any Default Loan or Shareholder Loan is defaulted and not paid, and

assuming one of the other shareholders advances such amount in lieu of the defaulting shareholder,

the percentage interests of the shareholders shall be recalculated, and the percentage interests of each

shareholder shall be adjusted such that each shareholder shall have an interest determined by

fraction, the numerator of which shall be the aggregate capital contributed by the shareholder, and

the denominator of which shall be the aggregate capital contributed by all shareholders, provided,

however, that for purposes of the foregoing calculation only, each shareholder shall be treated as

having contributed his proportionate share (in accordance with his percentage Interest in RDI) of the aggregate capital contributed by Craig as of the Effective Date of the Plan.

The consequence of a shareholder default shall be the dilution of the shareholder's equity in RDI, but a default will not result under any circumstance in personal liability of the defaulting shareholder.

For illustration purposes only, assume that Craig contributed a total of $4,000,000 as of the Effective Date of the Plan, and that there are three (3) shareholders – Craig at 60%, Shareholder A at 24% and Shareholder B at 16%.  Then assume that additional capital in the amount of $500,000 is required by RDI, and that Craig contributes 60% of such amount ($300,000); Shareholder A contributes 24% ($120,000), but Shareholder B does not contribute any amounts and Craig advances to RDI the share otherwise allocable to Shareholder B ($80,000).  In such event, the denominator in the following dilution formula would be $4.5 million (the original Plan Funding of $4 million plus the $500,000 capital call), and the percentage interests of the shareholders would be adjusted as follows:

For Craig:  $4,000,000 (allocable share of original Plan capital) + $300,000 (Craig share of current capital call) + $80,000 (Shareholder B capital call advanced by Craig) = $4,380,000.  $4,380,000/ $7,166,667 = 61.1%.

For Shareholder A:  $1,600,000 (imputed allocable share of original Plan capital) + $120,000 (Shareholder A share of current capital call) = $1,720,000.  $1,720,000 / $7,166,667 = 24%.

For Shareholder B:  $1,066,667 (imputed allocable share of original Plan capital) + $0 (Shareholder B unpaid current capital call) = $1,066,667.  $1,066,667 / $7,166,667 = 14.9%.

   3.    **Composition Of Reorganized Debtors' Board Of Directors And Identity And Compensation Of Officers**

The following are the titles and the salaries expected to be provided to the directors and officers of the Reorganized Debtors during the 2019 and 2020 fiscal years:[17]  Craig, Chairman of the Board, will not be paid a salary; Cavanaugh, Chief Executive Officer and Director, will be paid $250,000 from RDI per annum; Kosmides, Special Projects Coordinator and Director, will be paid

---

[17] The compensation of officers is subject to modification both pre and post-Effective Date.

$225 per hour on an as-requested basis; Mr. Belshe, Executive Vice President of Operations, will be paid $102,000 per annum; and Lori Smith, Secretary, will be paid $1,000 per annum.

RDI shall enter into at-will employment agreements with Messrs. Cavanaugh, Kosmides and Belshe and Ms. Smith as of the Effective Date which will provide for their compensation as set forth above and will provide for the continuation of medical insurance coverage in accordance with the medical insurance coverage provided to them by the Debtors as of the Petition Dates.

**L.    Estate Representative**

The Reorganized Debtors shall be appointed the Estate Representative for purposes of prosecuting any Rights of Action (subject to the limitations set forth in the Plan), objecting to Claims, disbursing monies to Holders of Claims under the Plan, liquidating property of the Estates and administering the Disputed Claim Reserve established pursuant to the Plan.  Without further order of the Court, the Reorganized Debtors may employ professionals, including counsel and accountants, the duties of which may include, without limitation, assisting in fulfilling the obligations under the Plan, including prosecuting any Rights of Action, objecting to Claims, filing tax returns and disposing of the assets of the Estates.  Such professionals shall be entitled to receive compensation for services rendered after the Effective Date without further order of the Court.

The Reorganized Debtors may pursue or decline to pursue any Rights of Action, as they deem appropriate in their sole discretion.  The Reorganized Debtors may settle, release, sell, and assign, otherwise transfer or compromise such Rights of Action.  Similarly, subject to the obligations set forth in the Plan, the Reorganized Debtors may sell any assets of Reorganized Debtors in their sole discretion.  The Reorganized Debtors may, but shall not be required to, set-off against any Claim and the Distributions to be made pursuant to the Plan in respect of such Claim, any claims the Estates may have against the Holder of the Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Reorganized Debtors of any such claims, set-off or recoupment rights which Reorganized Debtors may have against such Holder.

Unless a claim against a Creditor or other person is expressly waived, relinquished, compromised or settled in the Plan or in a Final Order, all rights with respect to such claim are reserved to the Reorganized Debtors, which may pursue such claim.  Upon the substantial

consummation of the Plan, the Reorganized Debtors may file, and after full consummation shall file, a report with the Court and request the entry of a final decree closing these Cases.

**M.    Disputed Claims and Unclaimed Property**

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Interests or Administrative Claims under the Plan, including the determination of the amount of Distributions due to the Holders of Allowed Claims and Administrative Claims, each Disputed Claim shall be treated as if it were an Allowed Claim or authorized Administrative Claim, as appropriate, except that if the Court estimates the likely portion of a Disputed Claim to be Allowed or otherwise determines the amount which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Debtors or the Reorganized Debtors, such amount as determined by the Court shall be used as to such Claim.

The Distributions due with respect to Disputed Claims based on the calculations required by the Plan shall be reserved for the Holders of the Disputed Claims and deposited in a segregated account (the "Disputed Claims Reserve").  The amount so deposited on behalf of a Creditor holding a particular Disputed Claim is referred to herein as the "Reserve Amount."

After an objection to a Disputed Claim is withdrawn or determined by Final Order, the Distributions due on account of any resulting Allowed Claim or authorized Administrative Claim shall be paid by the Reorganized Debtors from the Reserve Amounts for such Creditor held in the Disputed Claims Reserve together with the interest, if any, actually accrued on the Reserve Amounts (up to a maximum of the interest actually accrued on the amount of the resulting Allowed Claim or authorized Administrative Claim).  Such payment shall be made on the earlier of (1) the next payment date for Claims or Administrative Claims of the Class or type of the Claim or Administrative Claim of such Holder and (2) within forty-five (45) days of the date the Disputed Claim becomes an Allowed Claim or authorized Administrative Claim.  No interest shall be due to a Disputed Claim Holder based on the delay attendant to determining the allowance of such Claim except as set forth in this subsection.

Should the Distribution due with respect to a finally Allowed Claim of such Creditor exceed

the Reserve Amount for Administrative Claims, Secured Claims or Priority Claims, the shortfall may be paid from any available sums of the Reorganized Debtors and, for Unsecured Claims, the shortfall may be paid from funds, if any, otherwise available to distribute to Unsecured Claims, collectively.  In no event shall the Creditor have recourse to any payments already made to others.

After an objection to such a Disputed Claim is sustained in whole or in part by a Final Order, any Reserve Amounts for such Claim held in the Disputed Claims Reserve in excess of the Distributions due on account of any resulting Allowed Claim may be removed from the Disputed Claims Reserve and put in the Reorganized Debtors' general accounts, as applicable.

Any Cash or other property which is unclaimed for one-hundred eighty (180) days after the Distribution is sent by mail to the last known mailing address for the person entitled thereto as provided in the Plan ("Unclaimed Property") will be deemed paid to such entitled Person, for purposes of determining the Person's rights.  Any Creditor that does not claim its Distribution within one hundred eighty (180) days will receive no future Distribution under the Plan.  Unclaimed Property resulting from a Distribution shall revest in the respective Reorganized Debtor.

**N.      Claim Objection Bar Date**

The Debtors, Creditors and other parties in interest shall have until 120 days following the Effective Date of the Plan (the "Claim Objection Bar Date") to file all objections to Claims in these Chapter 11 Cases, subject to extension by Court order.

**VII.**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.      Unexpired Leases and Executory Contracts to be Assumed**

During the pendency of the Chapter 11 Cases, the Debtors assumed (and in the case of Laguna Hills, assigned) their leases for the restaurants for the Huntington Beach, Oceanside, Palm Springs and Laguna Hills locations and the corporate headquarters lease.  Attached to the Disclosure Statement as **Exhibit L** is a chart, which identifies the Debtors' other unexpired leases and executory contracts, and which specifically includes, without limitation, the Franchise Agreements which will be assumed by RFS and the RFS/RDI License Agreement under the Plan on the Effective Date (the "Assumed Contracts/Leases").  **Exhibit L** to the Disclosure Statement also itemizes the amount of

monetary defaults, if any, which exist under such leases and executory contracts, which the Debtors

must cure pursuant to section 365(b) of the Bankruptcy Code.  The Confirmation Order shall

constitute an Order approving the assumption of each lease and contract listed, and the assignment

thereof to the applicable Reorganized Debtor, and each such Assumed Contract/Lease shall be

binding on the respective Reorganized Debtor and the counter-parties thereto.  If you are a party to a

lease or contract to be assumed and you object to the assumption of your lease or contract and/or you

object to the amount that the Debtors have set forth on **Exhibit L** to the Disclosure Statement as

owing to cure monetary defaults, you must file and serve your objection to the Plan within the

deadline for objecting to the Confirmation of the Plan.[18]

**B.**      **Unexpired Leases and Executory Contracts to Be Rejected**

Attached to the Disclosure Statement as **Exhibit M** is a chart, which identifies unexpired

leases and executory contracts the Debtors will reject as of the Effective Date (the "Rejected

Contracts/Leases").  The Confirmation Order shall constitute an Order approving the rejection of

each lease and contract listed.  If you are a party to a contract or lease to be rejected and you object

to the rejection of your contract or lease, you must file and serve your objection to the Plan within

the deadline for objecting to the Confirmation of the Plan.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING

FROM THE REJECTION OF A LEASE OR CONTRACT UNDER THE PLAN IS THIRTY (30)

CALENDAR DAYS FROM THE DATE THE CONFIRMATION ORDER IS ENTERED ON THE

COURT'S DOCKET.  Any Claim based on the rejection of a contract or lease will be barred if the

Proof of Claim is not timely filed.

**VIII.**

**EFFECT OF CONFIRMATION OF PLAN**

**A.**      **Binding Effect Of Confirmation**

Confirmation will bind the Debtors, all Creditors, Interest Holders and other parties in

interest to the provisions of the Plan whether or not the Claim or Interest of such Creditor or Interest

---

[18] The Debtors reserve the rights to add or withdraw any contract or lease from the lists of Assumed Contracts/Leases or Rejected Contracts/Leases at any time prior to the Confirmation Hearing.

1   Holder is Impaired under the Plan and whether or not such Creditor or Interest Holder has accepted

2   the Plan.

3   **B.**      **Vesting of Assets Free and Clear of Liens, Claims and Interests**

4              Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective

5   Date, title to all assets and property of the Debtors, and all property of the Estates, including,

6   pursuant to section 1123(b)(3)(b) of the Bankruptcy Code, each and every claim, demand or cause of

7   action which each Debtor had or had power to assert immediately prior to Confirmation, will revest

8   in the Reorganized Debtors, free and clear of all liens, Claims and Interests.  Thereafter, the

9   Reorganized Debtors will hold these assets without further jurisdiction, restriction or supervision of

10  the Bankruptcy Court.

11  **C.**      **Good Faith, Exculpation and Release**

12             Confirmation of the Plan shall constitute a finding that:  (1) the Plan has been proposed in

13  good faith and in compliance with applicable provisions of the Bankruptcy Code; and (2) the

14  solicitation of acceptances or rejections of the Plan by all Persons has been in good faith and in

15  compliance with applicable provisions of the Bankruptcy Code.  Accordingly, on the Effective Date,

16  each of the of the Debtors, the D&Os, the Affiliated Entities, the Plan Sponsor, the Committee and

17  the members of the Committee, and each of their respective advisors and attorneys (all of the

18  foregoing, collectively, the "Exculpated Parties"), effective as of the Effective Date, will be deemed

19  exculpated by Holders of Claims against and Interests in the Debtors and other parties in interest to

20  the Chapter 11 Cases (including, without limitation, the Debtors and the Estates), from any and all

21  Claims, causes of action and other assertions of liability (including, without limitation, breach of

22  fiduciary duty), arising out of or related to the Debtors, the D&Os, the Affiliate Entities, the Plan

23  Sponsor, the Committee, the Chapter 11 Cases or the exercise by such entities of their functions as

24  members of or advisors to or attorneys for any such individuals or committee or otherwise under

25  applicable law, in connection with or related to the Chapter 11 Cases, and no Exculpated Party shall

26  have or incur any liability to any Entity for any act taken or omission made in connection with,

27  relating to or arising out of the Debtors' restructuring efforts, the Chapter 11 Cases, the formulation,

28  preparation, dissemination, negotiation or filing of the Disclosure Statement, Plan, or any contract,

instrument, release or other agreement or document created or entered into in connection therewith, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan or the Distribution of property under the Plan or any other related agreement; *provided, however,* that the foregoing shall not apply to the extent of any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

**D.      The D&O/Affiliate Release**

Prior to the Effective Date, there shall have been approved by the Bankruptcy Court, pursuant to a motion to be filed with the Bankruptcy Court under Section 9019 of the Bankruptcy Rules, a full and complete release (the "D&O/Affiliate Release") of any claims or causes of action, including but not limited to, avoidable transfers and breach of fiduciary duty claims (the "D&O/Affiliate Claims") against the D&Os, and any entity in which the D&Os, individually or together, hold a controlling interest or in which either of them, either directly or through an entity owned by either or both of them, is the managing partner or otherwise manages or controls the entity (each an "Affiliated Entity" and, together, the "Affiliated Entities").  Creditors shall have the right to object to the 9010 Motion notwithstanding how said creditor voted in connections with the Plan.

If the D&O/Affiliate Release is approved by the Bankruptcy Court, unsecured Creditors' claims of RDI (classified in Class 11(a)) will be entitled to payment of a total of Two Million Five Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of Six Hundred and Twenty-Five Thousand Dollars ($625,000) on each of the second (2nd), third (3rd), fourth (4th) and fifth (5th) anniversaries of the Effective Date, with Cavanaugh and Kosmides contributing an additional $ 1 million dollars to the Debtors through a further dilution of their stock in the Reorganized Debtors down to 25%.

Alternatively, if the D&O/Affiliate Release is not approved by the Bankruptcy Court, unsecured Creditors' claims of RDI (classified in Class 11(a)) will be entitled to a *pro rata* distribution from any proceeds ultimately recovered by the Litigation Trust that will have the right,

following the Effective Date, to investigate and, if appropriate, prosecute the D&O/Affiliate Claims, if any, against the D&Os and D&O Affiliated Entities; *provided, however*, that any distribution to the RDI unsecured Creditors from any recovery by the Litigation Trust shall be after payment of the fees and costs incurred by the Litigation Trust incurred in connection with the prosecution of claims or otherwise.

**E.    No Limitations on Effect of Confirmation**

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

**F.    Discharge of Claims**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

1

**G.    Injunction**

2        A FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY

3    ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF

4    ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE

5    CONFIRMATION ORDER.  FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT

6    OF THE RELEASES AND EXCULPATION GRANTED IN SECTION VIII.C., THE

7    RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR

8    CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE

9    EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE,

10    ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY

11    CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION,

12    INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO SECTION

13    VIII.C.

14        EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED

15    DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES

16    WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN

17    RELEASED, DISCHARGED OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY

18    ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE

19    FOLLOWING ACTIONS:  (I) COMMENCING OR CONTINUING IN ANY MANNER ANY

20    ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION

21    WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING,

22    ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY

23    JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF

24    OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS;

25    (III) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND

26    AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON

27    ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS

28    OR INTERESTS; (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION

OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL SUCH CLAIMS AND INTERESTS SHALL BE DEEMED SURRENDERED AND EXTINGUISHED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE DEEMED SURRENDERED OR EXTINGUISHED, AS THE CASE MAY BE, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

**H.**     **Securities Laws**

The entry of the Confirmation Order shall be a final determination of the Bankruptcy Court that the equity in reorganized RDI to be distributed pursuant to the Plan is entitled to all of the benefits and exemptions provided by section 1145 of the Bankruptcy Code.

**IX.**

**CONDITIONS TO EFFECTIVENESS OF THE PLAN**

The effectiveness of the Plan is conditioned upon the events described below:

A.     The receipt of the Plan Funding from the Plan Sponsor sufficient to make the Effective Date payments.

B.     The transfer of 100% of the equity interests in RFS to RDI in accordance with the terms of the Plan, and the agreement of the Plan Sponsor to contribute the Interests in the HOP Restaurant Entities to RDI.

C.     The issuance of the Interests in RDI in accordance with the terms of the Plan.

D.     Satisfaction of the Going Concern Value Requirement.

E.     Assumption by RFS of the Franchise Agreements and assumption by RDI and RFS of the RFS/RDI License Agreement.

F.     Approval of the New Value Contribution and the Reconciliation.

G.     Approval of the D&O/Affiliate Release or, alternatively, creation of the Litigation Trust.

H.     The Debtors' execution of all other Plan related agreements required to be executed by the Debtors.

I.     The Plan is conditioned on an agreement by the Professionals, or other determination, as to the treatment of their Professional Fees under the Plan that will allow the Plan to become effective.  If an agreement is not reached with respect to payment of professional fees that is acceptable to the Debtors and the Professionals, the Plan will not go effective.

# X.

## MISCELLANEOUS PLAN PROVISIONS

**A.    Rounding of Amounts / De Minimis Amount**

Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors may round all amounts for Distributions of Cash hereunder to Holders of Allowed Claims and Interests to the nearest whole dollar amount.  In addition, the Reorganized Debtors shall not be required to make a Distribution on account of any Claim until the Distribution to such Creditor totals a minimum of $5.00.

**B.    Name and Address of Holder**

For purposes of all Distributions under this Plan, the Reorganized Debtors will be entitled to rely on the name and address of the Holder of each Allowed Claim or Interest as shown on any timely filed Proof of Claim and, if none, as shown on the Debtors' Schedules, as of the date of the Confirmation Hearing, except to the extent that both the Reorganized Debtors and their counsel first receive adequate written notice of a transfer or change of address, properly executed by the Holder or its authorized agent.

**C.    Orders to Aid Consummation of Plan**

The Plan constitutes and incorporates a motion under 11 U.S.C. § 1142 and Bankruptcy Rules 7069 and 7070 for an order to cause the Debtors and all their present and former directors, officers, agents, employees, attorneys, and accountants to cooperate fully in providing the Debtors with all information regarding and access to properties and assets of the Debtors and their Estates; and to execute and deliver such documents and perform such acts as are reasonably necessary to enable the Debtors to take possession, custody, and control of all assets vested in the Debtors' Estates pursuant to the Plan to the extent provided for under the Plan and reasonably necessary to transfer all of the assets of the Debtors to the Reorganized Debtors as provided by the Plan, including the transfer of the Interests in RFS to RDI, the transfer of the HOP Assets to the New HOP Entities and the post-Effective Date transfer of the New HOP Entities to RDI.  Confirmation of the Plan shall be deemed a granting of such motion and the Confirmation Order shall be deemed the order thereon.

**D.      Severability**

If the Court determines, prior to the date of entry of the Confirmation Order, that any provision of the Plan is illegal either as written or as applied to any Claim or Interest, as the case may be, such provision shall be either unenforceable generally or as applied to such Claim or Interest.  A determination that a provision of the Plan is illegal or not enforceable as to a particular Claim or Interest shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan or of that provision as applied to other Claims or Interests and the Debtors may modify the Plan to withdraw or modify such provision.

**E.      Headings of Articles and Sections**

The headings of the articles and sections of the Plan are inserted for convenience only and shall in no way affect the interpretation of its provisions.

**F.      Successors and Assigns**

The rights, benefits and obligations of any Entity referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors or assigns of such Entity.

**G.      Changes in Rates Subject to Regulatory Commission Approval**

The Debtors are not subject to governmental regulatory commission approval of their prices.

**H.      Services By And Fees For Professionals**

      1.      **Prior to the Effective Date**

          a.      **Generally**

Fees and expenses for the Professionals retained by the Debtors for the services rendered and costs incurred after the Petition Date and prior to the Effective Date, will be fixed by the Bankruptcy Court after notice and a hearing and such fees and expenses will be paid after approval by the Bankruptcy Court to the extent so approved.

          b.      **From the Effective Date**

Fees owing for services rendered and costs incurred and owing on and after the Effective Date by the Professionals retained by the Reorganized Debtors will be paid by the Reorganized Debtors from the funds held by the Reorganized Debtors twenty (20) days after submission of a bill

therefore to the Reorganized Debtors, if there is no objection within such time.  If there is such an

objection, the fees and expenses will be fixed by the Bankruptcy Court after notice and a hearing.

The Bankruptcy Court will retain jurisdiction until the Chapter 11 Cases are closed, to determine

disputed post-Effective Date fees of Reorganized Debtors' professionals.

## I.    **Dissolution of Committee**

As of the Effective Date, the Committee and each of its members shall be released and

discharged from all duties and obligations arising from or related to the Chapter 11 Cases.

## J.    **Litigation Trust**

If the D&O/Affiliate Release is not approved by the Bankruptcy Court, the Class 11(a)

claimants will not be entitled to the payment of the $2.5 million.  Instead, on the Effective Date, a

litigation trust will be formed pursuant to the Plan (the "Litigation Trust").  The Litigation Trust will

have the express purpose of investigating and, if appropriate, prosecuting any D&O/Affiliate Claims,

and making a *pro rata* distribution from any proceeds ultimately recovered by the Litigation Trust

from such D&O/Affiliate Claims to the holders of Class 11(a) claims.   The Litigation Trust is

entitled to retain counsel or other advisors, which may include the advisors to the Committee, at the

expense of the Litigation Trust.  Any distribution to the Class 11(a) from the Litigation Trust shall be

after payment in full of the fees and costs incurred by the Litigation Trust incurred in connection

with the prosecution of D&O/Affiliate Claims or otherwise.  The Reorganized Debtors shall have no

liability for the payment of any fees or costs of the Litigation Trust, nor any liability to the holders of

Class 11(a) claimants, which shall obtain their recovery solely from the Litigation Trust.

## K.    **Amendment, Withdrawal or Revocation of the Plan**

The Debtors reserve the right to amend, revoke or withdraw the Plan prior to the

Confirmation Date.  If the Debtors should revoke or withdraw the Plan, then the Plan shall be null

and void, and nothing contained in the Plan shall constitute an admission by any of the Plan

Proponents, a waiver or release of any Claims by or against, or any Interests in the Debtors, or

prejudice in any manner the rights of Debtors

**L.    Impact of Default Under Plan**

In the event that the Reorganized Debtors default on their payment obligations under the Plan, Creditors will have the right to enforce their rights and remedies under applicable law.  As provided by Local Bankruptcy Rule 3020-1(d), if the Chapter 11 Cases are converted to chapter 7, the property of the Reorganized Debtors that has not been distributed under the Plan shall be vested in the chapter 7 trustee, except for property that would have been excluded from the estates if the Chapter 11 Cases had always been under chapter 7.

**M.    Payment of Post-Confirmation Quarterly Fees**

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the United States Trustee by each of the Debtors in accordance with 28 U.S.C. § 1930(a)(6) until entry of a final decree, or entry of an order of dismissal/conversion to chapter 7.

**N.    Notices**

Except as set forth elsewhere in this Plan, any notice required or permitted to be provided under this Plan, or any request for information with respect to the Plan, shall be in writing and served by either (1) certified mail, return receipt requested, postage prepaid, (2) hand delivery or (3) reputable overnight delivery service, freight prepaid, to be addressed as follows:

o    The Debtors (or Reorganized Debtors) and counsel for the Debtors (or Reorganized Debtors), at the following addresses:

Plan Proponents
Douglas Cavanaugh and Ralph Kosmides
Ruby's Diner, Inc., *et al.* and Ruby's Franchising Systems, Inc.
4100 MacArthur Blvd., Suite 310
Newport Beach, California 92660
Telephone: (949) 644-7829
Facsimile: (949) 644-4265


Counsel for the RDI Debtors
William N. Lobel, Esq.
Pachulski Stang Ziehl & Jones LLP
650 Town Center Drive, 15th Floor
Costa Mesa, California 92626
Telephone:  (714) 384-4740
Facsimile:   (714) 384-4741

E-mail:  wlobel@pszjlaw.com

Counsel for RFS

Eric J. Fromme, Esq.
Theodora Oringher PC
535 Anton Blvd., 9th Floor
Costa Mesa, California 92626
Telephone:  (714) 549-6200
Facsimile:  (714) 549-6201
E-mail:  efromme@tocounsel.com

o    The Plan Sponsor and counsel for the Plan Sponsor, at the following addresses:

Plan Sponsor

Steven L. Craig
c/o Craig Realty Group
4100 MacArthur Blvd, Suite 200
Newport Beach, California 92660

Counsel for the Plan Sponsor

Alan J. Friedman, Esq.
Shulman Hodges & Bastian LLP
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Telephone:  (949) 340-3400
Facsimile:  (949) 340-3000
Email:  afriedman@shbllp.com

o    Counsel to the Committee, at the following address:

Garrick Hollander, Esq.
Winthrop Couchot Golubow Hollander, LLP
1301 Dove Street, Suite 500
Newport Beach, California 92660
Telephone:  (949) 720-4100
Facsimile:  (949) 720-4111
Email:  ghollander@wcghlaw.com

## XI.

## **RETENTION OF JURISDICTION**

The Bankruptcy Court will retain and have exclusive jurisdiction over any matter (a) arising

under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that

relates to the following:

A.    Resolution of any matters related to the assumption, assumption and assignment, or

rejection of any executory contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date of the Plan, to add any executory contracts or unexpired leases to the lists of Assumed Contracts/Leases or Rejected Contracts/Leases;

B.      Entry of such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

C.      Determination of any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtors after the Effective Date;

D.      Ensuring that Distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

E.      Hearing and determining any timely objections to Administrative Claims or to Proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of secured or unsecured status of any Claim, in whole or in part;

F.      Entry and implementation of such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

G.      Issuance of such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

H.      Consideration of any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

I.      Hearing and determining all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

J.      Hearing and determining disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released or exculpated under the Plan;

K.      Issuance of injunctions or other orders as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

L.      Determination of any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument release, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Litigation Trust;

M.      Hearing and determining matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

N.      Hearing any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

O.      Entry of a final decree closing the Chapter 11 Cases.

## XII.

### **CONFIRMATION REQUEST**

In the event that all of the applicable requirements of 11 U.S.C. § 1129(a) are met other than paragraph (8), the Debtors requests confirmation of the Plan notwithstanding the requirements of such paragraph under 11 U.S.C. § 1129(b).

SUBMITTED BY:


Dated: October 1, 2019                      PACHULSKI STANG ZIEHL & JONES LLP


By:     _____/s/ William N. Lobel_____
                William N. Lobel
                Attorneys for Ruby's Diner, Inc., *et al.,* Debtors
                and Debtors in Possession


APPROVED BY JOINT PLAN PROPONENT:


Dated: October 1, 2019                      THEODORA ORINGHER PC


By:     _____*Eric J. Fromme*_____
                Eric J. Fromme
                Attorneys for Ruby's Franchising Systems,
                Inc., Debtor and Debtor in Possession

EXHIBIT "1"

## PLAN EXHIBIT 1 – "DEFINITIONS"

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein (and their plural or singular forms shall have correlative meanings):

*"2016 Restructuring Agreement"* means the Consent Solicitation Statement, the Restructured Notes, the Omnibus First Amendment, the UCC-1 Financing Statements filed in connection therewith, and any related documentation (including the Original Secured Credit Documents and Original Unsecured Credit Documents not amended by way of the Restructured Notes and Omnibus First Amendment).

*"9019 Motion"* means the motion to be filed with the Bankruptcy Court under Section 9019 of the Bankruptcy Rules wherein the Debtors will seek a full and complete release of any claims or cases of action, including by not limited to, avoidable transfers and breach of fiduciary claims against the Directors and Officers, and any entity in which either of the Directors and Officers individually or together, hold a controlling interest or in which either of them, either directly or through an entity owned by either of them, is the managing partner or otherwise manages or controls the entity.

*"Ad Fund"* means the fund created through Franchisees' payments in connection with the marketing and advertising of the Ruby's® brand on a regional and a system/national level, as required by certain Franchise Agreements.

*"Ad Fund Obligations"* means the Franchisees' obligations to contribute to the Ad Fund.

*"Administrative Claim"* means any Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code or by order of the Bankruptcy Court, including, without limitation, (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) the Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*"Administrative Claims Bar Date"* means the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

*"Administrative Personal Property Taxes"* means personal property tax Claims arising for the period from the Petition Date to the Effective Date.

*"Administrative Tax Claim"* means a Claim that is not an Allowed Secured Claim and that a Governmental Unit asserts against the Debtor either for taxes or for related interest or penalties for any tax period that, in whole or in part, falls within the period beginning on the Petition Date and ending on the Effective Date.

*"Affiliate"* means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

*"Allowed"* (this term is used both separately and in conjunction with other defined terms in the Plan (*e.g.*, Allowed Priority Tax Claim)) means, except as otherwise provided herein, (a) a Claim or Interest specifically allowed under the terms of the Plan, (b) a Claim or Interest that has been allowed by a Final Order or in a stipulation of amount and nature of the Claim or Interest executed by the Reorganized Debtors on, or after, the Effective Date, (c) an Interest or Claim as reflected by a Filed Proof of Claim that is not withdrawn or disallowed, or (d) if the Proof of Claim has not been Filed, the Claim as reflected in the Schedules if therein listed as undisputed, unliquidated and not

contingent or the Interest as reflected in the Schedules; <u>provided</u> that in the case of allowance under either subsections (c) or (d), any Claim's allowance is subject to any limitations imposed by section 502 of the Bankruptcy Code; and provided further that, for only the purpose of determining the timing of distributions pursuant to Plan, allowance under subsections (c) and (d) only is applicable once any of the following occur (1) before the Claims Objection Bar Date, the Debtors or the Reorganized Debtors have determined not to object to the Claim, (2) the Claims Objection Bar Date passes without an objection being Filed, or (3) after the Debtors timely object to the Claim, the Claim is allowed as provided in subparagraph (a) above.

*"Armory"* means Armory Consulting Co., financial advisor to RFS.

*"Assumed Contracts/Leases"* means the Debtors' unexpired leases and executory contracts to be assumed pursuant to the Plan, as set forth on **Exhibit L** to the Disclosure Statement.

*"Avoidance Actions"* means any and all actual or potential avoidance, recovery, subordination or other claims, actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, claims, actions or remedies arising under sections 502, 510, 542-553 and 724(a) of the Bankruptcy Code.

*"Ballot"* means the Ballot for accepting or rejecting the Plan.

*"Bankruptcy Code"* means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time and as applicable to the Chapter 11 Cases.

*"Bankruptcy Court"* or *"Court"* means the United States Bankruptcy Court for the Central District of California, or any other court having jurisdiction over the Chapter 11 Cases.

*"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

*"Bar Dates"* means the deadlines set by order of the Bankruptcy Court or the Plan for Filing Proofs of Claim or requests for payment of Administrative Claims in the Chapter 11 Cases.

*"Belshe"* means Tad Belshe.

*"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

*"Cash"* means the legal tender of the United States of America or the equivalent thereof.

*"Cash Flow Projections"* means the statements of estimated flows of Cash into and from the Debtors from and after the Effective Date, as set forth in **Exhibit B** to the Disclosure Statement.

*"Cavanaugh"* means Douglas Cavanaugh.

*"Chapter 11 Cases"* means, with respect to a Debtor, such Debtor's voluntary case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases (except that of Ruby's Franchising System, Inc.), under chapter 11 of the Bankruptcy Code, and styled *In re Ruby's Diner, Inc., et al.*, Case Nos. 8:18-bk-13311-CB; 8:18-bk-13197-CB; 8:18-bk-13198-CB; 8:18-bk-13199-CB; 8:18-bk-13200-CB; 8:18-bk-13201-CB; 8:18-bk-13202-CB (Jointly Administered); and *In re Ruby's Franchise Systems, Inc.*, Case No.: 8:18-bk-13324-CB.

"*Claim*" means any "claim" against any Debtor as defined in section 101(5) of the Bankruptcy Code.

"*Claim Objection Bar Date*" means the first Business Day that is 120 days following the Effective Date of the Plan.

"*Claimant*" means the Holder of a Claim.

"*Claims Register*" means the official register of Claims filed in the Debtors' Chapter 11 Cases..

"*Class*" means a category of Holders of Claims or Interests as set forth in Article V of the Plan pursuant to sections 1122(a) and 1123(a) of the Bankruptcy Code.

"*CMA*" means Credit Management Association, the Collateral Agent in connection with the Original Secured Notes and Restructured Secured Notes.

"*Collateral Agent*" means CMA, in its capacity as collateral agent in respect of the Original Secured Notes and Restructured Secured Notes.

"*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case of RDI pursuant to section 1102 of the Bankruptcy Code.

"*Company Restaurants*" means, collectively, the RDI Restaurants and the SoCal Restaurants.

"*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code that is in form and substance reasonably acceptable to the Debtors.

"*Consent Solicitation Statement*" means the Consent Solicitation Statement dated May 19, 2016.

"*Craig*" means Steven L. Craig.

"*Creditor*" means the Holder of a Claim or an Administrative Claim against any of the Debtors.

"*D&Os*" means Cavanaugh, Kosmides and Belshe.

"*D&O Affiliated Entity(ies)*" means any entity in which the D&Os, individually or together, hold a controlling interest or in which either of them, either directly or through an entity owned by either or both of them, is the managing partner or otherwise manages or controls the entity.

"*D&O/Affiliate Release*" means a full and complete release of any claims or causes of action, including but limited to avoidable transfers and breach of fiduciary duty claims against the D&Os and the D&O Affiliated Entities, approved by the Bankruptcy Court.

"*Debtors*" mean the RDI Debtors and RFS in their capacities as debtors in the Chapter 11 Cases.

"*DIP Lender*" means Steven L. Craig.

*"Disallowed Claim"* means (i) a Claim, or any portion thereof, that has been disallowed by a Final Order; (ii) a Claim that has been listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which no proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law; or (iii) a Claim that has not been listed in the Schedules and as to which no proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law.

*"Disclosure Statement"* means that certain *First Amended Disclosure Statement Describing First Amended Joint Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes the Plan, including all exhibits and schedules thereto and references therein that relate to the Plan.

*"Disclosure Statement Order"* means the order of the Bankruptcy Court approving the Disclosure Statement, as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto.

*"Disputed"* means, with respect to a Claim, Interest or any portion thereof that is not specifically Allowed under the Plan, that such Claim, Interest or portion thereof:  (a) is the subject of an objection or request for estimation filed by any of the Debtors or any other party in interest in accordance with applicable law, which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; (b) has not been otherwise Allowed and is scheduled by the Debtors as contingent, unliquidated, or disputed; or (c) is otherwise disputed in an adversary proceeding or otherwise before a court of competent jurisdiction or in a consensual private dispute resolution process by any of the Debtors or any other party in interest, which dispute has not been withdrawn, resolved, or overruled by a Final Order or other applicable final determination.

*"Disputed Claims Reserve"* means the segregated account(s) in which the Distributions due with respect to Disputed Claims based on the calculations required by the Plan shall be reserved for the Holders of the Disputed Claims.

*"Distribution"* means the distributions to be made pursuant to the Plan.

*"DRC"* means Donlin Recano & Company, Inc., the claims, noticing and balloting agent for the RDI Debtors.

*"Effective Date"* means the later of: (1) the first (1st) Business Day of the first (1st) month which begins at least fifteen (15) days following the Confirmation Date; and (2) the first (1st) day of the first (1st) month after such date under clause (1) on which there is not in force any stay or injunction against the enforcement of the Plan or the Confirmation Order, provided that the Effective Date will not occur until all Conditions to the Effective Date set forth in Section VIII of the Plan have been satisfied or waived by the Plan Proponents.

*"Entity"* means an "entity" as defined in section 101(15) of the Bankruptcy Code.

*"Equity Security"* means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

*"Estate Representative"* means the Reorganized Debtors, whose responsibilities shall include prosecuting any Rights of Action, objecting to Claims, disbursing monies to Holders of Claims under the Plan, liquidating property of the Estates and administering the Reserves established pursuant to the Plan (other than any Claims assigned to the Litigation Trust).

*"Estates"* means, collectively, the bankruptcy estates of the Debtors created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

*"Executory Contract"* means a contract to which any Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

*"Exhibit"* means an exhibit annexed to the Plan or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

*"Family Tree"* means Family Tree Produce, Inc.

*"File"* or *"Filed"* or *"Filing"* means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

*"Final Order"* means an order or judgment of the Bankruptcy Court, the operation or effect of which has not been reversed, stayed, modified or amended and which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined to be in effect by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order; provided, further, that the Debtors or the Reorganized Debtors, as applicable, reserve the right to waive any appeal period for an order or judgment to become a Final Order.

*"Founders"* means Cavanaugh and Kosmides.

*"Franchise Agreements"* means, collectively, the agreements between RFS and the Franchisees.

*"Franchise Royalties"* means the franchise royalty fees payable by the Franchisees to RFS as franchisor under the terms of the Franchise Agreements.

*"Franchised Restaurants"* means the Ruby's® Diner franchises (or licensed units) located in Southern California, Arizona, Pennsylvania, New Jersey, Nevada and Texas that are owned and, with certain limited exceptions, operated by independent third parties.

*"Franchisees"* means, collectively, the Ruby's® franchisee and licensee counterparties to Franchise Agreements with RFS.

*"General Unsecured Claim"* means any Prepetition Claim against any Debtor that is not a(n): (a) Administrative Claim; (b) Priority Tax Claim; (c) Priority Non-Tax Claim; or (d) Secured Claim.

*"GlassRatner"* means GlassRatner Advisory & Capital Group LLC, financial advisor to RDI.

*"Going Concern Value"* means (a) the total assets of RDI (including the value of its direct and indirect interests in RFS and the New HOP Entities), after taking into account the Plan Funding and

the New Value Contribution, less (b) the total liabilities of RDI, as restructured under the Plan or as otherwise discounted, as set forth in **Exhibit K** to the Disclosure Statement.

*"Going Concern Value Requirement"* means, as a prerequisite to the Plan Sponsor's funding of the Plan Funding whereby RDI's balance sheet as of the Effective Date must show a Going Concern Value of not less than Six Million Seven Hundred Thousand Dollars ($6,700,000).

*"Governmental Unit"* means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

*"Governmental Units Bar Date"* means the date that is 180 days after the date of entry of the Order for Relief in the relevant Chapter 11 Case.

*"Holder"* means an Entity holding a Claim against, or Interest in, any Debtor.

*"HOP Assets"* means the assets owned by the HOP Restaurant Entities.

*"HOP Plan Funding"* means that portion of the Plan Funding utilized to fund the Plan as to the HOP Restaurant Entities.

*"HOP Restaurant Entities"* means Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs.

*"Huntington Beach Lease"* means that certain nonresidential real property between Ruby's Huntington Beach and the City of Huntington Beach in respect to real property located at the Huntington Beach Pier, 1 Main Street, Huntington Beach, California 92648.

*"Huntington Beach Lease Stipulation"* means that stipulation between Ruby's Huntington Beach and the City of Huntington Beach authorizing the assumption of the Huntington Beach Lease and curing defaults thereof, approved by the Bankruptcy Court on March 11, 2019.

*"Impaired"* means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

*"Intercompany Claims"* means any Claim or Cause of Action of a Debtor against any other Debtor, whether or not a Proof of Claim is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code in any of the Chapter 11 Cases.

*"Interest"* means any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock or limited company interests.  The term "Interest" also includes any Claim that is determined to be subordinated to the status of an Equity Security by Final Order of the Bankruptcy Court, whether under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

*"Kosmides"* means Ralph Kosmides.

*"Laguna Hills Lease"* means that certain lease agreement, as amended from time to time, by and between Ruby's Laguna Hills and MGP Fund X Laguna Hills, , dated on or about September 16, 1994, in respect of real property within the Laguna Hills Mall, located at 24155 Laguna Hills Mall, Suite 184A, Laguna Hills, California 92653.

*"Laguna Hills Lease Assumption and Assignment Order"* means the order of the Bankruptcy Court granting the Laguna Hills Lease Motion, entered on March 21, 2019.

"*Laguna Hills Lease Motion*" means the motion filed by RDI, Ruby's Laguna Hills and SoCal Diners to assume and assign the Laguna Hills Lease, sell FF&E to the assignee and to obtain other relief, filed with the Bankruptcy Court on March 15, 2019.

"*Laguna Hills Restaurant*" means the Ruby's Diner within the Laguna Hills Mall, located at 24155 Laguna Hills Mall, Suite 184A, Laguna Hills, California 92653.

"*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

"*Litigation*" means lawsuits to which one or more of the Debtors were a party as of the Petition Date listed on **Exhibit C** to the Disclosure Statement.

"*Litigation Trust*" means the litigation trust to be formed pursuant to the Plan, if the D&O/Affiliate Release is not approved,  that will have the right to investigate and, if appropriate, prosecute claims, if any, against the D&Os and D&O Affiliated Entities, as further discussed in Section VI.I.10 of the Disclosure Statement.

"*Marks and Intellectual Property*" means the trademarks, system and intellectual property owned by RDI, including, without limitation, trade names such as "Ruby's®," "Ruby's® Diner," and "The Ruby Restaurant Group."

"*Netdown Process*" means the Post-Petition Netdown and Pre-Petition Netdown described in Section III.C.12 and VI.E.7 of the Disclosure Statement.

"*New HOP Entities*" means the entities owned by the Plan Sponsor that will own the HOP Assets subject to the debt against the HOP Restaurant Entities and the HOP Assets, as restructured under the Plan.  The ownership of the New HOP Entities will be contributed by the Plan Sponsor to RDI post-Effective Date.

"*New Opus Bank HOP Note*" means the new note issued to Opus Bank by the New HOP Entities in connection with the Class 2 Allowed Secured Claim.

"*New Opus Bank RFS Note*" means the new note issued to Opus Bank by RFS  in connection with the Class 6 Allowed Secured Claim.

"*New Value Contribution*" means the Founders' contribution to RDI on the Effective Date of the Plan in the form of a portion of the value of their ownership interests in RFS (based on the equity value of RFS adjusted by the Reconciliation) as provided by the Plan and as described in greater detail in Section VI.E.4 and **Exhibit A** to the Disclosure Statement.

"*Noteholders*" means, collectively, the Secured Noteholders and the Unsecured Noteholders.

"*Oceanside Lease*" means that certain lease, as amended from time to time, by and between RDI and the City of Oceanside, on or about March 1, 1996, of real property located at 1 Oceanside Pier, Oceanside, California 92054.

"*Omnibus First Amendment*" means the Consent Solicitation Statement, the Restructured Notes, the First Amendment to Security Agreement, Credit Agreement (Secured), Collateral Agent and Intercreditor Agreement (Secured), Credit Agreement (Unsecured), and Representative and Intercreditor Agreement (Unsecured), and Agreement Regarding Restatement of Promissory Notes, effective as of July 1, 2016.

*"Opus Bank"* means Opus Bank, the Holder of the Class 2 Allowed Secured Claim (SoCal Debtors) and the Holder of the Class 6 Allowed Secured Claim (RFS).

*"Original Notes"* means, collectively, the Original Secured Notes and Original Unsecured Notes.

*"Original Secured Credit Documents"* means the Credit Agreement, Collateral Agent and Intercreditor Agreement, the Security Agreement (Personal Property), dated as of February 10, 2012, by and between RDI and CMA, as collateral agent for and the representative of each of the Secured Noteholders of RDI, and related documentation, including, without limitation, the UCC-1 Financing Statement filed in connection therewith., relating to the Original Secured Notes.

*"Original Secured Notes"* means the Secured Promissory Notes, dated as of February 10, 2012, by and between RDI and CMA, as collateral agent for and the representative of each of the Secured Noteholders of RDI.

*"Original Unsecured Credit Documents"* means the Credit Agreement and the Representative and Intercreditor Agreement, dated as of July 16, 2012, by and between RDI and the Steering Committee, as the representative of each of the Unsecured Noteholders of RDI, relating to the Original Unsecured Notes.

*"Original Unsecured Notes"* means the Unsecured Promissory Note, by and between RDI and the Steering Committee, as the representative of each of the Unsecured Noteholders of RDI, dated as of July 16, 2012.

*"PACA Claims"* means Claims arising in connection with the sale of perishable agricultural commodities pursuant to the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. §§ 499, *et seq.*

*"Palm Springs Lease"* means that certain commercial lease agreement by and between Ruby's Palm Springs and John Wessman dba Plaza Mercado, dated on or about October 25, 1999, in respect of real property located at 155 S. Palm Canyon Drive, Palm Springs, California 92262.

*"Person"* means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

*"Petition Date(s)"* means, individually, the date on which the relevant Debtor commenced its Chapter 11 Case, i.e., August 29, 2018, with respect to the SoCal Debtors, September 5, 2018, with respect to RDI, and September 6, 2018, with respect to RFS.

*"Petitions"* means the respective voluntary petitions for relief (Official Form 201 and all attachments thereto) Filed by the Debtors on the Petition Date.

*"Pillsbury"* means Pillsbury Winthrop Shaw Pittman LLP.

*"Pillsbury Claim"* means the Claims asserted by Pillsbury in the amount of $658,095 against RDI, SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs.

*"Plan"* means the *First Amended Joint Chapter 11 Plan of Reorganization*, including the Exhibits and Plan Schedules and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

*"Plan Funding"* means the consideration to be provided by the Plan Sponsor as described in Section VI.E.2 of the Disclosure Statement.

*"Plan Proponents"* means the RDI Debtors and RFS.

*"Plan Sponsor"* means Steven L. Craig.

*"Plaza Bonita"* means Plaza Bonita, the holder of a Claim against SoCal Diners.

*"Post-Petition"* means the time period beginning immediately upon the filing of the relevant Chapter 11 Case and ending on the Effective Date.

*"Post-Petition Netdown"* means the process whereby RDI and RFS were authorized by the Bankruptcy Court to honor post-petition obligations between and among RDI, RFS and the Ruby's® Franchisees, as described in Section III.C.12 of the Disclosure Statement.

*"Preference Actions"* means lawsuits to recover transfers pursuant to the provisions of section 547 of the Bankruptcy Code.

*"Preference Period"* means, as to Creditors who are not Insiders, the ninety (90) day period preceding the applicable Petition Date and, as to Creditors who are Insiders, the one (1) year period preceding the applicable Petition Date.

*"Preference Period Payments Listing"* means the summary of the gross dollar amount of payments made by each of the Debtors during the ninety (90) day period preceding the respective Petition Dates and the one (1) year period for Creditors who are Insiders, attached as **Exhibit E** to the Disclosure Statement.

*"Pre-Petition"* means the time period prior to the Petition Date in the relevant Debtor's Chapter 11 Case.

*"Pre-Petition Claims"* means Claims against the relevant Debtor arising prior to the Petition Date in such Debtor's Chapter 11 Case.

*"Pre-Petition Netdown"* means the Netdown Process for the Pre-Petition period implemented under the Plan, as described in Section VI.E.7 of the Disclosure Statement.

*"Priority Claims"* means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

*"Priority Non-Tax Claims"* means Claims referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7).

*"Priority Tax Claim"* means certain unsecured income, employment and other taxes described in section 507(a)(8) of the Bankruptcy Code.

*"Professional"* means (a) any Entity employed in the Chapter 11 Cases pursuant to section 327, 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

*"Professional Claims"* means Claims by Professionals or other entities requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b) and 1103 for services rendered prior to the Effective Date.

*"Proof of Claim"* means a proof of Claim or Interest Filed against any Debtor in the Chapter 11 Cases.

*"PSZJ"* means Pachulski Stang Ziehl & Jones LLP, general insolvency counsel to the RDI Debtors.

*"Quality"* means Ruby's Quality Diners, LLC, a Delaware limited liability company.

*"RDI"* means Ruby's Diner, Inc., a California corporation.

*"RDI Debtors"* means, collectively, the SoCal Debtors and RDI.

*"RDI DIP Financing Order"* means the order of the Bankruptcy Court approved the RDI DIP Loan, entered on March 21, 2019.

*"RDI DIP Loan"* means the $300,000 debtor in possession loan from the DIP Lender.

*"RDI Entities"* means, collectively, non-debtors Ruby's Beach Ventures LLC, Ruby's Diner South Coast Plaza LP, Ruby's Woodbridge LLC and Ruby's Spectrum LLC.

*"RDI License Fee"* means the license fee payable to RDI under the RDI/RFS License Agreement in the amount of one percent (1%) of the Gross Sales (as such term is defined in the RDI/RFS License Agreement) generated by RFS and the Franchisees.

*"RDI Plan Funding"* means that portion of the Plan Funding utilized to fund the Plan as to RDI, SoCal and Quality.

*"RDI Restaurants"* means, collectively, the restaurants owned by the RDI Entities.

*"RDI/RFS License Agreement"* means that certain Amended and Restated Trademark and Intellectual Property License Agreement, between RDI and RFS, dated June 1, 1990.

*"Reconciliation"* means the process by which the Claims between and among the Debtors and the Founders, as reflected in **Exhibit E** to the Disclosure Statement, will be reconciled and utilized to calculate the New Value Contribution by the Founders.

*"Regulations"* means the income tax regulations promulgated pursuant to the Tax Code.

*"Rejected Contracts/Leases"* means the Debtors' unexpired leases and executory contracts to be rejected pursuant to the Plan, as set forth on **Exhibit M** to the Disclosure Statement.

*"Reorganized Debtors"* or *"Reorganized [Debtor name]"* means either all Debtors or the indicated Debtor, as reorganized pursuant to this Plan, on or after the Effective Date.

*"Replacement Collateral Agent"* means the entity appointed under the Plan to serve as Collateral Agent in connection with the Secured Notes following the Effective Date.

*"Reserve Amount"* means the amount deposited in the Disputed Claims Reserve on behalf of a Creditor holding a particular Disputed Claim.

*"Restaurants"* means, collectively, the Company Restaurants and the Franchised Restaurants.

*"Restructured Notes"* means RDI's amendment and restatement of the Original Notes on or about June 30, 2016, with the approval of the Noteholders and in accordance with the Consent

Solicitation Statement, and any amendments, addendums or modifications thereto, or restatements thereof.

*"Restructured Secured Notes"* means the Secured Notes.

*"RFS"* means Ruby's Franchise Systems, Inc., a California corporation.

*"RFS Note"* means that certain Restated and Amended Promissory Note, dated December 22, 2014, by and between RFS and Steven L. Craig, in the principal amount of $1,000,000, and any amendments or modifications thereto, or restatements thereof.

*"Rights of Action"* means any action, proceeding, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, reduced to judgment or not reduced to judgment, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Right of Action includes: (a) any right of setoff, counterclaim or recoupment (except to the extent that the result of including any setoff or recoupment in this definition would result in an outcome, including, by example, an impermissible discharge of setoff or recoupment rights, prohibited by otherwise applicable bankruptcy law) and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

*"Ruby's Huntington Beach"* means Ruby's Huntington Beach, Ltd., a California limited partnership.

*"Ruby's Huntington Beach Unsecured Distribution Amount"* has the meaning set forth in Section VI.C.5.c of the Disclosure Statement.

*"Ruby's Laguna Hills"* means Ruby's Laguna Hills, Ltd., a California limited partnership.

*"Ruby's Oceanside"* means Ruby's Oceanside, Ltd., a California limited partnership.

*"Ruby's Oceanside Unsecured Distribution Amount"* has the meaning set forth in Section VI.C.5.c of the Disclosure Statement.

*"Ruby's Palm Springs"* means Ruby's Palm Springs, Ltd., a California limited partnership.

*"Ruby's Palm Springs Unsecured Distribution Amount"* has the meaning set forth in Section VI.C.5.c of the Disclosure Statement.

*"Schedules"* means the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests and all amendments or supplements thereto, including any global notes, statement of limitations, methodology and disclaimers incorporated by reference therein, Filed or to be Filed by the Debtors with the Bankruptcy Court (as may be amended, modified or supplemented from time to time).

*"SEC"* means the Securities and Exchange Commission, or any successor agency.

"*Secured Claim*" means a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to a valid right of setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

"*Secured Noteholders*" means, collectively, the Holders of the Secured Notes.

"*Secured Notes*" means, collectively, Amended and Restated Secured Promissory Notes, dated on or about July 1, 2016, and any amendments or modifications thereto, or restatements thereof.

"*Secured Tax Claims*" means Claims of taxing authorities secured by personal property owned by RDI, the SoCal Debtors and RFS, including, without limitation, the Claims identified on **Exhibit H** to the Disclosure Statement.

"*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

"*Securities Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

"*SoCal Debtors*" means, collectively, SoCal Diners, Quality, Ruby's Huntington Beach, Ruby's Laguna Hills, Ruby's Oceanside and Ruby's Palm Springs.

"*SoCal Diners*" means Ruby's SoCal Diners, LLC, a Delaware limited liability company.

"*SoCal Entities*" means, collectively, Ruby's Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs, Ruby's Laguna Hills and Ruby's Mission Valley, Ltd.

"*SoCal Restaurants*" means, collectively, the restaurants owned by the SoCal Entities.

"*Steering Committee*" means the "steering committee" comprised of Unsecured Noteholders designated as the representative with respect to the Original Unsecured Notes and Restructured Unsecured Notes, pursuant to the Original Unsecured Credit Documents.

"*Tax Code*" means the Internal Revenue Code of 1986, as amended.

"*TO*" means Theodora Oringher PC, general insolvency counsel to RFS.

"*Unclaimed Property*" means any Cash or other property distributed pursuant to the Plan which is unclaimed for one-hundred eighty (180) days after the Distribution is sent by mail to the last known mailing address for the person entitled thereto as provided in the Plan.

"*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means, when used with reference to a Claim, subclass or Class, the circumstance where such Claim, subclass or Class is treated in a manner comporting with the requirements of Bankruptcy Code section 1124, providing, with certain exceptions, that the treatment has left unaltered the legal, equitable, and contractual rights to which a particular Claim (or all of the Claims in a Class) entitles the Holder of such Claim(s). In accordance with, by example, Bankruptcy Code sections 365 or 1123(a)(5)(G), unless expressly specified otherwise, such

treatment includes the waiver or curing of defaults and the reinstatement of maturity of such Claim, without payment of penalties or other default-related amounts.

*"Unsecured Claims"* means unsecured Claims not entitled to priority under Bankruptcy Code section 507(a).

*"Unsecured Noteholder Claims"* means Unsecured Claims of Unsecured Noteholders against RDI classified in Class 11(a) of the Plan.

*"Unsecured Noteholders"* means, collectively, the Holders of RDI Unsecured Notes.

*"Unsecured Notes"* means the Amended and Restated Unsecured Promissory Notes, dated as of July 1, 2016, and any amendments, addendums or modifications thereto, or restatements thereof.

*"US Foods"* means U.S. Foods, Inc.

*"US Foods Settlement"* means the terms of the settlement between the Debtors and US Foods as set forth in Section VI.E.8 of the Disclosure Statement.

*"UST Reports"* means the Debtors' Monthly Operating Reports filed with the Office of the United States Trustee.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 Town Center Drive, Suite 1500, Costa Mesa, CA  92626**

A true and correct copy of the foregoing document entitled:  **FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION** thereof will be served or was served (a) on the judge in chamber in the form and manner required by LBR 5005-2(d); and the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **10/1/2019**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On _____  I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **10/2/2019**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 10/1/2019 | Nancy Lockwood | /s/ Nancy Lockwood |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:316841.1 76135/001

**F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **George B Blackmar**   gblackmar@bpslaw.net
- **Dustin P Branch**   branchd@ballardspahr.com, carolod@ballardspahr.com;hubenb@ballardspahr.com
- **Aaron Davis**   aaron.davis@bryancave.com, kat.flaherty@bryancave.com
- **Alan J Friedman**   afriedman@shbllp.com, lgauthier@shbllp.com
- **Eric J Fromme**   efromme@tocounsel.com, lchapman@tocounsel.com;sschuster@tocounsel.com
- **Alastair M Gesmundo**   agesmundo@wcghlaw.com, jmartinez@wcghlaw.com
- **Richard H Golubow**   rgolubow@wcghlaw.com,
  pj@wcghlaw.com;jmartinez@wcghlaw.com;Meir@virtualparalegalservices.com
- **Steven T Gubner**   sgubner@bg.law, ecf@bg.law
- **Michael J Hauser**   michael.hauser@usdoj.gov
- **Garrick A Hollander**   ghollander@wcghlaw.com,
  pj@wcghlaw.com;jmartinez@wcghlaw.com;Meir@virtualparalegalservices.com
- **Lillian Jordan**   ENOTICES@DONLINRECANO.COM, RMAPA@DONLINRECANO.COM
- **David S Kupetz**   dkupetz@sulmeyerlaw.com,
  dperez@sulmeyerlaw.com;dperez@ecf.courtdrive.com;dkupetz@ecf.courtdrive.com
- **William N Lobel**   wlobel@pszjlaw.com, nlockwood@pszjlaw.com;jokeefe@pszjlaw.com;banavim@pszjlaw.com
- **Robert S Marticello**   Rmarticello@swelawfirm.com,
  gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- **Jessica G McKinlay**   mckinlay.jessica@dorsey.com
- **Malcolm D Minnick**   dminnick@pillsburylaw.com, m.minnick@comcast.net
- **Ernie Zachary Park**   ernie.park@bewleylaw.com
- **Valerie Smith**   claims@recoverycorp.com
- **United States Trustee (SA)**   ustpregion16.sa.ecf@usdoj.gov
- **Matthew S Walker**   matthew.walker@pillsburylaw.com,
  renee.evans@pillsburylaw.com,docket@pillsburylaw.com
- **Corey R Weber**   ecf@bg.law, cweber@bg.law
- **Sharon Z. Weiss**   sharon.weiss@bclplaw.com, raul.morales@bclplaw.com
- **Christopher K.S. Wong**   christopher.wong@arentfox.com, yvonne.li@arentfox.com

2. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**

Via Attorney Service (Messenger) on 10/2/2019
The Honorable Catherine E. Bauer
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5165 / Courtesy Bin
Santa Ana, CA 92701-4593

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.