William N. Lobel, State Bar No. 93202
PACHULSKI STANG ZIEHL & JONES LLP
650 Town Center Drive, Suite 1500
Costa Mesa, California 92626
Telephone:  (714) 384-4740
Facsimile:   (714) 384-4741
E-mail:  wlobel@pszjlaw.com

Attorneys for Ruby's Diner, Inc., a California corporation,
*et al.,* Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA

| | |
|---|---|
| RUBY'S DINER, INC., a California corporation, *et al.,*[1]<br><br>Debtors and Debtors in Possession.<br><br>Affects:<br><br>☒ All Debtors<br><br>☐ RUBY'S DINER, INC., ONLY<br><br>☐ RUBY'S SOCAL DINERS, LLC, ONLY<br><br>☐ RUBY'S QUALITY DINERS, LLC, ONLY<br><br>☐ RUBY'S HUNTINGTON BEACH, LTD., ONLY<br><br>☐ RUBY'S LAGUNA HILLS, LTD. ONLY<br><br>☐ RUBY'S OCEANSIDE, LTD., ONLY<br><br>☐ RUBY'S PALM SPRINGS, LTD., ONLY | Chapter 11<br><br>Case No. 8:18-bk-13311-CB<br><br>Jointly Administered With Case Nos. 8:18-bk-13197-CB; 8:18-bk-13198-CB; 8:18-bk-13199-CB; 8:18-bk-13200-CB; 8:18-bk-13201-CB; 8:18-bk-13202-CB<br><br>**FIRST AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**<br><br><u>**Disclosure Statement Hearing**</u>:<br><br>DATE:       October 23, 2019<br>TIME:        10:00 a.m.<br>CTRM:      5D |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

---

[1] The chapter 11 cases of Ruby's Diner, Inc., Ruby's SoCal Diners, LLC, Ruby's Quality Diners, LLC, Ruby's Huntington Beach, Ltd., Ruby's Laguna Hills, Ltd., Ruby's Oceanside, Ltd. and Ruby Palm Springs, Ltd. (referred to herein as the "<u>RDI Debtors</u>") are jointly-administered.  The chapter 11 case of Ruby's Franchising System, Inc. ("<u>RFS</u>"), Case No. 8:18-bk-13324-CB, is not jointly-administered with the RDI Debtors' chapter 11 cases, but the Plan is jointly proposed by the RDI Debtors and RFS.

DOCS_LA:323709.20

1

2

## <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ....................................................................................... 1

    A.    Purpose of This Document ................................................................ 5

    B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing .............. 5

        1.    Time and Place of the Confirmation Hearing ............................. 6

        2.    Deadline For Voting For or Against the Plan ............................. 6

        3.    Deadline For Objecting to the Confirmation of the Plan ............ 6

        4.    Identity of Persons to Contact for More Information Regarding the Plan ............ 7

II. DISCLAIMER .......................................................................................... 8

III. BACKGROUND ...................................................................................... 9

    A.    Description and History of the Plan Proponents' Business .................. 9

        1.    The Plan Proponents' Corporate Structure and Revenue Sources .............. 9

        2.    Overview of the Plan Proponents' Debt Structure ..................... 12

            a.    RDI's Secured and Unsecured Creditors .................... 12

            b.    The SoCal Debtors' Secured and Unsecured Creditors ......... 13

            c.    RFS' Secured and Unsecured Creditors ...................... 14

    B.    Events Leading to Chapter 11 Filings ............................................. 14

        1.    Overview of the RDI Debtors' Financial Difficulties ................. 14

    C.    Significant Events in the Bankruptcy Cases Through the Date of Filing of Disclosure Statement .............. 21

        1.    Chapter 11 Status Conference .................................................. 21

        2.    341(a) Meetings ....................................................................... 21

        3.    Appointment of an Official Committee of Unsecured Creditors in the RDI Case .............. 21

        4.    Joint Administration of the RDI Debtors' Cases ...................... 22

        5.    Employee Wages and Benefits ................................................. 22

        6.    Schedules and Statements of Financial Affairs ........................ 22

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

7.    Honoring of Customer Programs and Payment of Certain Pre-Petition Claims ........................................................................................................ 22

8.    Unexpired Leases and/or Executory Contracts .................................. 22

      a.    The Huntington Beach Lease ..................................................... 22

      b.    The Oceanside Lease ................................................................... 23

      c.    The Palm Springs Lease .............................................................. 23

      d.    The Laguna Hills Lease ............................................................... 24

      e.    The Corporate Lease ................................................................... 24

      f.    The Franchise Agreements ......................................................... 25

      g.    Other Agreements ....................................................................... 25

9.    The Claims Bar Dates ................................................................................ 25

10.   Use of Cash Collateral .............................................................................. 25

11.   Post-Petition Financing ............................................................................ 26

12.   Post-Petition Netdown Motion and Implementation of Pre-Petition Netdown Process Under the Plan ............................................................ 28

13.   The Exclusivity Periods and the Filing of the Plan and Disclosure Statement ....................................................................................................... 30

D.    Pending Litigation ................................................................................................. 31

E.    Retention and Compensation of Professionals ............................................... 31

      1.    Retention of Professionals ....................................................................... 31

      2.    Compensation of Professionals .............................................................. 32

IV. FINANCIAL INFORMATION ............................................................................................ 32

A.    Financial Information ........................................................................................... 32

      1.    Procedures Implemented to Resolve Financial Problems .................. 32

            a.    G&A Expenses ............................................................................. 33

            b.    Efforts to Increase Sales ........................................................... 33

            c.    Efforts to Further Develop Franchising Program ................ 33

B.    Principals/Affiliates of Debtors' Business ........................................................ 34

      1.    Shareholders, Directors and Officers .................................................... 34

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

| | | | 2. | Management Compensation | 34 |

V. ITEMIZATION OF THE DEBTORS' ASSETS .......................................................... 35

A.    Cash on Hand and Accounts Receivable .................................................. 35

B.    Intellectual Property and Franchising Related Interests ........................... 35

C.    Membership and Partnership Interests ...................................................... 35

D.    Leased Assets ........................................................................................... 37

E.    Furniture, Fixtures and Equipment .......................................................... 37

F.    Litigation Claims ..................................................................................... 37

1.    Actual and Projected Recovery of Preferential or Fraudulent Transfers ... 37

VI. SUMMARY OF THE PLAN OF REORGANIZATION ........................................... 39

A.    What Creditors and Interest Holders Will Receive Under The Proposed Plan ..... 39

B.    Unclassified Claims .................................................................................. 39

1.    Administrative Claims ................................................................ 40

a.    Administrative Claims of Non-Professionals ................... 40

b.    Administrative Claims of Professionals ........................... 41

c.    Administrative Personal Property Tax Claims ................. 43

d.    Administrative Bar Date for Filing of Administrative Claims ...... 43

i.    Bar Date for Administrative Tax Claims ........... 43

ii.    Bar Date for All Other Administrative Claims ....... 44

2.    Priority Tax Claims ..................................................................... 44

C.    Classified Claims and Interests ................................................................ 45

1.    Summary of Classification under the Plan .................................. 45

2.    Classes of Secured Claims .......................................................... 47

a.    Class 1:  Allowed Secured Claims of the Secured Noteholders (RDI) ...... 47

b.    Class 2: Allowed Secured Claim of Opus Bank (SoCal Debtors) ...... 48

c.    Class 3: Allowed Secured Claim of C&C Partnership (SoCal Debtors) ...... 49

d.    Class 4: Allowed Secured Claim of Pillsbury Winthrop Shaw
Pittman LLP (HOP Restaurant Entities)..........................................50

e.    Class 5: Allowed Secured Claim of Plaza Bonita LLC (SoCal
Diners)...................................................................................................51

f.    Class 6:  Allowed Secured Claim of Opus Bank (RFS) ...............52

g.    Class 7: Allowed Claim of Steven L. Craig (RFS)........................54

h.    Class 8:  Secured Tax Claims – Class 8(a) (RDI), Class 8(b)
(SoCal Debtors) and Class 8(c) (RFS)............................................54

3.    Class 9: Allowed PACA Claims (RDI and Certain of the SoCal
Debtors)..............................................................................................55

4.    Class 10:  Priority Non-Tax Claims – Class 10(a) (RDI), Class 10(b)
(SoCal Debtors) and Class 10(c) (RFS)...........................................55

5.    Classes of Unsecured Claims ..........................................................56

a.    Class 11(a):  Allowed Unsecured Claims Against RDI...............57

b.    Class 11(b):  Gift Card Reimbursement Claims of Franchisees
Satisfied Though Pre-Petition Netdown Process .........................57

c.    Class 11(c):  General Unsecured Claims Against the SoCal
Debtors ...............................................................................................58

d.    Class 11(d):  General Unsecured Claims Against RFS ................59

D.    Interests ..........................................................................................................59

E.    Means of Effectuating the Plan..................................................................61

1.    Funding for the Plan.........................................................................61

a.    Cash Needs on the Effective Date. .................................................61

b.    Sources of Cash on the Effective Date. .........................................61

2.    Plan Funding From Plan Sponsor ..................................................61

3.    Transfer of HOP Assets to New HOP Entities, Contribution of New
HOP Entities to RDI and Provision of the HOP Plan Funding and RDI
Plan Funding .....................................................................................62

4.    New Value Contribution ..................................................................63

5.    Reconciliation of Pre-Petition Claims Between and Among the
Debtors and the Founders ...............................................................63

6.    Transfer of Interests in RFS to RDI; Post-Effective Date Ownership of
RDI.......................................................................................................63

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

7.    Pre-Petition Netdown Process.................................................................63

8.    U.S. Foods Settlement.............................................................................64

9.    Treatment of Intercompany Claims .......................................................66

10.   Lending and Borrowing of Monies Between Reorganized Debtors..........66

11.   Corporate Structure and Governance....................................................66

      a.    Charter.......................................................................................66

      b.    Voting Rights and Shareholder Agreement ...............................67

      c.    Composition Of Reorganized Debtors' Board Of Directors And
            Identity And Compensation Of Officers......................................69

12.   Estate Representative ...........................................................................70

13.   Disputed Claims and Unclaimed Property.............................................71

F.    Claim Objection Bar Date ...............................................................................72

G.    Risk Factors ...................................................................................................72

      1.    Business Risks .......................................................................................73

            a.    Industry Conditions...................................................................73

            b.    Competition...............................................................................73

            c.    Seasonality ...............................................................................73

            d.    Operating Cash Flow ................................................................73

            e.    Trade Credit ..............................................................................74

            f.    Ability to Achieve the Business Plan.........................................74

            g.    Availability of Sufficient Cash to Sustain Operations
                  Following to the Effective Date..................................................75

            h.    Governmental Regulation and Litigation....................................75

                  i.     Governmental Regulation ................................................75

                  ii.    Certain Litigation .............................................................75

                  iii.   D&O/Affiliate Claim Litigation .........................................75

      2.    Bankruptcy Risk....................................................................................76

            a.    Objection to Classification.........................................................76

            b.    Risk of Non-Confirmation of Plan.............................................76

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

DOCS_LA:323709.20

|  |  | c. | Potential Effect of Bankruptcy on Certain Relationships | 77 |
|  |  | 3. | Risk of Default Under Plan | 77 |
|  | H. |  | Executory Contracts and Unexpired Leases | 77 |
|  |  | 1. | Unexpired Leases and Executory Contracts to be Assumed | 77 |
|  |  | 2. | Other Unexpired Leases and Executory Contracts to Be Rejected | 78 |
|  | I. |  | Miscellaneous Plan Provisions | 78 |
|  |  | 1. | Rounding of Amounts / De Minimis Amounts | 78 |
|  |  | 2. | Name and Address of Holder | 78 |
|  |  | 3. | Orders to Aid Consummation of Plan | 79 |
|  |  | 4. | Severability | 79 |
|  |  | 5. | Headings of Articles and Sections | 79 |
|  |  | 6. | Successors and Assigns | 80 |
|  |  | 7. | Changes in Rates Subject to Regulatory Commission Approval | 80 |
|  |  | 8. | Services By And Fees For Professionals | 80 |
|  |  | a. | Prior to the Effective Date | 80 |
|  |  | i. | Generally | 80 |
|  |  | b. | From the Effective Date | 80 |
|  |  | 9. | Dissolution of Committee | 80 |
|  |  | 10. | Litigation Trust | 80 |
|  |  | 11. | Amendment, Withdrawal or Revocation of the Plan | 81 |
|  |  | 12. | Retention of Jurisdiction | 81 |
|  |  | 13. | Impact of Default Under Plan | 83 |
|  |  | 14. | Payment of Post-Confirmation Quarterly Fees | 83 |
|  |  | 15. | Confirmation Request | 83 |
| VII. | TAX CONSEQUENCES OF THE PLAN |  |  | 83 |
|  | A. |  | General | 83 |
|  |  | 1. | Statutory Overview | 83 |
|  | B. |  | Tax Consequences to the Debtors | 84 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1.    Summary of the Plan.................................................................84

2.    Tax Consequences of the Transactions.....................................85

VIII. CONDITIONS TO EFFECTIVENESS OF THE PLAN........................................85

IX. CONFIRMATION REQUIREMENTS AND PROCEDURES ................................86

A.    Who May Vote or Object...........................................................86

1.    Who May Object to Confirmation of the Plan...........................86

2.    Who May Vote to Accept/Reject the Plan..................................86

a.    What Is an Allowed Claim/Interest................................86

b.    What Is an Impaired Claim/Interest...............................87

3.    Who is Not Entitled to Vote......................................................87

4.    Who Can Vote in More Than One Class ...................................88

5.    Votes Necessary to Confirm the Plan.......................................88

6.    Votes Necessary for a Class to Accept the Plan .......................88

7.    Treatment of Nonaccepting Classes..........................................88

8.    Request for Confirmation Despite Nonacceptance by Impaired
Class(es)......................................................................................89

B.    Liquidation Analysis .................................................................89

C.    Feasibility..................................................................................90

X. EFFECT OF CONFIRMATION OF PLAN ......................................................91

A.    Binding Effect Of Confirmation ...............................................91

B.    Vesting of Assets Free and Clear of Liens, Claims and Interests.........................91

C.    Good Faith, Exculpation and Release .......................................92

D.    The D&O/Affiliate Release .......................................................93

E.    No Limitations on Effect of Confirmation.................................94

F.    Discharge of Claims...................................................................94

G.    Injunction ..................................................................................95

H.    Securities Laws .........................................................................96

XI. ALTERNATIVES TO THE PLAN.................................................................96

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

DOCS_LA:323709.20

vii

A.    Liquidation Under Chapter 7 ................................................................. 96

B.    Alternate Plan........................................................................................ 97

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

TO THE HONORABLE CATHERINE E. BAUER, UNITED STATES BANKRUPTCY
JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, CREDITORS AND OTHER
PARTIES IN INTEREST:

## I.

## INTRODUCTION

Ruby's Diner, Inc., a California corporation ("RDI"), Ruby's SoCal Diners, LLC, a Delaware

limited liability company ("SoCal Diners"), Ruby's Quality Diners, LLC, a Delaware limited

liability company ("Quality"), Ruby's Huntington Beach, Ltd., a California limited partnership

("Ruby's Huntington Beach"), Ruby's Laguna Hills, Ltd., a California limited partnership ("Ruby's

Laguna Hills"), Ruby's Oceanside, Ltd., a California limited partnership ("Ruby's Oceanside"), and

Ruby's Palm Springs, Ltd., a California limited partnership ("Ruby's Palm Springs") (collectively,

without RDI, the "SoCal Debtors" and, with RDI , the "RDI Debtors"), and Ruby's Franchise

Systems, Inc., a California corporation ("RFS"), an entity affiliated with the RDI Debtors through

common ownership and control, are debtors and debtors in possession in chapter 11 proceedings

pending in front of this Court (collectively, the RDI Debtors and RFS are referred to as the

"Debtors" or the "Plan Proponents").

The Plan Proponents submit this *First Amended Joint Disclosure Statement Describing First
Amended Joint Chapter 11 Plan of Reorganization* (the "Disclosure Statement") in connection with

the solicitation of acceptances and rejections with respect to their *First Amended Joint Chapter 11
Plan of Reorganization* (the "Plan"), a copy of which is submitted concurrently herewith.  The Plan

and Disclosure Statement contain a number of capitalized terms.  An appendix containing the

definitions for these capitalized terms (the "Definitions") is contained in **Exhibit 1** to the Plan.[2]

On August 29, 2018, the SoCal Debtors filed voluntary petitions for relief under chapter 11

of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code").  On

September 5, 2018, RDI filed a related Chapter 11 Case and, on September 6, 2018, RFS

commenced a separate proceeding under chapter 11 of the Bankruptcy Code (respectively, the

"Petition Date(s)").  Following the Petition Dates, the United States Bankruptcy Court for the

---

[2] Capitalized terms used and not otherwise defined herein shall have the same meanings as ascribed to them in the Plan
and the Definitions set forth in **Exhibit 1** to the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Central District of California (the "Bankruptcy Court") entered an order jointly administering the RDI Debtors' Chapter 11 Cases for procedural purposes.  The RFS Chapter 11 Case is not jointly administered with the RDI Debtors' Chapter 11 Cases.  The Plan is proposed jointly by the Plan Proponents and contemplates RFS becoming a wholly owned subsidiary of RDI, but the Plan does not provide for the substantive consolidation of the Plan Proponents' assets and liabilities.

Chapter 11 allows a debtor, and under some circumstances, creditors and others parties in interest, to propose a plan of reorganization.  A plan may provide for the debtor to reorganize by continuing to operate, to liquidate by selling assets of the bankruptcy estate, or a combination of both.  The Plan Proponents (the RDI Debtors and RFS) are the parties proposing the Plan sent to you in the same envelope as this document.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

The Plan incorporates the terms of settlements reached with Opus Bank and U.S. Foods, two of the major creditors in the Debtors' Chapter 11 Cases, and the Plan has their support.

The Plan provides for a restructuring of the Debtors' secured, priority and unsecured debt, infusion of new funding, the continuation of the Ruby's® brand as a going concern under a new equity structure, and a transfer of the ownership of RFS to RDI, with the license agreement between them remaining in effect.  The Plan will be funded through a combination of Cash from operations, as well as the conversion of debt and the provision of plan funding by Steven L. Craig (the "Plan Sponsor") totaling Four Million Dollars ($4,000,000) (the "Plan Funding").[3]  In addition, Douglas Cavanaugh and Ralph Kosmides, the founders of Ruby's (the "Founders") will make a "new value" contribution on the Effective Date of the Plan in the form of a portion of the value of their ownership Interests in RFS, which will be contributed to RDI as part of a reconciliation of amounts due to and from the Founders and the Debtors as provided by the Plan.  The net New Value Contribution by the Founders has been valued by RDI's financial advisor at approximately $5.5 million. *See* **Exhibit A** hereto.

---

[3] This amount may be subject to increase based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

A portion of the Plan Funding from the Plan Sponsor will be utilized to fund the Plan as it relates to RDI (defined herein as the "RDI Plan Funding"). The ownership of RDI will be transferred to the Plan Sponsor in consideration of the RDI Plan Funding and the Founders in consideration of the Founders' New Value Contribution. Equity in RFS valued at approximately $5.5 million will be contributed by the Founders to RDI as the New Value Contribution in return for the Founders receiving a 40% interest in RDI.[4] The assets (the "HOP Assets") owned by Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs (the "HOP Restaurant Entities") will be transferred to entities owned by the Plan Sponsor (the "New HOP Entities") in consideration of his contribution of a portion of the Plan Funding to fund the Plan as to the HOP Restaurant Entities (the "HOP Plan Funding"). The New HOP Entities will own the HOP Assets subject to the debt against the HOP Restaurant Entities and the HOP Assets, as restructured under the Plan. The Plan Sponsor will then contribute his ownership of the New HOP Entities to RDI post-Effective Date, and the New HOP Entities will be wholly owned subsidiaries of RDI. RFS will continue as the franchising arm of the business, as a wholly owned subsidiary of RDI. As a result of the implementation of the terms of the Plan, following the Effective Date, RDI will be owned 60% by the Plan Sponsor, 24% by Cavanaugh and 16% by Kosmides, and RFS and the New HOP Entities will be solely owned by RDI (subject to adjustment based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

The Plan provides for the payment in full, over time, of all secured Creditors, and payment in full of all administrative and priority Creditors, except as otherwise agreed. The Plan further provides for payment in full, over time, of the unsecured Creditors' claims of RFS. The unsecured Creditors of each of the HOP Restaurant Entities will be paid, on the Effective Date of the Plan, their *pro rata* share from distribution funds totaling of $200,000, as follows: $113,118.78 (Ruby's Huntington Beach), $62,397.43 (Ruby's Oceanside) and $24,413.78 (Ruby's Palm Springs). The unsecured Creditors' claims of Ruby's Laguna Hills will not be entitled to a distribution as there is

---

[4] The balance of the equity in RFS, valued at $2.5 million, will be provided to RDI as consideration for the D&O/Affiliate Release. The ownership percentages of the Plan Sponsor and the Founders may be subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

no residual value in the estate to make such payment.  The unsecured Creditors' claims of SoCal Diners and Quality (if any)[5] will be paid, on the fourth (4th) year anniversary of the Effective Date of the Plan, two and one-half percent (2.5%) of their allowed claims.  The unsecured Creditors' claims of RDI (classified in Class 11(a)) will be entitled to one of the following treatments:  (1)  Paid a total of Two Million Five Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of Six Hundred and Twenty-Five Thousand Dollars ($625,000) on each of the second (2nd), third (3rd), fourth (4th) and fifth (5th) anniversaries of the Effective Date, if there is a Bankruptcy Court approved release of claims (defined herein as the "D&O/Affiliate Release") against the Debtors' directors and officers (defined herein as the "D&Os") and their affiliated entities (defined herein as the  "D&O Affiliated Entities"); or (2) if such D&O/Affiliate Release is not approved by the Bankruptcy Court, a *pro rata* distribution from any proceeds ultimately recovered by a litigation trust formed pursuant to the Plan (defined herein as the "Litigation Trust") that will have the right, following the Effective Date, to investigate and, if appropriate, prosecute claims, if any, against the D&Os and D&O Affiliated Entities; *provided, however*, that any distribution to the  RDI unsecured Creditors from any recovery by the Litigation Trust shall be after payment of the fees and costs incurred by the Litigation Trust incurred in connection with the prosecution of claims or otherwise.  As discussed in detail below, the Plan Proponents believe that a reorganization – as opposed to a liquidation – will maximize value for all Creditor and equity constituencies.

The Effective Date of the proposed Plan is the later of: (a) the first (1st) Business Day of the first month which begins at least fifteen (15) days following the Confirmation Date; and (2) the first (1st) Business Day of the first (1st) month after such date under clause (a) on which there is not in force any stay or injunction against the enforcement of the Plan or the Confirmation Order, provided that the Effective Date will not occur until all Conditions to the Effective Date set forth in Section VII of the Plan have been satisfied or waived by the Plan Proponents.  The Plan Proponents anticipate that the Effective Date will be on or about ***January 26, 2019***.

---

[5] The Debtors do not believe that Quality will have any allowed unsecured creditor claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**A.    Purpose of This Document**

This Disclosure Statement summarizes what is in the Plan, and gives you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan. **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

> **(1)    WHO CAN VOTE OR OBJECT;**
>
> **(2)    THE TREATMENT OF YOUR CLAIM (*i.e.*, what you will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**
>
> **(3)    THE HISTORY OF THE DEBTORS, FINANCIAL INFORMATION REGARDING THE DEBTORS' BUSINESSES AND OPERATIONS AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES;**
>
> **(4)    WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**
>
> **(5)    THE EFFECT OF CONFIRMATION; AND**
>
> **(6)    WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you. Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing sufficient information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE PLAN PROPONENTS AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CHAPTER 11 CASES.**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

DOCS_LA:323709.20

- 5 -

1. **Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan (the "Confirmation Hearing") will take place on _____, **2019, at** ____: ___**.m.,** at the United States Bankruptcy Court for the Central District of California, located at the Ronald Reagan Federal Building and U.S. Courthouse, 411 West Fourth Street, Santa Ana, California 92701, in Courtroom 5D, before the Honorable Catherine E. Bauer.

2. **Deadline For Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed Ballot and return the Ballot in the enclosed envelope to Nancy Lockwood, Paralegal, Pachulski Stang Ziehl & Jones LLP, 650 Town Center Drive, 15th Floor, Costa Mesa, California 92626. **YOUR BALLOT MUST BE RECEIVED BY** _____**, 2019 OR IT WILL NOT BE COUNTED.**

3. **Deadline For Objecting to the Confirmation of the Plan**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE COURT AND SERVED UPON ALL THE PARTIES LISTED BELOW BY** _____**, 2019.**

o   The Office of the United States Trustee, at the following address:

> Office of The United States Trustee
> 411 West Fourth Street, Suite 7160
> Santa Ana, California 92701
> Telephone: (714) 338-3400
> Facsimile: (714) 338-3421

o   The Debtors and counsel for the Debtors, at the following addresses:

> <u>Plan Proponents</u>
> Douglas Cavanaugh and Ralph Kosmides
> Ruby's Diner, Inc., *et al.* and Ruby's Franchising Systems, Inc.
> 4100 MacArthur Blvd., Suite 310
> Newport Beach, California 92660
> Telephone: (949) 644-7829
> Facsimile: (949) 644-4265

> <u>Counsel for the RDI Debtors</u>
> William N. Lobel, Esq.
> Pachulski Stang Ziehl & Jones LLP
> 650 Town Center Drive, 15th Floor
> Costa Mesa, California 92626
> Telephone:  (714) 384-4740
> Facsimile:   (714) 384-4741
> E-mail:  wlobel@pszjlaw.com

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP<br>ATTORNEYS AT LAW<br>COSTA MESA, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Counsel for RFS
Eric J. Fromme, Esq.
Theodora Oringher PC
535 Anton Blvd., 9th Floor
Costa Mesa, California 92626
Telephone:  (714) 549-6200
Facsimile:  (714) 549-6201
E-mail:  efromme@tocounsel.com

o    The Plan Sponsor and counsel for the Plan Sponsor, at the following addresses:

Plan Sponsor
Steven L. Craig
c/o Craig Realty Group
4100 MacArthur Blvd, Suite 200
Newport Beach, California 92660

Counsel for the Plan Sponsor
Alan J. Friedman, Esq.
Shulman Hodges & Bastian LLP
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Telephone:  (949) 340-3400
Facsimile:  (949) 340-3000
Email:  afriedman@shbllp.com

o    Counsel to the Committee, at the following address:

Garrick Hollander, Esq.
Winthrop Couchot Golubow Hollander, LLP
1301 Dove Street, Suite 500
Newport Beach, California 92660
Telephone:  (949) 720-4100
Facsimile:  (949) 720-4111
Email:  ghollander@wcghlaw.com

**4.    Identity of Persons to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact counsel for

the RDI Debtors, William N. Lobel, Esq. and Nancy Lockwood, paralegal, Pachulski Stang Ziehl &

Jones LLP, 650 Town Center Drive, 15th Floor, Costa Mesa, California 92626, Telephone: (714)

384-4740, Facsimile: (714) 384-4741; E-mail: wlobel@pszjlaw.com and nlockwood@pszjlaw.com;

and/or counsel for RFS, Eric J. Fromme, Esq., Theodora Oringher PC, 535 Anton Blvd., 9th Floor,

Costa Mesa, California 92626, Telephone: (714) 549-6200, Facsimile: (714) 549-6201, E-mail:

efromme@tocounsel.com.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

## II.

## DISCLAIMER

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION, WHICH MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PROPOSED PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE PLAN PROPONENTS AND THE CONDITION OF THE PLAN PROPONENTS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.  *SEE* 11 U.S.C. § 1125(a).  UNLESS OTHERWISE INDICATED, THE DATE OF ALL OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE OF THE FILING OF THE DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE PLAN PROPONENTS, THEIR FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED.  IN ADDITION, BECAUSE OF THE COMPLEXITY OF THE PLAN PROPONENTS' FINANCIAL MATTERS AND CERTAIN FINANCIAL DIFFICULTIES FACING THEM, THE BOOKS AND RECORDS OF THE PLAN PROPONENTS, UPON WHICH THIS DISCLOSURE STATEMENT IS BASED IN PART, MAY BE INCOMPLETE OR INACCURATE.  THE PLAN PROPONENTS, THEREFORE, ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.  HOWEVER, GREAT EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.  WITH RESPECT TO THE FINANCIAL PROJECTIONS, THESE SIMPLY REPRESENT THE PLAN PROPONENTS' BEST ESTIMATE OF THE REORGANIZED DEBTORS' PERFORMANCE UNDER THE PLAN.  HOWEVER, THERE ARE UNCERTAINTIES ASSOCIATED WITH ANY PROJECTIONS AND THEY SHOULD NOT BE CONSIDERED WARRANTIES OR GUARANTEES OF THE REORGANIZED DEBTORS' PERFORMANCE HEREUNDER.  THESE RISKS ARE FURTHER DESCRIBED IN SECTION VI OF THIS DISCLOSURE STATEMENT.

PRIOR TO THE PETITION DATE, PACHULSKI STANG ZIEHL & JONES LLP ("PSZJ"), AS TO THE RDI DEBTORS, AND THEODORA ORINGHER PC ("TO"), AS TO RFS, COMMENCED REPRESENTING THESE ENTITIES AS INSOLVENCY COUNSEL.  PSZJ AND TO HAVE NOT AT ANY TIME IN THE PAST REPRESENTED, NOR DO THEY PRESENTLY REPRESENT, THE PLAN PROPONENTS IN A GENERAL WAY, OR IN ANY OTHER WAY, OTHER THAN AS SET FORTH ABOVE.  PSZJ AND TO HAVE RELIED UPON INFORMATION PROVIDED BY THE PLAN PROPONENTS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT.  ALTHOUGH COUNSEL FOR THE PLAN PROPONENTS HAVE PERFORMED CERTAIN LIMITED DUE DILIGENCE IN

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, COUNSEL HAVE NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

ALTHOUGH A COPY OF THE DISCLOSURE STATEMENT HAS BEEN SERVED ON THE SECURITIES AND EXCHANGE COMMISSION ("SEC") AND THE SEC HAS BEEN GIVEN AN OPPORTUNITY TO OBJECT TO THE ADEQUACY OF THE DISCLOSURE STATEMENT, THIS DISCLOSURE STATEMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR APPLICABLE STATE SECURITIES LAWS.  NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT, THE EXHIBITS HERETO OR THE STATEMENTS CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS, HER OR ITS OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS, HER OR ITS CLAIM OR INTEREST.

## III.

## BACKGROUND

A.  **Description and History of the Plan Proponents' Business**

   1.  **The Plan Proponents' Corporate Structure and Revenue Sources**

RDI was incorporated on February 13, 1985.  Its principal business address is 4100 MacArthur Blvd., Suite 310, Newport Beach, California 92660.  RDI owns varying percentages of and operates diners in Southern California through its subsidiaries, including through its wholly-owned subsidiary, SoCal Diners.  RDI and its affiliates own, operate and manage restaurants under trade names such as "Ruby's®," "Ruby's® Diner," and "The Ruby Restaurant Group."  RDI and its affiliates have operated Ruby's® Diner restaurants since prior to 1985 and are known as purveyors of very popular burgers, fries and shakes.  RDI is owned 60% by Cavanaugh and 40% by Kosmides, the Founders of Ruby's.  RDI is the owner of the Ruby's® trademarks, system and intellectual property (the "Marks and Intellectual Property") and is the employer of the employees of RDI and its affiliates.

RDI is the 100% owner and sole and managing member of SoCal Diners.  SoCal Diners is the 100% owner and sole and managing member of Quality.  SoCal Diners is the general partner and 50% owner, and Quality is the limited partner and 50% owner, of the following California limited partnerships: (a) Ruby's Huntington Beach, which owns and operates a Ruby's® restaurant on the pier in Huntington Beach, California and is one of the SoCal Debtors; (b) Ruby's Oceanside, which

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

owns and operates a Ruby's® restaurant in Oceanside, California and is one of the SoCal Debtors; (c) Ruby's Palm Springs, which owns and operates a Ruby's® restaurant in Palm Springs, California and is one of the SoCal Debtors; (d) Ruby's Laguna Hills, which, until March 2019, owned and operated a Ruby's® restaurant in the Laguna Hill Mall in Laguna Hills, California, and is one of the SoCal Debtors; and (e) Ruby's Mission Valley, Ltd., which until a few months prior to the Petition Date, owned and operated a Ruby's® restaurant in the Westfield Mission Valley Mall in San Diego, California[6] (collectively, the "SoCal Entities" and the restaurants owned by the SoCal Entities, the "SoCal Restaurants").

In addition, RDI holds ownership interests in, and management roles in connection with, the following joint venture entities:  (a) RDI is the managing member and 70% owner of Ruby's Beach Ventures LLC, which owns and operates a Ruby's® restaurant in Long Beach, California;[7] (b) RDI is the general partner and 50% owner of Ruby's Diner South Coast Plaza LP, which owns and operates a Ruby's® restaurant at South Coast Plaza Mall in Costa Mesa, California;[8] (c) RDI is the managing member and sole owner of Ruby's Woodbridge LLC, which owns and operates a Ruby's® restaurant in Woodbridge in Irvine, California; and (d) RDI is the managing member and 50% owner of Ruby's Spectrum LLC, which until a few months prior to the Petition Date, owned and operated a Ruby's® restaurant at the Irvine Spectrum in Irvine, California[9] (collectively, the "RDI Entities" and the restaurants owned by the RDI Entities, the "RDI Restaurants").  The RDI Entities have not filed chapter 11 cases.  The RDI Restaurants, together with the SoCal Restaurants, are referred to as the "Company Restaurants").

---

[6] The Mission Valley restaurant was closed prior to the Petition Date, in April 2018.  Ruby's Mission Valley, Ltd., while owned by SoCal Diners and Quality, is not operating and is not a debtor entity.

[7] The other 30% ownership interest in Ruby's Beach Ventures LLC is held by various third-party investors.

[8] The other 50% interest in Ruby's Diner South Coast Plaza LP is owned by South Coast Plaza Expansion, a California general partnership, as the limited partner.

[9] The other 50% ownership interest in Ruby's Spectrum LLC is held by William C. Taormina, Trustee of the Taormina Revocable Inter Vivos Trust u/d/t dated July 26, 1983.  The Irvine Spectrum restaurant was closed prior to the Petition Date, in April 2018.

As of the Petition Date, there also were twenty-four (24) Ruby's® Diner franchises (or licensed units) located in Southern California, Arizona, Pennsylvania, New Jersey, Nevada and Texas that are owned and, with certain limited exceptions, operated by independent third parties (the "Franchised Restaurants" and, together with the Company Restaurants, the "Restaurants").[10] Eureka Food Enterprises, LLC, an entity owned by Craig (the DIP Lender and Plan Sponsor), directly or indirectly, is the franchisee with respect to four (4) Franchised Restaurants located in California (Citadel, Corona del Mar, Laguna Beach, San Clemente) and Arizona (Anthem), and also operates a Ruby's® food truck.[11]

RFS serves as the franchisor to the Ruby's® franchisees/licensees (the "Franchisees") and licenses the Marks and Intellectual Property from RDI as licensor pursuant to the RFS/RDI License Agreement (as defined hereinbelow). Under RFS' agreements with the Franchisees (the "Franchise Agreements"), RFS (as franchisor) is entitled to franchise royalty fees from the Franchisees (the "Franchise Royalties"), which are generally the greater of a set dollar amount and four percent (4%) of "Gross Sales" as such term is defined in the Franchise Agreements.[12] The Franchise Royalties historically averaged approximately Two Million Four Hundred Thousand Dollars ($2,400,000) per annum (assuming payment of Franchise Royalties by the Franchisees). In addition, the majority of the Franchisees[13] are obligated under the Franchise Agreements to make payments to an advertising fund (the "Ad Fund") in connection with the marketing and advertising of the Ruby's® brand on a regional and a system/national level, each in the amount of one percent (1%) of Gross Sales (i.e., a total marketing contribution of two percent (2%) of Gross Sales) (the "Ad Fund Obligations").

---

[10] Prior to its closure in January 2019, RDI provided operational support and related services to the franchise located in Yorba Linda, California (Ruby's Yorba Linda, Ltd.). Ruby's Management, LLC ("RMLLC") (an Entity owned by Cavanaugh, Kosmides and Douglas Salisbury), receives a management fee for operational support and related services provided to a Ruby's® restaurant located in Morongo, California (Ruby's Morongo) and owned by the Morongo Native American tribe. RMLCC sub-contracts with RDI for some services for which RDI is paid an administrative fee.

[11] Eureka Food Enterprises, LLC has the right to open a franchise in Castle Rock, Colorado, but that has not yet occurred.

[12] Three locations, Ruby's Anaheim, Ruby's Morongo and Ruby's Arizona, utilize the Marks and Intellectual Property, but do not pay royalties to RFS, nor do Ruby's Anaheim or Ruby's Arizona contribute to the Ad Fund (as defined herein).

[13] Certain Franchisees in specialty locations do not have Ad Fund Obligations as they serve a "captive" customer base, such as the Restaurants located at casinos and airports, or are part of an effort to grow brand recognition in as-yet undeveloped areas. As noted above, Ruby's Anaheim and Ruby's Arizona do not have Ad Fund Obligations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

As licensor of the Marks and Intellectual Property to RFS, pursuant to an Amended and Restated Trademark and Intellectual Property License Agreement, dated June 1, 1990 (the "RDI/RFS License Agreement"), RDI is entitled to one percent (1%) of the Gross Sales generated by RFS and the Franchisees as a license fee (*i.e.,* 25% of the Franchise Royalties paid to RFS) which historically averaged approximately Six Hundred Thousand Dollars ($600,000) per annum (assuming payment of Franchise Royalties by the Franchisees) (the "RDI License Fee").

### 2.    Overview of the Plan Proponents' Debt Structure

#### a.    RDI's Secured and Unsecured Creditors

RDI has approximately $2.985 million in secured obligations to the Secured Noteholders (secured against substantially all of the personal property of RDI, including Cash and accounts receivable, the Marks and Intellectual Property and RDI's interests in SoCal Diners, Quality and the RDI Entities) (the "Secured Notes"), and approximately $32,239 in secured tax obligations.  Pre-Petition PACA Trust Claims were asserted against RDI (and the SoCal Debtors) by Family Tree Produce, Inc. ("Family Tree") in the amount of $47,666, however, this amount was paid in full during the pendency of the Chapter 11 Cases.  RDI also had asserted against it a judgment lien (UCC-1) in favor of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") in the amount of approximately $658,095 (the "Pillsbury Claim"),[14] however, Pillsbury filed a unsecured proof of claim in the RDI case on account of the Pillsbury Claim and is, therefore, treated as unsecured in the RDI case.

RDI also has approximately $5.54 million in unsecured obligations to the Unsecured Noteholders (the "Unsecured Notes") and approximately $4.64 million in other unsecured debt (which reflects RDI's best estimates regarding the ultimate allowability of the claims), for total estimated unsecured claims in the amount of approximately $10.2 million.

In addition, RDI has pre-petition (and post-petition) Gift Card Reimbursement Obligations to the Franchisees, the majority of which will be satisfied by way of the Netdown Process (described in

---

[14] The Pillsbury Claim is also asserted against SoCal Diners on an unsecured basis, and against the HOP Restaurant Entities on a secured basis.  Pillsbury also asserts a second Pillsbury Claim in the amount of $658,095 based on partner liability in connection with the sale of the Laguna Beach restaurant.  The Debtors do not believe that there is any collateral value to support the Pillsbury Claim.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

further detail in Section III.C.12 and VI.E.7 of this Disclosure Statement).[15]  As described herein,
RDI sought and obtained approval from the Court to honor and pay pre-petition employee-related
claims and certain other amounts, which have been funded through operations, the use of cash
collateral and the proceeds of the RDI DIP Loan (as herein defined).[16]

> **b.** **The SoCal Debtors' Secured and Unsecured Creditors**

The SoCal Debtors have approximately $2.72 million in secured obligations to Opus Bank
(secured by substantially all of the personal property assets of the SoCal Debtors, including Cash and
a pledge of the assets of the SoCal Restaurants).  The SoCal Debtors (with the exception of Quality
and Ruby's Laguna Hills) also have obligations in the amount of approximately $658,000 on
account of the Pillsbury Claim and the amount of $297,500 on account of a secured lien in favor of
C&C Partnership.  The SoCal Debtors (and RDI) were also obligated for Pre-Petition PACA Trust
Claims to Family Tree in the amount of $47,666, which amounts were paid in full during the
pendency of the Chapter 11 Cases.  SoCal Diners (but not the other SoCal Debtors) is obligated in
connection with a lease guaranty settlement in favor of Plaza Bonita, LLC in the asserted amount of
approximately $154,000 that is purportedly secured by an attachment lien against SoCal Diners.

The Debtors do not believe that there is any collateral to secure the obligations to Pillsbury or
Plaza Bonita and believe that these obligations will be treated as unsecured claims under the Plan.

The SoCal Debtors have unsecured obligations (not including any cure payments in
connection with assumed leases which will be paid as administrative claims under the Plan), in the

---

[15] The Debtors' gift card programs are discussed in further detail herein.  These programs consist of gift cards issued
directly by the Restaurants to customers, which programs have been continued following the Petition Date, and gift cards
sold through a third-party retailer, mainly Costco Wholesale Corporation, which program was terminated by RDI on a
go-forward basis.  RDI intends to satisfy the majority of the gift card obligations to the Franchisees by way of the
Netdown Process.  Gift card obligations not satisfied by way of the Netdown Process for the pre-petition period will be
treated as pre-petition unsecured claims against RDI.  Post-petition and post-Effective Date gift card obligations not
satisfied by way of the Netdown Process will be paid in full, either on the Effective Date or as they come due in the
ordinary course.  As of the Petition Date, RDI also issued dining cards to the Unsecured Noteholders allowing them to
dine at Ruby's® Restaurants free of charge up to certain amounts based on the face amount of their notes.  This program
was discontinued following the Petition Date.

[16] As of the Petition Date, RDI owed to RFS the amount of approximately $400,000 (after accounting for all
intercompany obligations between them).  In addition, RDI owes to RFS certain amounts pursuant to the Netdown
Process described in further detail *infra*.  So long as RDI and RFS are in compliance with their obligations under the
Plan, including their obligations to Opus Bank, any intercompany receivable owed to RFS from RDI as a result of the
Netdown Process and any other intercompany obligations between them will not be collected or paid, but will remain on
the books as non-cash journal entries.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

following estimated amounts:  (i) SoCal Diners - $1.3 million; (ii) Quality - $0.00; (iii) Ruby's

Huntington Beach - $1.2 million; (iv) Ruby's Oceanside - $1.2 million; (v) Ruby's Palm Springs -

$1.1 million; and (vi) Ruby's Laguna Hills - $569,000.

c.    **RFS' Secured and Unsecured Creditors**

RFS has approximately $1.28  million in secured obligations to Opus Bank (secured by

substantially all of the personal property assets of RFS), an unsecured note owed to Craig in the

principal amount of $1 million, plus accrued interest thereon (in the amount of approximately

$120,000) (defined herein as the "RFS Note"),[17] and approximately $430,515 in accounts payable

and other unsecured obligations.[18]

**B.    Events Leading to Chapter 11 Filings**

1.    **Overview of the RDI Debtors' Financial Difficulties**

The RDI Debtors' revenue generally comes directly from the operation of the SoCal

Restaurants (in the case of the SoCal Debtors) and from management fees and partnership

distributions from the RDI Restaurants (in the case of the RDI Entities and RDI).  The RDI Debtors

also receive revenue in connection with the sale of gift cards to customers and, as discussed above,

RDI is entitled to the RDI License Fee.  The RDI Debtors' and RFS' annual revenues for calendar

year 2017 were approximately $13.9 million and $2.6 million, respectively, and in 2018,

approximately $13.7 million and $2.5 million, respectively.  While certain of the SoCal Debtors

were and continue to be profitable, RDI, faced with an overleveraged balance sheet and continuing

operating losses, was unable to adequately address its financial difficulties outside of a chapter 11

filing.

---

[17] The Plan provides for Craig, as the Plan Sponsor, to convert the principal amount of the RFS Note into equity in RDI. Craig holds a right of offset against the RFS Note for Franchise Royalties, but this offset right will not be exercised and, on the Effective Date, Craig will pay Franchise Royalties and Ad Fees, pursuant to the Netdown Process, in the amount of approximately $635,556, as reflected in the Cash Flow Projections.

[18] This figure does not include the amount of approximately $371,530 owed by RFS to Cavco Restaurant Serv., an entity affiliated with Cavanaugh, or the approximate amount of $98,428 owed by RFS to Kosmides, which amounts are included in the Reconciliation.

1    Several factors contributed to the deterioration in the RDI Debtors' financial condition,

2   which resulted in the commencement of the RDI Debtors' Chapter 11 Cases, and the separate

3   chapter 11 filing by RFS.

4    In early 2012, after years of ongoing disputes, the company entered into agreements whereby

5   the interests of two of its partners, Douglas Salisbury and Doug DiCinces, were bought out.  Funding

6   for the buy-outs was obtained through financing obtained from Craig and Opus Bank.  The

7   company, however, did not replace the equity from these partners and did not otherwise have

8   sufficient cash flow to meet the costs associated with the buy-outs as well as to meet the company's

9   other financial challenges and ongoing operational needs, including with respect to the obligations to

10   RDI's Secured Noteholders and Unsecured Noteholders.

11    As a result, on or about February 10, 2012, RDI entered into a consensual restructuring of its

12   secured notes (in the aggregate face amount of approximately $2.9 million) (the "Original Secured

13   Notes") and, on or about July 16, 2012, of its unsecured notes (in the aggregate face amount of

14   approximately $5.6 million) (the "Original Unsecured Notes" and, together with the Original

15   Secured Notes, the "Original Notes" and the holders thereof, the "Secured Noteholders" and the

16   "Unsecured Noteholders," respectively).  The Original Secured Notes (and the restructured Secured

17   Notes issued in connection with the 2016 Restructuring Agreement (as such terms are defined

18   hereinbelow)) are secured by all or substantially all of the personal property of RDI (including Cash

19   and accounts receivable, the Marks and Intellectual Property and RDI's interests in SoCal Diners,

20   Quality and the RDI Entities).  The Original Secured Notes were governed by the Credit Agreement,

21   the Collateral Agent and Intercreditor Agreement, the Security Agreement (Personal Property), dated

22   as of February 10, 2012, and related documentation, including the UCC-1 Financing Statement filed

23   in connection therewith (the "Original Secured Credit Documents").  Pursuant to the Original

24   Secured Credit Documents, Credit Management Association ("CMA") was designated as collateral

25   agent ("Collateral Agent") in connection with the Original Secured Notes (and, until recently,

26   continued to serve in this capacity in connection with the restructured Secured Notes).[19]  The

---

[19] RDI has been advised that CMA filed its own bankruptcy proceeding, and has stepped down as Collateral Agent in connection with the Secured Notes.  The Plan provides for the appointment of a Replacement Collateral Agent.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Original Unsecured Notes were governed by Credit Agreement and the Representative and Intercreditor Agreement, dated as of July 16, 2012 (the "Original Unsecured Credit Documents"). Pursuant to the Original Unsecured Credit Documents, a "steering committee" comprised of Unsecured Noteholders was designated as the representative with respect to the Original Unsecured Notes (the "Steering Committee") (and continued to serve in this capacity in connection with the restructured Unsecured Notes).[20]

As noted above, during this time frame, the company was faced with several legal challenges in connection with, among other things, the buy-out of its partners and disputes related to its Laguna Beach restaurant location, which not only unnecessarily diverted management's attention away from the company's operations, but also resulted in the incurrence of significant professional fees. In addition, notwithstanding the company's efforts to grow its brand through the development of new franchiseable models, company-owned Ruby's® restaurants and the conversion of certain locations from a full-service restaurant to a "fast casual" restaurant concept, unfortunately, as a result of an industrywide slowdown in terms of growth and sales figures and high operational costs, the new locations and concepts did not perform as projected, and the company was ultimately forced to close down four (4) of its restaurants (Plaza Bonita in National City, California, Parkway Plaza in El Cajon, California, 17th Street (Redburger) in Costa Mesa, California (each directly or indirectly owned by RDI) and Whalers Village in Maui, Hawaii (owned by RFS), resulting in significant obligations associated with these closures. Around the same time, RFS' efforts at developing new franchises was otherwise hampered by the industry slowdown and a profitable Ruby's® franchise located at the Newark Airport was lost due to the airport's removal of all vendors at the terminal.

In addition, leading up to 2015, significant increased competition in the restaurant industry emerged, creating an array of dining options for consumers. This competition emergence impacted many key brands and, while the Ruby's® brand continued to see strong loyalty with its guests, the company was impacted by these competitive forces, which adversely impacted the revenue

---

[20] The members of the Steering Committee were Don Lavoie, Dick Silva, Bill Pope, John Teele, Maureen Melvold, Michael Munz, Mike Dingillo, John Overdevest and Bob Converse. Messrs. Silva, Pope and Munz are also members for the Official Committee of Unsecured Creditors for the RDI estate.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

generated by the company stores, as well as the sales figures of the Ruby's® franchisees (and, as a result, the amount of the revenue generated by way of the RDI License Fee).

After several years of continuing losses and the closure of several restaurants, in early 2015, RDI was forced to suspend interest payments on the Original Notes.  In addition, SoCal Diners was in covenant violation of its loan agreement with Opus Bank (which holds liens on all or substantially all of the assets of SoCal Diners, Quality and the SoCal Restaurants and, at the time, was owed approximately $4 million).

The company explored various business and restructuring alternatives over the course of 2015 and early 2016.  In October 2016, SoCal Diners entered into a restructuring of the Opus Bank loan.  As of the Petition Date, SoCal Diners was in material compliance with the restructured terms of the Opus Bank loan, which is currently in the amount of approximately $2.72 million.[21]

RDI also engaged the Steering Committee (and CMA) in an ongoing dialogue regarding the company's financial situation and possible restructuring alternatives.  As a result, RDI and the Steering Committee reached a conceptual agreement regarding a revised business plan for the company and a consensual proposal for the restructuring of the Original Unsecured Notes.  The restructuring of the Original Unsecured Notes was subject to the approval of at least 51% of the total amount loaned to RDI by each Secured Noteholder under the Original Secured Notes, as well as an aggregate of at least 66.7% of the total amount loaned to RDI by each Unsecured Noteholder under the Original Unsecured Notes.

On June 30, 2016, with the requisite approval of the Noteholders and in accordance with RDI's Consent Solicitation Statement, dated May 19, 2016 (the "Consent Solicitation Statement"), RDI completed a restructuring transaction involving the Original Notes, whereby RDI amended and restated the Original Notes (the "Restructured Notes").  The Consent Solicitation Statement, the Restructured Notes, the First Amendment to Security Agreement, Credit Agreement (Secured), Collateral Agent and Intercreditor Agreement (Secured), Credit Agreement (Unsecured), and Representative and Intercreditor Agreement (Unsecured), and Agreement Regarding Restatement of

---

[21] Opus Bank is also the lender to RFS, and holds a Secured Claim against RFS in the amount of approximately $1.28 million.  Opus Bank is not a Creditor of RDI.

- 17 -

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1  Promissory Notes, effective as of July 1, 2016 (the "Omnibus First Amendment"), the UCC-1

2  Financing Statements filed in connection therewith, and any related documentation (including the

3  Original Secured Credit Documents and Original Unsecured Credit Documents not amended by way

4  of the Restructured Notes and Omnibus First Amendment), are referred to herein as the "2016

5  Restructuring Agreement."

6        An overview of the material terms of the Restructured Notes under the 2016 Restructuring

7  Agreement, and the current state of the obligations to the holders thereof (**in bold**), are as follows:[22]

8        *Term.*  The initial maturity of the Restructured Notes is ten years from the Note Restatement
    Date (*i.e.,* June 30, 2026), subject to an additional five-year extension under certain
9    conditions.  In the event of a Sale of the Business (as defined in the Restructured Notes),
    prior to the otherwise applicable maturity date, then the Restructured Notes are due sixty (60)
10   days following such Sale of the Business.

11       *Interest.*  Interest begins to accrue on January 1, 2017, and will be paid in semi-annual
    installments at 2.17%.  Payments to commence on June 30, 2017, and are to continue each
12   June 30 and December 30 thereafter.  Accrued but unpaid interest owing as of the Note
    Restatement Date was cancelled and forgiven.
13
        **RDI made the required interest payments under the Restructured Notes due on
14      June 30, 2017, and December 20, 2017, but was unable to make the June 30,
        2018, December 20, 2018, or June 30, 2019 payments.**
15
        *Principal – Accelerated Principal Payment Waterfall.*  In addition to the interest payments,
16      85% of all Free Cash Flow From Operations (or Free Cash Flow From Sale of the Business)
    (each as defined in the Restructured Notes) (such 85% referred to as the "First Tier
17   Accelerated Principal Payments") will be paid to the Noteholders every year until (i) an
    aggregate amount of all payments paid pursuant to the Restructured Notes to the Secured
18   Noteholders equals $2,985,016.64 (referred to as the "Secured Note Recoupment"), and
    (ii) an aggregate amount of all payments paid pursuant to the Restructured Notes to the
19   Unsecured Noteholders equals $5,540,527.72 (referred to as the "Unsecured Note
    Recoupment").  In general, once the Unsecured Note Recoupment has been achieved, the
20   Noteholders then receive 45% of Free Cash Flow From Operations (or Free Cash Flow From
    Sale of the Business) (such 45% referred to as the "Second Tier Accelerated Principal
21   Payments") until the remaining balance owing on the Restructured Notes is repaid.

22       **85% of all Free Cash Flow From Operations amount subsequently changed to
        100% through an Addendum.**
23
    The First Tier Accelerated Principal Payments will be paid 55.6% in respect of the Secured
24  Notes and 44.4% in respect of the Unsecured Notes until the Secured Notes have achieved
    the Secured Note Recoupment.  Upon satisfying the Secured Note Recoupment, First Tier
25  Accelerated Principal Payments will be paid entirely to the Unsecured Noteholders until the
    Unsecured Note Recoupment is achieved.  After the Unsecured Note Recoupment is
26

27  _____
    [22] The following is necessarily a summary overview of the material terms of the Restructured Notes.  For full and
    complete disclosure of the terms of the Restructured Notes and related matters, please refer to the 2016 Restructuring
28  Agreement.

    DOCS_LA:323709.20                              - 18 -

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

achieved, the Second Tier Accelerated Principal Payments will be paid 55.6% in respect of the Secured Notes and 44.4% in respect of the Unsecured Notes until the Secured Notes have been paid off in full.  After the Secured Notes have been paid off in full, the Second Tier Accelerated Principal Payments will be paid entirely to the Unsecured Noteholders until the Unsecured Notes have been paid off in full.

In the event that all of RDI's (direct or indirect) assets are sold, the Noteholders will generally share in a portion of Free Cash Flow From Sale of the Business in a similar fashion as such Noteholders share in Free Cash Flow From Operations; *provided, however*, that following such sale and related payments, any remaining unpaid amounts respecting the applicable Restructured Note shall be automatically cancelled and forgiven.

**As there has been no Free Cash Flow From Operations (or Free Cash Flow From Sale of the Business), no First Tier Accelerated Principal Payments, or Second Tier Accelerated Principal Payments, are due and owing, and no such amounts have been paid by RDI.**

*Contingent Additional Principal*.  In addition, if, upon Maturity (as defined in the Restructured Notes), the total Net Equity (as defined in the Restructured Notes) of RDI, as reasonably determined by RDI's accountants and management, is equal to or greater than $15,000,000, then in addition to any other amounts payable pursuant to each Restructured Note, each Noteholder will be paid a contingent additional payment equal to 1.115% of the principal amount owed with respect to such Noteholder's Restructured Note as of the Note Restatement Date.

**No contingent additional principal payments are due and owing, and no such amounts have been paid by RDI.**

As contemplated in connection with the 2016 Restructuring Agreement, the company set out to implement its business plan to increase franchise unit sales and reduce company-owned assets through the sale of multiple restaurant locations (by way of refranchising these restaurants to third parties).  Concurrently, through the reduction of company-owned restaurants, the company planned to be in a position to significantly reduce its corporate overhead and infrastructure obligations related to the company-owned restaurants.  In accordance with the company's business plan, during the time period from October 2015 to June 2016, three (3) restaurants were sold and refranchised to third party franchisees (the Ruby's® locations in Corona del Mar, Laguna Beach and Mission Viejo, California), for total net sale proceeds of approximately $2.5 million.[23]

The company also entered into negotiations for the sale of three (3) other restaurant locations (Huntington Beach, Oceanside and Palm Springs), and received several offers in connection with

---

[23] The Corona del Mar and Laguna Beach restaurants were purchased by Eureka Food Enterprises, LLC, which is owned by Craig.

these restaurants from various prospective purchasers.[24]  However, the offers ultimately proved

insufficient, and the company determined it could not proceed with these sales.  As a result of the

required continued management of the company-owned stores, however, notwithstanding the

company's efforts and corresponding reduction of expenses, the company was not in a position to

materially reduce much of its corporate overhead and infrastructure obligations at the pace outlined

in the business plan, although the company substantially reduced its overhead in the 12 months

leading up to the bankruptcy filings.

In addition, 2017 restaurant sales were adversely affected by inclement weather in the first

half of the year which severely degraded sales volumes over prior years and forecasts.  The weather

also impacted commodity prices, increasing the company's cost of goods.  Moreover, newly enacted

governmental regulations and policies drove many expenses higher (including medical benefits, sick

pay requirements and minimum wage increases), all of which increased costs at a time when the

restaurant industry as a whole was experiencing declining same store sales.  Concurrently, grocery

store prices decreased, which generally reduced the frequency of visitation by restaurant

customers.  While the company experienced a rebound in the second half of 2017, the company's

cash flow remained insufficient to meet its ongoing obligations.

Another factor impacting the company was the lower than forecasted income from the

company's third-party retailer gift card program.  Historically, RDI engaged in gift card sales

through third-party retailers (predominantly through Costco Wholesale Corporation) as a means by

which to increase customer visitation to the Ruby's® Restaurants (defined herein as the "Costco Gift

Card Program").  With respect to the Costco Gift Card Program, however, RDI was unable to

continue to reimburse the Franchisees accepting the Costco gift cards (which reimbursement was

typically at a rate of 85%, but in two instances at the rate of 90%).  RDI's inability to reimburse the

Franchisees resulted in the Franchisees not paying their royalty fees to RFS and RDI not receiving

the RDI License Fee.  Ultimately, prior to the Petition Date, RDI terminated the Costco Gift Card

Program on a go-forward basis, although RDI intends to honor the majority of its outstanding Gift

---

[24] One of these prospective purchasers was Craig or a related entity.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Card Reimbursement Obligations to Franchisees (as defined herein) in accordance with the Netdown Process as described in further detail, *infra*.

In sum, RDI found itself with an overleveraged balance sheet, and without the cash flow to pay its operating costs or its obligations to creditors.  In turn, RDI's inability to meet its obligations to the Franchisees on account of Gift Card Reimbursement Obligations impeded RFS' ability to collect royalties from the Franchisees.  In addition, Opus Bank commenced enforcement proceedings against the SoCal Debtors, seeking the appointment of a receiver over their assets and operations, precipitating the SoCal Debtors' bankruptcy filings.  The Debtors, therefore, commenced these Chapter 11 Cases in order to restructure their financial affairs.

C.    **Significant Events in the Bankruptcy Cases Through the Date of Filing of Disclosure Statement**

1.    **Chapter 11 Status Conference**

The Court has held chapter 11 status conferences in these Chapter 11 Cases on September 24, 2018, October 22, 2018, November 2, 2018, December 18, 2018, February 27, 2019, April 25, 2019, June 5, 2019 and July 24, 2019.  The Debtors have filed status conference reports in connection with these status conferences [RDI Debtors, Docket Nos. 65, 114, 151, 244, 334, 369, 394 and 417]; RFS, Docket Nos. 40, 138, 175 and 218].

2.    **341(a) Meetings**

The SoCal Debtors' meeting of creditors under section 341(a) of the Bankruptcy Code was conducted on October 3, 2018.  RDI's meeting of creditors was conducted on October 15, 2018.  RFS' meeting of creditors was held on October 15, 2018.

3.    **Appointment of an Official Committee of Unsecured Creditors in the RDI Case**

On September 19, 2018, the U.S. Trustee appointed the Committee in the RDI Chapter 11 Case.  The Committee consists of the following Creditors:  Richard Silva, William E. Pope and Michael Munz.[25]  The Committee is represented by Winthrop Couchot Golubow Hollander, LLP as its insolvency counsel and Force 10 Partners as its financial advisor.  No Committee was appointed in the RFS Chapter 11 Case.

---

[25] Mssrs. Silva, Pope and Munz each were members of the Steering Committee.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

### 4. Joint Administration of the RDI Debtors' Cases

On September 5, 2018, the Court entered an order authorizing the joint administration of the RDI Debtors' cases [Docket No. 6]. The RDI Debtors' cases are jointly administered for procedural purposes only. The Plan does not provide for the substantive consolidation of the Plan Proponents' assets and liabilities. The RFS Chapter 11 Case is administered separately from the RDI Debtors.

### 5. Employee Wages and Benefits

On September 10, 2018, the Court entered an order authorizing RDI to pay certain Pre-Petition wages and salaries of its employees and honor other employee benefits [Docket No. 31].

### 6. Schedules and Statements of Financial Affairs

On September 28, 2018, the RDI Debtors filed with the Court their Schedules and Statement of Financial Affairs. On October 4, 2018, RFS filed with the Court its Schedules and Statement of Financial Affairs.

### 7. Honoring of Customer Programs and Payment of Certain Pre-Petition Claims

On August 31, 2018, and September 10, 2018, the Court entered orders granting the RDI Debtors' motions for authority to continue to honor customers' gift cards following the Petition Date. [Docket Nos. 30 and 32].

### 8. Unexpired Leases and/or Executory Contracts

#### a. The Huntington Beach Lease

Ruby's Huntington Beach is a party to a nonresidential lease with the City of Huntington Beach (the "City of Huntington Beach") for the operation of a Ruby's restaurant located on the Huntington Beach Pier, 1 Main Street, Huntington Beach, California 92648 (the "Huntington Beach Lease"). Ruby's Huntington Beach determined in its sound business judgment that it was in the best interest of its Estate and its Creditors to assume the Huntington Beach Lease. To that end, Ruby's Huntington Beach entered into a stipulation with the City of Huntington Beach authorizing the assumption of the Huntington Beach Lease and curing defaults (the "Huntington Beach Lease Stipulation"), and on February 6, 2019 [Docket No. 233], Ruby's Huntington Beach filed a motion to approve the Huntington Beach Lease Stipulation. On March 11, 2019, the Court entered its order approving the Huntington Beach Lease Stipulation [Docket No. 282]. On April 2, 2019, the City of Huntington Beach sent correspondence to Ruby's Huntington Beach that it had not yet received

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1   payment as set forth in the Huntington Beach Lease Stipulation and notifying Ruby's Huntington

2   Beach of its intent to terminate the Huntington Beach Lease in thirty (30) days.  The amounts due

3   and owing to the City of Huntington Beach pursuant to the Huntington Beach Lease Stipulation have

4   been paid.  In accordance with the agreement with the City of Huntington Beach, Ruby's Huntington

5   Beach is required to make certain improvements to the lighting and signage of the premises, which

6   improvements are in process.

7               **b.      The Oceanside Lease**

8         On or about March 1, 1996, RDI entered into a lease agreement with the City of Oceanside

9   (as amended from time to time thereafter, the "Oceanside Lease") for a Ruby's Diner located at 1

10  Oceanside Pier, Oceanside, California 92054.  In January 2014, Ruby's Oceanside succeeded to the

11  interest of RDI in the Oceanside Lease.  In 2018, Ruby's Oceanside exercised the first of the two

12  remaining options to extend the term of the Oceanside Lease.  Ruby's Oceanside determined in its

13  sound business judgment that it was in the best interest of its Estate and its Creditors to assume the

14  Oceanside Lease.  To that end, on February 6, 2019, RDI and Ruby's Oceanside filed a motion

15  seeking to assume the Oceanside Lease [Docket No. 232], which was granted by the Court on

16  March 11, 2019 [Docket No. 281].  Any amounts due and owing in connection with the assumption

17  of the Oceanside Lease will be paid on the Effective Date of the Plan.

18              **c.      The Palm Springs Lease**

19        On or about October 25, 1999, RDI entered into a commercial lease agreement (the "Palm

20  Springs Lease") with John Wessman dba Plaza Mercado for the Ruby's Diner located at 155 S. Palm

21  Canyon Drive, Palm Springs, California 92262.  In or about 2013, Ruby's Palm Springs succeeded

22  to the interest of RDI in the Palm Springs Lease.

23        Ruby's Palm Springs determined in its sound business judgment that it was in the best

24  interest of its Estate and its Creditors to assume the Palm Springs Lease.  To that end, on February 6,

25  2019, RDI and Ruby's Palm Springs filed a motion seeking to assume the Palm Springs Lease

26  [Docket No. 232], which was granted by the Court on March 11, 2019 [Docket No. 281].  Any

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1   amounts due and owing in connection with the assumption of the Palm Springs Lease will be paid on

2   the Effective Date of the Plan.

3              **d.    The Laguna Hills Lease**

4              On or about September 16, 1994, RDI entered into a lease agreement (as amended from time

5   to time thereafter, the "Laguna Hills Lease") with Shopping Centers Associates, a New York general

6   partnership, for the Ruby's Diner located within the Laguna Hills Mall, located at 24155 Laguna

7   Hills Mall, Suite 184A, Laguna Hills, California 92653 (the "Laguna Hills Restaurant").  MGP

8   Fund X Laguna Hills, LLC ("MGP") currently owns the Laguna Hills Mall and is the landlord in

9   connection with Laguna Hills Lease.   Ruby's Laguna Hills succeeded to the interest of RDI in the

10  Laguna Hills Lease.

11             RDI, Ruby's Laguna Hills and SoCal Diners determined in their sound business judgment

12  that it was in the best interest of their Estates and Creditors to assume and assign the Laguna Hills

13  Lease.  To this end, these Debtors negotiated with MGP and an existing franchisee regarding the

14  assignment of the Laguna Hills Lease, the resolution of MGP's claims against the Debtors, and the

15  sale of certain furniture, fixtures and equipment (the "FF&E") (which FF&E, consisting of a limited

16  amount of "small goods," would be of no further use to the Debtors following the assignment) for a

17  purchase price of Fourteen Thousand Dollars ($14,000).

18             On March 15, 2019, RDI, Ruby's Laguna Hills, SoCal Diners filed a motion to assume and

19  assign the Laguna Hills Lease, resolve MGP's claims and sell the FF&E to the assignee (the

20  "Laguna Hills Lease Motion") [Docket No. 301].  On March 21, 2019, the Court entered its order

21  approving the Laguna Hills Lease Motion [Docket No. 315].

22             Any amounts due and owing in connection with the assignment of the Laguna Hills Lease

23  will be paid on the Effective Date of the Plan.

24             **e.    The Corporate Lease**

25             On March 28, 2019, RFS filed a motion to assume the lease of the corporate headquarters

26  [Docket No. 161], which was approved by the Court by order entered April 4, 2019 [Docket No.

27  169].  There are no amounts due in connection with the assumption of the corporate lease.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

### f.     The Franchise Agreements

Pursuant to the Plan, RFS will assume the Franchise Agreements and the Confirmation Order shall serve as the order approving such assumption.

### g.     Other Agreements

Other agreements that the Debtors intend to assume and/or reject pursuant to the Plan are set forth in **Exhibit L** and **Exhibit M** to the Disclosure Statement.

### 9.     The Claims Bar Dates

Pursuant to section 502(b)(9) of the Bankruptcy Code, the deadlines for a Governmental Unit to file a proof of claim was February 25, 2019 (for Pre-Petition Claims against the SoCal Debtors which filed petitions on August 29, 2018), March 4, 2019 (for Pre-Petition Claims against RDI which filed its petition on September 5, 2018) and March 5, 2019 (for Pre-Petition Claims against RFS which filed its petition on September 6, 2018, each of which is 180 days after the dates of the Orders for Relief in the cases (the "Governmental Units Bar Date").[26]

The general Bar Dates by which all Creditors of the Debtors must have filed Proofs of Claim against the Debtors were June 3, 2019 as to the RDI Debtors, and May 15, 2019 as to RFS.

### 10.     Use of Cash Collateral

With respect to RDI, the following entities claim, or claimed, an interest in RDI's cash collateral:  (a) the Secured Noteholders; (b) the Internal Revenue Service; (c) Pillsbury; and (d) Family Tree.  In the SoCal Debtors' cases, the following entities assert, or asserted, an interest in some or all of the SoCal Debtors' cash collateral:  (a) Opus Bank; (b) C&C Partnership; (c) Pillsbury; (d) Plaza Bonita; (e) Family Tree; and (f) U.S. Foods.  Opus Bank asserts an interest in RFS' cash collateral.

Since the outset of the Chapter 11 Cases, the Court has authorized the Debtors' use of cash collateral, with the most recent orders being as follows:

---

[26] The Governmental Units Bar Date is subject to any dates authorizing an extension of the deadline pursuant to the *Order Granting the United States' Omnibus Motion for Enlargement of Deadlines and a Stay of Proceeding with which the United States Government is a Party in Light of Lapse of Appropriations*, entered on January 23, 2019, as Docket No. 3, Misc. No. 1:19-mp-00101 MT.

1    On March 29, 2019, Opus Bank filed its fourth stipulation between the RDI Debtors, Opus

2    Bank, Pillsbury, Family Tree, and U.S. Foods authorizing the RDI Debtors' continued use of cash

3    collateral (the "Fourth Cash Collateral Stipulation") [Docket No. 323], and on April 4, 2019, the

4    Court entered its order granting the Fourth Cash Collateral Stipulation [Docket No. 328].

5    On April 16, 2019, the Court entered its order granting RFS' continued use of cash collateral

6    [Docket No. 176].

7    On August 9, 2019, the RDI Debtors filed a fifth stipulation between the RDI Debtors, Opus

8    Bank, Pillsbury and U.S. Foods[27] authorizing the RDI Debtors' continued use of cash collateral (the

9    "Fifth Cash Collateral Stipulation") [Docket No. 407] and, on August 19, 2019, the Court entered its

10    order granting the Fifth Cash Collateral Stipulation [Docket No. 413].

11    On September 3, 2019, RFS filed a third stipulation between the RFS and Opus Bank,

12    authorizing RFS' continued use of cash collateral (the "Third Cash Collateral Stipulation") [Docket

13    No. 231] and, on September 13, 2019, the Court entered its order granting the Third Cash Collateral

14    Stipulation [Docket No. 237].

15    **11.    Post-Petition Financing**

16    On January 8, 2019, the Debtors filed a motion seeking approval of, among other things,

17    debtor in possession financing from Craig in the amount of $2 million (which was to be utilized not

18    only to support operations of certain of the Debtors during the pendency of their Chapter 11 Cases,

19    but also amounts necessary to make effective date payments under a chapter 11 plan) (the "Initial

20    DIP Motion") [Docket No. 185].  In addition to seeking approval of the $2 million loan, the Initial

21    DIP Motion also requested approval of RDI's assumption of and entry into a Pre-Petition plan

22    support agreement, approval of a break-up fee and approval of a "post-petition netdown" process

23    pursuant to which the amounts due among RDI, RFS and the Franchisees could be "trued-up" and

24    funds could flow into the Estates (defined herein as the "Post-Petition Netdown").  The Initial DIP

25    Motion was opposed by Opus Bank and Pillsbury.

26

27    _____

28    [27] Family Tree is not a party to the Fifth Cash Collateral Stipulation as its PACA claims were paid in full during the
pendency of the Chapter 11 Cases in accordance with terms of prior cash collateral orders.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Following discussion among the parties, and in an attempt to address the objections to the Initial DIP Motion which threatened to derail the forward movement of the Debtors' Chapter 11 Cases, RDI determined to enter into a more limited debtor in possession loan (with RDI as the only borrowing entity) reflecting only the minimum amount necessary to fund RDI's operations pending confirmation of a plan – with the additional amounts necessary to fund the Effective Date payments to be provided, not in the form of a DIP loan, but by way of plan funding.  The SoCal Debtors are not parties to the more limited DIP loan, nor do their assets serve as collateral for the DIP Loan.

On February 6, 2019, RDI filed a motion seeking approval of a DIP loan in the amount of $200,000 (the "RDI DIP Motion") [Docket No. 235].  Concurrently therewith, the Debtors filed a withdrawal of the Initial DIP Motion and its more expansive relief (i.e., the Debtors no longer sought approval of the $2 million loan, the plan support agreement or the break-up fee).  On February 20, 2019, following discussions among the various parties, RDI filed a supplement to the RDI DIP Motion requesting an increase in the DIP Loan from $200,000 to $300,000 [Docket No. 252] and, thereafter, on March 13, 2019, filed a motion seeking approval of the $300,000 DIP loan from the DIP Lender (the "RDI DIP Loan") [Docket No. 235], which was approved by the Court by order entered March 21, 2019 (the "RDI DIP Financing Order") [Docket No. 314].  As required by the DIP Lender, the Founders personally guaranteed the RDI DIP Loan.  The proceeds of the RDI DIP Loan will be utilized to fund RDI's operations pending the Effective Date, at which time additional funding, in the form of the Plan Funding from the Plan Sponsor, will be provided to fund the Debtors' operations and obligations under the Plan.  Pursuant to the Plan, the Plan Sponsor will convert the amounts due on account of the RDI DIP Loan to equity in RDI.

The RDI DIP Financing Order provides for the payment of the DIP Lender's fees and expenses, subject to Bankruptcy Court approval,[28] and the Plan contemplates satisfaction of such

---

[28] Paragraph 12 of the DIP Agreement provides as follows:  Payment of the fees and expenses of the DIP Lender and his professionals (including all reasonable fees and expenses of counsel to the DIP Lender incurred in connection with this Agreement and the Chapter 11 Case) shall be subject to Bankruptcy Court order approving such fees and expenses. Professionals for the DIP Lender shall not be required to comply with the U.S. Trustee fee guidelines, however any time that such professionals seek payment of fees and expenses from RDI, each professional shall file with the Court summary copies of its fee and expense statements or invoices (which shall contain reasonably detailed time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1  fees and expenses in the estimated amount of $300,000 on the Effective Date or upon allowance.

2  The basis for payment of such fees and expenses includes the fact that, while the amount of the DIP

3  Loan was ultimately reduced to a lower amount to facilitate a consensual chapter 11 and plan

4  process, the DIP Lender's fees and expenses were incurred in connection with the much larger ($2

5  million) funding arrangement contemplated by the Initial DIP Motion, payment thereof was

6  negotiated in connection with the RDI DIP Loan approved by way of the RDI DIP Financing Order,

7  and the approval of such fees and expenses is subject to a notice and objection period and

8  Bankruptcy Court approval.  Such fees, along with the fees of the Plan Sponsor's tax advisors (in the

9  estimated amount of $25,000), will be satisfied by way of a reduction in the amount of the cash

10  component of the Plan Funding by the Plan Sponsor.

**12.   Post-Petition Netdown Motion and Implementation of Pre-Petition Netdown Process Under the Plan**

12        As discussed above, RDI has significant obligations to reimburse the Franchisees in

13  connection with the redemption of the gift cards by customers at the Ruby's® Restaurants (primarily

14  in connection with the Costco Gift Cards), both on a Pre- and a Post-Petition basis.  Prior to its

15  chapter 11 filing, RDI lacked the funding to make such payments on account of its Gift Card

16  Reimbursement Obligations.  The Franchisees, in turn, ceased making payments to RFS under the

17  Franchise Agreements (*i.e.,* the Franchisees were not paying their franchise-related obligations – the

18  Franchise Royalties and Ad Fund Obligations – because RDI was not paying the Gift Card

19  Reimbursement Obligations to the Franchisees).  Without the payment of the Franchise Royalties by

20  the Franchisees, RFS was no longer in a position to pay 25% of the royalties to RDI as the RDI

21  License Fee.  In other words, the cycle of payments between and among RDI, RFS and the

22  Franchisees significantly diminished.

23        On February 6, 2019, RDI filed its motion (the "Post-Petition Netdown Motion") [Docket

24  No. 234], seeking an order authorizing it to honor Post-Petition obligations between and among RDI,

27  product doctrine) and serve such request on RDI, the U.S. Trustee and counsel for the Committee.  The request for payment shall be filed and served in accordance with the negative notice provisions under Rule 9013-1(o) of the Local

28  Bankruptcy Rules for the Central District of California.  If an objection is raised, a hearing thereon will be scheduled

RFS and the Franchisees in accordance with the "Post-Petition Netdown" process described therein. Specifically, the Post-Petition Netdown works as follows:

Any amounts that RDI owes a particular Franchisee in connection with Post-Petition Gift Card Reimbursement Obligations will first be reduced (as a non-cash journal entry) by any amounts that that Franchisee owes to RDI for any miscellaneous charges (the "<u>Net Amount RDI Owes to the Franchisee</u>"). The Net Amount RDI Owes to the Franchisee will be applied (as a non-cash journal entry) to the amount of Post-Petition Franchise Royalties that the Franchisee owes to RFS, leaving a remaining balance (the "<u>Remaining Balance Owed by the Franchisee</u>"). The Franchisee will pay to RFS (in Cash) the Remaining Balance Owed by the Franchisee, as well as any Post-Petition Ad Funds Obligations it owes. From the Remaining Balance Owed by the Franchisee paid to RFS by the Franchisee, RFS will pay to RDI (in Cash) the RDI License Fee (calculated on the total Franchise Royalties owed by Franchisee). The above-described "credit" that RFS has extended to RDI by way of applying the Net Amount RDI Owes to the Franchisee against the Franchise Royalties owed by the Franchisee resulting in the Remaining Balance Owed by the Franchisee, will be booked (as a non-cash journal entry) as an intercompany receivable owed to RFS from RDI.

On March 11, 2019, the Court entered its order granting the Post-Petition Netdown Motion [Docket No. 283]. Similar relief was sought and obtained by RFS in its case [Docket Nos. 134 and 156].

As of July 30, 2019, implementation of the Post-Petition Netdown Process has resulted in the amount of approximately $642,977 in Franchise Royalties being paid to RFS – with approximately $187,655 of this amount being paid to RDI in the form of the RDI License Fees. In addition, RFS has received the approximate sum of $344,067 in Post-Petition Ad Fund Obligations. Pursuant to this process, there is an intercompany post-petition receivable owed to RFS by RDI in the approximate amount of $107,681.

For the period following July 30, 2019 though the Effective Date (estimated to be January 26, 2020), with respect to both the Post-Petition Netdown and, following the Effective Date, implementation with respect to the Pre-Petition amounts owed among RDI, RFS and the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Franchisees, as reflected in the Cash Flow Projections (attached hereto as **Exhibit B**), the

implementation of the Netdown Process as to these obligations is projected to generate cash to RFS

in the estimated total amount of $533,694 in Franchise Royalties, $349,585 in Ad Fund Obligations

and miscellaneous charges for a total sum of $888,279.  These amounts include the amount of

$635,556 in unpaid Franchise Royalties and Ad Fund Obligations owed by Eureka Food Enterprises,

LLC to be paid on the Effective Date, and the balance from other Franchisees (to be paid on the

Effective Date and during the year following the Effective Date), as reflected in the Cash Flow

Projections.  Pursuant to the implementation of this Netdown Process, RDI is projected to receive

the amount of $133,423 as the RDI License Fee.  As a result of the Netdown Process, a projected

intercompany receivable owed by RDI to RFS in the approximate amount of $858,349 will be

booked.

        Craig holds rights of offset of his obligations for Franchise Royalties as a Franchisee as

against the RFS Note (in the principal amount of $1 million, plus interest thereon).  Such offset

rights have not been, and will not be, enforced with respect to the RFS Note.  Instead, the Plan

provides that the Allowed Claim of Craig against RFS shall be converted into equity in RDI as of the

Effective Date of the Plan.  The amounts owed by Eureka Food Enterprises, LLC for Franchise

Royalties (both Pre- and Post-Petition), in the approximate amount of $363,664, shall be paid by

Eureka Food Enterprises, LLC on the Effective Date in accordance with the Netdown Process (as

will his Ad Fund Obligations in the amount of $271,891).  These amounts to be paid by Eureka Food

Enterprises, LLC are reflected in the above-discussed figures.

        So long as RDI and RFS are in compliance with their obligations under the Plan, including

RFS's obligations to Opus Bank, any intercompany receivable owed to RFS from RDI as a result of

the Netdown Process will not be collected or paid, but will remain on the books as a non-cash

journal entry.

        **13.    The Exclusivity Periods and the Filing of the Plan and Disclosure Statement**

        The RDI Debtors' initial time period in which they had the exclusive right to file a plan of

reorganization and the time period in which the Debtors had the exclusive right to solicit votes

thereon were December 27, 2018, and February 25, 2019, respectively.  On December 26, 2018, the

RDI Debtors filed a motion seeking a 60-day extension of the exclusivity periods (the "RDI Debtors Exclusivity Extension Motion") [Docket No. 175]. On March 11, 2019, the Court entered its order granting the RDI Debtors Exclusivity Extension Motion, extending the Debtors' exclusive right to file a plan of reorganization and the time period in which the RDI Debtors have the exclusive right to solicit votes thereon to April 25, 2019, and June 24, 2019, respectively. [Docket No. 280].

RFS's exclusive right to file a plan of reorganization and the initial time period in which RFS has the exclusive right to solicit votes thereon were January 4, 2019, and March 5, 2019, respectively. On January 3, 2019, RFS filed a motion seeking a 60-day extension of the exclusivity periods (the "RFS Exclusivity Extension Motion") [Docket No. 99]. On March 11, 2019, the Court entered its order granting the RFS Exclusivity Extension Motion, extending RFS's exclusive right to file a plan of reorganization and the time period in which RFS has the exclusive right to solicit votes thereon to April 25, 2019, and June 24, 2019, respectively. [Docket No. 154].

The RDI Debtors, jointly with RFS, as Plan Proponents, filed the initial Plan and Disclosure Statement on April 24, 2019.

On June 19, 2019, the RDI Debtors filed a motion to further extend the solicitation deadline to and including October 7, 2019 [Docket No. 390], which was granted by Court by Order entered August 1, 2019 [Docket No. 401]. On June 24, 2019, RFS filed a motion to further extend the solicitation deadline to and including October 7, 2019 [Docket No. 214].

**D.    Pending Litigation**

As of the Petition Dates, the Debtors were parties to several lawsuits (the "Litigation"). Attached as **Exhibit C** is a list of such Litigation and a description of the status of each lawsuit.

**E.    Retention and Compensation of Professionals**

**1.    Retention of Professionals**

The RDI Debtors retained Pachulski Stang Ziehl & Jones LLP ("PSZJ") as the RDI Debtors' general insolvency counsel, which employment was approved by the Court by order entered December 12, 2018 [Docket No. 170].

RDI retained GlassRatner Advisory & Capital Group LLC ("GlassRatner") as its financial advisor, which employment was approved by the Court by order entered July 30, 2019 [Docket No. 399].

The RDI Debtors retained Donlin Recano & Company, Inc. ("DRC") as their claims, noticing and balloting agent, which employment was approved by the Court by order entered April 9, 2019 [Docket No. 331].

RFS retained Theodora Oringher PC ("TO") as RFS's general insolvency counsel, which employment was approved by the Court by order entered December 18, 2018 [Docket No. 93].

RFS retained Armory Consulting Co. ("Armory") as its financial advisor, which employment was approved by order entered January 3, 2019, the Court entered its order granting the Armory Application [Docket No. 99].

**2.    Compensation of Professionals**

The Court has determined that, absent further order of the Court, no amounts shall be paid on account of Professional Claims in the Debtors' Chapter 11 Cases prior to the Effective Date of the Plan or further order of the Court.  The Plan provides for payment of the Allowed Professional Claims on the earlier of the Effective Date or allowance thereof, unless otherwise agreed.

**IV.**

**FINANCIAL INFORMATION**

**A.    Financial Information**

For information on the Debtors' financial condition, please refer to the Debtors' Monthly Operating Reports that have been filed with the Office of the United States Trustee (the "UST Reports").  Copies of the UST Reports are available upon a request, in writing, to counsel to the Debtors at the addresses listed on the cover page of this Disclosure Statement.

**1.    Procedures Implemented to Resolve Financial Problems**

As reflected above, in the years preceding the chapter 11 filings, while certain of the SoCal Debtors and RFS were profitable or had assets that exceeded their liabilities, RDI operated at a loss and was in need of financial restructuring.  Pursuant to the RDI DIP Loan, the Plan Sponsor (as DIP Lender) provided the amount of $300,000 in debtor in possession financing to RDI.  Under the Plan,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

the Plan Sponsor will provide the Plan Funding (which includes the conversion of the $300,000 RDI

DIP Loan to equity, conversion of the $1 million RFS Note to equity and an additional infusion of

cash, for total consideration of $4 million),[29] which will be utilized by the Reorganized Debtors to

make Effective Date and plan-related payments, stabilize operations and pay operating expenses.

In addition, the Debtors have implemented several measures designed to increase the

Debtors' profitability.  These efforts are outlined below.

### a.    G&A Expenses

The Debtors have evaluated their general and administrative expenses and have taken the

following measures to reduce expenses during the pendency of the Chapter 11 Cases:  (i) reductions

in the Founders' compensation; (ii) elimination of certain managerial and leadership positions;

(iii) replacing certain administrative support services, such as accounting services, to new providers

are reduced costs; (iv) utilization of automated food costs analytical modeling tools; and

(v) reduction in commissions to delivery providers through the implementation of online ordering

programs.

### b.    Efforts to Increase Sales

The Debtors have undertaken a number of actions designed to increase sales.  Specifically,

the Debtors have: (i) engaged a specialized marketing firm to implement a focused digital marketing

program; (ii) partnered with delivery providers to develop and implement online consumer ordering

programs; and (iii) developed a digital guest loyalty and frequent dining program.

### c.    Efforts to Further Develop Franchising Program

The Debtors have also undertaken a number of steps designed to further develop the Ruby's

franchising program.  Specifically, the Debtors have introduced a new concept under the trade name

Ruby's Shake Shop, which provides for smaller sized units with reduced menu options, which

provides potential franchisees with a less expensive franchising investment opportunity.  In addition,

the Debtors are developing a shake only, kiosk-style franchising model.  The Debtors are working to

---

[29] The amount of the Plan Funding is subject to change based upon whether or not there is to be a payment to the RDI
Unsecured Creditors of $2.5 million under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

develop franchises in Pennsylvania, Texas, Utah, Colorado and California.  The Debtors also anticipate expanding the Ruby's brand into the international arena following the Effective Date.

**B.**    **Principals/Affiliates of Debtors' Business**

    **1.**    **Shareholders, Directors and Officers**

The following chart lists the names of the shareholders, the members of the Board of Directors and Officers of RDI and RFS, as of the Petition Date and during the pendency of the Chapter 11 Cases:

| Name | Position with RDI | Position with RFS |
|---|---|---|
| Douglas Cavanaugh | 60% Shareholder<br>President<br>Chairman of the Board of Directors | 60% Shareholder<br>President<br>Chairman of the Board of  Directors |
| Ralph Kosmides | 40% Shareholder<br>Special Projects Coordinator<br>Board Member | 40% Shareholder<br>Special Projects Coordinator<br>Board Member |
| Tad Belshe | Executive Vice President of Operations & Secretary<br>Board Member | Board Member |

    **2.**    **Management Compensation**

The following are the annual salaries of the Debtors' executive management personnel as of the Petition Date and during the pendency of the Chapter 11 Cases:  Cavanaugh, President, $125,000 annual salary from RDI, which has been paid during the pendency of the cases, and $125,000 annual salary from RFS that has not been paid during the pendency of the cases but accrued; Kosmides, Special Projects Coordinator, $75,000 annual salary from RDI during the pendency of the cases (and on an as-requested basis from RFS at an hourly rate of $125); and Mr. Belshe, Executive Vice President of Operations and Secretary, $96,000 from RDI subject to reimbursement RFS or Affiliated Entities for services provided by Mr. Belshe to RFS or Affiliated Entities.  In addition to salary, the Debtors' executive management personnel are provided with health and life insurance by RDI.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**V.**

**ITEMIZATION OF THE DEBTORS' ASSETS**

The Debtors' assets are generally summarized as follows:

**A.    Cash on Hand and Accounts Receivable**

The current cash on hand and anticipated accounts receivable in the respective Estates are reflected in the Cash Flow Projections, and will be utilized as a source of funding for the Plan.

**B.    Intellectual Property and Franchising Related Interests**

RDI is the owner of the Marks and Intellectual Property, which are licensed to RFS (the Entity serving as the franchisor to the Franchisees) pursuant to the RFS/RDI License Agreement. Under the Franchise Agreements, RFS (as franchisor) is entitled to Franchise Royalties, which are generally the greater of a set dollar amount and four percent (4%) of "Gross Sales" as such term is defined in the Franchise Agreements.  The Franchise Royalties historically averaged approximately $2,400,000 per annum (assuming payment of Franchise Royalties by the Franchisees).

As licensor of the Marks and Intellectual Property to RFS, RDI is entitled to the RDI License Fee, which is one percent (1%) of the Gross Sales generated by RFS and the Franchisees (*i.e.,* 25% of the Franchise Royalties owed to RFS), which historically averaged approximately $600,000 per annum (assuming payment of Franchise Royalties by the Franchisees).

The Plan will effectuate a transfer of the Interests in RFS to RDI.  The RFS/RDI License Agreement will remain in effect and RFS will continue its role of franchisor to the Ruby's Franchisees.

**C.    Membership and Partnership Interests**

RDI holds membership or partnership interests in various entities.  These entities have been valued, prior to consideration of the debt against them, based on EBITDA (without G&A expense) with a multiple of 3.5 x EBITDA,[30] as follows: (1) 100% Interest in SoCal Diners (which holds interests (along with Quality) in the SoCal Entities which, in turn, own and operate the SoCal Restaurants) - valued at $3,573,193 (as detailed below); (2) 100% interest in Ruby's Woodbridge,

---

[30] The multiple is based on several previous offers for the Huntington Beach, Oceanside and Palm Springs restaurants in the range of $4.5 million, and does not include cash on hand, FF&E, inventory, intercompany receivables or goodwill.

*(left margin)* PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

LLC (which owns and operates a restaurant in Irvine, California) – which interest is valued at $0.00; (3) 50% of Ruby's Spectrum, LLC (which owned and operated a restaurant at the Irvine Spectrum in California but is now closed) – valued at $0.00; (4) 50% of Ruby's Diner South Coast Plaza, LP (which owns and operates a restaurant at South Coast Plaza in California) – valued at $289,808; and (5) 70% of Ruby's Beach Ventures, LLC (which owns and operates a restaurant in Long Beach, California) – valued at $220,006, prior to consideration of the debt against these entities.  As set forth in the Cash Flow Projections (**Exhibit B**), RDI is projected to continue to receive distributions from Ruby's Diner South Coast Plaza, LP and Ruby's Beach Ventures, LLC, which will be utilized to fund distributions under the Plan.

SoCal Diners and Quality own 100% of the SoCal Entities, which have been valued, prior to consideration of the debt against them, at $3,573,193, as follows:  (1) Ruby's Huntington Beach – valued at $1,883,761; (2) Ruby's Oceanside – valued at $1,164,694; (3) Ruby's Palm Springs – valued at $524,739; (4) Ruby's Mission Valley, Ltd. (which owned and operated a restaurant in the Westfield Mission Valley Mall in San Diego, California that was closed prior to the Petition Date) – valued at $0.00; and (5) Ruby's Laguna Hills (which, until March 2019, owned and operated a restaurant in the Laguna Hill Mall in Laguna Hills, California) – valued at $0.00.  These values are prior to the consideration of debt.  After consideration of debt, as set forth in **Exhibit B**, there is no equity value to SoCal or Quality in connection with the SoCal Entities.

Similarly, as reflected in **Exhibit B**, after consideration of the secured, administrative and priority debt against each HOP Restaurant Entity, there is no residual value in the HOP Restaurant Entities, however, these entities will be paid a total of $200,000, which is the amount that will be distributed, *pro rata*, on the Effective Date of the Plan, to the unsecured creditors of the respective HOP Restaurant Entity, as follows:

| **HOP Restaurant Entity – Unsecured Distribution** | **Amount** |
|---|---|
| Huntington Beach Unsecured Distribution Amount | $113,118.78 |
| Oceanside Unsecured Distribution Amount | $62,397.43 |
| Palm Springs Unsecured Distribution Amount | $24,413.78 |

There is no residual value in Ruby's Laguna Hills after consideration of the secured, administrative and priority debt and, therefore, no amounts will be paid to unsecured creditors of that entity.

The unsecured Creditors' claims of RDI will be entitled to one of the following treatments: (1) Paid a total of Two Million Five Hundred Dollars ($2,500,000) over a period of five (5) years following the Effective Date, assuming approval of the D&O/Affiliate Release; or if the D&O Release is not approved, a *pro rata* distribution from any proceeds ultimately recovered by the Litigation Trust after payment of the fees and costs incurred by the Litigation Trust.

The unsecured creditors of SoCal Diners and Quality will receive a two and one-half percent (2.5%) distribution on the fourth (4th) year anniversary of the Effective Date of the Plan (in the total estimated amount of $33,289) (the Debtors do not believe that there are any allowed unsecured claims against Quality).  These distributions are set forth in the Cash Flow Projections attached to the Disclosure Statement as **Exhibit B**.

**D.    Leased Assets**

As of the Petition Date, the RDI Debtors' Assets included four (4) nonresidential real property leases (Huntington Beach, Oceanside, Palm Springs and, until its assignment in March 2019, Laguna Hills).  The Debtors also lease their corporate offices and a *de minimis* amount of equipment.  The Debtors' non-residential real property leases have been assumed and, in the case of Laguna Hills, assigned).

**E.    Furniture, Fixtures and Equipment**

The Debtors own various FF&E located at their corporate offices.  The value of the FF&E is *de minimis*.  In connection with the assignment of the Laguna Hills Lease, the FF&E located at the Laguna Hills restaurant was sold to the assignee for $14,000.  In addition, in connection with the Laguna Hills restaurant closing, perishable inventory was sold for $8,000.

**F.    Litigation Claims**

**1.    Actual and Projected Recovery of Preferential or Fraudulent Transfers**

The Debtors and the Committee have conducted a review and investigation regarding potential litigation claims, including potential claims against the D&Os and Affiliated Entities (as

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

such terms are defined herein), and the available coverage under the D&O insurance policy (which may provide up to $5 million in possible insurance coverage in connection with such claims). The Committee believes that there may exist viable claims against the D&Os and Affiliated Entities. The D&Os and Affiliated Entities dispute these contentions. To address these differing positions, and in light of the consideration to be provided to RDI's unsecured Creditors and the benefit to the Debtors' Estates in having the potential claims against the D&Os and Affiliated Entities resolved so that the D&Os are in a position to devote their full attention to the operations of the Debtors and Reorganized Debtors, the Plan provides the unsecured Creditors of RDI with two alternative treatments with respect to a distribution on account of their Class 11(a) Claims depending on whether the D&O/Affiliate Release is approved. If the D&O/Affiliate Release is approved by the Bankruptcy Court, the unsecured Creditors of RDI will be paid a total of Two Million Five Hundred Dollars ($2,500,000). Alternatively, if the D&O/Affiliate Release is not approved by the Bankruptcy Court, the Class 11(a) Claimant will participate in a *pro rata* distribution from any proceeds that may ultimately be recovered by the Litigation Trust. In addition, any Avoidance Action that could be asserted against U.S. Foods by or on behalf of Debtors' Estates shall be waived pursuant to the U.S. Foods Settlement. The Debtors are in the process of reviewing and analyzing whether there exist any other potential Avoidance Actions.

With respect to preferential transfers, attached hereto as **Exhibit D** is a summary of the gross dollar amount of payments made by each of the Debtors during the ninety (90) day period preceding the Petition Dates and the one (1) year period for Creditors who are Insiders (the "Preference Period Payments Listing").[31] Some of the payments made during these periods (the "Preference Period") may be recoverable as preferential transfers pursuant to the provisions of section 547 of the Bankruptcy Code (the "Preference Actions"). It should be noted, however, that the amounts set forth in **Exhibit D** simply represent the gross payments made within the Preference Periods and are not the amount of payments that are recoverable as preferential transfers.

---

[31] Except as otherwise provided in the Plan (including without limitation the waiver of claims by way of the U.S. Foods Settlement), the Debtors reserve the right to pursue actions for avoidance of preferential transfers against any and all individuals or entities listed on **Exhibit D**.

DOCS_LA:323709.20                                    - 38 -

1   To qualify as a preference, each payment must meet certain criteria set forth in section 547 of

2   the Bankruptcy Code.  Indeed, the Debtors believe that after the statutory criteria and business

3   criteria are applied, recoverable preferences will be substantially less.  The gross figure also does not

4   take into account defenses, which may be asserted by the transferees, such as ordinary course of

5   business, contemporaneous payment, collateral proceeds as a source and/or new value.  In addition,

6   the net recovery on account of such claims will also be reduced by legal fees and costs incurred to

7   prosecute such claims.  After taking into account these considerations, the Debtors do not believe

8   that there will be any significant recovery in connection with Preference Actions.

9   The Avoidance Actions will be pursued by the respective Debtors if commenced prior to the

10   Effective Date or, following the Effective Date, by the respective Reorganized Debtors.   The

11   respective Debtors will have the ability to assert any Avoidance Actions defensively, as grounds

12   under section 502(g) of the Bankruptcy Code to deny a Creditor's distribution.  See Section VI

13   (Summary of Plan of Reorganization) for a further discussion of the proposed treatment of the

14   Avoidance Actions.

15   Pursuant to the Plan, the Pre-Petition claims between and among the Founders and the

16   Debtors (as set forth in **Exhibit E**) will be reconciled, resulting in an adjustment to the amount of

17   New Value Contribution being contributed by the Founders (the "Reconciliation").

**VI.**

19   **SUMMARY OF THE PLAN OF REORGANIZATION**

20   **A.    What Creditors and Interest Holders Will Receive Under The Proposed Plan**

21   The Plan classifies Claims and Interests in various classes, by Debtor, according to their right

22   to priority.  The Plan states whether each class of Claims or Interests is impaired or unimpaired.  The

23   Plan provides the treatment each class will receive.

24   **B.    Unclassified Claims**

25   As required by the Bankruptcy Code, certain types of Claims are not placed into voting

26   classes; instead they are unclassified.  They are not considered impaired and they do not vote on the

27   Plan because they are automatically entitled to specific treatment provided for them in the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Bankruptcy Code.  As such, the Debtors have <u>not</u> placed the following Claims in a class.

**1.    Administrative Claims**

Administrative expenses are Claims for costs or expenses of administering the Debtors' Cases, which are allowed under Bankruptcy Code section 507(a)(1) (the "<u>Administrative Claims</u>"). The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.  The following tables list the Debtors' section 507(a)(1) Administrative Claims and their treatment under the Plan.

**a.    Administrative Claims of Non-Professionals**

Other than those listed in Table 1 below, the Plan Proponents do not believe any amounts will be owed to parties who provide goods and services after the Petition Date (other than Professionals) except for current obligations (including Post-Petition, pre-Effective Date personal property taxes), which will be paid in the ordinary course of business.

**Table 1: Summary of Administrative Claims of Non-Professionals**

| <u>Administrative Creditor</u> | <u>Relationship to Applicable Debtor</u> | <u>Estimate of Amount Owing (as of the Effective Date)</u> | Treatment[32] |
|---|---|---|---|
| U.S. Foods | Supplier (RDI Debtors) | $0.00 | Any amounts owed to U.S. Foods will be paid in accordance with the terms of the U.S. Foods Settlement |
| City of Huntington Beach | Lessor (Huntington Beach restaurant) (SoCal Debtor Ruby's Huntington Beach) | $0.00 | Ruby's Huntington Beach expects that all amounts owing to City of Huntington Beach will be paid in full prior to the Effective Date as provided by the Huntington Beach Lease Stipulation. |
| MGP Fund X Laguna Hills, LLC | Lessor (Laguna Hills restaurant) (SoCal Debtor Ruby's Laguna Hills) | $36,000 | The outstanding amounts owing to MGP as of the Effective Date will be paid in accordance with the terms of the Laguna Hills Lease Assumption and Assignment Order. |

---

[32] The payments on account of Administrative Claims of Non-Professionals will be paid by the applicable Debtor liable for such amounts.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

| | | | |
|---|---|---|---|
| City of Oceanside | Lessor (Oceanside restaurant)<br><br>(SoCal Debtor Ruby's Oceanside) | $13,920 | The outstanding amounts owing to the City of Oceanside in connection with the assumption of the Oceanside Lease will be paid on the Effective Date as provided by the order approving the assumption of the Oceanside Lease. |
| Plaza Mercado | Lessor (Palm Springs restaurant)<br><br>(SoCal Debtor Ruby's Palm Springs) | $21,286 | The outstanding amounts owing to Plaza Mercado in connection with the assumption of the Palm Springs Lease will be paid on the Effective Date as provided by the order approving the assumption of the Palm Springs Lease. |
| Donlin Recano & Company | Claims and Noticing Agent<br><br>(RDI Debtors) | $140,000 | The outstanding amounts owing to Donlin Recano will be paid on the Effective Date. |
| DIP Lender | Administrative claims of counsel and tax advisors to the DIP Lender<br><br>(RDI) | $325,000 | The amounts owing to counsel and tax advisors to the DIP Lender will be satisfied through a reduction of the cash component of the Plan Funding by the Plan Sponsor; to the extent applicable, in accordance with the procedures set forth in the RDI DIP Financing Order. |
| U.S. Trustee Fees | Quarterly Fees<br><br>(All Debtors) | $0.00 | The quarterly payments to the U.S. Trustee will be paid as and when due. To the extent that any amounts are outstanding, such amounts will be paid in full on the Effective Date. The Plan Proponents shall continue to pay U.S. Trustee's fees after the Effective Date as provided by applicable law. |
| Administrative Personal Property Taxes | Taxing Authorities<br><br>(All Debtors) | $0.00 | All accrued Administrative Personal Property Taxes will have been paid in full in the ordinary course of business by the Effective Date. These taxes are not yet due and payable and will be paid in the ordinary course of business by the applicable Debtor when due and payable under applicable state law. |
| Total | | $501,000 | |

#### b.    Administrative Claims of Professionals

With respect to Professionals, pursuant to Court order, the Debtors have not been paying Professionals on a current basis on account of their accruing fees and expenses. The Plan provides for the payment of Allowed Professional Claims on the later of the Effective Date, or allowance

thereof, unless otherwise agreed.  Those amounts are estimated in Table 2 below.  The Plan is

conditioned on an agreement by the Professionals, or other determination, as to the treatment of their

Professional Fees under the Plan that will allow the Plan to become effective.  If an agreement is not

reached with respect to payment of professional fees that is acceptable to the Debtors and the

Professionals, the Plan will not go effective.

**Table 2: Summary of Administrative Claims of Professionals**

| Administrative Creditor | Relationship to Debtors | Amount Estimated | Treatment |
|---|---|---|---|
| Pachulski Stang Ziehl & Jones LLP | Counsel to RDI and the SoCal Debtors | $2,900,000 (RDI) $540,000 (HOP Entities) | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| GlassRatner Advisory & Capital Group LLC | Financial Advisors to RDI | $700,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| Theodora Oringher PC | Counsel to RFS | $425,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| Armory Consulting | Financial Advisors to RFS | $30,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| The Verdon Law Group | Tax Advisor to RFS | $0.00 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| AFP Saddington | Tax Preparers to the Debtors | $25,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

| Administrative Creditor | Relationship to Debtors | Amount Estimated | Treatment |
|---|---|---|---|
| | | | Order, unless otherwise agreed by the Professional. |
| Winthrop Couchot Golubow Hollander, LLP | Counsel to the Committee | $750,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| Force 10 Partner, LLC | Financial Advisors to the Committee | $400,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| Total | | $5,770,000 | |

The Court will rule on all Professional Claims incurred after the Petition Date and any Administrative Claims asserted by private parties not paid in the ordinary course of business before such Claims will be owed.  Only the amount of Administrative Claims allowed by the Court will be owed and required to be paid under the Plan.  The Professionals listed above will file and serve a properly noticed fee application and the Court will rule on the applications.

### c.    Administrative Personal Property Tax Claims

Any personal property tax Claims arising for the period from the Petition Date to the Effective Date (the "Administrative Personal Property Taxes") will be paid by the applicable Debtor in the ordinary course of business as and when such taxes become due.

### d.    Administrative Bar Date for Filing of Administrative Claims

### i.    Bar Date for Administrative Tax Claims

All requests for payment of Administrative Tax Claims and for which no earlier bar date has been or is established outside of the Plan, such as may be established by requesting an expedited audit under Bankruptcy Code section 505, must be filed on or before the later of the forty-fifth (45th) day following entry of the Confirmation Order or, if a tax return is required to be filed with respect

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

to such Administrative Tax Claim, one hundred twenty (120) days following the filing of the applicable tax return.

### ii.        Bar Date for All Other Administrative Claims

Requests for payment of Administrative Claims must be filed and served on the Plan Proponents' counsel and the Office of the United States Trustee no later than the thirtieth (30th) day following the entry of the Confirmation Order. Excluded from this requirement are Administrative Tax Claims, Professional Claims (defined below), statutory fees and Administrative Claims described in <u>Table 1</u> and <u>Table 2</u> above. Any objection to any other Administrative Claim must be filed within 120 days from the date such Administrative Claim is filed.

Professionals or other entities requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b) and 1103 for services rendered prior to the Effective Date ("<u>Professional Claims</u>") must file and serve on all parties entitled to notice thereof, an application for final allowance of compensation and reimbursement of expenses no later than the tenth (10th) day following entry of the Confirmation Order (unless such deadline is shortened or extended by agreement of the Professionals and the Reorganized Debtors or Court order). All such requests for payment of Administrative Claims and applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

Holders of Administrative Claims (including, without limitation, Professional Claims) that do not file such requests by the applicable bar date will be forever barred from asserting such Claims against the Debtors, the Debtors' Estates, the Reorganized Debtors or their property. Any objection to Administrative Claims of Professionals shall be filed on or before the date specified in the application for final compensation.

### 2.        Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment and other taxes described by Bankruptcy Code section 507(a)(8). The Bankruptcy Code requires that each Holder of such a section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred cash

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

payments, over a period not exceeding five (5) years from the date of the order for relief.  Attached

to the Disclosure Statement as **Exhibit F** is a list of all Priority Tax Claims filed against the

Estates.[33]

### Table 3: Summary of Priority Tax Claims

| Claimant | Type of Tax Claim | Claim Amount | Proposed Treatment |
|---|---|---|---|
| All Priority Tax Claims Identified on **Exhibit F** | Various<br><br>*See* attached **Exhibit F** | Total of approximately $29,509 | Each Claimant identified on **Exhibit F** shall receive deferred payments on account of its Allowed Claim over a period not exceeding five (5) years from the order for relief.  Each Claimant shall receive quarterly installments of principal and interest on the unpaid portion thereof at five percent (5%) per annum.  The first installment shall be due on first day of the first quarter following the thirtieth (30th) day after the Effective Date with each installment due each quarter thereafter.  The Debtors may, without penalty, prepay the entire amount of a Priority Tax Claim at any time. |

**C.**     **Classified Claims and Interests**

    **1.**     **Summary of Classification under the Plan**

As is further described in this Subsection (C), the Plan Proponents have classified Claims and

Interests under the Plan as follows:

### Table 4: Summary of Classification of Claims and Interests

Each of the below-referenced Classes (even if designated as a "sub-class"), if entitled to vote,

will vote as a separate Class.

| Class | Claims / Interest and Holder(s) | Impaired/Not Impaired |
|---|---|---|
| 1 | Secured Claims of the Secured Noteholders - RDI | No |
| 2 | Secured Claim of Opus Bank – SoCal Debtors | Yes |
| 3 | Secured Claim of C&C Partnership – SoCal Debtors | Yes |

---

[33] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Priority Tax Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

| 4 | Secured Claim of Pillsbury Winthrop Shaw Pittman LLP – HOP Restaurant Entities | Yes |
| 5 | Secured Claim of Plaza Bonita, LLC – SoCal Diners | Yes |
| 6 | Secured Claim of Opus Bank – RFS | Yes |
| 7 | Secured Claim of Craig – RFS | Yes |
| 8(a) | Secured Tax Claims – RDI | Yes |
| 8(b) | Secured Tax Claims – SoCal | Yes |
| 8(c) | Secured Tax Claims – RFS | Yes |
| 9 | PACA Claims – RDI and SoCal Debtors | No |
| 10(a) | Priority Non-Tax Claims – RDI | No |
| 10(b) | Priority Non-Tax Claims – SoCal Debtors | No |
| 10(c) | Priority Non-Tax Claims – RFS | No |
| 11(a) | Unsecured Claims – RDI | Yes |
| 11(b) | Gift Card Reimbursement Claims of Franchisees Satisfied Through Pre-Petition Netdown Process – RDI | No |
| 11(c) | Unsecured Claims – SoCal Debtors (Classified in separate voting subclasses 11(c)(i) – (vi)):<br><br>Class 11(c)(i) – Ruby's Huntington Beach Unsecured Claims<br>Class 11(c)(ii) – Ruby's Oceanside Unsecured Claims<br>Class 11(c)(iii) – Ruby's Palm Springs Unsecured Claims<br>Class 11(c)(iv) – Ruby's Laguna Hills Unsecured Claims<br>Class 11(c)(v) – SoCal Diners Unsecured Claims<br>Class 11(c)(vi) – Quality Unsecured Claims | Yes |
| 11(d) | Unsecured Claims – RFS | Yes |
| 12(a) | Interests – Founders' Interests in RDI | Yes |
| 12(b) | Interests – Founders' Interests in RFS | Yes |

| 12(c) | Interests – RDI Debtors' Interests in Other Entities | No |
| --- | --- | --- |

### 2.    Classes of Secured Claims

Secured Claims are Claims secured by liens on property of the Estates.  The following sets

forth all classes containing the Debtors' Pre-Petition Secured Claims and their treatment under the

Plan:

#### a.    Class 1:  Allowed Secured Claims of the Secured Noteholders (RDI)

Class 1 consists of the Allowed Secured Claims of the Secured Noteholders against RDI.

Class 1 is impaired.  The Allowed Secured Claims of the Secured Noteholders are in the aggregate

face amount of $2,984,923, as reflected in the Secured Notes.  Each Allowed Secured Claim of the

Secured Noteholders shall be an obligation of RDI following the Effective Date and shall be treated

as follows, which treatment renders the Class 1 Claimants unimpaired:

*Principal Amount*.  Each Allowed Secured Claim of the Secured Noteholders shall have a principal amount equal to the principal balance as set forth in **Exhibit G** to the Disclosure Statement.

*Payment of Accrued But Unpaid Interest*.  On the Effective Date, accrued but unpaid interest owing on account of the Secured Notes shall be paid.

*Term*.  In accordance with the 2016 Restructuring Agreement, the maturity of the Secured Notes shall be June 30, 2026, with the maturity subject to an additional five-year extension, at RDI's sole election, if RDI is current on its payments to the Class 1 Claimants as provided by the Plan.

*Interest*.  In accordance with the 2016 Restructuring Agreement, interest on the Secured Notes shall be paid in semi-annual installments at 2.17%.  Interest-only payments shall commence on June 30, 2020 and shall continue each December 30th and June 30th thereafter.

*Accelerated Principal Payments From Free Cash Flow From Operations*.  In accordance with the 2016 Restructuring Agreement, in addition to semi-annual interest payments, commencing on the first (1st) anniversary of the Effective Date, and on an annual basis thereafter, until paid in full, the Secured Noteholders shall be entitled to one hundred percent (100%) of  Free Cash Flow From Operations, if any, which shall be calculated in accordance with the definition of Free Cash Flow From Operations set forth in the 2016 Restructuring Agreement, to be paid on a *pro rata* basis based on the unpaid principal balance owed with respect to each of the Secured Notes.  For clarification purposes, Free Cash Flow From Operations shall be from RDI and RDI Subsidiaries, as defined in the 2016 Restructuring Agreement, as these entities existed pre-Effective Date (*i.e.*, RFS is not to be considered an RDI Subsidiary for the purposes of determining Free Cash Flow From Operations).

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the Allowed Secured Claims of the Secured Noteholders, in aggregate, may be prepaid, in whole or in

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

part, in RDI's sole discretion, provided that such prepayment would not reasonably be expected to cause a default on RDI's other payment obligations under the Plan.

*Retention of Collateral*.  Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claims of the Secured Noteholders granted in connection with 2016 Restructuring Agreement shall remain in full force and effect following the Effective Date to secure the payments to the Class 1 Claimants as provided by the Plan.

*Appointment of Successor Collateral Agent*.  The Confirmation Order shall name a successor Collateral Agent to be appointed with respect to the Allowed Secured Claims of the Secured Noteholders and shall succeed to the rights and duties previously held by CMA with respect to the Secured Notes.

*Other Rights In Full Force and Effect*.  All other terms of the 2016 Restructuring Agreement or any other documents governing the Secured Notes and/or Secured Claims of the Secured Noteholders shall remain in full force and effect.

### b.    Class 2: Allowed Secured Claim of Opus Bank (SoCal Debtors)

Class 2 consists of the Allowed Secured Claim of Opus Bank against the SoCal Debtors.

Class 2 is impaired.  The Class 2 Claim shall be treated as follows:

*Effective Date Payment*.  On the Effective Date, Opus Bank shall be paid the adequate protection payments due and owing under the Fourth Cash Collateral Stipulation or any other cash collateral order entered in the RDI Debtors' Chapter 11 Cases (at the rate of $8,557.70 per month, and estimated to be approximately $128,365 as of the Effective Date).

*New Note*.  The New HOP Entities shall issue a new note to Opus Bank (the "New Opus Bank HOP Note").  The New Opus Bank HOP Note shall have a principal amount equal to the principal balance of the Allowed Class 2 Claim as of the Effective Date in the amount of $2,098,050.36, plus: i) interest in the amount of $303,539.75, assuming an Effective Date of January 26, 2020, and ii) fees (including attorneys' fees) and costs that have accrued on account of the Class 2 Claim through and including the Effective Date in the amount of $354,082.72.  The New Opus HOP Note shall include covenants and conditions customary to notes accepted by Opus Bank.

*Interest*.  Post-Effective Date interest shall accrue on the principal balance of the New Opus Bank HOP Note at a fixed rate of 5.5% per annum.

*Payments*.  The first monthly payment on account of the New Opus Bank HOP Note will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the New Opus Bank HOP Note from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

balance on account of the New Opus Bank HOP Note during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*.  The maturity date of the New Opus Bank HOP Note shall be five (5) years following the Effective Date.

*Lending and Borrowing of Monies Between Reorganized Debtors*.  The New Opus Bank HOP Note shall provide that, so long as there is no default thereunder or under the New Opus Bank RFS Note (as defined herein), the obligors under the New Opus Bank HOP Note may lend to and borrow monies between themselves, RFS and RDI.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the New Opus Bank HOP Note may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtor obligors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtor obligors' other payment obligations under the Plan.

*Collateral*.  Except to the extent inconsistent with applicable law, the validity and priority of the security interests securing the New Opus Bank HOP Note shall be the same as provided by the Opus Bank/SoCal Debtors Loan and Security Documents.

### c.    Class 3: Allowed Secured Claim of C&C Partnership (SoCal Debtors)

Class 3 consists of the Allowed Secured Claim of C&C Partnership against certain of the SoCal Debtors (SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs).  Class 3 is impaired.  The Allowed Secured Claim of C&C Partnership, as of the Effective Date, is in the principal amount of approximately $297,500.  The Allowed Secured Claim of C&C Partnership shall be treated as follows:

*Principal Amount*.  The Allowed Secured Claim of C&C Partnership shall have a principal amount equal to the principal balance as of the Petition Date, plus all amounts that have accrued on account of the Allowed Secured Claim of C&C Partnership through and including the Effective Date.

*Interest*.  Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of C&C Partnership at the non-default rate set forth in the C&C Partnership Loan and Security Documents.

*Payments*.  The first monthly payment on account of the Allowed Secured Claim of C&C Partnership will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of C&C Partnership from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of C&C

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Partnership during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*.  The maturity date of the Allowed Secured Claim of C&C Partnership shall be extended, and will be due and payable seven (7) years following the Effective Date.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of C&C Partnership may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtors' other payment obligations under the Plan.

*Retention of Collateral*.  Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of C&C Partnership shall remain in full force and effect following the Effective Date.

*Other Terms Unchanged*.  Except to the extent provided above, the legal, equitable and contractual rights of C&C Partnership, as Holder of an Allowed Class 3 Claim, shall remain unaltered under the Plan.

### d.    Class 4: Allowed Secured Claim of Pillsbury Winthrop Shaw Pittman LLP (HOP Restaurant Entities)

Class 4 consists of the Allowed Secured Claim of Pillsbury against the HOP Restaurant Entities.  Class 4 is impaired.  The Allowed Secured Claim of Pillsbury, if any, shall be treated as follows: [34]

*Principal Amount*.  The Allowed Secured Claim of Pillsbury shall be the amount of the Pillsbury Claim supported by collateral in accordance with Section 506 of the Bankruptcy Code.

*Interest*.  Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of Pillsbury at the rate of five percent (5%) per annum.

*Payments*.  The first monthly payment on account of the Allowed Secured Claim of Pillsbury will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of Pillsbury from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of Pillsbury during the previous month,

---

[34] The Debtors do not believe that there is collateral securing the Pillsbury Claim and, therefore believe that Pillsbury will be treated as an unsecured creditor in the RDI, SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs cases, and this is the treatment reflected in Cash Flow Projections..

plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*.  The maturity date of the Allowed Secured Claim of Pillsbury shall be extended, and will be due and payable seven (7) years following the Effective Date.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of Pillsbury may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtors' other payment obligations under the Plan.

*Retention of Collateral*.  Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of Pillsbury shall remain in full force and effect following the Effective Date.

*Other Terms Unchanged*.  Except to the extent provided above, the legal, equitable and contractual rights of Pillsbury, as Holder of an Allowed Class 4 Claim, shall remain unaltered under the Plan; including any legal right that Pillsbury holds to enforce the Pillsbury Claim against non-debtor entities, which right shall not be curtailed by the Plan.  In addition, while Pillsbury shall be bound by the provisions of the Plan and Confirmation Order, Article X.C. of Plan does not require Pillsbury, as former counsel to certain of the Debtors, to aid the Debtors in consummating the Plan.

*Unsecured Claim*.  To the extent that the Pillsbury Claim is not an Allowed Secured Claim, the Allowed unsecured portion of the Pillsbury Claim shall be treated as an Unsecured Claim against the applicable Reorganized Debtors (RDI, SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs).

e.     **Class 5: Allowed Secured Claim of Plaza Bonita LLC (SoCal Diners)**

Class 5 consists of the Allowed Secured Claim of Plaza Bonita against SoCal Diners.  Class 5 is impaired.  The Allowed Secured Claim of Plaza Bonita, if any, shall be treated as follows: [35]

*Principal Amount*.  The Allowed Secured Claim of Plaza Bonita shall have a principal amount equal to the principal balance as of the Petition Date, plus all amounts that have accrued on account of the Allowed Secured Claim of Plaza Bonita through and including the Effective Date, to the extent the Claim is supported by collateral in accordance with Section 506 of the Bankruptcy Code.

*Interest*.  Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of Plaza Bonita at the rate of five percent (5%) per annum.

*Payments*.  The first monthly payment on account of the Allowed Secured Claim of Plaza Bonita will be due on the first (1st) day of the first calendar month following the Effective

---

[35] The Debtors do not believe that there is collateral securing the Plaza Bonita claim and, therefore believe that Plaza Bonita will be treated as an unsecured creditor against SoCal Diners, and this is the treatment reflected in Cash Flow Projections.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of Plaza Bonita from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of Plaza Bonita during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*. The maturity date of the Allowed Secured Claim of Plaza Bonita shall be extended, and will be due and payable seven (7) years following the Effective Date.

*Pre-Payment*. At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of Plaza Bonita may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtors' other payment obligations under the Plan.

*Retention of Collateral*. Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of Plaza Bonita shall remain in full force and effect following the Effective Date.

*Other Terms Unchanged*. Except to the extent provided above, the legal, equitable and contractual rights of Plaza Bonita, as Holder of an Allowed Class 5 Claim, shall remain unaltered under the Plan.

*Unsecured Claim*. To the extent that the Plaza Bonita Claim is not an Allowed Secured Claim, the Allowed unsecured portion of the Claim shall be treated as an Unsecured Claim against the SoCal Diners.

**f.     Class 6:  Allowed Secured Claim of Opus Bank (RFS)**

Class 6 consists of the Allowed Secured Claim of Opus Bank against RFS. Class 6 is impaired. The Allowed Class 6 Claim shall be treated as follows:

*Effective Date Payment*. On the Effective Date, RFS shall pay to Opus Bank the amount of $80,000.

*New Note*. RFS shall issue a new note to Opus Bank (the "New Opus Bank RFS Note"). The New Opus Bank RFS Note shall have a principal amount equal to the principal balance of the Allowed Class 6 Claim as of the Effective Date in the amount of $1,091,755.94, plus: i) interest in the amount of $6,306.33, assuming an Effective Date of January 26, 2020, and ii) fees (including attorneys' fees) and costs that have accrued on account of the Class 6 Claim through and including the Effective Date, in the amount of $184,036.91. The New Opus HOP Note shall include covenants and conditions customary to notes accepted by Opus Bank.

*Interest*. Post-Effective Date interest shall accrue on the principal balance of the New Opus Bank RFS Note at a fixed rate of 5.5% per annum.

*Payments*.  The first monthly payment on account of the New Opus Bank RFS Note will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the New Opus Bank RFS Note from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 4-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the New Opus Bank RFS Note during the previous month, plus (b) an installment of principal calculated on the basis of a 4-year amortization schedule.

*Maturity Date*.  The maturity date of the New Opus Bank RFS Note shall be four (4) years following the Effective Date.

*Lending and Borrowing of Monies Between Reorganized Debtors*.  The New Opus Bank RFS Note shall provide that, so long as there is no default thereunder or under the New Opus Bank HOP Note (as defined herein), RFS may lend to and borrow monies between it, RDI and the New HOP Entities.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the New Opus Bank RFS Note may be prepaid, in whole or in part, in the sole discretion of RFS, provided that such prepayment would not reasonably be expected to cause a default on RFS' other payment obligations under the Plan.

*Collateral*.  Except to the extent inconsistent with the foregoing or applicable law, the validity and priority of the security interests securing the New Opus Bank RFS Note shall be the same as provided by the Opus Bank/RFS Loan and Security Documents.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

g.    **Class 7: Allowed Claim of Steven L. Craig (RFS)**

Class 7 consists of the Allowed Claim of Craig against RFS based on the RFS Note. Class 7 is impaired. The Allowed Claim of Craig against RFS, as of the Petition Date, is in the principal amount of $1,000,000, plus accrued interest under the RFS Note. Craig holds rights of offset of his obligations for Franchise Royalties as a Franchisee as against the RFS Note, but such offset rights have not been, and will not be, enforced with respect to the RFS Note. Instead, the Plan provides that the principal amount of the Allowed Claim of Craig against RFS ($1,000,000) shall be converted into equity in RDI as of the Effective Date of the Plan. Accrued interest on the RFS Note, in the amount of approximately $120,000, shall be paid on the Effective Date of the Plan. The amounts owed by Eureka Food Enterprises, LLC for Franchise Royalties and Ad Fees, in the amount of $635,556, shall be paid by Craig on the Effective Date in accordance with the Netdown Process, as reflected in the Cash Flow Projections.

h.    **Class 8: Secured Tax Claims – Class 8(a) (RDI), Class 8(b) (SoCal Debtors) and Class 8(c) (RFS)**

Class 8 consists of all of the Claims of taxing authorities secured by personal property owned by RDI (Class 8(a)), the SoCal Debtors (Class 8(b)) and RFS (Class 8(c)) (the "Secured Tax Claims"). Classes 8(a), (b) and (c) are impaired. Attached hereto as **Exhibit H** is a list of what the Debtors' records reflect as outstanding Pre-Petition Secured Tax Claims for RDI, the SoCal Debtors and RFS.[36]

**Table 5: Treatment of Secured Tax Claims**

| Classes | Claimant | Type of Tax Claim | Claim Amount | Proposed Treatment |
|---|---|---|---|---|
| 8(a), 8(b) and 8(c) | All Secured Tax Claims Identified on **Exhibit H** | Various *See* attached **Exhibit H** | Total of approximately $74,475.30 | Each Claimant identified on **Exhibit H** shall receive deferred payments on account of its Allowed Claim over a period not exceeding five (5) years from the order for relief. Each Claimant shall receive quarterly installments of principal and interest on the unpaid portion thereof at five percent (5%) per annum. The first installment shall be due on first |

---

[36] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Secured Personal Property Tax Claims.

| | | | | day of the first quarter following the thirtieth (30th) day after the Effective Date with each installment due each quarter thereafter. The Debtors may, without penalty, prepay the entire amount of a Secured Tax Claim at any time. |
|---|---|---|---|---|

### 3. Class 9: Allowed PACA Claims (RDI and Certain of the SoCal Debtors)

Class 9 consists of any Allowed PACA Claims against RDI and certain of the SoCal Debtors (Ruby's Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs and Ruby's Laguna Hills). Class 9 is unimpaired. The Allowed PACA Claims, if any, shall be paid in full on the Effective Date of the Plan. The Debtors do not believe that there are any unpaid PACA Claims.

### 4. Class 10: Priority Non-Tax Claims – Class 10(a) (RDI), Class 10(b) (SoCal Debtors) and Class 10(c) (RFS)

Certain priority Claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes (the "Priority Non-Tax Claims"). These types of Claims are entitled to priority treatment as follows: the Code requires that each Holder of such a Claim receive cash on the Effective Date equal to the allowed amount of such Claim. However, a class of Priority Non-Tax Claims may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claims. Class 10 consists of all of the Priority Non-Tax Claims owed by RDI (Class 10(a)), the SoCal Debtors (Class 10(b)) and RFS (Class 10(c)). Classes 10(a), 10(b) and 10(c) are unimpaired. Following the Petition Date, RDI obtained authority from the Bankruptcy Court to pay certain Pre-Petition Claims of current employees. RDI believes that all priority claims owing to its employees on account of wages and benefits have been paid. Attached hereto as **Exhibit I** is a list of Priority Non-Tax Claims, the treatment under the Plan of which is as follows:[37]

---

[37] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Priority Non-Tax Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**Table 6: Treatment of Allowed Priority Non-Tax Claims**

| Class | Claimant | Amount | Treatment |
|---|---|---|---|
| 10(a), 10(b) and 10(c) | Priority Non-Tax Claims as listed on **Exhibit I** | $0.00 | Allowed Claims will be paid in full on the later of (1) the Effective Date; or (2) the date upon which the Claim becomes an Allowed Claim pursuant to a Final Order. |

### 5.    Classes of Unsecured Claims

Unsecured Claims are unsecured Claims not entitled to priority under Code section 507(a).

As is further described below, the Debtors' Unsecured Claims shall be classified as follows:[38]

**TABLE 7: SUMMARY OF CLASSIFICATION OF UNSECURED CLAIMS
AND ESTIMATED AMOUNT OF CLAIMS**[39]

| Class | Description |
|---|---|
| 11(a) | Class 11 is comprised of all Allowed Unsecured Claims against RDI.  The estimated Allowed amount of the Class 11(a) Claims, in aggregate, is $10,176,824. <br><br> Class 11(a) is comprised of the following: <br><br>     Unsecured Noteholder Claims against RDI as set forth in **Exhibit J** in the estimated amount of $5,540,528. <br><br>     Other General Unsecured Claims against RDI (including RDI's Gift Card Obligations not satisfied by way of the Netdown Process) in the estimated amount of  $4,636,296. |
| 11(b) | Class 11(b) is comprised of the Gift Card Reimbursement Claims of Franchisees Satisfied Though Pre-Petition Netdown Process. |
| 11(c) | Class 11(c) (subclasses (i) – (vi)) is comprised of all Allowed Unsecured Claims against the SoCal Debtors. <br><br>     Class 11(c)(i) is comprised of all Allowed Unsecured Claims against Ruby's Huntington Beach. The Debtors estimate that Class 11(c)(iii) Claims total approximately $1,260,481. |

---

[38] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Unsecured Claims.

[39] The estimates set forth herein are based on the Debtors' best estimate as to the ultimate allowability of the Claims following the Debtors' review and analysis of the Claims that have been asserted against the Debtors.  While the Debtors have used their best efforts to provide reasonable estimates, the actual allowed amount of the Claims could differ from the estimates set forth in this Disclosure Statement, and will in some cases depend on the resolution of objections to claims.  In such event, distributions to Claimants could differ from the estimated percentage distributions set forth in this Disclosure Statement.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

|  | |
|---|---|
|  | Class 11(c)(ii) is comprised of all Allowed Unsecured Claims against Ruby's Oceanside.  The Debtors estimate that Class 11(c)(iv) Claims total approximately $1,211,015.<br><br>Class 11(c)(iii) is comprised of all Allowed Unsecured Claims against Ruby's Palm Springs.  The Debtors estimate that Class 11(c)(v) Claims total approximately $1,090,812.<br><br>Class 11(c)(iv) is comprised of all Allowed Unsecured Claims against Ruby's Laguna Hills.  The Debtors estimate that Class 11(c)(vi) Claims total approximately $569,076.<br><br>Class 11(c)(v) is comprised of all Allowed Unsecured Claims against SoCal Diners.  The Debtors estimate that Class 11(c)(i) Claims total approximately $1,331,567.<br><br>Class 11(c)(vi) is comprised of all Allowed Unsecured Claims against Quality.  The Debtors estimate that Class 11(c)(ii) Claims total approximately $0.00. |
| 11(d) | Class 11(d) is comprised of all Allowed General Unsecured Claims against RFS.  The Debtors estimate that Class 11(d) Claims total approximately $430,329. |

### a.    Class 11(a):  Allowed Unsecured Claims Against RDI

Class 11(a) is impaired.  The Allowed Claims of the Unsecured Creditors against RDI shall be entitled to one of the following treatments, as follows:

Payment of a total of Two Million Five Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of  Six Hundred and Twenty-Five Thousand Dollars ($625,000) on each of the second (2nd), third (3rd), fourth (4th) and fifth (5th) anniversaries of the Effective Date, provided that the D&O/Affiliate Release is approved by the Bankruptcy Court.

If the D&O/Affiliate Release is not approved by the Bankruptcy Court, payment of a *pro rata* distribution from any proceeds ultimately recovered by the Litigation Trust that will have the right, following the Effective Date, to investigate and, if appropriate, prosecute claims, if any, against the D&Os and D&O Affiliated Entities; *provided, however*, that any distribution to the  RDI unsecured Creditors from any recovery by the Litigation Trust shall be after payment of the fees and costs incurred by the Litigation Trust incurred in connection with the prosecution of the D&O/Affiliate Claims or otherwise.

### b.    Class 11(b):  Gift Card Reimbursement Claims of Franchisees Satisfied Though Pre-Petition Netdown Process

Class 11(b) is unimpaired.  Class 11(b) Claims will be satisfied in full through the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

implementation of the Pre-Petition Netdown Process, pursuant to which such claims will be satisfied in full. To the extent any such Gift Card Reimbursement Claims of Franchisees are not satisfied by implementation of the Pre-Petition Netdown Process, such Claims shall be treated as Class 11(a) Claims.

###### c.    Class 11(c):  General Unsecured Claims Against the SoCal Debtors

Class 11(c) is impaired. Class 11(c) has six (6) subclasses, as follows: Class 11(c)(i) – Ruby's Huntington Beach; Class 11(c)(ii) – Ruby's Oceanside; Class 11(c)(iii) – Ruby's Palm Springs; Class 11(c)(iv) – Ruby's Laguna Hills; Class 11(c)(v) – SoCal Diners; and Class 11(c)(vi) – Quality. Each subclass shall vote as a separate class.

**Class 11(c)(i)** - The Allowed General Unsecured Claims against Ruby's Huntington Beach are designated as Class 11(c)(i). The Allowed General Unsecured Claims against Ruby's Huntington Beach shall be paid the total amount of $113,118.78 (the "Huntington Beach Unsecured Distribution Amount"), on a *pro rata* basis, on the Effective Date of the Plan.

Based on Ruby's Huntington Beach's estimate as to the ultimate allowability of the Class 11(c)(i) Claims, the percentage distribution to the holders of Allowed Class 11(c)(i) Claims is estimated to be approximately 9%.

**Class 11(c)(ii)** - The Allowed General Unsecured Claims against Ruby's Oceanside are designated as Class 11(c)(ii). The Allowed General Unsecured Claims against Ruby's Oceanside shall be paid the total amount of $62,397.43 (the "Oceanside Unsecured Distribution Amount") on a *pro rata* basis, on the Effective Date of the Plan.

Based on Ruby's Oceanside's estimate as to the ultimate allowability of the Class 11(c)(ii) Claims, the percentage distribution to the holders of Allowed Class 11(c)(ii) Claims is estimated to be approximately 5.2%.

**Class 11(c)(iii)** - The Allowed General Unsecured Claims against Ruby's Palm Springs are designated as Class 11(c)(iii). The Allowed General Unsecured Claims against Ruby's Palm Springs shall be paid the total amount of $24,413.78 (the "Palm Springs Unsecured Distribution Amount"), on a *pro rata* basis, on the Effective Date of the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1    Based on Ruby's Palm Spring's estimate as to the ultimate allowability of the Class 11(c)(iii)

2    Claims, the percentage distribution to the holders of Allowed Class 11(c)(iii) Claims is estimated to

3    be approximately 2.2%.

4        **Class 11(c)(iv)** - The Allowed General Unsecured Claims against Ruby's Laguna Hills are

5    designated as Class 11(c)(iv).  In March 2019, Ruby's Laguna Hills assigned the Laguna Hills

6    Restaurant operations to an assignee, and ceased operating the Laguna Hills Restaurant.  The

7    Holders of Allowed Unsecured Claims against Ruby's Laguna Hills shall not be entitled to a

8    distribution as Ruby's Laguna Hills has no assets available to pay such claims.

9        **Classes 11(c)(v) and (vi)** - The Allowed General Unsecured Claims against SoCal Diners

10   and Quality are designated as Classes 11(c)(v) and (vi), respectively.  Allowed Claims in Classes

11   11(c)(v) and (vi) shall be paid a total of two and one-half percent (2.5%) of their Allowed Claims

12   (estimated to be a total distribution in the amount of $33,289), on the fourth (4th) year anniversary of

13   the Effective Date of the Plan.  The Debtors do not believe that there are any claims against Quality.

14        **d.    Class 11(d):  General Unsecured Claims Against RFS**

15        Class 11(d) is impaired.  Allowed Claims in Class 11(d) shall be paid in full, over time, with

16   post-Effective Date interest, as follows:  On the first (1st) anniversary of the Effective Date, and

17   continuing on an annual basis until the fourth (4th) anniversary of the Effective Date, the Holders of

18   Allowed Class 11(d) Claims shall be paid annual distributions of twenty-five percent (25%) of the

19   Allowed Amount of their Class 11(d) Claims, plus interest at the rate of five percent (5%) per

20   annum, for a total distribution on account of Class 11(d) Allowed Claims of one hundred percent

21   (100%), plus interest.

22   **D.    Interests**

23        The Founders, Cavanaugh and Kosmides, respectively, hold 60% and 40% of the common

24   stock of RDI and RFS.  RDI holds ownership interests in SoCal Diners and in the RDI Entities

25   (Ruby's Beach Ventures, LLC, Ruby's Diner South Coast Plaza, LP, Ruby's Spectrum, LLC and

26   Ruby's Woodbridge, LLC).  SoCal Diners and Quality own Interests in the SoCal Entities (Ruby's

27   Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs, and Ruby's Laguna Hills).  The

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

following chart identifies the Plan's treatment of the Interests:

| Class | Type of Interest | Treatment |
|---|---|---|
| 12(a) | Founders' Interests in RDI | Founders' Interests in RDI shall be cancelled pursuant to the Plan. Based upon the RDI Plan Funding and the New Value Contribution, respectively, the Plan Sponsor and the Founders will own the equity in the post-Effective Date RDI. |
| 12(b) | Founders' Interests in RFS | Founders' Interests in RFS shall be shall be cancelled pursuant to the Plan and the interests in RFS shall be transferred to RDI, and RFS will thereafter be a wholly-owned subsidiary of post-Effective Date RDI. |
| 12(c) | RDI Debtors' Interests in Other Entities | RDI's ownership interests in the RDI Entities (non-debtor entities) shall continue to be held by post-Effective Date RDI, and the distributions to RDI from these entities will be used to fund the Plan.<br><br>RDI's ownership interests in the SoCal Entities shall continue to be held by post-Effective Date RDI.<br><br>Based upon the HOP Plan Funding, the New HOP Entities will own the HOP Assets. The New HOP Entities will be contributed by the Plan Sponsor to post-Effective Date RDI. |

Post-Effective Date of the Plan, the Plan Sponsor will own 60% of RDI in consideration of the RDI Plan Funding. The Founders will own 40% (24% by Cavanaugh and 16% by Kosmides) in consideration of the New Value Contribution to RDI (which consists of their equity Interests in RFS).[40] RFS will be a wholly-owned subsidiary of RDI, and will continue as the franchising arm of the business. The HOP Assets will be transferred to the New HOP Entities in consideration of the Plan Sponsor's contribution of the HOP Plan Funding. The Plan Sponsor will then contribute the New HOP Entities to RDI post-Effective Date. RDI's Interests in the RDI Entities (Ruby's Beach Ventures, LLC, Ruby's Diner South Coast Plaza, LP, Ruby's Spectrum, LLC and Ruby's Woodbridge, LLC) and the SoCal Entities shall continue to be held by post-Effective Date RDI.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

---

[40] The percentage interests of the Plan Sponsor and the Founders may be subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

E.    **Means of Effectuating the Plan**

    1.    **Funding for the Plan**

        a.    **Cash Needs on the Effective Date.**

After taking into account all of the payments described in the Plan, the Debtors will have the following Cash needs on the Effective Date (which estimates exclude the amount of Administrative Claims of Professionals, the terms of payment of which shall be subject to agreement, or other determination, and the resolution of which are a condition to the effectiveness of the Plan).

| Type of Payment | Amount |
|---|---|
| Class 1 – Secured Noteholders Interest Payment | $129,546 |
| Opus Bank Effective Date Payments | $216,923 |
| HOP Effective Date Payments | $200,000 |
| Administrative Claims (Non-Professionals) | $501,000 |
| Other Effective Date Payments | $498,558 |
| **TOTAL** | $1,546,027 |

        b.    **Sources of Cash on the Effective Date.**

The Debtors will have the Cash needed to make payments required on the Effective Date from Cash on hand as of the Effective Date, implementation of the Netdown Process and Plan Funding from the Plan Sponsor, as set forth in the Cash Flow Projections (**Exhibit B**).

    2.    **Plan Funding From Plan Sponsor**

The Plan Funding from the Plan Sponsor shall be utilized, along with the Debtors' Cash and the proceeds from operations, to make (a) the payments required to be made on the Effective Date; and (b) the payments to Creditors following the Effective Date, as set forth in the Cash Flow Projections attached hereto as **Exhibit B**.

The Plan Funding from the Plan Sponsor consists of the following:  (a) the contribution of Two Million Seven Hundred Thousand  Dollars ($2,700,000) in Cash (less the amount that will be utilized to satisfy the fees of his counsel and tax advisors, in the amount of approximately $325,000);

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

(b) the conversion of the amounts due to the Plan Sponsor (as DIP Lender) and counsel in connection with the RDI DIP Loan (in the amount of $300,000) into equity in RDI; and (c) the conversion of the amounts due to the Plan Sponsor (as lender) in connection with the RFS Note (in the principal amount of $1,000,000) into equity in RDI, for total consideration in the amount of Four Million Dollars ($4,000,000).[41]  The Plan Sponsor's obligation to make such Plan Funding is conditioned on the transfer of the Interests in RFS to RDI, the provision to the Plan Sponsor of equity in RDI, the transfer of HOP Assets to the New HOP Entities (which New HOP Entities will be contributed by the Plan Sponsor to post-Effective Date RDI) and the other conditions as set forth in the Plan.  Under no circumstances shall the Plan Sponsor be personally responsible for any of the debt of the Debtors or Reorganized Debtors or the payment thereof.

In addition, and as condition a to the Plan Sponsor's funding of the Plan Funding, as of the Effective Date, RDI must have a "Going Concern Value" of not less than Six Million Sixty Six Hundred Sixty Thousand Sixty Seven Dollars ($6,666,667) (the "Going Concern Value Requirement").  "Going Concern Value" shall include (a) the total assets of RDI (including the value of its direct and indirect interests in RFS and the New HOP Entities), after taking into account the Plan Funding and the New Value Contribution, less (b) the total liabilities of RDI, as restructured under the Plan or as otherwise discounted, as set forth in **Exhibit K.**

###    3.    Transfer of HOP Assets to New HOP Entities, Contribution of New HOP Entities to RDI and Provision of the HOP Plan Funding and RDI Plan Funding

As of the Effective Date, ownership of the HOP Assets (which will remain subject to the debt against them, as restructured under Plan) will be transferred to the New HOP Entities in consideration of the Plan Sponsor's provision of the HOP Plan Funding.  The Plan Sponsor will then contribute ownership of the New HOP Entities to post-Effective Date RDI.

The amount of the HOP Plan Funding is in the amount of $200,000 which will be utilized to make the payments to the unsecured creditors of the HOP Restaurant Entities as provided by the Plan.

---

[41] This amount may be subject to increase based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

The balance of the Plan Funding from the Plan Sponsor shall be utilized to fund the Plan as set forth in the Cash Flow Projections (**Exhibit B**).

      **4.**      **New Value Contribution**

Under the Plan, the Founders will make a "new value" contribution on the Effective Date of the Plan in the form of a portion of the value of their ownership Interests in RFS, which will be contributed to RDI as provided by the Plan (the "New Value Contribution"). The New Value Contribution shall be a net amount based on the equity value of RFS adjusted by the Reconciliation. The New Value Contribution by the Founders is valued at approximately $5.5 million, as set forth in **Exhibit A**. The value of the New Value Contribution and the satisfaction of the requirements of the Bankruptcy Code with respect thereto will be determined in connection with Confirmation of the Plan.

      **5.**      **Reconciliation of Claims Between and Among the Debtors and the Founders**

Pursuant to the Plan, the claims between and among the Debtors and the Founders (and certain affiliates), as reflected in **Exhibit E**, will be reconciled and utilized to calculate the New Value Contribution by the Founders. By way of the Reconciliation, the claims between and among the Debtors and the Founders and these affiliates will be eliminated. Any net amounts owed to or by the Founders or these affiliates with respect to any Debtor will be applied to the value of the New Value Contribution being made by the Founders.

      **6.**      **Transfer of Interests in RFS to RDI; Post-Effective Date Ownership of RDI**

As of the Effective Date, all of the Founders' Interests in RFS will be transferred to RDI. Post-Effective Date, RDI will be owned 60% by the Plan Sponsor, 24% by Cavanaugh and 16% by Kosmides. These ownership percentages may be subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

      **7.**      **Pre-Petition Netdown Process**

On March 11, 2019, the Court entered its order approving the Netdown Process pursuant to which RDI, RFS and the Franchisees were authorized to honor their Post-Petition obligations among them. Under the Plan, as of the Effective Date, the Netdown Process shall be implemented for the Pre-Petition period (the "Pre-Petition Netdown Process"), as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1   Any amounts that RDI owes a particular Franchisee in connection with Pre-Petition Gift

2   Card Reimbursement Obligations will first be reduced (as a non-cash journal entry) by any amounts

3   that that Franchisee owes to RDI for any miscellaneous charges (the "Net Amount RDI Owes to the

4   Franchisee").  The Net Amount RDI Owes to the Franchisee will be applied (as a non-cash journal

5   entry) to the amount of Pre-Petition Franchise Royalties that the Franchisee owes to RFS, leaving a

6   remaining balance (the "Remaining Balance Owed by the Franchisee").  The Franchisee will pay to

7   RFS (in cash) the Remaining Balance Owed by the Franchisee, as well as any Pre-Petition Ad Funds

8   Obligations it owes, and RFS will pay the RDI License Fee.

9   As reflected in the Cash Flow Projections (attached hereto as **Exhibit B**), for the period

10   following July 30, 2019 though the Effective Date (estimated to be January 26, 2020), with respect

11   to both the Post-Petition Netdown and, following the Effective Date, implementation with respect to

12   the Pre-Petition amounts owed among RDI, RFS and the Franchisees, the implementation of the

13   Netdown Process as to these obligations is projected to generate cash to RFS in the estimated total

14   amount of $533,694 in Franchise Royalties, $349,585 in Ad Fund Obligations and miscellaneous

15   charges).  These amounts include the amount of $635,556 from Craig (to be paid on the Effective

16   Date) and the balance from other Franchisees (to be paid on the Effective Date and during the year

17   following the Effective Date), as reflected in the Cash Flow Projections.  Pursuant to the

18   implementation of this Netdown Process, RDI is projected to receive the amount of $133,423 as the

19   RDI License Fees.  These additional Netdown amounts are projected to result in the amount of

20   approximately $858,349 to be booked as an intercompany receivable between RDI and RFS.

21   Pursuant to the Pre-Petition Netdown Process, the majority of the pre-petition claims of the

22   Franchisees against RDI will be satisfied in full.  These claims are classified in Class 11(b) under the

23   Plan and are unimpaired.  The Plan Proponents believe that the disparate treatment between the

24   unsecured creditors of RDI (Class 11(a) and Class 11(b)) is justified by virtue of the fact that an

25   ongoing relationship with the Franchisees is critical to the success of the Reorganized Debtors'

26   business operations and their ability to meet their Plan obligations to other creditors.

27   **8.    U.S. Foods Settlement**

28   In accordance with the US Foods Settlement, US Foods agrees to the following treatment

DOCS_LA:323709.20                              - 64 -

under the Plan, which treatment is set forth in the Cash Flow Projections:

1.      All proofs of claims filed by US Foods in the RDI Debtors' cases (Claim No. 85 (RDI), Claim No. 6 (Ruby's Huntington Beach), Claim No. 5 (Ruby's Oceanside), Claim No. 7 (Ruby's Palm Springs) and Claim No. 4 (Ruby's Laguna Hills) (the "US Foods POCs") shall be allowed in full in accordance with their asserted priorities, subject to business discussions regarding minor discrepancies between the amounts set forth in the US Foods POCs and the RDI Debtors' books and records (the "US Foods Claims"). Reconciliation regarding the unsecured portion of the US Foods Claims (the "US Foods Unsecured Claims") will start immediately and must be completed by the Effective Date of the Plan, or an amount shall be held in a Disputed Claims Reserve to ensure that US Foods is not at risk of non-payment. The US Foods Unsecured Claims will be classified and treated like other general unsecured claims against the respective Debtor obligors, and will be entitled to and be paid their *pro rata* share of distributions in connection therewith as provided by the Plan.

2.      The portion of the US Foods Claims subject to priority pursuant to Section 503(b)(9) of the Bankruptcy Code (the "US Foods 503(b)(9) Claims") against the RDI Debtors shall be allowed as administrative claims, in the following amounts: $64,116.20 (Ruby's Huntington Beach), $51,486.60 (Ruby's Oceanside), $25,337.02 (Ruby's Palm Springs) and $8,513.53 (Ruby's Laguna Hills). US Foods' 503(b)(9) Claims shall be paid in twelve (12) equal monthly payments, commencing one (1) month following the Effective Date of the Plan. The RDI Debtors agree to make the payments to US Foods on account of the US Foods 503(b)(9) Claims through an "autopayment" mechanism acceptable to US Foods.

3.      Except as set forth in the following paragraphs (4) and (5), US Foods' post-petition administrative claims will be on forty-five (45) day terms through the Effective Date of the Plan and will be paid in the ordinary course as they come due pursuant to the terms of the existing supplier agreement between the parties (the "MDA"), which terms, except as otherwise provided for in the Plan, will remain in full force and effect, and will be incorporated into the Plan by reference.

4.      US Foods will agree that Debtors may defer payments for purchases made on or after September 2, 2019, up to a total aggregate amount of $200,000 (the "Deferred Amount"), with the Deferred Amount to be paid over twelve (12) months commencing on the Effective Date of the Plan. RDI and US Foods will execute a mutually acceptable letter agreement (the "Letter Agreement") for the payment of the amount of any such deferred payments, which will be payable in twelve (12) monthly installments with a twelve percent (12%) interest rate. The Letter Agreement, when executed, will be incorporated into the Plan by reference. The RDI Debtors agree to make the payments to US Foods on account of these amounts through an "autopayment" mechanism acceptable to US Foods.

5.      US Foods will restart shipments to the Irvine/Woodbridge restaurant, and will be paid each Wednesday for the prior week's orders/deliveries. For the past due amount (approximately $43,000) owed by Irvine/Woodbridge for post-petition deliveries, US Foods

agrees to payment in full in equal weekly installments for fifty-two (52) weeks commencing on the first week after deliveries have resumed, plus twelve percent (12%) annual interest.

6.    The Reorganized RDI Debtors agree to use US Foods as their primary supplier, and the Parties further agree that the termination date of the MDA is hereby extended to one year after the Effective Date of the Plan (or December 31, 2019 if no plan is confirmed prior to that date), during which time the parties will cooperate to negotiate an amended supplier agreement.

7.    Avoidance Actions against US Foods will be waived by all parties with standing to bring them, including the Debtors, their Estates and the Committee.

### 9.    Treatment of Intercompany Claims

As of the Petition Date, after accounting for all intercompany obligations between them, RDI owes RFS the approximate amount of $400,000.  In addition, there will be an intercompany receivable on RDI's books in favor of RFS pursuant to the Netdown Process.

So long as RDI and RFS are in compliance with their obligations under the Plan, any intercompany receivable owed to RFS from RDI as a result of the Netdown Process and any other intercompany obligations between them will not be collected or paid, but will remain on the books as non-cash journal entries.

### 10.    Lending and Borrowing of Monies Between Reorganized Debtors

So long as there is no default under the Plan, including with respect to the obligations to Opus Bank, following the Effective Date, the New HOP Entities, RFS and RDI may lend to and borrow monies between and among themselves.  Such intercompany obligations will not be collected or paid, but will remain on the books as non-cash journal entries.

### 11.    Corporate Structure and Governance

#### a.    Charter

As of the Effective Date, and subject to such charter amendments as may be made pursuant to the Plan, the articles of incorporation and bylaws of RDI will be the same as the articles of incorporation and bylaws of RDI immediately before the Effective Date.  Effective as of the Effective Date, the officers and directors of RDI will be the same as the officers and directors of RDI immediately before the Effective Date, with the exceptions that Craig will be the Chairman of the board of directors of RDI and Tad Belshe will no longer participate on the board (*i.e.,* the initial

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

board of directors of RDI will consist of Craig, Cavanaugh and Kosmides).  RDI will hold all of the

equity Interests in RFS, in the RDI Entities and, following the post-Effective Date contribution by

the Plan Sponsor, the equity Interests in the New HOP Entities.  Following the Effective Date and

satisfaction of their Plan obligations, SoCal Diners, Quality and Ruby's Laguna Hills will be

terminated as entities.  Charter amendments that may be made pursuant to the Plan include changes

as may be necessary or appropriate to (i) conform such documents to the terms of the Plan;

(ii) conform such documents to recent amendments to corporation statutes; and (iii) to include a

prohibition on the issuance of non-voting equity securities.

### b.    Voting Rights and Shareholder Agreement

Voting shall be weighted based on the respective ownership interests in RDI held by Craig,

Cavanaugh and Kosmides.  As of the Effective Date, Craig, Cavanaugh and Kosmides shall enter

into a shareholders' agreement with respect to RDI which shall include terms and conditions that are

typical in privately held entities, including the delegation of management and control of RDI's

operations (including menu, design and branding decisions) to Cavanaugh.  All major decisions, and

those customarily identified as such in operating and shareholder agreements typical to privately

held entities, including without limitation, business decisions with respect to expansion of the

business or other business decisions that might require the contribution or expenditure of new capital

of RDI, will be made by majority vote of the equity holders based on their respective ownership

Interests.

With respect to capital calls, the shareholder agreement will provide that, if a shareholder

fails to contribute the capital called with the necessary vote of the shareholders in accordance with

his respective ownership Interest percentage as set forth above within thirty (30) days after the

capital call is made, the other shareholders shall have the right, but not the obligation, to make a loan

to RDI in the amount of the capital contribution that is not made, equal to his respective pro rata

share (based on his respective percentage equity interest) of the defaulting shareholder's share of the

capital, or the entire amount of the capital call deficiency, if not made by the other non-defaulting

shareholder.  Any such loan shall be treated as if RDI made a loan to the defaulting shareholder and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

the non-defaulting shareholder made a loan to RDI.  Any such loan by RDI to a defaulting

shareholder (the "Default Loan") and any such loan from a non-defaulting shareholder to RDI (the

"Shareholder Loan") shall bear interest at a rate equal to the federal prime rate plus three percent

(3%) per annum and shall be secured by a pledge of the defaulting shareholder's equity interest in

RDI.   The defaulting shareholder shall execute and deliver such documents as are reasonably

necessary to create and perfect such security interest and the shareholder agreement for RDI shall

provide for a power of attorney in favor of the non-defaulting shareholders to effectuate such

documents if the defaulting shareholder fails to promptly execute and deliver same.  Any such

Default Loan and any such Shareholder Loan shall provide for the payment of accrued interest

monthly and for all principal and accrued and unpaid interest to be due and payable on or before the

date that is (i) six (6) months following the date the Default Loan and the Shareholder Loan are

advanced if the Default Loan and the Shareholder Loan are less than one million dollars

($1,000,000), or (ii) one year following the date the Default Loan and the Shareholder Loan are

advanced if the Default Loan and the Shareholder Loan is one million dollars  ($1,000,000) or more.

Failure to pay the Default Loan and the Shareholder Loan on or before the applicable maturity date

pursuant to the foregoing shall constitute a default under each of the Default Loan and the

Shareholder Loan.

At such time as any Default Loan or Shareholder Loan is defaulted and not paid, and

assuming one of the other shareholders advances such amount in lieu of the defaulting shareholder,

the percentage interests of the shareholders shall be recalculated, and the percentage interests of each

shareholder shall be adjusted such that each shareholder shall have an interest determined by

fraction, the numerator of which shall be the aggregate capital contributed by the shareholder, and

the denominator of which shall be the aggregate capital contributed by all shareholders, provided,

however, that for purposes of the foregoing calculation only, each shareholder shall be treated as

having contributed his proportionate share (in accordance with his percentage Interest in RDI) of the

aggregate capital contributed by Craig as of the Effective Date of the Plan.

The consequence of a shareholder default shall be the dilution of the shareholder's equity in

RDI, but a default will not result under any circumstance in personal liability of the defaulting shareholder.

For illustration purposes only, assume that Craig contributed a total of $4,000,000 as of the Effective Date of the Plan, and that there are three (3) shareholders – Craig at 60%, Shareholder A at 24% and Shareholder B at 16%.  Then assume that additional capital in the amount of $500,000 is required by RDI, and that Craig contributes 60% of such amount ($300,000); Shareholder A contributes 24% ($120,000), but Shareholder B does not contribute any amounts and Craig advances to RDI the share otherwise allocable to Shareholder B ($80,000).  In such event, the denominator in the following dilution formula would be $4.5 million (the original Plan Funding of $4 million plus the $500,000 capital call), and the percentage interests of the shareholders would be adjusted as follows:

For Craig:  $4,000,000 (allocable share of original Plan capital) + $300,000 (Craig share of current capital call) + $80,000 (Shareholder B capital call advanced by Craig) = $4,380,000. $4,380,000/ $7,166,667 = 61.1%.

For Shareholder A:  $1,600,000 (imputed allocable share of original Plan capital) + $120,000 (Shareholder A share of current capital call) = $1,720,000.  $1,720,000 / $7,166,667 = 24%.

For Shareholder B:  $1,066,667 (imputed allocable share of original Plan capital) + $0 (Shareholder B unpaid current capital call) = $1,066,667.  $1,066,667 / $7,166,667 = 14.9%.

c.    **Composition Of Reorganized Debtors' Board Of Directors And Identity And Compensation Of Officers.**

The following are the titles and the salaries expected to be provided to the directors and officers of the Reorganized Debtors during the 2019 and 2020 fiscal years:[42]  Craig, Chairman of the Board, will not be paid a salary; Cavanaugh, Chief Executive Officer and Director, will be paid $250,000 per annum; Kosmides, Special Projects Coordinator and Director, will be paid $225 per hour on an as-requested basis; Mr. Belshe, Executive Vice President of Operations, will be paid $102,000 per annum; and Lori Smith, Secretary, will be paid $1,000 per annum.

---

[42] The compensation of officers is subject to modification both pre and post-Effective Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1

2

3

4

RDI shall enter into at-will employment agreements with Messrs. Cavanaugh, Kosmides and Belshe and Ms. Smith as of the Effective Date which will provide for their compensation as set forth above and will provide for the continuation of medical insurance coverage in accordance with the medical insurance coverage provided to them by the Debtors as of the Petition Dates.

5

### 12.    Estate Representative

6

7

8

9

10

11

12

13

14

The Reorganized Debtors shall be appointed the Estate Representative for purposes of prosecuting any Rights of Action (subject to the limitations set forth in the Plan), objecting to Claims, disbursing monies to Holders of Claims under the Plan, liquidating property of the Estates and administering the Disputed Claim Reserve established pursuant to the Plan.  Without further order of the Court, the Reorganized Debtors may employ professionals, including counsel and accountants, the duties of which may include, without limitation, assisting in fulfilling the obligations under the Plan, including prosecuting any Rights of Action, objecting to Claims, filing tax returns and disposing of the assets of the Estates.  Such professionals shall be entitled to receive compensation for services rendered after the Effective Date without further order of the Court.

15

16

17

18

19

20

21

22

23

The Reorganized Debtors may pursue or decline to pursue any Rights of Action, as they deem appropriate in their sole discretion.  The Reorganized Debtors may settle, release, sell, and assign, otherwise transfer or compromise such Rights of Action.  Similarly, subject to the obligations set forth in the Plan, the Reorganized Debtors may sell any assets of Reorganized Debtors in their sole discretion.  The Reorganized Debtors may, but shall not be required to, set-off against any Claim and the Distributions to be made pursuant to the Plan in respect of such Claim, any claims the Estates may have against the Holder of the Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Reorganized Debtors of any such claims, set-off or recoupment rights which Reorganized Debtors may have against such Holder.

24

25

26

27

28

Unless a claim against a Creditor or other person is expressly waived, relinquished, compromised or settled in the Plan or in a Final Order, all rights with respect to such claim are reserved to the Reorganized Debtors, which may pursue such claim.  Upon the substantial consummation of the Plan, the Reorganized Debtors may file, and after full consummation shall file, a report with the Court and request the entry of a final decree closing these Cases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

DOCS_LA:323709.20

**13.    Disputed Claims and Unclaimed Property**

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Interests or Administrative Claims under the Plan, including the determination of the amount of Distributions due to the Holders of Allowed Claims and Administrative Claims, each Disputed Claim shall be treated as if it were an Allowed Claim or authorized Administrative Claim, as appropriate, except that if the Court estimates the likely portion of a Disputed Claim to be Allowed or otherwise determines the amount which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Debtors or the Reorganized Debtors), such amount as determined by the Court shall be used as to such Claim.

The Distributions due with respect to Disputed Claims based on the calculations required by the Plan shall be reserved for the Holders of the Disputed Claims and deposited in a segregated account (the "Disputed Claims Reserve").  The amount so deposited on behalf of a Creditor holding a particular Disputed Claim is referred to herein as the "Reserve Amount."

After an objection to a Disputed Claim is withdrawn or determined by Final Order, the Distributions due on account of any resulting Allowed Claim or authorized Administrative Claim shall be paid by the Reorganized Debtors from the Reserve Amounts for such Creditor held in the Disputed Claims Reserve together with the interest, if any, actually accrued on the Reserve Amounts (up to a maximum of the interest actually accrued on the amount of the resulting Allowed Claim or authorized Administrative Claim).  Such payment shall be made on the earlier of (a) the next payment date for Claims or Administrative Claims of the Class or type of the Claim or Administrative Claim of such Holder and, (b) within forty-five (45) days of the date the Disputed Claim becomes an Allowed Claim or authorized Administrative Claim.  No interest shall be due to a Disputed Claim Holder based on the delay attendant to determining the allowance of such Claim except as set forth in this subsection.

Should the Distribution due with respect to a finally Allowed Claim of such Creditor exceed the Reserve Amount for Administrative Claims, Secured Claims or Priority Claims, the shortfall may be paid from any available sums of the Reorganized Debtors and, for Unsecured Claims, the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

DOCS_LA:323709.20

- 71 -

shortfall may be paid from funds, if any, otherwise available to distribute to Unsecured Claims, collectively.  In no event shall the Creditor have recourse to any payments already made to others.

After an objection to such a Disputed Claim is sustained in whole or in part by a Final Order, any Reserve Amounts for such Claim held in the Disputed Claims Reserve in excess of the Distributions due on account of any resulting Allowed Claim may be removed from the Disputed Claims Reserve and put in the Reorganized Debtors' general accounts, as applicable.

Any Cash or other property which is unclaimed for one-hundred eighty (180) days after the Distribution is sent by mail to the last known mailing address for the person entitled thereto as provided in the Plan ("Unclaimed Property") will be deemed paid to such entitled Person, for purposes of determining the Person's rights.  Any Creditor that does not claim its Distribution within one hundred eighty (180) days will receive no future Distribution under the Plan.  Unclaimed Property resulting from a Distribution shall revest in the respective Reorganized Debtor.

**F.    Claim Objection Bar Date**

The Debtors, Creditors and other parties in interest shall have until 120 days following the Effective Date of the Plan (the "Claim Objection Bar Date") to file all objections to Claims in these cases, subject to extension by Court order.

**G.    Risk Factors**

While the Debtors' Cash Flow Projections (**Exhibit B**) incorporate assumptions, there are events which could occur and risks associated with the Debtors' reorganization that would hinder the Debtors' ability to meet their Plan obligations.  Moreover, the successful implementation of the Debtors' business plan is dependent on the interaction of many variables, including Debtors' ability to exploit and maintain their current market niche, the effects of changing industry conditions, competition and the extension of trade credit by the Debtors' suppliers.  While the Debtors believe that the Cash Flow Projections are reflective of the Debtors' reasonable judgments in assessing those risks, factors or events not foreseen or anticipated by the Debtors could adversely affect the ability of the Debtors to execute their business plan strategies.  Specifically, the Debtors' ability to meet their Cash Flow Projections are subject to the following risks:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1        **1.      Business Risks**

2              **a.      Industry Conditions**

3        There can be no assurance that the industry conditions under which the Debtors will operate

4   will enable them to achieve the revenues, or the gross margins thereon, which the Debtors have

5   relied upon to project future business prospects.  Industry-wide demand is subject to fluctuations in

6   consumer tastes.  Moreover, the industry in which the Debtors participate is highly competitive.  As

7   new restaurant chains vie for market share, the relative market share enjoyed by the Debtors may be

8   adversely affected.

9              **b.      Competition**

10       The restaurant industry is highly competitive and is affected by changes in the public's eating

11  habits and preferences, demographic and sociocultural patterns, and local and national economic

12  conditions affecting consumer spending habits.  The restaurants operated by the Debtors compete

13  directly and indirectly with a large number of national and regional restaurant operations, as well as

14  with locally owned restaurants and numerous other establishments that offer moderately priced

15  hamburgers, salads and other menu items.  The Debtors compete in terms of perceived value, the

16  variety and quality of menu items, service, and price.  There are other companies engaged in

17  restaurant operations similar to the restaurants operated by the Debtors that have substantially

18  greater financial resources and a higher volume of sales than the Debtors.  In response to

19  competition, the Debtors may need to develop and implement new concepts in order for their

20  businesses to remain viable.

21             **c.      Seasonality**

22       The restaurants operated by the Debtors are subject to some seasonal fluctuation with the

23  third quarter being the strongest quarter followed by the second quarter.   The first and fourth quarter

24  seasons are weaker due to climatic and other conditions which negatively impact guest patterns.

25             **d.      Operating Cash Flow**

26       Ongoing plan payments are being funded largely by internal operations.  There can be no

27  assurance that the operating cash flow of the Reorganized Debtors, after giving effect to operating

28  requirements, will be adequate to fully fund the payment of the Plan obligations, as and when due.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

The ability of the Debtors to repay or refinance their indebtedness may depend on their ability to obtain trade credit terms from its suppliers at historical support levels. The pendency of the Chapter 11 Cases has negatively affected the operations of the Debtors and results of operations. Adverse effects of the Chapter 11 Cases may affect future periods as well.

### e.    Trade Credit

The Reorganized Debtors will rely on the resumption of trade credit terms at levels historically extended to the Debtors by their suppliers. While some of these suppliers have undertaken to extend trade credit to the Debtors during the pendency of the Chapter 11 Cases, the aggregate credit so extended is well below historical levels, and there can be no assurance that credit currently extended will be continued, nor that sufficient additional credit would be extended by currently non-participating suppliers upon confirmation of the Plan. In formulating their Cash Flow Projections, the Debtors assumed that the Reorganized Debtors would obtain trade credit from all suppliers on terms that were normal and customary during the Debtors' fiscal year ended 2017. The extension of less aggregate trade credit than relied upon by the Debtors in formulating the Cash Flow Projections would adversely affect the Reorganized Debtors' ability to meet their obligations under the Plan. The failure of suppliers to extend credit to the Reorganized Debtors in accordance with industry practice would further place the reorganized entities at a disadvantage vis-à-vis their principal competitors, which would have continued access to this valuable funding medium.

### f.    Ability to Achieve the Business Plan

Successful implementation of the Debtors' business plan is dependent on the interaction of many variables including the effects of changing industry conditions, competition and the extension of trade credit by the Debtors' suppliers. Other factors include the effects of general economic trends influencing consumers' discretionary expenditures and the effectiveness of the Debtors' tax planning strategies. While the Debtors believe that the Cash Flow Projections filed concurrently herewith are reflective of the Debtors' reasonable judgments in assessing those risks, there can be no assurance that influences not foreseen by Debtors would not adversely impact the ability of the Debtors and/or the Reorganized Debtors to execute their business plan strategies.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

ultimately obtained by the Litigation Trust in connection with the D&O/Affiliate Claims, the amount available for distribution to holders of Class 11(a) claims would be subject to the prior payment of the fees and costs of the Liquidating Trust in pursuit of such recovery and otherwise.  Accordingly, the recovery to Class 11(a) claimants is uncertain and could exceed or fall materially short of the treatment under the Plan providing for a $2.5 million payment should the D&O/Affiliate Release be approved by the Bankruptcy Court.

In addition, the pursuit of such D&O/Affiliate Claims against the D&Os/Affiliated Entities is likely to serve to distract the D&Os from the operations of the Reorganized Debtors, which could have a material adverse impact of the Reorganized Debtors' performance under the Plan.

### 2.    Bankruptcy Risk

#### a.    Objection to Classification

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

#### b.    Risk of Non-Confirmation of Plan

Even if all Classes of Claims that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization, and that the value of distributions to dissenting Creditors and equity security holders not be less than the value of distributions such Creditors and equity security holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies all the requirements for Confirmation of a plan of reorganization under the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court would also conclude that the requirements for Confirmation of the Plan have been satisfied.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

### c.    Potential Effect of Bankruptcy on Certain Relationships

The effect, if any, which the continuation of these cases may have upon the operations of the Reorganized Debtors cannot be accurately predicted or quantified.  Although bankruptcy no longer has the same negative stigma it once had, some entities are uncomfortable doing business with a company that has sought bankruptcy relief.  If Confirmation and consummation of the Plan do not occur expeditiously, the ongoing pendency of the Chapter 11 Cases could adversely affect the Reorganized Debtors' relationships with its customers, suppliers and employees, resulting in a material adverse impact on the Reorganized Debtors' operations.

### 3.    Risk of Default Under Plan

In the event that the Reorganized Debtors are unable to execute their business plan strategies as contemplated by the Plan, the Reorganized Debtors may be unable to meet their payment obligations under the Plan.  In such event, a default under the Plan could occur.  Under these circumstances, Creditors could seek to pursue their legal rights and remedies against the Reorganized Debtors occasioned by such default.

## H.    Executory Contracts and Unexpired Leases

### 1.    Unexpired Leases and Executory Contracts to be Assumed

During the pendency of the Chapter 11 Cases, the Debtors assumed (and in the case of Laguna Hills, assigned) their leases for the restaurants for the Huntington Beach, Oceanside, Palm Springs and Laguna Hills locations and the corporate headquarters lease.  Attached hereto as **Exhibit L** is a chart, which identifies the Debtors' other unexpired leases and executory contracts, and which specifically includes, without limitation, the Franchise Agreements which will be assumed by RFS and the RFS/RDI License Agreement under the Plan on the Effective Date (the "Assumed Contracts/Leases").  **Exhibit L** also itemizes the amount of monetary defaults, if any, which exist under such leases and executory contracts, which the Debtors must cure pursuant to section 365(b) of the Bankruptcy Code.  The Confirmation Order shall constitute an Order approving the assumption of each lease and contract listed, and the assignment thereof to the applicable Reorganized Debtor, and each such Assumed Contract/Lease shall be binding on the respective Reorganized Debtor and the counter-parties thereto.  If you are a party to a lease or contract to be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

assumed and you object to the assumption of your lease or contract and/or you object to the amount that the Debtors have set forth on **Exhibit L** as owing to cure monetary defaults, you must file and serve your objection to the Plan within the deadline for objecting to the Confirmation of the Plan. *See* Section I (Introduction) of this document for the specific deadline.[43]

### 2.    Other Unexpired Leases and Executory Contracts to Be Rejected

Attached hereto as **Exhibit M** is a chart, which identifies unexpired leases and executory contracts the Debtors will reject as of the Effective Date (the "Rejected Contracts/Leases"). The Confirmation Order shall constitute an Order approving the rejection of each lease and contract listed. If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the Confirmation of the Plan. *See* Section I (Introduction) of this document for the specific deadline.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT UNDER THE PLAN IS THIRTY (30) CALENDAR DAYS FROM THE DATE THE CONFIRMATION ORDER IS ENTERED ON THE COURT'S DOCKET. Any Claim based on the rejection of a contract or lease will be barred if the Proof of Claim is not timely filed.

### I.    Miscellaneous Plan Provisions

#### 1.    Rounding of Amounts / De Minimis Amounts

Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors may round all amounts for Distributions of Cash hereunder to Holders of Allowed Claims and Interests to the nearest whole dollar amount. In addition, the Reorganized Debtors shall not be required to make a Distribution on account of any Claim until the Distribution to such Creditor totals a minimum of $5.00.

#### 2.    Name and Address of Holder

For purposes of all Distributions under the Plan, the Reorganized Debtors will be entitled to rely on the name and address of the Holder of each Allowed Claim or Interest as shown on any

---

[43] The Debtors reserve the right to add or withdraw any contract or lease from the lists of Assumed Contracts/Leases or Rejected Contracts/Leases at any time prior to the Confirmation Hearing.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1    timely filed Proof of Claim and, if none, as shown on the Debtors' Schedules, as of the date of the

2    hearing on Confirmation of the Plan, except to the extent that both the Reorganized Debtors and

3    their counsel first receive adequate written notice of a transfer or change of address, properly

4    executed by the Holder or its authorized agent.

###    3.    Orders to Aid Consummation of Plan

5    
6    The Plan constitutes and incorporates a motion under 11 U.S.C. § 1142 and the Bankruptcy

7    Rules 7069 and 7070 for an order to cause the Debtors and all their present and former directors,

8    officers, agents, employees, attorneys, and accountants to cooperate fully in providing the Debtors

9    with all information regarding and access to properties and assets of the Debtors and their Estates;

10    and to execute and deliver such documents and perform such acts as are reasonably necessary to

11    enable the Debtors to take possession, custody, and control of all assets vested in the Debtors'

12    Estates pursuant to the Plan to the extent provided for under the Plan and reasonably necessary to

13    transfer all of the assets of the Debtors to the Reorganized Debtors as provided by the Plan,

14    including the transfer of the Interests in RFS to RDI, the transfer of the HOP Assets to the New HOP

15    Entities and the post-Effective Date transfer of the New HOP Entities to RDI.  Confirmation of the

16    Plan shall be deemed a granting of such motion and the Confirmation Order shall be deemed the

17    order thereon.

###    4.    Severability

18    
19    If the Court determines, prior to the date of entry of the Confirmation Order, that any

20    provision of the Plan is illegal either as written or as applied to any Claim or Interest, as the case

21    may be, such provision shall be either unenforceable generally or as applied to such Claim or

22    Interest.  A determination that a provision of the Plan is illegal or not enforceable as to a particular

23    Claim or Interest shall in no way limit or affect the enforceability and operative effect of any other

24    provision of the Plan or of that provision as applied to other Claims or Interests and the Debtors may

25    modify the Plan to withdraw or modify such provision.

###    5.    Headings of Articles and Sections

26    
27    The headings of the articles and sections of the Plan are inserted for convenience only and

28    shall in no way affect the interpretation of its provisions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

### 6.     Successors and Assigns

The rights, benefits and obligations of any Entity referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors or assigns of such Entity.

### 7.     Changes in Rates Subject to Regulatory Commission Approval

The Debtors are not subject to governmental regulatory commission approval of their prices.

### 8.     Services By And Fees For Professionals

#### a.     Prior to the Effective Date

##### i.     Generally

The Plan provides that fees and expenses for the Professionals retained by the Debtors or the services rendered and costs incurred after the Petition Date and prior to the Effective Date, will be fixed by the Bankruptcy Court after notice and a hearing and such fees and expenses will be paid after approval by the Bankruptcy Court to the extent so approved and as provided in the Plan.

#### b.     From the Effective Date

The Plan provides that fees owing for services rendered and costs incurred and owing on and after the Effective Date by the Professionals retained by the Reorganized Debtors will be paid by the Reorganized Debtors from the funds held by the Reorganized Debtors twenty (20) days after submission of a bill therefore to the Reorganized Debtors, if there is no objection within such time. If there is such an objection, the fees and expenses will be fixed by the Bankruptcy Court after notice and a hearing.  The Bankruptcy Court will retain jurisdiction until the Chapter 11 Cases are closed, to determine disputed post-Effective Date fees of Reorganized Debtors' professionals.

### 9.     Dissolution of Committee

As of the Effective Date, the Committee and each of its members shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Cases.

### 10.     Litigation Trust

If the D&O/Affiliate Release is not approved by the Bankruptcy Court, the Class 11(a) claimants will not be entitled to the payment of the $2.5 million.  Instead, on the Effective Date, a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

litigation trust will be formed pursuant to the Plan (the "Litigation Trust").  The Litigation Trust will

have the express purpose of investigating and, if appropriate, prosecuting any D&O/Affiliate Claims,

and making a *pro rata* distribution from any proceeds ultimately recovered by the Litigation Trust

from such D&O/Affiliate Claims to the holders of Class 11(a) claims.   The Litigation Trust is

entitled to retain counsel or other advisors, which may include the advisors to the Committee, at the

expense of the Litigation Trust.  Any distribution to the Class 11(a) from the Litigation Trust shall be

after payment in full of the fees and costs incurred by the Litigation Trust incurred in connection

with the prosecution of D&O/Affiliate Claims or otherwise.  The Reorganized Debtors shall have no

liability for the payment of any fees or costs of the Litigation Trust, nor any liability to the holders of

Class 11(a) claimants, which shall obtain their recovery solely from the Litigation Trust.

**11.    Amendment, Withdrawal or Revocation of the Plan**

The Debtors reserve the right to amend, revoke or withdraw the Plan prior to the

Confirmation Date.  If the Debtors should revoke or withdraw the Plan, then the Plan shall be null

and void, and nothing contained in the Plan shall constitute an admission by any of the Plan

Proponents, a waiver or release of any Claims by or against, or any Interests in the Debtors, or

prejudice in any manner the rights of Debtors.

**12.    Retention of Jurisdiction**

The Bankruptcy Court will retain and have exclusive jurisdiction over any matter (a) arising

under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that

relates to the following:

a.    Resolution of any matters related to the assumption, assumption and assignment, or

rejection of any executory contract or unexpired lease to which the Debtors are a party or with

respect to which the Debtors may be liable and to hear, determine and, if necessary, liquidate, any

Claims arising therefrom, including those matters related to the amendment after the Effective Date

of the Plan, to add any executory contracts or unexpired leases to the lists of Assumed

Contracts/Leases or Rejected Contracts/Leases;

b.    Entry of such orders as may be necessary or appropriate to implement or consummate

the provisions of the Plan and all contracts, instruments, releases, and other agreements or

1    documents created in connection with the Plan;

2        c.    Determination of any and all motions, adversary proceedings, applications, and

3    contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan,

4    may be instituted by the Reorganized Debtors after the Effective Date;

5        d.    Ensuring that Distributions to Holders of Allowed Claims are accomplished as

6    provided in the Plan;

7        e.    Hearing and determining any timely objections to Administrative Claims or to Proofs

8    of Claim filed, both before and after the Confirmation Date, including any objections to the

9    classification of any Claim and to allow, disallow, determine, liquidate, classify, estimate, or

10    establish the priority of secured or unsecured status of any Claim, in whole or in part;

11        f.    Entry and implementation of such orders as may be appropriate in the event the

12    Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

13        g.    Issuance of such orders in aid of execution of the Plan, to the extent authorized by

14    section 1142 of the Bankruptcy Code;

15        h.    Consideration of any modifications of the Plan, to cure any defect or omission, or

16    reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

17        i.    Hearing and determining all applications for awards of compensation for services

18    rendered and reimbursement of expenses incurred prior to the Confirmation Date;

19        j.    Hearing and determining disputes arising in connection with or relating to the Plan or

20    the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's

21    obligations incurred in connection with or released or exculpated under the Plan;

22        k.    Issuance of injunctions or other orders as may be necessary or appropriate to restrain

23    interference by any Entity with consummation or enforcement of the Plan;

24        l.    Determination of any other matters that may arise in connection with or are related to

25    the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument release, or

26    other agreement or document created in connection with the Plan or the Disclosure Statement,

27    including the Litigation Trust;

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1    m.    Hearing and determining matters concerning state, local, and federal taxes in

2 accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

3    n.    Hearing any other matter or for any purpose specified in the Confirmation Order that

4 is not inconsistent with the Bankruptcy Code; and

5    o.    Entry of a final decree closing the Chapter 11 Cases.

6    **13.    Impact of Default Under Plan**

7    In the event that the Reorganized Debtors default on their payment obligations under the

8 Plan, Creditors will have the right to enforce their rights and remedies under applicable law.   As

9 provided by Local Bankruptcy Rule 3020-1(d), if the Chapter 11 Cases are converted to chapter 7,

10 the property of the Reorganized Debtors that has not been distributed under the Plan shall be vested

11 in the chapter 7 trustee, except for property that would have been excluded from the estates if the

12 Chapter 11 Cases had always been under chapter 7.

13    **14.    Payment of Post-Confirmation Quarterly Fees**

14    Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the

15 United States Trustee by each of the Debtors in accordance with 28 U.S.C. § 1930(a)(6) until entry

16 of a final decree, or entry of an order of dismissal/conversion to chapter 7.

17    **15.    Confirmation Request**

18    In the event that all of the applicable requirements of 11 U.S.C. § 1129(a) are met other than

19 subparagraph (8), the Debtors request Confirmation of the Plan notwithstanding the requirements of

20 such subparagraph under 11 U.S.C. § 1129(b).

21    **VII.**

22    **TAX CONSEQUENCES OF THE PLAN**

23    **A.    General**

24    **1.    Statutory Overview**

25    Under the Internal Revenue Code of 1986, as amended, (the "Tax Code") and income tax

26 regulations (the "Regulations") promulgated thereunder, there are certain significant federal income

27 tax consequences associated with the Plan described in this Disclosure Statement.  Certain of these

28 consequences are discussed below.  Due to the unsettled nature of several of the tax issues presented

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

by the Plan, the differences in the nature of the Claims of the various claimants, their taxpayer status, residence and methods of accounting (including claimants within the same class of Claims) and prior actions taken by claimants with respect to their Claims, as well as the possibility that events or legislation subsequent to the date hereof could change the federal tax consequences of the transactions, the federal tax consequences described herein are subject to significant uncertainties.

Finally, except as otherwise specifically indicated, this summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as taxpayers who are not United States domestic corporations or citizens or residents of the United States, S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers, non-profit entities or foundations, small business investment companies, persons that hold Claims or Interests as part of a straddle or conversion transaction and tax-exempt organizations).

No administrative rulings will be sought from the IRS with respect to any of the federal income tax aspects of the Plan.  Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be accepted by the IRS.  No opinion of counsel has either been sought or obtained with respect to the federal income tax aspects of the Plan.

THE DISCUSSION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR GENERAL INFORMATION ONLY.  ALL CLAIMANTS AND STOCKHOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN, INCLUDING STATE AND LOCAL TAX CONSEQUENCES.

**B.** **Tax Consequences to the Debtors**

    **1.** **Summary of the Plan**

Pursuant to the Plan, the Debtors anticipate that they will receive the Plan Funding, which will then be distributed to Creditors in full, or partial satisfaction of their Claims.  The Debtors intend to engage in certain transactions (the "Transactions") on, prior to or following the Effective Date of the Plan.  It is envisioned that 100% of the equity Interests in RFS will be transferred to RDI.

It is also envisioned that, following the Effective Date, RDI will own the Interests in the New HOP Entities.  Accordingly, after the Effective Date, RDI will hold the Interests the RDI Entities that it held as of the Petition Date, plus all of the Interests in RFS and the New HOP Entities, the RDI Entities and the SoCal Entities.

### 2. Tax Consequences of the Transactions

The Debtors not believe that any significant adverse tax consequences will result from the Transactions.  The Plan is designed so that the creditors should not be exposed to adverse income tax treatment, such as the loss of deductions, or reporting taxable income.  Although each creditor should be able to take advantage of the income tax benefits resulting from the Plan under Chapter 11, we have not been provided with a creditor's individual income tax situation.   Therefore, a creditor cannot rely upon the Plan as tax advice.  Instead, each creditor must consult with his, her or its own tax advisor regarding his, her or its income tax treatment under the Plan.

### VIII.

### CONDITIONS TO EFFECTIVENESS OF THE PLAN

The effectiveness of the Plan is conditioned upon the events described below:

A.    The receipt of the Plan Funding from the Plan Sponsor sufficient to make the Effective Date payments.

B.    The transfer of 100% of the equity interests in RFS to RDI in accordance with the terms of the Plan, and the agreement of the Plan Sponsor to contribute the Interests in the HOP Restaurant Entities to RDI.

C.    The issuance of the Interests in RDI in accordance with the terms of the Plan.

D.    Satisfaction of the Going Concern Value Requirement.

E.    Assumption by RFS of the Franchise Agreements and assumption by RDI and RFS of the RFS/RDI License Agreement.

F.    Approval of the New Value Contribution and the Reconciliation.

G.    Approval of the D&O/Affiliate Release or, alternatively, creation of the Litigation Trust.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

H.    The Debtors' execution of all other Plan related agreements required to be executed by the Debtors.

I.    The Plan is conditioned on an agreement by the Professionals, or other determination, as to the treatment of their Professional Fees under the Plan that will allow the Plan to become effective.

IX.

**<u>CONFIRMATION REQUIREMENTS AND PROCEDURES</u>**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic Confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a plan.  Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan, whether the plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and whether the plan is feasible.  These requirements are <u>not</u> the only requirements for confirmation.

A.    <u>Who May Vote or Object</u>

1.    **Who May Object to Confirmation of the Plan**

Any party in interest may object to the Confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

2.    **Who May Vote to Accept/Reject the Plan**

A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of a Claim or Interest has a Claim or Interest which is both (a) Allowed or Allowed for voting purposes and (b) classified in an Impaired Class.

a.    **What Is an Allowed Claim/Interest**

As noted above, a Holder of a Claim or Interest must first have an <u>Allowed</u> Claim or Interest to have the right to vote.  Generally, any Claim or Interest will be Allowed, unless a party in interest

brings a motion objecting to the Claim or Interest.  When an objection to a Claim or Interest is filed, the Holder of the Claim or Interest holding the Claim or Interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

THE GENERAL BAR DATE FOR FILING A PROOF OF CLAIM IN THE RDI DEBTORS' CASES WAS ***JUNE 3, 2019*** AND, IN THE RFS CASE, WAS ***MAY 15, 2019***.  THE BAR DATE FOR FILING A REQUEST FOR PAYMENT OF AN ADMINISTRATIVE CLAIM is the 30th day after the entry of the Confirmation Order   A Holder of a Claim or Interest may have an Allowed Claim or Interest even if a Proof of Claim or Interest was not timely filed.  A Claim is deemed Allowed if (i) it is scheduled on the Debtors' Schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (ii) no party in interest has objected to the Claim.  An Interest is deemed Allowed if it is scheduled and no party in interest has objected to the Interest.

### b.      What Is an Impaired Claim/Interest

As noted above, an Allowed Claim or Interest only has the right to vote if it is in a Class that is Impaired under the Plan.  A Class is Impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.  For example, a Class comprised of Unsecured Claims is Impaired if the Plan fails to pay the members of that class 100% of what they are owed on the Effective Date of the Plan.

The Debtors believe that, with the exception of Classes 1, 9, 10(a), 10(b), 10(c), 11(b) and 12(c), all other Classes – Classes 2, 3, 4, 5, 6, 7, 8(a), 8(b), 8(c), 11(a), 11(c)(i)-(vi), 11(d), 12(a) and 12(b) – are Impaired and that Holders of Claims and Interests in each of these Classes are therefore entitled to vote to accept or reject the Plan.  Parties who dispute the Debtors' characterization of their Claim or Interest as being Impaired or Unimpaired may file an objection to the Plan contending that the Debtors have incorrectly characterized the Class. (*See* Table 4: Classification of Claims and Interests)

### 3.      Who is Not Entitled to Vote

The following four types of Claims and Interests are not entitled to vote: (a) Claims or Interests that have been disallowed; (b) Claims or Interests in Unimpaired Classes; (c) Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(8); and (d) Claims

or Interests in Classes that do not receive or retain any value under the Plan. Claims in Unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4. Who Can Vote in More Than One Class

A Creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one Ballot for the secured part of the Claim and another Ballot for the Unsecured Claim.

### 5. Votes Necessary to Confirm the Plan

If impaired Classes exist, the Court cannot confirm the Plan unless (a) at least one Impaired Class has accepted the Plan without counting the votes of any Insiders within that Class, and (b) all Impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes.

### 6. Votes Necessary for a Class to Accept the Plan

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted, voted in favor of the Plan. A Class of Interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the Interest-Holders of such Class which actually voted, voted to accept the Plan.

### 7. Treatment of Nonaccepting Classes

As noted above, even if all impaired Classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Bankruptcy Code. The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

"crammed down" on nonaccepting Classes of Claims or Interests if it meets all consensual requirements except the voting requirements of section 1129(a)(8) of the Bankruptcy Code and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each Impaired Class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

**8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)**

The Debtors ask the Court to confirm the Plan by cramdown on Impaired Classes 2, 3, 4, 5, 6, 7, 8(a), 8(b), 8(c), 11(a), 11(c)(i)-(vi), 11(d), 12(a) and 12(b) if any of these Classes do not vote to accept the Plan.

**B.    Liquidation Analysis**

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a Holder of a Claim or Interest is in an Impaired Class and that Holder of a Claim or Interest does not vote to accept the Plan, then that Holder of a Claim or Interest must receive or retain under the Plan property of a value not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

As the Debtors' Liquidation Analysis (attached hereto as **Exhibit N**) demonstrates, the Debtors believe that Holders of Unsecured Claims against the Debtors would receive very little if the Debtors were liquidated under chapter 7 of the Bankruptcy Code and will receive a greater or equal distribution under the Plan.

Chapter 7 differs from chapter 11. Under chapter 7 of the Bankruptcy Code, a trustee always is appointed and may not operate the business of the Debtors absent seeking and obtaining Court approval. The Debtors doubt that a chapter 7 trustee could or would operate the Debtors' business. First, it is not typical for a chapter 7 trustee to elect to continue business operations. Second, the chapter 7 trustee may not have sufficient Cash resources or the knowledge and expertise required to operate the business which could preclude the continuation of business operations by a chapter 7 trustee.

Even if the chapter 7 trustee chose, and was able, to operate the RDI Debtors' business pending a sale of the Debtors' assets through an orderly sales process, there still would likely be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

insufficient sums after the payment of Secured, Administrative and Priority Claims to pay the RDI Debtors' Unsecured Claims. Attached as **Exhibit N** is a liquidation analysis reflecting the Debtors' projection of the outcome were a chapter 7 trustee to cease operating the Debtors' businesses and sell their assets through an expedited liquidation. The figures in **Exhibit N** are based upon the Debtors' books and records, the Debtors' experience within their industry, and the Debtors' and their financial advisors' evaluation of likely recoveries as explained and qualified in the accompanying footnotes. **Exhibit N** shows a summary comparison of the potential recoveries under the Plan versus a chapter 7 liquidation.

For all of the foregoing reasons, the Debtors' proposed Plan will yield a greater or equal recovery for Creditors than a liquidation under chapter 7 of the Bankruptcy Code.

**C.**     **Feasibility**

Another requirement for Confirmation involves the feasibility of the Plan, which means that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtors will have enough Cash on hand on the Effective Date of the Plan to pay all the Claims and expenses which are entitled to be paid on such date. The Debtors maintain that this aspect of feasibility will be satisfied. As discussed in the Plan, the Debtors will be required to make payments on the Effective Date as reflected in the following chart: [44]

**SUMMARY OF CASH NEEDS ON EFFECTIVE DATE**

| Type of Payment | Amount |
|---|---|
| Class 1 – Secured Noteholders Interest Payment | $129,546 |
| Opus Bank Effective Date Payments | $216,923 |

---

[44] These estimates exclude the amount of Administrative Claims of Professionals, the terms of payment of which shall be subject to agreement, or other determination, and the resolution of which are a condition to the effectiveness of the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

| HOP Effective Date Payments | $200,000 |
|---|---|
| Administrative Claims (Non-Professionals) | $501,000 |
| Other Effective Date Payments | $498,558 |
| **TOTAL** | $1,546,027 |

Accordingly, the Debtors will need an estimated $1,546,027 to make the payments required on the Effective Date. The Debtors will have the requisite amount of Cash on the Effective Date as set forth in the Debtors' Cash Flow Projections.

The second aspect of "feasibility" considers whether the Debtors will have enough Cash over the life of the Plan to make the required Plan payments. Attached hereto as **Exhibit B** are the Debtors' Cash Flow Projections and accompanying notes, which explain the assumptions incorporated by the Debtors. The Cash Flow Projections demonstrate that the Debtors will have sufficient funds with which to make all payments required under the Plan.

A condition to the effectiveness of the Plan is an agreement, or other resolution, regarding the payment of the Administrative Claims of Professionals.

Accordingly, the Plan is feasible.

## X.

## EFFECT OF CONFIRMATION OF PLAN

### A. Binding Effect Of Confirmation

Confirmation will bind the Debtors, all Creditors, Interest Holders and other parties in interest to the provisions of the Plan whether or not the Claim or Interest of such Creditor or Interest Holder is Impaired under the Plan and whether or not such Creditor or Interest Holder has accepted the Plan.

### B. Vesting of Assets Free and Clear of Liens, Claims and Interests

Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective Date, title to all assets and property of the Debtors, and all property of the Estates, including,

DOCS_LA:323709.20

1    pursuant to section 1123(b)(3)(b) of the Bankruptcy Code, each and every claim, demand or cause of

2    action which each Debtor had or had power to assert immediately prior to Confirmation, will revest

3    in the Reorganized Debtors, free and clear of all liens, Claims and Interests.  Thereafter, the

4    Reorganized Debtors will hold these assets without further jurisdiction, restriction or supervision of

5    the Bankruptcy Court.

6    **C.**    **Good Faith, Exculpation and Release**

7        Confirmation of the Plan shall constitute a finding that:  (1) the Plan has been proposed in

8    good faith and in compliance with applicable provisions of the Bankruptcy Code; and (2) the

9    solicitation of acceptances or rejections of the Plan by all Persons has been in good faith and in

10    compliance with applicable provisions of the Bankruptcy Code.  Accordingly, on the Effective Date,

11    each of the of the Debtors, the D&Os, the Affiliated Entities, the Plan Sponsor, the Committee and

12    the members of the Committee, and each of their respective advisors and attorneys (all of the

13    foregoing, collectively, the "Exculpated Parties"), effective as of the Effective Date, will be deemed

14    exculpated by Holders of Claims against and Interests in the Debtors and other parties in interest to

15    the Chapter 11 Cases (including, without limitation, the Debtors and the Estates), from any and all

16    Claims, causes of action and other assertions of liability (including, without limitation, breach of

17    fiduciary duty), arising out of or related to the Debtors, the D&Os, the Affiliate Entities, the Plan

18    Sponsor, the Committee, the Chapter 11 Cases or the exercise by such entities of their functions as

19    members of or advisors to or attorneys for any such individuals or committee or otherwise under

20    applicable law, in connection with or related to the Chapter 11 Cases, and no Exculpated Party shall

21    have or incur any liability to any Entity for any act taken or omission made in connection with,

22    relating to or arising out of the Debtors' restructuring efforts, the Chapter 11 Cases, the formulation,

23    preparation, dissemination, negotiation or filing of the Disclosure Statement, Plan, or any contract,

24    instrument, release or other agreement or document created or entered into in connection therewith,

25    the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the

26    Plan, the administration and implementation of the Plan or the Distribution of property under the

27    Plan or any other related agreement; *provided, however,* that the foregoing shall not apply to the

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1    extent of any act or omission that is determined in a Final Order to have constituted gross

2    negligence, willful misconduct or fraud, but in all respects such Entities shall be entitled to

3    reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant

4    to the Plan.

5    **D.    The D&O/Affiliate Release**

6          Prior to the Effective Date, there shall have been approved by the Bankruptcy Court,

7    pursuant to a motion to be filed with the Bankruptcy Court under Section 9019 of the Bankruptcy

8    Rules (the "9019 Motion"), a full and complete release (the "D&O/Affiliate Release") of any claims

9    or causes of action, including but not limited to, avoidable transfers and breach of fiduciary duty

10   claims (the "D&O/Affiliate Claims") against the D&Os, and any entity in which the D&Os,

11   individually or together, hold a controlling interest or in which either of them, either directly or

12   through an entity owned by either or both of them, is the managing partner or otherwise manages or

13   controls the entity (each an "Affiliated Entity" and, together, the "Affiliated Entities").  Creditors

14   shall have the right to object to the 9019 Motion notwithstanding how said creditor voted in

15   connection with the Plan.

16         If the D&O/Affiliate Release is approved by the Bankruptcy Court, unsecured Creditors'

17   claims of RDI (classified in Class 11(a)) will be entitled to payment of a total of Two Million Five

18   Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of Six Hundred and Twenty-Five

19   Thousand Dollars ($625,000) on each of the second (2nd), third (3rd), fourth (4th) and fifth (5th)

20   anniversaries of the Effective Date, with Cavanaugh and Kosmides contributing an additional $ 1

21   million dollars to the Debtors through a further dilution of their stock in the Reorganized Debtors

22   down to 25%.

23         Alternatively, if the D&O/Affiliate Release is not approved by the Bankruptcy Court,

24   unsecured Creditors' claims of RDI (classified in Class 11(a)) will be entitled to a *pro rata*

25   distribution from any proceeds ultimately recovered by the Litigation Trust that will have the right,

26   following the Effective Date, to investigate and, if appropriate, prosecute the D&O/Affiliate Claims,

27   if any, against the D&Os and D&O Affiliated Entities; *provided, however*, that any distribution to

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

the RDI unsecured Creditors from any recovery by the Litigation Trust shall be after payment of the fees and costs incurred by the Litigation Trust incurred in connection with the prosecution of claims or otherwise.

Based on an investigation of the potential D&O/Affiliate Claims against the D&Os and D&O Affiliated Entities, the Debtors believe that the approval of the D&O/Affiliate Release is supported by the consideration to be provided by the D&Os under the Plan ($2.5 million of value), the particulars of which will be set forth in the motion to be filed with the Bankruptcy Court under Section 9019 of the Bankruptcy Rules. In addition, the Debtors believe that pursuit of the D&O/Affiliate Claims against the D&Os/Affiliated Entities will distract the D&Os from the operations of the Reorganized Debtors, which could have an adverse impact of the Reorganized Debtors' ability to perform under the Plan.

**E.      No Limitations on Effect of Confirmation**

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

**F.      Discharge of Claims**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim,
debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder
of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default
by the Debtors with respect to any Claim or Interest that existed before or on account of the filing of
the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be
a judicial determination of the discharge of all Claims and Interests subject to the Effective Date
occurring, except as otherwise expressly provided in the Plan.

**G.**     **Injunction**

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY
ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF
ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE
CONFIRMATION ORDER.  FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT
OF THE RELEASES AND EXCULPATION GRANTED IN THE GOOD FAITH,
EXCULPATION AND RELEASE SECTION, THE RELEASING PARTIES SHALL BE
PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER
AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR
ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER
PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY,
OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR
TO BE RELEASED PURSUANT TO THE GOOD FAITH, EXCULPATION AND RELEASE
SECTION.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED
DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES
WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN
RELEASED, DISCHARGED OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY
ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE
FOLLOWING ACTIONS:  (I) COMMENCING OR CONTINUING IN ANY MANNER ANY
ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION
WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING,
ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY
JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF
OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS;
(III) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND
AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON
ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS
OR INTERESTS; (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION
OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH
OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR
DISCHARGED PURSUANT TO THE PLAN; AND (V) ACTING OR PROCEEDING IN ANY
MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE
PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL SUCH CLAIMS AND INTERESTS SHALL BE DEEMED SURRENDERED AND EXTINGUISHED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE DEEMED SURRENDERED OR EXTINGUISHED, AS THE CASE MAY BE, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

**H.    Securities Laws**

The entry of the Confirmation Order shall be a final determination of the Bankruptcy Court that the equity in reorganized RDI to be distributed pursuant to the Plan is entitled to all of the benefits and exemptions provided by section 1145 of the Bankruptcy Code.

### XI.

### ALTERNATIVES TO THE PLAN

The Debtors believe that, if the Plan is not Confirmed or is not confirmable, the alternatives to the Plan include (a) the conversion to a chapter 7 case and concomitant liquidation of the Debtors' Assets on a "forced sale" basis, and (b) an alternative plan of reorganization.

**A.    Liquidation Under Chapter 7**

If no plan can be confirmed, the Debtors' cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution to Creditors and Interest Holders in accordance with the priorities

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1   established by the Bankruptcy Code. For the reasons discussed above, the Debtors believe that

2   Confirmation of the Plan will provide each Holder of a Claim entitled to receive a Distribution under

3   the Plan with a recovery that is expected to be substantially more than or at least equal to what it

4   would receive in a liquidation under chapter 7 of the Bankruptcy Code.

5   **B.        Alternate Plan**

6           If the Plan is not confirmed, the Debtors or any other party in interest may be entitled to file a

7   different plan. Such plan could involve another form of reorganization, an orderly liquidation of the

8   Debtors' Assets under chapter 11 or a sale of the Debtors' business as a going concern. The Debtors

9   have determined that the Plan provides for the realization of the most value under the circumstances.

10

11  SUBMITTED BY:

12

13      Dated: October 1, 2019                PACHULSKI STANG ZIEHL & JONES LLP

14                                            By:    _/s/ William N. Lobel_____

15                                                      William N. Lobel
                                                    Attorneys for Ruby's Diner, Inc., *et al.,* Debtors
16                                                  and Debtors in Possession

17

18  APPROVED BY JOINT PLAN PROPONENT:

19

20      Dated: October 1, 2019                THEODORA ORINGHER PC

21                                            By:    *Eric J. Fromme*
22                                                 _____
                                                      Eric J. Fromme
23                                                  Attorneys for Ruby's Franchising Systems,
                                                    Inc., Debtor and Debtor in Possession
24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

EXHIBIT "A"

## Ruby's Franchise Systems

## New Value Contribution to Ruby's Diner Inc.

| Assets | | |
|---|---|---:|
| Cash On Hand | $ | 421,541 |
| Pre & Post Petition Netdown | | 662,459 |
| Value of Franchise Royalties @ 9.13x multiple [1] | | 13,474,703 |
| D&R Reconciliation | | 50,406 |
| **Total Assets** | $ | **14,609,109** |
| **Liabilities** | | |
| Sec. Debt Opus | $ | 1,281,400 |
| Post Petition AP | | 310,651 |
| Priority Tax Claims | | 15,572 |
| Unsecured Creditors | | 430,342 |
| Professional Fees | | 455,000 |
| Steve Craig RFS Note Interest | | 120,000 |
| **Total Liabilities** | $ | **2,612,965** |
| **Equity Value** | | |
| **Estimated FMV Equity** | $ | **11,996,144** |
| Illiquidity Discount [2] | | 21% |
| Additional Company Discount [3] | | 12% |
| **Adjusted FMV Equity** | $ | **8,037,416** |
| | | |
| Value to RDI Unsecured Creditors Pursuant to Committee Settlement | $ | (2,500,000) |
| **Total New Value Contribution** | $ | **5,537,416** |

[1]  Valuation is based on 2018 financials. Valuation is also based on franchise being purchased by strategic buyer.

[2]  Stout Restricted Stock Study Companion Guide - 2018 Edition

[3]  Valuing a Business – Shannon P. Pratt – Chapter 18, Other Valuation Discounts

EXHIBIT "B"

**Ruby's Diner Inc. ("RDI") – Cash Flow Projections Assumptions**

1. **License Fee from RFS:** RDI has a contractual right to receive a license fee from RFS for the licensing of the trademark to RFS, which is the franchisor of the Ruby's brand to franchisees. The amount accrued approximates 25% of royalties received by RFS from the franchisees.

2. **G&A Fees:** RDI is projected to collect G&A Fees from the HOP, South Coast Plaza, Woodbridge and Long Beach restaurants.  This fee is for General and Administrative services and use of RDI's resources, including such items as HR, accounting, marketing, and management of restaurant performance metrics.

   The restaurants managed by RDI are as follows:
   - Huntington Beach
   - Oceanside
   - Palm Springs
   - South Coast Plaza (Flat G&A fees which currently is around 1.8% of sales)
   - Long Beach
   - Woodbridge

3. **LP/LLC Distributions to RDI:** RDI is projected to receive distributions from its jointly-owned restaurants listed below:
   - Long Beach
   - South Coast Plaza

4. **Salaries & Related:** 70% of the total corporate salaries and related expenses are allocated to RDI.

5. **Office Rent:** The headquarters location of RDI is shared with various other entities including RFS, the annual allocation of rent is ~$55 thousand for RDI, these amounts grow at 2% starting after year 3 due to forecasted inflation.

6. **Operating Expenses:** 70% of the total operating expenses were allocated to RDI.

7. **Founders Medical:** 70% of the total Founders Medical was allocated to RDI.

8. **Professional Expenses:** Total professional fees for RDI is estimated to be $4,775,000. The model currently reflects a $0 payment to professionals as terms of payments are still under negotiation. The list of professionals who provided services to RDI are below.
   - **Glass Ratner**
   - **RDI GU Committee Professionals**
   - **PSZJ**
   - **Plan Sponsor Attorney**
   - **AFP Saddington**

9. **Secured NH Interest:** The secured noteholders are assumed to be receiving their interest at a rate of 2.17% on their total balance of $2,984,923.

10. **Worker's Comp Special Assessment:** California Restaurant Mutual Benefit Corporation ("CRMBC") is the current workers' comp insurance provider for RDI. Based on a special assessment in 2017, Ruby's restaurants are required to make monthly payments until 2025. The annual payments are assumed to be ~$82 thousand. RDI will be reimbursed by several of the restaurants totaling ~$50 thousand per year.

11. **Post-Petition GC (Anaheim, Morongo):** RDI is obligated to reimburse Ruby's restaurants for the use of Costco gift cards. Anaheim and Morongo have current outstanding balances of ~$26 thousand and ~$13 thousand respectively.

12. **Expected Future Costco Redemption Payments:** RDI is obligated to reimburse Ruby's restaurants for the use of Costco gift cards.

13. **Unsecured Creditors:** In accordance with the Committee Settlement, the unsecured creditors (including the unsecured noteholders, general unsecured creditors, and pre-petition gift cards owing to the HOPL restaurants) are assumed to be paid a total of $2.5 million as follows: $0 on the Effective Date, and four equal installments of $0 in years 1, $625 thousands from year 2 through 4. These payments are assumed to be distributed on a pro-rata basis between the various classes of unsecured creditors as shown in the projections. In the case where unsecured creditors vote to pursue the D&O policy litigation, the model assumes no payments to the unsecured creditors.

14. **Plan Sponsor Contribution:** The plan sponsor is assumed to be contributing this amount to RDI on the effective date.

15. **Transfers between Entities:** The transfers between entities are assumed in the model to maintain working capital reserves on every entity as shown on each entity's projections.

## Ruby's Franchise Systems ("RFS") – Cash Flow Projections Assumptions

1. **Total New Franchise Royalty:** This is the additional royalty income expected to be derived from the opening of new franchise locations.

2. **Sale of Franchise Rights:** These are the initial franchisee payments for the sale of franchise rights, which are paid upon the execution of the Franchise Agreement. These amounts are forecasted at $45 thousand per Full Size Diner and $30 thousand per Small Unit.

3. **Creative Management Fee from Franchisees:** These are amounts contributed by the franchisees per their agreement. These amounts are expensed on the Operating Expenses line of the RFS projections.

4. **License Fee to RDI:** RDI has a contractual right to receive a license fee from RFS for the licensing of the trademark to RFS, which is the franchisor of the Ruby's brand to franchisees. The amount accrued approximates 25% of royalties received by RFS from the franchisees.

5. **Salaries & Related:** 30% of the total corporate salaries and related were allocated to RFS.

6. **Office Rent:** The headquarters location of RFS is shared with various other entities including RDI, the annual allocation of rent is ~$90 thousand for RFS, these amounts grow at 2% starting after year 3 due to forecasted inflation.

7. **Cost of Growth:** These are forecasted expenses that RFS is assumed to incur in order to sell new franchises.

8. **Operating Expenses:** 30% of the total operating expenses were allocated to RFS in addition to 100% of the Creative Management Fee expense.

9. **Founders Medical:** 30% of the total Founders Medical was allocated to RFS.

10. **Pre & Post-Petition Netdown:** RDI has pre-petition and post-petition Gift Card Reimbursement Obligations to the Franchisees and the Franchisees have past due royalty payments to RFS. After the netdown process pursuant to the order approving the netdown motion, the franchisees are expected to owe $883,279 to Ruby's.

11. **Professional Expenses:** Total professional fees for RFS are estimated to be $455,000. The model currently reflects a $0 payment to professionals as terms of payments are still under negotiation. The list of professionals who provided services to RFS are below.
    - Theodora Oringher
    - Armory Consulting

12. **RFS Opus:** $80 thousand is paid to Opus Bank on the Effective Date which is assumed to be applied towards the total principal loan balance. The RFS Note balance is assumed to be ~$1.2 million with payments being made based on a 4-year amortization with an interest rate of 5.5%.

13. **SLC RF Note:** The Plan Sponsor has a $1 million note owing by RFS which he will convert to equity on the effective date.   His accrued interest amount owing is assumed to be paid on the Effective Date.

14. **Unsecured Creditors:** RFS has general unsecured obligations of ~$430 thousand, these creditors are assumed to be paid 100% on a four-year basis.

15. **Transfers between Entities:** The transfers between entities are assumed in the model to maintain working capital reserves for each entity.

**Ruby's Huntington Beach ("HB") – Cash Flow Projections Assumptions**

1. **Pre-Petition Gift Cards from RDI:** Pre-petition gift cards obligation that RDI owes to the restaurant are assumed to be treated the same as other RDI unsecured creditors.

2. **HB Rent Contingency:** Cash reserved for percentage rent payment.

3. **\*Seasonal AP Contingency:** Accounts Payable are generally on 45+ day terms. Cash needs to be reserved for payments to Accounts Payable vendors during the slow season after the Effective Date.

4. **\*Professional Expenses**: Total professional fees for HB is estimated to be $305,610. The model currently reflects a $0 payment to professionals as terms of payments are still under negotiation.

5. **\*HOPL Opus Bank**: ~$136 thousand is assumed to be paid to Opus Bank on the Effective Date to be applied towards the total principal loan balance. The HOPL Note balance is assumed to be ~$2.6 million with payments being made based on a 10-year amortization with an interest rate of 5.5% and a balloon payment for the remaining balance owing at 5 years.

6. **\*C&C Partnership:** The C&C balance is assumed to be ~$300 thousand with payments being made based on a 10-year amortization with an interest rate of 9.5% and a balloon payment for remaining balance owing at 7 years.

7. **US Foods 503(b)(9):** US Foods is assumed to be paid a total of ~$64 thousand in the first year for their 503(b)(9) claims which are the value of goods sold and delivered to the debtor entities in the ordinary course of business within the 20 days immediately prior to the commencement of the debtors' bankruptcy cases.

8. **\*US Foods Term Change Payments:** US Foods terms are assumed to change from 45 days to 30 days beginning at the end of year 1.

9. **Unsecured Creditors:** Unsecured Creditors are paid according to the pot calculation.

10. **Plan Sponsor Contribution:** The plan sponsor is assumed to be contributing this amount to RDI on the effective date.

11. **Transfers between Entities:** The transfers between entities are assumed in the model to maintain working capital reserves on every entity as shown on each entity's projections.

*These amounts were allocated based on the following schedule based on each entity's value after the deduction of accrued post-petition administrative expenses and US Foods 503(b)(9) claim, please see the Pot Calculation section for more detail:

| | |
|---|---|
| **HB** | **56.6%** |
| **OS** | **31.2%** |
| **PS** | **12.2%** |

**Ruby's Oceanside ("OS") – Cash Flow Projections Assumptions**

1. **Pre-Petition Gift Cards from RDI:** Pre-petition gift cards obligation that RDI owes to the restaurant is assumed to be treated the same as other RDI unsecured creditors.

2. **\*Seasonal AP Contingency:** Accounts Payable are generally on 45+ day terms. Cash needs to be reserved for payments to Accounts Payable vendors during the slow season after the Effective Date.

3. **\*Professional Expenses**: Total professional fees for OS is estimated to be $168,473. The model currently reflects a $0 payment to professionals as terms of payments are still under negotiation.

4. **\*HOPL Opus Bank**: ~$136 thousand is assumed to be paid to Opus Bank on the Effective Date to be applied towards the total principal loan balance. The HOPL Note balance is assumed to be ~$2.6 million with payments being made based on a 10-year amortization with an interest rate of 5.5% and a balloon payment for the total amount owing at 5 years.

5. **\*C&C Partnership:** The C&C balance is assumed to be ~$300 thousand with payments being made based on a 10-year amortization with an interest rate of 9.5% and a balloon payment for the remaining balance owing at 7 years.

6. **O/S NNN Property Tax:** Cash reserved for NNN property tax payments.

7. **US Foods 503(b)(9):** US Foods is assumed to be paid a total of ~$51 thousand in the first year for their 503(b)(9) claims which are the value of goods sold and delivered to the debtor entities in the ordinary course of business within the 20 days immediately prior to the commencement of the debtors' bankruptcy cases.

8. **\*US Foods Term Change Payments:** US Foods terms are assumed to change from 45 days to 30 days beginning at the end of year 1.

9. **Unsecured Creditors:** Unsecured Creditors are paid according to the pot calculation.

10. **Plan Sponsor Contribution:** The plan sponsor is assumed to be contributing this amount to RDI on the effective date.

11. **Transfers between Entities:** The transfers between entities are assumed in the model to maintain working capital reserves for every entity as shown on each entity's projections.

\*These amounts were allocated based on the following schedule based on each entity's value after the deduction of accrued post-petition administrative expenses and US Foods 503(b)(9) claim, please see the Pot Calculation section for more detail:

| | |
|---|---|
| **HB** | **56.6%** |
| **OS** | **31.2%** |
| **PS** | **12.2%** |

**Ruby's Palm Springs ("PS") – Cash Flow Projections Assumptions**

1. **Pre-Petition Gift Cards from RDI:** Pre-petition gift cards obligation that RDI owes to the restaurant is assumed to be treated the same as other RDI unsecured creditors.

2. **\*Seasonal AP Contingency:** Accounts Payable are generally on 45+ day terms. Cash needs to be reserved for payments to Accounts Payable vendors during the slow season after the Effective Date.

3. **\*Professional Expenses**: Total professional fees for PS is estimated to be $65,917. The model currently reflects a $0 payment to professionals as terms of payments are still under negotiation.

4. **\*HOPL Opus Bank**: ~$136 thousand is assumed to be paid to Opus Bank on the Effective Date to be applied towards the total principal loan balance. The HOPL Note balance is assumed to be ~$2.6 million with payments being made based on a 10-year amortization with an interest rate of 5.5% and a balloon payment for the remaining balance owing at 5 years.

5. **\*C&C Partnership:** The C&C balance is assumed to be ~$300 thousand with payments being made based on a 10-year amortization with an interest rate of 9.5% and a balloon payment for the remaining balance owing at 7 years.

6. **US Foods 503(b)(9):** US Foods is assumed to be paid a total of ~$25 thousand in the first year for their 503(b)(9) claims which are the value of goods sold and delivered to the debtor entities in the ordinary course of business within the 20 days immediately prior to the commencement of the debtors' bankruptcy cases.

7. **\*US Foods Term Change Payments:** US Foods terms are assumed to change from 45 days to 30 days beginning at the end of year 1.

8. **Unsecured Creditors:** Unsecured Creditors are paid according to the pot calculation.

9. **Plan Sponsor Contribution:** The plan sponsor is assumed to be contributing this amount to RDI on the effective date.

10. **Transfers between Entities:** The transfers between entities are assumed in the model to maintain working capital reserves for every entity as shown on each entity's projections.

\*These amounts were allocated based on the following schedule based on each entity's value after the deduction of accrued post-petition administrative expenses and US Foods 503(b)(9) claim, please see the Pot Calculation section for more detail:

| | |
|---|---|
| HB | 56.6% |
| OS | 31.2% |
| PS | 12.2% |

**Ruby's SoCal ("SoCal") – Cash Flow Projections Assumptions**

1. **SoCal Unsecured:** SoCal unsecured creditors are assumed to be paid a pot amount of ~$33 thousand which is based on 2.5% of the current unsecured claims outstanding. Please see the Pot Plan Calculations.

2. **Transfers between Entities:** RDI is assumed to be funding this payment to the unsecured creditors and is assumed to be not reimbursed since SoCal has no source of income.

**Ruby's Diner Inc (RDI)**
**Cash Flow Projections**

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| License Fee from RFS [1] | - | 533,611 | 584,884 | 641,251 | 798,987 | 1,005,006 |
| G&A Fees [2] | | 1,094,438 | 1,106,095 | 1,129,680 | 1,147,437 | 1,164,649 |
| LP/LLC Distributions to RDI [3] | - | 183,465 | 162,731 | 178,367 | 181,042 | 183,758 |
| **Total Revenue** | **-** | **1,811,514** | **1,853,710** | **1,949,298** | **2,127,466** | **2,353,413** |
| | | | | | | |
| **Expenses** | | | | | | |
| Salaries & Related [4] | - | 1,049,328 | 1,053,244 | 1,013,544 | 1,088,674 | 1,178,792 |
| Office Rent [5] | - | 55,486 | 55,486 | 56,596 | 57,728 | 58,883 |
| Operating Expenses [6] | - | 260,235 | 265,440 | 270,748 | 276,163 | 281,687 |
| Founders Medical [7] | - | 92,820 | 94,676 | 96,570 | 98,501 | 100,471 |
| **Total Expenses** | **-** | **1,457,869** | **1,468,847** | **1,437,458** | **1,521,066** | **1,619,832** |
| **EBITDA** | **-** | **353,645** | **384,863** | **511,840** | **606,400** | **733,581** |
| | | | | | | |
| **Professional Expenses [8]** | | | | | | |
| Glass Ratner | | - | - | - | - | - |
| RDI GU Committee Professionals | | - | - | - | - | - |
| PSZJ | | - | - | - | - | - |
| AFP Saddington | | - | - | - | - | - |
| **Total Professional Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Secured Creditors** | | | | | | |
| Secured NH Interest [9] | 129,546 | 64,773 | 64,773 | 64,773 | 64,773 | 64,773 |
| **Total Secured Creditors** | **129,546** | **64,773** | **64,773** | **64,773** | **64,773** | **64,773** |
| | | | | | | |
| **Priority Creditors and Other Payments** | | | | | | |
| US Trustee | - | 40,839 | - | - | - | - |
| Donlin Recano | | - | - | - | - | - |
| FUTA RDI | - | 16,972 | 16,972 | - | - | - |
| Property Tax | 8,752 | | | | | |
| Federal Business Tax | 200 | | | | | |
| Worker's Comp Special Assessment [10] | - | 82,990 | 82,990 | 82,990 | 82,990 | 82,990 |
| Worker's Comp Special Assessment Reimbursements [10] | - | (50,955) | (50,955) | (50,955) | (50,955) | (50,955) |
| Post-Petition GC (Anaheim, Morongo) [11] | 39,096 | - | | | | |
| Expected Future Costco Redemption Payments [12] | - | 220,000 | 170,000 | 120,000 | 70,000 | 70,000 |
| Deferred Comp | - | 80,000 | - | - | - | - |
| **Total Secured and Priority Creditors** | **48,048** | **389,847** | **219,007** | **152,035** | **102,035** | **102,035** |
| | | | | | | |
| **Unsecured Creditors [13]** | | | | | | |
| Unsecured Noteholders | | - | - | - | - | - |
| RDI GU Creditors | | - | - | - | - | - |
| HOPL Gift Cards | | - | - | - | - | - |
| **Total Unsecured Creditors** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Total Plan Payments** | **48,048** | **389,847** | **219,007** | **152,035** | **102,035** | **102,035** |
| | | | | | | |
| **Beginning Cash** | | 101,095 | 1,921,596 | 1,441,593 | 1,730,500 | 2,243,821 | 2,878,237 |
| Change in Cash | | (177,594) | (100,975) | 101,083 | 295,032 | 439,592 | 566,773 |
| Plan Sponsor Contribution [14] | | 2,175,000 | | | | | |
| Transfers from (to) RFS [15] | | | | | | |
| Transfers from (to) HB [15] | | (119,318) | (169,534) | 83,572 | 88,113 | 92,722 | 97,400 |
| Transfers from (to) OS [15] | | (8,338) | (45,831) | 137,578 | 163,293 | 168,295 | 172,632 |
| Transfers from (to) PS [15] | | (13,249) | (154,499) | (33,326) | (33,116) | (32,904) | (32,689) |
| Transfers from (to) SoCal [15] | | (36,000) | (9,164) | - | - | (33,289) | - |
| **Ending Cash** | | **1,921,596** | **1,441,593** | **1,730,500** | **2,243,821** | **2,878,237** | **3,682,353** |

**Ruby's Franchise Systems (RFS)**

## Cash Flow Projections

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Royalty Projection** | | | | | | |
| Ardmore PA | - | 53,879 | 54,956 | 56,055 | 57,176 | 58,320 |
| Brinton Lake PA | - | 95,216 | 97,121 | 99,063 | 101,044 | 103,065 |
| Downey | - | - | - | - | - | - |
| Citadel | - | 206,382 | 210,510 | 214,720 | 219,015 | 223,395 |
| Laguna Beach | - | 87,232 | 88,977 | 90,756 | 92,571 | 94,423 |
| Corona Del Mar | - | 86,196 | 87,920 | 89,678 | 91,472 | 93,301 |
| San Clemente | - | 122,071 | 124,512 | 127,002 | 129,542 | 132,133 |
| Brea | - | 100,000 | 102,000 | 104,040 | 106,121 | 108,243 |
| Mission Viejo Mall | - | 65,975 | 67,295 | 68,640 | 70,013 | 71,414 |
| Carlsbad | - | 149,268 | 152,254 | 155,299 | 158,405 | 161,573 |
| Balboa Pier | - | 96,667 | 98,600 | 100,572 | 102,584 | 104,636 |
| Redondo Beach | - | 77,741 | 79,295 | 80,881 | 82,499 | 84,149 |
| San Juan Capistrano | - | - | - | - | - | - |
| Laguna Hills | - | 61,909 | 63,147 | 64,410 | 65,698 | 67,012 |
| Whittwood Mall | - | - | - | - | - | - |
| Palos Verde | - | 47,948 | 48,907 | 49,885 | 50,882 | 51,900 |
| Orange | - | 74,869 | - | - | - | - |
| North Hollywood | - | - | - | - | - | - |
| Tustin | - | 71,469 | 72,899 | 74,357 | 75,844 | 77,361 |
| Anaheim | - | - | - | - | - | - |
| Atlantic City | - | 65,209 | 66,513 | 67,843 | 69,200 | 70,584 |
| Orange County | - | 167,382 | 170,730 | 174,145 | 177,627 | 181,180 |
| Las Vegas | - | 208,589 | 212,761 | 217,016 | 221,356 | 225,783 |
| Houston | - | 218,412 | 222,780 | - | - | - |
| **Royalty Income-Existing Franchises** | - | **2,056,413** | **2,021,175** | **1,834,363** | **1,871,050** | **1,908,471** |
| Total New Franchise Royalty [1] | - | 78,030 | 318,362 | 730,642 | 1,324,897 | 2,111,555 |
| **Total Royalty Revenue** | - | **2,134,443** | **2,339,537** | **2,565,005** | **3,195,947** | **4,020,026** |
| Sale of Franchise Rights [2] | - | 225,000 | 225,000 | 300,000 | 375,000 | 450,000 |
| Creative Management Fee from Franchisees [3] | - | 265,711 | 250,025 | 271,939 | 301,529 | 339,233 |
| **Total Franchise Revenue** | - | **2,625,154** | **2,814,563** | **3,136,943** | **3,872,476** | **4,809,259** |
| | | | | | | |
| **Expenses** | | | | | | |
| License Fee to RDI [4] | - | 533,611 | 584,884 | 641,251 | 798,987 | 1,005,006 |
| Salaries & Related [5] | - | 449,712 | 451,390 | 434,376 | 466,574 | 505,196 |
| Office Rent [6] | - | 90,299 | 90,299 | 92,105 | 93,948 | 95,827 |
| Cost of Growth [7] | - | 124,410 | 176,195 | 219,980 | 273,765 | 363,200 |
| Operating Expenses [8] | - | 377,240 | 363,785 | 387,974 | 419,885 | 459,956 |
| Founders Medical [9] | - | 39,780 | 40,576 | 41,387 | 42,215 | 43,059 |
| **Total Expenses** | | **1,615,052** | **1,707,130** | **1,817,073** | **2,095,374** | **2,472,245** |
| **EBITDA** | | **1,010,102** | **1,107,433** | **1,319,870** | **1,777,103** | **2,337,014** |
| | | | | | | |
| **Pre & Post-Petition Netdown [10]** | 735,000 | 148,279 | - | - | - | - |
| | | | | | | |
| **Professional Expenses [11]** | | | | | | |
| Legal-Theodora Oringher | | - | - | - | - | - |
| Armory Consulting | | - | - | - | - | - |
| **Total Professional Expenses** | - | - | - | - | - | - |
| | | | | | | |
| **Secured Creditors** | | | | | | |
| RFS Opus [12] | 80,000 | 335,284 | 335,284 | 335,284 | 335,284 | - |
| **Total Secured Creditors** | **80,000** | **335,284** | **335,284** | **335,284** | **335,284** | **-** |
| | | | | | | |
| **Priority Creditors and Other Payments** | | | | | | |
| US Trustee | - | 19,500 | - | - | - | - |
| Employment Tax | 15,372 | | | | | |
| SLC RFS Note [13] | 120,000 | - | - | - | - | - |
| **Total Priority Creditors and Other Payments** | **135,372** | **19,500** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Unsecured Creditors [14]** | | | | | | |
| RFS GU Creditors | 19,952 | 114,054 | 114,054 | 114,054 | 114,054 | - |
| **Total Unsecured Creditors** | **19,952** | **114,054** | **114,054** | **114,054** | **114,054** | **-** |
| | | | | | | |
| **Total Plan Payments** | **155,324** | **133,554** | **114,054** | **114,054** | **114,054** | **-** |
| | | | | | | |
| **Beginning Cash** | **351,630** | **851,306** | **1,540,848** | **2,198,942** | **3,069,473** | **4,397,238** |
| Change in Cash | 499,676 | 689,542 | 658,094 | 870,532 | 1,327,764 | 2,337,014 |
| Transfer from (to) RDI [15] | - | | | | | |
| **Ending Cash** | **851,306** | **1,540,848** | **2,198,942** | **3,069,473** | **4,397,238** | **6,734,252** |

**Ruby's Huntington Beach (HB)**

**Cash Flow Projections**

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Total Revenues** | | **4,588,518** | **4,657,345** | **4,727,205** | **4,798,114** | **4,870,085** |
| | | | | | | |
| Total Cost of Sales | | 1,130,122 | 1,145,707 | 1,162,892 | 1,180,336 | 1,198,041 |
| Total Labor | | 1,634,211 | 1,658,015 | 1,682,885 | 1,708,129 | 1,733,750 |
| Total Supplies | | 90,517 | 79,175 | 80,362 | 81,568 | 82,791 |
| Total Operating Expense | | 594,000 | 600,798 | 609,809 | 618,957 | 628,241 |
| **Unit Level EBITDAR** | | **1,139,668** | **1,173,651** | **1,191,256** | **1,209,125** | **1,227,261** |
| Total Occupancy | | 447,065 | 451,762 | 458,539 | 465,417 | 472,398 |
| Total Corporate Overhead & Other | | 368,555 | 372,588 | 378,176 | 383,849 | 389,607 |
| **Unit Level EBITDA (with allocations)** | | **324,048** | **349,301** | **354,540** | **359,859** | **365,256** |
| Capital Expenditures | | 91,770 | 46,573 | 47,272 | 47,981 | 48,701 |
| **Unit Level Cash Flow** | | **232,278** | **302,727** | **307,268** | **311,877** | **316,556** |
| | | | | | | |
| **Pre-Petition Gift Cards from RDI (In RDI Unsecured Pool) [1]** | - | - | - | - | - | - |
| | | | | | | |
| **Contingency** | | | | | | |
| HB Rent Contingency [2] | 290,000 | - | - | - | - | - |
| Seasonal AP Contingency [3] | 113,189 | - | - | - | - | - |
| **Total Contingency** | **403,189** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Professional Expenses [4]** | | | | | | |
| PSZJ | | - | - | - | - | - |
| **Total Professional Expenses** | **-** | **-** | **-** | **-** | **-** | |
| | | | | | | |
| **Secured Creditors** | | | | | | |
| HOPL Opus Bank [5] | 77,491 | 193,012 | 193,012 | 193,012 | 193,012 | 193,012 |
| C&C Partnership [6] | - | 26,144 | 26,144 | 26,144 | 26,144 | 26,144 |
| **Total Secured Creditors** | **77,491** | **219,155** | **219,155** | **219,155** | **219,155** | **219,155** |
| | | | | | | |
| **Priority Creditors and Other Payments** | | | | | | |
| HB Property Tax | 2,785 | | | | | |
| US Trustee Fees | | 19,500 | | | | |
| Franchise Tax Board | 800 | | | | | |
| US Foods 503(b)(9) Payments [7] | | 64,116 | | | | |
| US Foods Term Change Payments [8] | | 42,446 | | | | |
| **Total Priority Creditors and Other Payments** | **3,585** | **126,062** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Unsecured Creditors [9]** | | | | | | |
| Unsecured Creditor Payments (Total Pot) | 113,189 | | | | | |
| **Total Unsecured** | **113,189** | | | | | |
| | | | | | | |
| **Total Plan Payments** | **116,774** | **126,062** | **-** | **-** | **-** | **-** |
| | | | | | | |
| | | | | | | |
| **Beginning Cash** | **421,541** | **56,594** | **113,189** | **113,189** | **113,189** | **113,189** |
| Change in Cash | (597,454) | (112,940) | 83,572 | 88,113 | 92,722 | 97,400 |
| Plan Sponsor Contribution [10] | 113,189 | - | - | - | - | - |
| Transfers from (to) RDI [11] | 119,318 | 169,534 | (83,572) | (88,113) | (92,722) | (97,400) |
| **Ending Cash** | **56,594** | **113,189** | **113,189** | **113,189** | **113,189** | **113,189** |

**Ruby's Oceanside (OS)**

**Cash Flow Projections**

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Total Revenues** | | **3,787,393** | **3,844,203** | **3,891,866** | **3,960,394** | **4,019,800** |
| Total Cost of Sales | | 946,848 | 961,051 | 972,967 | 990,099 | 1,004,950 |
| Total Controllable Labor | | 880,331 | 891,855 | 902,913 | 918,811 | 932,594 |
| Total Labor Fixed | | 236,326 | 238,341 | 241,296 | 245,544 | 249,228 |
| Total Labor Employee Related | | 238,544 | 242,185 | 245,188 | 249,505 | 253,247 |
| Total Labor | | 1,355,201 | 1,372,380 | 1,389,396 | 1,413,861 | 1,435,069 |
| Total Supplies | | 75,803 | 65,351 | 66,162 | 67,327 | 68,337 |
| Total Operating Expense | | 500,000 | 507,435 | 513,726 | 522,772 | 530,614 |
| Total Non Controllable Expense | | - | | | | |
| Unit Level EBITDAR | | 308,000 | 311,380 | 315,241 | 320,792 | 325,604 |
| Total Occupancy | | 601,541 | 626,605 | 634,374 | 645,544 | 655,227 |
| Total Corporate Overhead & Other | | 302,991 | 307,536 | 311,349 | 316,832 | 321,584 |
| **Unit Level EBITDA (with allocations)** | | **298,550** | **319,069** | **323,025** | **328,713** | **333,643** |
| Capital Expenditures | | 75,748 | 38,442 | 38,919 | 39,604 | 40,198 |
| **Unit Level Cash Flow** | | **222,802** | **280,627** | **284,106** | **289,109** | **293,445** |
| | | | | | | |
| **Pre-Petition Gift Cards from RDI (In RDI Unsecured Pool) [1]** | - | - | - | - | - | - |
| | | | | | | |
| **Contingency** | | | | | | |
| Seasonal AP Contingency [2] | 62,397 | - | - | - | - | - |
| **Total Contingency** | **62,397** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Professional Expenses [3]** | | | | | | |
| PSZJ | | - | - | - | - | - |
| **Total Professional Expenses** | **-** | **-** | **-** | **-** | **-** | |
| | | | | | | |
| **Secured Creditors** | | | | | | |
| HOPL Opus Bank [4] | 42,718 | 106,401 | 106,401 | 106,401 | 106,401 | 106,401 |
| C&C Partnership [5] | - | 14,412 | 14,412 | 14,412 | 14,412 | 14,412 |
| **Total Secured Creditors** | **42,718** | **120,814** | **120,814** | **120,814** | **120,814** | **120,814** |
| | | | | | | |
| **Priority Creditors and Other Payments** | | | | | | |
| US Trustee Fee | | 19,500 | | | | |
| City of Oceanside Lease Cure Payments | 13,920 | - | - | - | - | - |
| Franchise Tax Board | 800 | | | | | |
| O/S NNN Property Tax [6] | - | 22,235 | 22,235 | - | - | - |
| US Foods 503(b)(9) Payments [7] | - | 51,487 | - | - | - | - |
| US Foods Term Change Payments [8] | - | 23,399 | - | - | - | - |
| **Total Priority Creditors and Other Payments** | **14,720** | **116,621** | **22,235** | **-** | **-** | **-** |
| | | | | | | |
| **Unsecured Creditors [9]** | | | | | | |
| Unsecured Creditor Payments (Total Pot) | 62,397 | | | | | |
| **Total Unsecured** | **62,397** | | | | | |
| | | | | | | |
| **Total Plan Payments** | **77,117** | **116,621** | **22,235** | **-** | **-** | **-** |
| | | | | | | |
| | | | | | | |
| **Beginning Cash** | **142,696** | **31,199** | **62,397** | **62,397** | **62,397** | **62,397** |
| Change in Cash | (182,233) | (14,632) | 137,578 | 163,293 | 168,295 | 172,632 |
| Plan Sponsor Contribution [10] | 62,397 | - | - | - | - | - |
| Transfers from (to) RDI [11] | 8,338 | 45,831 | (137,578) | (163,293) | (168,295) | (172,632) |
| **Ending Cash** | **31,199** | **62,397** | **62,397** | **62,397** | **62,397** | **62,397** |

**Ruby's Palm Springs (PS)**

**Cash Flow Projections**

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Total Revenues** | | **2,289,686** | **2,324,031** | **2,358,891** | **2,394,275** | **2,430,189** |
| Total Cost of Sales | | 613,000 | 613,544 | 622,747 | 632,089 | 641,570 |
| Total Controllable Labor | | 520,000 | 520,583 | 528,392 | 536,318 | 544,362 |
| Total Labor Fixed | | 165,000 | 165,006 | 167,481 | 169,994 | 172,543 |
| Total Labor Employee Related | | 155,000 | 155,710 | 158,046 | 160,416 | 162,823 |
| Total Labor | | 840,000 | 841,299 | 853,919 | 866,728 | 879,728 |
| Total Supplies | | 48,000 | 48,805 | 49,537 | 50,280 | 51,034 |
| Total Operating Expense | | 338,000 | 336,984 | 342,039 | 347,170 | 352,377 |
| Total Non Controllable Expense | | - | | | | |
| Unit Level EBITDAR | | 260,000 | 260,291 | 264,196 | 268,159 | 272,181 |
| Total Occupancy | | 190,686 | 223,107 | 226,454 | 229,850 | 233,298 |
| Total Corporate Overhead & Other | | 185,922 | 185,922 | 188,711 | 191,542 | 194,415 |
| **Unit Level EBITDA (with allocations)** | | **4,764** | **37,184** | **37,742** | **38,308** | **38,883** |
| Capital Expenditures | | 45,794 | 23,240 | 23,589 | 23,943 | 24,302 |
| **Unit Level Cash Flow** | | **(41,030)** | **13,944** | **14,153** | **14,366** | **14,581** |
| | | | | | | |
| **Pre-Petition Gift Cards from RDI (In RDI Unsecured Pool) [1]** | - | | - | - | - | - |
| | | | | | | |
| **Contingency** | | | | | | |
| Seasonal AP Contingency [2] | 24,414 | - | - | - | - | - |
| **Total Contingency** | **24,414** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Professional Expenses [3]** | | | | | | |
| PSZJ | | - | - | - | - | - |
| **Total Professional Expenses** | **-** | **-** | **-** | **-** | **-** | |
| | | | | | | |
| **Secured Creditors** | | | | | | |
| HOPL Opus [4] | 16,714 | 41,631 | 41,631 | 41,631 | 41,631 | 41,631 |
| C&C Partnership [5] | - | 5,639 | 5,639 | 5,639 | 5,639 | 5,639 |
| **Total Secured Creditors** | **16,714** | **47,270** | **47,270** | **47,270** | **47,270** | **47,270** |
| | | | | | | |
| **Priority Creditors and Other Payments** | | | | | | |
| US Trustee Fee | | 19,500 | | | | |
| Palm Springs Lease Cure Payment | 21,286 | - | - | - | - | |
| Franchise Tax Board | 800 | | | | | |
| US Foods 503(b)(9) Payments [6] | | 25,337 | | | | |
| US Foods Term Change Payments [7] | | 9,155 | | | | |
| **Total Priority Creditors and Other Payments** | **22,086** | **53,992** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Unsecured Creditors [8]** | | | | | | |
| Unsecured Creditor Payments | 24,414 | | | | | |
| **Total Unsecured** | **24,414** | | | | | |
| | | | | | | |
| **Total Plan Payments** | **46,500** | **53,992** | **-** | **-** | **-** | **-** |
| | | | | | | |
| | | | | | | |
| **Beginning Cash** | | **62,172** | **12,207** | **24,414** | **24,414** | **24,414** | 
| Change in Cash | | (87,628) | (142,292) | (33,326) | (33,116) | (32,904) | (32,689) |
| Plan Sponsor Contribution [9] | 24,414 | - | - | - | - | - |
| Transfers from (to) RDI [10] | 13,249 | 154,499 | 33,326 | 33,116 | 32,904 | 32,689 |
| **Ending Cash** | | **12,207** | **24,414** | **24,414** | **24,414** | **24,414** | **24,414** |

**Ruby's SoCal Diners (SoCal)**

**Cash Flow Projections**

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Secured and Priority Creditors** | | | | | | |
| Laguna Hills Lease Settlement | 36,000 | | | | | |
| US Trustee Fee | | 650 | | | | |
| Laguna Hills US Foods Settlement | | 8,514 | | | | |
| SoCal Unsecured [1] | - | - | | - | 33,289 | - |
| **Total Secured and Priority Creditors** | **36,000** | **9,164** | **-** | **-** | **33,289** | **-** |
| | | | | | | |
| **Total Plan Payments** | **36,000** | **9,164** | **-** | **-** | **33,289** | **-** |
| | | | | | | |
| **Beginning Cash** | **-** | **-** | **-** | **-** | **-** | **-** |
| Change in Cash | (36,000) | (9,164) | - | - | (33,289) | - |
| Transfer from (to) RDI [2] | 36,000 | 9,164 | - | - | 33,289 | - |
| **Ending Cash** | **-** | **-** | **-** | **-** | **-** | **-** |

**Ruby's Diner Inc (RDI)**

## Cash Flow Projections

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| License Fee from RFS [1] | - | 533,611 | 584,884 | 641,251 | 798,987 | 1,005,006 |
| G&A Fees [2] | | 1,094,438 | 1,106,095 | 1,129,680 | 1,147,437 | 1,164,649 |
| LP/LLC Distributions to RDI [3] | - | 183,465 | 162,731 | 178,367 | 181,042 | 183,758 |
| **Total Revenue** | **-** | **1,811,514** | **1,853,710** | **1,949,298** | **2,127,466** | **2,353,413** |
| | | | | | | |
| **Expenses** | | | | | | |
| Salaries & Related [4] | - | 1,049,328 | 1,053,244 | 1,013,544 | 1,088,674 | 1,178,792 |
| Office Rent [5] | - | 55,486 | 55,486 | 56,596 | 57,728 | 58,883 |
| Operating Expenses [6] | - | 260,235 | 265,440 | 270,748 | 276,163 | 281,687 |
| Founders Medical [7] | - | 92,820 | 94,676 | 96,570 | 98,501 | 100,471 |
| **Total Expenses** | **-** | **1,457,869** | **1,468,847** | **1,437,458** | **1,521,066** | **1,619,832** |
| **EBITDA** | **-** | **353,645** | **384,863** | **511,840** | **606,400** | **733,581** |
| | | | | | | |
| **Professional Expenses [8]** | | | | | | |
| Glass Ratner | | - | - | - | - | - |
| RDI GU Committee Professionals | | - | - | - | - | - |
| PSZJ | | - | - | - | - | - |
| AFP Saddington | | - | - | - | - | - |
| **Total Professional Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Secured Creditors** | | | | | | |
| Secured NH Interest [9] | 129,546 | 64,773 | 64,773 | 64,773 | 64,773 | 64,773 |
| **Total Secured Creditors** | **129,546** | **64,773** | **64,773** | **64,773** | **64,773** | **64,773** |
| | | | | | | |
| **Priority Creditors and Other Payments** | | | | | | |
| US Trustee | - | 40,839 | - | - | - | - |
| Donlin Recano | | - | - | - | - | - |
| FUTA RDI | - | 16,972 | 16,972 | - | - | - |
| Property Tax | 8,752 | | | | | |
| Federal Business Tax | 200 | | | | | |
| Worker's Comp Special Assessment [10] | - | 82,990 | 82,990 | 82,990 | 82,990 | 82,990 |
| Worker's Comp Special Assessment Reimbursements [10] | - | (50,955) | (50,955) | (50,955) | (50,955) | (50,955) |
| Post-Petition GC (Anaheim, Morongo) [11] | 39,096 | - | - | - | - | - |
| Expected Future Costco Redemption Payments [12] | - | 220,000 | 170,000 | 120,000 | 70,000 | 70,000 |
| Deferred Comp | - | 80,000 | - | - | - | - |
| **Total Secured and Priority Creditors** | **48,048** | **389,847** | **219,007** | **152,035** | **102,035** | **102,035** |
| | | | | | | |
| **Unsecured Creditors [13]** | | | | | | |
| Unsecured Noteholders | - | - | 340,266 | 340,266 | 340,266 | 340,266 |
| RDI GU Creditors | - | - | 212,533 | 212,533 | 212,533 | 212,533 |
| HOPL Gift Cards | - | - | 72,201 | 72,201 | 72,201 | 72,201 |
| **Total Unsecured Creditors** | **-** | **-** | **625,000** | **625,000** | **625,000** | **625,000** |
| | | | | | | |
| **Total Plan Payments** | **48,048** | **389,847** | **844,007** | **777,035** | **727,035** | **727,035** |
| | | | | | | |
| **Beginning Cash** | 101,095 | 2,921,596 | 2,441,593 | 2,177,701 | 2,138,223 | 2,219,840 |
| Change in Cash | (177,594) | (100,975) | (523,917) | (329,968) | (185,408) | (58,227) |
| Plan Sponsor Contribution [14] | 2,175,000 | | | | | |
| Additional D&R Dilutive Funding | 1,000,000 | | | | | |
| Transfers from (to) RFS [15] | | | | | | |
| Transfers from (to) HB [15] | (119,318) | (169,534) | 125,164 | 129,704 | 134,314 | 138,992 |
| Transfers from (to) OS [15] | (8,338) | (45,831) | 157,286 | 183,001 | 188,004 | 192,340 |
| Transfers from (to) PS [15] | (13,249) | (154,499) | (22,425) | (22,215) | (22,003) | (21,788) |
| Transfers from (to) SoCal [15] | (36,000) | (9,164) | - | - | (33,289) | - |
| **Ending Cash** | **2,921,596** | **2,441,593** | **2,177,701** | **2,138,223** | **2,219,840** | **2,471,157** |

**Ruby's Franchise Systems (RFS)**
## Cash Flow Projections

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Royalty Projection** | | | | | | |
| Ardmore PA | - | 53,879 | 54,956 | 56,055 | 57,176 | 58,320 |
| Brinton Lake PA | - | 95,216 | 97,121 | 99,063 | 101,044 | 103,065 |
| Downey | - | - | - | - | - | - |
| Citadel | - | 206,382 | 210,510 | 214,720 | 219,015 | 223,395 |
| Laguna Beach | - | 87,232 | 88,977 | 90,756 | 92,571 | 94,423 |
| Corona Del Mar | - | 86,196 | 87,920 | 89,678 | 91,472 | 93,301 |
| San Clemente | - | 122,071 | 124,512 | 127,002 | 129,542 | 132,133 |
| Brea | - | 100,000 | 102,000 | 104,040 | 106,121 | 108,243 |
| Mission Viejo Mall | - | 65,975 | 67,295 | 68,640 | 70,013 | 71,414 |
| Carlsbad | - | 149,268 | 152,254 | 155,299 | 158,405 | 161,573 |
| Balboa Pier | - | 96,667 | 98,600 | 100,572 | 102,584 | 104,636 |
| Redondo Beach | - | 77,741 | 79,295 | 80,881 | 82,499 | 84,149 |
| San Juan Capistrano | - | - | - | - | - | - |
| Laguna Hills | - | 61,909 | 63,147 | 64,410 | 65,698 | 67,012 |
| Whittwood Mall | - | - | - | - | - | - |
| Palos Verde | - | 47,948 | 48,907 | 49,885 | 50,882 | 51,900 |
| Orange | - | 74,869 | - | - | - | - |
| North Hollywood | - | - | - | - | - | - |
| Tustin | - | 71,469 | 72,899 | 74,357 | 75,844 | 77,361 |
| Anaheim | - | - | - | - | - | - |
| Atlantic City | - | 65,209 | 66,513 | 67,843 | 69,200 | 70,584 |
| Orange County | - | 167,382 | 170,730 | 174,145 | 177,627 | 181,180 |
| Las Vegas | - | 208,589 | 212,761 | 217,016 | 221,356 | 225,783 |
| Houston | - | 218,412 | 222,780 | - | - | - |
| **Royalty Income-Existing Franchises** | - | **2,056,413** | **2,021,175** | **1,834,363** | **1,871,050** | **1,908,471** |
| Total New Franchise Royalty [1] | - | 78,030 | 318,362 | 730,642 | 1,324,897 | 2,111,555 |
| **Total Royalty Revenue** | - | **2,134,443** | **2,339,537** | **2,565,005** | **3,195,947** | **4,020,026** |
| Sale of Franchise Rights [2] | - | 225,000 | 225,000 | 300,000 | 375,000 | 450,000 |
| Creative Management Fee from Franchisees [3] | - | 265,711 | 250,025 | 271,939 | 301,529 | 339,233 |
| **Total Franchise Revenue** | - | **2,625,154** | **2,814,563** | **3,136,943** | **3,872,476** | **4,809,259** |
| | | | | | | |
| **Expenses** | | | | | | |
| License Fee to RDI [4] | - | 533,611 | 584,884 | 641,251 | 798,987 | 1,005,006 |
| Salaries & Related [5] | - | 449,712 | 451,390 | 434,376 | 466,574 | 505,196 |
| Office Rent [6] | - | 90,299 | 90,299 | 92,105 | 93,948 | 95,827 |
| Cost of Growth [7] | - | 124,410 | 176,195 | 219,980 | 273,765 | 363,200 |
| Operating Expenses [8] | - | 377,240 | 363,785 | 387,974 | 419,885 | 459,956 |
| Founders Medical [9] | - | 39,780 | 40,576 | 41,387 | 42,215 | 43,059 |
| **Total Expenses** | | **1,615,052** | **1,707,130** | **1,817,073** | **2,095,374** | **2,472,245** |
| **EBITDA** | | **1,010,102** | **1,107,433** | **1,319,870** | **1,777,103** | **2,337,014** |
| | | | | | | |
| **Pre & Post-Petition Netdown [10]** | 735,000 | 148,279 | - | - | - | - |
| | | | | | | |
| **Professional Expenses [11]** | | | | | | |
| Legal-Theodora Oringher | | - | - | - | - | - |
| Armory Consulting | | - | - | - | - | - |
| **Total Professional Expenses** | - | - | - | - | - | - |
| | | | | | | |
| **Secured Creditors** | | | | | | |
| RFS Opus [12] | 80,000 | 335,284 | 335,284 | 335,284 | 335,284 | - |
| **Total Secured Creditors** | **80,000** | **335,284** | **335,284** | **335,284** | **335,284** | - |
| | | | | | | |
| **Priority Creditors and Other Payments** | | | | | | |
| US Trustee | - | 19,500 | - | - | - | - |
| Employment Tax | 15,372 | | | | | |
| Deferred Comp | 69,911 | - | - | - | - | - |
| SLC RFS Note [13] | 120,000 | - | - | - | - | - |
| **Total Priority Creditors and Other Payments** | **205,283** | **19,500** | - | - | - | - |
| | | | | | | |
| **Unsecured Creditors [14]** | | | | | | |
| RFS GU Creditors | 19,952 | 113,553 | 113,553 | 113,553 | 113,553 | - |
| **Total Unsecured Creditors** | **19,952** | **113,553** | **113,553** | **113,553** | **113,553** | - |
| | | | | | | |
| **Total Plan Payments** | **225,235** | **133,053** | **113,553** | **113,553** | **113,553** | - |
| | | | | | | |
| **Beginning Cash** | | **421,541** | **851,306** | **1,541,350** | **2,199,946** | **3,070,979** | **4,399,245** |
| Change in Cash | | 429,765 | 690,044 | 658,596 | 871,034 | 1,328,266 | 2,337,014 |
| Transfer from (to) RDI [15] | | - | - | - | - | - | - |
| **Ending Cash** | | **851,306** | **1,541,350** | **2,199,946** | **3,070,979** | **4,399,245** | **6,736,260** |

**Ruby's Huntington Beach (HB)**

**Cash Flow Projections**

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Total Revenues** | | **4,588,518** | **4,657,345** | **4,727,205** | **4,798,114** | **4,870,085** |
| | | | | | | |
| Total Cost of Sales | | 1,130,122 | 1,145,707 | 1,162,892 | 1,180,336 | 1,198,041 |
| Total Labor | | 1,634,211 | 1,658,015 | 1,682,885 | 1,708,129 | 1,733,750 |
| Total Supplies | | 90,517 | 79,175 | 80,362 | 81,568 | 82,791 |
| Total Operating Expense | | 594,000 | 600,798 | 609,809 | 618,957 | 628,241 |
| **Unit Level EBITDAR** | | **1,139,668** | **1,173,651** | **1,191,256** | **1,209,125** | **1,227,261** |
| Total Occupancy | | 447,065 | 451,762 | 458,539 | 465,417 | 472,398 |
| Total Corporate Overhead & Other | | 368,555 | 372,588 | 378,176 | 383,849 | 389,607 |
| **Unit Level EBITDA (with allocations)** | | **324,048** | **349,301** | **354,540** | **359,859** | **365,256** |
| Capital Expenditures | | 91,770 | 46,573 | 47,272 | 47,981 | 48,701 |
| **Unit Level Cash Flow** | | **232,278** | **302,727** | **307,268** | **311,877** | **316,556** |
| | | | | | | |
| **Pre-Petition Gift Cards from RDI (In RDI Unsecured Pool) [1]** | - | - | 41,592 | 41,592 | 41,592 | 41,592 |
| | | | | | | |
| **Contingency** | | | | | | |
| HB Rent Contingency [2] | 290,000 | - | - | - | - | - |
| Seasonal AP Contingency [3] | 113,189 | - | - | - | - | - |
| **Total Contingency** | **403,189** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Professional Expenses [4]** | | | | | | |
| PSZJ | | - | - | - | - | - |
| **Total Professional Expenses** | **-** | **-** | **-** | **-** | **-** | |
| | | | | | | |
| **Secured Creditors** | | | | | | |
| HOPL Opus Bank [5] | 77,491 | 193,012 | 193,012 | 193,012 | 193,012 | 193,012 |
| C&C Partnership [6] | - | 26,144 | 26,144 | 26,144 | 26,144 | 26,144 |
| **Total Secured Creditors** | **77,491** | **219,155** | **219,155** | **219,155** | **219,155** | **219,155** |
| | | | | | | |
| **Priority Creditors and Other Payments** | | | | | | |
| HB Property Tax | 2,785 | | | | | |
| US Trustee Fees | | 19,500 | | | | |
| Franchise Tax Board | 800 | | | | | |
| US Foods 503(b)(9) Payments [7] | | 64,116 | | | | |
| US Foods Term Change Payments [8] | | 42,446 | | | | |
| **Total Priority Creditors and Other Payments** | **3,585** | **126,062** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Unsecured Creditors [9]** | | | | | | |
| Unsecured Creditor Payments (Total Pot) | 113,189 | | | | | |
| **Total Unsecured** | **113,189** | | | | | |
| | | | | | | |
| **Total Plan Payments** | **116,774** | **126,062** | **-** | **-** | **-** | **-** |
| | | | | | | |
| | | | | | | |
| **Beginning Cash** | **421,541** | **56,594** | **113,189** | **113,189** | **113,189** | **113,189** |
| Change in Cash | (597,454) | (112,940) | 125,164 | 129,704 | 134,314 | 138,992 |
| Plan Sponsor Contribution [10] | 113,189 | - | - | - | - | - |
| Transfers from (to) RDI [11] | 119,318 | 169,534 | (125,164) | (129,704) | (134,314) | (138,992) |
| **Ending Cash** | **56,594** | **113,189** | **113,189** | **113,189** | **113,189** | **113,189** |

**Ruby's Oceanside (OS)**
**Cash Flow Projections**

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Total Revenues** | | **3,787,393** | **3,844,203** | **3,891,866** | **3,960,394** | **4,019,800** |
| Total Cost of Sales | | 946,848 | 961,051 | 972,967 | 990,099 | 1,004,950 |
| Total Controllable Labor | | 880,331 | 891,855 | 902,913 | 918,811 | 932,594 |
| Total Labor Fixed | | 236,326 | 238,341 | 241,296 | 245,544 | 249,228 |
| Total Labor Employee Related | | 238,544 | 242,185 | 245,188 | 249,505 | 253,247 |
| Total Labor | | 1,355,201 | 1,372,380 | 1,389,396 | 1,413,861 | 1,435,069 |
| Total Supplies | | 75,803 | 65,351 | 66,162 | 67,327 | 68,337 |
| Total Operating Expense | | 500,000 | 507,435 | 513,726 | 522,772 | 530,614 |
| Total Non Controllable Expense | | - | | | | |
| Unit Level EBITDAR | | 308,000 | 311,380 | 315,241 | 320,792 | 325,604 |
| Total Occupancy | | 601,541 | 626,605 | 634,374 | 645,544 | 655,227 |
| Total Corporate Overhead & Other | | 302,991 | 307,536 | 311,349 | 316,832 | 321,584 |
| **Unit Level EBITDA (with allocations)** | | **298,550** | **319,069** | **323,025** | **328,713** | **333,643** |
| Capital Expenditures | | 75,748 | 38,442 | 38,919 | 39,604 | 40,198 |
| **Unit Level Cash Flow** | | **222,802** | **280,627** | **284,106** | **289,109** | **293,445** |
| | | | | | | |
| **Pre-Petition Gift Cards from RDI (In RDI Unsecured Pool) [1]** | - | - | 19,708 | 19,708 | 19,708 | 19,708 |
| | | | | | | |
| **Contingency** | | | | | | |
| Seasonal AP Contingency [2] | 62,397 | - | - | - | - | - |
| **Total Contingency** | **62,397** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Professional Expenses [3]** | | | | | | |
| PSZJ | | - | - | - | - | - |
| **Total Professional Expenses** | **-** | **-** | **-** | **-** | **-** | |
| | | | | | | |
| **Secured Creditors** | | | | | | |
| HOPL Opus Bank [4] | 42,718 | 106,401 | 106,401 | 106,401 | 106,401 | 106,401 |
| C&C Partnership [5] | - | 14,412 | 14,412 | 14,412 | 14,412 | 14,412 |
| **Total Secured Creditors** | **42,718** | **120,814** | **120,814** | **120,814** | **120,814** | **120,814** |
| | | | | | | |
| **Priority Creditors and Other Payments** | | | | | | |
| US Trustee Fee | | 19,500 | | | | |
| City of Oceanside Lease Cure Payments | 13,920 | - | - | - | - | - |
| Franchise Tax Board | 800 | | | | | |
| O/S NNN Property Tax [6] | - | 22,235 | 22,235 | - | - | - |
| US Foods 503(b)(9) Payments [7] | - | 51,487 | - | - | - | - |
| US Foods Term Change Payments [8] | - | 23,399 | - | - | - | - |
| **Total Priority Creditors and Other Payments** | **14,720** | **116,621** | **22,235** | **-** | **-** | **-** |
| | | | | | | |
| **Unsecured Creditors [9]** | | | | | | |
| Unsecured Creditor Payments (Total Pot) | 62,397 | | | | | |
| **Total Unsecured** | **62,397** | | | | | |
| | | | | | | |
| **Total Plan Payments** | **77,117** | **116,621** | **22,235** | **-** | **-** | **-** |
| | | | | | | |
| **Beginning Cash** | **142,696** | **31,199** | **62,397** | **62,397** | **62,397** | **62,397** |
| Change in Cash | (182,233) | (14,632) | 157,286 | 183,001 | 188,004 | 192,340 |
| Plan Sponsor Contribution [10] | 62,397 | - | - | - | - | - |
| Transfers from (to) RDI [11] | 8,338 | 45,831 | (157,286) | (183,001) | (188,004) | (192,340) |
| **Ending Cash** | **31,199** | **62,397** | **62,397** | **62,397** | **62,397** | **62,397** |

**Ruby's Palm Springs (PS)**

**Cash Flow Projections**

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Total Revenues** | | **2,289,686** | **2,324,031** | **2,358,891** | **2,394,275** | **2,430,189** |
| Total Cost of Sales | | 613,000 | 613,544 | 622,747 | 632,089 | 641,570 |
| Total Controllable Labor | | 520,000 | 520,583 | 528,392 | 536,318 | 544,362 |
| Total Labor Fixed | | 165,000 | 165,006 | 167,481 | 169,994 | 172,543 |
| Total Labor Employee Related | | 155,000 | 155,710 | 158,046 | 160,416 | 162,823 |
| Total Labor | | 840,000 | 841,299 | 853,919 | 866,728 | 879,728 |
| Total Supplies | | 48,000 | 48,805 | 49,537 | 50,280 | 51,034 |
| Total Operating Expense | | 338,000 | 336,984 | 342,039 | 347,170 | 352,377 |
| Total Non Controllable Expense | | - | | | | |
| Unit Level EBITDAR | | 260,000 | 260,291 | 264,196 | 268,159 | 272,181 |
| Total Occupancy | | 190,686 | 223,107 | 226,454 | 229,850 | 233,298 |
| Total Corporate Overhead & Other | | 185,922 | 185,922 | 188,711 | 191,542 | 194,415 |
| **Unit Level EBITDA (with allocations)** | | **4,764** | **37,184** | **37,742** | **38,308** | **38,883** |
| Capital Expenditures | | 45,794 | 23,240 | 23,589 | 23,943 | 24,302 |
| **Unit Level Cash Flow** | | **(41,030)** | **13,944** | **14,153** | **14,366** | **14,581** |
| | | | | | | |
| Pre-Petition Gift Cards from RDI (In RDI Unsecured Pool) [1] | - | - | 10,901 | 10,901 | 10,901 | 10,901 |
| | | | | | | |
| **Contingency** | | | | | | |
| Seasonal AP Contingency [2] | 24,414 | - | - | - | - | - |
| **Total Contingency** | **24,414** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Professional Expenses [3]** | | | | | | |
| PSZJ | | - | - | - | - | - |
| **Total Professional Expenses** | **-** | **-** | **-** | **-** | **-** | |
| | | | | | | |
| **Secured Creditors** | | | | | | |
| HOPL Opus [4] | 16,714 | 41,631 | 41,631 | 41,631 | 41,631 | 41,631 |
| C&C Partnership [5] | - | 5,639 | 5,639 | 5,639 | 5,639 | 5,639 |
| **Total Secured Creditors** | **16,714** | **47,270** | **47,270** | **47,270** | **47,270** | **47,270** |
| | | | | | | |
| **Priority Creditors and Other Payments** | | | | | | |
| US Trustee Fee | | 19,500 | | | | |
| Palm Springs Lease Cure Payment | 21,286 | - | - | - | - | - |
| Franchise Tax Board | 800 | | | | | |
| US Foods 503(b)(9) Payments [6] | | 25,337 | | | | |
| US Foods Term Change Payments [7] | | 9,155 | | | | |
| **Total Priority Creditors and Other Payments** | **22,086** | **53,992** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Unsecured Creditors [8]** | | | | | | |
| Unsecured Creditor Payments | 24,414 | | | | | |
| **Total Unsecured** | **24,414** | | | | | |
| | | | | | | |
| **Total Plan Payments** | **46,500** | **53,992** | **-** | **-** | **-** | **-** |
| | | | | | | |
| | | | | | | |
| **Beginning Cash** | | **62,172** | **12,207** | **24,414** | **24,414** | **24,414** | **24,414** |
| Change in Cash | | (87,628) | (142,292) | (22,425) | (22,215) | (22,003) | (21,788) |
| Plan Sponsor Contribution [9] | | 24,414 | - | - | - | - | - |
| Transfers from (to) RDI [10] | | 13,249 | 154,499 | 22,425 | 22,215 | 22,003 | 21,788 |
| **Ending Cash** | | **12,207** | **24,414** | **24,414** | **24,414** | **24,414** | **24,414** |

**Ruby's SoCal Diners (SoCal)**

**Cash Flow Projections**

| | Effective Date | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Secured and Priority Creditors** | | | | | | |
| Laguna Hills Lease Settlement | 36,000 | | | | | |
| US Trustee Fee | | 650 | | | | |
| Laguna Hills US Foods Settlement | | 8,514 | | | | |
| SoCal Unsecured [1] | - | - | | - | 33,289 | - |
| **Total Secured and Priority Creditors** | **36,000** | **9,164** | **-** | **-** | **33,289** | **-** |
| | | | | | | |
| **Total Plan Payments** | **36,000** | **9,164** | **-** | **-** | **33,289** | **-** |
| | | | | | | |
| **Beginning Cash** | **-** | **-** | **-** | **-** | **-** | **-** |
| Change in Cash | (36,000) | (9,164) | - | - | (33,289) | - |
| Transfer from (to) RDI [2] | 36,000 | 9,164 | - | - | 33,289 | - |
| **Ending Cash** | **-** | **-** | **-** | **-** | **-** | **-** |

EXHIBIT "C"

LITIGATION

EXHIBIT "C"

| | SHORT TITLE | AFFECTS DEBTOR(S) | PLAINTIFF | NATURE OF CASE | COURT/CASE NUMBER | STATUS OF CASE |
|---|---|---|---|---|---|---|
| 1. | Opus Bank vs. Ruby's SoCal Diners, *et al.* | Ruby's SoCal Diners, LLC Ruby's Quality Diners, LLC Ruby's Huntington Beach, Ltd. Ruby's Laguna Hills, Ltd. Ruby's Oceanside, Ltd. Ruby's Palm Springs, Ltd. | Opus Bank | Breach of Contract/Warranty | Superior Court of California, Orange County 30-2018-00983314 | Pending. Notice of Stay Filed. |
| 2. | Pillsbury Winthrop Shaw Pittman LLP vs. Ruby's Diner, Inc., *et al.* | Ruby's Diner, Inc. Ruby's SoCal Diners, LLC Ruby's Huntington Beach, Ltd. Ruby's Oceanside, Ltd. Ruby's Palm Springs, Ltd. | Pillsbury Winthrop Shaw Pittman LLP | Enforcement | Superior Court of California, Orange County 30-2018-00986898 | Judgment Lien |
| 3. | Plaza Bonita, LLC vs. Ruby's SoCal Diners, LLC *et al.* | Ruby's SoCal Diners, LLC | Plaza Bonita, LLC | Breach of Contract | Superior Court of California, San Diego 37-2014-00041495 | Judgment Lien |
| 4. | US Air Conditioning v. Ruby's Diner, Inc., *et al.* | Ruby's Diner, Inc. | US Air Conditioning | Small Claim/Collections | Superior Court of California, Indio INS1801590 | Pending. Notice of Stay Filed. |
| 5. | California Restaurant Mutual Benefit Corporation v. S. & D. Coffee, and related cross actions | Ruby's Diner, Inc. | S. & D. Coffee, Inc. | Indemnity | Superior Court of California, Los Angeles, BC703502 | Filed post-petition. Pending. Notice of Stay Filed. |
| 6. | Salier Rustem v. Ruby's Diner, Inc. | Ruby's Diner, Inc. | Salier Rustem | Personal Injury | Superior Court of California, Riverside PSC1905572 | Filed post-petition. Pending. Notice of Stay Filed. |

LITIGATION

EXHIBIT "C"

| | SHORT TITLE | AFFECTS DEBTOR(S) | PLAINTIFF | NATURE OF CASE | COURT/CASE NUMBER | STATUS OF CASE |
|---|---|---|---|---|---|---|
| 7. | MGP Fund X Laguna Hills, LLC vs. Ruby's Diner, Inc., *et al.* | Ruby's Diner, Inc. Ruby's SoCal Diners, LLC Ruby's Laguna Hills, Ltd. | MGP Fund X Laguna Hills, LLC | Unlawful Detainer | Superior Court of California, Orange County 30-2018-00982994 | Judgment resolved pursuant to Laguna Hills Lease Assumption and Assignment Order. |
| 8. | Darryl Bentley vs. Ruby's Diner, Inc., *et al.* | Ruby's Diner, Inc. | Darryl Bentley | Personal Injury | Superior Court of California, Orange County 30-2018-01013352 | Dismissed. 03/25/2019 |
| 9. | Robert Smith vs. Ruby's Diner, Inc., *et al.* | Ruby's Diner, Inc. | Robert Smith | Civil Rights | Superior Court of California, Long Beach NC061912 | Dismissed 12/05/2018 |
| 10. | Teresa Lara vs. Ruby's Diner, Inc., *et al.* | Ruby's Diner, Inc. | Teresa Lara | Breach of Contract/Warranty | Superior Court of California, Los Angeles BC691604 | Dismissed 12/7/2018 |
| 11. | Nora Noel Canaday vs. Ruby's Diner, Inc., *et al.* | Ruby's Diner, Inc. Ruby's SoCal Diners, LLC Ruby's Laguna Hills, Ltd. | Nora Noel Canaday | Product Liability | Superior Court of California, Orange County 30-2017-00952832 | Dismissed 6/21/2018 |
| 12. | Jason Nelson vs. Ruby's Diner, Inc., *et al.* | Ruby's Diner, Inc. Ruby's Huntington Beach, Ltd. | Jason Nelson | Collections | Superior Court of California, Orange County 30-2016-00890864 | Dismissed 02/06/2017 |

LITIGATION

EXHIBIT "C"

| | SHORT TITLE | AFFECTS DEBTOR(S) | PLAINTIFF | NATURE OF CASE | COURT/CASE NUMBER | STATUS OF CASE |
|---|---|---|---|---|---|---|
| **13.** | Star-West Parkway Mall vs. Ruby's SoCal Diners, LLC, *et al.* | Ruby's SoCal Diners, LLC | Star-West Parkway Mall | Breach of Contract | Superior Court of California, San Diego<br><br>37-2018-00028275 | Dismissed 09/16/2018 |
| **14.** | Adam Ghadiri vs. Ruby's Diner, Inc., *et al.* | Ruby's Diner, Inc. | Adam Ghadiri | Civil Rights, American with Disabilities | United States District Court, Central District<br><br>8:18-cv-01657-AG-ADS | Dismissed 02/22/2019 |
| **15.** | Shonna Counter v. Ruby's Diner, Inc., *et al.* | Ruby's Diner, Inc. | Shonna county | Civil Rights, American with Disabilities | 8:19-cv-00092-DOC-KES | Dismissed 05/13/2019 |

EXHIBIT "D"

PREFERENCE PERIOD PAYMENTS

EXHIBIT "D"

|  | DEBTOR | NINETY (90) DAYS | ONE (1) YEAR WHO ARE INSIDERS |
|---|---|---|---|
| **1.** | Ruby's Diner, Inc. | $506,255.92 | $403,387.13[1] |
| **2.** | Ruby's SoCal Diners, LLC | $0.00 | $0.00 |
| **3.** | Ruby's Quality Diners, LLC | $0.00 | $0.00 |
| **4.** | Ruby's Huntington Beach, Ltd. | $246,855.89 | $54.00 |
| **5.** | Ruby's Laguna Hills, Ltd. | $174,725.91 | $0.00 |
| **6.** | Ruby's Oceanside, Ltd. | $528,842.95 | $720.00 |
| **7.** | Ruby's Palm Springs, Ltd. | $276,759.47 | $0.00 |
| **8.** | Ruby's Franchise Systems, Inc. | $159,666.72 | $64,939.12 |
|  |  |  |  |
| **TOTALS** | **RUBY'S DINER, INC.:** | **$506,255.92** | **$403,387.13** |
|  | **SOCAL DEBTORS:**[2] | **$1,227,184.22** | **$774.00** |
|  | **RUBY'S FRANCHISE SYSTEM, INC.:** | **$159,666.72** | **$64,939.12** |
|  | **ALL DEBTORS:** | **$1,893,106.86** | **$469,100.25** |

---

[1] These payments represent payments made to the Founders and Mr. Belshe (the Debtors' Executive Vice President of Operations).  Pursuant to the terms of the Plan, any Avoidance Action that could be asserted against the Founders or Mr. Belshe shall be waived in consideration of the amounts to be paid to RDI's General Unsecured Creditors under the Plan.

[2] The SoCal Debtors are comprised of Ruby's SoCal Diners, LLC; Ruby's Quality Diners, LLC; Ruby's Huntington Beach, Ltd.; Ruby's Laguna Hills, Ltd.; Ruby's Oceanside, Ltd.; and Ruby's Palm Springs, Ltd.

1

EXHIBIT "E"

**DC - RK Reconciliation**

| | AT PERIOD 1 2020 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | RDI | | | RFS | | | |
| **DC** | **PRE** | **POST** | **Total** | **PRE** | **POST** | **Total** | **Net Total** |
| Personal Accounts Receivable | (75,392) | (18,021) | (93,413) | | | | (93,413) |
| Misc. Accounts Payable to DC | 16,748 | 5,752 | 22,500 | | | | 22,500 |
| Consulting Fee Payable to DC Post Petition | | | | | 155,769 | 155,769 | 155,769 |
| Consulting Fee Payable to DC Pre Petition | | | | 371,530 | | 371,530 | 371,530 |
| BC Mgt Payable to RDI - Salaries | (51,334) | (36,892) | (88,226) | | | | (88,226) |
| Note Receivable from DC | | | | (300,000) | | (300,000) | (300,000) |
| BC Mgt Payable to RFS - Rent | | | | (5,774) | (11,980) | (17,754) | (17,754) |
| **Total** | **(109,978)** | **(49,161)** | **(159,139)** | **65,757** | **143,789** | **209,546** | **50,406** |

| | RDI | | | RFS | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **RK** | **PRE** | **POST** | **Total** | **PRE** | **POST** | **Total** | **Net Total** |
| Personal Accounts Receivable | (19,755) | (5,374) | (25,128) | | | | (25,128) |
| Consulting Fee Payable to RK Pre Petition | | | | 57,185 | | 57,185 | 57,185 |
| Consulting Fee Payable to RK Post Petition | | | | | 75,000 | 75,000 | 75,000 |
| Notes Payable to RK | 121,611 | 0 | 121,611 | 41,243 | | 41,243 | 162,854 |
| Note Receivable from RK | | | | (200,000) | | (200,000) | (200,000) |
| **Total** | **101,856** | **(5,374)** | **96,482** | **(101,571)** | **75,000** | **(26,571)** | **69,911** |

EXHIBIT "F"

PRIORITY TAX CLAIMS

EXHIBIT "F"

| | DEBTOR | CLAIMANT | TYPE OF TAX CLAIM | AMOUNT |
|---|---|---|---|---|
| 1. | Ruby's Diner, Inc. | Franchise Tax Board | State Income Tax | [TBD]$^1$ |
| 2. | Ruby's Diner, Inc. | Internal Revenue Service | Federal Business Tax | $200.00$^2$ |
| 3. | Ruby's Diner, Inc. | County of Orange | 2015 Property Tax Assessment | $2,713.69 |
| 4. | Ruby's Diner, Inc. | County of Orange | 2016 Property Tax Assessment | $2,427.69 |
| 5. | Ruby's Diner, Inc. | County of Orange | 2017 Property Tax Assessment | $2,272.41 |
| 6. | Ruby's Diner, Inc. | County of Orange | 2018 Property Tax Assessment | $1,338.24 |
| 7. | Ruby's Huntington Beach, Ltd | County of Orange | 2018 Property Tax Assessment | $2,785.08 |
| 8. | Ruby's SoCal Diners, LLC | None | n/a | n/a |
| 9. | Ruby's Quality Diners, LLC | None | n/a | n/a |
| 10. | Ruby's Huntington Beach, Ltd. | Franchise Tax Board | State Business Tax | $800.00$^3$ |
| 11. | Ruby's Oceanside, Ltd. | Franchise Tax Board | State Business Tax | $800.00$^4$ |
| 12. | Ruby's Palm Springs, Ltd. | Franchise Tax Board | State Business Tax | $800.00$^5$ |
| 13. | Ruby's Franchise Systems, Inc. | Employment Development Department | State Employment Taxes | $15,371.64 |
| 13. | Ruby's Franchise Systems, Inc. | Internal Revenue Service | Federal Business Tax | $200.00$^6$ |
| | TOTAL: | | | **$29,509$^7** |

---

[1] To be determined by the Franchise Tax Board, and is anticipated to be $0.00.
[2] Estimated by the Internal Revenue Service, and is anticipated to be $0.00.
[3] Estimated by the Franchise Tax Board, and is anticipated to be $0.00.
[4] Estimated by the Franchise Tax Board, and is anticipated to be $0.00.
[5] Estimated by the Franchise Tax Board, and is anticipated to be $0.00.
[6] Estimated by the Internal Revenue Service, and is anticipated to be $0.00.
[7] Total does not include those taxes estimated at $0.00

1

EXHIBIT "G"

SECURED NOTEHOLDERS

EXHIBIT "G"

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| 1. | Rudy and Eileen Amaya, The Amaya Family Trust | $61,404.94 |
| 2. | Wayne and Joanne Aspinall, The Wayne and Joanne Aspinall Family Trust | $40,961.28 |
| 3. | David and Arlene Belt | $20,369.72 |
| 4. | John J. and Mary L. Blaha, Blaha Family Trust | $20,591.56 |
| 5. | Milton and Cora Blevins | $20,591.56 |
| 6. | Thomas and Judith Brady, The Brady Family Trust | $41,183.11 |
| 7. | Dorothy Brideweser | $20,443.67 |
| 8. | Cathy C. Campbell | $10,000.00 |
| 9. | Mark and Kathleen Chiu | $61,552.83 |
| 10. | Anne L. Clark | $20,443.67 |
| 11. | Marsha Clark, Jack M. Clark and Marsha H. Clark Revocable Trust | $20,591.56 |
| 12. | Merrill and Carol Clisby, The Clisby Family Trust | $20,591.56 |
| 13. | Robert P. and Elaine A. Converse, POA Susan Spoul, The Converse Family Trust | $102,218.33 |
| 14. | Frances Cooper, Cooper Declaration Trust | $10,443.67 |
| 15. | Alice C. Coury and Thomas Pike | $123,179.61 |
| 16. | Julia Ann Davidson, The Davidson Living Trust | $20,480.64 |
| 17.5 | Maureen Debeer, The Hans & Maureen Debeer Living Trust | $20,443.67 |
| 18. | Donald and Ann Delaney, Donald and Ann Delaney Revocable Trust | $40,961.28 |
| 19. | Michael and Janice Dingillo, Amendment and Restatement of M & J Dingillo Trust | $10,000.00 |

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| 20. | Celia Dudley | $21,035.22 |
| 21. | Christa G. Dyer, The Dyer Family Trust | $61,626.78 |
| 22. | Mary Elin and Mark H. Ellis, Ellis Trust | $40,887.33 |
| 23. | Robert Wayne Fairweather | $10,591.56 |
| 24. | Anne Farber, The Farber Family Trust | $20,369.72 |
| 25. | Pamela L. Farber | $20,591.56 |
| 26. | David and Lois Goren | $20,591.56 |
| 27. | James L. and Celeste Gray | $10,000.00 |
| 28. | Gary and Janet Green, The Green Family Trust | $61,774.67 |
| 29. | Phillip Griffith | $102,366.22 |
| 30. | Ryan and Sharyl Griffith | $20,591.56 |
| 31. | R. John and Jeanne C. Hannah, The Hannah Living Trust | $102,957.78 |
| 32. | Richard and Susan Hanson | $20,591.56 |
| 33. | William and Susanne Hardy, William T. Hardy Jr. and Susann Ohlund Hardy Revocable Trust | $41,183.11 |
| 34. | Raymond L. and Maureen Harris | $20,591.56 |
| 35. | Raymond and Gayle Haskell, Raymond E. Haskell and Gayle K. Haskell Revocable Trust | $20,369.72 |
| 36. | Robert and Jayne Hess, Robert Allen and Jayne R. Hess Trust | $20,443.67 |
| 37. | John and Rita Holiday | $41,035.22 |
| 38. | Harvey and Joyce Jensen, Jensen Family Trust | $20,443.67 |
| 39. | Howard and Carol Jensen, The Jensen Family Trust | $20,369.72 |

1

SECURED NOTEHOLDERS

EXHIBIT "G"

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| **40.** | Vernon Lee Johnson, Vernon Lee Johnson Trust | $41,035.22 |
| **41.** | Thomas and Arlene Jones | $20,591.56 |
| **42.S** | Wesley and Marcy Kim, The 2002 Kim Family Trust | $40,887.33 |
| **43.** | Ronald and Linda Kirkpatrick, Ronald and Linda L. Kirkpatrick Living Trust | $40,961.28 |
| **44.** | David and Gretchen Landau | $10,000.00 |
| **45.** | James and Mary Lou Lester, The Lester Family Trust | $20,591.56 |
| **46.** | Willard and Jutta Loomis, Loomis Family Trust | $20,517.61 |
| **47.** | Hope Luedke, Luedeke Family Trust | $10,591.56 |
| **48.** | Darlene H. MacDonald, James W. MacDonald Family Trust | $20,591.56 |
| **49.** | Kenneth Mailman, Kenneth Charles Mailman and Annie S. Mailman 1996 Trust | $41,035.22 |
| **50.** | John and Mary Jane Malmquist, The Malmquist Family Trust | $41,035.22 |
| **51.** | Thomas and Sherre May | $20,443.67 |
| **52.** | Alexander B. and Irene M. McDonald, McDonald Living Trust | $40,887.33 |
| **53.** | Bette McKinney, Terry Miller and Betty McKinney Trust | $41,035.22 |
| **54.** | Terence Lee and Rosann McLaughlin, McLaughlin Revocable Trust of 2012 | $20,369.72 |
| **55.** | Hal and Hannah Meany, Meany Family Trust | $20,591.56 |
| **56.** | David and Maureen Melvold, 1991 Melvold Family Trust | $20,443.67 |
| **57.** | Kelly Michelle Mercer | $20,591.56 |
| **58.** | Pamela J. Monger | $20,443.67 |

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| **59.** | Warren and Sheila Newman, Newman Family Trust | $10,369.72 |
| **60.** | Launa Nuttman and Phillip Griffith | $71,331.01 |
| **61.** | Michael and Candace O'Brien, The O'Brien Trust | $41,035.22 |
| **62.** | Myra L. O'Connell, Myra L. O'Connell | $20,443.67 |
| **63.** | Ronald R. and Patty J. Panico | $20,591.56 |
| **64.** | Jerome J. Pearl | $71,626.78 |
| **65.** | Norman and Margaret Petrucci | $41,183.11 |
| **66.** | William E. Pope, William E. Pope and Anne Pierce Pope Revocable Trust dtd 04/14/2016 | $90,000.00 |
| **67.** | William E. Pope, Pope Family By-Pass Trust dtd 04/13/2009 | $95,324.04 |
| **68.** | Diana Rainforth | $102,366.22 |
| **69.** | Anne K. Relph, The Relph Living Trust | $20,591.56 |
| **70.** | Allan and Shirley Richardson | $41,035.22 |
| **71.** | Roger and Marilyn Riley | $20,591.56 |
| **72.** | Joel B. Rothman | $20,443.67 |
| **73.** | Walter and Norma Schulte | $20,369.72 |
| **74.** | Kerwin S. and Carolyn S. Secrist, Secrist Living Trust | $20,591.56 |
| **75.** | Janet Shields, Shields Family Trust | $41,183.11 |
| **76.** | Richard John Silva, Silva Family Trust | $10,000.00 |
| **77.** | O.A. Simmon, The Simmon Trust | $41,035.23 |
| **78.** | Robert G. Stebe | $20,443.67 |
| **79.** | Clifford E. and Karen J. Stember | $41,035.22 |

SECURED NOTEHOLDERS

EXHIBIT "G"

|  | CLAIMANT(S) | AMOUNT |
|---|---|---|
| **80.** | John P. and Kathleen H. Teele, The Teele Family Trust | $40,887.33 |
| **81.** | Kevin B. Thomas | $20,591.56 |
| **82.** | Cheryl J. Thoreen | $20,591.56 |
| **83.** | Gerald and Phyllis Waters, Gerald I. and Phyllis E. Waters Family Trust | $20,443.67 |
| **84.** | David Pearson Wells | $20,591.56 |
| **85.** | Janet Westerfield, POA Sue Donahoe | $10,591.56 |
| **86.** | Keith Westerfield | $10,000.00 |
| **87.** | Susan F. White | $20,443.67 |
| **88.** | John R. Wilson, Jr. | $20,591.56 |
| **89.** | William S. and Myrna A. Wright | $20,591.56 |
| **90.** | Arthur and Beth Young | $20,591.56 |
|  | **TOTAL** | **$2,984,923** |

EXHIBIT "H"

SECURED TAX CLAIMS

EXHIBIT "H"

|  | DEBTOR | CLAIMANT | TYPE OF TAX CLAIM | AMOUNT |
|---|---|---|---|---|
| 1. | Ruby's Diner, Inc. | Internal Revenue Service | Federal Unemployment Tax | $32,239.07 |
| 2. | Ruby's SoCal Diners, LLC | None | n/a | n/a |
| 3. | Ruby's Quality Diners, LLC | None | n/a | n/a |
| 4. | Ruby's Huntington Beach, Ltd. | None | n/a | n/a |
| 5. | Ruby's Laguna Hills, Ltd. | None | n/a | n/a |
| 6. | Ruby's Oceanside, Ltd. | San Diego County Treasurer | Property Tax Lien | $42,236.23 |
| 7. | Ruby's Palm Springs, Ltd. | None | n/a | n/a |
| 8. | Ruby's Franchise Systems, Inc. | None | n/a | n/a |
| 9. | Ruby's Franchise Systems, Inc. | None | n/a | n/a |
|  | **Total:** |  |  | **$74,475.30** |

DOCS_LA:321304.1 76135/003

EXHIBIT "I"

PRIORITY NON- TAX CLAIMS

EXHIBIT "I"

|  | DEBTOR | CLAIMANT | TYPE OF TAX CLAIM | AMOUNT |
|---|---|---|---|---|
| 1. | Ruby's Diner, Inc. | None | n/a | $0.00 |
| 2. | Ruby's SoCal Diners, LLC | None | n/a | $0.00 |
| 3. | Ruby's Quality Diners, LLC | None | n/a | $0.00 |
| 4. | Ruby's Huntington Beach, Ltd. | None | n/a | $0.00 |
| 5. | Ruby's Laguna Hills, Ltd. | None | n/a | $0.00 |
| 6. | Ruby's Oceanside, Ltd. | None | n/a | $0.00 |
| 7. | Ruby's Palm Springs, Ltd. | None | n/a | $0.00 |
| 8. | Ruby's Franchise Systems, Inc. | None | n/a | $0.00 |
| 9. | Ruby's Franchise Systems, Inc. | None | n/a | $0.00 |
|  | **TOTAL:** |  |  | **$0.00** |

1

EXHIBIT "J"

**UNSECURED NOTEHOLDERS**

**EXHIBIT "J"**

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| 1. | Gary Lee and Shirley Allen, The Allen Revocable Trust | $42,070.44 |
| 2. | Anthony A. and Jill A. Alvarez, Jr. | $10,591.56 |
| 3. | Donna D. Andrews, Mort and Patty Memorial Fund | $42,366.22 |
| 4. | Richard and Donna Bashor | $10,591.56 |
| 5. | Eileen Baumel's Daughter Karen Pressman, Eileen R. Baumel Family Trust | $10,591.56 |
| 6. | Mildred Beaver, Beaver Family Trust | $21,183.11 |
| 7. | David and Arlene Belt | $10,591.56 |
| 8. | Judy Bonilla, Judy Bonilla Living Trust | $52,957.78 |
| 9. | Georgia Borland, The Georgia Bentley Trust | $21,035.22 |
| 10. | Robert Borland. The Borland Exemption Trust of the Borland Trust | $21,183.11 |
| 11. | Dorothy Brideweser | $21,183.11 |
| 12. | Kathleen and Robert Burnham | $10,591.56 |
| 13. | Vivien K. and Madeleine S. Burt and Kleinman | $10,591.56 |
| 14. | Timothy J. and/or Brook D. Butler, Timothy and Brook Butler Trust | $21,035.22 |
| 15. | Richard Steven and Catherine Call | $21,035.22 |
| 16. | Jeanne Cannine-Cox, The Jeanne Cannine-Cox Separate Property Trust | $21,183.11 |
| 17. | Douglas S. Cavanaugh | $84,436.67 |
| 18. | Dennis C. Chatton, The Dennis C. Chatton Living Trust | $10,591.56 |
| 19. | John Chiu, John Chiu Revocable Inter Vivos Trust | $10,369.72 |
| 20. | Anne L. Clark | $42,292.28 |
| 21. | Merrill and Carol Clisby, The Clisby Family Trust | $10,591.56 |
| 22. | John R. Concar, John R. and Judith L. Concar Trust, August 13, 1999 | $31,515.86 |

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| 23. | Diane Connor, Mary Gustafson and Jean Ann Gustafson | $10,591.56 |
| 24. | Robert P. and Elaine A. Converse, POA Susan Spoul,The Converse Family Trust | $52,662.00 |
| 25. | Frances Cooper, Cooper Declaration Trust | $10,591.56 |
| 26. | Gary and Judith Cox | $10,443.67 |
| 27. | Daniel and Dawn Craig | $10,591.56 |
| 28. | Joseph Scott Crosby | $21,183.11 |
| 29. | William M. Crosby | $21,183.11 |
| 30. | Julia Ann Davidson, The Davidson Living Trust | $52,588.06 |
| 31. | Joseph and Christina Deaton, Deaton Family Revocable Trust | $10,591.56 |
| 32. | Maureen Debeer, The Hans & Maureen Debeer Living Trust | $63,401.44 |
| 33. | Donald and Ann Delaney, Donald and Ann Delaney Revocable Trust | $52,809.89 |
| 34. | Susan P. Demille | $21,183.11 |
| 35. | Arlen Robert and Vivien Burt Diamond, Arlen Diamond and Vivien Burt Diamond Family Trust | $31,774.67 |
| 36. | Donato M. and Nancy G. Dingillo, The Dingillo Family 1994 Trust | $10,591.56 |
| 37. | Michael and Janice Dingillo, Amendment and Restatement of M & J Dingillo Trust | $63,253.56 |
| 38. | Rocco and Deborah Dingillo | $10,369.72 |
| 39. | John Doerr, the John Nelson Doerr & Betty Jean Doerr 1998 Revocable Trust | $10,369.72 |
| 40. | Roy and Janet Dohner, Dohner Trust | $31,478.89 |
| 41. | Mason Donahoe, c/o Traci Donahoe | $10,591.56 |
| 42. | Preston Donahoe, c/o Traci Donahoe | $10,591.56 |
| 43. | Floranne Dunning, The Ronald A. Dunning and Floranne F. Dunning Family Trust | $21,183.11 |

1

**UNSECURED NOTEHOLDERS**

**EXHIBIT "J"**

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| **44.** | Richard Durette, Durette Family Trust, Carol A Raftery POA | $21,183.11 |
| **45.** | Christa G. Dyer, The Dyer Family Trust | $52,846.86 |
| **46.** | Mary Elin and Mark H. Ellis, Ellis Survivors Trust | $73,993.00 |
| **47.** | Frank L. and Shirley Feller, Feller Family Trust | $21,183.11 |
| **48.** | Pat Feller | $10,591.56 |
| **49.** | Maria Qing Feng | $10,443.67 |
| **50.** | Thomas Ferguson | $10,369.72 |
| **51.** | Cedric C. and Elizabeth A. Fields, The Fields Living Trust | $42,366.22 |
| **52.** | Joan A. Finn-Hanson, Joan Adrian Fin-Hanson Trust | $31,441.92 |
| **53.** | Virginia L. Franks, Virginia L. Franks Trust | $31,626.78 |
| **54.** | Richard and Patricia Freeman, Richard and Patricia Freeman Revocable Living Trust | $10,591.56 |
| **55.** | William G. Freitag, William G. Freitag Revocable Trust | $52,588.06 |
| **56.** | Lynn A. Friedman | $10,591.56 |
| **57.** | John E. and Mary E. Fritz | $10,591.56 |
| **58.** | Chihiro Fujikawa | $10,591.56 |
| **59.** | Mary B. Garver, Mary B. Garver Survivor's Trust created under the Garver Living Trust | $10,591.56 |
| **60.** | Betty J. Gefell, The Betty J. Gefell 1990 Trust | $42,218.33 |
| **61.** | Emanuel and Jean Glass | $73,993.00 |
| **62.** | Murray Glass | $21,183.11 |
| **63.** | Mary Glenane, Peter J. & Mary Glenane Family Trust | $31,700.72 |
| **64.** | Ruben Roberto Gomez and Lynne Alana Delaney | $42,144.39 |
| **65.** | Virginia M. Gordon, The Gordon Trust | $10,591.56 |

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| **66.** | David and Lois Goren | $31,626.78 |
| **67.** | Gary and Janet Green, The Green Family Trust | $31,774.67 |
| **68.** | Phillip Griffith | $21,183.11 |
| **69.** | Carol P. Gruber, Gruber Family Trust | $41,922.56 |
| **70.** | Joel Gruber | $10,591.56 |
| **71.** | Terry Gruber | $10,443.67 |
| **72.** | Larry and Theresa Hambleton | $21,183.11 |
| **73.** | William Harnacker | $31,626.78 |
| **74.** | Raymond L. & Maureen Harris | $21,183.11 |
| **75.** | Rose M. Hartman | $10,591.56 |
| **76.** | Raymond and Gale Haskell, Raymond E. Haskell & Gayle K. Haskell Revocable Trust | $10,591.56 |
| **77.** | David and Claire Hecht, Hecht Family Trust | $21,183.11 |
| **78.** | Cory Helms | $31,774.67 |
| **79.** | Harris R. Henningsen, Declaration of Trust of Harris Henningsen & Lorraine Viola Henningsen | $21,183.11 |
| **80.** | Robert and Jayne Hess, Robert Allen and Jayne R. Hess Trust | $41,996.50 |
| **81.** | Robert and Patricia Holler, Holler Family Trust | $21,035.22 |
| **82.** | John and Rita Holliday | $21,183.11 |
| **83.** | Edward and Joyce Horowitz | $10,591.56 |
| **84.** | Thomas and Kristen Hylton | $10,591.56 |
| **85.** | Shirley E. Jacobs and/or Carol J. Dalton, Robert M. Donahue Jr. | $21,183.11 |
| **86.** | Harvey and Joyce Jensen, Jensen Family Trust | $21,183.11 |
| **87.** | Howard and Carol Jensen, The Jensen Family Trust | $42,366.22 |

**UNSECURED NOTEHOLDERS**

**EXHIBIT "J"**

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| 88. | Charles and Gloria Johnson | $63,549.33 |
| 89. | James and Stephanie Johnson | $31,626.78 |
| 90. | Vernon Lee Johnson, Vernon Lee Johnson Trust | $21,183.11 |
| 91. | Lon Roy Kavanaugh III | $10,591.56 |
| 92. | Scott F. Kavanaugh | $10,591.56 |
| 93. | (Melvin) and Jean Keleman, Keleman Family Trust | $21,183.11 |
| 94. | William L. and Judy Kelly | $10,369.72 |
| 95. | Richard and Eleanor Kichline, The Kichline 1992 Family Trust | $10,591.56 |
| 96. | Wesley and Marcy Kim, The 2002 Kim Family Trust | $21,183.11 |
| 97. | Mildred G. Kosmides | $10,591.56 |
| 98. | Ralph L. Kosmides | $52,957.78 |
| 99. | Sharon M. Kouma, Kouma Family Trust | $31,774.67 |
| 100. | Randall Kroha | $21,183.11 |
| 101. | Frances (Jackie Riegel POA) Lambert | $21,183.11 |
| 102. | Ronald and Sandra Lamperts | $21,183.11 |
| 103. | Donald Lavoie | $10,591.56 |
| 104. | Penny Lavoie | $31,478.89 |
| 105. | Penny Lavoie, Martha Blackburn Living Trust | $31,626.79 |
| 106. | Gerald L. and Diane Lenning, Gerald L. and Diane A. Lenning Revocable Trust | $20,961.28 |
| 107. | James and Mary Lou Lester, The Lester Family Trust | $10,591.56 |
| 108. | Willard and Jutta Loomis, Loomis Family Trust | $21,109.17 |
| 109. | Robert John and Elizabeth Luraschi Knight, Robert N. Luraschi Trust (Liz Knight – Trustee) | $10,591.56 |

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| 110. | Robert Luraschi, Robert N. Luraschi Trust (Liz Knight – Trustee) | $116,285.28 |
| 111. | Barbara Lyons, Lyons Family Trust | $20,813.39 |
| 112. | Darlene H. MacDonald, James W. MacDonald Family Trust | $21,183.11 |
| 113. | Nancy J. (Afred Price) Macnair | $10,480.64 |
| 114. | Kenneth Mailman, Kenneth Charles Mailman and Annie S. Mailman 1996 Trust | $31,774.67 |
| 115. | Geoffrey and Kimberly Maloney | $52,070.44 |
| 116. | Lyn B. Maloney | $52,070.44 |
| 117. | Karen E. Marbach | $10,591.56 |
| 118. | Thomas and Sherre May | $10,591.56 |
| 119. | Richard George Mcclellan, Jr. | $10,591.56 |
| 120. | Gilbert and Maureen McCutchan, McCutchan Family Trust | $41,626.78 |
| 121. | Shelli Miller, The Lloyd D. McDaniel Living Trust | $10,591.56 |
| 122. | University Arkansas Tech, The Lloyd D. McDaniel Living Trust | $10,591.56 |
| 123. | Bruce & Elizabeth Bingham, The Lloyd D. McDaniel Living Trust | $10,443.67 |
| 124. | Paul Brian McDonald | $10,665.50 |
| 125. | Mary and James McKennon | $31,552.83 |
| 126. | Michael and Jennell McKinzie | $10,591.56 |
| 127. | Terence Lee and Rosann McLaughlin, McLaughlin Revocable Trust of 2012 | $31,626.78 |
| 128. | (Hal) Roger (Meade) Welt, Catherine Meade Welt (POA) | $31,552.83 |
| 129. | Catherine C. Mealer | $21,183.11 |
| 130. | Hal and Hannah Meany, Meany Family Trust | $10,591.56 |
| 131. | David and Maureen Melvold, 1991 Melvold Family | $10,591.56 |

UNSECURED NOTEHOLDERS

EXHIBIT "J"

| | CLAIMANT(S) | AMOUNT | | CLAIMANT(S) | AMOUNT |
|---|---|---|---|---|---|
| | Trust | | 153. | John Overdevest | $10,369.72 |
| 132. | Marjorie Reed Meyer | $20,961.28 | 154. | Thomas and Colleen Paddock | $10,591.56 |
| 133. | Dennis H. Miller | $10,369.72 | 155. | Vincent S. and Marion L. Pallotta | $10,591.56 |
| 134. | Stephen John Misch | $21,183.11 | 156. | Ronald R. and Patty J. Panico | $10,591.56 |
| 135. | Maria Suzette L. Moates, The Moates Trust | $42,218.33 | 157. | Edythe B. Pearce, Pearce Family Trust | $20,887.33 |
| 136. | Pamela J. Monger | $42,218.33 | 158. | Lauretta M. Pearce, GLP Family Trust Dated 12/18/90 | $21,183.11 |
| 137. | Kenneth Scott & Deborah John Morgan, Trustees of Kenneth S. & Deborah J. Morgan Family Trust 2002 | $31,626.78 | 159. | Barbara J. Pebbles | $73,845.11 |
| 138. | Linda Marie Morgan, Linda Marie Morgan Separate Property Trust Established 4/28/2000 | $42,366.24 | 160. | Mike and Ina Petokas | $21,035.22 |
| 139. | Neva and Willita Morrill & Hussey | $21,183.11 | 161. | Rene M. Piazza, Piazza Trust dated July 2, 1997 – Trust A | $21,183.11 |
| 140. | Larry Martin Munz | $20,961.28 | 162. | Gregory Carl Pommerenk (Contact Lynne Weiss) | $10,591.56 |
| 141. | Michael and Kathryn Munz, Munz Family Trust | $84,066.94 | 163. | William E. Pope, Pope Family By-Pass Trust dtd 04/13/2009 | $116,507.11 |
| 142. | Pat M. Murphy, Murphy Family Trust | $52,735.94 | 164. | Devin Pourian | $31,774.67 |
| 143. | Leon and Nancy Nadolski, The Leon R. & Nancy A. Nadolski Revocable Trust | $31,626.78 | 165. | Elaine Proko | $31,774.67 |
| 144. | (Warren) and Sheila Newman, Newman Family Trust | $94,510.61 | 166. | Evangeline V. Provost, Provost Family Trust | $52,809.89 |
| 145. | Launa and Phillip Nuttman and Griffith | $52,957.78 | 167. | Barbara Quick, Quick Family Trust dtd 4/23/15 | $52,809.89 |
| 146. | Connie R. O'Brien, O'Brien Family Trust | $31,626.78 | 168. | Emmy Quinn | $63,105.67 |
| 147. | Myra L. O'Connell, Myra L. O'Connell | $21,183.11 | 169. | Malcolm and Julie Read, The Read Family Trust | $21,109.17 |
| 148. | Ronald and Bobbie Olsen, Olsen Family Trust | $21,035.22 | 170. | James W and Jann Lea, Reinke Family Trust | $10,591.56 |
| 149. | Pamela Ann O'Shea, Pamela A O'Shea Living Trust | $10,443.67 | 171. | Allan and Shirley Richardson | $10,591.56 |
| 150. | Scott & Katie O'Shea, Michael O'Shea & Katie O'Shea Trust | $10,591.56 | 172. | Jacquelyn Riegel, The Jacquelyn G.F.S. Riegel Living Trust | $10,591.56 |
| 151. | Francis and Jean Rita O'Toole, Descendant's Trust of the O'Toole Family Trust dtd 5/26/89 | $42,366.22 | 173. | Kenneth B. Roath, Roath Family Trust | $21,183.11 |
| 152. | Moira O'Toole, Moira G. O'Toole Trust | $21,183.11 | 174. | Marc S. Rogers, The Rogers Trust dtd 12/8/08 | $21,183.11 |

**UNSECURED NOTEHOLDERS**

**EXHIBIT "J"**

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| 175. | Laura Lynn Rosales | $10,591.56 |
| 176. | Walter and Norma Schulte, The Walter B. Schulte & Norma G. Schulte Living Trust dtd 9/19/90; Amended 10/2/14 | $10,591.56 |
| 177. | Mary Ann Shields, Shields Family Trust, Feb. 10, 2014 | $20,961.28 |
| 178. | Roland L. and Deanna J. Shorter | $21,183.11 |
| 179. | Richard Silva, Richard Silva Profit Sharing Plan | $137,024.72 |
| 180. | William and Jeannette M. Simek, The William J. and Jeannette M. Simek Family Trust | $31,626.78 |
| 181. | Deborah Simmons | $21,183.11 |
| 182. | Patricia Stanley | $10,591.56 |
| 183. | Robert G. Stebe | $42,366.22 |
| 184. | Kelli Stember | $10,591.56 |
| 185. | Henry and Elaine Stemke, Stemke Family Trust | $21,109.17 |
| 186. | Norma Strother, Strother Family Trust | $10,591.56 |
| 187. | Steve and Sandra Sultanoff, Steven M. Sultanoff Trust | $42,144.39 |
| 188. | Ron Suneri | $10,591.56 |
| 189. | Richard O. Tanny, Tanny Revocable Inter Vivos Trust | $41,959.53 |
| 190. | Stacey Teagno | $10,591.56 |
| 191. | John P. and Kathleen H. Teele, The Teele Family Trust | $148,133.89 |
| 192. | Kevin B. Thomas | $10,591.56 |
| 193. | Jeff and Joan Tyner | $63,401.44 |
| 194. | Gerald and Phyllis Waters, Gerald I. and Phyllis E. Waters Family Trust | $31,774.67 |
| 195. | Lynne Weiss | $10,591.56 |

| | CLAIMANT(S) | AMOUNT |
|---|---|---|
| 196. | Alexis Westerfield, Troy Westerfield Guardian | $10,480.64 |
| 197. | Samantha Westerfield, Troy Westerfield Guardian | $10,591.56 |
| 198. | Merideth Wiberg, The Wiberg Family Trust | $10,591.56 |
| 199. | Patricia Wilhite | $10,591.56 |
| 200. | Louise Powell Wilson | $31,626.78 |
| 201. | Nan Wilson and/or Simona J. Wilson | $10,591.56 |
| 202. | Katharine E. Winebrenner | $10,369.72 |
| 203. | Barbara L. Wood | $10,591.56 |
| 204. | Bonnie C. Wylie | $10,591.56 |
| 205. | Janet Morgan Wylie | $21,035.22 |
| 206. | Arthur and Beth Young | $21,183.11 |
| | **TOTAL** | **$5,540,528** |

EXHIBIT "K"

**Ruby's Diner Inc.**

## Going Concern Valuation

| | RDI | RFS | SoCal | HB | Oceanside | PS | Lag | South Coast | Long Beach |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| Cash On Hand | | 421,541 | | 421,541 | 142,696 | 62,172 | | 49,994 | 25,737 |
| Cash infusion from equity | 4,000,000 | | | | | | | | |
| Gift Cards & Other Claims | | | | 206,468 | 93,317 | 51,834 | | | |
| Pre & Post Petition Net Down | 220,820 | 662,459 | | | | | | | |
| Value of Restaurants | | | | 1,883,761 | 1,164,694 | 524,739 | | 289,808 | 220,006 |
| Value of Franchise Royalties @ 9.13x multiple [5] | 4,491,568 | 13,474,703 | | | | | | | |
| **Total Assets** | **8,712,387** | **14,558,703** | **0** | **2,511,770** | **1,400,706** | **638,745** | | **339,801** | **245,743** |
| **Liabilities** | | | | | | | | | |
| Sec. Debt Opus | | 1,281,400 | 0 | 1,559,556 | 859,735 | 336,382 | | | |
| US Foods 503(b)9 | | | | 64,116 | 51,487 | 25,337 | | | |
| Secured Noteholders | 2,984,923 | | | | | | | | |
| C&C | | | 0 | 168,368 | 92,816 | 36,316 | | | |
| Deferred Comp/Bonus | 80,000 | | | | | | | | |
| HOP Tax | | | | | | | | | |
| FUTA RDI | 32,239 | | | | | | | | |
| Property Tax | | | | 2,785 | 42,236 | | | | |
| Priority Tax Claims | 8,752 | 15,572 | | 800 | 800 | 800 | | | |
| Professional Fees [4] | 4,202,500 | 455,000 | 0 | 259,768 | 143,202 | 56,030 | | | |
| Gift Card Obligations | 650,000 | | | | | | | | |
| Steve Craig Note Interest | | 120,000 | | | | | | | |
| SoCal HOPL Lease Settlements | | | | | 13,920 | 21,286 | 36,000 | | |
| Post Petition Gift Cards | 87,429 | | | | | | | | |
| Lease Settlements Plaza Bonita | | | | | | | | | |
| Post Petition AP | 320,180 | 310,651 | 247 | 433,391 | 265,424 | 129,568 | | 116,755 | 80,075 |
| Unsecured Creditors [3] | $ 2,500,000 | 430,342 | $ 33,289 | 113,189 | 62,397 | 24,414 | | | |
| **Total Liabilities by Entity** | **10,866,023** | **2,612,965** | **33,536** | **2,601,974** | **1,532,016** | **630,132** | **36,000** | **116,755** | **80,075** |
| **Total Liabilities** | **18,509,476** | | | | | | | | |

| Equity Value | |
|---|---|
| **Estimated FMV Equity** | **$ 9,898,380** |
| Illiquidity Discount [1] | 21% |
| Additional Company Discount [2] | 12% |
| **Adjusted FMV Equity** | **$ 6,671,508** |

| | Discount Percentage | | | | | | |
|---|---|---|---|---|---|---|---|
| | 25% | 28% | 30% | 33% | 35% | 38% | 40% |
| **Adj Equity Value** | 7,413,887 | 7,166,427 | 6,918,968 | 6,671,508 | 6,424,049 | 6,176,589 | 5,929,130 |

[1] Stout Restricted Stock Study Companion Guide - 2018 Edition
[2] Valuing a Business – Shannon P. Pratt – Chapter 18, Other Valuation Discounts
[3] RDI Unsecured Creditors are paid at 12.5% on ED and 5% in year 1 and 5% in year 2.
[4] Professional Fees are estimates through Jan. 2020.
[5] Value of the franchise is based on strategic buyers purchasing the franchise.

EXHIBIT "L"

**NON-RESIDENTIAL REAL PROPERTY LEASES AND EXECUTORY CONTRACTS
TO BE ASSUMED**

**EXHIBIT "L"**

| | DEBTOR(S) AFFECTED | TYPE | DESCRIPTION | PARTY (S) | CURE AMOUNTS ($) |
|---|---|---|---|---|---|
| 1. | Ruby's Diner, Inc.; Ruby's Huntington Beach, Ltd. | Executory contract | Licensing Agreement for Intellectual Property | Ruby's Diner, Inc.; Ruby's Huntington Beach, Ltd. | $0.00 |
| 2. | Ruby's Diner, Inc.; Ruby's Oceanside, Ltd. | Executory contract | Licensing Agreement for Intellectual Property | Ruby's Diner, Inc.; Ruby's Oceanside, Ltd. | $0.00 |
| 3. | Ruby's Diner, Inc.; Ruby's Palm Springs, Ltd. | Executory contract | Licensing Agreement for Intellectual Property | Ruby's Diner, Inc.; Ruby's Palm Springs, Ltd. | $0.00 |
| 4. | Ruby's Diner, Inc.; Ruby's Franchise Systems, Inc. | Executory contract | License Agreement | Ruby's Diner, Inc.; Ruby's Franchise Systems, Inc. | $0.00 |
| 5. | Ruby's Diner, Inc. | Executory contract | Point of Service Agreement | Worldpay US, Inc. | $0.00 |
| 6. | Ruby's Diner, Inc.; Ruby's SoCal Diners, LLC; Ruby's Huntington Beach, Ltd.; Ruby's Oceanside, Ltd.; Ruby's Palm Springs, Ltd. | Executory contract | Master Distribution Agreement | US Foods | Pursuant to Settlement |
| 7. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Ardmore PA | Roughdraft Restaurant Group Jonathan Litt | $0.00 |
| 8. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Brinton Lake PA | Roughdraft Restaurant Group Jonathan Litt | $0.00 |
| 9. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Downey | KRG Investments, LLC   Abraham Kobi | $0.00 |
| 10. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Citadel | Eureka Food Enterprises, LLC Steve Craig | $0.00 |
| 11. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Laguna Beach | Eureka Food Enterprises, LLC Steve Craig | $0.00 |
| 12. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Corona del Mar | Eureka Food Enterprises, LLC Steve Craig | $0.00 |
| 13. | Ruby's Franchise Systems, Inc. | Franchise Agreement | San Clemente | Eureka Food Enterprises, LLC Steve Craig | $0.00 |
| 14. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Mission Viejo Mall | Ruby's MV Inc.        George Alexander | $0.00 |
| 15. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Carlsbad | Eat at Joes Restaurant, Inc. Joe Campbell | $0.00 |

1

**NON-RESIDENTIAL REAL PROPERTY LEASES AND EXECUTORY CONTRACTS
TO BE ASSUMED**

**EXHIBIT "L"**

| | DEBTOR(S) AFFECTED | TYPE | DESCRIPTION | PARTY (S) | CURE AMOUNTS ($) |
|---|---|---|---|---|---|
| 16. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Balboa Pier | Heritage Restaurant Management, Inc.    John Fisher & Joe Campbell | $0.00 |
| 17. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Redondo Beach | John Fisher | $0.00 |
| 18. | Ruby's Franchise Systems, Inc. | Franchise Agreement | San Juan Capistrano | Benchmark Hospitality, Inc.  Joe Campbell & John Fisher | $0.00 |
| 19. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Whitwood Mall, Whittier | Marvi Land Inc.    Micheal Youssef | $0.00 |
| 20. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Palos Verdes | PV Hospitality Inc. Suhail Hashim | $0.00 |
| 21. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Orange | Ruby's Diner Orange Depot, LLC | $0.00 |
| 22. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Tustin | Dimitri's Restaurant, Inc. | $0.00 |
| 23. | Ruby's Franchise Systems, Inc. | Franchise Agreement | North Hollywood | Coffix, LLC    Abraham Kobi | $0.00 |
| 24. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Orange County Airport | HMS | $0.00 |
| 25. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Las Vegas Airport | HMS | $0.00 |
| 26. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Houston Airport | National Pizza Restaurant Inc.  Chris Pappas | $0.00 |
| 27. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Atlantic City Casino | AC Food Hall Partners    William White | $0.00 |
| 28. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Anthem, AZ | Eureka Food Enterprises, LLC Steve Craig | $0.00 |
| 29. | Ruby's Franchise Systems, Inc. | Future Franchise Agreement, Rights Granted for Unit | Castle Rock, CO | Eureka Food Enterprises, LLC Steve Craig | $0.00 |
| 30. | Ruby's Franchise Systems, Inc. | Marketing Agreement | Pechanga Casino – Sports Arena | Levy Premium Food Service Ltd. | $0.00 |
| 31. | Ruby's Franchise Systems, Inc. | Franchise Agreement | Laguna Hills | Maria Land Inc., Micheal Youssef | $0.00 |

EXHIBIT "M"

**OTHER NON-RESIDENTIAL REAL PROPERTY LEASES AND EXECUTORY CONTRACTS
TO BE REJECTED**

**EXHIBIT "M'**

|  | DEBTOR(S) AFFECTED | TYPE | DESCRIPTION | PARTY (S) | ACTION TO TAKE |
|---|---|---|---|---|---|
| **1.** | Ruby's Diner, Inc. | Executory Contract | License Agreement | Ruby's Retail Brands | Reject |

DOCS_LA:321309.2 76135/003

EXHIBIT "N"

**RDI Liquidation Analysis**

| Assets | Liq. Analysis | Plan Treatment |
|---|---|---|
| (1) Value of Trademark and IP | 3,009,350 | |
| (2) Value of Interests in SoCal | 0 | |
| Value of 50% interest in Ruby's South Coast Plaza | 289,808 | |
| Value of 65% interest in Ruby's Long Beach | 220,006 | |
| Value of Interests in Quality Diners | 0 | |
| **Total Assets** | 3,519,164 | |
| | | |
| **RDI Secured Liabilities** | | |
| Secured Noteholders | 2,984,923 | |
| **Total Secured Debt** | **2,984,923** | |
| | | |
| **Priority and Administrative Payments** | | |
| Deferred Comp/Bonus | 80,000 | |
| Priority Tax Claims | 8,752 | |
| Professional Fees | 4,202,500 | |
| FUTA RDI | 32,239 | |
| Gift Card Obligations | 650,000 | |
| Post Petition Gift Cards | 87,429 | |
| Post Petition AP | 320,180 | |
| **Total Priority and Administrative** | **5,381,099** | |
| | | |
| **Available for Unsecured Creditors** | 0 | |
| | | |
| **Total Unsecured Creditors** | **10,176,824** | |
| | | |
| **Total Liabilities** | **18,542,847** | |
| | | |
| **Liquidaton Value of RDI** | 0 | |
| | | |
| (3) **Recovery to Unsecureds** | **0%** | **0% to 24.6%** |

1  In a Ch 7 liquidation, we believe that it would be difficult for a buyer to maintain a franchise system.
   One or more of the current franchisees would be the most likely buyers.    We assign a value of 75% of 9.13X the
   EBITDA from the franchise royalty with 33% discount.

2  SoCal Restaurants Liquidation Analysis shows a value of zero to equity and to unsecured creditors.

3  Unsecured Creditors recovery ranges from 0% to 24.6% base on treatment voted by individual creditors.

**HOPL Equity Valuation-Sale of Restaurants**

| | Assets | Liq. Analysis | Plan Treatment |
|---|---|---|---|
| | Cash | 684,235 | |
| | Value of Restaurants (3x) | 3,573,193 | |
| | Reduction in value from market perception of failed BK, Gift card obligations, and Trustee's sale (15%) | (535,979) | |
| (1) | **Total Assets** | **3,721,450** | |
| | | | |
| | Trustee Fee | 127,196 | |
| | Brokerage Fee (standard 10% in the restaurant broker industry) | 357,319 | |
| | Trustee Attorney's Fee | 50,000 | |
| | | | |
| | **Net Available for OPUS Secured Debt** | **3,186,934** | |
| | | | |
| (2) | OPUS Debt | 2,755,673 | |
| | **OPUS payout percentage** | **100%** | |
| | | | |
| | **Other Secured & Priority Payments** | | |
| (3) | Tax | 47,421 | |
| (4) | C&C Judgment | 297,500 | |
| | **Total Other Secured Debt** | **3,100,595** | |
| | | | |
| | **Net Available for Admins** | **86,340** | |
| | | | |
| | **Administrative Expenses** | | |
| | Professional Fees | 540,000 | |
| | Post Petition AP Huntington Beach | 497,507 | |
| | Post Petition AP Oceanside | 316,910 | |
| | Post Petition AP Palm Springs | 154,905 | |
| | | **1,509,322** | |
| | **Cure Payments** | | |
| | Other Lease Cure Payments | 71,206 | |
| | **Total Cure Payments** | **71,206** | |
| | | | |
| | **Net Available from Unsecureds** | **(1,494,189)** | |
| | | | |
| | **HOP Unsecured Liabilities** | | |
| | Huntington Beach Unsecured Creditors | 1,260,481 | |
| | Oceanside Unsecured Creditors | 1,211,015 | |
| | Palm Springs Unsecured Creditors | 1,090,812 | |
| | **Total HOP Unsecured Creditors** | **3,562,308** | |
| | | | |
| | **Recovery to Unsecured** | **0%** | **2.2% to 9%** |

1 Adjusted valuation based on decline in HOP EBITDA. Receivable from RDI for gift card obligation is assumed to be uncollectible in liquidation scenario.

2 Opus has security interests in the assets of the the HOPL units.

3 This includes property tax for Ocean Side restaurant.

4 C&C has a judgement against each of the HOPL units and SoCal.

**RFS Liquidation Analysis**

| Assets | Low Estimate | High Estimate | Plan Treatment |
|---|---|---|---|
| Cash | 421,541 | 421,541 | |
| (1) Value of Trademark and IP | 2,000,000 | 9,028,051 | |
| **Total Assets** | **2,421,541** | **9,449,592** | |
| | | | |
| **RFS Secured Liabilities** | | | |
| Secured Noteholders | 1,281,400 | 1,281,400 | |
| **Total Secured Debt** | **1,281,400** | **1,281,400** | |
| | | | |
| **Priority and Administrative Payments** | | | |
| Priority Tax Claims | 15,572 | 15,572 | |
| Professional Fees [4] | 455,000 | 455,000 | |
| Steve Craig Note Interest | 120,000 | 120,000 | |
| Post Petition AP | 310,651 | 310,651 | |
| **Total Priority and Administrative Payments** | **901,223** | **901,223** | |
| | | | |
| **Available for Unsecured Creditors** | **238,918** | **7,266,969** | |
| | | | |
| Total Unsecured Creditors | 430,342 | 430,342 | |
| | | | |
| **Total Liabilities** | **1,711,742** | **1,711,742** | |
| | | | |
| **Recovery Pct. to Unsecureds** | 56% | 100% | 100% |

1 In a Ch 7 liquidation, a Trustee might reject the license agreement between RDI, the owner of the Trademark, and RFS
   In the event that the license agreement, RFS' primary asset will be non-exclusive, we believe the value of RFS would approximate $2M.
   In the alternative, if the license agreement were not terminated, one of the current franchisees would be the most likely buyers.
   In that case, we assign a value of 75% of 9.13X the EBITDA multiple from the franchise royalty with 33% discount.
   The value is based on purchase been made by a strategic buyer.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 Town Center Drive, Suite 1500, Costa Mesa, CA  92626**

A true and correct copy of the foregoing document entitled:  **FIRST AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
 thereof will be served or was served (a) on the judge in chamber in the form and manner required by LBR 5005-2(d); and the manner stated below:


1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **10/1/2019**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

2.  **SERVED BY UNITED STATES MAIL**:
On _____ I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

3.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **10/2/2019**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service information continued on attached page


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


| <u>10/1/2019</u> | <u>Nancy Lockwood</u> | <u>/s/ Nancy Lockwood</u> |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:316841.1 76135/001

**F 9013-3.1.PROOF.SERVICE**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **George B Blackmar**    gblackmar@bpslaw.net
- **Dustin P Branch**    branchd@ballardspahr.com, carolod@ballardspahr.com;hubenb@ballardspahr.com
- **Aaron Davis**    aaron.davis@bryancave.com, kat.flaherty@bryancave.com
- **Alan J Friedman**    afriedman@shbllp.com, lgauthier@shbllp.com
- **Eric J Fromme**    efromme@tocounsel.com, lchapman@tocounsel.com;sschuster@tocounsel.com
- **Alastair M Gesmundo**    agesmundo@wcghlaw.com, jmartinez@wcghlaw.com
- **Richard H Golubow**    rgolubow@wcghlaw.com, pj@wcghlaw.com;jmartinez@wcghlaw.com;Meir@virtualparalegalservices.com
- **Steven T Gubner**    sgubner@bg.law, ecf@bg.law
- **Michael J Hauser**    michael.hauser@usdoj.gov
- **Garrick A Hollander**    ghollander@wcghlaw.com, pj@wcghlaw.com;jmartinez@wcghlaw.com;Meir@virtualparalegalservices.com
- **Lillian Jordan**    ENOTICES@DONLINRECANO.COM, RMAPA@DONLINRECANO.COM
- **David S Kupetz**    dkupetz@sulmeyerlaw.com, dperez@sulmeyerlaw.com;dperez@ecf.courtdrive.com;dkupetz@ecf.courtdrive.com
- **William N Lobel**    wlobel@pszjlaw.com, nlockwood@pszjlaw.com;jokeefe@pszjlaw.com;banavim@pszjlaw.com
- **Robert S Marticello**    Rmarticello@swelawfirm.com, gcruz@swelawfirm.com;lgarrett@swelawfirm.com;jchung@swelawfirm.com
- **Jessica G McKinlay**    mckinlay.jessica@dorsey.com
- **Malcolm D Minnick**    dminnick@pillsburylaw.com, m.minnick@comcast.net
- **Ernie Zachary Park**    ernie.park@bewleylaw.com
- **Valerie Smith**    claims@recoverycorp.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Matthew S Walker**    matthew.walker@pillsburylaw.com, renee.evans@pillsburylaw.com,docket@pillsburylaw.com
- **Corey R Weber**    ecf@bg.law, cweber@bg.law
- **Sharon Z. Weiss**    sharon.weiss@bclplaw.com, raul.morales@bclplaw.com
- **Christopher K.S. Wong**    christopher.wong@arentfox.com, yvonne.li@arentfox.com

2. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**

Via Attorney Service (Messenger) on 10/2/2019
The Honorable Catherine E. Bauer
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5165 / Courtesy Bin
Santa Ana, CA 92701-4593

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.