William N. Lobel, State Bar No. 93202
PACHULSKI STANG ZIEHL & JONES LLP
650 Town Center Drive, Suite 1500
Costa Mesa, California 92626
Telephone:  (714) 384-4740
Facsimile:  (714) 384-4741
E-mail:  wlobel@pszjlaw.com

Attorneys for Ruby's Diner, Inc., a California corporation,
*et al.,* Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA

| | |
|---|---|
| RUBY'S DINER, INC., a California corporation, *et al.,*[1] | Chapter 11 |
| Debtors and Debtors in Possession. | Case No. 8:18-bk-13311-CB |
| Affects: | Jointly Administered With Case Nos. 8:18-bk-13197-CB; 8:18-bk-13198-CB; 8:18-bk-13199-CB; 8:18-bk-13200-CB; 8:18-bk-13201-CB; 8:18-bk-13202-CB |
| ☒ All Debtors | |
| ☐ RUBY'S DINER, INC., ONLY | |
| ☐ RUBY'S SOCAL DINERS, LLC, ONLY | ~~FIRST~~SECOND **AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION** |
| ☐ RUBY'S QUALITY DINERS, LLC, ONLY | |
| ☐ RUBY'S HUNTINGTON BEACH, LTD., ONLY | **Disclosure Statement Hearing:** |
| ☐ RUBY'S LAGUNA HILLS, LTD. ONLY | DATE:    December 19, 2019<br>TIME:    10:00 a.m.<br>CTRM:    5D |
| ☐ RUBY'S OCEANSIDE, LTD., ONLY | **Plan Confirmation Hearing:** |
| ☐ RUBY'S PALM SPRINGS, LTD., ONLY | DATE:    [To Be Scheduled]<br>TIME:<br>CTRM:    5D |

[1] The chapter 11 cases of Ruby's Diner, Inc., Ruby's SoCal Diners, LLC, Ruby's Quality Diners, LLC, Ruby's Huntington Beach, Ltd., Ruby's Laguna Hills, Ltd., Ruby's Oceanside, Ltd. and Ruby Palm Springs, Ltd. (referred to herein as the "RDI Debtors") are jointly-administered.  The chapter 11 case of Ruby's ~~Franchising~~Franchise System, Inc.

## <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ...................................................................................... 11

II. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND
    GOVERNING LAW.................................................................................. 6

    A.     Defined Terms ................................................................................ 6

    B.     Rules of Interpretation .................................................................. 6

    C.     Computation of Time .................................................................... 7

    D.     Governing Law .............................................................................. 7

    E.     Reference to Monetary Figures...................................................... 7

III. GENERAL RULES OF CLASSIFICATION.......................................... 8

IV. TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS ..................... 8

    A.     Administrative Claims .................................................................. 8

            1.     Administrative Claims of Non-Professionals ................................. 8

            2.     Administrative Claims of Professionals...................................... 10

            3.     Administrative Personal Property Tax Claims .......................... 13

            4.     Administrative Bar Date for Filing of Administrative Claims ................. 13

    B.     Priority Tax Claims...................................................................... 14

V. TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS............................................. 15

    A.     Summary of Classification under the Plan............................................. 15

    B.     Classes of Secured Claims.......................................................... 16

            1.     Class 1:  Allowed Secured Claims of the Secured Noteholders (RDI)...... 16

    C.     Classes of Unsecured Claims...................................................... 25

            1.     Class 11(a):  Allowed Unsecured Claims Against RDI........................ 2626

            2.     Class 11(b):  Gift Card Reimbursement Claims of Franchisees
                    Satisfied Though Pre-Petition Netdown Process ......................................... 27

            3.     Class 11(c):  General Unsecured Claims Against the SoCal Debtors ....... 27

4.    Class 11(d):  General Unsecured Claims Against RFS ............................29

D.    Interests ................................................................................................29

VI. MEANS OF EFFECTUATING THE PLAN ........................................................30

A.    Funding for the Plan................................................................................30

1.    Cash Needs on the Effective Date ..............................................30

2.    Sources of Cash on the Effective Date ...................................3131

B.    Plan Funding ~~from~~From Plan Sponsor ...................................................31

C.    ~~Transfer~~Issuance of HOP ~~Assets~~Interests to ~~New HOP Entities, Contribution of New HOP Entities to RDI and~~the Plan Sponsor, Provision of the RDI Plan Funding and HOP Plan Funding and ~~RDI Plan Funding~~Contribution of HOP Interests to Reorganized RDI ................................................................32

D.    New Value Contribution ..........................................................................33

E.    Reconciliation of Claims Between and Among the Debtors and the Founders.....33

F.    ~~Transfer~~Contribution of Interests in RFS to RDI; Post-Effective Date Ownership of Reorganized RDI..............................................................34

G.    Pre-Petition Netdown Process..................................................................34

H.    ~~U.S.~~RDI Professional and Unsecured Creditor Distribution Agreement; Litigation Trust ........................................................................................35

1.    Claim Amounts of the RDI Professionals and RDI General Unsecured Creditors.....................................................................35

2.    Priority of Distributions to RDI Professionals and RDI General Unsecured Creditors.....................................................................35

3.    Source of Distributions to RDI Professionals and RDI General Unsecured Creditors.....................................................................36

4.    Reorganized RDI's Payment Obligations to RDI Professionals and RDI General Unsecured Creditors .......................................36

5.    Litigation Trust .............................................................................38

6.    Events of Default ..........................................................................40

I.    US Foods Settlement.................................................................................40

~~I.~~J.    Treatment of Intercompany Claims; Waiver of Avoidance Actions Between Debtors........................................................................................42

JK.    Lending and Borrowing of Monies Between Reorganized Debtors.....................42

KL.    Corporate Structure and Governance.......................................................43

    1.    Charter..............................................................................43

    2.    Voting Rights and Shareholder Agreement ......................................43

    31.    Composition Of Reorganized Debtors' Board Of Directors And
       Identity And Compensation Of Officers.....................................46

LM.    Estate Representative and Litigation Trustee ...............................46

MN.    Disputed Claims and Unclaimed Property...................................47

NO.    Claim Objections and Claims Objection Bar Date ..........................49

VII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........................49

    A.    Unexpired Leases and Executory Contracts to be Assumed ................49

    B.    Unexpired Leases and Executory Contracts to Be Rejected.................50

VIII. EFFECT OF CONFIRMATION OF PLAN.............................................51

    A.    Binding Effect Of Confirmation .............................................51

    B.    Vesting of Assets Free and Clear of Liens, Claims and Interests............51

    C.    Good Faith, Exculpation and Release .......................................51

    D.    The D&O/Affiliate Release ...................................................52

    ED.    No Limitations on Effect of Confirmation...................................53

    FE.    Discharge of Claims..........................................................53

    GF.    Injunction ....................................................................54

    HG.    Securities Laws ..............................................................56

IX. CONDITIONS TO EFFECTIVENESS OF THE PLAN .................................56

X. MISCELLANEOUS PLAN PROVISIONS ..............................................58

    A.    Rounding of Amounts / De Minimis Amount ...............................58

    B.    Name and Address of Holder.................................................58

    C.    Orders to Aid Consummation of Plan........................................58

D.      Severability ................................................................................. 59

E.      Headings of Articles and Sections ............................................... 59

F.      Successors and Assigns................................................................. 59

G.      Changes in Rates Subject to Regulatory Commission Approval............ 59

H.      Services By And Fees For Professionals ..................................... 59

        1.      Prior to the Effective Date ................................................ 59

I.      Dissolution of Committee ............................................................ 60

J.      Litigation Trust ............................................................................ 60

KJ.     Amendment, Withdrawal or Revocation of the Plan ................... 60

LK.     Impact of Default Under Plan ...................................................... 61

ML.     Payment of Post-Confirmation Quarterly Fees............................ 61

NM.     Notices ......................................................................................... 61

XI. RETENTION OF JURISDICTION.................................................................. 62

XII. CONFIRMATION REQUEST ....................................................................... 64

**TO THE HONORABLE CATHERINE E. BAUER, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, CREDITORS AND OTHER PARTIES IN INTEREST:**

## I.

## INTRODUCTION

Ruby's Diner, Inc., a California corporation ("RDI"), Ruby's SoCal Diners, LLC, a Delaware limited liability company ("SoCal Diners"), Ruby's Quality Diners, LLC, a Delaware limited liability company ("Quality"), Ruby's Huntington Beach, Ltd., a California limited partnership ("Ruby's Huntington Beach"), Ruby's ~~Laguna Hills, Ltd., a California limited partnership ("Ruby's Laguna Hills"), Ruby's~~ Oceanside, Ltd., a California limited partnership ("Ruby's Oceanside"), ~~and~~ Ruby's Palm Springs, Ltd., a California limited partnership ("Ruby's Palm Springs") and Ruby's Laguna Hills, Ltd., a California limited partnership ("Ruby's Laguna Hills") (collectively, without RDI, the "SoCal Debtors" and, with RDI , the "RDI Debtors"), and Ruby's Franchise Systems, Inc., a California corporation ("RFS"), an entity affiliated with the RDI Debtors through common ownership and control, are debtors and debtors in possession in chapter 11 proceedings pending in front of this Court (collectively, the RDI Debtors and RFS are referred to as the "Debtors" or the "Plan Proponents"), and submit this ~~*First*~~*Second* *Amended Joint Chapter 11 Plan of Reorganization* (the "Plan").  The Plan and appurtenant ~~*First*~~*Second* *Amended Joint Disclosure Statement Describing* ~~*First*~~*Second* *Amended Joint Chapter 11 Plan of Reorganization* (the "Disclosure Statement") contain a number of capitalized terms.  An appendix containing the definitions for these capitalized terms (the "Definitions") is contained in **Exhibit 1** annexed hereto.[2]

On August 29, 2018, the SoCal Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code").  On September 5, 2018, RDI filed a related Chapter 11 Case and, on September 6, 2018, RFS commenced a separate proceeding under chapter 11 of the Bankruptcy Code (respectively, the "Petition Date(s)").  Following the Petition Dates, the United States Bankruptcy Court for the

---

[2] Capitalized terms used and not otherwise defined herein shall have the same meanings as ascribed to them in the Definitions set forth in **Exhibit 1** annexed hereto.

Central District of California (the "Bankruptcy Court") entered an order jointly administering the RDI Debtors' Chapter 11 Cases for procedural purposes.  The RFS Chapter 11 Case is not jointly administered with the RDI Debtors' Chapter 11 Cases.  The Plan is proposed jointly by the Plan Proponents, and contemplates RFS becoming a wholly-owned subsidiary of RDI, but the Plan does not provide for the substantive consolidation of the Plan Proponents' assets and liabilities.

Chapter 11 allows a debtor, and under some circumstances, creditors and others parties in interest, to propose a plan of reorganization.  A plan may provide for the debtor to reorganize by continuing to operate, to liquidate by selling assets of the bankruptcy estate, or a combination of both.  The Plan Proponents (the RDI Debtors and RFS) are the parties proposing ~~this~~the Plan.

~~The Plan incorporates the terms of settlements reached with Opus Bank and U.S. Foods, two of the major creditors in the Debtors' Chapter 11 Cases, and the Plan has their support.~~

The Plan incorporates the terms of settlements reached with the Official Committee of Unsecured Creditors appointed in the RDI Chapter 11 Case (the "Committee") regarding treatment of unsecured creditors in the Chapter 11 Case of RDI, as well as an agreement with the professionals retained in the RDI Chapter 11 Case (defined herein as the "RDI Professionals") regarding the payment of their allowed professional fees and costs (including an agreement to defer payment of a percentage of such fees and costs).  In addition, the Plan incorporates the terms of settlements reached between two of the major creditors in the Debtors' Chapter 11 Cases – Opus Bank and each of the SoCal Debtors and RFS, and US Foods and each of the SoCal Debtors and RDI.  The Plan, therefore, has the support of the major constituencies in these Chapter 11 Cases, other than Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury").  *[Certain aspects of the agreement with the Committee have not yet been finalized as of the filing of the Plan and Disclosure Statement and may be subject to change].*

The Plan provides for a restructuring of the Debtors' secured, priority and unsecured debt, infusion of new funding, the continuation of the Ruby's® brand as a going concern under a new equity structure, and a ~~transfer~~contribution of the ownership of RFS to RDI, with the license agreement between them remaining in effect.  The Plan will be funded through a combination of Cash from operations, as well as the conversion of debt and the provision of plan funding by Steven

L. Craig or an affiliated entity(ies) (the "Plan Sponsor") totaling ~~Four~~Five Million Dollars ($~~4~~5,000,000) (the "Plan Funding").[3]  In addition, Douglas Cavanaugh and Ralph Kosmides, the founders of Ruby's (the "Founders") will make a "new value" contribution on the Effective Date of the Plan in the form of ~~a portion of~~ the value of their ownership Interests in RFS, which will be contributed to Reorganized RDI as part of a reconciliation of amounts due to and from the Founders and the Debtors as provided by the Plan.  The net New Value Contribution by the Founders has been valued by RDI's financial advisor at approximately $~~5.5~~8 million.  *See* **Exhibit A to the Disclosure Statement**.

A portion of the Plan Funding from the Plan Sponsor will be utilized to fund the Plan as it relates to RDI (~~defined herein as~~ the "RDI Plan Funding")~~.  The~~"), with the cash component of the RDI Plan Funding being the approximate amount of Two Million Seven Hundred Eighty-Six Thousand Three Hundred and Eighty-Four Dollars ($2,786,384).  Seventy-five percent (75%) ownership of Reorganized RDI will be ~~transferred~~issued to the Plan Sponsor in consideration of the RDI Plan Funding and twenty-five percent (25%) to the Founders in consideration of the Founders' New Value Contribution.~~  ~~ Equity in RFS valued at approximately $~~5.5~~8 million will be contributed by the Founders to Reorganized RDI as the New Value Contribution in return for the Founders receiving a ~~40%~~the twenty-five percent (25%) interest in Reorganized RDI.[4]~~  The assets (~~ On the ~~"HOP~~ ~~Assets") owned by~~Effective Date (which will occur one (1) day prior to the Effective Date which relates to the other Plan Proponents)), one hundred percent (100%) of the interests (the "HOP Interests") in Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs (the "HOP Restaurant Entities") will be ~~transferred~~issued to ~~entities owned by~~ the Plan Sponsor ~~(the "New~~

---

[3] ~~This amount may be subject to increase based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.~~  The $5 million Plan Funding from the Plan Sponsor consists of the following: (a) the contribution of Three Million Seven Hundred Thousand  Dollars ($3,700,000) in Cash (less the amount that will be utilized to satisfy the fees of the Plan Sponsor's counsel and tax advisors, in the amount of approximately $325,000); (b) the conversion of the amounts due to the Plan Sponsor (as DIP Lender) in connection with the RDI DIP Loan (in the amount of $300,000) into equity in RDI; and (c) the conversion of the amounts due to the Plan Sponsor (as lender) in connection with the RFS Note (in the principal amount of $1,000,000) into equity in RDI, for total consideration in the amount of Five Million Dollars ($5,000,000).

[4] ~~The balance of the equity in RFS, valued at $2.5 million, will be provided to RDI as consideration for the D&O/Affiliate Release.  The ownership percentages of the Plan Sponsor and the Founders may be subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.~~

HOP Entities") in consideration of histhe Plan Sponsor's contribution of a portion of the Plan Funding to fund the Plan as to each of the respective HOP Restaurant Entities, in the aggregate approximate amount of Five Hundred and Eighty-Eight Thousand Six Hundred and Sixteen Dollars ($588,616) (the "HOP Plan Funding"). The NewThe Plan Sponsor will contribute the HOP Entities will own the HOP Assets Interests to Reorganized RDI one (1) day following the Effective Date, and the HOP Restaurant Entities will be wholly owned subsidiaries of Reorganized RDI. The HOP Restaurant Entities will continue to be subject to the secured debt against the HOP Restaurant Entities and the HOP Assetsthem, as restructured under the Plan. The Plan Sponsor will then contribute his ownership of the New., and Reorganized RDI will guaranty the secured debt of the HOP Restaurant Entities to Opus Bank and C&C Partnership until such claims are satisfied. The HOP Entities to RDI post-Effective Date, and the NewPlan Funding will be utilized to, among other things, make distributions to the HOP Entities will be wholly owned subsidiaries of RDI.Restaurant Entities' unsecured creditors on the Effective Date as provided by the Plan. RFS will continue as the franchising arm of the business, as a wholly owned subsidiary of Reorganized RDI. As a result of the implementation of the terms of the Plan, followingas of the Effective Date, RDIRFS and the HOP Restaurant Entities will be wholly owned 60by Reorganized RDI, and Reorganized RDI will be owned 75% by the Plan Sponsor, 2415% by Cavanaugh and 16% by Kosmides, and RFS and the New HOP 10% by Kosmides. The ownership interests of RDI in SoCal Diners, the ownership interest of SoCal Diners in Quality, and SoCal Diners' and Quality's ownership interests in the SoCal Entities (Ruby's Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs, Ruby's Laguna Hills and Ruby's Mission Valley) will be cancelled and the entities (with the exception of the HOP Restaurant Entities will be solely owned by RDI (subject to adjustment based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan and the resolution of issues regarding the payment of Professional Fees and the source of payment thereof).) will be dissolved.

The Plan provides for the payment in full, over time, of all secured Creditors, and payment in full of all administrative and priority Creditors, except as otherwise agreed. The Plan further provides for payment in full, over time, of the unsecured Creditors' claims of RFS. The unsecured

Creditors of ~~each of~~ the HOP Restaurant Entities will be paid, on the Effective Date of the Plan, their *pro rata* share from distribution funds ~~totaling of $200,000, as follows~~, in the following amounts: $113,118.78 (Ruby's Huntington Beach), $62,397.43 (Ruby's Oceanside~~) and~~); $24,413.78 (Ruby's Palm Springs). The unsecured Creditors' claims of SoCal Diners and Quality (if any)[5] will be paid, on a *pro rata* basis, on the Effective Date of the Plan, two and one-half percent (2.5%) of their allowed claims. The unsecured Creditors' claims of Ruby's Laguna Hills will not be entitled to a distribution as this entity is no longer operating and there is no residual value in the estate to make such payment. ~~The unsecured Creditors' claims of SoCal Diners and Quality (if any)[6] will be paid, on~~In accordance with an agreement between and among the ~~fourth (4th) year anniversary of~~Committee, RDI, the ~~Effective Date of~~Founders and the ~~Plan, two and one-half percent (2.5%) of their allowed claims. The~~RDI Professionals (defined herein as the "RDI Professional and Unsecured Creditor Distribution Agreement"), the unsecured Creditors' claims of RDI (classified in Class 11(a)) will be entitled to ~~one of the following treatments: (1) Paid a total of Two Million Five Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of Six Hundred and Twenty-Five Thousand Dollars ($625,000) on each of the second (2nd), third (3rd), fourth (4th) and fifth (5th) anniversaries of the Effective Date, if there is a Bankruptcy Court approved release of claims (defined herein as the "D&O/Affiliate Release") against the Debtors' directors and officers (defined herein as the "D&Os") and their affiliated entities (defined herein as the "D&O Affiliated Entities"); or (2) if such D&O/Affiliate Release is not approved by the Bankruptcy Court,~~ a *pro rata* distribution from ~~any proceeds ultimately recovered~~funds obtained by a litigation trust formed pursuant to the Plan (defined herein as the "Litigation Trust") that will have the right, following the Effective Date, to ~~investigate and, if appropriate, prosecute claims, if any, against the D&Os and D&O Affiliated Entities; *provided, however,* that any distribution to the RDI unsecured Creditors from any recovery by the Litigation Trust shall be after payment of the fees and costs incurred by the Litigation Trust incurred in connection with the prosecution of claims or otherwise~~pursue RDI Rights of Action (such distributions being made after payment of the reasonable expenses incurred

---

[5] The Debtors do not believe that Quality will have any allowed unsecured creditor claims.

~~[6] The Debtors do not believe that Quality will have any allowed unsecured creditor claims.~~

by the Litigation Trust and the administrative priority claims of the RDI Professionals), as more particularly set forth in Article VI.H of the Plan.  As discussed in detail below, the Plan Proponents believe that a reorganization – as opposed to a liquidation – will maximize value for all Creditor and equity constituencies, and the Plan has the support of the Committee representing the interests of the RDI General Unsecured Creditors, Opus Bank, US Foods and the RDI Professionals.

The Effective Date of the ~~proposed~~ Plan is the later of: (a) the first (1st) Business Day of the first month which begins at least fifteen (15) days following the Confirmation Date; ~~and (2~~or (b) the first (1st) Business Day of the first (1st) month after such date under clause (a) on which there is not in force any stay or injunction against the enforcement of the Plan or the Confirmation Order, provided that the Effective Date will not occur until all Conditions to the Effective Date set forth in Section VII of the Plan have been satisfied or waived by the Plan Proponents; *provided, however,* that the Effective Date must occur by no later than sixty (60) days following the Confirmation Date. The Plan Proponents anticipate that the Effective Date will be on or about February 29, 2020.   The HOP Effective Date will occur one (1) day prior to the general Effective Date.

## II.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

**A.**     **Defined Terms**

Unless the content otherwise requires, the terms utilized in ~~this~~the Plan and the Disclosure Statement, when used in capitalized form, shall have the meanings set forth in **Exhibit 1** annexed hereto.

**B.**     **Rules of Interpretation**

For purposes of the Plan, (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced

document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (4) unless otherwise specified, all references herein to "Article __" and "Section ——.——"__" are references to articles or sections hereof or hereto; (5) unless otherwise stated, the words "herein," "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

**C.    Computation of Time**

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**D.    Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of California, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or organized in California shall be governed by the laws of the jurisdiction of incorporation or organization of the applicable Debtor or Reorganized Debtor.

**E.    Reference to Monetary Figures**

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

### III.

### <u>GENERAL RULES OF CLASSIFICATION</u>

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

### IV.

### <u>TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS</u>

As required by section 1123(a)(1) of the Bankruptcy Code, certain types of Claims are not placed into voting Classes; instead they are unclassified.  They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtors have <u>not</u> placed the following Claims in a Class.

### A.    <u>Administrative Claims</u>

Administrative expenses are claims for costs or expenses of administering the Debtors' Chapter 11 Cases, which are Allowed under Bankruptcy Code section 507(a)(1) (the "<u>Administrative Claims</u>").  The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular Claimant agrees to a different treatment.  The following tables list the Debtors' section 507(a)(1) Administrative Claims and their treatment under the Plan.

### 1.    <u>Administrative Claims of Non-Professionals</u>

Other than those listed in Table 1 below, the Plan Proponents do not believe any amounts will be owed to parties who provide goods and services after the Petition Date (other than Professionals) except for current obligations (including Post-Petition, pre-Effective Date personal property taxes), which will be paid in the ordinary course of business.

**Table 1: Summary of Administrative Claims of Non-Professionals**

| Administrative Creditor | Relationship to Applicable Debtor | Estimate of Amount ~~Owing (as of~~To Be Paid (on or about the Effective Date) | Treatment[7] |
|---|---|---|---|
| ~~U.S.~~US Foods | Supplier (RDI Debtors) | $0.00 | ~~Any amounts owed to U.S. Foods will be paid in accordance with the terms of the U.S. Foods Settlement~~US Foods' administrative claims are comprised of the following: $64,116.20 (Ruby's Huntington Beach), $51,486.60 (Ruby's Oceanside), $25,337.02 (Ruby's Palm Springs), $8,513.53 (Ruby's Laguna Hills), $43,000 (Woodbridge), plus any deferred amounts or ordinary course administrative amounts owing as of the Effective Date as set forth in the US Foods Settlement.  Any amounts owed to US Foods will be paid in accordance with the terms of the US Foods Settlement.  *See* Section VI.E.8 of the Disclosure Statement and Article VI.H of the Plan. |
| City of Huntington Beach | Lessor (Huntington Beach restaurant) (SoCal Debtor Ruby's Huntington Beach) | $0.00 | Ruby's Huntington Beach expects that all amounts owing to City of Huntington Beach will be paid in full prior to the Effective Date as provided by the Huntington Beach Lease Stipulation~~.~~; but that it will owe 2019 percentage rent at the end of January 2020 n the amount of approximately $290,000 which will be paid as and when due and payable. |
| MGP Fund X Laguna Hills, LLC | Lessor (Laguna Hills restaurant) (SoCal Debtor Ruby's Laguna Hills) | $36,000 | The outstanding amounts owing to MGP as of the Effective Date will be paid in accordance with the terms of the Laguna Hills Lease Assumption and Assignment Order. |
| City of Oceanside | Lessor (Oceanside restaurant) (SoCal Debtor Ruby's Oceanside) | $13,920 | The outstanding amounts owing to the City of Oceanside in connection with the assumption of the Oceanside Lease will be paid on the Effective Date as provided by the order approving the assumption of the Oceanside Lease. |
| Plaza Mercado | Lessor (Palm Springs restaurant) (SoCal Debtor Ruby's Palm Springs) | $21,286 | The outstanding amounts owing to Plaza Mercado in connection with the assumption of the Palm Springs Lease will be paid on the Effective Date as provided by the order approving the assumption of the Palm Springs Lease. |

[7] The payments on account of Administrative Claims of Non-Professionals will be paid by the applicable Debtor liable for such amounts.

| Donlin Recano & Company | Claims and Noticing Agent (RDI Debtors) | $140,000 | The outstanding amounts owing to Donlin Recano will be paid on the Effective Date. |
|---|---|---|---|
| DIP Lender | Administrative claims of counsel and tax advisors to the DIP Lender (RDI) | $325,000 | The amounts owing to counsel and tax advisors to the DIP Lender will be satisfied through a reduction of the cash component of the Plan Funding by the Plan Sponsor; to the extent applicable, in accordance with the procedures set forth in the RDI DIP Financing Order. |
| U.S. Trustee Fees | Quarterly Fees (All Debtors) | $0.00 | The quarterly payments to the U.S. Trustee will be paid as and when due. To the extent that any amounts are outstanding, such amounts will be paid in full on the Effective Date. The Plan Proponents shall continue to pay U.S. Trustee's fees after the Effective Date as provided by applicable law. |
| Administrative Personal Property Taxes | Taxing Authorities (All Debtors) | $0.00 | All accrued Administrative Personal Property Taxes will have been paid in full in the ordinary course of business by the Effective Date. These taxes are not yet due and payable and will be paid in the ordinary course of business by the applicable Debtor when due and payable under applicable state law. |
| Total | | $~~501,000~~536,206 | |

## 2.  Administrative Claims of Professionals

With respect to Professionals, pursuant to Court order, the Debtors have not been paying Professionals on a current basis on account of their accruing fees and expenses.  With respect to the payment of the RDI Professional Claims,[8] the Plan provides for payment of such RDI Professional Claims in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement, as described in further detail in Article VI.H of the Plan and Section VI.E.8 of the Disclosure Statement.  The Plan provides for the payment of ~~Allowed~~RFS Professional Claims on the later of the Effective Date~~,~~ or allowance thereof~~, unless otherwise agreed.  Those~~.  The Professional Claim amounts are estimated in Table 2 below. ~~The Plan is conditioned on an agreement by the Professionals, or other determination, as to the treatment of their Professional Fees under the Plan~~

___

[8] The RDI Professionals are the Professionals retained in connection with the Chapter 11 Cases of some or all of the RDI Debtors, as follows:  (1) Pachulski Stang Ziehl & Jones LLP, (2) GlassRatner Advisory & Capital Group LLC, (3) Winthrop Golubow Hollander, LLP and (4) Force 10 Partners, LLC.

1    ~~that will allow the Plan to become effective.  If an agreement is not reached with respect to payment~~

2    ~~of professional fees that is acceptable to the Debtors and the Professionals, the Plan will not go~~

3    ~~effective~~.

**Table 2: Summary of Administrative Claims of Professionals**

| Administrative Creditor | Relationship to Debtors | Amount Estimated | Treatment |
|---|---|---|---|
| Pachulski Stang Ziehl & Jones LLP | Counsel to RDI and the SoCal Debtors | $~~2,900,000~~3,069,943 (RDI) $~~540,000~~571,654 (HOP Restaurant Entities) | ~~Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional.~~Paid in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement. (*See* Article VI.H of the Plan and Section VI.E.8 of the Disclosure Statement). |
| GlassRatner Advisory & Capital Group LLC | Financial Advisors to RDI | $~~700,000~~741,021 | ~~Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional.~~Paid in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement. (*See* Article VI.H of the Plan and Section VI.E.8 of the Disclosure Statement). |
| Winthrop Golubow Hollander, LLP | Counsel to the Committee | $793,951 | Paid in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement. (*See* Article VI.H of the Plan and Section VI.E.8 of the Disclosure Statement). |
| Force 10 Partners, LLC | Financial Advisors to the Committee | $423,440 | Paid in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement. (*See* Article VI.H of the Plan and Section VI.E.8 of the Disclosure Statement). |
| Theodora Oringher PC | Counsel to RFS | $425,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| Armory Consulting | Financial Advisors to RFS | $30,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| The Verdon Law Group | Tax Advisor to RFS | $0.00 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final |

| Administrative Creditor | Relationship to Debtors | Amount Estimated | Treatment |
|---|---|---|---|
| | | | Order, unless otherwise agreed by the Professional. |
| AFP Saddington | Tax Preparers to the Debtors | $25,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| ~~Winthrop Couchot~~ Golubow Hollander, ~~LLP~~Total | ~~Counsel to the Committee~~ | ~~$750~~ $6,080,000 | ~~Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional.~~ |
| ~~Force 10 Partner, LLC~~ | ~~Financial Advisors to the Committee~~ | ~~$400,000~~ | ~~Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional.~~ |

The Court will rule on all Professional Claims incurred after the Petition Date and any Administrative Claims asserted by private parties not paid in the ordinary course of business before such Claims will be owed. Only the amount of Administrative Claims allowed by the Court will be owed and required to be paid under the Plan. The Professionals listed above will file and serve a properly noticed fee application and the Court will rule on the applications. In accordance with the RDI Professional and Unsecured Creditor Distribution Agreement, and in consideration therefor, no objections to Professional Claims will be asserted by the Committee, the Debtors, the Founders, the Plan Sponsor, or any affiliate owned or otherwise controlled by the foregoing, and any such objections are waived. In addition, the RDI Professionals have agreed that their Professional Claims, in aggregate, will not exceed the amount of the RDI Professional Fee Cap (as defined herein), in the amount of $6,000,000. To the extent that the RDI Professional Fee Cap is exceeded, the Professional Claims of the RDI Professionals will be reduced, on a *pro rata* basis, to the "capped" amount of $6,000,000.[9]  *See* Article VI.H and Section VI.E.8 of the Disclosure Statement for a further discussion of the RDI Professional and Unsecured Creditor Distribution Agreement.

---

[9] The Professional Claims of the RDI Professionals are estimated to be approximately $5.6 million as of the Effective Date, but could exceed such amount. In any event, the RDI Professional Claims are subject to the $6 million RDI Professional Fee Cap.

**3.    Administrative Personal Property Tax Claims**

Any personal property tax Claims arising for the period from the Petition Date to the Effective Date (the "Administrative Personal Property Taxes") will be paid by the applicable Debtor in the ordinary course of business as and when such taxes become due.

**4.    Administrative Bar Date for Filing of Administrative Claims**

**a.    Bar Date for Administrative Tax Claims**

All requests for payment of Administrative Tax Claims and for which no earlier Bar Date has been or is established outside of ~~this~~the Plan, such as may be established by requesting an expedited audit under Bankruptcy Code section 505, must be filed on or before the later of the forty-fifth (45th) day following entry of the Confirmation Order or, if a tax return is required to be filed with respect to such Administrative Tax Claim, one hundred twenty (120) days following the filing of the applicable tax return.

**b.    Bar Date for All Other Administrative Claims**

Requests for payment of Administrative Claims must be filed and served on the Plan ~~Proponents'~~Proponents, their counsel and the Office of the United States Trustee no later than the thirtieth (30th) day following the entry of the Confirmation Order.  Excluded from this requirement are Administrative Tax Claims, Professional Claims (defined below), statutory fees and Administrative Claims described in Table 1 and Table 2 above.  Any objection to any other Administrative Claim must be filed within one hundred twenty (120) days from the date such Administrative Claim is filed.

Professionals or other entities requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b) and 1103 for services rendered prior to the Effective Date ("Professional Claims") must file and serve on all parties entitled to notice thereof, an application for final allowance of compensation and reimbursement of expenses no later than the ~~sixtieth (60th~~tenth (10th) day following entry of the Confirmation Order (unless such deadline is shortened or extended by agreement of the Professionals and the Reorganized Debtors or Court order).  All such requests for payment of Administrative Claims and applications

for final allowance of compensation and reimbursement of expenses will be subject to the
authorization and approval of the Bankruptcy Court.

Holders of Administrative Claims (including, without limitation, Professional Claims) that
do not file such requests by the applicable Bar Date will be forever barred from asserting such
Claims against the Debtors, the Debtors' Estates, the Reorganized Debtors or their property. Any
objection to Administrative Claims of Professionals shall be filed on or before the date specified in
the application for final compensation.

**B.     Priority Tax Claims**

Priority Tax Claims are certain unsecured income, employment and other taxes described by
Bankruptcy Code section 507(a)(8). The Bankruptcy Code requires that each Holder of such a
section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred Cash
payments, over a period not exceeding five (5) years from the date of the order for relief. Attached
to the Disclosure Statement as **Exhibit F** is a list of all Priority Tax Claims filed against the
Estates.[10]

**Table 3: Summary of Priority Tax Claims**

| Claimant | Type of Tax Claim | Claim Amount | Proposed Treatment |
|---|---|---|---|
| All Priority Tax Claims Identified on **Exhibit F** to the Disclosure Statement | Various<br><br>*See* **Exhibit F** to the Disclosure Statement | Total of approximately $~~29,509~~32,239 | Each Claimant identified on **Exhibit F** to the Disclosure Statement shall receive deferred payments on account of its Allowed Claim over a period not exceeding five (5) years from the ~~Order~~order for ~~Relief~~relief. Each Claimant shall receive quarterly installments of principal and interest on the unpaid portion thereof at five percent (5%) per annum. The first installment shall be due on first day of the first quarter following the thirtieth (30th) day after the Effective Date with each installment due each quarter thereafter. The Debtors may, without penalty, prepay the entire amount of a Priority Tax Claim at any time. |

---

[10] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Priority Tax Claims.

# V.

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**A.**    **Summary of Classification under the Plan**

As is further described in this Subsection (C), the Plan Proponents have classified Claims and Interests under the Plan as follows:

### Table 4: Summary of Classification of Claims and Interests

Each of the below-referenced Classes (even if designated as a "sub-class"), if entitled to vote, will vote as a separate Class.

| Class | Claims / Interest and Holder(s) | Impaired/Not Impaired |
|---|---|---|
| 1 | Secured Claims of the Secured Noteholders - RDI | ~~No~~Yes |
| 2 | Secured Claim of Opus Bank – SoCal Debtors | Yes |
| 3 | Secured Claim of C&C Partnership – SoCal Debtors | Yes |
| 4 | Secured Claim of Pillsbury Winthrop Shaw Pittman LLP – HOP Restaurant Entities | Yes |
| 5 | Secured Claim of Plaza Bonita, LLC – SoCal Diners | Yes |
| 6 | Secured Claim of Opus Bank – RFS | Yes |
| 7 | Secured Claim of Craig – RFS | Yes |
| 8(a) | Secured Tax Claims – RDI | Yes |
| 8(b) | Secured Tax Claims – SoCal | Yes |
| 8(c) | Secured Tax Claims – RFS | Yes |
| 9 | PACA Claims – RDI and SoCal Debtors | No |
| 10(a) | Priority Non-Tax Claims – RDI | No |
| 10(b) | Priority Non-Tax Claims – SoCal Debtors | No |
| 10(c) | Priority Non-Tax Claims – RFS | No |
| 11(a) | Unsecured Claims – RDI | Yes |
| 11(b) | Gift Card Reimbursement Claims of Franchisees Satisfied Through Pre-Petition Netdown Process – RDI | ~~No~~Yes |
| 11(c) | Unsecured Claims – SoCal Debtors (Classified in separate voting subclasses 11(c)(i) – (vi)): | Yes |
| | Class 11(c)(i) – Ruby's Huntington Beach Unsecured Claims<br>Class 11(c)(ii) – Ruby's Oceanside Unsecured Claims<br>Class 11(c)(iii) – Ruby's Palm Springs Unsecured Claims<br>Class 11(c)(iv) – Ruby's Laguna Hills Unsecured Claims<br>Class 11(c)(v) – SoCal Diners Unsecured Claims<br>Class 11(c)(vi) – Quality Unsecured Claims | |
| 11(d) | Unsecured Claims – RFS | Yes |

| 12(a) | Interests – Founders' Interests in RDI | Yes |
| 12(b) | Interests – Founders' Interests in RFS | Yes |
| 12(c) | Interests – RDI Debtors' Interests in Other Entities | Yes |

## B.    Classes of Secured Claims

Secured Claims are Claims secured by Liens on property of the Estates.  The following sets forth all Classes containing the Debtors' Pre-Petition Secured Claims and their treatment under the Plan:

### 1.    Class 1:  Allowed Secured Claims of the Secured Noteholders (RDI)

Class 1 consists of the Allowed Secured Claims of the Secured Noteholders against RDI. Class 1 is impaired.  The Allowed Secured Claims of the Secured Noteholders are in the aggregate face amount of $2,984,923, as reflected in the Secured Notes.  Each Allowed Secured Claim of the Secured Noteholders shall be an obligation of RDI following the Effective Date and shall be treated as follows, which treatment renders the Class 1 Claimants unimpaired:

*Principal Amount*.  Each Allowed Secured Claim of the Secured Noteholders shall have a principal amount equal to the principal balance as set forth in **Exhibit G** to the Disclosure Statement.

*Payment of Accrued But Unpaid Interest*.  On the Effective Date, accrued but unpaid interest owing on account of the Secured Notes shall be paid.(four interest payments for June 30, 2018, December 30, 2018, June 30, 2019 and December 30, 2019) shall be paid.

*Term*.  In accordance with the 2016 Restructuring Agreement, the*Term*.  The maturity of the Secured Notes shall be June 30, 2026, with the maturity subject to an additional five-year extension, at RDI's sole election, if RDI is current on its payments to the Class 1 Claimants as provided by the Plan.

*Interest*.  In accordance with the 2016 Restructuring Agreement, interest*Interest* on the Secured Notes shall be paid in semi-annual installments at 2.17%.  Interest-only payments shall commence on June 30, 2020 and shall continue each December 30th and June 30th thereafter.

*Accelerated Principal Payments From Free Cash Flow From Operations*.  In accordance with the 2016 Restructuring Agreement, inIn addition to semi-annual interest payments, commencing on the first (1st) anniversary of the Effective Date, and on an annual basis thereafter, until paid in full, the Secured Noteholders shall be entitled to one hundred percent (100%) of  Free Cash Flow From Operations, if any, which shall be calculated in accordance with the definition of Free Cash Flow From Operations set forth in the 2016 Restructuring Agreementtwenty percent (20%) of any distributions to be made to equity, to be paid on a pro rata basis based on the unpaid principal balance owed with respect to each of the Secured Notes.  For clarification purposes, Free Cash Flow From Operations shall be from RDI and RDI Subsidiaries, as defined in the 2016 Restructuring Agreement, as these entities existed pre-Effective Date (*i.e.,* RFS is not to be considered an RDI Subsidiary for the purposes of

~~determining Free Cash Flow From Operations).~~Any and all distribution amounts and the timing thereof shall be at the discretion of Reorganized RDI.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the Allowed Secured Claims of the Secured Noteholders, in aggregate, may be prepaid, on a *pro rata basis,* in whole or in part, in RDI's sole discretion, provided that such prepayment would not reasonably be expected to cause a default on RDI's other payment obligations under the Plan.

*Retention of Collateral*.  Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claims of the Secured Noteholders granted in connection with the 2016 Restructuring Agreement shall remain in full force and effect following the Effective Date to secure the payments to the Class 1 Claimants as provided by the Plan.

*Appointment of Successor Collateral Agent*.  The Confirmation Order shall name a successor Collateral Agent to be appointed with respect to the Allowed Secured Claims of the Secured Noteholders and shall succeed to the rights and duties previously held by CMA with respect to the Secured Notes, as modified by the Plan.

*Other Repayment* ~~Rights~~ ~~In Full~~*Cancelled and No Further* *Force and Effect*.  ~~All other~~Except as specifically set forth herein, all terms of the 2016 Restructuring Agreement or any other documents governing the Secured Notes and/or Secured Claims of the Secured Noteholders ~~shall~~as to the terms of repayment of the Secured Notes and/or Secured Claims shall be cancelled and of no further force and effect.

*Releases Under 2016 Restructuring Agreement Remain in Full Force and Effect.*  Nothing contained in the Plan has any impact on any of the releases given to RDI or its officers and directors in connection with the 2016 Restructuring Agreement or otherwise, and such provisions remain in full force and effect.

**2.    Class 2: Allowed Secured Claim of Opus Bank (SoCal Debtors)**

Class 2 consists of the Allowed Secured Claim of Opus Bank against the SoCal Debtors.

Class 2 is impaired.  The Class 2 Claim shall be treated as follows:

*Effective Date Payment*.  On the Effective Date, Opus Bank shall be paid the adequate protection payments due and owing under the Fourth Cash Collateral Stipulation or any other cash collateral order entered in the RDI Debtors' Chapter 11 Cases (at the rate of $8,557.70 per month, and ~~estimated to be~~approximately $~~128,365 as of the~~154,039 assuming an Effective Date of February 29, 2020).

*New Note*.  The ~~New~~ HOP Restaurant Entities shall issue a new note to Opus Bank (the "New Opus Bank HOP Note").  The New Opus Bank HOP Note shall have a principal amount equal to the principal balance of the Allowed Class 2 Claim as of the Effective Date in the amount of $2,098,050.36, plus: i) interest in the amount of $~~303,539.75~~319,634.38, assuming an Effective Date of ~~January 26~~February 29, 2020, and ii) fees (including attorneys' fees) and costs that have accrued on account of the Class 2 Claim through and including the Effective Date in the amount of not less than $354,082.72.  The New Opus

HOP Note shall include covenants and conditions customary to notes accepted by Opus Bank.

*Interest*.  Post-Effective Date interest shall accrue on the principal balance of the New Opus Bank HOP Note at a fixed rate of 5.5% per annum.

*Payments*.  The first monthly payment on account of the New Opus Bank HOP Note will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the New Opus Bank HOP Note from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the New Opus Bank HOP Note during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*.  The maturity date of the New Opus Bank HOP Note shall be five (5) years following the Effective Date.

*Lending and Borrowing of Monies Between Reorganized Debtors*.  The New Opus Bank HOP Note shall provide that, so long as there is no default thereunder or under the New Opus Bank RFS Note (as defined herein), the obligors under the New Opus Bank HOP Note may lend to and borrow monies between themselves, RFS and RDI.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the New Opus Bank HOP Note may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtor obligors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtor obligors' other payment obligations under the Plan.

*Retention of Collateral*.  Except to the extent inconsistent with applicable law, the validity and priority of the security interests securing the New Opus Bank HOP Note shall remain in full force and effect following the Effective Date and shall be the same as provided by the Opus Bank/SoCal Debtors Loan and Security Documents.

*Release of Claims*.  Claims, including Avoidance Actions, against Opus Bank will be waived by all parties with standing to bring them, including the Debtors, their Estates, the Committee and the Liquidating Trustee.

*Other Terms Unchanged*.  Except to the extent provided above, the legal, equitable and contractual rights of Opus Bank, as Holder of an Allowed Class 2 Claim, shall remain unaltered under the Plan.

**3.    Class 3: Allowed Secured Claim of C&C Partnership (SoCal Debtors)**

Class 3 consists of the Allowed Secured Claim of C&C Partnership against certain of the

SoCal Debtors (SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm

Springs).  Class 3 is ~~Impaired~~impaired.  The Allowed Secured Claim of C&C Partnership, as of the

Effective Date, is in the ~~principal~~ amount of $297,500~~.~~ (principal and accrued interest).  The

Allowed Secured Claim of C&C Partnership shall be treated as follows:

> *Principal Amount*.  The Allowed Secured Claim of C&C Partnership shall have a principal amount equal to the principal balance as of the Petition Date, plus all amounts that have accrued on account of the Allowed Secured Claim of C&C Partnership through and including the Effective Date.

> *Interest*.  Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of C&C Partnership at the non-default rate set forth in the C&C Partnership Loan and Security Documents.

> *Payments*.  The first monthly payment on account of the Allowed Secured Claim of C&C Partnership will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of C&C Partnership from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of C&C Partnership during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

> *Maturity Date*.  The maturity date of the Allowed Secured Claim of C&C Partnership shall be extended, and will be due and payable seven (7) years following the Effective Date.

> *Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of C&C Partnership may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtors' other payment obligations under ~~this~~the Plan.

> *Retention of Collateral*.  Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of C&C Partnership shall remain in full force and effect following the Effective Date.

> *Other Terms Unchanged*.  Except to the extent provided above, the legal, equitable and contractual rights of C&C Partnership, as Holder of an Allowed Class 3 Claim, shall remain unaltered under the Plan.

> **4.**      **Class 4: Allowed Secured Claim of Pillsbury Winthrop Shaw Pittman LLP (~~RDI and SoCal Debtors~~HOP Restaurant Entities)**

Class 4 consists of the Allowed Secured Claim of Pillsbury against the HOP Restaurant

Entities, if any.  Class 4 is impaired.  The Allowed Secured Claim of Pillsbury, if any, shall be

treated as follows:‑[11]

*Principal Amount*.  The Allowed Secured Claim of Pillsbury shall be the amount of the Pillsbury Claim supported by collateral in accordance with Section 506 of the Bankruptcy Code.

*Interest*.  Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of Pillsbury at the rate of five percent (5%) per annum.

*Payments*.  The first monthly payment on account of the Allowed Secured Claim of Pillsbury will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of Pillsbury from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of Pillsbury during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*.  The maturity date of the Allowed Secured Claim of Pillsbury shall be extended, and will be due and payable seven (7) years following the Effective Date.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of Pillsbury may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtors' other payment obligations under the Plan.

*Retention of Collateral*.  Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of Pillsbury shall remain in full force and effect following the Effective Date.

*Other Terms Unchanged*.  Except to the extent provided above, the legal, equitable and contractual rights of Pillsbury, as Holder of an Allowed Class 4 Claim, shall remain unaltered under the Plan; including any legal right that Pillsbury holds to enforce the Pillsbury Claim against non-debtor entities, which right shall not be curtailed by the Plan.  In addition, while Pillsbury shall be bound by the provisions of the Plan and Confirmation Order, Article X.C. of Plan does not require Pillsbury, as former counsel to certain of the Debtors, to aid the Debtors in consummating the Plan.

*Unsecured Claim*.  To the extent that the Pillsbury Claim is not an Allowed Secured Claim, the Allowed unsecured portion of the Pillsbury Claim shall be treated as an Unsecured Claim

---

[11] The Debtors do not believe that there is collateral securing the Pillsbury Claim and, therefore believe that Pillsbury will be treated as an unsecured creditor in the RDI, SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs cases, and this is the treatment reflected in the Plan and Cash Flow Projections..

against the applicable Reorganized Debtors (RDI, SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs).

**5.    Class 5: Allowed Secured Claim of Plaza Bonita LLC (SoCal Diners)**

Class 5 consists of the Allowed Secured Claim of Plaza Bonita against SoCal Diners, if any.

Class 5 is impaired.  The Allowed Secured Claim of Plaza Bonita, if any, shall be treated as follows: [12]

*Principal Amount*.  The Allowed Secured Claim of Plaza Bonita shall have a principal amount equal to the principal balance as of the Petition Date, plus all amounts that have accrued on account of the Allowed Secured Claim of Plaza Bonita through and including the Effective Date, to the extent the Claim is supported by collateral in accordance with Section 506 of the Bankruptcy Code.

*Interest*.  Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of Plaza Bonita at the rate of five percent (5%) per annum.

*Payments*.  The first monthly payment on account of the Allowed Secured Claim of Plaza Bonita will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of Plaza Bonita from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule.  Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of Plaza Bonita during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*.  The maturity date of the Allowed Secured Claim of Plaza Bonita shall be extended, and will be due and payable seven (7) years following the Effective Date.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of Plaza Bonita may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtors' other payment obligations under the Plan.

*Retention of Collateral*.  Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of Plaza Bonita shall remain in full force and effect following the Effective Date.

---

[12] The Debtors do not believe that there is collateral securing the Plaza Bonita claim and, therefore believe that Plaza Bonita will be treated as an unsecured creditor against SoCal Diners, and this is the treatment reflected in the Plan and Cash Flow Projections.

*Other Terms Unchanged*.  Except to the extent provided above, the legal, equitable and contractual rights of Plaza Bonita, as Holder of an Allowed Class 5 Claim, shall remain unaltered under the Plan.

*Unsecured Claim*.  To the extent that the Plaza Bonita Claim is not an Allowed Secured Claim, the Allowed unsecured portion of the Claim shall be treated as an Unsecured Claim against the SoCal Diners.

**6.     Class 6: Allowed Secured Claim of Opus Bank (RFS)**

Class 6 consists of the Allowed Secured Claim of Opus Bank against RFS.  Class 6 is impaired.  The Allowed Class 6 Claim shall be treated as follows:

*Effective Date Payment*.  On the Effective Date, RFS shall pay to Opus Bank the amount of $80,000.

*New Note*.  RFS shall issue a new note to Opus Bank (the "New Opus Bank RFS Note").  The New Opus Bank RFS Note shall have a principal amount equal to the principal balance of the Allowed Class 6 Claim as of the Effective Date in the amount of $1,091,755.94, plus: i) interest in the amount of $6,306.33, assuming an Effective Date of ~~January 26~~February 29, 2020, and ii) fees (including attorneys' fees) and costs that have accrued on account of the Class 6 Claim through and including the Effective Date, in the amount of not less than $184,036.91. The New Opus ~~HOP~~RFS Note shall include covenants and conditions customary to notes accepted by Opus Bank.

*Interest*.  Post-Effective Date interest shall accrue on the principal balance of the New Opus Bank RFS Note at a fixed rate of 5.5% per annum.

*Payments*.  The first monthly payment on account of the New Opus Bank RFS Note will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the New Opus Bank RFS Note from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 4-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the New Opus Bank RFS Note during the previous month, plus (b) an installment of principal calculated on the basis of a 4-year amortization schedule.

*Maturity Date*.  The maturity date of the New Opus Bank RFS Note shall be four (4) years following the Effective Date.

*Lending and Borrowing of Monies Between Reorganized Debtors*.  The New Opus Bank RFS Note shall provide that, so long as there is no default thereunder or under the New Opus Bank HOP Note (as defined herein), RFS may lend to and borrow monies between it, RDI and the ~~New~~ HOP Restaurant Entities.

*Pre-Payment*.  At any time after the Effective Date, without penalty or premium, the New Opus Bank RFS Note may be prepaid, in whole or in part, in the sole discretion of RFS,

provided that such prepayment would not reasonably be expected to cause a default on RFS' other payment obligations under the Plan.

*Retention of Collateral*.  Except to the extent inconsistent with ~~the foregoing or~~ applicable law, the validity and priority of the security interests securing the New Opus Bank RFS Note shall remain in full force and effect following the Effective Date and shall be the same as provided by the Opus Bank/RFS Loan and Security Documents.

*Release of Claims*.  Claims, including Avoidance Actions, against Opus Bank will be waived by all parties with standing to bring them, including the Debtors, their Estates, the Committee and the Liquidating Trustee.

*Other Terms Unchanged*.  Except to the extent provided above, the legal, equitable and contractual rights of Opus Bank, as Holder of an Allowed Class 6 Claim, shall remain unaltered under the Plan.

**7.    Class 7: Allowed Claim of Steven L. Craig (RFS)**

Class 7 consists of the Allowed Claim of Craig against RFS based on the RFS Note.  Class 7 is impaired.  The Allowed Claim of Craig against RFS, as of the Petition Date, is in the principal amount of $1,000,000, plus accrued interest under the RFS Note.  Craig holds rights of offset of ~~his~~the obligations for Franchise Royalties as the owner of Eureka Food Enterprises, LLC, a Franchisee, as against the RFS Note, but such offset rights have not been, and will not be, enforced with respect to the RFS Note.  Instead, the Plan provides that the principal amount of the Allowed Claim of Craig against RFS ($1,000,000) shall be converted into equity in RDI as of the Effective Date of the Plan.  Accrued interest on the RFS Note, in the amount of approximately $~~120~~135,000, shall be paid on the Effective Date of the Plan.  The amounts owed by ~~Craig~~Eureka Food Enterprises, LLC for Franchise Royalties and Ad ~~Fees~~Fund Obligations, in the amount of $635,556, shall be paid ~~by Craig~~ on the Effective Date in accordance with the Netdown Process, as reflected in the Cash Flow Projections.

**8.    Class 8:  Secured Tax Claims – Class 8(a) (RDI), Class 8(b) (SoCal Debtors) and Class 8(c) (RFS)**

Class 8 consists of all of the Claims of taxing authorities secured by personal property owned by RDI (Class 8(a)), the SoCal Debtors (Class 8(b)) and RFS (Class 8(c)) (the "Secured Tax Claims").  Classes 8(a), (b) and (c) are Impaired.  Attached as **Exhibit H** to the Disclosure Statement is a list of what the Debtors' records reflect as outstanding Pre-Petition Secured Tax Claims for RDI,

the SoCal Debtors and RFS.[13]

## Table 5: Treatment of Secured Tax Claims

| Classes | Claimant | Type of Tax Claim | Claim Amount | Proposed Treatment |
|---|---|---|---|---|
| 8(a), 8(b) and 8(c) | All Secured Tax Claims Identified on **Exhibit H** to the Disclosure Statement | Various<br><br>*See* **Exhibit H** to the Disclosure Statement | Total of approximately $74,475.30 | Each Claimant identified on **Exhibit H** to the Disclosure Statement shall receive deferred payments on account of its Allowed Claim over a period not exceeding five (5) years from the Order for Relief.  Each Claimant shall receive quarterly installments of principal and interest on the unpaid portion thereof at five percent (5%) per annum.  The first installment shall be due on first day of the first quarter following the thirtieth (30th) day after the Effective Date with each installment due each quarter thereafter.  The Debtors may, without penalty, prepay the entire amount of a Secured Tax Claim at any time. |

**9.      Class 9: Allowed PACA Claims (RDI and Certain of the SoCal Debtors)**

Class 9 consists of any Allowed PACA Claims against RDI and certain of the SoCal Debtors (Ruby's Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs and Ruby's Laguna Hills). Class 9 is unimpaired.  The Allowed PACA Claims, if any, shall be paid in full on the Effective Date of the Plan.  The Debtors do not believe that there are any unpaid PACA Claims.

**10.     Class 10:  Priority Non-Tax Claims – Class 10(a) (RDI), Class 10(b) (SoCal Debtors) and Class 10(c) (RFS)**

Certain priority Claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in Classes (the "Priority Non-Tax Claims").  These types of Claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each Holder of such a Claim receive Cash on the Effective Date equal to the Allowed amount of such Claim. However, a class of Priority Non-Tax Claims may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claims.  Class 10 consists of all of the Priority Non-Tax Claims owed by RDI (Class 10(a)), the SoCal Debtors (Class 10(b)) and RFS (Class 10(c)).  Classes 10(a), 10(b) and 10(c) are Unimpaired.  Following the Petition Date, RDI

---

[13] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Secured Personal Property Tax Claims.

obtained authority from the Bankruptcy Court to pay certain Pre-Petition Claims of current

employees.  RDI believes that all Priority Claims owing to its employees on account of wages and

benefits have been paid.  Attached as **Exhibit I** to the Disclosure Statement is a list of Priority Non-

Tax Claims, the treatment under the Plan of which is as follows:[14]

**Table 6: Treatment of Allowed Priority Non-Tax Claims**

| Class | Claimant | Amount | Treatment |
|---|---|---|---|
| 10(a), 10(b) and 10(c) | Priority Non-Tax Claims as listed on **Exhibit I** to the Disclosure Statement | $0.00 | Allowed Claims will be paid in full on the later of (1) the Effective Date; or (2) the date upon which the Claim becomes an Allowed Claim pursuant to a Final Order. |

**C.    Classes of Unsecured Claims**

Unsecured Claims are unsecured Claims not entitled to priority under the Bankruptcy Code

section 507(a).  As is further described below, the Debtors' Unsecured Claims shall be classified as

follows:[15]

**TABLE 7: SUMMARY OF CLASSIFICATION OF UNSECURED CLAIMS AND ESTIMATED AMOUNT OF CLAIMS[16]**

| Class | Description |
|---|---|
| 11(a) | Class 11 is comprised of all Allowed Unsecured Claims against RDI.  The estimated Allowed amount of the Class 11(a) Claims, in aggregate, is ~~$10,176,824.~~approximately $10.5 million.[17] <br><br> Class 11(a) is comprised of the following: <br><br> Unsecured Noteholder Claims against RDI as set forth in **Exhibit J** in the estimated amount of approximately $5,~~540,528~~.5 million. <br><br> Other General Unsecured Claims against RDI (including RDI's Gift Card Obligations not satisfied by way of the Netdown Process) in the estimated amount of ~~$4,636,296.~~approximately $5 million. |

---

[14] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Priority Non-Tax Claims.

[15] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Unsecured Claims.

[16] The estimates set forth herein are based on the Debtors' best estimate as to the ultimate allowability of the Claims following the Debtors' review and analysis of the Claims that have been asserted against the Debtors.  While the Debtors have ~~used their best efforts to provide~~provided reasonable estimates, the actual allowed amount of the Claims could differ from the estimates set forth in ~~this~~herein and in the Disclosure Statement, and will in some cases depend on the resolution of objections to claims.  If such claims were allowed in their filed amounts, the amount of claims could increase, perhaps significantly.  In such event, distributions to Claimants could differ from the estimated ~~percentage~~ distributions set forth in ~~this~~herein and in the Disclosure Statement.

[17] This amount is based on the Debtors' best estimate as to the ultimate allowability of the Claims.  If such claims were allowed in their filed amounts, the amount of claims could increase to approximately $15 million.

| 11(b) | Class 11(b) is comprised of the Gift Card Reimbursement Claims of Franchisees Satisfied Though Pre-Petition Netdown Process. |
|---|---|
| 11(c) | Class 11(c) (subclasses (i) – (vi)) is comprised of all Allowed Unsecured Claims against the SoCal Debtors. <br><br> Class 11(c)(i) is comprised of all Allowed Unsecured Claims against Ruby's Huntington Beach. The Debtors estimate that Class 11(c)(iii) Claims total approximately $1,260,481. <br><br> Class 11(c)(ii) is comprised of all Allowed Unsecured Claims against Ruby's Oceanside. The Debtors estimate that Class 11(c)(iv) Claims total approximately $1,211,015. <br><br> Class 11(c)(iii) is comprised of all Allowed Unsecured Claims against Ruby's Palm Springs. The Debtors estimate that Class 11(c)(v) Claims total approximately $1,090,812. <br><br> Class 11(c)(iv) is comprised of all Allowed Unsecured Claims against Ruby's Laguna Hills. The Debtors estimate that Class 11(c)(vi) Claims total approximately $569,076. <br><br> Class 11(c)(v) is comprised of all Allowed Unsecured Claims against SoCal Diners. The Debtors estimate that Class 11(c)(i) Claims total approximately $1,331,567. <br><br> Class 11(c)(vi) is comprised of all Allowed Unsecured Claims against Quality. The Debtors estimate that Class 11(c)(ii) Claims total approximately $0.00. |
| 11(d) | Class 11(d) is comprised of all Allowed General Unsecured Claims against RFS. The Debtors estimate that Class 11(d) Claims total approximately $430,329. |

## 1.    Class 11(a):  Allowed Unsecured Claims Against RDI

Class 11(a) is impaired.  ~~The~~In accordance with the RDI Professional and Unsecured Creditor Distribution Agreement, the Allowed Claims of the Unsecured Creditors against RDI entitled to participate in whole or in part in any distribution shall be entitled to ~~one~~a *pro rata* distribution from any proceeds paid to or ultimately recovered by the Litigation Trust, after payment in full on account of ~~the following treatments~~Allowed Professional Claims of the RDI Professionals and the expenses of the Litigation Trust, as ~~follows:~~more particularly described in Section VI.E.8 of the Disclosure Statement and Article VI.H hereof.

~~Payment of a total of Two Million Five Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of  Six Hundred and Twenty-Five Thousand Dollars ($625,000) on each of the second (2nd), third (3rd), fourth (4th) and fifth (5th) anniversaries of the Effective Date, provided that the D&O/Affiliate Release is approved by the Bankruptcy Court.~~

~~If the D&O/Affiliate Release is not approved by the Bankruptcy Court, payment of a *pro rata* distribution from any proceeds ultimately recovered by the Litigation Trust that will have the right, following the Effective Date, to investigate and, if appropriate, prosecute claims, if any, against the D&Os and D&O Affiliated Entities; *provided, however*, that any distribution to the  RDI unsecured~~

1    ~~Creditors from any recovery by the Litigation Trust shall be after payment of the fees and costs~~

2    ~~incurred by the Litigation Trust incurred in connection with the prosecution of the D&O/Affiliate~~

3    ~~Claims or otherwise.~~

4        Class 11(a) includes the Allowed US Foods Unsecured Claims against RDI as provided by

5    the US Foods Settlement.

6        **2.    Class 11(b):  Gift Card Reimbursement Claims of Franchisees Satisfied Though
         Pre-Petition Netdown Process**

7    Class 11(b) is ~~unimpaired~~impaired.  Class 11(b) Claims will be satisfied in full through the

8    implementation of the Pre-Petition Netdown Process, pursuant to which such claims will be satisfied

9    in full.  To the extent any such Gift Card Reimbursement Claims of Franchisees are not satisfied by

10   implementation of the Pre-Petition Netdown Process, such Claims shall be treated as Class 11(a)

11   Claims.

12

13       **3.    Class 11(c):  General Unsecured Claims Against the SoCal Debtors**

14   Class 11(c) is impaired.  Class 11(c) has six (6) subclasses, as follows:  Class 11(c)(i) –

15   Ruby's Huntington Beach; Class 11(c)(ii) – Ruby's Oceanside; Class 11(c)(iii) – Ruby's Palm

16   Springs; Class 11(c)(iv) – Ruby's Laguna Hills; Class 11(c)(v) – SoCal Diners; and Class 11(c)(vi) –

17   Quality.  Each subclass shall vote as a separate class.

18       **Class 11(c)(i)** - The Allowed General Unsecured Claims against Ruby's Huntington Beach

19   are designated as Class 11(c)(i).  The Allowed General Unsecured Claims against Ruby's

20   Huntington Beach shall be paid the total amount of $113,118.78 (the "Huntington Beach Unsecured

21   Distribution Amount"), on a *pro rata* basis, on the Effective Date of the Plan.  Class 11(c)(i)

22   includes the Allowed US Foods Unsecured Claims against Ruby's Huntington Beach as provided by

23   the US Foods Settlement.

24       ~~Based on Ruby's Huntington Beach's estimate as to the ultimate allowability of the Class~~

25   ~~11(c)(i) Claims, the percentage distribution to the holders of Allowed Class 11(c)(i) Claims is~~

26   ~~estimated to be approximately 9%.~~

27       **Class 11(c)(ii)** - The Allowed General Unsecured Claims against Ruby's Oceanside are

28   designated as Class 11(c)(ii).  The Allowed General Unsecured Claims against Ruby's Oceanside

shall be paid the total amount of $62,397.43 (the "Oceanside Unsecured Distribution Amount") on a

*pro rata* basis, on the Effective Date of the Plan.  Class 11(c)(ii) includes the Allowed US Foods

~~Based on Ruby's Oceanside's estimate as to the ultimate allowability of the Class 11(c)(ii)~~

~~Claims, the percentage distribution to the holders of Allowed Class 11(c)(ii) Claims is estimated to~~

~~be approximately 5.2%.~~

Unsecured Claims against Ruby's Oceanside as provided by the US Foods Settlement.

**Class 11(c)(iii)** - The Allowed General Unsecured Claims against Ruby's Palm Springs are

designated as Class 11(c)(iii).  The Allowed General Unsecured Claims against Ruby's Palm Springs

shall be paid the total amount of $24,413.78 (the "Palm Springs Unsecured Distribution Amount"),

on a *pro rata* basis, on the Effective Date of the Plan.  Class 11(c)(iii) includes the Allowed US

~~Based on Ruby's Palm Spring's estimate as to the ultimate allowability of the Class 11(c)(iii)~~

~~Claims, the percentage distribution to the holders of Allowed Class 11(c)(iii) Claims is estimated to~~

~~be approximately 2.2%.~~

Foods Unsecured Claims against Ruby's Palm Springs as provided by the US Foods Settlement.

**Class 11(c)(iv)** - The Allowed General Unsecured Claims against Ruby's Laguna Hills are

designated as Class 11(c)(iv). Class 11(c)(iv) includes the Allowed US Foods Unsecured Claims

against Ruby's Laguna Hills as provided by the US Foods Settlement.  In March 2019, Ruby's

Laguna Hills assigned the Laguna Hills Restaurant operations to an assignee, and ceased operating

the Laguna Hills Restaurant.  The Holders of Allowed Unsecured Claims against Ruby's Laguna

Hills shall not be entitled to a distribution as Ruby's Laguna Hills is no longer operating and has no

assets available to pay such claims.

**Classes 11(c)(v) and (vi)** - The Allowed General Unsecured Claims against SoCal Diners

and Quality are designated as Classes 11(c)(v) and (vi), respectively.  Allowed Claims in Classes

11(c)(v) and (vi) shall be paid a total of two and one-half percent (2.5%) of their Allowed Claims

(estimated to be a total distribution in the amount of $33,289), on ~~the fourth (4th) year anniversary~~

~~of~~a *pro rata* basis, on the Effective Date of the Plan.  The Debtors do not believe that there are any

claims against Quality.

**4.    Class 11(d):  General Unsecured Claims Against RFS**

Class 11(d) is impaired.  Allowed Claims in Class 11(d) shall be paid in full, over time, with post-Effective Date interest, as follows:  On the first (1st) anniversary of the Effective Date, and continuing on an annual basis until the fourth (4th) anniversary of the Effective Date, the Holders of Allowed Class 11(d) Claims shall be paid annual distributions of twenty-five percent (25%) of the Allowed Amount of their Class 11(d) Claims, plus interest at the rate of five percent (5%) per annum, for a total distribution on account of Class 11(d) Allowed Claims of one hundred percent (100%), plus interest.

**D.    Interests**

The Founders, Cavanaugh and Kosmides, respectively, hold 60% and 40% of the common stock of RDI and RFS.  RDI holds ownership interests in SoCal Diners and in the RDI Entities (Ruby's Beach Ventures, LLC, Ruby's Diner South Coast Plaza, LP, Ruby's Spectrum, LLC and Ruby's Woodbridge, LLC).  SoCal Diners and Quality own Interests in the SoCal Entities ~~(Ruby's Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs, and Ruby's Laguna Hills).~~.  The following chart identifies the Plan's treatment of the Interests:

| Class | Type of Interest | Treatment |
|---|---|---|
| 12(a) | Founders' Interests in RDI | Founders' Interests in RDI shall be cancelled pursuant to the Plan.  Based upon the RDI Plan Funding and the New Value Contribution, respectively, the Plan Sponsor and the Founders will own the equity in ~~the post-Effective Date RDI~~Reorganized RDI (75% Plan Sponsor and 25% Founders (15% Cavanaugh and 10% Kosmides)). |
| 12(b) | Founders' Interests in RFS | Founders' Interests in RFS shall be shall be ~~cancelled pursuant to the Plan and the interests in RFS shall be transferred~~contributed to RDI in return for a 25% interest in RDI, and RFS will thereafter be a wholly-owned subsidiary of ~~post-Effective Date~~Reorganized RDI. |
| 12(c) | RDI Debtors' Interests in Other Entities | RDI's ownership interests in the RDI Entities (non-debtor entities) shall continue to be held by ~~post-Effective Date~~Reorganized RDI, and the distributions to RDI from these entities will be used to fund the Plan.<br><br>RDI's and SoCal Diners/Quality's respective ownership interests in the SoCal Entities ~~shall continue to~~(the HOP Restaurant Entities, SoCal Diners and Quality) will be ~~held by post-~~cancelled and these entities (with the exception of the HOP Restaurant Entities) will be dissolved.  On the HOP ~~Effective Date~~RDI, in consideration of the contribution of the HOP Plan Funding, the Plan Sponsor will own the HOP Interests.<br><br>Based upon the HOP Plan Funding, the ~~New HOP Entities~~Plan Sponsor will own the HOP ~~Assets~~Interests.  The ~~New~~HOP |

| | | EntitiesInterests will be contributed by the Plan Sponsor to post-Reorganized RDI one (1) day following the Effective Date (which itself will occur one (1) day following the HOP Effective Date RDI.). |

Post-Effective Date of the Plan, the Plan Sponsor will own 6075% of Reorganized RDI in consideration of the RDI Plan Funding.  The Founders will own 40% (2425% (15% by Cavanaugh and 1610% by Kosmides) in consideration of the New Value Contribution to RDI (which consists of their equity Interests in RFS). [18] RFS will be a wholly-owned subsidiary of Reorganized RDI, and will continue as the franchising arm of the business.  TheOn the HOP Assets will be transferred to the New HOP EntitiesEffective Date, in consideration of the Plan Sponsor's contributionprovision of the HOP Plan Funding., the Plan Sponsor will own the HOP Interests.  The Plan Sponsor will then contribute the New HOP EntitiesInterests to Reorganized RDI post one (1) day following the Effective Date.  RDI's Interests in the RDI Entities (Ruby's Beach Ventures, LLC, Ruby's Diner South Coast Plaza, LP, Ruby's Spectrum, LLC and Ruby's Woodbridge, LLC) and the SoCal Entities shall continue to be held by post-Effective DateReorganized RDI.

## VI.

## MEANS OF EFFECTUATING THE PLAN

### A.  Funding for the Plan

#### 1.  Cash Needs on the Effective Date

After taking into account all of the payments described in the Plan, the Debtors will have the following Cash needs on the Effective Date (which estimates exclude the amount of Administrative Claims of Professionals, the terms of payment of which shall be subject to agreement, or other determination, and the resolution of which are a condition to the effectiveness of the Plan)..

| Type of Payment | Amount |
|---|---|
| Class 1 – Secured Noteholders Interest Payment | $129,546 |
| Opus Bank Effective Date Payments | $216,923234,039 |

---

[18] The percentage interests of the Plan Sponsor and the Founders may be subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

| | |
|---|---|
| ~~HOP~~SoCal Debtors Effective Date Payments to Unsecured Creditors | $~~200,000~~233,289 |
| Administrative Claims (Non-Professionals) | $~~501,000~~536,206 |
| Professional Fee Claims | $3,480,000 |
| Litigation Trust | $80,000 |
| Other Effective Date Payments | $~~498,558~~226,088 |
| **TOTAL** | $~~1,546,027~~4,919,168 |

**2.        Sources of Cash on the Effective Date**

The Debtors will have the Cash needed to make payments required on the Effective Date from Cash on hand as of the Effective Date, implementation of the Netdown Process and the Plan Funding from the Plan Sponsor, as set forth in the Cash Flow Projections (**Exhibit B**).[19] to the Disclosure Statement).

**B.        Plan Funding ~~from~~From Plan Sponsor**

The Plan Funding from the Plan Sponsor shall be utilized, along with the Debtors' Cash and the proceeds from operations, to make (a) the payments required to be made on the Effective Date; and (b) the payments to Creditors following the Effective Date~~.~~, as set forth in the Cash Flow Projections attached hereto as **Exhibit B** to the Disclosure Statement.

The Plan Funding from the Plan Sponsor consists of the following:  (a) the contribution of ~~Two~~Three Million Seven Hundred Thousand  Dollars ($~~2~~3,700,000) in Cash (less the amount that will be utilized to satisfy the fees of ~~his~~the Plan Sponsor's counsel and tax advisors, in the amount of approximately $325,000); (b) the conversion of the amounts due to the Plan Sponsor (as DIP Lender) ~~and counsel~~ in connection with the RDI DIP Loan (in the amount of $300,000) into equity in RDI; and (c) the conversion of the amounts due to the Plan Sponsor (as lender) in connection with the RFS Note (in the principal amount of $1,000,000) into equity in RDI, for total consideration in

---

[19] ~~The Plan is conditioned on an agreement by the Professionals, or other determination, as to the treatment of their Professional Fees under the Plan that will allow the Plan to become effective.  If an agreement is not reached with respect to payment of professional fees that is acceptable to the Debtors and the Professionals, the Plan will not go effective.~~

1  the amount of ~~Four~~Five Million Dollars ($~~4~~5,000,000).[20]  The cash component of the RDI Plan

2  Funding is in the amount of Two Million Seven Hundred Eighty-Six Thousand Three Hundred and

3  Eighty-Four Dollars ($2,786,384).  The HOP Plan Funding is in the aggregate amount of Five

4  Hundred and Eighty-Eight Thousand Six Hundred and Sixteen Dollars ($588,616).  The Plan

5  Sponsor's obligation to make such Plan Funding is conditioned on the ~~transfer~~contribution of the

6  Interests in RFS to RDI, the ~~provision~~issuance to the Plan Sponsor of equity in RDI, the

7  ~~transfer~~issuance of ~~HOP Assets to~~ the ~~New~~Interests in the HOP ~~Restaurant~~ Entities to the Plan

8  Sponsor on the HOP Effective Date (which ~~New HOP Entities~~Interests will be contributed by the

9  Plan Sponsor to ~~post-~~Reorganized RDI one (1) day following the Effective Date ~~RDI~~) and the other

10  conditions as set forth in the Plan.  Under no circumstances shall ~~the Plan Sponsor~~Steve Craig be

11  personally responsible for any of the debt of the Debtors or Reorganized Debtors or ~~the~~any guaranty

12  or payment thereof.

13       In addition, and as a condition ~~a~~ to the Plan Sponsor's funding of the Plan Funding, as of the

14  Effective Date, RDI must have a "Going Concern Value" of not less than Six Million Sixty Six

15  Hundred Sixty Thousand Sixty Seven Dollars ($6,666,667) (the "Going Concern Value

16  Requirement").  "Going Concern Value" shall include ~~(a)~~ the total assets of RDI (including the value

17  of its direct and indirect interests in RFS, the RDI Entities and the ~~New~~ HOP Restaurant Entities),

18  after taking into account the Plan Funding and the New Value Contribution~~, less (b) the total~~

19  ~~liabilities of RDI, as restructured under the Plan or as otherwise discounted~~, as set forth in **Exhibit K**

20  to the Disclosure Statement.

21  **C.**    ~~**Transfer**~~**Issuance of HOP ~~Assets~~Interests to ~~New HOP Entities, Contribution of New**~~

22      ~~**HOP Entities to RDI and**~~**the Plan Sponsor, Provision of the RDI Plan Funding and**

23      **HOP Plan Funding and ~~RDI Plan Funding~~Contribution of HOP Interests to**

24      **Reorganized RDI**

25       As of the HOP Effective Date, 100% of the ownership of the HOP ~~Assets (which will remain~~

26  ~~subject to the debt against them, as restructured under Plan)~~Interests will be ~~transferred~~issued to the

---

27  [20] ~~This amount may be subject to increase based upon whether or not there is to be a payment to the RDI Unsecured~~

28  ~~Creditors of $2.5 million under the Plan.~~

New HOP EntitiesPlan Sponsor in consideration of the Plan Sponsor's provision of the HOP Plan Funding.  The Plan SponsorThe HOP Restaurant Entities will continue to be subject to the secured debt against them, as restructured under the Plan, and Reorganized RDI will thenguaranty the secured debt of the HOP Restaurant Entities to Opus Bank and C&C Partnership until such claims are satisfied.  The unsecured creditors of the HOP Restaurant Entities will be paid as provided by the Plan from the HOP Plan Funding.  One (1) day following the Effective Date, the Plan Sponsor will contribute ownership of the New HOP EntitiesInterests to post-Effective DateReorganized RDI.

TheAs set forth in the Cash Flow Projections (**Exhibit B** to the Disclosure Statement), the amount of the HOP Plan Funding is in the amount of approximately $588,616, which includes the amount of $200,000 which will be utilized to make the payments to the unsecured creditors of the HOP Restaurant Entities as provided by the Plan.

The balance of the cash Plan Funding from the Plan Sponsor, in the amount of approximately $2,786,384, shall be utilized to fund the Plan as set forth in the Cash Flow Projections.

**D.**    **New Value Contribution**

Under the Plan, the Founders will make a "new value" contribution on the Effective Date of the Plan in the form of a portion of the value of their ownership Interests in RFS, which will be contributed to RDI as provided by the Plan (the "New Value Contribution").  The New Value Contribution shall be a net amount based on the equity value of RFS adjusted by the Reconciliation. The New Value Contribution by the Founders is valued at approximately $5.58 million, as set forth in **Exhibit A** to the Disclosure Statement.  The value of the New Value Contribution and the satisfaction of the requirements of the Bankruptcy Code with respect thereto will be determined in connection with Confirmation of the Plan.

**E.**    **Reconciliation of Claims Between and Among the Debtors and the Founders**

Pursuant to the Plan, thecertain claims between and among the Debtors and the Founders (and certain affiliates), as reflected in **Exhibit E** to the Disclosure Statement, will be reconciled and utilized to calculate the New Value Contribution by the Founders.  By way of the Reconciliation, thethese specified claims between and among the Debtors and the Founders and these affiliates will be eliminated.  Any net amounts owed to or by the Founders or these affiliates with respect to any

1  Debtor will be applied to the value of the New Value Contribution being made by the Founders.

2  **F.    ~~Transfer~~Contribution of Interests in RFS to RDI; Post-Effective Date Ownership of**

3      **Reorganized RDI**

4          ~~As of~~On the Effective Date, all of the Founders' Interests in RFS will be

5  ~~transferred~~contributed to RDI~~.~~ in return for a 25% interest in RDI.  Post-Effective Date, RDI will be

6  owned ~~60~~75% by the Plan Sponsor, ~~24~~15% by Cavanaugh and ~~16~~10% by Kosmides.  ~~These~~The

7  contribution by the Plan Sponsor of the HOP Interests to Reorganized RDI on the day following the

8  Effective Date will not change the percentage ownership ~~percentages may be subject to change~~

9  ~~based upon whether or not there is to be a payment to the RDI Unsecured Creditors~~ of ~~$2.5 million~~

10  ~~under the Plan.~~Reorganized RDI as between the Plan Sponsor and the Founders (75% by the Plan

11  Sponsor, 15% by Cavanaugh and 10% by Kosmides).

12  **G.    Pre-Petition Netdown Process**

13          On March 11, 2019, the Court entered its order approving the Netdown Process pursuant to

14  which RDI, RFS and the Franchisees were authorized to honor their Post-Petition obligations among

15  them.  Under the Plan, as of the Effective Date, the Netdown Process shall be implemented for the

16  Pre-Petition period (the "Pre-Petition Netdown Process"), as follows:

17          Any amounts that RDI owes a particular Franchisee in connection with Pre-Petition Gift

18  Card Reimbursement Obligations will first be reduced (as a non-cash journal entry) by any amounts

19  that that Franchisee owes to RDI for any miscellaneous charges (the "Net Amount RDI Owes to the

20  Franchisee").  The Net Amount RDI Owes to the Franchisee will be applied (as a non-cash journal

21  entry) to the amount of Pre-Petition Franchise Royalties that the Franchisee owes to RFS, leaving a

22  remaining balance (the "Remaining Balance Owed by the Franchisee").  The Franchisee will pay to

23  RFS (in Cash) the Remaining Balance Owed by the Franchisee, as well as any Pre-Petition Ad

24  Funds Obligations it owes, and RFS will pay the RDI License Fee.  Pursuant to the Pre-Petition

25  Netdown Process, the majority of the pre-petition claims of the Franchisees against RDI will be

26  satisfied in full.  These claims are classified in Class 11(b) under the Plan and are

27  ~~unimpaired.~~impaired.

28

**H.    RDI Professional and Unsecured Creditor Distribution Agreement; Litigation Trust**

The Plan incorporates the following agreement that has been reached between and among the Debtors, the Committee, the RDI Professionals and the Founders with respect the payment of the Allowed Professional Claims of the RDI Professionals and the RDI General Unsecured Creditors to provide for the payment of such claims in accordance with the priority scheme of the Bankruptcy Code, as modified hereby (the "RDI Professional and Unsecured Creditor Distribution Agreement"). The terms of the RDI Professional and Unsecured Creditor Distribution Agreement are as follows:

**1.    Claim Amounts of the RDI Professionals and RDI General Unsecured Creditors**

Provisions regarding the amounts of the RDI Professionals and the RDI General Unsecured Creditors are as follows:

a.    The Professional Claims of the RDI Professionals through the Effective Date will be in the amount allowed by the Bankruptcy Court (the "RDI Allowed Professional Fees"), but will not exceed the amount of Six Million Dollars ($6,000,000) (the "RDI Professional Fee Cap").[21]   In the event that the RDI Professional Fee Cap is exceeded, the RDI Professionals will reduce their Professional Claims, on a *pro rata* basis, to the amount of the RDI Professional Fee Cap.  No objections to the Professional Claims of the RDI Professionals will be made by the Debtors, the Founders, the Committee, the Plan Sponsor, the RDI Professionals, or any affiliate owned or otherwise controlled by the foregoing, and any such objections are waived.  Any other creditor can object to the RDI Professional Fee Claims, as can the U.S. Trustee.

b.    The Allowed Claims of the RDI General Unsecured Creditors (Class 11(a)) are anticipated to be in the aggregate amount of approximately Ten Million Five Hundred Thousand Dollars ($10,500,000); *provided, however,* that the ultimate amount of the Allowed Claims of the RDI General Unsecured Creditors (Class 11(a)) will not impact the rights and obligations of the parties in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement as described herein.

**2.    Priority of Distributions to RDI Professionals and RDI General Unsecured Creditors**

The RDI Professionals and the RDI General Unsecured Creditors will be paid, pursuant to the priority scheme established by the Bankruptcy Code (*i.e.*, RDI Unsecured Creditors will only be paid after the RDI Professionals have been paid in full).

---

[21] The RDI Professional Fee Cap applies irrespective of whether the RDI Professionals are paid by Reorganized RDI or from recoveries by the Litigation Trust.

**3.    Source of Distributions to RDI Professionals and RDI General Unsecured Creditors**

The RDI Professionals and the RDI General Unsecured Creditors will be paid from two (2) sources as further detailed herein:  (i)  Reorganized RDI's business and the Plan Funding; and (ii) litigation proceeds from the Liquidating Trust's prosecution of RDI Rights of Action (as described in further detail below).

**4.    Reorganized RDI's Payment Obligations to RDI Professionals and RDI General Unsecured Creditors**

Reorganized RDI shall pay to the Liquidating Trust (as defined hereinbelow) for the benefit of the RDI Professionals and RDI General Unsecured Creditors an amount not less than eighty percent (80%) and up to one hundred percent (100%) of the lesser of the RDI Professional Fee Cap or total RDI Allowed Professional Fees.  The applicable percentage and amount will depend upon the timing of Reorganized RDI's payments as described below and the amount of the RDI Professional Fees allowed by the Bankruptcy Court.

**a.    Mandatory Time Sensitive Payment Obligations**

The RDI Debtors and Reorganized RDI have the following mandatory time sensitive payment obligations:

(i)    Three Million Dollars ($3,000,000) shall be paid from the RDI Debtors on the Effective Date to make *pro rata* payments to the RDI Professionals on account of the RDI Allowed Professional Fees.

(ii)    Eighty Thousand Dollars ($80,000) shall be paid on the Effective Date to fund the Litigation Trust.

(iii)    The lesser of Nine Hundred Thousand Dollars ($900,000), or the unpaid portion of the Allowed RDI Professional Fees, shall be paid by Reorganized RDI by the end of the second (2nd) year following the Effective Date.

(iv)    If Reorganized RDI does not qualify for the 20% Discount as described below, then the lesser of Nine Hundred Thousand Dollars ($900,000), or the unpaid portion of the Allowed RDI Professional Fees, shall be paid by Reorganized RDI by the end of the third (3rd) year following the Effective Date..

(v)     If Reorganized RDI does not qualify for the "20% Discount" or the "10% Discount" as described below, then an additional amount necessary to pay the difference between the RDI Allowed Professional Fees and any post-Confirmation payments made as of such time shall be paid by Reorganized RDI by the end of the fourth (4th) year following the Effective Date.

**b.   Conditions to Qualification for Discount on Reorganized RDI's Payment Obligations Under the RDI Professional and Unsecured Creditor Distribution Agreement**

Reorganized RDI will be entitled to a discount on its obligations under the Plan as set forth in the RDI Professional and Unsecured Creditor Distribution Agreement pursuant to the following terms and conditions:

(i)     Reorganized RDI's  total payment obligation to the RDI Professionals/RDI General Unsecured Creditors shall be discounted by an amount equal to twenty percent (20%) of the RDI Allowed Professional Fees (the "20% Discount"), so long as:

(a)  The mandatory timing obligations in Article VI.H.4.a(i)-(iii) are paid within the time prescribed;

(b)  The lesser of an additional Five Hundred Thousand Dollars ($500,000), or the unpaid portion of the Allowed RDI Professional Fees, is paid by the end of the second (2nd) year following the Effective Date; and

(c)  An additional amount equal to the product of eighty percent (80%) and the difference between the RDI Allowed Professional Fees and the Five Million Six Hundred Thousand Dollar ($5,600,000) estimate of RDI Professionals Fees, if applicable, is paid by the end of the third (3rd) year following the Effective Date.

(ii)     If Reorganized RDI does not qualify for the 20% Discount, Reorganized RDI's total obligation may be discounted by an amount equal to ten percent (10%) of the Allowed RDI Professional Fees (the "10% Discount"), so long as:

(a)  The mandatory timing obligations (Article VI.H.4.a(i)-(iv)) are paid within the time prescribed; and

(b)  An additional amount equal to the product of ninety percent (90%) and the difference between Allowed RDI Professional Fees and all fees

paid by the RDI Debtors and Reorganized RDI is paid by the end of the third (3rd) year following the Effective Date.

(iii)    If Reorganized RDI does not qualify for the 20% Discount or the 10% Discount, then Reorganized RDI shall pay 100% of the RDI Allowed Professional Fees by the end of the fourth (4th) year following the Effective Date.

**5.    Litigation Trust**U.S.

On the Effective Date, a litigation trust (the "Litigation Trust") will be formed to control and prosecute all RDI Rights of Action[22] on behalf of Reorganized RDI and to make distributions to the RDI Professionals and the RDI Unsecured Creditors (Class 11(a)) as provided under the Plan as set forth in the RDI Professional and Unsecured Creditor Distribution Agreement.  The documentation relative to the formation, and the rights and responsibilities, of the Litigation Trust (the "Litigation Trust Agreement") will be filed with the Bankruptcy Court prior to or concurrently with the filing of the brief in support of confirmation of the Plan.  The Litigation Trust Agreement will be prepared by the Committee, with the terms thereof consistent with the provisions of the Plan, including the RDI Professional and Unsecured Creditor Distribution Agreement, and subject to the mutual agreement of RDI, the Committee and the RDI Professionals, which agreement will not be unreasonably withheld.

---

[22] *"RDI Rights of Action"* means Rights of Action of the RDI Estate, *[TBD - specifically excluding the right to object to Claims or Interests.]*

*"Rights of Action"* means any action, proceeding, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, reduced to judgment or not reduced to judgment, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Right of Action includes: (a) any right of setoff, counterclaim or recoupment (except to the extent that the result of including any setoff or recoupment in this definition would result in an outcome, including, by example, an impermissible discharge of setoff or recoupment rights, prohibited by otherwise applicable bankruptcy law) and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.  Rights of Action specifically exclude any claims against the Plan Sponsor, or any affiliate owned or controlled by the Plan Sponsor or any advisor to the Plan Sponsor in connection with the Chapter 11 Cases.

An independent litigation trustee (the "Litigation Trustee") will be appointed to manage the Litigation Trust.  The Litigation Trustee will be selected by mutual agreement of RDI, the Committee and the RDI Professionals.  As will be more particularly set forth in the Litigation Trust Agreement, the Litigation Trustee will have all rights and obligations necessary to manage the Litigation Trust; *provided, however*, that the Litigation Trustee must seek Bankruptcy Court approval for the settlement of any RDI Rights of Action involving an amount in excess of Two Hundred and Fifty Thousand Dollars ($250,000).  The Litigation Trustee shall not have any responsibility to pursue objections to Claims, including claims of RDI Unsecured Creditors, which shall be the responsibility of RDI, or Reorganized RDI as the case may be.  Eighty Thousand Dollars ($80,000) shall be paid on the Effective Date to fund the Litigation Trust, and all fees and expenses of the Litigation Trust (including the reasonable fees and costs of the Litigation Trustee and any counsel retained by the Litigation Trust to pursue RDI Rights of Action) shall be the sole responsibility of the Litigation Trust.

Any funds generated by the Litigation Trust, after payment of the Litigation Trust's reasonable expenses (including the reasonable fees and costs of the Litigation Trustee and any counsel retained by the Litigation Trust to pursue RDI Rights of Action, which shall be the sole responsibility of the Litigation Trust), will be paid as follows:

*First*, to the RDI Professionals on account of their Allowed Professional Claims until such Allowed Professional Claims have been paid in full from Reorganized RDI or the Litigation Trust as set forth in the RDI Professional and Unsecured Creditor Distribution Agreement. [23]

*Second*, to the holders of the Allowed RDI Unsecured Claims entitled to participate in whole or in part in any distribution (Class 11(a)), on a *pro rata* basis.  For the purpose of clarity, any funds collected by the Litigation Trust that are not utilized to pay the expenses of the Litigation Trust or

---

[23] The Founders and RFS are not a party to the treatment of the RDI Unsecured Creditors under the Plan which was separately negotiated between the RDI Unsecured Creditors Committee and the RDI Professionals, including the terms and provisions of the Litigation Trust.  If any of the terms of the treatment of the RDI Professionals under the Litigation Trust are altered in any respect by the Court, the RDI Professionals have agreed to accept the Court's treatment of the RDI Professionals under the Litigation Trust without impairing the confirmability of the Plan.

the payment of Allowed RDI Professional Claims shall be utilized to make distributions to the holders of Allowed RDI Unsecured Claims.

**6.**      **Events of Default**

The following constitute events of default, and the consequences thereof, under the RDI Professional and Unsecured Creditor Distribution Agreement:

a.      If the Effective Date payment is not made, a trustee will be appointed in the RDI Debtors Cases and RFS will be permitted to pursue confirmation of the RFS Alternative Plan.

b.      If Reorganized RDI does not pay the required payment of Nine Hundred Thousand Dollars ($900,000), or the remaining amount owed to the RDI Professionals by Reorganized RDI, as applicable, by the end of the second (2nd) year following the Effective Date, a trustee will be appointed upon thirty (30) days' notice of default issued by the RDI Professionals or Liquidating Trustee, providing that the default has not been cured.

c.      If Reorganized RDI has not made the requisite payments by end of the second (2nd) year following the Effective Date to comply with the qualification requirements to be eligible for the 20% Discount, and an additional Nine Hundred Thousand Dollars ($900,000), or the remaining amount owed to the RDI Professionals by Reorganized RDI, as applicable, is not paid by the end of the third (3rd) year following the Effective Date, a trustee will be appointed upon thirty (30) days' notice of default issued by the RDI Professionals or Liquidating Trustee, providing that the default has not been cured.

d.      If Reorganized RDI has not paid an amount equal to one hundred percent (100%) of the difference between the RDI Allowed Professional Fees and the post-Confirmation payments made by end of the fourth (4th) year following the Effective Date, a trustee will be appointed upon thirty (30) days' notice of default issued by the RDI Professionals or Liquidating Trustee, providing that the default has not been cured.

To the extent that any provision of the Plan is inconsistent with the foregoing provisions of RDI Professional and Unsecured Creditor Distribution Agreement, the provisions of Article VI.H of the Plan shall prevail and control.

**H.I.**      **US Foods Settlement**

In accordance with the US Foods Settlement, US Foods agrees to the following treatment under the Plan, which treatment is set forth in the Cash Flow Projections:

1.      All proofs of claims filed by US Foods in the RDI Debtors' cases (Claim No. 85 (RDI), Claim No. 6 (Ruby's Huntington Beach), Claim No. 5 (Ruby's Oceanside), Claim No. 7 (Ruby's Palm Springs) and Claim No. 4 (Ruby's Laguna Hills) (the "US Foods POCs") shall be allowed in full in accordance with their asserted priorities, subject to business discussions regarding minor discrepancies between the amounts set forth in the US Foods POCs and the RDI Debtors' books and records (the "US Foods Claims"). Reconciliation regarding the unsecured portion of the US Foods Claims (the "US Foods Unsecured Claims") will start immediately and must be completed by the Effective Date of the Plan, or an amount shall be held in a Disputed Claims Reserve to ensure that US Foods is not at risk of non-payment.  The US Foods Unsecured Claims will be classified and treated like other general unsecured claims against the respective Debtor obligors, and will be entitled to and be paid their *pro rata* share of distributions in connection therewith as provided by the Plan.

2.      The portion of the US Foods Claims subject to priority pursuant to Section 503(b)(9) of the Bankruptcy Code (the "US Foods 503(b)(9) Claims") against the RDI Debtors shall be allowed as administrative claims, in the following amounts: $64,116.20 (Ruby's Huntington Beach), $51,486.60 (Ruby's Oceanside), $25,337.02 (Ruby's Palm Springs) and $8,513.53 (Ruby's Laguna Hills).  US Foods' 503(b)(9) Claims shall be paid in twelve (12) equal monthly payments, commencing one (1) month following the Effective Date of the Plan.  The RDI Debtors agree to make the payments to US Foods on account of the US Foods 503(b)(9) Claims through an "autopayment" mechanism acceptable to US Foods.

3.      Except as set forth in the following paragraphs (4) and (5), US Foods' post-petition administrative claims will be on forty-five (45) day terms through the Effective Date of the Plan and will be paid in the ordinary course as they come due pursuant to the terms of the existing supplier agreement between the parties (the "MDA"), which terms, except as otherwise provided for in the Plan, will remain in full force and effect, and will be incorporated into the Plan by reference.

4.      US Foods will agree that Debtors may defer payments for purchases made on or after September 2, 2019, up to a total aggregate amount of $200,000 (the "Deferred Amount"), with the Deferred Amount to be paid over twelve (12) months commencing on the Effective Date of the Plan.  RDI and US Foods will execute a mutually acceptable letter agreement (the "Letter Agreement") for the payment of the amount of any such deferred payments, which will be payable in twelve (12) monthly installments with a twelve percent (12%) interest rate.  The Letter Agreement, when executed, will be incorporated into the Plan by reference. The RDI Debtors agree to make the payments to US Foods on account of these amounts through an "autopayment" mechanism acceptable to US Foods.

5.      US Foods will restart shipments to the Irvine/Woodbridge restaurant, and will be paid each Wednesday for the prior week's orders/deliveries.  For the past due amount (approximately $43,000) owed by Irvine/Woodbridge for post-petition deliveries, US Foods agrees to payment in full in equal weekly installments for fifty-two (52) weeks commencing on the first week after deliveries have resumed, plus twelve percent (12%) annual interest.

6.    The Reorganized RDI Debtors agree to use US Foods as their primary supplier, and the Parties further agree that the termination date of the MDA is hereby extended to one year after the Effective Date of the Plan (or December 31, 2019 if no plan is confirmed prior to that date), during which time the parties will cooperate to negotiate an amended supplier agreement.

7.    Avoidance Actions against US Foods will be waived by all parties with standing to bring them, including the Debtors, their Estates, the Committee and the ~~Committee~~Liquidating Trustee.

### ~~I.~~J.    Treatment of Intercompany Claims; Waiver of Avoidance Actions Between Debtors

As of the Petition Date, after accounting for all intercompany obligations between them, RDI owes RFS the approximate amount of $400,000.  In addition, there will be an intercompany receivable on RDI's books in favor of RFS pursuant to the Netdown Process.

So long as RDI and RFS are in compliance with their obligations under the Plan, including without limitations all obligations owing to Opus Bank on the New Opus Bank RFS Note, any intercompany receivable owed to RFS from RDI as a result of the Netdown Process and any other intercompany obligations between them will not be collected or paid, ~~but will remain on the books as non-cash journal entries.~~and will be cancelled as of  the Effective Date; *provided, however,* that RDI will guaranty RFS' obligation to Opus Bank under the New Opus Bank RFS Note in the amount that RDI owes to RFS as of the Effective Date on account of such cancelled receivable.

Any Avoidance Action that could be asserted by any Debtor against any other Debtor shall be waived by all parties with standing to bring such action, including the Debtors, their Estates, the Committee and the Liquidating Trustee.

### ~~J.~~K.    Lending and Borrowing of Monies Between Reorganized Debtors

So long as there is no default under the Plan, including with respect to the obligations to Opus Bank, following the Effective Date, the ~~New~~ HOP Restaurant Entities, RFS and RDI may lend to and borrow monies between and among themselves.  Such post-Effective Date intercompany obligations will ~~not~~ be ~~collected~~paid or ~~paid, but will remain~~shown on the respective Debtors' books as ~~non-cash journal entries~~obligations.

**K.L.    Corporate Structure and Governance**

**1.    Charter**

As of the Effective Date, and subject to such charter amendments as may be made pursuant to the Plan, the articles of incorporation and bylaws of(or similar governance documents)  of Reorganized RDI will be the same as the articles of incorporation and bylaws (or similar governance documents)  of RDI immediately before the Effective Date.  Effective as of the Effective Date, the officers and directors of Reorganized RDI will be the same as the officers and directors of RDI immediately before the Effective Date, with the exceptions that Craig will be the Chairman of the board of directors of Reorganized RDI and Tad Belshe will no longer participate on the board (*i.e.,* the initial board of directors of Reorganized RDI will consist of Craig, Cavanaugh and Kosmides). Reorganized RDI will hold all of the equity Interests in RFS, in the RDI Entities and, following the post-Effective Date contribution by the Plan Sponsor, the equity Interests in the New HOP Entities. Following the Effective Date and satisfaction of their Plan obligations, SoCal Diners, Quality and Ruby's Laguna Hills will be terminated as entities.HOP Entities.  Charter amendments that may be made pursuant to the Plan include changes as may be necessary or appropriate to (i) conform such documents to the terms of the Plan; (ii) conform such documents to recent amendments to corporation statutes; and (iii) to include a prohibition on the issuance of non-voting equity securities.

**2.    Voting Rights and Shareholder Agreement**

Voting shall be weighted based on the respective ownership interests in RDI held by Craig, Cavanaugh and Kosmides.  As of the Effective Date, Craig, Cavanaugh and Kosmides shall enter into a shareholders' agreement with respect to RDI which shall include terms and conditions that are typical in privately held entities, including the delegation of management and control of RDI's operations (including menu, design and branding decisions) to Cavanaugh.  All major decisions, and those customarily identified as such in operating and shareholder agreements typical to privately held entities, including without limitation, business decisions with respect to expansion of the business or other business decisions that might require the contribution or expenditure of new capital of RDI, will be made by majority vote of the equity holders based on their respective ownership Interests.

1    With respect to capital calls, the shareholder agreement will provide that, if a shareholder

2    fails to contribute the capital called with the necessary vote of the shareholders in accordance with

3    his respective ownership Interest percentage as set forth above within thirty (30) days after the

4    capital call is made, the other shareholders shall have the right, but not the obligation, to make a loan

5    to RDI in the amount of the capital contribution that is not made, equal to his respective pro rata

6    share (based on his respective percentage equity interest) of the defaulting shareholder's share of the

7    capital, or the entire amount of the capital call deficiency, if not made by the other non-defaulting

8    shareholder.  Any such loan shall be treated as if RDI made a loan to the defaulting shareholder and

9    the non-defaulting shareholder made a loan to RDI.  Any such loan by RDI to a defaulting

10   shareholder (the "Default Loan") and any such loan from a non-defaulting shareholder to RDI (the

11   "Shareholder Loan") shall bear interest at a rate equal to the federal prime rate plus three percent

12   (3%) per annum and shall be secured by a pledge of the defaulting shareholder's equity interest in

13   RDI.   The defaulting shareholder shall execute and deliver such documents as are reasonably

14   necessary to create and perfect such security interest and the shareholder agreement for RDI shall

15   provide for a power of attorney in favor of the non-defaulting shareholders to effectuate such

16   documents if the defaulting shareholder fails to promptly execute and deliver same.  Any such

17   Default Loan and any such Shareholder Loan shall provide for the payment of accrued interest

18   monthly and for all principal and accrued and unpaid interest to be due and payable on or before the

19   date that is (i) six (6) months following the date the Default Loan and the Shareholder Loan are

20   advanced if the Default Loan and the Shareholder Loan are less than one million dollars

21   ($1,000,000), or (ii) one year following the date the Default Loan and the Shareholder Loan are

22   advanced if the Default Loan and the Shareholder Loan is one million dollars  ($1,000,000) or more.

23   Failure to pay the Default Loan and the Shareholder Loan on or before the applicable maturity date

24   pursuant to the foregoing shall constitute a default under each of the Default Loan and the

25   Shareholder Loan.

26   At such time as any Default Loan or Shareholder Loan is defaulted and not paid, and

27   assuming one of the other shareholders advances such amount in lieu of the defaulting shareholder,

28   the percentage interests of the shareholders shall be recalculated, and the percentage interests of each

shareholder shall be adjusted such that each shareholder shall have an interest determined by fraction, the numerator of which shall be the aggregate capital contributed by the shareholder, and the denominator of which shall be the aggregate capital contributed by all shareholders, provided, however, that for purposes of the foregoing calculation only, each shareholder shall be treated as having contributed his proportionate share (in accordance with his percentage Interest in RDI) of the aggregate capital contributed by Craig as of the Effective Date of the Plan.

The consequence of a shareholder default shall be the dilution of the shareholder's equity in RDI, but a default will not result under any circumstance in personal liability of the defaulting shareholder.

For illustration purposes only, assume that Craig contributed a total of $4,000,000 as of the Effective Date of the Plan, and that there are three (3) shareholders—Craig at 60%, Shareholder A at 24% and Shareholder B at 16%. Then assume that additional capital in the amount of $500,000 is required by RDI, and that Craig contributes 60% of such amount ($300,000); Shareholder A contributes 24% ($120,000), but Shareholder B does not contribute any amounts and Craig advances to RDI the share otherwise allocable to Shareholder B ($80,000). In such event, the denominator in the following dilution formula would be $4.5 million (the original Plan Funding of $4 million plus the $500,000 capital call), and the percentage interests of the shareholders would be adjusted as follows:

For Craig: $4,000,000 (allocable share of original Plan capital) + $300,000 (Craig share of current capital call) + $80,000 (Shareholder B capital call advanced by Craig) = $4,380,000. $4,380,000/ $7,166,667 = 61.1%.

For Shareholder A: $1,600,000 (imputed allocable share of original Plan capital) + $120,000 (Shareholder A share of current capital call) = $1,720,000. $1,720,000 / $7,166,667 = 24%.

For Shareholder B: $1,066,667 (imputed allocable share of original Plan capital) + $0 (Shareholder B unpaid current capital call) = $1,066,667. $1,066,667 / $7,166,667 = 14.9%.

### 3.1.   Composition Of Reorganized Debtors' Board Of Directors And Identity And Compensation Of Officers

The following are the titles and the salaries expected to be provided to the directors and officers of the Reorganized DebtorsRDI during the 2019 and 2020 fiscal years:[24]  Craig, Chairman of the Board, will not be paid a salary; Cavanaugh, Chief Executive Officer and Director, will be paid $250,000 from RDI per annum; Kosmides, Special Projects Coordinator and Director, will be paid $225125 per hour on an as-requested basis; Mr. Belshe, Executive Vice President of Operations, will be paid $102,000 per annum; and Lori Smith, Secretary, will be paid $1,000 per annum.

Reorganized RDI shall enter into at-will employment agreements with Messrs. Cavanaugh, Kosmides and Belshe and Ms. Smith as of the Effective Date which will provide for their compensation as set forth above and will provide for the continuation of medical insurance coverage in accordance with the medical insurance coverage provided to them by the Debtors as of the Petition Dates.

### L.M.   Estate Representative and Litigation Trustee

TheSubject to the limitations set forth in the Plan, including with respect to the rights of the Litigation Trust to pursue RDI Rights of Actions following the Effective Date and make distributions on account of Professional Claims of the RDI Professionals and RDI Unsecured Claims in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement, Reorganized DebtorsRDI shall be appointed the Estate Representative for purposes of prosecuting any Rights of Action (subject to the limitations set forth in the Plan), including objecting to Claims, disbursing monies to Holders of Claims under the Plan, liquidating property of the Estates and administering the Disputed Claim Reserve established pursuant to the Plan.  Without further order of the Court, the Reorganized Debtors may employ professionals, including counsel and accountants, the duties of which may include, without limitation, assisting in fulfilling the obligations under the Plan, including prosecuting any Rights of Action, objecting to Claims, (other than RDI Rights of Action that will be pursued on behalf of the RDI Estate by the Litigation Trustee), objecting to

---

[24] The compensation of officers is subject to modification both pre and post-Effective Date.

Claims (including Claims asserted against RDI, which will not be handled by the Litigation Trustee), filing tax returns and disposing of the assets of the Estates.  Such professionals shall be entitled to receive compensation for services rendered after the Effective Date without further order of the Court.

The~~The~~Subject to the obligations set forth in the Plan and the rights of the Litigation Trust with respect to RDI Rights of Action, the Reorganized Debtors may pursue or decline to pursue any Rights of Action, as they deem appropriate in their sole discretion.  The Reorganized Debtors may settle, release, sell, and assign, otherwise transfer or compromise such Rights of Action.  Similarly, subject to the obligations set forth in the Plan, the Reorganized Debtors may sell any assets of Reorganized Debtors in their sole discretion.  The Reorganized Debtors may, but shall not be required to, set-off against any Claim and the Distributions to be made pursuant to the Plan in respect of such Claim, any claims the Estates may have against the Holder of the Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Reorganized Debtors of any such claims, set-off or recoupment rights which Reorganized Debtors may have against such Holder.

Unless a claim against a Creditor or other person is expressly waived, relinquished, compromised or settled in the Plan or in a Final Order, all rights with respect to such claim are reserved to the Reorganized Debtors or the Litigation Trustee, as applicable, which may pursue such claim.  Upon the substantial consummation of the Plan, the Reorganized Debtors may file, and after full consummation shall file, a report with the Court and request the entry of a final decree closing these Cases.

Reorganized RDI, the Litigation Trustee, the Founders and the Plan Sponsor will make reasonable efforts to close the Chapter 11 Cases as soon as possible following the Effective Date.

## ~~M.~~N.   Disputed Claims and Unclaimed Property

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Interests or Administrative Claims under the Plan, including the determination of the amount of Distributions due to the Holders of Allowed Claims and Administrative Claims, each Disputed Claim shall be treated as if it were an Allowed

Claim or authorized Administrative Claim, as appropriate, except that if the Court estimates the

likely portion of a Disputed Claim to be Allowed or otherwise determines the amount which would

constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be

requested by the Debtors or the Reorganized Debtors~~,~~), such amount as determined by the Court

shall be used as to such Claim.

The Distributions due with respect to Disputed Claims based on the calculations required by

the Plan shall be reserved for the Holders of the Disputed Claims and deposited in a segregated

account (the "Disputed Claims Reserve").  The amount so deposited on behalf of a Creditor holding

a particular Disputed Claim is referred to herein as the "Reserve Amount."

After an objection to a Disputed Claim is withdrawn or determined by Final Order, the

Distributions due on account of any resulting Allowed Claim or authorized Administrative Claim

shall be paid by the Reorganized Debtors or the Litigation Trustee, as applicable, from the Reserve

Amounts for such Creditor held in the Disputed Claims Reserve together with the interest, if any,

actually accrued on the Reserve Amounts (up to a maximum of the interest actually accrued on the

amount of the resulting Allowed Claim or authorized Administrative Claim).  Such payment shall be

made on the earlier of (~~1~~a) the next payment date for Claims or Administrative Claims of the Class

or type of the Claim or Administrative Claim of such Holder and ~~(2,~~ (b) within forty-five (45) days

of the date the Disputed Claim becomes an Allowed Claim or authorized Administrative Claim.  No

interest shall be due to a Disputed Claim Holder based on the delay attendant to determining the

allowance of such Claim except as set forth in this subsection.

Should the Distribution due with respect to a finally Allowed Claim of such Creditor exceed

the Reserve Amount for Administrative Claims, Secured Claims ~~or,~~ Priority Claims or Unsecured

Claims, the shortfall may be paid from any available sums of the Reorganized Debtors or Litigation

Trustee, as applicable, and, for RDI Unsecured Claims, the shortfall may be paid from funds, if any,

otherwise available to distribute to RDI Unsecured Claims, collectively.  In no event shall the

Creditor have recourse to any payments already made to others.

After an objection to such a Disputed Claim is sustained in whole or in part by a Final Order,

any Reserve Amounts for such Claim held in the Disputed Claims Reserve in excess of the

Distributions due on account of any resulting Allowed Claim may be removed from the Disputed

Claims Reserve and put in the Reorganized Debtors' ~~general accounts, as applicable.~~or Litigation

Trust's general accounts, as applicable, to be redistributed to the other members of the Class of the

sustained objection until such Class of claims have been paid in full together with post-petition

interest at the federal legal rate with the excess, if any, reverting to the Reorganized Debtors.

Any Cash or other property which is unclaimed for one-hundred eighty (180) days after the

Distribution is sent by mail to the last known mailing address for the person entitled thereto as

provided in the Plan ("Unclaimed Property") will be deemed paid to such entitled Person, for

purposes of determining the Person's rights.  Any Creditor that does not claim its Distribution within

one hundred eighty (180) days will receive no future Distribution under the Plan.  Unclaimed

Property resulting from a Distribution shall revest in the respective Reorganized Debtor or

Liquidating Trust, as applicable, to be redistributed to the other members of the Class of the

sustained objection until such Class of claims have been paid in full together with post-petition

interest at the federal legal rate with the excess, if any, reverting to the Reorganized Debtors.

**~~N.~~O.    Claim Objections and Claims Objection Bar Date**

The Debtors, Creditors and other parties in interest shall have until one hundred twenty (120)

days following the Effective Date of the Plan (the "Claim Objection Bar Date") to file all objections

to Claims in these Chapter 11 Cases, subject to extension by Court order.  Objections to Claims,

including any objections to the Claims of the Unsecured Creditors of RDI, will be prosecuted by the

Debtors or Reorganized RDI; the Litigation Trust will not be responsible for prosecuting objections

to Claims.

**VII.**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.    Unexpired Leases and Executory Contracts to be Assumed**

During the pendency of the Chapter 11 Cases, the Debtors assumed (and in the case of

Laguna Hills, assigned) their leases for the restaurants for the Huntington Beach, Oceanside, Palm

Springs and Laguna Hills locations and the corporate headquarters lease.  Attached to the Disclosure

Statement as **Exhibit L** is a chart, which identifies the Debtors' other unexpired leases and executory

contracts, and which specifically includes, without limitation, the Franchise Agreements which will be assumed by RFS and the RFS/RDI License Agreement under the Plan on the Effective Date (the "Assumed Contracts/Leases").  **Exhibit L** to the Disclosure Statement also itemizes the amount of monetary defaults, if any, which exist under such leases and executory contracts, which the Debtors must cure pursuant to section 365(b) of the Bankruptcy Code.  The Confirmation Order shall constitute an Order approving the assumption of each lease and contract listed, and the assignment thereof to the applicable Reorganized Debtor, and each such Assumed Contract/Lease shall be binding on the respective Reorganized Debtor and the counter-parties thereto.  If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract and/or you object to the amount that the Debtors have set forth on **Exhibit L** to the Disclosure Statement as owing to cure monetary defaults, you must file and serve your objection to the Plan within the deadline for objecting to the Confirmation of the Plan.[25]

B.    **Unexpired Leases and Executory Contracts to Be Rejected**

Attached to the Disclosure Statement as **Exhibit M** is a chart, which identifies unexpired leases and executory contracts the Debtors will reject as of the Effective Date (the "Rejected Contracts/Leases").  The Confirmation Order shall constitute an Order approving the rejection of each lease and contract listed.  If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the Confirmation of the Plan.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT UNDER THE PLAN IS THIRTY (30) CALENDAR DAYS FROM THE DATE THE CONFIRMATION ORDER IS ENTERED ON THE COURT'S DOCKET.  Any Claim based on the rejection of a contract or lease will be barred if the Proof of Claim is not timely filed.

---

[25] The Debtors reserve the ~~rights~~right to add or withdraw any contract or lease from the lists of Assumed Contracts/Leases or Rejected Contracts/Leases at any time prior to the Confirmation Hearing.

# VIII.

## EFFECT OF CONFIRMATION OF PLAN

**A.**     **Binding Effect Of Confirmation**

Confirmation will bind the Debtors, all Creditors, Interest Holders and other parties in interest to the provisions of the Plan whether or not the Claim or Interest of such Creditor or Interest Holder is Impaired under the Plan and whether or not such Creditor or Interest Holder has accepted the Plan.

**B.**     **Vesting of Assets Free and Clear of Liens, Claims and Interests**

Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective Date, title to all assets and property of the Debtors, and all property of the Estates, including, pursuant to section 1123(b)(3)(b) of the Bankruptcy Code, each and every claim, demand or cause of action which each Debtor had or had power to assert immediately prior to Confirmation, will revest in the Reorganized Debtors or Litigation Trust, as applicable, free and clear of all liens, Claims and Interests.  Thereafter, the Reorganized Debtors or Litigation Trust, as applicable, will hold these assets without further jurisdiction, restriction or supervision of the Bankruptcy Court.

**C.**     **Good Faith, Exculpation and Release**

Confirmation of the Plan shall constitute a finding that:  (1) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (2) the solicitation of acceptances or rejections of the Plan by all Persons has been in good faith and in compliance with applicable provisions of the Bankruptcy Code.  ~~Accordingly, on the Effective Date, each~~Each of the of the Debtors, the D&Os, the ~~Affiliated Entities~~Founders, the Plan Sponsor, the Committee and the members of the Committee~~,~~ and each of their respective advisors and attorneys (all of the foregoing, collectively, the "Exculpated Parties"), effective as of the Effective Date, will be deemed exculpated ~~by Holders of Claims against and Interests in the Debtors and other parties in interest to the Chapter 11 Cases (including, without limitation, the Debtors and the Estates), from any and all Claims, causes of action and other assertions of liability (including, without limitation, breach of fiduciary duty), arising out of or related to the Debtors, the D&Os, the Affiliate Entities, the Plan Sponsor, the Committee, the Chapter 11 Cases or the exercise by such entities of their~~

1   ~~functions as members of or advisors to or attorneys for any such individuals or committee or~~

2   ~~otherwise under applicable law, in connection with or related to~~with respect to the commencement

3   of the Chapter 11 Cases and matters undertaken in the Chapter 11 Cases, and no Exculpated Party

4   shall have or incur any liability to any Entity for any act taken or omission made in connection with,

5   relating to or arising out of the Debtors' restructuring efforts in the Chapter 11 Cases, the Chapter 11

6   Cases, the formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement,

7   Plan, or any contract, instrument, release or other agreement or document created or entered into in

8   connection therewith, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of

9   consummation of the Plan, the administration and implementation of the Plan or the Distribution of

10  property under the Plan or any other related agreement; *provided, however,* that the foregoing shall

11  not apply to the extent of any act or omission that is determined in a Final Order to have constituted

12  gross negligence, willful misconduct or fraud, but in all respects such Entities shall be entitled to

13  reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant

14  to the Plan.  Notwithstanding the foregoing, there is no release of any RDI Rights of Action which

15  are expressly reserved for prosecution by the Litigation Trust.  And notwithstanding any of the terms

16  or provisions in the Plan, Disclosure Statement, Litigation Trust, and RDI Rights of Action, all

17  defenses to any claims or causes asserted against the Founders or any D&Os of RDI shall be deemed

18  preserved and not impaired or waived, including but not limited to the releases arising from the 2016

19  Restructuring Agreement with the Secured Noteholders and Unsecured Noteholders including those

20  Noteholders in Class 11(a), any applicable statute of limitations and standing defenses to such

21  claims.

22  **~~D.      The D&O/Affiliate Release~~**

23  ~~Prior to the Effective Date, there shall have been approved by the Bankruptcy Court,~~

24  ~~pursuant to a motion to be filed with the Bankruptcy Court under Section 9019 of the Bankruptcy~~

25  ~~Rules, a full and complete release (the "D&O/Affiliate Release") of any claims or causes of action,~~

26  ~~including but not limited to, avoidable transfers and breach of fiduciary duty claims (the~~

27  ~~"D&O/Affiliate Claims") against the D&Os, and any entity in which the D&Os, individually or~~

28  ~~together, hold a controlling interest or in which either of them, either directly or through an entity~~

1 owned by either or both of them, is the managing partner or otherwise manages or controls the entity

2 (each an "Affiliated Entity" and, together, the "Affiliated Entities").  Creditors shall have the right to

3 object to the 9010 Motion notwithstanding how said creditor voted in connections with the Plan.

4 If the D&O/Affiliate Release is approved by the Bankruptcy Court, unsecured Creditors'

5 claims of RDI (classified in Class 11(a)) will be entitled to payment of a total of Two Million Five

6 Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of Six Hundred and Twenty-Five

7 Thousand Dollars ($625,000) on each of the second (2nd), third (3rd), fourth (4th) and fifth (5th)

8 anniversaries of the Effective Date, with Cavanaugh and Kosmides contributing an additional $ 1

9 million dollars to the Debtors through a further dilution of their stock in the Reorganized Debtors

10 down to 25%.

11 Alternatively, if the D&O/Affiliate Release is not approved by the Bankruptcy Court,

12 unsecured Creditors' claims of RDI (classified in Class 11(a)) will be entitled to a *pro rata*

13 distribution from any proceeds ultimately recovered by the Litigation Trust that will have the right,

14 following the Effective Date, to investigate and, if appropriate, prosecute the D&O/Affiliate Claims,

15 if any, against the D&Os and D&O Affiliated Entities; *provided, however*, that any distribution to

16 the  RDI unsecured Creditors from any recovery by the Litigation Trust shall be after payment of the

17 fees and costs incurred by the Litigation Trust incurred in connection with the prosecution of claims

18 or otherwise.

19 **E.D.    No Limitations on Effect of Confirmation**

20 Nothing contained in the Plan will limit the effect of Confirmation as described in section

21 1141 of the Bankruptcy Code.

22 **F.E.    Discharge of Claims**

23 Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically

24 provided in the Plan, the Distributions, rights and treatment that are provided in the Plan shall be in

25 full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all

26 Claims, Interests and causes of action of any nature whatsoever, including any interest accrued on

27 Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities

28 of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or

1    properties, regardless of whether any property shall have been distributed or retained pursuant to the

2    Plan on account of such Claims and Interests, including demands, liabilities and causes of action that

3    arose before the Effective Date, any contingent or non-contingent liability on account of

4    representations or warranties issued on or before the Effective Date, and all debts of the kind

5    specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), in each case whether or not:  (1) a

6    Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed

7    pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim,

8    debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder

9    of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default

10    by the Debtors with respect to any Claim or Interest that existed before or on account of the filing of

11    the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be

12    a judicial determination of the discharge of all Claims and Interests subject to the Effective Date

13    occurring, except as otherwise expressly provided in the Plan.

14    **G.F.    Injunction**

15    A FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY

16    ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF

17    ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE

18    CONFIRMATION ORDER.  FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT

19    OF THE RELEASES AND EXCULPATION GRANTED IN SECTION VIII.C.,IN THE GOOD

20    FAITH, EXCULPATION AND RELEASE SECTION, THE RELEASING PARTIES SHALL BE

21    PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER

22    AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR

23    ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER

24    PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY,

25    OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR

26    TO BE RELEASED PURSUANT TO SECTION VIII.CTHE GOOD FAITH, EXCULPATION

27    AND RELEASE SECTION.

28    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED

DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL SUCH CLAIMS AND INTERESTS SHALL BE DEEMED SURRENDERED AND EXTINGUISHED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN

OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE DEEMED SURRENDERED OR EXTINGUISHED, AS THE CASE MAY BE, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING THE FOREGOING, NOTHING HEREIN IS INTENDED TO ENJOIN OR INTERFERE WITH THE DEBTORS' OR REORGANIZED DEBTORS' COVERAGE UNDER ANY INSURANCE POLICIES, INCLUDING BUT NOT LIMITED TO THOSE CERTAIN INSURANCE POLICIES ISSUED ON BEHALF OF BEAZLEY INSURANCE FOR D&O COVERAGE WITH THE CARRIER INCLUDING PAYMENT FOR DEFENSE COSTS AND CLAIMS.

H.G.    **Securities Laws**

The entry of the Confirmation Order shall be a final determination of the Bankruptcy Court that the equity in reorganized RDI to be distributed pursuant to the Plan is entitled to all of the benefits and exemptions provided by section 1145 of the Bankruptcy Code.

**IX.**

**CONDITIONS TO EFFECTIVENESS OF THE PLAN**

The effectiveness of the Plan is conditioned upon the events described below:

A.      The receipt of the Plan Funding from the Plan Sponsor sufficient to make the HOP Effective Date and Effective Date payments.

B.      The transferOn the HOP Effective Date, the issuance of 100% of the equity interests in the HOP Entities to the Plan Sponsor in accordance with the terms of the Plan.

C.      On the Effective Date, the contribution of 100% of the equity interests in RFS to RDI in accordance with the terms of the Plan, and.

D.      One (1) day following the agreement of the Effective Date, the contribution by the Plan Sponsor of the interests in the HOP Entities to contribute the Interests inReorganized RDI.

B.E.      Reorganized RDI's guaranty of the secured debt of the HOP Restaurant Entities to RDI.Opus Bank and C&C Partnership, as restructured under the Plan.

C.F.      TheOn the Effective Date, the issuance of the Interests in RDI in accordance with the terms of the Plan.

D.      Satisfaction of the Going Concern Value Requirement.

E.G.      AssumptionCourt approval of assumption by RFS of the Franchise Agreements and assumption by RDI and RFS of the RFS/RDI License Agreement.

F.H.      ApprovalCourt approval of the New Value Contribution and the Reconciliation.

I.      ApprovalCourt approval of the D&O/Affiliate Release or, alternatively, creationRDI Professional and Unsecured Creditor Distribution Agreement.

G.J.      Creation of the Litigation Trust.

H.K.      The Debtors' execution ofExecution of corporate documentation governing Reorganized RDI and all other Plan related agreements required to be executed by the Debtorsrelevant parties.

I.      The Plan is conditioned on an agreement by the Professionals, or other determination, as to the treatment of their Professional Fees under the Plan that will allow the Plan to become effective.  If an agreement is not reached with respect to payment of professional fees that is acceptable to the Debtors and the Professionals, the Plan will not go effective.

# X.

## MISCELLANEOUS PLAN PROVISIONS

### A.    Rounding of Amounts / De Minimis Amount

Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors may round all amounts for Distributions of Cash hereunder to Holders of Allowed Claims and Interests to the nearest whole dollar amount.  In addition, the Reorganized Debtors shall not be required to make a Distribution on account of any Claim until the Distribution to such Creditor totals a minimum of $5.00.

### B.    Name and Address of Holder

For purposes of all Distributions under ~~this~~the Plan, the Reorganized Debtors will be entitled to rely on the name and address of the Holder of each Allowed Claim or Interest as shown on any timely filed Proof of Claim and, if none, as shown on the Debtors' Schedules, as of the date of the Confirmation Hearing, except to the extent that both the Reorganized Debtors and their counsel first receive adequate written notice of a transfer or change of address, properly executed by the Holder or its authorized agent.

### C.    Orders to Aid Consummation of Plan

The Plan constitutes and incorporates a motion under 11 U.S.C. § 1142 and the Bankruptcy Rules 7069 and 7070 for an order to cause the Debtors and all their present and former directors, officers, agents, employees, attorneys, and accountants to cooperate fully in providing the Debtors with all information regarding and access to properties and assets of the Debtors and their Estates; and to execute and deliver such documents and perform such acts as are reasonably necessary to enable the Debtors to take possession, custody, and control of all assets vested in the Debtors' Estates pursuant to the Plan to the extent provided for under the Plan and reasonably necessary to transfer all of the assets of the Debtors to the Reorganized Debtors as provided by the Plan, including the ~~transfer~~contribution of the Interests in RFS to RDI, the ~~transfer~~issuance of the HOP ~~Assets~~Interests to the ~~New HOP Entities~~Plan Sponsor and ~~the post-Effective Date transfer~~contribution of the ~~New~~ HOP ~~Entities~~Interests to Reorganized RDI.  Confirmation of the Plan shall be deemed a granting of such motion and the Confirmation Order shall be deemed the

order thereon.

**D.     Severability**

If the Court determines, prior to the date of entry of the Confirmation Order, that any provision of the Plan is illegal either as written or as applied to any Claim or Interest, as the case may be, such provision shall be either unenforceable generally or as applied to such Claim or Interest.  A determination that a provision of the Plan is illegal or not enforceable as to a particular Claim or Interest shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan or of that provision as applied to other Claims or Interests and the Debtors may modify the Plan to withdraw or modify such provision.

**E.     Headings of Articles and Sections**

The headings of the articles and sections of the Plan are inserted for convenience only and shall in no way affect the interpretation of its provisions.

**F.     Successors and Assigns**

The rights, benefits and obligations of any Entity referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors or assigns of such Entity.

**G.     Changes in Rates Subject to Regulatory Commission Approval**

The Debtors are not subject to governmental regulatory commission approval of their prices.

**H.     Services By And Fees For Professionals**

**1.     Prior to the Effective Date**

**a.     Generally**

Fees and expenses for the Professionals retained by the Debtors for the services rendered and costs incurred after the Petition Date and prior to the Effective Date, will be fixed by the Bankruptcy Court after notice and a hearing and such fees and expenses will be paid after approval by the Bankruptcy Court to the extent so approved.

**b.     From the Effective Date**

Fees owing for services rendered and costs incurred and owing on and after the Effective Date by the Professionals retained by the Reorganized Debtors will be paid by the Reorganized

Debtors from the funds held by the Reorganized Debtors twenty (20) days after submission of a bill

therefore to the Reorganized Debtors, if there is no objection within such time.  If there is such an

objection, the fees and expenses will be fixed by the Bankruptcy Court after notice and a hearing.

The Bankruptcy Court will retain jurisdiction until the Chapter 11 Cases are closed, to determine

disputed post-Effective Date fees of Reorganized Debtors' professionals.

**I.     Dissolution of Committee**

As of the Effective Date, the Committee and each of its members shall be released and

discharged from all duties and obligations arising from or related to the Chapter 11 Cases.

**J.     Litigation Trust**

If the D&O/Affiliate Release is not approved by the Bankruptcy Court, the Class 11(a)

claimants will not be entitled to the payment of the $2.5 million.  Instead, on the Effective Date, a

litigation trust will be formed pursuant to the Plan (the "Litigation Trust").  The Litigation Trust will

have the express purpose of investigating and, if appropriate, prosecuting any D&O/Affiliate Claims,

and making a *pro rata* distribution from any proceeds ultimately recovered by the Litigation Trust

from such D&O/Affiliate Claims to the holders of Class 11(a) claims.   The Litigation Trust is

entitled to retain counsel or other advisors, which may include the advisors to the Committee, at the

expense of the Litigation Trust.  Any distribution to the Class 11(a) from the Litigation Trust shall be

after payment in full of the fees and costs incurred by the Litigation Trust incurred in connection

with the prosecution of D&O/Affiliate Claims or otherwise.  The Reorganized Debtors shall have no

liability for the payment of any fees or costs of the Litigation Trust, nor any liability to the holders of

Class 11(a) claimants, which shall obtain their recovery solely from the Litigation Trust.

**K.J.     Amendment, Withdrawal or Revocation of the Plan**

The Debtors reserve the right to amend, revoke or withdraw the Plan prior to the

Confirmation Date.  If the Debtors should revoke or withdraw the Plan, then the Plan shall be null

and void, and nothing contained in the Plan shall constitute an admission by any of the Plan

Proponents, a waiver or release of any Claims by or against, or any Interests in the Debtors, or

prejudice in any manner the rights of Debtors

1  ## ~~L.~~K.    Impact of Default Under Plan

2          In the event that the Reorganized Debtors default on their payment obligations under the

3  Plan, Creditors will have the right to enforce their rights and remedies under ~~applicable law.~~the Plan

4  and applicable law, including as specifically provided by the RDI Professional and Unsecured

5  Distribution Agreement.   As provided by Local Bankruptcy Rule 3020-1(d), if the Chapter 11 Cases

6  are converted to chapter 7, the property of the Reorganized Debtors that has not been distributed

7  under the Plan shall be vested in the chapter 7 trustee, except for property that would have been

8  excluded from the estates if the Chapter 11 Cases had always been under chapter 7.

9  ## ~~M.~~L.    Payment of Post-Confirmation Quarterly Fees

10          Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the

11  United States Trustee by each of the Debtors in accordance with 28 U.S.C. § 1930(a)(6) until entry

12  of a final decree, or entry of an order of dismissal/conversion to chapter 7.

13  ## ~~N.~~M.    Notices

14          Except as set forth elsewhere in ~~this~~the Plan, any notice required or permitted to be provided

15  under ~~this~~the Plan, or any request for information with respect to the Plan, shall be in writing and

16  served by either (1) certified mail, return receipt requested, postage prepaid, (2) hand delivery or (3)

17  reputable overnight delivery service, freight prepaid, to be addressed as follows:

18

19      o   The Debtors (or Reorganized Debtors) and counsel for the Debtors (or Reorganized Debtors),

20  at the following addresses:

21                          Plan Proponents
                     Douglas Cavanaugh and Ralph Kosmides
22       Ruby's Diner, Inc., *et al.* and Ruby's ~~Franchising~~Franchise Systems, Inc.
                      4100 MacArthur Blvd., Suite 310
23                    Newport Beach, California 92660
                        Telephone: (949) 644-7829
24                       Facsimile: (949) 644-4265

25

26                     Counsel for the RDI Debtors
                        William N. Lobel, Esq.
27                  Pachulski Stang Ziehl & Jones LLP
                  650 Town Center Drive, 15th Floor
28                     Costa Mesa, California 92626

Telephone:  (714) 384-4740
Facsimile:   (714) 384-4741
E-mail:  wlobel@pszjlaw.com

<u>Counsel for RFS</u>
Eric J. Fromme, Esq.
Theodora Oringher PC
535 Anton Blvd., 9th Floor
Costa Mesa, California 92626
Telephone:  (714) 549-6200
Facsimile:   (714) 549-6201
E-mail:  efromme@tocounsel.com

o  The Plan Sponsor and counsel for the Plan Sponsor, at the following addresses:

<u>Plan Sponsor</u>
Steven L. Craig
c/o Craig Realty Group
4100 MacArthur Blvd, Suite 200
Newport Beach, California 92660

<u>Counsel for the Plan Sponsor</u>
Alan J. Friedman, Esq.
Shulman ~~Hodges &~~ Bastian LLP
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Telephone:  (949) 340-3400
Facsimile:  (949) 340-3000
Email:  afriedman@~~shbllp~~shulmanbastian.com

o  Counsel to the Committee, at the following address:

Garrick Hollander, Esq.
Winthrop ~~Couchot~~ Golubow Hollander, LLP
1301 Dove Street, Suite 500
Newport Beach, California 92660
Telephone:  (949) 720-4100
Facsimile:  (949) 720-4111
Email:  ghollander@wcghlaw.com

## XI.

## <u>RETENTION OF JURISDICTION</u>

The Bankruptcy Court will retain and have exclusive jurisdiction over any matter (a) arising

under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that

relates to the following:

A.    Resolution of any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date of the Plan, to add any executory contracts or unexpired leases to the lists of Assumed Contracts/Leases or Rejected Contracts/Leases;

B.    Entry of such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

C.    Determination of any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtors after the Effective Date;

D.    Ensuring that Distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

E.    Hearing and determining any timely objections to Administrative Claims or to Proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of secured or unsecured status of any Claim, in whole or in part;

F.    Entry and implementation of such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

G.    Issuance of such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

H.    Consideration of any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

I.    Hearing and determining all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

J.    Hearing and determining disputes arising in connection with or relating to the Plan or

1    the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's

2    obligations incurred in connection with or released or exculpated under the Plan;

3           K.    Issuance of injunctions or other orders as may be necessary or appropriate to restrain

4    interference by any Entity with consummation or enforcement of the Plan;

5           L.    Determination of any other matters that may arise in connection with or are related to

6    the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument release, or

7    other agreement or document created in connection with the Plan or the Disclosure Statement,

8    including the Litigation Trust Agreement;

9           M.    Hearing and determining matters concerning state, local, and federal taxes in

10    accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

11           N.    Hearing any other matter or for any purpose specified in the Confirmation Order that

12    is not inconsistent with the Bankruptcy Code; and

13           O.    Entry of a final decree closing the Chapter 11 Cases.

14    **XII.**

15    **CONFIRMATION REQUEST**

16          In the event that all of the applicable requirements of 11 U.S.C. § 1129(a) are met other than

17    paragraph (8), the Debtors requests confirmation of the Plan notwithstanding the requirements of

18    such paragraph under 11 U.S.C. § 1129(b).

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*[Signatures on Following Page]*

SUBMITTED BY:

Dated: ~~October 1~~December 6, 2019          PACHULSKI STANG ZIEHL & JONES LLP


By:        */s/ William N. Lobel*
           William N. Lobel
           Attorneys for Ruby's Diner, Inc., *et al.,* Debtors
           and Debtors in Possession


APPROVED BY JOINT PLAN PROPONENT:


Dated: ~~October 1~~December 6, 2019          THEODORA ORINGHER PC


By:        *Eric J. Fromme*
           Eric J. Fromme
           Attorneys for Ruby's ~~Franchising~~Franchise
           Systems, Inc., Debtor and Debtor in Possession

## PLAN EXHIBIT 1 – "DEFINITIONS"

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein (and their plural or singular forms shall have correlative meanings):

*"2016 Restructuring Agreement"* means the Consent Solicitation Statement, the Restructured Notes, the Omnibus First Amendment, the UCC-1 Financing Statements filed in connection therewith, and any related documentation (including the Original Secured Credit Documents and Original Unsecured Credit Documents not amended by way of the Restructured Notes and Omnibus First Amendment).

*"9019 Motion"* means the motion to be filed with the Bankruptcy Court under Section 9019 of the Bankruptcy Rules wherein the Debtors will seek a full and complete release of any claims or cases of action, including by not limited to, avoidable transfers and breach of fiduciary claims against the Directors and Officers, and any entity in which either of the Directors and Officers individually or together, hold a controlling interest or in which either of them, either directly or through an entity owned by either of them, is the managing partner or otherwise manages or controls the entity.

*"Ad Fund"* means the fund created through Franchisees' payments in connection with the marketing and advertising of the Ruby's® brand on a regional and a system/national level, as required by certain Franchise Agreements.

*"Ad Fund Obligations"* means the Franchisees' obligations to contribute to the Ad Fund.

*"Administrative Claim"* means any Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code or by order of the Bankruptcy Court, including, without limitation, (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) the Professional Claims; and (c) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*"Administrative Claims Bar Date"* means the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

*"Administrative Personal Property Taxes"* means personal property tax Claims arising for the period from the Petition Date to the Effective Date.

*"Administrative Tax Claim"* means a Claim that is not an Allowed Secured Claim and that a Governmental Unit asserts against ~~the~~a Debtor either for taxes or for related interest or penalties for any tax period that, in whole or in part, falls within the period beginning on the respective Petition Date and ending on the Effective Date.

"*Affiliate*" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

*"Allowed"* (this term is used both separately and in conjunction with other defined terms in the Plan (*e.g.*, Allowed Priority Tax Claim)) means, except as otherwise provided herein, (a) a Claim, Eligible Claim or Interest specifically allowed under the terms of the Plan, (b) a Claim or Interest that has been allowed by a Final Order or in a stipulation of amount and nature of the Claim or Interest executed by the Reorganized Debtors on, or after, the Effective Date, (c) an Interest or Claim as reflected by a Filed Proof of Claim that is not withdrawn or disallowed, or (d) if the Proof of Claim has not been Filed, the Claim as reflected in the Schedules if therein listed as undisputed,

unliquidated and not contingent or the Interest as reflected in the Schedules; <u>provided</u> that in the case of allowance under either subsections (c) or (d), any Claim's allowance is subject to any limitations imposed by section 502 of the Bankruptcy Code; and provided further that, for only the purpose of determining the timing of distributions pursuant to Plan, allowance under subsections (c) and (d) only is applicable once any of the following occur (1) before the Claims Objection Bar Date, the Debtors or the Reorganized Debtors have determined not to object to the Claim, (2) the Claims Objection Bar Date passes without an objection being Filed, or (3) after the Debtors timely object to the Claim, the Claim is allowed as provided in subparagraph (a) above.

*"Armory"* means Armory Consulting Co., financial advisor to RFS.

*"Assumed Contracts/Leases"* means the Debtors' unexpired leases and executory contracts to be assumed pursuant to the Plan, as set forth on **Exhibit L** to the Disclosure Statement.

*"Avoidance Actions"* means any and all actual or potential avoidance, recovery, subordination or other claims, actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, claims, actions or remedies arising under sections 502, 510, 542-553 and 724(a) of the Bankruptcy Code.

*"Ballot"* means the Ballot for accepting or rejecting the Plan.

*"Bankruptcy Code"* means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time and as applicable to the Chapter 11 Cases.

*"Bankruptcy Court"* or *"Court"* means the United States Bankruptcy Court for the Central District of California, or any other court having jurisdiction over the Chapter 11 Cases.

*"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

*"Bar Dates"* means the deadlines set by order of the Bankruptcy Court or the Plan for Filing Proofs of Claim or requests for payment of Administrative Claims in the Chapter 11 Cases.

*"Belshe"* means Tad Belshe.

*"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

*"Cash"* means the legal tender of the United States of America or the equivalent thereof.

*"Cash Flow Projections"* means the statements of estimated flows of Cash into and from the Debtors from and after the Effective Date, as set forth in **Exhibit B** to the Disclosure Statement.

*"Cavanaugh"* means Douglas Cavanaugh.

*"Chapter 11 Cases"* means, with respect to a Debtor, such Debtor's voluntary case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases (except that of Ruby's ~~Franchising System~~Franchise Systems, Inc.), under chapter 11 of the Bankruptcy Code, and styled *In re Ruby's Diner, Inc., et al.*, Case Nos. 8:18-bk-13311-CB; 8:18-bk-13197-CB; 8:18-bk-13198-CB; 8:18-bk-13199-CB; 8:18-bk-13200-CB; 8:18-bk-13201-CB; 8:18-bk-13202-CB (Jointly Administered); and *In re Ruby's Franchise Systems, Inc.*, Case No.: 8:18-bk-13324-CB.

"*Claim*" means any "claim" against any Debtor as defined in section 101(5) of the Bankruptcy Code.

"*Claim Objection Bar Date*" means the first Business Day that is 120 days following the Effective Date of the Plan, subject to extension by Court order.

"*Claimant*" means the Holder of a Claim.

"*Claims Register*" means the official register of Claims filed in the Debtors' Chapter 11 Cases..

"*Class*" means a category of Holders of Claims or Interests as set forth in Article V of the Plan pursuant to sections 1122(a) and 1123(a) of the Bankruptcy Code.

"*CMA*" means Credit Management Association, the Collateral Agent in connection with the Original Secured Notes and Restructured Secured Notes.

"*Collateral Agent*" means CMA, in its capacity as collateral agent in respect of the Original Secured Notes and Restructured Secured Notes.

"*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case of RDI pursuant to section 1102 of the Bankruptcy Code.

"*Company Restaurants*" means, collectively, the RDI Restaurants and the SoCal Restaurants.

"*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming ~~this~~the Plan pursuant to section 1129 of the Bankruptcy Code that is in form and substance reasonably acceptable to the Debtors.

"*Consent Solicitation Statement*" means the Consent Solicitation Statement dated May 19, 2016.

 "*Craig*" means Steven L. Craig.

"*Creditor*" means the Holder of a Claim or an Administrative Claim against any of the Debtors.

"*D&Os*" means Cavanaugh, Kosmides and Belshe.

~~"*D&O Affiliated Entity(ies)*" means any entity in which the D&Os, individually or together, hold a controlling interest or in which either of them, either directly or through an entity owned by either or both of them, is the managing partner or otherwise manages or controls the entity.~~

~~"*D&O/Affiliate Release*" means a full and complete release of any claims or causes of action, including but limited to avoidable transfers and breach of fiduciary duty claims against the D&Os and the D&O Affiliated Entities, approved by the Bankruptcy  Court.~~

 "*Debtors*" mean the RDI Debtors and RFS in their capacities as debtors in the Chapter 11 Cases.

"*DIP Lender*" means Steven L. Craig.

*"Disallowed Claim"* means (i) a Claim, or any portion thereof, that has been disallowed by a Final Order; (ii) a Claim that has been listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which no proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law; or (iii) a Claim that has not been listed in the Schedules and as to which no proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law.

*"Disclosure Statement"* means that certain ~~First~~Second *Amended Disclosure Statement Describing* ~~First~~Second *Amended Joint Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes the Plan, including all exhibits and schedules thereto and references therein that relate to the Plan.

*"Disclosure Statement Order"* means the order of the Bankruptcy Court approving the Disclosure Statement, as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto.

*"Disputed"* means, with respect to a Claim, Eligible Claim, Interest or any portion thereof that is not specifically Allowed under the Plan, that such Claim, Eligible Claim, Interest or portion thereof: (a) is the subject of an objection or request for estimation filed by any of the Debtors or any other party in interest in accordance with applicable law, which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; (b) has not been otherwise Allowed and is scheduled by the Debtors as contingent, unliquidated, or disputed; or (c) is otherwise disputed in an adversary proceeding or otherwise before a court of competent jurisdiction or in a consensual private dispute resolution process by any of the Debtors or any other party in interest, which dispute has not been withdrawn, resolved, or overruled by a Final Order or other applicable final determination.

*"Disputed Claims Reserve"* means the segregated account(s) in which the Distributions due with respect to Disputed Claims based on the calculations required by the Plan shall be reserved for the Holders of the Disputed Claims.

*"Distribution"* means the distributions to be made pursuant to the Plan.

~~*"DRC"*~~*"Donlin Recano"* means Donlin Recano & Company, Inc., the claims, noticing and balloting agent for the RDI Debtors.

*"Effective Date"* means the later of: (~~1~~a) the first (1st) Business Day of the first ~~(1st)~~ month which begins at least fifteen (15) days following the Confirmation Date; ~~and (2~~or (b) the first (1st) ~~day~~Business Day of the first (1st) month after such date under clause (~~1~~a) on which there is not in force any stay or injunction against the enforcement of the Plan or the Confirmation Order, provided that the Effective Date will not occur until all Conditions to the Effective Date set forth in Section ~~VIII~~VII of the Plan have been satisfied or waived by the Plan Proponents; *provided, however*, that the Effective Date must occur by no later than sixty (60) days following the Confirmation Date.

*"Eligible Claim"* means an Allowed Claim entitled to participate on a pro rata basis within any Class with respect to all or a portion of the distribution made to such Class.

*"Entity"* means an "entity" as defined in section 101(15) of the Bankruptcy Code.

*"Equity Security"* means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

*"Estate Representative"* means the Reorganized Debtors, whose responsibilities shall include prosecuting any Rights of Action, (excluding the RDI Rights of Action), objecting to Claims, disbursing monies to Holders of Claims under the Plan, (excluding those monies to be distributed by the Litigation Trustee), liquidating property of the Estates and administering the Reserves established pursuant to the Plan (other than any Claims assigned to the Litigation Trust)..

*"Estates"* means, collectively, the bankruptcy estates of the Debtors created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

*"Executory Contract"* means a contract to which any Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

*"Exhibit"* means an exhibit annexed to the Plan or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

*"Family Tree"* means Family Tree Produce, Inc.

*"File"* or *"Filed"* or *"Filing"* means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

*"Final Order"* means an order or judgment of the Bankruptcy Court, the operation or effect of which has not been reversed, stayed, modified or amended and which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined to be in effect by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order; *provided, further*, that the Debtors or the Reorganized Debtors, as applicable, reserve the right to waive any appeal period for an order or judgment to become a Final Order.

*"Founders"* means Cavanaugh and Kosmides.

*"Franchise Agreements"* means, collectively, the agreements between RFS and the Franchisees.

*"Franchise Royalties"* means the franchise royalty fees payable by the Franchisees to RFS as franchisor under the terms of the Franchise Agreements.

*"Franchised Restaurants"* means the Ruby's® Diner franchises (or licensed units) located in Southern California, Arizona, Pennsylvania, New Jersey, Nevada and Texas that are owned and, with certain limited exceptions, operated by independent third parties.

*"Franchisees"* means, collectively, the Ruby's® franchisee and licensee counterparties to Franchise Agreements with RFS.

*"General Unsecured Claim"* means any Prepetition Claim against any Debtor that is not a(n): (a) Administrative Claim; (b) Priority Tax Claim; (c) Priority Non-Tax Claim; or (d) Secured Claim.

*"GlassRatner"* means GlassRatner Advisory & Capital Group LLC, financial advisor to RDI.

*"Going Concern Value"* means ~~(a)~~shall include the total assets of RDI (including the value of its direct and indirect interests in RFS, the RDI Entities and the ~~New~~ HOP Restaurant Entities), after taking into account the Plan Funding and the New Value Contribution~~, less (b) the total liabilities of RDI, as restructured under the Plan or as otherwise discounted~~, as set forth in **Exhibit K** to the Disclosure Statement.

*"Going Concern Value Requirement"* means, as a ~~prerequisite~~condition to the Plan Sponsor's funding of the Plan Funding whereby ~~RDI's balance sheet~~, as of the Effective Date, RDI must ~~show~~have a RDI must have a Going Concern Value of not less than Six Million ~~Seven~~Sixty Six Hundred Sixty Thousand Sixty Seven Dollars ($6,~~700,000). ~~666,667).  "

*"Governmental Unit"* means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

*"Governmental Units Bar Date"* means the date that is 180 days after the date of entry of the Order for Relief in the relevant Chapter 11 Case.

*"Holder"* means an Entity holding a Claim against, or Interest in, any Debtor.

*"HOP ~~Assets~~Interests"* means the ~~assets owned by~~ownership interests in the HOP Restaurant Entities.

*"HOP Plan Funding"* means that portion of the Plan Funding utilized to fund the Plan as to the HOP Restaurant Entities.

*"HOP Restaurant Entities"* means Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs.

*"Huntington Beach Lease"* means that certain nonresidential real property between Ruby's Huntington Beach and the City of Huntington Beach in respect to real property located at the Huntington Beach Pier, 1 Main Street, Huntington Beach, California 92648.

*"Huntington Beach Lease Stipulation"* means that stipulation between Ruby's Huntington Beach and the City of Huntington Beach authorizing the assumption of the Huntington Beach Lease and curing defaults thereof, approved by the Bankruptcy Court on March 11, 2019.

*"Impaired"* means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

*"Intercompany Claims"* means any Claim or Cause of Action of a Debtor against any other Debtor, whether or not a Proof of Claim is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code in any of the Chapter 11 Cases.

*"Interest"* means any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock or limited company interests.  The term "Interest" also includes any Claim that is determined to be subordinated to the status of an Equity Security by Final Order of the Bankruptcy Court, whether under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

*"Kosmides"* means Ralph Kosmides.

"*Laguna Hills Lease*" means that certain lease agreement, as amended from time to time, by and between Ruby's Laguna Hills and MGP Fund X Laguna Hills, , dated on or about September 16, 1994, in respect of real property within the Laguna Hills Mall, located at 24155 Laguna Hills Mall, Suite 184A, Laguna Hills, California 92653.

"*Laguna Hills Lease Assumption and Assignment Order*" means the order of the Bankruptcy Court granting the Laguna Hills Lease Motion, entered on March 21, 2019.

"*Laguna Hills Lease Motion*" means the motion filed by RDI, Ruby's Laguna Hills and SoCal Diners to assume and assign the Laguna Hills Lease, sell FF&E to the assignee and to obtain other relief, filed with the Bankruptcy Court on March 15, 2019.

"*Laguna Hills Restaurant*" means the Ruby's Diner within the Laguna Hills Mall, located at 24155 Laguna Hills Mall, Suite 184A, Laguna Hills, California 92653.

"*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

"*Litigation*" means lawsuits to which one or more of the Debtors were a party as of the Petition Date listed on **Exhibit C** to the Disclosure Statement.

"*Litigation Trust*" means the litigation trust to be formed pursuant to the Plan~~, if~~ on the ~~D&O/Affiliate Release is not approved,  that will have the right~~Effective Date to ~~investigate~~control and~~, if appropriate,~~ prosecute ~~claims, if any, against~~all RDI Rights of Action on behalf of Reorganized RDI and to make distributions to the RDI Professionals and the ~~D&Os and D&O Affiliated Entities,~~RDI Unsecured Creditors (Class 11(a)), as further discussed in Section VI.~~I.10~~E.8 of the Disclosure Statement and Article VI.H of the Plan.

"*Litigation Trust Agreement*" means the documentation relative to the formation, and the rights and responsibilities, of the Litigation Trust, which will be filed with the Bankruptcy Court prior to or concurrently with the filing of the brief in support of confirmation of the Plan.

"*Litigation Trustee*" means an independent litigation trustee selected by mutual agreement of RDI, the Committee and the RDI Professionals and appointed to manage the Litigation Trust.

"*Marks and Intellectual Property*" means the trademarks, system and intellectual property owned by RDI, including, without limitation, trade names such as "Ruby's®," "Ruby's® Diner," and "The Ruby Restaurant Group."

"*Netdown Process*" means the Post-Petition Netdown and Pre-Petition Netdown described in ~~Section~~Sections III.C.12 and VI.E.7 of the Disclosure Statement.

~~"*New HOP Entities*" means the entities owned by the Plan Sponsor that will own the HOP Assets subject to the debt against the HOP Restaurant Entities and the HOP Assets, as restructured under the Plan.  The ownership of the New HOP Entities will be contributed by the Plan Sponsor to RDI post-Effective Date.~~

"*New Opus Bank HOP Note*" means the new note issued to Opus Bank by the ~~New~~ HOP Restaurant Entities in connection with the Class 2 Allowed Secured Claim.

"*New Opus Bank RFS Note*" means the new note issued to Opus Bank by RFS  in connection with the Class 6 Allowed Secured Claim.

"*New Value Contribution*" means the Founders' contribution to RDI on the Effective Date of the Plan in the form ~~of a portion~~ of the value of their ownership interests in RFS (based on the equity value of RFS adjusted by the Reconciliation) as provided by the Plan and as described in greater detail in Section VI.E.4 and **Exhibit A** to the Disclosure Statement.

"*Noteholders*" means, collectively, the Secured Noteholders and the Unsecured Noteholders.

"*Oceanside Lease*" means that certain lease, as amended from time to time, by and between RDI and the City of Oceanside, on or about March 1, 1996, of real property located at 1 Oceanside Pier, Oceanside, California 92054.

"*Omnibus First Amendment*" means the Consent Solicitation Statement, the Restructured Notes, the First Amendment to Security Agreement, Credit Agreement (Secured), Collateral Agent and Intercreditor Agreement (Secured), Credit Agreement (Unsecured), and Representative and Intercreditor Agreement (Unsecured), and Agreement Regarding Restatement of Promissory Notes, effective as of July 1, 2016.

"*Opus Bank*" means Opus Bank, the Holder of the Class 2 Allowed Secured Claim (SoCal Debtors) and the Holder of the Class 6 Allowed Secured Claim (RFS).

"*Original Notes*" means, collectively, the Original Secured Notes and Original Unsecured Notes.

"*Original Secured Credit Documents*" means the Credit Agreement, Collateral Agent and Intercreditor Agreement, the Security Agreement (Personal Property), dated as of February 10, 2012, by and between RDI and CMA, as collateral agent for and the representative of each of the Secured Noteholders of RDI, and related documentation, including, without limitation, the UCC-1 Financing Statement filed in connection therewith., relating to the Original Secured Notes.

"*Original Secured Notes*" means the Secured Promissory Notes, dated as of February 10, 2012, by and between RDI and CMA, as collateral agent for and the representative of each of the Secured Noteholders of RDI.

"*Original Unsecured Credit Documents*" means the Credit Agreement and the Representative and Intercreditor Agreement, dated as of July 16, 2012, by and between RDI and the Steering Committee, as the representative of each of the Unsecured Noteholders of RDI, relating to the Original Unsecured Notes.

"*Original Unsecured Notes*" means the Unsecured Promissory Note, by and between RDI and the Steering Committee, as the representative of each of the Unsecured Noteholders of RDI, dated as of July 16, 2012.

"*PACA Claims*" means Claims arising in connection with the sale of perishable agricultural commodities pursuant to the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. §§ 499, *et seq.*

"*Palm Springs Lease*" means that certain commercial lease agreement by and between Ruby's Palm Springs and John Wessman dba Plaza Mercado, dated on or about October 25, 1999, in respect of real property located at 155 S. Palm Canyon Drive, Palm Springs, California 92262.

"*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

*"Petition Date(s)"* means, individually, the date on which the relevant Debtor commenced its Chapter 11 Case, i.e., August 29, 2018, with respect to the SoCal Debtors, September 5, 2018, with respect to RDI, and September 6, 2018, with respect to RFS.

*"Petitions"* means the respective voluntary petitions for relief (Official Form 201 and all attachments thereto) Filed by the Debtors on the Petition Date.

*"Pillsbury"* means Pillsbury Winthrop Shaw Pittman LLP.

*"Pillsbury Claim"* means the Claims asserted by Pillsbury in the amount of $658,095 against RDI, SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs.

*"Plan"* means the ~~First~~*Second Amended Joint Chapter 11 Plan of Reorganization*, including the Exhibits and Plan Schedules and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

*"Plan Funding"* means the consideration to be provided by the Plan Sponsor as described in Section VI.E.2 of the Disclosure Statement.

*"Plan Proponents"* means the RDI Debtors and RFS.

*"Plan Sponsor"* means Steven L. Craig~~.~~ or an affiliated entity(ies).

*"Plaza Bonita"* means Plaza Bonita, the holder of a Claim against SoCal Diners.

*"Post-Petition"* means the time period beginning immediately upon the filing of the relevant Chapter 11 Case and ending on the Effective Date.

*"Post-Petition Netdown"* means the process whereby RDI and RFS were authorized by the Bankruptcy Court to honor post-petition obligations between and among RDI, RFS and the ~~Ruby's~~ Franchisees, as described in Section III.C.12 of the Disclosure Statement.

*"Preference Actions"* means lawsuits to recover transfers pursuant to the provisions of section 547 of the Bankruptcy Code.

*"Preference Period"* means, as to Creditors who are not Insiders, the ninety (90) day period preceding the applicable Petition Date and, as to Creditors who are Insiders, the one (1) year period preceding the applicable Petition Date.

*"Preference Period Payments Listing"* means the summary of the gross dollar amount of payments made by each of the Debtors during the ninety (90) day period preceding the respective Petition Dates and the one (1) year period for Creditors who are Insiders, attached as **Exhibit E** to the Disclosure Statement.

*"Pre-Petition"* means the time period prior to the Petition Date in the relevant Debtor's Chapter 11 Case.

*"Pre-Petition Claims"* means Claims against the relevant Debtor arising prior to the Petition Date in such Debtor's Chapter 11 Case.

*"Pre-Petition Netdown"* means the Netdown Process for the Pre-Petition period implemented under the Plan, as described in Section VI.E.7 of the Disclosure Statement.

*"Priority Claims"* means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

*"Priority Non-Tax Claims"* means Claims referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7).

*"Priority Tax Claim"* means certain unsecured income, employment and other taxes described in section 507(a)(8) of the Bankruptcy Code.

*"Professional"* means (a) any Entity employed in the Chapter 11 Cases pursuant to section 327, 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

*"Professional Claims"* means Claims by Professionals or other entities requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b) and 1103 for services rendered prior to the Effective Date.

 *"Proof of Claim"* means a proof of Claim or Interest Filed against any Debtor in the Chapter 11 Cases.

*"PSZJ"* means Pachulski Stang Ziehl & Jones LLP, general insolvency counsel to the RDI Debtors.

*"Quality"* means Ruby's Quality Diners, LLC, a Delaware limited liability company.

*"RDI"* means Ruby's Diner, Inc., a California corporation.

*"RDI Debtors"* means, collectively, RDI and the SoCal Debtors and RDI.

*"RDI DIP Financing Order"* means the order of the Bankruptcy Court approved the RDI DIP Loan, entered on March 21, 2019.

*"RDI DIP Loan"* means the $300,000 debtor in possession loan from the DIP Lender.

*"RDI Entities"* means, collectively, non-debtors Ruby's Beach Ventures LLC, Ruby's Diner South Coast Plaza LP, Ruby's Woodbridge LLC and Ruby's Spectrum LLC.

*"RDI License Fee"* means the license fee payable to RDI under the RDI/RFS License Agreement in the amount of one percent (1%) of the Gross Sales (as such term is defined in the RDI/RFS License Agreement) generated by RFS and the Franchisees.

*"RDI Plan Funding"* means that portion of the Plan Funding utilized to fund the Plan as to RDI, SoCal and Quality.

*"RDI Professional and Unsecured Creditor Distribution Agreement"* means the agreement between and among the Debtors, the Founders, the Committee and the RDI Professionals with respect the payment of the Allowed Professional Claims of the RDI Professionals and the RDI General Unsecured Creditors to provide for the payment of such claims in accordance with the priority scheme of the Bankruptcy Code, as modified by such agreement, as more particularly described in Section VI.E.8 of the Disclosure Statement and Article VI.H.

*"RDI Professional Fee Cap"* means the amount of Six Million Dollars ($6,000,000).

*"RDI Professionals"* means:  (1) Pachulski Stang Ziehl & Jones LLP, (2) GlassRatner Advisory & Capital Group LLC, (3) Winthrop Golubow Hollander, LLP and (4) Force 10 Partners, LLC.

*"RDI Restaurants"* means, collectively, the restaurants owned by the RDI Entities.

*"RDI Rights of Action"* means Rights of Action of the RDI Estate, specifically excluding the right to object to Claims or Interests.

*"RDI/RFS License Agreement"* means that certain Amended and Restated Trademark and Intellectual Property License Agreement, between RDI and RFS, dated June 1, 1990.

*"Reconciliation"* means the process by which the Claims between and among the Debtors and the Founders, as reflected in **Exhibit E** to the Disclosure Statement, will be reconciled and utilized to calculate the New Value Contribution by the Founders.

*"Regulations"* means the income tax regulations promulgated pursuant to the Tax Code.

*"Rejected Contracts/Leases"* means the Debtors' unexpired leases and executory contracts to be rejected pursuant to the Plan, as set forth on **Exhibit M** to the Disclosure Statement.

*"Reorganized Debtors"* or *"Reorganized [Debtor name]"* means either all Debtors or the indicated Debtor, as reorganized pursuant to this Plan, on or after the Effective Date.

*"Replacement Collateral Agent"* means the entity appointed under the Plan to serve as Collateral Agent in connection with the Secured Notes following the Effective Date.

*"Reserve Amount"* means the amount deposited in the Disputed Claims Reserve on behalf of a Creditor holding a particular Disputed Claim.

*"Restaurants"* means, collectively, the Company Restaurants and the Franchised Restaurants.

*"Restructured Notes"* means RDI's amendment and restatement of the Original Notes on or about June 30, 2016, with the approval of the Noteholders and in accordance with the Consent Solicitation Statement, and any amendments, addendums or modifications thereto, or restatements thereof.

*"Restructured Secured Notes"* means the Secured Notes.

*"RFS"* means Ruby's Franchise Systems, Inc., a California corporation.

*"RFS Alternative Plan and Disclosure Statement"* means the alternative plan and disclosure statement filed by RFS in the RFS Chapter 11 Case, as described in Sections III.C.14 and XI.A of the Disclosure Statement.

*"RFS Note"* means that certain Restated and Amended Promissory Note, dated December 22, 2014, by and between RFS and ~~Steven L.~~ Craig, in the principal amount of $1,000,000, and any amendments or modifications thereto, or restatements thereof.

*"Rights of Action"* means any action, proceeding, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, reduced to judgment or not reduced to judgment, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Right of Action includes: (a) any right of setoff, counterclaim or recoupment

(except to the extent that the result of including any setoff or recoupment in this definition would result in an outcome, including, by example, an impermissible discharge of setoff or recoupment rights, prohibited by otherwise applicable bankruptcy law) and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims. Rights of Action specifically exclude any claims against the Plan Sponsor, or any affiliate owned or controlled by the Plan Sponsor or any advisor to the Plan Sponsor in connection with the Chapter 11 Cases.

*"Ruby's Huntington Beach"* means Ruby's Huntington Beach, Ltd., a California limited partnership.

*"Ruby's Huntington Beach Unsecured Distribution Amount"* has the meaning set forth in Section VI.C.5.c of the Disclosure Statement.

*"Ruby's Laguna Hills"* means Ruby's Laguna Hills, Ltd., a California limited partnership.

*"Ruby's Oceanside"* means Ruby's Oceanside, Ltd., a California limited partnership.

*"Ruby's Oceanside Unsecured Distribution Amount"* has the meaning set forth in Section VI.C.5.c of the Disclosure Statement.

*"Ruby's Palm Springs"* means Ruby's Palm Springs, Ltd., a California limited partnership.

*"Ruby's Palm Springs Unsecured Distribution Amount"* has the meaning set forth in Section VI.C.5.c of the Disclosure Statement.

*"Schedules"* means the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests and all amendments or supplements thereto, including any global notes, statement of limitations, methodology and disclaimers incorporated by reference therein, Filed or to be Filed by the Debtors with the Bankruptcy Court (as may be amended, modified or supplemented from time to time).

*"SEC"* means the Securities and Exchange Commission, or any successor agency.

*"Secured Claim"* means a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to a valid right of setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

*"Secured Noteholders"* means, collectively, the Holders of the Secured Notes.

*"Secured Notes"* means, collectively, Amended and Restated Secured Promissory Notes, dated on or about July 1, 2016, and any amendments or modifications thereto, or restatements thereof.

*"Secured Tax Claims"* means Claims of taxing authorities secured by personal property owned by RDI, the SoCal Debtors and RFS, including, without limitation, the Claims identified on **Exhibit H** to the Disclosure Statement.

*"Securities Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

*"Securities Exchange Act"* means the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

*"SoCal Debtors"* means, collectively, SoCal Diners, Quality, Ruby's Huntington Beach, Ruby's Laguna Hills, Ruby's Oceanside and Ruby's Palm Springs.

*"SoCal Diners"* means Ruby's SoCal Diners, LLC, a Delaware limited liability company.

*"SoCal Entities"* means, collectively, Ruby's Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs, Ruby's Laguna Hills and Ruby's Mission Valley, Ltd.

*"SoCal Restaurants"* means, collectively, the restaurants owned by the SoCal Entities.

*"Steering Committee"* means the "steering committee" comprised of Unsecured Noteholders designated as the representative with respect to the Original Unsecured Notes and Restructured Unsecured Notes, pursuant to the Original Unsecured Credit Documents.

*"Tax Code"* means the Internal Revenue Code of 1986, as amended.

*"TO"* means Theodora Oringher PC, general insolvency counsel to RFS.

*"Unclaimed Property"* means any Cash or other property distributed pursuant to the Plan which is unclaimed for one-hundred eighty (180) days after the Distribution is sent by mail to the last known mailing address for the person entitled thereto as provided in the Plan.

*"Unexpired Lease"* means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

*"Unimpaired"* means, when used with reference to a Claim, subclass or Class, the circumstance where such Claim, subclass or Class is treated in a manner comporting with the requirements of Bankruptcy Code section 1124, providing, with certain exceptions, that the treatment has left unaltered the legal, equitable, and contractual rights to which a particular Claim (or all of the Claims in a Class) entitles the Holder of such Claim(s).  In accordance with, by example, Bankruptcy Code sections 365 or 1123(a)(5)(G), unless expressly specified otherwise, such treatment includes the waiver or curing of defaults and the reinstatement of maturity of such Claim, without payment of penalties or other default-related amounts.

*"Unsecured Claims"* means unsecured Claims not entitled to priority under Bankruptcy Code section 507(a).

*"Unsecured Noteholder Claims"* means Unsecured Claims of Unsecured Noteholders against RDI classified in Class 11(a) of the Plan.

*"Unsecured Noteholders"* means, collectively, the Holders of RDI Unsecured Notes.

*"Unsecured Notes"* means the Amended and Restated Unsecured Promissory Notes, dated as of July 1, 2016, and any amendments, addendums or modifications thereto, or restatements thereof.

*"US Foods"* means ~~U.S.~~US Foods, Inc.

*"US Foods Settlement"* means the terms of the settlement between the Debtors and US Foods as set forth in Article VI.H. of the Plan and Section VI.E.8 of the Disclosure Statement.

*"UST Reports"* means the Debtors' Monthly Operating Reports filed with the Office of the United States Trustee.