William N. Lobel, State Bar No. 93202
PACHULSKI STANG ZIEHL & JONES LLP
650 Town Center Drive, Suite 1500
Costa Mesa, California 92626
Telephone: (714) 384-4740
Facsimile: (714) 384-4741
E-mail: wlobel@pszjlaw.com

Attorneys for Ruby's Diner, Inc., a California corporation, *et al.*, Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA**

RUBY'S DINER, INC., a California corporation, *et al.*,[1]

Debtors and Debtors in Possession.

Affects:

☒ All Debtors

☐ RUBY'S DINER, INC., ONLY

☐ RUBY'S SOCAL DINERS, LLC, ONLY

☐ RUBY'S QUALITY DINERS, LLC, ONLY

☐ RUBY'S HUNTINGTON BEACH, LTD., ONLY

☐ RUBY'S LAGUNA HILLS, LTD. ONLY

☐ RUBY'S OCEANSIDE, LTD., ONLY

☐ RUBY'S PALM SPRINGS, LTD., ONLY

Chapter 11

Case No. 8:18-bk-13311-CB

Jointly Administered With Case Nos. 8:18-bk-13197-CB; 8:18-bk-13198-CB; 8:18-bk-13199-CB; 8:18-bk-13200-CB; 8:18-bk-13201-CB; 8:18-bk-13202-CB

**~~FIRST~~SECOND AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING ~~FIRST~~SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

**Disclosure Statement Hearing:**

DATE: ~~October 23~~December 19, 2019
TIME: 10:00 a.m.
CTRM: 5D

[1] The chapter 11 cases of Ruby's Diner, Inc., Ruby's SoCal Diners, LLC, Ruby's Quality Diners, LLC, Ruby's Huntington Beach, Ltd., Ruby's Laguna Hills, Ltd., Ruby's Oceanside, Ltd. and Ruby Palm Springs, Ltd. (referred to herein as the "RDI Debtors") are jointly-administered. The chapter 11 case of Ruby's ~~Franchising~~Franchise System, Inc. ("RFS"), Case No. 8:18-bk-13324-CB, is not jointly-administered with the RDI Debtors' chapter 11 cases, but the Plan is jointly proposed by the RDI Debtors and RFS.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 11

A. Purpose of This Document ..... 66

B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ..... 7

1. Time and Place of the Confirmation Hearing ..... 7

2. Deadline For Voting For or Against the Plan ..... 7

3. Deadline For Objecting to the Confirmation of the Plan ..... 8

4. Identity of Persons to Contact for More Information Regarding the Plan ..... 9

II. DISCLAIMER ..... 9

III. BACKGROUND ..... 11

A. Description and History of the Plan Proponents' Business ..... 11

1. The Plan Proponents' Corporate Structure and Revenue Sources ..... 11

2. Overview of the Plan Proponents' Debt Structure ..... 14

a. RDI's Secured and Unsecured Creditors ..... 14

b. The SoCal Debtors' Secured and Unsecured Creditors ..... 15

c. RFS' Secured and Unsecured Creditors ..... 16

B. Events Leading to Chapter 11 Filings ..... 16

1. Overview of the RDI Debtors' Financial Difficulties ..... 1616

C. Significant Events in the Bankruptcy Cases Through the Date of Filing of Disclosure Statement ..... 24

1. Chapter 11 Status Conference ..... 24

2. 341(a) Meetings ..... 24

3. Appointment of an Official Committee of Unsecured Creditors in the RDI Case ..... 24

4. Joint Administration of the RDI Debtors' Cases ..... 24

5. Employee Wages and Benefits ..... 25

6. Schedules and Statements of Financial Affairs ..... 25

7. Honoring of Customer Programs and Payment of Certain Pre-Petition Claims ..... 25

8. Unexpired Leases and/or Executory Contracts ..... 25

a. The Huntington Beach Lease ..... 25

b. The Oceanside Lease ..... 26

c. The Palm Springs Lease ..... 26

d. The Laguna Hills Lease ..... 27

e. The Corporate Lease ..... 27

f. The Franchise Agreements ..... 28

g. Other Agreements ..... 28

9. The Claims Bar Dates ..... 28

10. Use of Cash Collateral ..... 28

11. Post-Petition Financing ..... 2929

12. Post-Petition Netdown Motion and Implementation of Pre-Petition Netdown Process Under the Plan ..... 31

~~13~~13. Insurance Premium Financing ..... 34

14. The Exclusivity Periods and the Filing of the Plan and Disclosure Statement ..... 34

D. Pending Litigation ..... 35

E. Retention and Compensation of Professionals ..... 35

1. Retention of Professionals ..... 35

2. Compensation of Professionals ..... 36

IV. FINANCIAL INFORMATION ..... 36

A. Financial Information ..... 36

1. Procedures Implemented to Resolve Financial Problems ..... 37

a. G&A Expenses ..... 37

b. Efforts to Increase Sales ..... 37

c. Efforts to Further Develop Franchising Program ..... 38

B. Principals/Affiliates of Debtors' Business ..... 38

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

1. Shareholders, Directors and Officers ........ 38

2. Management Compensation ........ 38

V. ITEMIZATION OF THE DEBTORS' ASSETS ........ 39

A. Cash on Hand and Accounts Receivable ........ 39

B. Intellectual Property and Franchising Related Interests ........ 39

C. Membership and Partnership Interests ........ 40

D. Leased Assets ........ 42

E. Furniture, Fixtures and Equipment ........ 43

F. Litigation Claims ........ 4343

1. Actual and Projected Recovery of Rights of Action, Including Preferential or Fraudulent Transfers ........ 43

VI. SUMMARY OF THE PLAN OF REORGANIZATION ........ 46

A. What Creditors and Interest Holders Will Receive Under The Proposed Plan ........ 46

B. Unclassified Claims ........ 46

1. Administrative Claims ........ 46

a. Administrative Claims of Non-Professionals ........ 46

b. Administrative Claims of Professionals ........ 48

c. Administrative Personal Property Tax Claims ........ 51

d. Administrative Bar Date for Filing of Administrative Claims ........ 51

i. Bar Date for Administrative Tax Claims ........ 51

ii. Bar Date for All Other Administrative Claims ........ 51

2. Priority Tax Claims ........ 52

C. Classified Claims and Interests ........ 53

1. Summary of Classification under the Plan ........ 53

2. Classes of Secured Claims ........ 54

a. Class 1: Allowed Secured Claims of the Secured Noteholders (RDI) ........ 55

b. Class 2: Allowed Secured Claim of Opus Bank (SoCal Debtors) ........ 56

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

c. Class 3: Allowed Secured Claim of C&C Partnership (SoCal Debtors) 5757

d. Class 4: Allowed Secured Claim of Pillsbury Winthrop Shaw Pittman LLP (HOP Restaurant Entities) 58

e. Class 5: Allowed Secured Claim of Plaza Bonita LLC (SoCal Diners) 59

f. Class 6: Allowed Secured Claim of Opus Bank (RFS) 61

g. Class 7: Allowed Claim of Steven L. Craig (RFS) 6262

h. Class 8: Secured Tax Claims – Class 8(a) (RDI), Class 8(b) (SoCal Debtors) and Class 8(c) (RFS) 62

3. Class 9: Allowed PACA Claims (RDI and Certain of the SoCal Debtors) 6363

4. Class 10: Priority Non-Tax Claims – Class 10(a) (RDI), Class 10(b) (SoCal Debtors) and Class 10(c) (RFS) 63

5. Classes of Unsecured Claims 64

a. Class 11(a): Allowed Unsecured Claims Against RDI 6565

b. Class 11(b): Gift Card Reimbursement Claims of Franchisees Satisfied Though Pre-Petition Netdown Process 66

c. Class 11(c): General Unsecured Claims Against the SoCal Debtors 66

d. Class 11(d): General Unsecured Claims Against RFS 68

D. Interests 68

E. Means of Effectuating the Plan 70

1. Funding for the Plan 70

a. Cash Needs on the Effective Date. 70

b. Sources of Cash on the Effective Date. 70

2. Plan Funding From Plan Sponsor 70

3. ~~Transfer~~Issuance of HOP ~~Assets~~Interests to ~~New HOP Entities, Contribution of New HOP Entities to RDI and~~the Plan Sponsor, Provision of the RDI Plan Funding and HOP Plan Funding and ~~RDI Plan Funding~~Contribution of HOP Interests to Reorganized RDI 72

4. New Value Contribution 72

5. Reconciliation of ~~Pre-Petition~~ Claims Between and Among the Debtors and the Founders 73

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

6. TransferContribution of Interests in RFS to RDI; Post-Effective Date Ownership of Reorganized RDI ..... 73

7. Pre-Petition Netdown Process ..... 73

8. U.S.RDI Professional and Unsecured Creditor Distribution Agreement; Litigation Trust ..... 74

a. Claim Amounts of the RDI Professionals and RDI General Unsecured Creditors ..... 75

b. Priority of Distributions to RDI Professionals and RDI General Unsecured Creditors ..... 75

c. Source of Distributions to RDI Professionals and RDI General Unsecured Creditors ..... 75

d. Reorganized RDI's Payment Obligations to RDI Professionals and RDI General Unsecured Creditors ..... 76

e. Litigation Trust ..... 78

f. Events of Default ..... 79

9. US Foods Settlement ..... 80

910. Treatment of Intercompany Claims; Waiver of Avoidance Actions Between Debtors ..... 82

1011. Lending and Borrowing of Monies Between Reorganized Debtors. ..... 82

1112. Corporate Structure and Governance ..... 82

a. Charter ..... 82

b. Voting Rights and Shareholder Agreement ..... 83

ea. Composition Of Reorganized Debtors' Board Of Directors And Identity And Compensation Of Officers. ..... 85

1213. Estate Representative and Litigation Trustee ..... 86

1314. Disputed Claims and Unclaimed Property ..... 8787

F. Claim Objections and Claims Objection Bar Date ..... 89

G. Risk Factors ..... 89

1. Business Risks ..... 90

a. Industry Conditions ..... 90

b. Competition ..... 90

c. Seasonality ..... 90

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

d. Operating Cash Flow ..... 90

e. Trade Credit ..... 91

f. Ability to Achieve the Business Plan ..... 9191

g. Availability of Sufficient Cash to Sustain Operations Following to the Effective Date ..... 92

h. Governmental Regulation and Litigation ..... 92

i. Governmental Regulation ..... 92

ii. Certain Litigation ..... 92

iii. ~~D&O/Affiliate Claim~~ Litigation By the Litigation Trust ..... 92

2. Bankruptcy Risk ..... 93

a. Objection to Classification ..... 93

~~b~~b. Objection To Creditors Right to Receive A Pro Rata Distribution Under A Particular Class ..... 93

c. Risk of Non-Confirmation of Plan ..... 94

~~c~~d. Potential Effect of Bankruptcy on Certain Relationships ..... 94

3. Risk of Default Under Plan ..... 95

H. Executory Contracts and Unexpired Leases ..... 95

1. Unexpired Leases and Executory Contracts to be Assumed ..... 95

2. Other Unexpired Leases and Executory Contracts to Be Rejected ..... 96

I. Miscellaneous Plan Provisions ..... 96

1. Rounding of Amounts / De Minimis Amounts ..... 96

2. Name and Address of Holder ..... 96

3. Orders to Aid Consummation of Plan ..... 97

4. Severability ..... 97

5. Headings of Articles and Sections ..... 97

6. Successors and Assigns ..... 98

7. Changes in Rates Subject to Regulatory Commission Approval ..... 98

8. Services By And Fees For Professionals ..... 98

a. Prior to the Effective Date ..... 98

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Costa Mesa, California

i. Generally ....... 98

b. From the Effective Date ....... 98

9. Dissolution of Committee ....... 98

~~10. Litigation Trust ....... 98~~

~~11~~10. Amendment, Withdrawal or Revocation of the Plan ....... 99

11. ~~12.~~ Retention of Jurisdiction ....... 99

~~13.~~ 12. Impact of Default Under Plan ....... 101

~~14~~13. Payment of Post-Confirmation Quarterly Fees ....... 101

~~15~~14. Confirmation Request ....... 101

VII. TAX CONSEQUENCES OF THE PLAN ....... 101

A. General ....... 101

1. Statutory Overview ....... 101

B. Tax Consequences to the Debtors ....... 102

1. Summary of the Plan ....... 102

2. Tax Consequences of the Transactions ....... 103

VIII. CONDITIONS TO EFFECTIVENESS OF THE PLAN ....... 104

IX. CONFIRMATION REQUIREMENTS AND PROCEDURES ....... 105

A. Who May Vote or Object ....... 105

1. Who May Object to Confirmation of the Plan ....... 105

2. Who May Vote to Accept/Reject the Plan ....... 105

a. What Is an Allowed Claim/Interest ....... 105

b. What Is an Impaired Claim/Interest ....... 106

3. Who is Not Entitled to Vote ....... 106

4. Who Can Vote in More Than One Class ....... 107

5. Votes Necessary to Confirm the Plan ....... 107

6. Votes Necessary for a Class to Accept the Plan ....... 107

7. Treatment of Nonaccepting Classes ....... 107

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

8. Request for Confirmation Despite Nonacceptance by Impaired Class(es) ..... 108

B. Liquidation Analysis ..... 108

C. Feasibility ..... 109

X. EFFECT OF CONFIRMATION OF PLAN ..... 110

A. Binding Effect Of Confirmation ..... 110

B. Vesting of Assets Free and Clear of Liens, Claims and Interests ..... 110

C. Good Faith, Exculpation and Release ..... 111

D. The D&O/Affiliate Release ..... 112

ED. No Limitations on Effect of Confirmation ..... 113

FE. Discharge of Claims ..... 113

GF. Injunction ..... 114

HG. Securities Laws ..... 116

XI. ALTERNATIVES TO THE PLAN ..... 116

AA. RFS Alternative Plan ..... 116

B. Another Alternate Plan ..... 116

C. Liquidation Under Chapter 7 ..... 116

B. Alternate Plan ..... 117116

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**TO THE HONORABLE CATHERINE E. BAUER, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, CREDITORS AND OTHER PARTIES IN INTEREST:**

# I.

# INTRODUCTION

Ruby's Diner, Inc., a California corporation ("RDI"), Ruby's SoCal Diners, LLC, a Delaware limited liability company ("SoCal Diners"), Ruby's Quality Diners, LLC, a Delaware limited liability company ("Quality"), Ruby's Huntington Beach, Ltd., a California limited partnership ("Ruby's Huntington Beach"), Ruby's ~~Laguna Hills, Ltd., a California limited partnership ("Ruby's Laguna Hills"), Ruby's~~ Oceanside, Ltd., a California limited partnership ("Ruby's Oceanside"), ~~and~~ Ruby's Palm Springs, Ltd., a California limited partnership ("Ruby's Palm Springs") and Ruby's Laguna Hills, Ltd., a California limited partnership ("Ruby's Laguna Hills") (collectively, without RDI, the "SoCal Debtors" and, with RDI , the "RDI Debtors"), and Ruby's Franchise Systems, Inc., a California corporation ("RFS"), an entity affiliated with the RDI Debtors through common ownership and control, are debtors and debtors in possession in chapter 11 proceedings pending in front of this Court (collectively, the RDI Debtors and RFS are referred to as the "Debtors" or the "Plan Proponents").

The Plan Proponents submit this *~~First~~Second Amended Joint Disclosure Statement Describing ~~First~~Second Amended Joint Chapter 11 Plan of Reorganization* (the "Disclosure Statement") in connection with the solicitation of acceptances and rejections with respect to their *~~First~~Second Amended Joint Chapter 11 Plan of Reorganization* (the "Plan"), a copy of which is submitted concurrently herewith. The Plan and Disclosure Statement contain a number of capitalized terms. An appendix containing the definitions for these capitalized terms (the "Definitions") is contained in **Exhibit 1** to the Plan.[2]

On August 29, 2018, the SoCal Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). On September 5, 2018, RDI filed a related Chapter 11 Case and, on September 6, 2018, RFS

[2] Capitalized terms used and not otherwise defined herein shall have the same meanings as ascribed to them in the Plan and the Definitions set forth in **Exhibit 1** to the Plan.

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

commenced a separate proceeding under chapter 11 of the Bankruptcy Code (respectively, the "Petition Date(s)"). Following the Petition Dates, the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") entered an order jointly administering the RDI Debtors' Chapter 11 Cases for procedural purposes. The RFS Chapter 11 Case is not jointly administered with the RDI Debtors' Chapter 11 Cases. The Plan is proposed jointly by the Plan Proponents and contemplates RFS becoming a wholly owned subsidiary of RDI, but the Plan does not provide for the substantive consolidation of the Plan Proponents' assets and liabilities.

Chapter 11 allows a debtor, and under some circumstances, creditors and others parties in interest, to propose a plan of reorganization. A plan may provide for the debtor to reorganize by continuing to operate, to liquidate by selling assets of the bankruptcy estate, or a combination of both. The Plan Proponents (the RDI Debtors and RFS) are the parties proposing the Plan sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

~~The Plan incorporates the terms of settlements reached with Opus Bank and U.S. Foods, two of the major creditors in the Debtors' Chapter 11 Cases, and the Plan has their support.~~

The Plan incorporates the terms of settlements reached with the Official Committee of Unsecured Creditors appointed in the RDI Chapter 11 Case (the "Committee") regarding treatment of unsecured creditors in the Chapter 11 Case of RDI, as well as an agreement with the professionals retained in the RDI Chapter 11 Case (defined herein as the "RDI Professionals") regarding the payment of their allowed professional fees and costs (including an agreement to defer payment of a percentage of such fees and costs). In addition, the Plan incorporates the terms of settlements reached between two of the major creditors in the Debtors' Chapter 11 Cases – Opus Bank and each of the SoCal Debtors and RFS, and US Foods and each of the SoCal Debtors and RDI. The Plan, therefore, has the support of the major constituencies in these Chapter 11 Cases, other than Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"). ***[Certain aspects of the agreement with the Committee have not yet been finalized as of the filing of the Plan and Disclosure Statement and may be subject to change].***

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

The Plan provides for a restructuring of the Debtors' secured, priority and unsecured debt, infusion of new funding, the continuation of the Ruby's® brand as a going concern under a new equity structure, and a ~~transfer~~contribution of the ownership of RFS to RDI, with the license agreement between them remaining in effect. The Plan will be funded through a combination of Cash from operations, as well as the conversion of debt and the provision of plan funding by Steven L. Craig or an affiliated entity(ies) (the "Plan Sponsor") totaling ~~Four~~Five Million Dollars ($~~4~~5,000,000) (the "Plan Funding").[3] In addition, Douglas Cavanaugh and Ralph Kosmides, the founders of Ruby's (the "Founders") will make a "new value" contribution on the Effective Date of the Plan in the form of ~~a portion of~~ the value of their ownership Interests in RFS, which will be contributed to Reorganized RDI as part of a reconciliation of amounts due to and from the Founders and the Debtors as provided by the Plan. The net New Value Contribution by the Founders has been valued by RDI's financial advisor at approximately $~~5.5~~8 million. *See* **Exhibit A** hereto.

A portion of the Plan Funding from the Plan Sponsor will be utilized to fund the Plan as it relates to RDI (~~defined herein as~~ the "RDI Plan Funding~~"). The~~"), with the cash component of the RDI Plan Funding being the approximate amount of Two Million Seven Hundred Eighty-Six Thousand Three Hundred and Eighty-Four Dollars ($2,786,384). Seventy-five percent (75%) ownership of Reorganized RDI will be ~~transferred~~issued to the Plan Sponsor in consideration of the RDI Plan Funding and twenty-five percent (25%) to the Founders in consideration of the Founders' New Value Contribution. Equity in RFS valued at approximately $~~5.5~~8 million will be contributed by the Founders to Reorganized RDI as the New Value Contribution in return for the Founders receiving ~~a 40%~~the twenty-five percent (25%) interest in Reorganized RDI.[4] ~~The assets (~~ On the

[3] ~~This amount may be subject to increase based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.~~ The $5 million Plan Funding from the Plan Sponsor consists of the following: (a) the contribution of Three Million Seven Hundred Thousand Dollars ($3,700,000) in Cash (less the amount that will be utilized to satisfy the fees of the Plan Sponsor's counsel and tax advisors, in the amount of approximately $325,000); (b) the conversion of the amounts due to the Plan Sponsor (as DIP Lender) in connection with the RDI DIP Loan (in the amount of $300,000) into equity in RDI; and (c) the conversion of the amounts due to the Plan Sponsor (as lender) in connection with the RFS Note (in the principal amount of $1,000,000) into equity in RDI, for total consideration in the amount of Five Million Dollars ($5,000,000).

[4] ~~The balance of the equity in RFS, valued at $2.5 million, will be provided to RDI as consideration for the D&O/Affiliate Release. The ownership percentages of the Plan Sponsor and the Founders may be subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.~~

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

"HOP Assets") owned byEffective Date (which will occur one (1) day prior to the Effective Date which relates to the other Plan Proponents)), one hundred percent (100%) of the interests (the "HOP Interests") in Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs (the "HOP Restaurant Entities") will be transferredissued to entities owned by the Plan Sponsor (the "New HOP Entities") in consideration of histhe Plan Sponsor's contribution of a portion of the Plan Funding to fund the Plan as to each of the respective HOP Restaurant Entities, in the aggregate approximate amount of Five Hundred and Eighty-Eight Thousand Six Hundred and Sixteen Dollars ($588,616) (the "HOP Plan Funding"). The New HOP Entities will own the HOP Assets subject to the debt against the HOP Restaurant Entities and the HOP Assets, as restructured under the Plan. The The Plan Sponsor will then contribute his ownership of the New HOP EntitiesInterests to Reorganized RDI post one (1) day following the Effective Date, and the New HOP Restaurant Entities will be wholly owned subsidiaries of RDI.Reorganized RDI. The HOP Restaurant Entities will continue to be subject to the secured debt against them, as restructured under the Plan, and Reorganized RDI will guaranty the secured debt of the HOP Restaurant Entities to Opus Bank and C&C Partnership until such claims are satisfied. The HOP Plan Funding will be utilized to, among other things, make distributions to the HOP Restaurant Entities' unsecured creditors on the Effective Date as provided by the Plan. RFS will continue as the franchising arm of the business, as a wholly owned subsidiary of Reorganized RDI. As a result of the implementation of the terms of the Plan, followingas of the Effective Date, RFS and the HOP Restaurant Entities will be wholly owned by Reorganized RDI, and Reorganized RDI will be owned 6075% by the Plan Sponsor, 2415% by Cavanaugh and 1610% by Kosmides, and RFS and the New. The ownership interests of RDI in SoCal Diners, the ownership interest of SoCal Diners in Quality, and SoCal Diners' and Quality's ownership interests in the SoCal Entities (Ruby's Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs, Ruby's Laguna Hills and Ruby's Mission Valley) will be cancelled and the entities (with the exception of the HOP Restaurant Entities will be solely owned by RDI (subject to adjustment based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.) will be dissolved.

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

The Plan provides for the payment in full, over time, of all secured Creditors, and payment in full of all administrative and priority Creditors, except as otherwise agreed. The Plan further provides for payment in full, over time, of the unsecured Creditors' claims of RFS. The unsecured Creditors of ~~each of~~ the HOP Restaurant Entities will be paid, on the Effective Date of the Plan, their *pro rata* share from distribution funds~~ totaling of $200,000, as follows~~, in the following amounts: $113,118.78 (Ruby's Huntington Beach), $62,397.43 (Ruby's Oceanside~~) and~~); $24,413.78 (Ruby's Palm Springs). The unsecured Creditors' claims of SoCal Diners and Quality (if any)[5] will be paid, on a *pro rata* basis, on the Effective Date of the Plan, two and one-half percent (2.5%) of their allowed claims. The unsecured Creditors' claims of Ruby's Laguna Hills will not be entitled to a distribution as this entity is no longer operating and there is no residual value in the estate to make such payment. ~~The unsecured Creditors' claims of SoCal Diners and Quality (if any)[6] will be paid, on~~In accordance with an agreement between and among the ~~fourth (4th) year anniversary of~~Committee, RDI, the ~~Effective Date of~~ Founders and the ~~Plan, two and one-half percent (2.5%) of their allowed claims. The~~RDI Professionals (defined herein as the "RDI Professional and Unsecured Creditor Distribution Agreement"), the unsecured Creditors' claims of RDI (classified in Class 11(a)) will be entitled to ~~one of the following treatments: (1) Paid a total of Two Million Five Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of Six Hundred and Twenty-Five Thousand Dollars ($625,000) on each of the second (2nd), third (3rd), fourth (4th) and fifth (5th) anniversaries of the Effective Date, if there is a Bankruptcy Court approved release of claims (defined herein as the "D&O/Affiliate Release") against the Debtors' directors and officers (defined herein as the "D&Os") and their affiliated entities (defined herein as the "D&O Affiliated Entities"); or (2) if such D&O/Affiliate Release is not approved by the Bankruptcy Court,~~ a *pro rata* distribution from ~~any proceeds ultimately recovered~~funds obtained by a litigation trust formed pursuant to the Plan (defined herein as the "Litigation Trust") that will have the right, following the Effective Date, to ~~investigate and, if appropriate, prosecute claims, if any, against the D&Os and D&O Affiliated Entities; *provided, however*, that any distribution to the~~ pursue RDI ~~unsecured~~

[5] The Debtors do not believe that Quality will have any allowed unsecured creditor claims.

~~[6] The Debtors do not believe that Quality will have any allowed unsecured creditor claims.~~

~~Creditors from any recovery by the Litigation Trust shall be~~Rights of Action (such distributions being made after payment of the ~~fees and costs~~reasonable expenses incurred by the Litigation Trust ~~incurred~~and the administrative priority claims of the RDI Professionals), as more particularly described in ~~connection with the prosecution of claims or otherwise~~Section VI.E.8 hereof and Article VI.H of the Plan. As discussed in detail below, the Plan Proponents believe that a reorganization – as opposed to a liquidation – will maximize value for all Creditor and equity constituencies~~.~~, and the Plan has the support of the Committee representing the interests of the RDI General Unsecured Creditors, Opus Bank, US Foods and the RDI Professionals.

The Effective Date of the proposed Plan is the later of: (a) the first (1st) Business Day of the first month which begins at least fifteen (15) days following the Confirmation Date; ~~and (2~~or (b) the first (1st) Business Day of the first (1st) month after such date under clause (a) on which there is not in force any stay or injunction against the enforcement of the Plan or the Confirmation Order, provided that the Effective Date will not occur until all Conditions to the Effective Date set forth in Section VII of the Plan have been satisfied or waived by the Plan Proponents~~.~~; *provided, however*, that the Effective Date must occur by no later than sixty (60) days following the Confirmation Date. The Plan Proponents anticipate that the Effective Date will be on or about ~~***January 26, 2019***.~~ ***February 29, 2020***. The HOP Effective Date will occur one (1) day prior to the general Effective Date.

## A. Purpose of This Document

This Disclosure Statement summarizes what is in the Plan, and gives you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan. **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

**(1) WHO CAN VOTE OR OBJECT;**

**(2) THE TREATMENT OF YOUR CLAIM (*i.e.*, what you will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

**(3) THE HISTORY OF THE DEBTORS, FINANCIAL INFORMATION REGARDING THE DEBTORS' BUSINESSES AND OPERATIONS AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASES;**

**(4) WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

**(5) THE EFFECT OF CONFIRMATION; AND**

**(6) WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you. Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing sufficient information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

## B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE PLAN PROPONENTS AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CHAPTER 11 CASES.**

### 1. Time and Place of the Confirmation Hearing

The hearing where the Court will determine whether or not to confirm the Plan (the "Confirmation Hearing") will take place on ____________, ~~2019~~2020, at ____:____ _.m., at the United States Bankruptcy Court for the Central District of California, located at the Ronald Reagan Federal Building and U.S. Courthouse, 411 West Fourth Street, Santa Ana, California 92701, in Courtroom 5D, before the Honorable Catherine E. Bauer.

### 2. Deadline For Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed Ballot and return the Ballot in the enclosed envelope to Nancy Lockwood, Paralegal, Pachulski Stang Ziehl & Jones LLP, 650 Town Center Drive, 15th Floor, Costa Mesa, California 92626. **YOUR BALLOT MUST BE RECEIVED BY ___________, ~~2019~~2020 OR IT WILL NOT BE COUNTED.**

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

### 3. Deadline For Objecting to the Confirmation of the Plan

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE COURT AND SERVED UPON ALL THE PARTIES LISTED BELOW BY ___________, ~~2019~~2020.**

- The Office of the United States Trustee, at the following address:

Office of The United States Trustee
411 West Fourth Street, Suite 7160
Santa Ana, California 92701
Telephone: (714) 338-3400
Facsimile: (714) 338-3421

- The Debtors and counsel for the Debtors, at the following addresses:

Plan Proponents
Douglas Cavanaugh and Ralph Kosmides
Ruby's Diner, Inc., *et al.* and Ruby's ~~Franchising~~Franchise Systems, Inc.
4100 MacArthur Blvd., Suite 310
Newport Beach, California 92660
Telephone: (949) 644-7829
Facsimile: (949) 644-4265

Counsel for the RDI Debtors
William N. Lobel, Esq.
Pachulski Stang Ziehl & Jones LLP
650 Town Center Drive, 15th Floor
Costa Mesa, California 92626
Telephone: (714) 384-4740
Facsimile: (714) 384-4741
E-mail: wlobel@pszjlaw.com

Counsel for RFS
Eric J. Fromme, Esq.
Theodora Oringher PC
535 Anton Blvd., 9th Floor
Costa Mesa, California 92626
Telephone: (714) 549-6200
Facsimile: (714) 549-6201
E-mail: efromme@tocounsel.com

- The Plan Sponsor and counsel for the Plan Sponsor, at the following addresses:

Plan Sponsor
Steven L. Craig
c/o Craig Realty Group
4100 MacArthur Blvd, Suite 200
Newport Beach, California 92660

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Counter for the Plan Sponsor
Alan J. Friedman, Esq.
Shulman Hodges & Bastian LLP
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Telephone: (949) 340-3400
Facsimile: (949) 340-3000
Email: afriedman@shbllpshulmanbastian.com

- Counsel to the Committee, at the following address:

Garrick Hollander, Esq.
Winthrop Couchot Golubow Hollander, LLP
1301 Dove Street, Suite 500
Newport Beach, California 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
Email: ghollander@wcghlaw.com

**4. Identity of Persons to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact counsel for the RDI Debtors, William N. Lobel, Esq. and Nancy Lockwood, paralegal, Pachulski Stang Ziehl & Jones LLP, 650 Town Center Drive, 15th Floor, Costa Mesa, California 92626, Telephone: (714) 384-4740, Facsimile: (714) 384-4741; E-mail: wlobel@pszjlaw.com and nlockwood@pszjlaw.com; and/or counsel for RFS, Eric J. Fromme, Esq., Theodora Oringher PC, 535 Anton Blvd., 9th Floor, Costa Mesa, California 92626, Telephone: (714) 549-6200, Facsimile: (714) 549-6201, E-mail: efromme@tocounsel.com.

**II.**

**DISCLAIMER**

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION, WHICH MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE “ADEQUATE INFORMATION” OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE PLAN PROPONENTS AND THE CONDITION OF THE PLAN PROPONENTS’ BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. *SEE* 11 U.S.C. § 1125(a). UNLESS OTHERWISE INDICATED, THE DATE OF ALL OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE OF THE FILING OF THE DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE PLAN PROPONENTS, THEIR FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED.  IN ADDITION, BECAUSE OF THE COMPLEXITY OF THE PLAN PROPONENTS' FINANCIAL MATTERS AND CERTAIN FINANCIAL DIFFICULTIES FACING THEM, THE BOOKS AND RECORDS OF THE PLAN PROPONENTS, UPON WHICH THIS DISCLOSURE STATEMENT IS BASED IN PART, MAY BE INCOMPLETE OR INACCURATE.  THE PLAN PROPONENTS, THEREFORE, ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.  HOWEVER, GREAT EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.  WITH RESPECT TO THE FINANCIAL PROJECTIONS, THESE SIMPLY REPRESENT THE PLAN PROPONENTS' BEST ESTIMATE OF THE REORGANIZED DEBTORS' PERFORMANCE UNDER THE PLAN.  HOWEVER, THERE ARE UNCERTAINTIES ASSOCIATED WITH ANY PROJECTIONS AND THEY SHOULD NOT BE CONSIDERED WARRANTIES OR GUARANTEES OF THE REORGANIZED DEBTORS' PERFORMANCE HEREUNDER.  THESE RISKS ARE FURTHER DESCRIBED IN SECTION VI OF THIS DISCLOSURE STATEMENT.

PRIOR TO THE PETITION DATE, PACHULSKI STANG ZIEHL & JONES LLP ("PSZJ"), AS TO THE RDI DEBTORS, AND THEODORA ORINGHER PC ("TO"), AS TO RFS, COMMENCED REPRESENTING THESE ENTITIES AS INSOLVENCY COUNSEL.  PSZJ AND TO HAVE NOT AT ANY TIME IN THE PAST REPRESENTED, NOR DO THEY PRESENTLY REPRESENT, THE PLAN PROPONENTS IN A GENERAL WAY, OR IN ANY OTHER WAY, OTHER THAN AS SET FORTH ABOVE.  PSZJ AND TO HAVE RELIED UPON INFORMATION PROVIDED BY THE PLAN PROPONENTS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT.  ALTHOUGH COUNSEL FOR THE PLAN PROPONENTS HAVE PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, COUNSEL HAVE NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

ALTHOUGH A COPY OF THE DISCLOSURE STATEMENT HAS BEEN SERVED ON THE SECURITIES AND EXCHANGE COMMISSION ("SEC") AND THE SEC HAS BEEN GIVEN AN OPPORTUNITY TO OBJECT TO THE ADEQUACY OF THE DISCLOSURE STATEMENT, THIS DISCLOSURE STATEMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR APPLICABLE STATE SECURITIES LAWS.  NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT, THE EXHIBITS HERETO OR THE STATEMENTS CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS, HER OR ITS OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS, HER OR ITS CLAIM OR INTEREST.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

# III.

# BACKGROUND

## A. Description and History of the Plan Proponents' Business

### 1. The Plan Proponents' Corporate Structure and Revenue Sources

RDI was incorporated on February 13, 1985. Its principal business address is 4100 MacArthur Blvd., Suite 310, Newport Beach, California 92660. RDI owns varying percentages of and operates diners in Southern California through its subsidiaries, including through its wholly-owned subsidiary, SoCal Diners. RDI and ~~its~~certain affiliates own, operate and manage restaurants under trade names such as "Ruby's®," "Ruby's® Diner," and "The Ruby Restaurant Group." RDI and ~~its~~certain affiliates have operated Ruby's® Diner restaurants since prior to 1985 and are known as purveyors of very popular burgers, fries and shakes. RDI is owned 60% by Cavanaugh and 40% by Kosmides, the Founders of Ruby's. RDI is the owner of the Ruby's® trademarks, system and intellectual property (the "Marks and Intellectual Property") and is the employer of the employees of RDI and its affiliates.

RDI is the 100% owner and sole and managing member of SoCal Diners. SoCal Diners is the 100% owner and sole and managing member of Quality. SoCal Diners is the general partner and 50% owner, and Quality is the limited partner and 50% owner, of the following California limited partnerships: (a) Ruby's Huntington Beach, which owns and operates a Ruby's® restaurant on the pier in Huntington Beach, California and is one of the SoCal Debtors; (b) Ruby's Oceanside, which owns and operates a Ruby's® restaurant in Oceanside, California and is one of the SoCal Debtors; (c) Ruby's Palm Springs, which owns and operates a Ruby's® restaurant in Palm Springs, California and is one of the SoCal Debtors; (d) Ruby's Laguna Hills, which, until March 2019, owned and operated a Ruby's® restaurant in the Laguna Hill Mall in Laguna Hills, California, and is one of the SoCal Debtors; and (e) Ruby's Mission Valley, Ltd., which until a few months prior to the Petition Date, owned and operated a Ruby's® restaurant in the Westfield Mission Valley Mall in San Diego,

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

California[7] (collectively, the "SoCal Entities" and the restaurants owned by the SoCal Entities, the "SoCal Restaurants").

In addition, RDI holds ownership interests in, and management roles in connection with, the following joint venture entities: (a) RDI is the managing member and 70% owner of Ruby's Beach Ventures LLC, which owns and operates a Ruby's® restaurant in Long Beach, California;[8] (b) RDI is the general partner and 50% owner of Ruby's Diner South Coast Plaza LP, which owns and operates a Ruby's® restaurant at South Coast Plaza Mall in Costa Mesa, California;[9] (c) RDI is the managing member and sole owner of Ruby's Woodbridge LLC, which owns and operates a Ruby's® restaurant in Woodbridge in Irvine, California; and (d) RDI is the managing member and 50% owner of Ruby's Spectrum LLC, which until a few months prior to the Petition Date, owned and operated a Ruby's® restaurant at the Irvine Spectrum in Irvine, California[10] (collectively, the "RDI Entities" and the restaurants owned by the RDI Entities, the "RDI Restaurants"). The RDI Entities have not filed chapter 11 cases. The RDI Restaurants, together with the SoCal Restaurants, are referred to as the "Company Restaurants").

As of the Petition Date, there also were twenty-four (24) Ruby's® Diner franchises (or licensed units) located in Southern California, Arizona, Pennsylvania, New Jersey, Nevada and Texas that are owned and, with certain limited exceptions, operated by independent third parties (the "Franchised Restaurants" and, together with the Company Restaurants, the "Restaurants").[11] Eureka

---

[7] The Mission Valley restaurant was closed prior to the Petition Date, in April 2018. Ruby's Mission Valley, Ltd., while owned by SoCal Diners and Quality, is not operating and is not a debtor entity.

[8] The other 30% ownership interest in Ruby's Beach Ventures LLC is held by various third-party investors.

[9] The other 50% interest in Ruby's Diner South Coast Plaza LP is owned by South Coast Plaza Expansion, a California general partnership, as the limited partner.

[10] The other 50% ownership interest in Ruby's Spectrum LLC is held by William C. Taormina, Trustee of the Taormina Revocable Inter Vivos Trust u/d/t dated July 26, 1983. The Irvine Spectrum restaurant was closed prior to the Petition Date, in April 2018.

[11] Prior to its closure in January 2019, RDI provided operational support and related services to the franchise located in Yorba Linda, California (Ruby's Yorba Linda, Ltd.). Ruby's Management, LLC ("RMLLC") (an Entity owned by Cavanaugh, Kosmides and Douglas Salisbury), receives a management fee for operational support and related services provided to a Ruby's® restaurant located in Morongo, California (Ruby's Morongo) and owned by the Morongo Native American tribe. RMLCC sub-contracts with RDI for some services for which RDI is paid an administrative fee.

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Costa Mesa, California

Food Enterprises, LLC, an entity owned by Craig (the DIP Lender and Plan Sponsor), directly or indirectly, is the franchisee with respect to ~~four (4~~five (5) Franchised Restaurants, four (4) located in California (Citadel, Corona del Mar, Laguna Beach, San Clemente) and one (1) in Arizona (Anthem), and also operates a Ruby's® food truck.[12]

RFS serves as the franchisor to the Ruby's® franchisees/licensees (the "Franchisees") and licenses the Marks and Intellectual Property from RDI as licensor pursuant to the RFS/RDI License Agreement (as defined hereinbelow).  Under RFS' agreements with the Franchisees (the "Franchise Agreements"), RFS (as franchisor) is entitled to franchise royalty fees from the Franchisees (the "Franchise Royalties"), which are generally the greater of a set dollar amount and four percent (4%) of "Gross Sales" as such term is defined in the Franchise Agreements.[13]  The Franchise Royalties historically averaged approximately Two Million Four Hundred Thousand Dollars ($2,400,000) per annum (assuming payment of Franchise Royalties by the Franchisees).  In addition, the majority of the Franchisees[14] are obligated under the Franchise Agreements to make payments to an advertising fund (the "Ad Fund") in connection with the marketing and advertising of the Ruby's® brand on a regional and a system/national level, each in the amount of one percent (1%) of Gross Sales (*i.e.,* a total marketing contribution of two percent (2%) of Gross Sales) (the "Ad Fund Obligations").

As licensor of the Marks and Intellectual Property to RFS, pursuant to an Amended and Restated Trademark and Intellectual Property License Agreement, dated June 1, 1990 (the "RDI/RFS License Agreement"), RDI is entitled to one percent (1%) of the Gross Sales generated by RFS and the Franchisees as a license fee (*i.e.,* 25% of the Franchise Royalties paid to RFS) which historically averaged approximately Six Hundred Thousand Dollars ($600,000) per annum (assuming payment of Franchise Royalties by the Franchisees) (the "RDI License Fee").

---

[12] Eureka Food Enterprises, LLC has the right to open a franchise in Castle Rock, Colorado, but that has not yet occurred.

[13] Three locations, Ruby's Anaheim, Ruby's Morongo and Ruby's Arizona, utilize the Marks and Intellectual Property, but do not pay royalties to RFS, nor do Ruby's Anaheim or Ruby's Arizona contribute to the Ad Fund (as defined herein).

[14] Certain Franchisees in specialty locations do not have Ad Fund Obligations as they serve a "captive" customer base, such as the Restaurants located at casinos and airports, or are part of an effort to grow brand recognition in as-yet undeveloped areas.  As noted above, Ruby's Anaheim and Ruby's Arizona do not have Ad Fund Obligations.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

### 2. Overview of the Plan Proponents' Debt Structure

#### a. RDI's Secured and Unsecured Creditors

RDI has approximately $2.985 million in secured obligations to the Secured Noteholders (secured against substantially all of the personal property of RDI, including Cash and accounts receivable, the Marks and Intellectual Property and RDI's interests in SoCal Diners, Quality and the RDI Entities) (the "Secured Notes"), and approximately $32,239 in secured tax obligations. Pre-Petition PACA Trust Claims were asserted against RDI (and the SoCal Debtors) by Family Tree Produce, Inc. ("Family Tree") in the amount of $47,666, however, this amount was paid in full during the pendency of the Chapter 11 Cases. RDI also had asserted against it a judgment lien (UCC-1) in favor of Pillsbury~~ Winthrop Shaw Pittman LLP ("Pillsbury")~~ in the amount of approximately $658,095 (the "Pillsbury Claim"),[15] however, Pillsbury filed a unsecured proof of claim in the RDI case on account of the Pillsbury Claim and is, therefore, treated as unsecured in the RDI case.

RDI also has approximately $5.~~54~~5 million in unsecured obligations to the Unsecured Noteholders (the "Unsecured Notes") and approximately $~~4.64~~5 million in other unsecured debt (which reflects RDI's current best estimates regarding the ultimate allowability of the claims), for total estimated unsecured claims in the amount of approximately $10.~~2~~5 million.[16]

In addition, RDI has pre-petition (and post-petition) Gift Card Reimbursement Obligations to the Franchisees, the majority of which will be satisfied by way of the Netdown Process (described in further detail in Section III.C.12 and VI.E.7 of this Disclosure Statement).[17] As described herein,

---

[15] The Pillsbury Claim is also asserted against SoCal Diners on an unsecured basis, and against the HOP Restaurant Entities on a secured basis. Pillsbury also asserts a second Pillsbury Claim in the amount of $658,095 based on partner liability in connection with the sale of the Laguna Beach restaurant. The Debtors do not believe that there is any collateral value to support the Pillsbury Claim.

[16] The $10.5 million is based on RDI's current best estimate regarding the ultimate allowability of the RDI General Unsecured Claims. If such claims were allowed in their filed amounts, the amount of claims could increase to approximately $15 million.

[17] The Debtors' gift card programs are discussed in further detail herein. These programs consist of gift cards issued directly by the Restaurants to customers, which programs have been continued following the Petition Date, and gift cards sold through a third-party retailer, mainly Costco Wholesale Corporation, which program was terminated by RDI on a go-forward basis. RDI intends to satisfy the majority of the gift card obligations to the Franchisees by way of the Netdown Process. Gift card obligations not satisfied by way of the Netdown Process for the pre-petition period will be treated as pre-petition unsecured claims against RDI. Post-petition and post-Effective Date gift card obligations not satisfied by way of the Netdown Process will be paid in full, either on the Effective Date or as they come due in the

RDI sought and obtained approval from the Court to honor and pay pre-petition employee-related claims and certain other amounts, which have been funded through operations, the use of cash collateral and the proceeds of the RDI DIP Loan (as herein defined).[18]

**b. The SoCal Debtors' Secured and Unsecured Creditors**

The SoCal Debtors have approximately $2.7276 million in secured obligations to Opus Bank (secured by substantially all of the personal property assets of the SoCal Debtors, including Cash and a pledge of the assets of the SoCal Restaurants). The SoCal Debtors (with the exception of Quality and Ruby's Laguna Hills) also have obligations in the amount of approximately $658,000 on account of the Pillsbury Claim and the amount of $297,500 on account of a secured lien in favor of C&C Partnership. The SoCal Debtors (and RDI) were also obligated for Pre-Petition PACA Trust Claims to Family Tree in the amount of $47,666, which amounts were paid in full during the pendency of the Chapter 11 Cases. SoCal Diners (but not the other SoCal Debtors) is obligated in connection with a lease guaranty settlement in favor of Plaza Bonita, LLC in the asserted amount of approximately $154,000 that is purportedly secured by an attachment lien against SoCal Diners.

The Debtors do not believe that there is any collateral to secure the obligations to Pillsbury or Plaza Bonita and believe that these obligations will beare treated as unsecured claims under the Plan.

The SoCal Debtors have unsecured obligations (not including any cure payments in connection with assumed leases which will be paid as administrative claims under the Plan), in the following estimated amounts: (i) SoCal Diners - $1.3 million; (ii) Quality - $0.00; (iii) Ruby's

---

ordinary course. As ofPrior to the Petition Date, RDI alsohad issued dining cards to the Unsecured Noteholders allowing them to dine at Ruby's® Restaurants free of charge up to certain amounts based on the face amount of their notes. This program was discontinued following the Petition Date.

[18] As of the Petition Date, RDI owed to RFS the amount of approximately $400,000 (after accounting for all intercompany obligations between them). In addition, RDI owes to RFS certain amounts pursuant to the Netdown Process described in further detail *infra*. So long as RDI and RFS are in compliance with their obligations under the Plan, including theirwithout limitations all obligations owing to Opus Bank on the New Opus Bank RFS Note, any intercompany receivable owed to RFS from RDI as a result of the Netdown Process and any other intercompany obligations between them will not be collected or paid, but will remain on the books as non-cash journal entries. and will be cancelled as of the Effective Date; *provided*, *however*, that RDI will guaranty RFS' obligation to Opus Bank under the New Opus Bank RFS Note in the amount that RDI owes to RFS as of the Effective Date on account of such cancelled receivable.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Huntington Beach - $1.2 million; (iv) Ruby's Oceanside - $1.2 million; (v) Ruby's Palm Springs - $1.1 million; and (vi) Ruby's Laguna Hills - $569,000.

#### c. RFS' Secured and Unsecured Creditors

RFS has approximately $1.28 million in secured obligations to Opus Bank (secured by substantially all of the personal property assets of RFS), an unsecured note owed to Craig in the principal amount of $1 million, plus accrued interest thereon (in the amount of approximately $120135,000) (defined herein as the "RFS Note"),[19] and approximately $430,515 in accounts payable and other unsecured obligations.[20]

## B. Events Leading to Chapter 11 Filings

### 1. Overview of the RDI Debtors' Financial Difficulties

The RDI Debtors' revenue generally comes directly from the operation of the SoCal Restaurants (in the case of the SoCal Debtors) and from management fees and partnership distributions from the RDI Restaurants (in the case of the RDI Entities and RDI). The RDI Debtors also receive revenue in connection with the sale of gift cards to customers and, as discussed above, RDI is entitled to the RDI License Fee. The RDI Debtors' and RFS' annual revenues for calendar year 2017 were approximately $13.9 million and $2.6 million, respectively, and in 2018, approximately $13.7 million and $2.5 million, respectively. While certain of the SoCal Debtors were and continue to be profitable, RDI, faced with an overleveraged balance sheet and continuing operating losses, was unable to adequately address its financial difficulties outside of a chapter 11 filing.

Several factors contributed to the deterioration in the RDI Debtors' financial condition, which resulted in the commencement of the RDI Debtors' Chapter 11 Cases, and the separate chapter 11 filing by RFS.

---

[19] The Plan provides for Craig, as the Plan Sponsor, to convert the principal amount of the RFS Note into equity in RDI. Craig holds a right of offset against the RFS Note for Franchise Royalties as the owner of Eureka Food Enterprises, LLC, a Franchisee, but this offset right will not be exercised and, on the Effective Date, Craig will paythese Franchise Royalties and Ad FeesFund Obligations will be paid, pursuant to the Netdown Process, in the amount of approximately $635,556, as reflected in the Cash Flow Projections.

[20] This figure does not include the amount of approximately $371,530 owed by RFS to Cavco Restaurant Serv., an entity affiliated with Cavanaugh, or the approximate amount of $98,428 owed by RFS to Kono Enterprises LLC, an entity affiliated with Kosmides, which amounts are included in the Reconciliation.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

In early 2012, after years of ongoing disputes, the company entered into agreements whereby the interests of two of its partners, Douglas Salisbury and Doug DiCinces, were bought out. Funding for the buy-outs was obtained through financing obtained from Craig and Opus Bank. The company, however, did not replace the equity from these partners and did not otherwise have sufficient cash flow to meet the costs associated with the buy-outs as well as to meet the company's other financial challenges and ongoing operational needs, including with respect to the obligations to RDI's Secured Noteholders and Unsecured Noteholders.

As a result, onIn early 2012, RDI and RFS entered into an agreement whereby the interests in RDI and RFS held by Douglas Salisbury were purchased through a stock pledge and a promissory note from the Founders. The promissory note was paid through a short-term loan from Steve Craig. The short-term loan provided by Mr. Craig was paid through a loan from Opus to RFS. In a separate transaction, after RDI prevailed in litigation with Doug DeCinces and Mr. DeCinces chose to appeal the decision and did not have to "bond around" any potential damages, to avoid the time, distraction and expense of an appeal, an agreement was reached whereby RDI would purchase Mr. DeCinces' limited partnership interests in seven locations. In addition, RDI negotiated a separate purchase of the third-party limited partnership interests in Ruby's Oceanside in which Mr. DeCinces had no interest. The financing and equity structure for the transaction involved the Chairman of the Steering Committee (as defined below) and had the approval of the members of the Steering Committee. The current entity and debt (the SoCal Debtors' Opus Loan) structure was put in place in connection with that transaction, and also included a loan to the SoCal Debtors to fund improvements to the Mission Valley location. Around the same time the SoCal Debtors' Opus Loan was put into place, RFS also obtained loans from Opus to satisfy the obligations from the Salisbury transaction and to fund improvements for the Whaler's Village Hawaii location.

On or about February 10, 2012, RDI entered into a consensual restructuring of its secured notescreated the Secured Notes with the existing Unsecured Noteholders (in the aggregate face amount of approximately $2.9 million) (the "Original Secured Notes") and, on or about July 16, 2012, entered into a restructuring of its previous unsecured notes (in the aggregate face amount of

approximately $5.6 million) (the "Original Unsecured Notes" and, together with the Original Secured Notes, the "Original Notes" and the holders thereof, the "Secured Noteholders" and the "Unsecured Noteholders," respectively). The Original Secured Notes (and the restructured Secured Notes issued in connection with the 2016 Restructuring Agreement (as such terms are defined hereinbelow)) are secured by all or substantially all of the personal property of RDI (including Cash and accounts receivable, the Marks and Intellectual Property and RDI's interests in SoCal Diners, Quality and the RDI Entities). The Original Secured Notes were governed by the Credit Agreement, the Collateral Agent and Intercreditor Agreement, the Security Agreement (Personal Property), dated as of February 10, 2012, and related documentation, including the UCC-1 Financing Statement filed in connection therewith (the "Original Secured Credit Documents"). Pursuant to the Original Secured Credit Documents, Credit Management Association ("CMA") was designated as collateral agent ("Collateral Agent") in connection with the Original Secured Notes (and, until recently, continued to serve in this capacity in connection with the restructured Secured Notes).[21] The Original Unsecured Notes were governed by Credit Agreement and the Representative and Intercreditor Agreement, dated as of July 16, 2012 (the "Original Unsecured Credit Documents"). Pursuant to the Original Unsecured Credit Documents, a "steering committee" comprised of Unsecured Noteholders was designated as the representative with respect to the Original Unsecured Notes (the "Steering Committee") (and continued to serve in this capacity in connection with the restructured Unsecured Notes).[22]

As noted above, during this time frame, ~~the company was~~RDI and RFS were faced with several legal challenges in connection with, among other things, the buy-out of ~~its~~their partners and disputes related to ~~its~~the Laguna Beach restaurant location, which not only unnecessarily diverted management's attention away from ~~the company's~~ operations, but also resulted in the incurrence of

---

[21] RDI has been advised that CMA filed its own bankruptcy proceeding, and has stepped down as Collateral Agent in connection with the Secured Notes. The Plan provides for the appointment of a Replacement Collateral Agent.

[22] The members of the Steering Committee were Chairman Don Lavoie, Dick Silva, Bill Pope, John Teele, Maureen Melvold, –Michael Munz, Mike Dingillo, John Overdevest and Bob Converse. Steering Committee members Mssrs. Silva and Pope joined the RDI board as part of the 2016 Restructuring (as discussed below). Mr. Lavoie was also a consultant to RDI during his time on the Steering Committee. Messrs. Silva, Pope and Munz are ~~also~~ members ~~for~~of the Official Committee of Unsecured Creditors for the RDI estate.

significant professional fees. In addition, notwithstanding ~~the company's~~ efforts to grow ~~its~~the Ruby's® brand through the development of new franchiseable models, company-owned Ruby's® restaurants and the conversion of certain locations from a full-service restaurant to a "fast casual" restaurant concept, unfortunately, as a result of an industrywide slowdown in terms of growth and sales figures and high operational costs, the new locations and concepts did not perform as projected, and ~~the company was~~RDI and RFS were ultimately forced to close down four (4) of its restaurants (Plaza Bonita in National City, California, Parkway Plaza in El Cajon, California, 17th Street (Redburger) in Costa Mesa, California (each directly or indirectly owned by RDI) and Whalers Village in Maui, Hawaii (owned by RFS), resulting in significant obligations associated with these closures. Around the same time, RFS' efforts at developing new franchises was otherwise hampered by the industry slowdown and a successful and profitable Ruby's® franchise located at the Newark Airport was ~~lost~~forced to close due to the airport's removal of all vendors at the terminal.

In addition, leading up to 2015, significant increased competition in the restaurant industry emerged, creating an array of dining options for consumers. This competition emergence impacted many key brands and, while the Ruby's® brand continued to see strong loyalty with its guests, ~~the company was~~RDI and RFS were impacted by these competitive forces, which adversely impacted the revenue and profit generated by the company stores, as well as the sales figures of the Ruby's® franchisees (and, as a result, the amount of the revenue generated by way of the RDI License Fee).

After several years of continuing losses and the closure of several restaurants, in early 2015, RDI was forced to suspend interest payments on the Original Notes. In addition, SoCal Diners was in covenant violation of its loan agreement with Opus Bank (which holds liens on all or substantially all of the assets of SoCal Diners, Quality and the SoCal Restaurants and, at the time, was owed approximately $4 million).

~~The company explored various~~Various business and restructuring alternatives were explored over the course of 2015 and early 2016. In October 2016, SoCal Diners entered into a restructuring of the Opus Bank loan. As of the Petition Date, SoCal Diners believed it was in material compliance

with the restructured terms of the Opus Bank loan, which is currently in the amount of approximately $2.~~72~~76 million.[23]

RDI also engaged the Steering Committee ~~(~~and CMA~~)~~ in an ongoing dialogue regarding the ~~company's~~its financial situation and possible restructuring alternatives. As a result, RDI and the Steering Committee and CMA reached a conceptual agreement regarding a revised business plan ~~for the company~~ and a consensual proposal for the restructuring of the Original Unsecured and Secured Notes. The restructuring of the Original ~~Unsecured~~Secured Notes was subject to the approval of at least 51% of the total amount loaned to RDI by each Secured Noteholder under the Original Secured Notes, as well as an aggregate of at least 66.7% of the total amount loaned to RDI by each Unsecured Noteholder under the Original Unsecured Notes.

On June 30, 2016, with the requisite approval of the Noteholders and in accordance with RDI's Consent Solicitation Statement, dated May 19, 2016 (the "Consent Solicitation Statement"), RDI completed a restructuring transaction involving the Original Notes, whereby RDI amended and restated the Original Notes (the "Restructured Notes"). The Consent Solicitation Statement, the Restructured Notes, the First Amendment to Security Agreement, Credit Agreement (Secured), Collateral Agent and Intercreditor Agreement (Secured), Credit Agreement (Unsecured), and Representative and Intercreditor Agreement (Unsecured), and Agreement Regarding Restatement of Promissory Notes, effective as of July 1, 2016 (the "Omnibus First Amendment"), the UCC-1 Financing Statements filed in connection therewith, and any related documentation (including the Original Secured Credit Documents and Original Unsecured Credit Documents not amended by way of the Restructured Notes and Omnibus First Amendment), are referred to herein as the "2016 Restructuring Agreement." The 2016 Restructuring Agreement contained releases of RDI and its officers and directors by the Secured Noteholders and Unsecured Noteholders.

[23] Opus Bank is also the lender to RFS, and holds a Secured Claim against RFS in the amount of approximately $1.28 million. Opus Bank is not a Creditor of RDI.

Pachulski Stang Ziehl & Jones LLP
Attorneys at Law
Costa Mesa, California

An overview of the material terms of the Restructured Notes under the 2016 Restructuring Agreement, and the current state of the obligations to the holders thereof (**in bold**), are as follows:[24]

*Term*. The initial maturity of the Restructured Notes is ten years from the Note Restatement Date (*i.e.,* June 30, 2026), subject to an additional five-year extension under certain conditions. In the event of a Sale of the Business (as defined in the Restructured Notes), prior to the otherwise applicable maturity date, then the Restructured Notes are due sixty (60) days following such Sale of the Business.

*Interest*. Interest begins to accrue on January 1, 2017, and will be paid in semi-annual installments at 2.17%. Payments to commence on June 30, 2017, and are to continue each June 30 and December 30 thereafter. Accrued but unpaid interest owing as of the Note Restatement Date was cancelled and forgiven.

**RDI made the required interest payments under the Restructured Notes due on June 30, 2017, and December 20, 2017, but was unable to make the June 30, 2018, December 20, 2018, or June 30, 2019 payments.**

*Principal – Accelerated Principal Payment Waterfall*. In addition to the interest payments, 85% of all Free Cash Flow From Operations (or Free Cash Flow From Sale of the Business) (each as defined in the Restructured Notes) (such 85% referred to as the "First Tier Accelerated Principal Payments") will be paid to the Noteholders every year until (i) an aggregate amount of all payments paid pursuant to the Restructured Notes to the Secured Noteholders equals $2,985,016.64 (referred to as the "Secured Note Recoupment"), and (ii) an aggregate amount of all payments paid pursuant to the Restructured Notes to the Unsecured Noteholders equals $5,540,527.72 (referred to as the "Unsecured Note Recoupment"). In general, once the Unsecured Note Recoupment has been achieved, the Noteholders then receive 45% of Free Cash Flow From Operations (or Free Cash Flow From Sale of the Business) (such 45% referred to as the "Second Tier Accelerated Principal Payments") until the remaining balance owing on the Restructured Notes is repaid.

**85% of all Free Cash Flow From Operations; amount subsequently changed to 100% through an Addendum.**

The First Tier Accelerated Principal Payments will be paid 55.6% in respect of the Secured Notes and 44.4% in respect of the Unsecured Notes until the Secured Notes have achieved the Secured Note Recoupment. Upon satisfying the Secured Note Recoupment, First Tier Accelerated Principal Payments will be paid entirely to the Unsecured Noteholders until the Unsecured Note Recoupment is achieved. After the Unsecured Note Recoupment is achieved, the Second Tier Accelerated Principal Payments will be paid 55.6% in respect of the Secured Notes and 44.4% in respect of the Unsecured Notes until the Secured Notes have been paid off in full. After the Secured Notes have been paid off in full, the Second Tier Accelerated Principal Payments will be paid entirely to the Unsecured Noteholders until the Unsecured Notes have been paid off in full.

In the event that all of RDI's (direct or indirect) assets are sold, the Noteholders will generally share in a portion of Free Cash Flow From Sale of the Business in a similar fashion

[24] The following is necessarily a summary overview of the material terms of the Restructured Notes. For full and complete disclosure of the terms of the Restructured Notes and related matters, please refer to the 2016 Restructuring Agreement. The treatment of the holders of the Restructured Notes under the Plan is described in Section VI.C.2.a (Class 1 – Allowed Secured Claims of the Secured Noteholders (RDI)) and Section VI.C.5.a (Class 11(a) – Allowed Unsecured Claims Against RDI).

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

as such Noteholders share in Free Cash Flow From Operations; *provided, however*, that following such sale and related payments, any remaining unpaid amounts respecting the applicable Restructured Note shall be automatically cancelled and forgiven.

**As there has been no Free Cash Flow From Operations (or Free Cash Flow From Sale of the Business), no First Tier Accelerated Principal Payments, or Second Tier Accelerated Principal Payments, are due and owing, and no such amounts have been paid by RDI.**

*Contingent Additional Principal*. In addition, if, upon Maturity (as defined in the Restructured Notes), the total Net Equity (as defined in the Restructured Notes) of RDI, as reasonably determined by RDI's accountants and management, is equal to or greater than $15,000,000, then in addition to any other amounts payable pursuant to each Restructured Note, each Noteholder will be paid a contingent additional payment equal to 1.115% of the principal amount owed with respect to such Noteholder's Restructured Note as of the Note Restatement Date.

**No contingent additional principal payments are due and owing, and no such amounts have been paid by RDI.**

As contemplated in connection with the 2016 Restructuring Agreement, the ~~company~~RDI set out to implement its business plan to increase franchise unit sales and reduce company-owned assets through the sale of multiple restaurant locations (by way of refranchising these restaurants to third parties). Concurrently, through the reduction of company-owned restaurants, ~~the company~~RDI planned to be in a position to significantly reduce its corporate overhead and infrastructure obligations related to the company-owned restaurants. In accordance with the ~~company's~~ business plan, during the time period from October 2015 to June 2016, three (3) restaurants were sold and refranchised to third party franchisees (the Ruby's® locations in Corona del Mar, Laguna Beach and Mission Viejo, California), for total net sale proceeds of approximately $2.5 million.[25]

~~The company~~RDI also entered into negotiations for the sale of three (3) other restaurant locations (Huntington Beach, Oceanside and Palm Springs), and received several offers in connection with these restaurants from various prospective purchasers.[26] However, the offers ultimately proved insufficient, and ~~the company~~RDI determined it could not proceed with these sales. As a result of the required continued management of the company-owned stores, however, notwithstanding the ~~company's~~RDI's efforts and corresponding reduction of expenses, ~~the~~

[25] The Corona del Mar and Laguna Beach restaurants were purchased by Eureka Food Enterprises, LLC, which is owned by Craig.

[26] One of these prospective purchasers was Craig or a related entity.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

~~company~~RDI was not in a position to materially reduce much of its corporate overhead and infrastructure obligations at the pace outlined in the business plan, although ~~the company~~RDI substantially reduced its overhead in the 12 months leading up to the bankruptcy filings.

In addition, 2017 restaurant sales were adversely affected by inclement weather in the first half of the year which severely degraded sales volumes over prior years and forecasts. The weather also impacted commodity prices, increasing the company's cost of goods. Moreover, newly enacted governmental regulations and policies drove many expenses higher (including minimum wage increases, medical benefits~~,~~ and sick pay requirements~~ and minimum wage increases~~), all of which increased costs at a time when the restaurant industry as a whole was experiencing declining same store sales. Concurrently, grocery store prices decreased, which generally reduced the frequency of visitation by restaurant customers. While ~~the company~~RDI experienced a rebound in the second half of 2017, ~~the company's~~its cash flow remained insufficient to meet its ongoing obligations.

Another factor impacting ~~the company~~RDI was the lower than forecasted income from the company's third-party retailer gift card program. Historically, RDI engaged in gift card sales through third-party retailers (predominantly through Costco Wholesale Corporation) as a means by which to increase customer visitation to the Ruby's® Restaurants (defined herein as the "Costco Gift Card Program"). With respect to the Costco Gift Card Program, however, RDI was unable to continue to reimburse the Franchisees accepting the Costco gift cards (which reimbursement was typically at a rate of 85%, but in two instances at the rate of 90%). RDI's inability to reimburse the Franchisees resulted in the Franchisees not paying their royalty fees to RFS and RDI not receiving the RDI License Fee. Ultimately, prior to the Petition Date, RDI terminated the Costco Gift Card Program on a go-forward basis, although RDI intends to honor the majority of its outstanding Gift Card Reimbursement Obligations to Franchisees (as defined herein) in accordance with the Netdown Process as described in further detail, *infra*.

In sum, RDI found itself with an overleveraged balance sheet~~,~~ and ~~without the~~declining cash flow to pay its operating costs or its obligations to creditors. In turn, RDI's inability to meet its

obligations to the Franchisees on account of Gift Card Reimbursement Obligations impeded RFS' ability to collect royalties from the Franchisees. In addition, Opus Bank commenced enforcement proceedings against the SoCal Debtors, seeking the appointment of a receiver over their assets and operations, precipitating the SoCal Debtors' bankruptcy filings. The Debtors, therefore, commenced these Chapter 11 Cases in order to restructure their financial affairs.

## C. Significant Events in the Bankruptcy Cases Through the Date of Filing of Disclosure Statement

### 1. Chapter 11 Status Conference

The Court has held chapter 11 status conferences in these Chapter 11 Cases on September 24, 2018, October 22, 2018, November 2, 2018, December 18, 2018, February 27, 2019, April 25, 2019, June 5, 2019 and July 24, 2019. The Debtors have filed status conference reports in connection with these status conferences [RDI Debtors, Docket Nos. 65, 114, 151, 244, 334, 369, 394 and 417]; RFS, Docket Nos. 40, 138, 175 and 218].

### 2. 341(a) Meetings

The SoCal Debtors' meeting of creditors under section 341(a) of the Bankruptcy Code was conducted on October 3, 2018. RDI's meeting of creditors was conducted on October 15, 2018. RFS' meeting of creditors was held on October 15, 2018.

### 3. Appointment of an Official Committee of Unsecured Creditors in the RDI Case

On September 19, 2018, the U.S. Trustee appointed the Committee in the RDI Chapter 11 Case. The Committee consists of the following Creditors: Richard Silva, William E. Pope and Michael Munz.[27] The Committee is represented by Winthrop ~~Couchot~~ Golubow Hollander, LLP as its insolvency counsel and Force 10 Partners as its financial advisor. No Committee was appointed in the RFS Chapter 11 Case.

### 4. Joint Administration of the RDI Debtors' Cases

On September 5, 2018, the Court entered an order authorizing the joint administration of the RDI Debtors' cases [Docket No. 6]. The RDI Debtors' cases are jointly administered for procedural

[27] Mssrs. Silva, Pope and Munz each were members of the Steering Committee. Messrs. Silva and Pope served on the RDI Board of Directors.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

purposes only. The Plan does not provide for the substantive consolidation of the Plan Proponents' assets and liabilities. The RFS Chapter 11 Case is administered separately from the RDI Debtors.

**5. Employee Wages and Benefits**

On September 10, 2018, the Court entered an order authorizing RDI to pay certain Pre-Petition wages and salaries of its employees and honor other employee benefits [Docket No. 31].

**6. Schedules and Statements of Financial Affairs**

On September 28, 2018, the RDI Debtors filed with the Court their Schedules and Statement of Financial Affairs. On October 4, 2018, RFS filed with the Court its Schedules and Statement of Financial Affairs.

**7. Honoring of Customer Programs and Payment of Certain Pre-Petition Claims**

On August 31, 2018, and September 10, 2018, the Court entered orders granting the RDI Debtors' motions for authority to continue to honor customers' gift cards following the Petition Date. [Docket Nos. 30 and 32].

**8. Unexpired Leases and/or Executory Contracts**

**a. The Huntington Beach Lease**

Ruby's Huntington Beach is a party to a nonresidential lease with the City of Huntington Beach (the "City of Huntington Beach") for the operation of a Ruby's restaurant located on the Huntington Beach Pier, 1 Main Street, Huntington Beach, California 92648 (the "Huntington Beach Lease"). Ruby's Huntington Beach determined in its sound business judgment that it was in the best interest of its Estate and its Creditors to assume the Huntington Beach Lease. To that end, Ruby's Huntington Beach entered into a stipulation with the City of Huntington Beach authorizing the assumption of the Huntington Beach Lease and curing defaults (the "Huntington Beach Lease Stipulation"), and on February 6, 2019 [Docket No. 233], Ruby's Huntington Beach filed a motion to approve the Huntington Beach Lease Stipulation. On March 11, 2019, the Court entered its order approving the Huntington Beach Lease Stipulation [Docket No. 282]. On April 2, 2019, the City of Huntington Beach sent correspondence to Ruby's Huntington Beach that it had not yet received payment as set forth in the Huntington Beach Lease Stipulation and notifying Ruby's Huntington Beach of its intent to terminate the Huntington Beach Lease in thirty (30) days. The amounts due and owing to the City of Huntington Beach pursuant to the Huntington Beach Lease Stipulation have

been paid. In accordance with the agreement with the City of Huntington Beach, Ruby's Huntington Beach is required to make certain improvements to the lighting and signage of the premises, which improvements are in process. Ruby's Huntington Beach is also required to pay 2019 percentage rent, in the approximate amount of $290,000 by the end of January 2020, which will be paid as and when due and payable.

**b. The Oceanside Lease**

On or about March 1, 1996, RDI entered into a lease agreement with the City of Oceanside (as amended from time to time thereafter, the "Oceanside Lease") for a Ruby's Diner located at 1 Oceanside Pier, Oceanside, California 92054. In January 2014, Ruby's Oceanside succeeded to the interest of RDI in the Oceanside Lease. In 2018, Ruby's Oceanside exercised the first of the two remaining options to extend the term of the Oceanside Lease. Ruby's Oceanside determined in its sound business judgment that it was in the best interest of its Estate and its Creditors to assume the Oceanside Lease. To that end, on February 6, 2019, RDI and Ruby's Oceanside filed a motion seeking to assume the Oceanside Lease [Docket No. 232], which was granted by the Court on March 11, 2019 [Docket No. 281]. Any amounts due and owing in connection with the assumption of the Oceanside Lease will be paid on the Effective Date of the Plan.

**c. The Palm Springs Lease**

On or about October 25, 1999, RDI entered into a commercial lease agreement (the "Palm Springs Lease") with John Wessman dba Plaza Mercado for the Ruby's Diner located at 155 S. Palm Canyon Drive, Palm Springs, California 92262. In or about 2013, Ruby's Palm Springs succeeded to the interest of RDI in the Palm Springs Lease.

Ruby's Palm Springs determined in its sound business judgment that it was in the best interest of its Estate and its Creditors to assume the Palm Springs Lease. To that end, on February 6, 2019, RDI and Ruby's Palm Springs filed a motion seeking to assume the Palm Springs Lease [Docket No. 232], which was granted by the Court on March 11, 2019 [Docket No. 281]. Any amounts due and owing in connection with the assumption of the Palm Springs Lease will be paid on the Effective Date of the Plan.

**d. The Laguna Hills Lease**

On or about September 16, 1994, RDI entered into a lease agreement (as amended from time to time thereafter, the "Laguna Hills Lease") with Shopping Centers Associates, a New York general partnership, for the Ruby's Diner located within the Laguna Hills Mall, located at 24155 Laguna Hills Mall, Suite 184A, Laguna Hills, California 92653 (the "Laguna Hills Restaurant"). MGP Fund X Laguna Hills, LLC ("MGP") currently owns the Laguna Hills Mall and is the landlord in connection with Laguna Hills Lease. Ruby's Laguna Hills succeeded to the interest of RDI in the Laguna Hills Lease.

RDI, Ruby's Laguna Hills and SoCal Diners determined in their sound business judgment that it was in the best interest of their Estates and Creditors to assume and assign the Laguna Hills Lease. To this end, these Debtors negotiated with MGP and an existing franchisee regarding the assignment of the Laguna Hills Lease, the resolution of MGP's claims against the Debtors, and the sale of certain furniture, fixtures and equipment (the "FF&E") (which FF&E, consisting of a limited amount of "small goods," would be of no further use to the Debtors following the assignment) for a purchase price of Fourteen Thousand Dollars ($14,000).

On March 15, 2019, RDI, Ruby's Laguna Hills, SoCal Diners filed a motion to assume and assign the Laguna Hills Lease, resolve MGP's claims and sell the FF&E to the assignee (the "Laguna Hills Lease Motion") [Docket No. 301]. On March 21, 2019, the Court entered its order approving the Laguna Hills Lease Motion [Docket No. 315].

Any amounts due and owing in connection with the assignment of the Laguna Hills Lease will be paid on the Effective Date of the Plan.

**e. The Corporate Lease**

On March 28, 2019, RFS filed a motion to assume the lease of the corporate headquarters [Docket No. 161], which was approved by the Court by order entered April 4, 2019 [Docket No. 169]. There are no amounts due in connection with the assumption of the corporate lease.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**f. The Franchise Agreements**

Pursuant to the Plan, RFS will assume the Franchise Agreements and the Confirmation Order shall serve as the order approving such assumption.

**g. Other Agreements**

Other agreements that the Debtors intend to assume and/or reject pursuant to the Plan are set forth in **Exhibit L** and **Exhibit M** to the Disclosure Statement.

**9. The Claims Bar Dates**

Pursuant to section 502(b)(9) of the Bankruptcy Code, the deadlines for a Governmental Unit to file a proof of claim was February 25, 2019 (for Pre-Petition Claims against the SoCal Debtors which filed petitions on August 29, 2018), March 4, 2019 (for Pre-Petition Claims against RDI which filed its petition on September 5, 2018) and March 5, 2019 (for Pre-Petition Claims against RFS which filed its petition on September 6, 2018, each of which is 180 days after the dates of the Orders for Relief in the cases (the "Governmental Units Bar Date").[28]

The general Bar Dates by which all Creditors of the Debtors must have filed Proofs of Claim against the Debtors were June 3, 2019 as to the RDI Debtors, and May 15, 2019 as to RFS.

**10. Use of Cash Collateral**

With respect to RDI, the following entities claim, or claimed, an interest in RDI's cash collateral: (a) the Secured Noteholders; (b) the Internal Revenue Service; (c) Pillsbury; and (d) Family Tree. In the SoCal Debtors' cases, the following entities assert, or asserted, an interest in some or all of the SoCal Debtors' cash collateral: (a) Opus Bank; (b) C&C Partnership; (c) Pillsbury; (d) Plaza Bonita; (e) Family Tree; and (f) ~~U.S.~~US Foods. Opus Bank asserts an interest in RFS' cash collateral.

Since the outset of the Chapter 11 Cases, the Court has authorized the Debtors' use of cash collateral, with the most recent orders being as follows:

---

[28] The Governmental Units Bar Date is subject to any dates authorizing an extension of the deadline pursuant to the *Order Granting the United States' Omnibus Motion for Enlargement of Deadlines and a Stay of Proceeding with which the United States Government is a Party in Light of Lapse of Appropriations*, entered on January 23, 2019, as Docket No. 3, Misc. No. 1:19-mp-00101 MT.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

On March 29, 2019, Opus Bank filed its fourth stipulation between the RDI Debtors, Opus Bank, Pillsbury, Family Tree, and ~~U.S.~~US Foods authorizing the RDI Debtors' continued use of cash collateral (the "Fourth Cash Collateral Stipulation") [Docket No. 323], and on April 4, 2019, the Court entered its order granting the Fourth Cash Collateral Stipulation [Docket No. 328].

~~On April 16, 2019, the Court entered its order granting RFS' continued use of cash collateral [Docket No. 176].~~

On August 9, 2019, the RDI Debtors filed a fifth stipulation between the RDI Debtors, Opus Bank, Pillsbury and ~~U.S.~~US Foods[29] authorizing the RDI Debtors' continued use of cash collateral (the "Fifth Cash Collateral Stipulation") [Docket No. 407] and, on August 19, 2019, the Court entered its order granting the Fifth Cash Collateral Stipulation [Docket No. 413].

On November 1, 2019, the RDI Debtors filed a sixth stipulation between the RDI Debtors, Opus Bank, Pillsbury and US Foods authorizing the RDI Debtors' continued use of cash collateral (the "Sixth Cash Collateral Stipulation") [Docket No. 464] and, on November 6, 2019, the Court entered its order granting the Sixth Cash Collateral Stipulation authorizing the use of cash collateral through and including January 24, 2020 [Docket No. 467].

On September 3, 2019, RFS filed a third stipulation between the RFS and Opus Bank, authorizing RFS' continued use of cash collateral (the "Third Cash Collateral Stipulation") [Docket No. 231] and, on September 13, 2019, the Court entered its order granting the Third Cash Collateral Stipulation [Docket No. 237].

### 11. Post-Petition Financing

On January 8, 2019, the Debtors filed a motion seeking approval of, among other things, debtor in possession financing from Craig in the amount of $2 million (which was to be utilized not only to support operations of certain of the Debtors during the pendency of their Chapter 11 Cases, but also amounts necessary to make effective date payments under a chapter 11 plan) (the "Initial DIP Motion") [Docket No. 185]. In addition to seeking approval of the $2 million loan, the Initial DIP Motion also requested approval of RDI's assumption of and entry into a Pre-Petition plan

[29] Family Tree is not a party to the ~~Fifth~~subsequent Cash Collateral Stipulation as its PACA claims were paid in full during the pendency of the Chapter 11 Cases in accordance with terms of prior cash collateral orders.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

support agreement, approval of a break-up fee and approval of a "post-petition netdown" process pursuant to which the amounts due among RDI, RFS and the Franchisees could be "trued-up" and funds could flow into the Estates (defined herein as the "Post-Petition Netdown"). The Initial DIP Motion was opposed by Opus Bank and Pillsbury.

Following discussion among the parties, and in an attempt to address the objections to the Initial DIP Motion which threatened to derail the forward movement of the Debtors' Chapter 11 Cases, RDI determined to enter into a more limited debtor in possession loan (with RDI as the only borrowing entity) reflecting only the minimum amount necessary to fund RDI's operations pending confirmation of a plan – with the additional amounts necessary to fund the Effective Date payments to be provided, not in the form of a DIP loan, but by way of plan funding. The SoCal Debtors and RFS are not parties to the more limited DIP loan, nor do their assets serve as collateral for the DIP Loan.

On February 6, 2019, RDI filed a motion seeking approval of a DIP loan in the amount of $200,000 (the "RDI DIP Motion") [Docket No. 235]. Concurrently therewith, the Debtors filed a withdrawal of the Initial DIP Motion and its more expansive relief (*i.e.*, the Debtors no longer sought approval of the $2 million loan, the plan support agreement or the break-up fee). On February 20, 2019, following discussions among the various parties, RDI filed a supplement to the RDI DIP Motion requesting an increase in the DIP Loan from $200,000 to $300,000 [Docket No. 252] and, thereafter, on March 13, 2019, filed a motion seeking approval of the $300,000 DIP loan from the DIP Lender (the "RDI DIP Loan") [Docket No. 235], which was approved by the Court by order entered March 21, 2019 (the "RDI DIP Financing Order") [Docket No. 314]. As required by the DIP Lender, the Founders personally guaranteed the RDI DIP Loan. The proceeds of the RDI DIP Loan will be utilized to fund RDI's operations pending the Effective Date, at which time additional funding, in the form of the Plan Funding from the Plan Sponsor, will be provided to fund the Debtors' operations and obligations under the Plan. Pursuant to the Plan, the Plan Sponsor will convert the amounts due on account of the RDI DIP Loan to equity in RDI.

The RDI DIP Financing Order provides for the payment of the DIP Lender's fees and expenses, subject to Bankruptcy Court approval,[30] and the Plan contemplates satisfaction of such fees and expenses in the estimated amount of $300,000 on the Effective Date or upon allowance. The basis for payment of such fees and expenses includes the fact that, while the amount of the DIP Loan was ultimately reduced to a lower amount to facilitate a consensual chapter 11 and plan process, the DIP Lender's fees and expenses were incurred in connection with the much larger ($2 million) funding arrangement contemplated by the Initial DIP Motion, payment thereof was negotiated in connection with the RDI DIP Loan approved by way of the RDI DIP Financing Order, and the approval of such fees and expenses is subject to a notice and objection period and Bankruptcy Court approval. Such fees, along with the fees of the Plan Sponsor's tax advisors (in the estimated amount of $25,000), will be satisfied by way of a reduction in the amount of the cash component of the Plan Funding by the Plan Sponsor.

### 12. Post-Petition Netdown Motion and Implementation of Pre-Petition Netdown Process Under the Plan

As discussed above, RDI has significant obligations to reimburse the Franchisees in connection with the redemption of the gift cards by customers at the Ruby's® Restaurants (primarily in connection with the Costco Gift Cards), both on a Pre- and a Post-Petition basis. Prior to its chapter 11 filing, RDI lacked the funding to make such payments on account of its Gift Card Reimbursement Obligations. The Franchisees, in turn, ceased making payments to RFS under the Franchise Agreements (*i.e.*, the Franchisees were not paying their franchise-related obligations – the Franchise Royalties and Ad Fund Obligations – because RDI was not paying the Gift Card Reimbursement Obligations to the Franchisees). Without the payment of the Franchise Royalties by

[30] Paragraph 12 of the DIP Agreement provides as follows: Payment of the fees and expenses of the DIP Lender and his professionals (including all reasonable fees and expenses of counsel to the DIP Lender incurred in connection with this Agreement and the Chapter 11 Case) shall be subject to Bankruptcy Court order approving such fees and expenses. Professionals for the DIP Lender shall not be required to comply with the U.S. Trustee fee guidelines, however any time that such professionals seek payment of fees and expenses from RDI, each professional shall file with the Court summary copies of its fee and expense statements or invoices (which shall contain reasonably detailed time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) and serve such request on RDI, the U.S. Trustee and counsel for the Committee. The request for payment shall be filed and served in accordance with the negative notice provisions under Rule 9013-1(o) of the Local Bankruptcy Rules for the Central District of California. If an objection is raised, a hearing thereon will be scheduled

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

the Franchisees, RFS was no longer in a position to pay 25% of the royalties to RDI as the RDI License Fee. In other words, the cycle of payments between and among RDI, RFS and the Franchisees significantly diminished.

On February 6, 2019, RDI filed its motion (the "Post-Petition Netdown Motion") [Docket No. 234], seeking an order authorizing it to honor Post-Petition obligations between and among RDI, RFS and the Franchisees in accordance with the "Post-Petition Netdown" process described therein. Specifically, the Post-Petition Netdown works as follows:

Any amounts that RDI owes a particular Franchisee in connection with Post-Petition Gift Card Reimbursement Obligations will first be reduced (as a non-cash journal entry) by any amounts that that Franchisee owes to RDI for any miscellaneous charges (the "Net Amount RDI Owes to the Franchisee"). The Net Amount RDI Owes to the Franchisee will be applied (as a non-cash journal entry) to the amount of Post-Petition Franchise Royalties that the Franchisee owes to RFS, leaving a remaining balance (the "Remaining Balance Owed by the Franchisee"). The Franchisee will pay to RFS (in Cash) the Remaining Balance Owed by the Franchisee, as well as any Post-Petition Ad Funds Obligations it owes. From the Remaining Balance Owed by the Franchisee paid to RFS by the Franchisee, RFS will pay to RDI (in Cash) the RDI License Fee (calculated on the total Franchise Royalties owed by Franchisee). The above-described "credit" that RFS has extended to RDI by way of applying the Net Amount RDI Owes to the Franchisee against the Franchise Royalties owed by the Franchisee resulting in the Remaining Balance Owed by the Franchisee, will be ~~booked (~~cancelled on the books as a ~~non-cash journal entry) as an intercompany~~ receivable ~~owed~~owing between RDI to RFS ~~from RDI~~; *provided, however*, that RDI will guaranty RFS' obligation to Opus Bank under the New Opus Bank RFS Note in the amount that RDI owes to RFS as of the Effective Date on account of such cancelled receivable.

On March 11, 2019, the Court entered its order granting the Post-Petition Netdown Motion [Docket No. 283]. Similar relief was sought and obtained by RFS in its case [Docket Nos. 134 and 156].

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

As of July 30, 2019, implementation of the Post-Petition Netdown Process has resulted in the amount of approximately $642,977 in Franchise Royalties being paid to RFS – with approximately $187,655 of this amount being paid to RDI in the form of the RDI License Fees. In addition, RFS has received the approximate sum of $344,067 in Post-Petition Ad Fund Obligations. Pursuant to this process, there is an intercompany post-petition receivable owed to RFS by RDI in the approximate amount of $107,681.

For the period following July 30, 2019 though the Effective Date (estimated to be ~~January 26~~February 29, 2020), with respect to both the Post-Petition Netdown and, following the Effective Date, implementation with respect to the Pre-Petition amounts owed among RDI, RFS and the Franchisees, as reflected in the Cash Flow Projections (attached hereto as **Exhibit B**), the implementation of the Netdown Process as to these obligations is projected to generate cash to RFS in the estimated total amount of $533,694 in Franchise Royalties, $349,585 in Ad Fund Obligations and miscellaneous charges for a total sum of $888,279. These amounts include the amount of $635,556 in unpaid Franchise Royalties and Ad Fund Obligations owed by Eureka Food Enterprises, LLC to be paid on the Effective Date, and the balance from other Franchisees (to be paid on the Effective Date and during the year following the Effective Date), as reflected in the Cash Flow Projections. Pursuant to the implementation of this Netdown Process, RDI is projected to receive the amount of $133,423 as the RDI License Fee. As a result of the Netdown Process, RFS Franchisee receivables will be offset against RDI gift card payables, and a projected intercompany receivable owed by RDI to RFS in the approximate amount of $858,349 will be booked.

Craig holds rights of offset of ~~his~~the obligations for Franchise Royalties as the owner of Eureka Food Enterprises, LLC, a Franchisee, as against the RFS Note (in the principal amount of $1 million, plus interest thereon). Such offset rights have not been, and will not be, enforced with respect to the RFS Note. Instead, the Plan provides that the principal amount of the Allowed Claim of Craig against RFS shall be converted into equity in RDI as of the Effective Date of the Plan. The amounts owed by Eureka Food Enterprises, LLC for Franchise Royalties (both Pre- and Post-Petition), in the approximate amount of $363,664, shall be paid by Eureka Food Enterprises, LLC on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

the Effective Date in accordance with the Netdown Process (as will hisits Ad Fund Obligations in the amount of $271,891). These amounts to be paid by Eureka Food Enterprises, LLC are reflected in the above-discussed figures.

So long as RDI and RFS are in compliance with their obligations under the Plan, including RFS'swithout limitations all obligations owing to Opus Bank on the New Opus Bank RFS Note, any intercompany receivable owed to RFS from RDI as a result of the Netdown Process and any other intercompany obligations between them will not be collected or paid, butand will remain on the booksbe cancelled as of the Effective Date; *provided, however*, that RDI will guaranty RFS' obligation to Opus Bank under the New Opus Bank RFS Note in the amount that RDI owes to RFS as of the Effective Date on account of such cancelled receivable.

**13. Insurance Premium Financing**

On or about September 20, 2019, certain of the Debtors filed a non-cash journal entry.motion seeking authority to enter into an insurance premium financing agreement with FIRST Insurance Funding and to provide adequate protection in connection therewith [Docket No. 429] which was approved, with clarifications, by order entered on October 31, 2019 [Docket No. 461].

**13.14. The Exclusivity Periods and the Filing of the Plan and Disclosure Statement**

The RDI Debtors' initial time period in which they had the exclusive right to file a plan of reorganization and the time period in which the Debtors had the exclusive right to solicit votes thereon were December 27, 2018, and February 25, 2019, respectively. On December 26, 2018, the RDI Debtors filed a motion seeking a 60-day extension of the exclusivity periods (the "RDI Debtors Exclusivity Extension Motion") [Docket No. 175]. On March 11, 2019, the Court entered its order granting the RDI Debtors Exclusivity Extension Motion, extending the Debtors' exclusive right to file a plan of reorganization and the time period in which the RDI Debtors have the exclusive right to solicit votes thereon to April 25, 2019, and June 24, 2019, respectively. [Docket No. 280].

RFS's exclusive right to file a plan of reorganization and the initial time period in which RFS has the exclusive right to solicit votes thereon were January 4, 2019, and March 5, 2019, respectively. On January 3, 2019, RFS filed a motion seeking a 60-day extension of the exclusivity periods (the "RFS Exclusivity Extension Motion") [Docket No. 99]. On March 11, 2019, the Court

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

entered its order granting the RFS Exclusivity Extension Motion, extending RFS's exclusive right to file a plan of reorganization and the time period in which RFS has the exclusive right to solicit votes thereon to April 25, 2019, and June 24, 2019, respectively. [Docket No. 154].

The RDI Debtors, jointly with RFS, as Plan Proponents, filed the initial Plan and Disclosure Statement on April 24, 2019.

On June 19, 2019, the RDI Debtors filed a motion to further extend the solicitation deadline to and including October 7, 2019 [Docket No. 390], which was granted by Court by Order entered August 1, 2019 [Docket No. 401]. On October 3, 2019, the RDI Debtors filed a motion to extend the solicitation deadline through and including the hearing date on confirmation of the Plan [Docket No. 440], which was granted by the Court at a hearing held on November 6, 2019. On June 24, 2019, RFS filed a motion to further extend the solicitation deadline to and including October 7, 2019 [Docket No. 214]. 214], which was granted by the Court. On October 4, 2019, RFS filed a motion to extend the solicitation deadline through and including the hearing date on confirmation of the Plan [Docket No. 247], which was granted by the Court at a hearing held on November 6, 2019.

On October 21, 2019, RFS filed an alternative plan and disclosure statement in the RFS Chapter 11 Case (the "RFS Alternative Plan and Disclosure Statement") [Docket Nos. 251 and 252], and a motion to approve the RFS Disclosure Statement [Docket No. 253]. In light of the agreements reflected in the instant Plan and Disclosure Statement, RFS continues to support confirmation, along with the RDI Debtors as Plan Proponents, of the Plan. However, in the event that the Plan is not confirmed, RFS will seek confirmation of the RFS Alternative Plan.

## D. Pending Litigation

As of the Petition Dates, the Debtors were parties to several lawsuits (the "Litigation"). Attached as **Exhibit C** is a list of such Litigation and a description of the status of each lawsuit.

## E. Retention and Compensation of Professionals

### 1. Retention of Professionals

The RDI Debtors retained Pachulski Stang Ziehl & Jones LLP ("PSZJ") as the RDI Debtors' general insolvency counsel, which employment was approved by the Court by order entered December 12, 2018 [Docket No. 170].

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

RDI retained GlassRatner Advisory & Capital Group LLC ("GlassRatner") as its financial advisor, which employment was approved by the Court by order entered July 30, 2019 [Docket No. 399].

The RDI Debtors retained Donlin Recano & Company, Inc. ("DRC") as their claims, noticing and balloting agent, which employment was approved by the Court by order entered April 9, 2019 [Docket No. 331].

RFS retained Theodora Oringher PC ("TO") as RFS's general insolvency counsel, which employment was approved by the Court by order entered December 18, 2018 [Docket No. 93].

RFS retained Armory Consulting Co. ("Armory") as its financial advisor, which employment was approved by order entered January 3, 2019, the Court entered its order granting the Armory Application [Docket No. 99].

The Debtors are in the process of working with certain other professionals (AFP Saddington and The Verdon Law Group), regarding their retention in the Chapter 11 Cases with respect to tax return filings and tax advice.

**2. Compensation of Professionals**

The Court has determined that, absent further order of the Court, no amounts shall be paid on account of Professional Claims in the Debtors' Chapter 11 Cases prior to the Effective Date of the Plan or further order of the Court. The Plan provides for payment of the Allowed Professional Claims ~~on the earlier of the Effective Date or allowance thereof, unless otherwise agreed.~~ of the RDI Professionals in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement as described in Section VI.E.8 hereof and as provided by Article VI.H of the Plan. The Plan provides for payment of the Allowed Professional Claims of the other Professionals on the later of the Effective Date or allowance thereof.

## IV.

## FINANCIAL INFORMATION

### A. Financial Information

For information on the Debtors' financial condition, please refer to the Debtors' Monthly Operating Reports that have been filed with the Office of the United States Trustee (the "UST

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

Reports"). Copies of the UST Reports are available upon a request, in writing, to counsel to the Debtors at the addresses listed on the cover page of this Disclosure Statement.

**1. Procedures Implemented to Resolve Financial Problems**

As reflected above, in the years preceding the chapter 11 filings, while certain of the SoCal Debtors and RFS were profitable or had assets that exceeded their liabilities, RDI operated at a loss and was in need of financial restructuring. Pursuant to the RDI DIP Loan, the Plan Sponsor (as DIP Lender) provided the amount of $300,000 in debtor in possession financing to RDI. Under the Plan, the Plan Sponsor will provide the Plan Funding (which includes the conversion of the $300,000 RDI DIP Loan to equity, conversion of the $1 million RFS Note to equity and an additional infusion of cash, in the amount of $3.7 million (less the amount of $325,000 allocated for payment of advisory expenses of the Plan Sponsor), for total consideration of $45 million),[31] which will be utilized by the Reorganized Debtors to make Effective Date and plan-related payments, stabilize operations and pay operating expenses.

In addition, the Debtors have implemented several measures designed to increase the Debtors' profitability. These efforts are outlined below.

**a. G&A Expenses**

The Debtors have evaluated their general and administrative expenses and have taken the following measures to reduce expenses during the pendency of the Chapter 11 Cases: (i) reductions in the Founders' compensation; (ii) elimination of certain managerial and leadership positions; (iii) replacing certain administrative support services, such as accounting services, to new providers are reduced costs; (iv) utilization of automated food costs analytical modeling tools; and (v) reduction in commissions to delivery providers through the implementation of online ordering programs.

**b. Efforts to Increase Sales**

The Debtors have undertaken a number of actions designed to increase sales. Specifically, the Debtors have: (i) engaged a specialized marketing firm to implement a focused digital marketing

[31] The amount of the Plan Funding is subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

program; (ii) partnered with delivery providers to develop and implement online consumer ordering programs; and (iii) developed a digital guest loyalty and frequent dining program.

#### c. Efforts to Further Develop Franchising Program

The Debtors have also undertaken a number of steps designed to further develop the Ruby's franchising program. Specifically, the Debtors have introduced a new concept under the trade name Ruby's Shake Shop, which provides for smaller sized units with reduced menu options, which provides potential franchisees with a less expensive franchising investment opportunity. In addition, the Debtors are developing a shake only, kiosk-style franchising model. The Debtors are working to develop new franchises in ~~Pennsylvania, Texas, Utah, Colorado~~other areas and ~~California. The Debtors also~~ anticipate expanding the Ruby's brand into the international arena following the Effective Date.

## B. Principals/Affiliates of Debtors' Business

### 1. Shareholders, Directors and Officers

The following chart lists the names of the shareholders, the members of the Board of Directors and Officers of RDI and RFS, as of the Petition Date and during the pendency of the Chapter 11 Cases:

| Name | Position with RDI | Position with RFS |
|---|---|---|
| Douglas Cavanaugh | 60% Shareholder<br>President<br>Chairman of the Board of Directors | 60% Shareholder<br>President<br>Chairman of the Board of Directors |
| Ralph Kosmides | 40% Shareholder<br>Special Projects Coordinator<br>Board Member | 40% Shareholder<br>Special Projects Coordinator<br>Board Member |
| Tad Belshe | Executive Vice President of Operations & Secretary<br>Board Member | Board Member |

### 2. Management Compensation

The following are the annual salaries of the Debtors' executive management personnel as of the Petition Date and during the pendency of the Chapter 11 Cases: Cavanaugh, President, $125,000 annual salary from RDI, which has been paid during the pendency of the cases, and $125,000 annual

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

salary from RFS that has not been paid during the pendency of the cases but has been accrued; Kosmides, Special Projects Coordinator, $75,000 annual salary from RDI during the pendency of the cases (and on an as-requested basis from RFS at an hourly rate of $125); and Mr. Belshe, Executive Vice President of Operations and Secretary, $96,000 from RDI subject to reimbursement RFS or ~~Affiliated Entities~~affiliated entities for services provided by Mr. Belshe to RFS or ~~Affiliated Entities~~affiliated entities. In addition to salary, the Debtors' executive management personnel are provided with health and life insurance by RDI.

During the pendency of the Chapter 11 Cases, the Debtors have provided Mssrs. Cavanaugh and Kosmides with the following benefits: Health insurance (Aetna), dental insurance (Premier Access), and life insurance (Metlife), and Mr. Cavanaugh is also provided disability insurance (Unum Paul Revere Life Insurance), at the total cost of $54,554.22 and $46,837.83, respectively, per annum. Mr. Belshe is provided with dental insurance (Premier Access) and life insurance (Metlife), at the total cost of $4,409.43 per annum. It is anticipated that comparable benefits will continue to be provided following the Confirmation Date.

## V.

## ITEMIZATION OF THE DEBTORS' ASSETS

The Debtors' assets are generally summarized as follows:

### A. Cash on Hand and Accounts Receivable

The current cash on hand and anticipated accounts receivable in the respective Estates are reflected in the Cash Flow Projections, and will be utilized as a source of funding for the Plan.

### B. Intellectual Property and Franchising Related Interests

RDI is the owner of the Marks and Intellectual Property, which are licensed to RFS (the Entity serving as the franchisor to the Franchisees) pursuant to the RFS/RDI License Agreement. Under the Franchise Agreements, RFS (as franchisor) is entitled to Franchise Royalties, which are generally the greater of a set dollar amount and four percent (4%) of "Gross Sales" as such term is defined in the Franchise Agreements. The Franchise Royalties historically averaged approximately $2,400,000 per annum (assuming payment of Franchise Royalties by the Franchisees).

As licensor of the Marks and Intellectual Property to RFS, RDI is entitled to the RDI License Fee, which is one percent (1%) of the Gross Sales generated by RFS and the Franchisees (*i.e.*, 25% of the Franchise Royalties owed to RFS), which historically averaged approximately $600,000 per annum (assuming payment of Franchise Royalties by the Franchisees).

The Plan will effectuate ~~a transfer~~the contribution of the Interests in RFS to RDI. The RFS/RDI License Agreement will remain in effect and RFS will continue its role of franchisor to the Ruby's Franchisees.

## C. Membership and Partnership Interests

RDI holds membership or partnership interests in various entities. These entities have been valued, prior to consideration of the debt against them, based on EBITDA (without G&A expense) with a multiple of 3.5 x EBITDA,[32] as follows: (1) 100% Interest in SoCal Diners (which holds interests (along with Quality) in the ~~SoCal~~HOP Restaurant Entities~~ which, in turn, own~~, Ruby's Laguna Hills and ~~operate the SoCal Restaurants~~Ruby's Mission Valley) - valued at $3,573,193 (as detailed below); (2) 100% interest in Ruby's Woodbridge, LLC (which owns and operates a restaurant in Irvine, California) – which interest is valued at $0.00; (3) 50% of Ruby's Spectrum, LLC (which owned and operated a restaurant at the Irvine Spectrum in California but is now closed) – valued at $0.00; (4) 50% of Ruby's Diner South Coast Plaza, LP (which owns and operates a restaurant at South Coast Plaza in California) – valued at $289,808;[33] and (5) 70% of Ruby's Beach Ventures, LLC (which owns and operates a restaurant in Long Beach, California) – valued at $220,006, prior to consideration of the debt against these entities. As set forth in the Cash Flow Projections (**Exhibit B**), RDI is projected to continue to receive distributions from Ruby's Diner South Coast Plaza, LP and Ruby's Beach Ventures, LLC, which will be utilized to fund distributions under the Plan.

---

[32] ~~The~~As set forth in **Exhibit B**, the multiple is based on several previous third-party offers for the Huntington Beach, Oceanside and Palm Springs restaurants in the range of $4.5 million, and does not include cash on hand, FF&E, inventory, intercompany receivables or goodwill.

[33] A letter of intent regarding an extension of the lease of the South Coast Plaza location, which otherwise expires January 31, 2020, has been executed. The final documentation of this extension (through January 31, 2025) is currently in process.

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

SoCal Diners and Quality own 100% of the SoCal Entities, which have been valued, prior to consideration of the debt against them, at $3,573,193, as follows: (1) Ruby's Huntington Beach – valued at $1,883,761; (2) Ruby's Oceanside – valued at $1,164,694; (3) Ruby's Palm Springs – valued at $524,739; (4) Ruby's Mission Valley, Ltd. (which owned and operated a restaurant in the Westfield Mission Valley Mall in San Diego, California that was closed prior to the Petition Date) – valued at $0.00; and (5) Ruby's Laguna Hills (which, until March 2019, owned and operated a restaurant in the Laguna Hill Mall in Laguna Hills, California) – valued at $0.00. These values are prior to the consideration of debt. After consideration of debt, as set forth in **Exhibit B**, there is no equity value to SoCal or Quality in connection with the SoCal Entities. As set forth in **Exhibit B**, these values are based on a multiplier of 3.5x EBITDA based on several offers received prior to the Petition Date from potential third-party purchasers.

Similarly, as reflected in **Exhibit B**, after consideration of the secured, administrative and priority debt against each HOP Restaurant Entity, there is no residual value in the HOP Restaurant Entities, however, these entities will be paid a total of $200,000 from the HOP Plan Funding, which is the amount that will be distributed, *pro rata*, on the Effective Date of the Plan, to the unsecured creditors of the respective HOP Restaurant Entity, as follows:

| **HOP Restaurant Entity – Unsecured Distribution** | **Amount** |
|---|---|
| Huntington Beach Unsecured Distribution Amount | $113,118.78 |
| Oceanside Unsecured Distribution Amount | $62,397.43 |
| Palm Springs Unsecured Distribution Amount | $24,413.78 |

There is no residual value in Ruby's Laguna Hills after consideration of the secured, administrative and priority debt and this entity is no longer operating, therefore, no amounts will be paid to unsecured creditors of that entity.

~~The unsecured Creditors' claims of RDI will be entitled to one of the following treatments: (1) Paid a total of Two Million Five Hundred Dollars ($2,500,000) over a period of five (5) years following the Effective Date, assuming approval of the D&O/Affiliate Release; or if the D&O~~

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Release is not approved, a *pro rata* distribution from any proceeds ultimately recovered by the Litigation Trust after payment of the fees and costs incurred by the Litigation Trust.

The unsecured creditors of SoCal Diners and Quality will receive a two and one-half percent (2.5%) distribution on the fourth (4th) year anniversary of the Effective Date of the Plan (in the total estimated amount of $33,289) (the Debtors do not believe that there are any allowed unsecured claims against Quality). These distributions are set forth in the Cash Flow Projections attached to the Disclosure Statement as **Exhibit B**.

The distributions to the unsecured creditors of the SoCal Debtors (with the exception of Ruby's Laguna Hills) are set forth in the Cash Flow Projections attached to the Disclosure Statement as **Exhibit B**.

On the HOP Effective Date and Effective Date, as applicable, all of the interests in the SoCal Entities (i.e., RDI's interests in SoCal Diners, SoCal Diners' interests in Quality, and SoCal Diners' and Quality's ownership interests in the HOP Restaurant Entities, Ruby's Laguna Hills and Ruby's Mission Valley) will be cancelled and the entities (with the exception of the HOP Restaurant Entities) will be dissolved. No ownership interest in the SoCal Entities will be retained by RDI, SoCal Diners or Quality.

On the HOP Effective Date, the HOP Interests will be issued to the Plan Sponsor in consideration of the HOP Plan Funding.

The Unsecured Creditors of RDI will be entitled to a *pro rata* distribution from any proceeds paid to or recovered by the Litigation Trust after payment of the reasonable expenses of the Litigation Trust and after satisfaction in full of the Allowed Claims of the RDI Professionals, as provided by the RDI Professional and Unsecured Creditor Distribution Agreement, as discussed in Section VI.E.8. hereof and as provided in Article VI.H of the Plan.

## D. Leased Assets

As of the Petition Date, the RDI Debtors' Assets included four (4) nonresidential real property leases (Huntington Beach, Oceanside, Palm Springs and, until its assignment in March 2019, Laguna Hills). The Debtors also lease their corporate offices and a *de minimis* amount of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

equipment. The Debtors' non-residential real property leases have been assumed and, in the case of Laguna Hills, assigned~~)~~..

## E. Furniture, Fixtures and Equipment

The Debtors own various FF&E located at their corporate offices. The value of the FF&E is *de minimis*. In connection with the assignment of the Laguna Hills Lease, the FF&E located at the Laguna Hills restaurant was sold to the assignee for $14,000. In addition, in connection with the Laguna Hills restaurant closing, perishable inventory was sold for $8,000.

## F. Litigation Claims

### 1. Actual and Projected Recovery of Rights of Action, Including Preferential or Fraudulent Transfers

The Debtors and the Committee have conducted a review and investigation regarding potential ~~litigation claims~~Rights of Action, including potential claims against the D&Os and ~~Affiliated Entities (as such terms are defined herein),~~other potential third parties, and the available coverage under the D&O insurance policy (which may provide up to $5 million in possible insurance coverage in connection with ~~such claims).~~certain Rights of Action). The Committee believes that there ~~may exist~~exists viable Rights of Action, including Avoidance Actions and/or other claims against the D&Os and ~~Affiliated Entities. The D&Os and Affiliated Entities dispute these contentions. To address these differing positions~~other third parties, and ~~in light of the consideration~~has supported treatment to ~~be provided to RDI's unsecured Creditors and the benefit to the Debtors' Estates in having the potential claims against the D&Os and Affiliated Entities resolved so~~its creditor constituency that ~~the D&Os are in a position to devote their full attention to the operations of the Debtors and Reorganized Debtors, the Plan~~ provides for recovery to the ~~unsecured Creditors of~~ RDI ~~with two alternative treatments with respect to a distribution on account of their~~ Unsecured Creditors (Class 11(a~~) Claims depending on whether the D&O/Affiliate Release is approved. If the D&O/Affiliate Release is approved by the Bankruptcy Court, the unsecured Creditors of RDI will be paid a total of Two Million Five Hundred Dollars ($2,500,000). Alternatively, if the D&O/Affiliate Release is not approved by the Bankruptcy Court, the Class 11(a) Claimant will participate in a *pro rata* distribution~~)) from ~~any~~the proceeds ~~that may ultimately be~~ , if

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

any, paid to and recovered by the Litigation Trustee, after payment of the reasonable expenses of the Litigation Trust~~. In addition, any Avoidance Action that could be asserted against U.S. Foods by or on behalf~~ and after satisfaction in full of the Allowed Claims of ~~Debtors' Estates shall be waived pursuant to the U.S. Foods Settlement. The Debtors are in the process of reviewing~~the RDI Professionals, in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement (as further discussed in Section VI.E.8. hereof and ~~analyzing whether there exist any~~Article VI.H of the Plan).

With respect to other ~~potential~~ Avoidance Actions~~.~~

~~With respect to~~, specifically preferential transfers, attached hereto as **Exhibit D** is a summary of the gross dollar amount of payments made by each of the Debtors during the ninety (90) day period preceding the Petition Dates and the one (1) year period for Creditors who are Insiders (the "Preference Period Payments Listing").[34] Some of the payments made during these periods (the "Preference Period") may be recoverable as preferential transfers pursuant to the provisions of section 547 of the Bankruptcy Code (the "Preference Actions"). It should be noted, however, that the amounts set forth in **Exhibit D** simply represent the gross payments made within the Preference Periods and are not the amount of payments that are recoverable as preferential transfers.

To qualify as a preference, each payment must meet certain criteria set forth in section 547 of the Bankruptcy Code. Indeed, the Debtors believe that after the statutory criteria and business criteria are applied, recoverable preferences will be substantially less. The gross figure also does not take into account defenses, which may be asserted by the transferees, such as ordinary course of business, contemporaneous payment, collateral proceeds as a source and/or new value. In addition, the net recovery on account of such claims will also be reduced by legal fees and costs incurred to prosecute such claims. After taking into account these considerations, the Debtors do not believe that there will be any significant recovery in connection with Preference Actions.

---

[34] Except as otherwise provided in the Plan (including without limitation the waiver of claims by way of the ~~U.S.~~US Foods Settlement), the Debtors reserve the right to pursue actions for avoidance of preferential transfers against any and all individuals or entities listed on **Exhibit D**.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

~~The~~Rights of Action, including Avoidance Actions, if any, will be pursued by the respective Debtors if commenced prior to the Effective Date or, following the Effective Date, by the respective Reorganized Debtors~~.~~; *provided, however*, that in the case of RDI, RDI Rights of Action will be pursued solely by the Litigation Trustee. The respective Debtors or the Litigation Trustee, as applicable, will have the ability to assert any Rights of Action, including Avoidance Actions, defensively, as grounds under section 502(g) of the Bankruptcy Code to deny a Creditor's distribution. ~~See Section VI (Summary of Plan of Reorganization) for a further discussion of the proposed treatment of the Avoidance Actions.~~ Notwithstanding the foregoing, this provision shall have no effect on (a) the Debtors' ability to transfer funds between and among themselves in accordance with the terms of the Plan, or (b) the treatment of Intercompany Claims under the Plan, as described in Sections VI.E.10 and 11 hereof.

~~Pursuant~~Notwithstanding the foregoing, pursuant to the Plan, ~~the~~certain specified Pre-Petition claims between and among the Founders and the Debtors (as set forth in **Exhibit E**) will be reconciled, resulting in an adjustment to the amount of New Value Contribution being contributed by the Founders (defined herein as the "Reconciliation").

The Plan provides that any Avoidance Action that could be asserted against US Foods by or on behalf of Debtors' Estates, including by the Debtors, the Reorganized Debtors, the Committee or the Litigation Trustee, shall be waived pursuant to the US Foods Settlement.

The Plan further provides that any Avoidance Action that could be asserted by any Debtor against any other Debtor shall be waived by all parties with standing to bring such action, including the Debtors, their Estates, the Committee and the Liquidating Trustee.

The Plan further provides that any Claims, including Avoidance Action, that could be asserted by any Debtor against Opus Bank shall be waived by all parties with standing to bring such action, including the Debtors, their Estates, the Committee and the Liquidating Trustee.

# VI.

# SUMMARY OF THE PLAN OF REORGANIZATION

## A. What Creditors and Interest Holders Will Receive Under The Proposed Plan

The Plan classifies Claims and Interests in various classes, by Debtor, according to their right to priority. The Plan states whether each class of Claims or Interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

## B. Unclassified Claims

As required by the Bankruptcy Code, certain types of Claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following Claims in a class.

### 1. Administrative Claims

Administrative expenses are Claims for costs or expenses of administering the Debtors' Cases, which are allowed under Bankruptcy Code section 507(a)(1) (the "Administrative Claims"). The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. The following tables list the Debtors' section 507(a)(1) Administrative Claims and their treatment under the Plan.

#### a. Administrative Claims of Non-Professionals

Other than those listed in Table 1 below, the Plan Proponents do not believe any amounts will be owed to parties who provide goods and services after the Petition Date (other than Professionals) except for current obligations (including Post-Petition, pre-Effective Date personal property taxes), which will be paid in the ordinary course of business.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**Table 1: Summary of Administrative Claims of Non-Professionals**

| **Administrative Creditor** | **Relationship to Applicable Debtor** | **Estimate of Amount ~~Owing (as of~~To Be Paid (on or about the Effective Date)** | **Treatment[35]** |
|---|---|---|---|
| ~~U.S.~~US Foods | Supplier<br><br>(RDI Debtors) | $0.00 | ~~Any amounts owed to U.S. Foods will be paid in accordance with the terms of the U.S. Foods Settlement~~US Foods' administrative claims are comprised of the following: $64,116.20 (Ruby's Huntington Beach), $51,486.60 (Ruby's Oceanside), $25,337.02 (Ruby's Palm Springs), $8,513.53 (Ruby's Laguna Hills), $43,000 (Woodbridge), plus any deferred amounts or ordinary course administrative amounts owing as of the Effective Date as set forth in the US Foods Settlement. Any amounts owed to US Foods will be paid in accordance with the terms of the US Foods Settlement. *See* Section VI.E.8 of the Disclosure Statement and Article VI.H of the Plan. |
| City of Huntington Beach | Lessor (Huntington Beach restaurant)<br><br>(SoCal Debtor Ruby's Huntington Beach) | $0.00 | Ruby's Huntington Beach expects that all amounts owing to City of Huntington Beach will be paid in full prior to the Effective Date as provided by the Huntington Beach Lease Stipulation~~.~~; but that it will owe 2019 percentage rent at the end of January 2020 in the amount of approximately $290,000 which will be paid as and when due and payable. |
| MGP Fund X Laguna Hills, LLC | Lessor (Laguna Hills restaurant)<br><br>(SoCal Debtor Ruby's Laguna Hills) | $36,000 | The outstanding amounts owing to MGP as of the Effective Date will be paid in accordance with the terms of the Laguna Hills Lease Assumption and Assignment Order. |
| City of Oceanside | Lessor (Oceanside restaurant)<br><br>(SoCal Debtor Ruby's Oceanside) | $13,920 | The outstanding amounts owing to the City of Oceanside in connection with the assumption of the Oceanside Lease will be paid on the Effective Date as provided by the order approving the assumption of the Oceanside Lease. |

[35] The payments on account of Administrative Claims of Non-Professionals will be paid by the applicable Debtor liable for such amounts.

| | | | |
|---|---|---|---|
| Plaza Mercado | Lessor (Palm Springs restaurant)<br><br>(SoCal Debtor Ruby's Palm Springs) | $21,286 | The outstanding amounts owing to Plaza Mercado in connection with the assumption of the Palm Springs Lease will be paid on the Effective Date as provided by the order approving the assumption of the Palm Springs Lease. |
| Donlin Recano & Company | Claims and Noticing Agent<br><br>(RDI Debtors) | $140,000 | The outstanding amounts owing to Donlin Recano will be paid on the Effective Date. |
| DIP Lender | Administrative claims of counsel and tax advisors to the DIP Lender<br><br>(RDI) | $325,000 | The amounts owing to counsel and tax advisors to the DIP Lender will be satisfied through a reduction of the cash component of the Plan Funding by the Plan Sponsor; to the extent applicable, in accordance with the procedures set forth in the RDI DIP Financing Order. |
| U.S. Trustee Fees | Quarterly Fees<br><br>(All Debtors) | $0.00 | The quarterly payments to the U.S. Trustee will be paid as and when due. To the extent that any amounts are outstanding, such amounts will be paid in full on the Effective Date. The Plan Proponents shall continue to pay U.S. Trustee's fees after the Effective Date as provided by applicable law. |
| Administrative Personal Property Taxes | Taxing Authorities<br><br>(All Debtors) | $0.00 | All accrued Administrative Personal Property Taxes will have been paid in full in the ordinary course of business by the Effective Date. These taxes are not yet due and payable and will be paid in the ordinary course of business by the applicable Debtor when due and payable under applicable state law. |
| Total | | $~~501,000~~536,206 | |

### b. Administrative Claims of Professionals

With respect to Professionals, pursuant to Court order, the Debtors have not been paying Professionals on a current basis on account of their accruing fees and expenses. With respect to the payment of the RDI Professional Claims,[36] the Plan provides for payment of such RDI Professional Claims in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement, as

[36] The RDI Professionals are the Professionals retained in connection with the Chapter 11 Cases of some or all of the RDI Debtors, as follows: (1) Pachulski Stang Ziehl & Jones LLP, (2) GlassRatner Advisory & Capital Group LLC, (3) Winthrop Golubow Hollander, LLP and (4) Force 10 Partners, LLC.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

described in further detail in Section VI.E.8 hereof and Article VI.H of the Plan. The Plan provides for the payment of AllowedRFS Professional Claims on the later of the Effective Date, or allowance thereof, unless otherwise agreed. Those. The Professional Claim amounts are estimated in Table 2 below. The Plan is conditioned on an agreement by the Professionals, or other determination, as to the treatment of their Professional Fees under the Plan that will allow the Plan to become effective. If an agreement is not reached with respect to payment of professional fees that is acceptable to the Debtors and the Professionals, the Plan will not go effective.

**Table 2: Summary of Administrative Claims of Professionals**

| **Administrative Creditor** | **Relationship to Debtors** | **Amount Estimated** | **Treatment** |
|---|---|---|---|
| Pachulski Stang Ziehl & Jones LLP | Counsel to RDI and the SoCal Debtors | $2,900,0003,069,943 (RDI) $540,000571,654 (HOP Restaurant Entities) | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional.Paid in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement. (*See* Article VI.H of the Plan and Section VI.E.8 hereof). |
| GlassRatner Advisory & Capital Group LLC | Financial Advisors to RDI | $700,000741,021 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional.Paid in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement. (*See* Article VI.H of the Plan and Section VI.E.8 hereof). |
| Winthrop Golubow Hollander, LLP | Counsel to the Committee | $793,951 | Paid in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement. (*See* Article VI.H of the Plan and Section VI.E.8 hereof). |
| Force 10 Partners, LLC | Financial Advisors to the Committee | $423,440 | Paid in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement. (*See* Article VI.H of the Plan and Section VI.E.8 hereof). |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

| **Administrative Creditor** | **Relationship to Debtors** | **Amount Estimated** | **Treatment** |
|---|---|---|---|
| Theodora Oringher PC | Counsel to RFS | $425,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| Armory Consulting | Financial Advisors to RFS | $30,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| The Verdon Law Group | Tax Advisor to RFS | $0.00 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| AFP Saddington | Tax Preparers to the Debtors | $25,000 | Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional. |
| ~~Winthrop Couchot Golubow Hollander, LLP~~ | ~~Counsel to the Committee~~ | ~~$750,000~~ | ~~Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional.~~ |
| ~~Force 10 Partner, LLC~~ | ~~Financial Advisors to the Committee~~ | ~~$400,000~~ | ~~Paid on the later of (1) the Effective Date or (2) the date upon which the Claim is Allowed pursuant to a Final Order, unless otherwise agreed by the Professional.~~ |
| Total | | $~~5,770~~6,080,000 | |

The Court will rule on all Professional Claims incurred after the Petition Date and any Administrative Claims asserted by private parties not paid in the ordinary course of business before such Claims will be owed. Only the amount of Administrative Claims allowed by the Court will be owed and required to be paid under the Plan. The Professionals listed above will file and serve a

Pachulski Stang Ziehl & Jones LLP
Attorneys at Law
Costa Mesa, California

properly noticed fee application and the Court will rule on the applications. In accordance with the RDI Professional and Unsecured Creditor Distribution Agreement, and in consideration therefor, no objections to Professional Claims will be asserted by the Committee, the Debtors, the Founders, the Plan Sponsor, or any affiliate owned or otherwise controlled by the foregoing, and any such objections are waived. In addition, the RDI Professionals have agreed that their Professional Claims, in aggregate, will not exceed the amount of the RDI Professional Fee Cap (as defined herein), in the amount of $6,000,000. To the extent that the RDI Professional Fee Cap is exceeded, the Professional Claims of the RDI Professionals will be reduced, on a *pro rata* basis, to the "capped" amount of $6,000,000.[37] *See* Section VI.E.8 hereof for a further discussion of the RDI Professional and Unsecured Creditor Distribution Agreement.

**c. Administrative Personal Property Tax Claims**

Any personal property tax Claims arising for the period from the Petition Date to the Effective Date (the "Administrative Personal Property Taxes") will be paid by the applicable Debtor in the ordinary course of business as and when such taxes become due.

**d. Administrative Bar Date for Filing of Administrative Claims**

**i. Bar Date for Administrative Tax Claims**

All requests for payment of Administrative Tax Claims and for which no earlier bar date has been or is established outside of the Plan, such as may be established by requesting an expedited audit under Bankruptcy Code section 505, must be filed on or before the later of the forty-fifth (45th) day following entry of the Confirmation Order or, if a tax return is required to be filed with respect to such Administrative Tax Claim, one hundred twenty (120) days following the filing of the applicable tax return.

**ii. Bar Date for All Other Administrative Claims**

[37] The Professional Claims of the RDI Professionals are estimated to be approximately $5.6 million as of the Effective Date, but could exceed such amount. In any event, the RDI Professional Claims are subject to the $6 million RDI Professional Fee Cap.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Requests for payment of Administrative Claims must be filed and served on the Plan ~~Proponents'~~Proponents, their counsel and the Office of the United States Trustee no later than the thirtieth (30th) day following the entry of the Confirmation Order. Excluded from this requirement are Administrative Tax Claims, Professional Claims (defined below), statutory fees and Administrative Claims described in Table 1 and Table 2 above. Any objection to any other Administrative Claim must be filed within 120 days from the date such Administrative Claim is filed.

Professionals or other entities requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b) and 1103 for services rendered prior to the Effective Date ("Professional Claims") must file and serve on all parties entitled to notice thereof, an application for final allowance of compensation and reimbursement of expenses no later than the tenth (10th) day following entry of the Confirmation Order (unless such deadline is shortened or extended by agreement of the Professionals and the Reorganized Debtors or Court order). All such requests for payment of Administrative Claims and applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

Holders of Administrative Claims (including, without limitation, Professional Claims) that do not file such requests by the applicable bar date will be forever barred from asserting such Claims against the Debtors, the Debtors' Estates, the Reorganized Debtors or their property. Any objection to Administrative Claims of Professionals shall be filed on or before the date specified in the application for final compensation.

### 2. Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment and other taxes described by Bankruptcy Code section 507(a)(8). The Bankruptcy Code requires that each Holder of such a section 507(a)(8) Priority Tax Claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five (5) years from the date of the order for relief. Attached to the Disclosure Statement as **Exhibit F** is a list of all Priority Tax Claims filed against the

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Costa Mesa, California

Estates.[38]

**Table 3: Summary of Priority Tax Claims**

| **Claimant** | **Type of Tax Claim** | **Claim Amount** | **Proposed Treatment** |
|---|---|---|---|
| All Priority Tax Claims Identified on **Exhibit F** | Various<br><br>*See* attached **Exhibit F** | Total of approximately $~~29,509~~32,239 | Each Claimant identified on **Exhibit F** shall receive deferred payments on account of its Allowed Claim over a period not exceeding five (5) years from the order for relief. Each Claimant shall receive quarterly installments of principal and interest on the unpaid portion thereof at five percent (5%) per annum. The first installment shall be due on first day of the first quarter following the thirtieth (30th) day after the Effective Date with each installment due each quarter thereafter. The Debtors may, without penalty, prepay the entire amount of a Priority Tax Claim at any time. |

## C. Classified Claims and Interests

### 1. Summary of Classification under the Plan

As is further described in this Subsection (C), the Plan Proponents have classified Claims and Interests under the Plan as follows:

**Table 4: Summary of Classification of Claims and Interests**

Each of the below-referenced Classes (even if designated as a "sub-class"), if entitled to vote, will vote as a separate Class.

| **Class** | **Claims / Interest and Holder(s)** | **Impaired/Not Impaired** |
|---|---|---|
| 1 | Secured Claims of the Secured Noteholders - RDI | ~~No~~Yes |
| 2 | Secured Claim of Opus Bank – SoCal Debtors | Yes |
| 3 | Secured Claim of C&C Partnership – SoCal Debtors | Yes |
| 4 | Secured Claim of Pillsbury Winthrop Shaw Pittman LLP – HOP Restaurant Entities | Yes |
| 5 | Secured Claim of Plaza Bonita, LLC – SoCal Diners | Yes |

[38] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Priority Tax Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

| 6 | Secured Claim of Opus Bank – RFS | Yes |
|---|---|---|
| 7 | Secured Claim of Craig – RFS | Yes |
| 8(a) | Secured Tax Claims – RDI | Yes |
| 8(b) | Secured Tax Claims – SoCal | Yes |
| 8(c) | Secured Tax Claims – RFS | Yes |
| 9 | PACA Claims – RDI and SoCal Debtors | No |
| 10(a) | Priority Non-Tax Claims – RDI | No |
| 10(b) | Priority Non-Tax Claims – SoCal Debtors | No |
| 10(c) | Priority Non-Tax Claims – RFS | No |
| 11(a) | Unsecured Claims – RDI | Yes |
| 11(b) | Gift Card Reimbursement Claims of Franchisees Satisfied Through Pre-Petition Netdown Process – RDI | ~~No~~Yes |
| 11(c) | Unsecured Claims – SoCal Debtors (Classified in separate voting subclasses 11(c)(i) – (vi)):<br><br>Class 11(c)(i) – Ruby's Huntington Beach Unsecured Claims<br>Class 11(c)(ii) – Ruby's Oceanside Unsecured Claims<br>Class 11(c)(iii) – Ruby's Palm Springs Unsecured Claims<br>Class 11(c)(iv) – Ruby's Laguna Hills Unsecured Claims<br>Class 11(c)(v) – SoCal Diners Unsecured Claims<br>Class 11(c)(vi) – Quality Unsecured Claims | Yes |
| 11(d) | Unsecured Claims – RFS | Yes |
| 12(a) | Interests – Founders' Interests in RDI | Yes |
| 12(b) | Interests – Founders' Interests in RFS | Yes |
| 12(c) | Interests – RDI Debtors' Interests in Other Entities | ~~No~~Yes |

### 2. Classes of Secured Claims

Secured Claims are Claims secured by ~~liens~~Liens on property of the Estates. The following

sets forth all ~~classes~~Classes containing the Debtors' Pre-Petition Secured Claims and their treatment under the Plan:

**a. Class 1: Allowed Secured Claims of the Secured Noteholders (RDI)**

Class 1 consists of the Allowed Secured Claims of the Secured Noteholders against RDI. Class 1 is impaired. The Allowed Secured Claims of the Secured Noteholders are in the aggregate face amount of $2,984,923, as reflected in the Secured Notes. Each Allowed Secured Claim of the Secured Noteholders shall be an obligation of RDI following the Effective Date and shall be treated as follows~~, which treatment renders the Class 1 Claimants unimpaired~~:

*Principal Amount*. Each Allowed Secured Claim of the Secured Noteholders shall have a principal amount equal to the principal balance as set forth in **Exhibit G** to the Disclosure Statement.

*Payment of Accrued But Unpaid Interest*. On the Effective Date, accrued but unpaid interest owing on account of the Secured Notes ~~shall be paid.~~(four interest payments for June 30, 2018, December 30, 2018, June 30, 2019 and December 30, 2019) shall be paid.

~~*Term*. In accordance with the 2016 Restructuring Agreement, the~~*Term*. The maturity of the Secured Notes shall be June 30, 2026, with the maturity subject to an additional five-year extension, at RDI's sole election, if RDI is current on its payments to the Class 1 Claimants as provided by the Plan.

*Interest*. ~~In accordance with the 2016 Restructuring Agreement, interest~~Interest on the Secured Notes shall be paid in semi-annual installments at 2.17%. Interest-only payments shall commence on June 30, 2020 and shall continue each December 30th and June 30th thereafter.

*Accelerated Principal Payments From Free Cash Flow From Operations*. ~~In accordance with the 2016 Restructuring Agreement, in~~In addition to semi-annual interest payments, commencing on the first (1st) anniversary of the Effective Date, and on an annual basis thereafter, until paid in full, the Secured Noteholders shall be entitled to ~~one hundred percent (100%) of Free Cash Flow From Operations, if any, which shall be calculated in accordance with the definition of Free Cash Flow From Operations set forth in the 2016 Restructuring Agreement~~twenty percent (20%) of any distributions to be made to equity, to be paid on a *pro rata* basis based on the unpaid principal balance owed with respect to each of the Secured Notes. ~~For clarification purposes, Free Cash Flow From Operations shall be from RDI and RDI Subsidiaries, as defined in the 2016 Restructuring Agreement, as these entities existed pre-Effective Date (*i.e.*, RFS is not to be considered an RDI Subsidiary for the purposes of determining Free Cash Flow From Operations).~~ Any and all distribution amounts and the timing thereof shall be at the discretion of Reorganized RDI.

*Pre-Payment*. At any time after the Effective Date, without penalty or premium, the Allowed Secured Claims of the Secured Noteholders, in aggregate, may be prepaid, on a *pro rata* basis, in whole or in part, in RDI's sole discretion, provided that such prepayment would not reasonably be expected to cause a default on RDI's other payment obligations under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

*Retention of Collateral*. Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claims of the Secured Noteholders granted in connection with the 2016 Restructuring Agreement shall remain in full force and effect following the Effective Date to secure the payments to the Class 1 Claimants as provided by the Plan.

*Appointment of Successor Collateral Agent*. The Confirmation Order shall name a successor Collateral Agent to be appointed with respect to the Allowed Secured Claims of the Secured Noteholders and shall succeed to the rights and duties previously held by CMA with respect to the Secured Notes, as modified by the Plan.

*Other Repayment Rights ~~In Full~~Cancelled and No Further Force and Effect*. ~~All other~~Except as specifically set forth herein, all terms of the 2016 Restructuring Agreement or any other documents governing the Secured Notes and/or Secured Claims of the Secured Noteholders as to the terms of repayment of the Secured Notes and/or Secured Claims shall ~~remain in full~~be cancelled and of no further force and effect.

*Releases Under 2016 Restructuring Agreement Remain in Full Force and Effect.* Nothing contained in the Plan has any impact on any of the releases given to RDI or its officers and directors in connection with the 2016 Restructuring Agreement or otherwise, and such provisions remain in full force and effect.

**b. Class 2: Allowed Secured Claim of Opus Bank (SoCal Debtors)**

Class 2 consists of the Allowed Secured Claim of Opus Bank against the SoCal Debtors.

Class 2 is impaired. The Class 2 Claim shall be treated as follows:

*Effective Date Payment*. On the Effective Date, Opus Bank shall be paid the adequate protection payments due and owing under the Fourth Cash Collateral Stipulation or any other cash collateral order entered in the RDI Debtors' Chapter 11 Cases (at the rate of $8,557.70 per month, and estimated to be approximately $~~128,365 as of the~~154,039 assuming an Effective Date of February 29, 2020).

*New Note*. The ~~New~~ HOP Restaurant Entities shall issue a new note to Opus Bank (the "New Opus Bank HOP Note"). The New Opus Bank HOP Note shall have a principal amount equal to the principal balance of the Allowed Class 2 Claim as of the Effective Date in the amount of $2,098,050.36, plus: i) interest in the amount of $~~303,539.75~~319,634.38, assuming an Effective Date of ~~January 26~~February 29, 2020, and ii) fees (including attorneys' fees) and costs that have accrued on account of the Class 2 Claim through and including the Effective Date in the amount of not less than $354,082.72. The New Opus HOP Note shall include covenants and conditions customary to notes accepted by Opus Bank.

*Interest*. Post-Effective Date interest shall accrue on the principal balance of the New Opus Bank HOP Note at a fixed rate of 5.5% per annum.

*Payments*. The first monthly payment on account of the New Opus Bank HOP Note will be due on the first (1st) day of the first calendar month following the Effective Date and will be

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

in an amount equal to (a) the interest accrued on account of the New Opus Bank HOP Note from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the New Opus Bank HOP Note during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*. The maturity date of the New Opus Bank HOP Note shall be five (5) years following the Effective Date.

*Lending and Borrowing of Monies Between Reorganized Debtors*. The New Opus Bank HOP Note shall provide that, so long as there is no default thereunder or under the New Opus Bank RFS Note (as defined herein), the obligors under the New Opus Bank HOP Note may lend to and borrow monies between themselves, RFS and RDI.

*Pre-Payment*. At any time after the Effective Date, without penalty or premium, the New Opus Bank HOP Note may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtor obligors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtor obligors' other payment obligations under the Plan.

*Retention of Collateral*. Except to the extent inconsistent with applicable law, the validity and priority of the security interests securing the New Opus Bank HOP Note shall remain in full force and effect following the Effective Date and shall be the same as provided by the Opus Bank/SoCal Debtors Loan and Security Documents.

*Release of Claims*. Claims, including Avoidance Actions, against Opus Bank will be waived by all parties with standing to bring them, including the Debtors, their Estates, the Committee and the Liquidating Trustee.

*Other Terms Unchanged*. Except to the extent provided above, the legal, equitable and contractual rights of Opus Bank, as Holder of an Allowed Class 2 Claim, shall remain unaltered under the Plan.

**c. Class 3: Allowed Secured Claim of C&C Partnership (SoCal Debtors)**

Class 3 consists of the Allowed Secured Claim of C&C Partnership against certain of the SoCal Debtors (SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs). Class 3 is impaired. The Allowed Secured Claim of C&C Partnership, as of the Effective Date, is in the ~~principal~~ amount of approximately $297,500~~.~~ (principal and accrued interest). The Allowed Secured Claim of C&C Partnership shall be treated as follows:

*Principal Amount*. The Allowed Secured Claim of C&C Partnership shall have a principal amount equal to the principal balance as of the Petition Date, plus all amounts that have

accrued on account of the Allowed Secured Claim of C&C Partnership through and including the Effective Date.

*Interest*. Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of C&C Partnership at the non-default rate set forth in the C&C Partnership Loan and Security Documents.

*Payments*. The first monthly payment on account of the Allowed Secured Claim of C&C Partnership will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of C&C Partnership from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of C&C Partnership during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*. The maturity date of the Allowed Secured Claim of C&C Partnership shall be extended, and will be due and payable seven (7) years following the Effective Date.

*Pre-Payment*. At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of C&C Partnership may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtors' other payment obligations under the Plan.

*Retention of Collateral*. Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of C&C Partnership shall remain in full force and effect following the Effective Date.

*Other Terms Unchanged*. Except to the extent provided above, the legal, equitable and contractual rights of C&C Partnership, as Holder of an Allowed Class 3 Claim, shall remain unaltered under the Plan.

**d. Class 4: Allowed Secured Claim of Pillsbury Winthrop Shaw Pittman LLP (HOP Restaurant Entities)**

Class 4 consists of the Allowed Secured Claim of Pillsbury against the HOP Restaurant Entities, if any. Class 4 is impaired. The Allowed Secured Claim of Pillsbury, if any, shall be treated as follows:[39]

[39] The Debtors do not believe that there is collateral securing the Pillsbury Claim and, therefore believe that Pillsbury will be treated as an unsecured creditor in the RDI, SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs cases, and this is the treatment reflected in the Plan and Cash Flow Projections..

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

*Principal Amount*. The Allowed Secured Claim of Pillsbury shall be the amount of the Pillsbury Claim supported by collateral in accordance with Section 506 of the Bankruptcy Code.

*Interest*. Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of Pillsbury at the rate of five percent (5%) per annum.

*Payments*. The first monthly payment on account of the Allowed Secured Claim of Pillsbury will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of Pillsbury from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of Pillsbury during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*. The maturity date of the Allowed Secured Claim of Pillsbury shall be extended, and will be due and payable seven (7) years following the Effective Date.

*Pre-Payment*. At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of Pillsbury may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtors' other payment obligations under the Plan.

*Retention of Collateral*. Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of Pillsbury shall remain in full force and effect following the Effective Date.

*Other Terms Unchanged*. Except to the extent provided above, the legal, equitable and contractual rights of Pillsbury, as Holder of an Allowed Class 4 Claim, shall remain unaltered under the Plan; including any legal right that Pillsbury holds to enforce the Pillsbury Claim against non-debtor entities, which right shall not be curtailed by the Plan. In addition, while Pillsbury shall be bound by the provisions of the Plan and Confirmation Order, Article X.C. of Plan does not require Pillsbury, as former counsel to certain of the Debtors, to aid the Debtors in consummating the Plan.

*Unsecured Claim*. To the extent that the Pillsbury Claim is not an Allowed Secured Claim, the Allowed unsecured portion of the Pillsbury Claim shall be treated as an Unsecured Claim against the applicable Reorganized Debtors (RDI, SoCal Diners, Ruby's Huntington Beach, Ruby's Oceanside and Ruby's Palm Springs).

**e. Class 5: Allowed Secured Claim of Plaza Bonita LLC (SoCal Diners)**

Class 5 consists of the Allowed Secured Claim of Plaza Bonita against SoCal Diners, if any. Class 5 is impaired. The Allowed Secured Claim of Plaza Bonita, if any, shall be treated as follows:

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

[40]

*Principal Amount*. The Allowed Secured Claim of Plaza Bonita shall have a principal amount equal to the principal balance as of the Petition Date, plus all amounts that have accrued on account of the Allowed Secured Claim of Plaza Bonita through and including the Effective Date, to the extent the Claim is supported by collateral in accordance with Section 506 of the Bankruptcy Code.

*Interest*. Interest shall accrue on the unpaid principal balance of the Allowed Secured Claim of Plaza Bonita at the rate of five percent (5%) per annum.

*Payments*. The first monthly payment on account of the Allowed Secured Claim of Plaza Bonita will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the Allowed Secured Claim of Plaza Bonita from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 10-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the Allowed Secured Claim of Plaza Bonita during the previous month, plus (b) an installment of principal calculated on the basis of a 10-year amortization schedule.

*Maturity Date*. The maturity date of the Allowed Secured Claim of Plaza Bonita shall be extended, and will be due and payable seven (7) years following the Effective Date.

*Pre-Payment*. At any time after the Effective Date, without penalty or premium, the Allowed Secured Claim of Plaza Bonita may be prepaid, in whole or in part, in the sole discretion of the applicable Reorganized Debtors, provided that such prepayment would not reasonably be expected to cause a default on the applicable Reorganized Debtors' other payment obligations under the Plan.

*Retention of Collateral*. Except to the extent inconsistent with the law, the validity and priority of the security interests securing the Allowed Secured Claim of Plaza Bonita shall remain in full force and effect following the Effective Date.

*Other Terms Unchanged*. Except to the extent provided above, the legal, equitable and contractual rights of Plaza Bonita, as Holder of an Allowed Class 5 Claim, shall remain unaltered under the Plan.

*Unsecured Claim*. To the extent that the Plaza Bonita Claim is not an Allowed Secured Claim, the Allowed unsecured portion of the Claim shall be treated as an Unsecured Claim against the SoCal Diners.

[40] The Debtors do not believe that there is collateral securing the Plaza Bonita claim and, therefore believe that Plaza Bonita will be treated as an unsecured creditor against SoCal Diners, and this is the treatment reflected in the Plan and Cash Flow Projections.

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**f. Class 6: Allowed Secured Claim of Opus Bank (RFS)**

Class 6 consists of the Allowed Secured Claim of Opus Bank against RFS. Class 6 is impaired. The Allowed Class 6 Claim shall be treated as follows:

*Effective Date Payment*. On the Effective Date, RFS shall pay to Opus Bank the amount of $80,000.

*New Note*. RFS shall issue a new note to Opus Bank (the "New Opus Bank RFS Note"). The New Opus Bank RFS Note shall have a principal amount equal to the principal balance of the Allowed Class 6 Claim as of the Effective Date in the amount of $1,091,755.94, plus: i) interest in the amount of $6,306.33, assuming an Effective Date of ~~January 26~~February 29, 2020, and ii) fees (including attorneys' fees) and costs that have accrued on account of the Class 6 Claim through and including the Effective Date, in the amount of not less than $184,036.91. The New Opus ~~HOP~~RFS Note shall include covenants and conditions customary to notes accepted by Opus Bank.

*Interest*. Post-Effective Date interest shall accrue on the principal balance of the New Opus Bank RFS Note at a fixed rate of 5.5% per annum.

*Payments*. The first monthly payment on account of the New Opus Bank RFS Note will be due on the first (1st) day of the first calendar month following the Effective Date and will be in an amount equal to (a) the interest accrued on account of the New Opus Bank RFS Note from the Effective Date through the end of the calendar month in which the Effective Date occurs, plus (b) principal calculated on the basis of a 4-year amortization schedule. Thereafter, until maturity, a monthly payment will be due on the first (1st) day of each successive month in an amount equal to (a) the interest accrued on the unpaid principal balance on account of the New Opus Bank RFS Note during the previous month, plus (b) an installment of principal calculated on the basis of a 4-year amortization schedule.

*Maturity Date*. The maturity date of the New Opus Bank RFS Note shall be four (4) years following the Effective Date.

*Lending and Borrowing of Monies Between Reorganized Debtors*. The New Opus Bank RFS Note shall provide that, so long as there is no default thereunder or under the New Opus Bank HOP Note (as defined herein), RFS may lend to and borrow monies between it, RDI and the ~~New~~ HOP Restaurant Entities.

*Pre-Payment*. At any time after the Effective Date, without penalty or premium, the New Opus Bank RFS Note may be prepaid, in whole or in part, in the sole discretion of RFS, provided that such prepayment would not reasonably be expected to cause a default on RFS' other payment obligations under the Plan.

*Retention of Collateral*. Except to the extent inconsistent with ~~the foregoing or~~ applicable law, the validity and priority of the security interests securing the New Opus Bank RFS Note shall remain in full force and effect following the Effective Date and shall be the same as provided by the Opus Bank/RFS Loan and Security Documents.

*Release of Claims*. Claims, including Avoidance Actions, against Opus Bank will be waived by all parties with standing to bring them, including the Debtors, their Estates, the Committee and the Liquidating Trustee

*Other Terms Unchanged*. Except to the extent provided above, the legal, equitable and contractual rights of Opus Bank, as Holder of an Allowed Class 6 Claim, shall remain unaltered under the Plan.

**g. Class 7: Allowed Claim of Steven L. Craig (RFS)**

Class 7 consists of the Allowed Claim of Craig against RFS based on the RFS Note. Class 7 is impaired. The Allowed Claim of Craig against RFS, as of the Petition Date, is in the principal amount of $1,000,000, plus accrued interest under the RFS Note. Craig holds rights of offset of ~~his~~the obligations for Franchise Royalties as the owner of Eureka Food Enterprises, LLC, a Franchisee, as against the RFS Note, but such offset rights have not been, and will not be, enforced with respect to the RFS Note. Instead, the Plan provides that the principal amount of the Allowed Claim of Craig against RFS ($1,000,000) shall be converted into equity in RDI as of the Effective Date of the Plan. Accrued interest on the RFS Note, in the amount of approximately $~~120~~135,000, shall be paid on the Effective Date of the Plan. The amounts owed by Eureka Food Enterprises, LLC for Franchise Royalties and Ad ~~Fees~~Fund Obligations, in the amount of $635,556, shall be paid ~~by Craig~~ on the Effective Date in accordance with the Netdown Process, as reflected in the Cash Flow Projections.

**h. Class 8: Secured Tax Claims – Class 8(a) (RDI), Class 8(b) (SoCal Debtors) and Class 8(c) (RFS)**

Class 8 consists of all of the Claims of taxing authorities secured by personal property owned by RDI (Class 8(a)), the SoCal Debtors (Class 8(b)) and RFS (Class 8(c)) (the "Secured Tax Claims"). Classes 8(a), (b) and (c) are impaired. Attached hereto as **Exhibit H** is a list of what the Debtors' records reflect as outstanding Pre-Petition Secured Tax Claims for RDI, the SoCal Debtors and RFS.[41]

[41] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Secured Personal Property Tax Claims.

**Table 5: Treatment of Secured Tax Claims**

| Classes | Claimant | Type of Tax Claim | Claim Amount | Proposed Treatment |
|---|---|---|---|---|
| 8(a), 8(b) and 8(c) | All Secured Tax Claims Identified on **Exhibit H** | Various<br><br>*See* attached **Exhibit H** | Total of approximately $74,475.30 | Each Claimant identified on **Exhibit H** shall receive deferred payments on account of its Allowed Claim over a period not exceeding five (5) years from the order for relief. Each Claimant shall receive quarterly installments of principal and interest on the unpaid portion thereof at five percent (5%) per annum. The first installment shall be due on first day of the first quarter following the thirtieth (30th) day after the Effective Date with each installment due each quarter thereafter. The Debtors may, without penalty, prepay the entire amount of a Secured Tax Claim at any time. |

### 3. Class 9: Allowed PACA Claims (RDI and Certain of the SoCal Debtors)

Class 9 consists of any Allowed PACA Claims against RDI and certain of the SoCal Debtors (Ruby's Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs and Ruby's Laguna Hills). Class 9 is unimpaired. The Allowed PACA Claims, if any, shall be paid in full on the Effective Date of the Plan. The Debtors do not believe that there are any unpaid PACA Claims.

### 4. Class 10: Priority Non-Tax Claims – Class 10(a) (RDI), Class 10(b) (SoCal Debtors) and Class 10(c) (RFS)

Certain priority Claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes (the "Priority Non-Tax Claims"). These types of Claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each Holder of such a Claim receive cash on the Effective Date equal to the allowed amount of such Claim. However, a class of Priority Non-Tax Claims may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the Allowed amount of such Claims. Class 10 consists of all of the Priority Non-Tax Claims owed by RDI (Class 10(a)), the SoCal Debtors (Class 10(b)) and RFS (Class 10(c)). Classes 10(a), 10(b) and 10(c) are unimpaired. Following the Petition Date, RDI obtained authority from the Bankruptcy Court to pay certain Pre-Petition Claims of current employees. RDI believes that all priority claims owing to its employees on account of wages and benefits have been paid. Attached hereto as **Exhibit I** is a list of Priority Non-Tax Claims, the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

treatment under the Plan of which is as follows:[42]

**Table 6: Treatment of Allowed Priority Non-Tax Claims**

| Class | Claimant | Amount | Treatment |
|---|---|---|---|
| 10(a), 10(b) and 10(c) | Priority Non-Tax Claims as listed on **Exhibit I** | $0.00 | Allowed Claims will be paid in full on the later of (1)- the Effective Date; or (2) the date upon which the Claim becomes an Allowed Claim pursuant to a Final Order. |

### 5. Classes of Unsecured Claims

Unsecured Claims are unsecured Claims not entitled to priority under Code section 507(a). As is further described below, the Debtors' Unsecured Claims shall be classified as follows:[43]

**TABLE 7: SUMMARY OF CLASSIFICATION OF UNSECURED CLAIMS AND ESTIMATED AMOUNT OF CLAIMS**[44]

| Class | Description |
|---|---|
| 11(a) | Class 11 is comprised of all Allowed Unsecured Claims against RDI. The estimated Allowed amount of the Class 11(a) Claims, in aggregate, is $10,176,824.approximately $10.5 million.[45]<br><br>Class 11(a) is comprised of the following:<br><br>Unsecured Noteholder Claims against RDI as set forth in **Exhibit J** in the estimated amount of $5,540,528approximately $5.5 million.<br><br>Other General Unsecured Claims against RDI (including RDI's Gift Card Obligations not satisfied by way of the Netdown Process) in the estimated amount of $4,636,296.approximately $5million. |
| 11(b) | Class 11(b) is comprised of the Gift Card Reimbursement Claims of Franchisees Satisfied Though |

[42] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Priority Non-Tax Claims.

[43] The Debtors reserve their rights to object to the amount, validity and/or priority of any and all Unsecured Claims.

[44] The estimates set forth herein are based on the Debtors' best estimate as to the ultimate allowability of the Claims following the Debtors' review and analysis of the Claims that have been asserted against the Debtors. While the Debtors have used their best efforts to provideprovided reasonable estimates, the actual allowed amount of the Claims could differ from the estimates set forth in this Disclosure Statement, and will in some cases depend on the resolution of objections to claims. If such claims were allowed in their filed amounts, the amount of claims could increase, perhaps significantly. In such event, distributions to Claimants could differ from the estimated percentage distributions set forth in this Disclosure Statement.

[45] This amount is based on the Debtors' best estimate as to the ultimate allowability of the Claims. If such claims were allowed in their filed amounts, the amount of claims could increase to approximately $15 million.

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

| | Pre-Petition Netdown Process. |
|---|---|
| 11(c) | Class 11(c) (subclasses (i) – (vi)) is comprised of all Allowed Unsecured Claims against the SoCal Debtors.<br><br>Class 11(c)(i) is comprised of all Allowed Unsecured Claims against Ruby's Huntington Beach. The Debtors estimate that Class 11(c)(iii) Claims total approximately $1,260,481.<br><br>Class 11(c)(ii) is comprised of all Allowed Unsecured Claims against Ruby's Oceanside. The Debtors estimate that Class 11(c)(iv) Claims total approximately $1,211,015.<br><br>Class 11(c)(iii) is comprised of all Allowed Unsecured Claims against Ruby's Palm Springs. The Debtors estimate that Class 11(c)(v) Claims total approximately $1,090,812.<br><br>Class 11(c)(iv) is comprised of all Allowed Unsecured Claims against Ruby's Laguna Hills. The Debtors estimate that Class 11(c)(vi) Claims total approximately $569,076.<br><br>Class 11(c)(v) is comprised of all Allowed Unsecured Claims against SoCal Diners. The Debtors estimate that Class 11(c)(i) Claims total approximately $1,331,567.<br><br>Class 11(c)(vi) is comprised of all Allowed Unsecured Claims against Quality. The Debtors estimate that Class 11(c)(ii) Claims total approximately $0.00. |
| 11(d) | Class 11(d) is comprised of all Allowed General Unsecured Claims against RFS. The Debtors estimate that Class 11(d) Claims total approximately $430,329. |

### a. Class 11(a): Allowed Unsecured Claims Against RDI

Class 11(a) is impaired. ~~The~~In accordance with the RDI Professional and Unsecured Creditor Distribution Agreement, the Allowed Claims of the Unsecured Creditors against RDI entitled to participate in whole or in part in any distribution shall be entitled to ~~one~~a *pro rata* distribution from any proceeds paid to or ultimately recovered by the Litigation Trust, after payment in full on account of ~~the following treatments~~Allowed Professional Claims of the RDI Professionals and the expenses of the Litigation Trust, as ~~follows:~~more particularly described in Article VI.H of the Plan and Section VI.E.8 hereof.

~~Payment of a total of Two Million Five Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of Six Hundred and Twenty-Five Thousand Dollars ($625,000) on each of the second (2nd), third (3rd), fourth (4th) and fifth (5th) anniversaries of the Effective Date, provided that the D&O/Affiliate Release is approved by the Bankruptcy Court.~~

~~If the D&O/Affiliate Release is not approved by the Bankruptcy Court, payment of a *pro rata*~~

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

distribution from any proceeds ultimately recovered by the Litigation Trust that will have the right, following the Effective Date, to investigate and, if appropriate, prosecute claims, if any, against the D&Os and D&O Affiliated Entities; *provided, however*, that any distribution to the RDI unsecured Creditors from any recovery by the Litigation Trust shall be after payment of the fees and costs incurred by the Litigation Trust incurred in connection with the prosecution of the D&O/Affiliate Claims or otherwise.

Class 11(a) includes the Allowed US Foods Unsecured Claims against RDI as provided by the US Foods Settlement.

**b. Class 11(b): Gift Card Reimbursement Claims of Franchisees Satisfied Though Pre-Petition Netdown Process**

Class 11(b) is unimpairedimpaired. Class 11(b) Claims will be satisfied in full through the implementation of the Pre-Petition Netdown Process, pursuant to which such claims will be satisfied in full. To the extent any such Gift Card Reimbursement Claims of Franchisees are not satisfied by implementation of the Pre-Petition Netdown Process, such Claims shall be treated as Class 11(a) Claims.

**c. Class 11(c): General Unsecured Claims Against the SoCal Debtors**

Class 11(c) is impaired. Class 11(c) has six (6) subclasses, as follows: Class 11(c)(i) – Ruby's Huntington Beach; Class 11(c)(ii) – Ruby's Oceanside; Class 11(c)(iii) – Ruby's Palm Springs; Class 11(c)(iv) – Ruby's Laguna Hills; Class 11(c)(v) – SoCal Diners; and Class 11(c)(vi) – Quality. Each subclass shall vote as a separate class.

**Class 11(c)(i)** - The Allowed General Unsecured Claims against Ruby's Huntington Beach are designated as Class 11(c)(i). The Allowed General Unsecured Claims against Ruby's Huntington Beach shall be paid the total amount of $113,118.78 (the "Huntington Beach Unsecured Distribution Amount"), on a *pro rata* basis, on the Effective Date of the Plan. Class 11(c)(i) includes the Allowed US Foods Unsecured Claims against Ruby's Huntington Beach as provided by the US Foods Settlement.

Based on Ruby's Huntington Beach's estimate as to the ultimate allowability of the Class



PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

11(c)(i) Claims, the percentage distribution to the holders of Allowed Class 11(c)(i) Claims is estimated to be approximately 9%.

**Class 11(c)(ii)** - The Allowed General Unsecured Claims against Ruby's Oceanside are designated as Class 11(c)(ii). The Allowed General Unsecured Claims against Ruby's Oceanside shall be paid the total amount of $62,397.43 (the "Oceanside Unsecured Distribution Amount") on a *pro rata* basis, on the Effective Date of the Plan. Class 11(c)(ii) includes the Allowed US Foods Unsecured Claims against Ruby's Oceanside as provided by the US Foods Settlement.

Based on Ruby's Oceanside's estimate as to the ultimate allowability of the Class 11(c)(ii) Claims, the percentage distribution to the holders of Allowed Class 11(c)(ii) Claims is estimated to be approximately 5.2%.

**Class 11(c)(iii)** - The Allowed General Unsecured Claims against Ruby's Palm Springs are designated as Class 11(c)(iii). The Allowed General Unsecured Claims against Ruby's Palm Springs shall be paid the total amount of $24,413.78 (the "Palm Springs Unsecured Distribution Amount"), on a *pro rata* basis, on the Effective Date of the Plan. Class 11(c)(iii) includes the Allowed US Foods Unsecured Claims against Ruby's Palm Springs as provided by the US Foods Settlement.

Based on Ruby's Palm Spring's estimate as to the ultimate allowability of the Class 11(c)(iii) Claims, the percentage distribution to the holders of Allowed Class 11(c)(iii) Claims is estimated to be approximately 2.2%.

**Class 11(c)(iv)** - The Allowed General Unsecured Claims against Ruby's Laguna Hills are designated as Class 11(c)(iv). Class 11(c)(iv) includes the Allowed US Foods Unsecured Claims against Ruby's Laguna Hills as provided by the US Foods Settlement. In March 2019, Ruby's Laguna Hills assigned the Laguna Hills Restaurant operations to an assignee, and ceased operating the Laguna Hills Restaurant. The Holders of Allowed Unsecured Claims against Ruby's Laguna Hills shall not be entitled to a distribution as Ruby's Laguna Hills is no longer operating and has no assets available to pay such claims.

**Classes 11(c)(v) and (vi)** - The Allowed General Unsecured Claims against SoCal Diners and Quality are designated as Classes 11(c)(v) and (vi), respectively. Allowed Claims in Classes

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

11(c)(v) and (vi) shall be paid a total of two and one-half percent (2.5%) of their Allowed Claims (estimated to be a total distribution in the amount of $33,289), on ~~the fourth (4th) year anniversary of~~a *pro rata* basis, on the Effective Date of the Plan. The Debtors do not believe that there are any claims against Quality.

**d. Class 11(d): General Unsecured Claims Against RFS**

Class 11(d) is impaired. Allowed Claims in Class 11(d) shall be paid in full, over time, with post-Effective Date interest, as follows: On the first (1st) anniversary of the Effective Date, and continuing on an annual basis until the fourth (4th) anniversary of the Effective Date, the Holders of Allowed Class 11(d) Claims shall be paid annual distributions of twenty-five percent (25%) of the Allowed Amount of their Class 11(d) Claims, plus interest at the rate of five percent (5%) per annum, for a total distribution on account of Class 11(d) Allowed Claims of one hundred percent (100%), plus interest.

**D. Interests**

The Founders, Cavanaugh and Kosmides, respectively, hold 60% and 40% of the common stock of RDI and RFS. RDI holds ownership interests in SoCal Diners and in the RDI Entities (Ruby's Beach Ventures, LLC, Ruby's Diner South Coast Plaza, LP, Ruby's Spectrum, LLC and Ruby's Woodbridge, LLC). SoCal Diners and Quality own Interests in the SoCal Entities ~~(Ruby's Huntington Beach, Ruby's Oceanside, Ruby's Palm Springs, and Ruby's Laguna Hills).~~. The following chart identifies the Plan's treatment of the Interests:

| Class | Type of Interest | Treatment |
|---|---|---|
| 12(a) | Founders' Interests in RDI | Founders' Interests in RDI shall be cancelled pursuant to the Plan. Based upon the RDI Plan Funding and the New Value Contribution, respectively, the Plan Sponsor and the Founders will own the equity in ~~the post-Effective Date~~Reorganized RDI~~.~~ (75% Plan Sponsor and 25% Founders (15% Cavanaugh and 10% Kosmides)). |
| 12(b) | Founders' Interests in RFS | Founders' Interests in RFS shall be shall be ~~cancelled pursuant to the Plan and the interests in RFS shall be transferred~~contributed to RDI in return for a 25% interest in RDI, and RFS will thereafter be a wholly-owned subsidiary of ~~post-Effective Date~~Reorganized RDI. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

| | | |
|---|---|---|
| 12(c) | RDI Debtors' Interests in Other Entities | RDI's ownership interests in the RDI Entities (non-debtor entities) shall continue to be held by post-Effective DateReorganized RDI, and the distributions to RDI from these entities will be used to fund the Plan.<br><br>RDI's and SoCal Diners/Quality's respective ownership interests in the SoCal Entities shall continue to(the HOP Restaurant Entities, SoCal Diners and Quality) will be held by post-cancelled and these entities (with the exception of the HOP Restaurant Entities) will be dissolved. On the HOP Effective Date RDI, in consideration of the contribution of the HOP Plan Funding, the Plan Sponsor will own the HOP Interests.<br><br>Based upon the HOP Plan Funding, the New HOP EntitiesPlan Sponsor will own the HOP AssetsInterests. The New HOP EntitiesInterests will be contributed by the Plan Sponsor to post-Reorganized RDI one (1) day following the Effective Date (which itself will occur one (1) day following the HOP Effective Date RDI.). |

Post-Effective Date of the Plan, the Plan Sponsor will own 6075% of Reorganized RDI in consideration of the RDI Plan Funding. The Founders will own 40% (2425% (15% by Cavanaugh and 1610% by Kosmides) in consideration of the New Value Contribution to RDI (which consists of their equity Interests in RFS). [46] RFS will be a wholly-owned subsidiary of Reorganized RDI, and will continue as the franchising arm of the business. TheOn the HOP Assets will be transferred to the New HOP EntitiesEffective Date, in consideration of the Plan Sponsor's contributionprovision of the HOP Plan Funding., the Plan Sponsor will own the HOP Interests. The Plan Sponsor will then contribute the New HOP EntitiesInterests to Reorganized RDI post-one (1) day following the Effective Date. RDI's Interests in the RDI Entities (Ruby's Beach Ventures, LLC, Ruby's Diner South Coast Plaza, LP, Ruby's Spectrum, LLC and Ruby's Woodbridge, LLC) and the SoCal Entities shall continue to be held by post-Effective DateReorganized RDI.

[46] The percentage interests of the Plan Sponsor and the Founders may be subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

### E. Means of Effectuating the Plan

#### 1. Funding for the Plan

##### a. Cash Needs on the Effective Date.

After taking into account all of the payments described in the Plan, the Debtors will have the following Cash needs on the Effective Date (which estimates exclude the amount of Administrative Claims of Professionals, the terms of payment of which shall be subject to agreement, or other determination, and the resolution of which are a condition to the effectiveness of the Plan)..

| Type of Payment | Amount |
|---|---|
| Class 1 – Secured Noteholders Interest Payment | $129,546 |
| Opus Bank Effective Date Payments | $216,923234,039 |
| HOPSoCal Debtors Effective Date Payments to Unsecured Creditors | $200,000233,289 |
| Administrative Claims (Non-Professionals) | $501,000536,206 |
| Professional Fee Claims | $3,480,000 |
| Litigation Trust | $80,000 |
| Other Effective Date Payments | $498,558226,088 |
| **TOTAL** | $1,546,0274,919,168 |

##### b. Sources of Cash on the Effective Date.

The Debtors will have the Cash needed to make payments required on the Effective Date from Cash on hand as of the Effective Date, implementation of the Netdown Process and the Plan Funding from the Plan Sponsor, as set forth in the Cash Flow Projections (**Exhibit B**).

#### 2. Plan Funding From Plan Sponsor

The Plan Funding from the Plan Sponsor shall be utilized, along with the Debtors' Cash and the proceeds from operations, to make (a) the payments required to be made on the Effective Date; and (b) the payments to Creditors following the Effective Date, as set forth in the Cash Flow Projections attached hereto as **Exhibit B**.

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

The Plan Funding from the Plan Sponsor consists of the following: (a) the contribution of ~~Two~~Three Million Seven Hundred Thousand Dollars ($~~2~~3,700,000) in Cash (less the amount that will be utilized to satisfy the fees of ~~his~~the Plan Sponsor's counsel and tax advisors, in the amount of approximately $325,000); (b) the conversion of the amounts due to the Plan Sponsor (as DIP Lender) ~~and counsel~~ in connection with the RDI DIP Loan (in the amount of $300,000) into equity in RDI; and (c) the conversion of the amounts due to the Plan Sponsor (as lender) in connection with the RFS Note (in the principal amount of $1,000,000) into equity in RDI, for total consideration in the amount of ~~Four~~Five Million Dollars ($~~4~~5,000,000).[47] The cash component of the RDI Plan Funding is in the amount of Two Million Seven Hundred Eighty-Six Thousand Three Hundred and Eighty-Four Dollars ($2,786,384). The HOP Plan Funding is in the aggregate amount of Five Hundred and Eighty-Eight Thousand Six Hundred and Sixteen Dollars ($588,616). The Plan Sponsor's obligation to make such Plan Funding is conditioned on the ~~transfer~~contribution of the Interests in RFS to RDI, the ~~provision~~issuance to the Plan Sponsor of equity in RDI, the ~~transfer~~issuance of ~~HOP Assets to~~ the ~~New~~Interests in the HOP Restaurant Entities to the Plan Sponsor on the HOP Effective Date (which ~~New HOP Entities~~Interests will be contributed by the Plan Sponsor to ~~post-~~Reorganized RDI one (1) day following the Effective Date ~~RDI~~) and the other conditions as set forth in the Plan. Under no circumstances shall ~~the Plan Sponsor~~ Steve Craig be personally responsible for any of the debt of the Debtors or Reorganized Debtors or ~~the~~any guaranty or payment thereof.

In addition, and as a condition ~~a~~ to the Plan Sponsor's funding of the Plan Funding, as of the Effective Date, RDI must have a "Going Concern Value" of not less than Six Million Sixty Six Hundred Sixty Thousand Sixty Seven Dollars ($6,666,667) (the "Going Concern Value Requirement"). "Going Concern Value" shall include ~~(a)~~ the total assets of RDI (including the value of its direct and indirect interests in RFS, the RDI Entities and the ~~New~~ HOP Restaurant Entities), after taking into account the Plan Funding and the New Value Contribution, ~~less (b) the total liabilities of RDI, as restructured under the Plan or as otherwise discounted,~~ as set forth in **Exhibit**

~~[47] This amount may be subject to increase based upon whether or not there is to be a payment to the RDI Unsecured Creditors of $2.5 million under the Plan.~~

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Costa Mesa, California

**K.**

### 3. ~~Transfer~~Issuance of HOP ~~Assets~~Interests to ~~New HOP Entities, Contribution of New HOP Entities to RDI and~~the Plan Sponsor, Provision of the RDI Plan Funding and HOP Plan Funding and ~~RDI Plan Funding~~Contribution of HOP Interests to Reorganized RDI

As of the HOP Effective Date, 100% of the ownership of the HOP ~~Assets (which will remain subject to the debt against them, as restructured under Plan)~~Interests will be ~~transferred~~issued to the ~~New HOP Entities~~Plan Sponsor in consideration of the Plan Sponsor's provision of the HOP Plan Funding. ~~The Plan Sponsor~~The HOP Restaurant Entities will continue to be subject to the secured debt against them, as restructured under the Plan, and Reorganized RDI will ~~then~~guaranty the secured debt of the HOP Restaurant Entities to Opus Bank and C&C Partnership until such claims are satisfied. The unsecured creditors of the HOP Restaurant Entities will be paid as provided by the Plan from the HOP Plan Funding. One (1) day following the Effective Date, the Plan Sponsor will contribute ownership of the ~~New~~ HOP ~~Entities~~Interests to ~~post-Effective Date~~Reorganized RDI.

~~The~~As set forth in the Cash Flow Projections (**Exhibit B**), the amount of the HOP Plan Funding is in the amount of approximately $588,616, which includes the amount of $200,000 which will be utilized to make the payments to the unsecured creditors of the HOP Restaurant Entities as provided by the Plan.

The balance of the cash Plan Funding from the Plan Sponsor, in the amount of approximately $2,786,384, shall be utilized to fund the Plan as set forth in the Cash Flow Projections ~~(**Exhibit B**).~~.

### 4. New Value Contribution

Under the Plan, the Founders will make a "new value" contribution on the Effective Date of the Plan in the form of ~~a portion of~~ the value of their ownership Interests in RFS, which will be contributed to RDI as provided by the Plan (the "New Value Contribution"). The New Value Contribution shall be a net amount based on the equity value of RFS adjusted by the Reconciliation. The New Value Contribution by the Founders is valued at approximately $~~5.5~~8 million, as set forth in **Exhibit A**. The value of the New Value Contribution and the satisfaction of the requirements of the Bankruptcy Code with respect thereto will be determined in connection with Confirmation of the Plan.

Pachulski Stang Ziehl & Jones LLP
Attorneys at Law
Costa Mesa, California

### 5. Reconciliation of Claims Between and Among the Debtors and the Founders

Pursuant to the Plan, ~~the~~certain claims between and among the Debtors and the Founders (and certain affiliates), as reflected in **Exhibit E**, will be reconciled and utilized to calculate the New Value Contribution by the Founders. By way of the Reconciliation, ~~the~~these specified claims between and among the Debtors and the Founders and these affiliates will be eliminated. Any net amounts owed to or by the Founders or these affiliates with respect to any Debtor will be applied to the value of the New Value Contribution being made by the Founders.

### 6. ~~Transfer~~Contribution of Interests in RFS to RDI; Post-Effective Date Ownership of Reorganized RDI

~~As of~~On the Effective Date, all of the Founders' Interests in RFS will be ~~transferred~~contributed to RDI~~.~~ in return for a 25% interest in RDI. Post-Effective Date, RDI will be owned ~~60~~75% by the Plan Sponsor, ~~24~~15% by Cavanaugh and ~~16~~10% by Kosmides. ~~These~~The contribution by the Plan Sponsor of the HOP Interests to Reorganized RDI on the day following the Effective Date will not change the percentage ownership ~~percentages may be subject to change based upon whether or not there is to be a payment to the RDI Unsecured Creditors~~ of ~~$2.5 million under the Plan.~~ Reorganized RDI as between the Plan Sponsor and the Founders (75% by the Plan Sponsor, 15% by Cavanaugh and 10% by Kosmides).

### 7. Pre-Petition Netdown Process

On March 11, 2019, the Court entered its order approving the Netdown Process pursuant to which RDI, RFS and the Franchisees were authorized to honor their Post-Petition obligations among them. Under the Plan, as of the Effective Date, the Netdown Process shall be implemented for the Pre-Petition period (the "Pre-Petition Netdown Process"), as follows:

Any amounts that RDI owes a particular Franchisee in connection with Pre-Petition Gift Card Reimbursement Obligations will first be reduced (as a non-cash journal entry) by any amounts that that Franchisee owes to RDI for any miscellaneous charges (the "Net Amount RDI Owes to the Franchisee"). The Net Amount RDI Owes to the Franchisee will be applied (as a non-cash journal entry) to the amount of Pre-Petition Franchise Royalties that the Franchisee owes to RFS, leaving a remaining balance (the "Remaining Balance Owed by the Franchisee"). The Franchisee will pay to RFS (in cash) the Remaining Balance Owed by the Franchisee, as well as any Pre-Petition Ad Funds

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Obligations it owes, and RFS will pay the RDI License Fee.

As reflected in the Cash Flow Projections (attached hereto as **Exhibit B**), for the period following July 30, 2019 though the Effective Date (estimated to be ~~January 26~~February 29, 2020), with respect to both the Post-Petition Netdown and, following the Effective Date, implementation with respect to the Pre-Petition amounts owed among RDI, RFS and the Franchisees, the implementation of the Netdown Process as to these obligations is projected to generate cash to RFS in the estimated total amount of $533,694 in Franchise Royalties, $349,585 in Ad Fund Obligations and miscellaneous charges). These amounts include the amount of $635,556 from Craig (to be paid on the Effective Date) and the balance from other Franchisees (to be paid on the Effective Date and during the year following the Effective Date), as reflected in the Cash Flow Projections. Pursuant to the implementation of this Netdown Process, RDI is projected to receive the amount of $133,423 as the RDI License Fees. These additional Netdown amounts are projected to result in the amount of approximately $858,349 to be booked as an intercompany receivable between RDI and RFS.

Pursuant to the Pre-Petition Netdown Process, the majority of the pre-petition claims of the Franchisees against RDI will be satisfied in full. These claims are classified in Class 11(b) under the Plan and are unimpaired. The Plan Proponents believe that the disparate treatment between the unsecured creditors of RDI (Class 11(a) and Class 11(b)) is justified by virtue of the fact that an ongoing relationship with the Franchisees is critical to the success of the Reorganized Debtors' business operations and their ability to meet their Plan obligations to other creditors.

**8. RDI Professional and Unsecured Creditor Distribution Agreement; Litigation Trust**

The Plan incorporates the following agreement that has been reached between and among the Debtors, the Committee, the RDI Professionals and the Founders with respect the payment of the Allowed Professional Claims of the RDI Professionals and the RDI General Unsecured Creditors to provide for the payment of such claims in accordance with the priority scheme of the Bankruptcy Code, as modified hereby (the "RDI Professional and Unsecured Creditor Distribution Agreement"). The terms of the RDI Professional and Unsecured Creditor Distribution Agreement are as follows:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**a. Claim Amounts of the RDI Professionals and RDI General Unsecured Creditors**

Provisions regarding the amounts of the RDI Professionals and the RDI General Unsecured Creditors are as follows:

1. The Professional Claims of the RDI Professionals through the Effective Date will be in the amount allowed by the Bankruptcy Court (the "RDI Allowed Professional Fees"), but will not exceed the amount of Six Million Dollars ($6,000,000) (the "RDI Professional Fee Cap").[48] In the event that the RDI Professional Fee Cap is exceeded, the RDI Professionals will reduce their Professional Claims, on a *pro rata* basis, to the amount of the RDI Professional Fee Cap. No objections to the Professional Claims of the RDI Professionals will be made by the Debtors, the Founders, the Committee, the Plan Sponsor, the RDI Professionals, or any affiliate owned or otherwise controlled by the foregoing, and any such objections are waived. Any other creditor can object to the RDI Professional Fee Claims, as can the U.S. Trustee.

2. The Allowed Claims of the RDI General Unsecured Creditors (Class 11(a)) are anticipated to be in the aggregate amount of approximately Ten Million Five Hundred Thousand Dollars ($10,500,000); *provided*, *however*, that the ultimate amount of the Allowed Claims of the RDI General Unsecured Creditors (Class 11(a)) will not impact the rights and obligations of the parties in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement as described herein.

**b. Priority of Distributions to RDI Professionals and RDI General Unsecured Creditors**

The RDI Professionals and the RDI General Unsecured Creditors will be paid, pursuant to the priority scheme established by the Bankruptcy Code (*i.e.*, RDI Unsecured Creditors will only be paid after the RDI Professionals have been paid in full).

**c. Source of Distributions to RDI Professionals and RDI General Unsecured Creditors**

The RDI Professionals and the RDI General Unsecured Creditors will be paid from two (2) sources as further detailed herein: (i) Reorganized RDI's business and the Plan Funding; and (ii) litigation proceeds from the Liquidating Trust's prosecution of RDI Rights of Action (as described in further detail below).

[48] The RDI Professional Fee Cap applies irrespective of whether the RDI Professionals are paid by Reorganized RDI or from recoveries by the Litigation Trust.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**d. Reorganized RDI's Payment Obligations to RDI Professionals and RDI General Unsecured Creditors**

Reorganized RDI shall pay to the Liquidating Trust (as defined hereinbelow) for the benefit of the RDI Professionals and RDI General Unsecured Creditors an amount not less than eighty percent (80%) and up to one hundred percent (100%) of the lesser of the RDI Professional Fee Cap or total RDI Allowed Professional Fees. The applicable percentage and amount will depend upon the timing of Reorganized RDI's payments as described below and the amount of the RDI Professional Fees allowed by the Bankruptcy Court.

**1. Mandatory Time Sensitive Payment Obligations.**

The RDI Debtors and Reorganized RDI have the following mandatory time sensitive payment obligations:

(a) Three Million Dollars ($3,000,000) shall be paid from the RDI Debtors on the Effective Date to make *pro rata* payments to the RDI Professionals on account of the RDI Allowed Professional Fees.

(b) Eighty Thousand Dollars ($80,000) shall be paid on the Effective Date to fund the Litigation Trust.

(c) The lesser of Nine Hundred Thousand Dollars ($900,000), or the unpaid portion of the Allowed RDI Professional Fees, shall be paid by Reorganized RDI by the end of the second (2nd) year following the Effective Date.

(d) If Reorganized RDI does not qualify for the 20% Discount as described below, then the lesser of Nine Hundred Thousand Dollars ($900,000), or the unpaid portion of the Allowed RDI Professional Fees, shall be paid by Reorganized RDI by the end of the third (3rd) year following the Effective Date.

(e) If Reorganized RDI does not qualify for the "20% Discount" or the "10% Discount" as described below, then an additional amount necessary to pay the difference between the RDI Allowed Professional Fees and any post-Confirmation payments made as of such time shall be paid by Reorganized RDI by the end of the fourth (4th) year following the Effective Date.

**2. Conditions to Qualification for Discount on Reorganized RDI's Payment Obligations Under the RDI Professional and Unsecured Creditor Distribution Agreement**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Reorganized RDI will be entitled to a discount on its obligations under the Plan as set forth in the RDI Professional and Unsecured Creditor Distribution Agreement pursuant to the following terms and conditions:

(a) Reorganized RDI's total payment obligation to the RDI Professionals/RDI General Unsecured Creditors shall be discounted by an amount equal to twenty percent (20%) of the RDI Allowed Professional Fees (the "20% Discount"), so long as:

1. The mandatory timing obligations in section IV.E.8.d.1(a)-(c) are paid within the time prescribed;

2. The lesser of an additional Five Hundred Thousand Dollars ($500,000), or the unpaid portion of the Allowed RDI Professional Fees, is paid by the end of the second (2nd) year following the Effective Date; and

3. An additional amount equal to the product of eighty percent (80%) and the difference between the RDI Allowed Professional Fees and the Five Million Six Hundred Thousand Dollar ($5,600,000) estimate of RDI Professionals Fees, if applicable, is paid by the end of the third (3rd) year following the Effective Date.

(b) If Reorganized RDI does not qualify for the 20% Discount, Reorganized RDI's total obligation may be discounted by an amount equal to ten percent (10%) of the Allowed RDI Professional Fees (the "10% Discount"), so long as:

1. The mandatory timing obligations (section IV.E.8.d.1(a)-(d)) are paid within the time prescribed; and

2. An additional amount equal to the product of ninety percent (90%) and the difference between Allowed RDI Professional Fees and all fees paid by the RDI Debtors and Reorganized RDI is paid by the end of the third (3rd) year following the Effective Date.

(c) If Reorganized RDI does not qualify for the 20% Discount or the 10% Discount, then Reorganized RDI shall pay 100% of the RDI Allowed Professional Fees by the end of the fourth (4th) year following the Effective Date.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

e. Litigation TrustU.S.

On the Effective Date, a litigation trust (the "Litigation Trust") will be formed to control and prosecute all RDI Rights of Action[49] on behalf of Reorganized RDI and to make distributions to the RDI Professionals and the RDI Unsecured Creditors (Class 11(a)) as provided under the Plan as set forth in the RDI Professional and Unsecured Creditor Distribution Agreement. The documentation relative to the formation, and the rights and responsibilities, of the Litigation Trust (the "Litigation Trust Agreement") will be filed with the Bankruptcy Court prior to or concurrently with the filing of the brief in support of confirmation of the Plan. The Litigation Trust Agreement will be prepared by the Committee, with the terms thereof consistent with the provisions of the Plan, including the RDI Professional and Unsecured Creditor Distribution Agreement, and subject to the mutual agreement of RDI, the Committee and the RDI Professionals, which agreement will not be unreasonably withheld.

An independent litigation trustee (the "Litigation Trustee") will be appointed to manage the Litigation Trust. The Litigation Trustee will be selected by mutual agreement of RDI, the Committee and the RDI Professionals. As will be more particularly set forth in the Litigation Trust Agreement, the Litigation Trustee will have all rights and obligations necessary to manage the

[49] *"RDI Rights of Action"* means Rights of Action of the RDI Estate, specifically excluding the right to object to Claims or Interests.

*"Rights of Action"* means any action, proceeding, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, reduced to judgment or not reduced to judgment, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Right of Action includes: (a) any right of setoff, counterclaim or recoupment (except to the extent that the result of including any setoff or recoupment in this definition would result in an outcome, including, by example, an impermissible discharge of setoff or recoupment rights, prohibited by otherwise applicable bankruptcy law) and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims. Rights of Action specifically exclude any claims against the Plan Sponsor, or any affiliate owned or controlled by the Plan Sponsor or any advisor to the Plan Sponsor in connection with the Chapter 11 Cases.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Litigation Trust; *provided*, *however*, that the Litigation Trustee must seek Bankruptcy Court approval for the settlement of any RDI Rights of Action involving an amount in excess of Two Hundred and Fifty Thousand Dollars ($250,000). The Litigation Trustee shall not have any responsibility to pursue objections to Claims, including claims of RDI Unsecured Creditors, which shall be the responsibility of RDI, or Reorganized RDI as the case may be. Eighty Thousand Dollars ($80,000) shall be paid on the Effective Date to fund the Litigation Trust, and all fees and expenses of the Litigation Trust (including the reasonable fees and costs of the Litigation Trustee and any counsel retained by the Litigation Trust to pursue RDI Rights of Action) shall be the sole responsibility of the Litigation Trust.

Any funds generated by the Litigation Trust, after payment of the Litigation Trust's reasonable expenses (including the reasonable fees and costs of the Litigation Trustee and any counsel retained by the Litigation Trust to pursue RDI Rights of Action, which shall be the sole responsibility of the Litigation Trust), will be paid as follows:

*First*, to the RDI Professionals on account of their Allowed Professional Claims until such Allowed Professional Claims have been paid in full from Reorganized RDI or the Litigation Trust as set forth in the RDI Professional and Unsecured Creditor Distribution Agreement.[50]

*Second*, to the holders of the Allowed RDI Unsecured Claims entitled to participate in whole or in part in any distribution (Class 11(a)), on a *pro rata* basis. For the purpose of clarity, any funds collected by the Litigation Trust that are not utilized to pay the expenses of the Litigation Trust or the payment of Allowed RDI Professional Claims shall be utilized to make distributions to the holders of Allowed RDI Unsecured Claims.

**f. Events of Default**

The following constitute events of default, and the consequences thereof, under the RDI Professional and Unsecured Creditor Distribution Agreement:

[50] The Founders and RFS are not a party to the treatment of the RDI Unsecured Creditors under the Plan which was separately negotiated between the RDI Unsecured Creditors Committee and the RDI Professionals, including the terms and provisions of the Litigation Trust. If any of the terms of the treatment of the RDI Professionals under the Litigation Trust are altered in any respect by the Court, the RDI Professionals have agreed to accept the Court's treatment of the RDI Professionals under the Litigation Trust without impairing the confirmability of the Plan.

a. If the Effective Date payment is not made, a trustee will be appointed in the RDI Debtors Cases and RFS will be permitted to pursue confirmation of the RFS Alternative Plan.

b. If Reorganized RDI does not pay the required payment of Nine Hundred Thousand Dollars ($900,000), or the remaining amount owed to the RDI Professionals by Reorganized RDI, as applicable, by the end of the second (2nd) year following the Effective Date, a trustee will be appointed upon thirty (30) days' notice of default issued by the RDI Professionals or Liquidating Trustee, providing that the default has not been cured.

c. If Reorganized RDI has not made the requisite payments by end of the second (2nd) year following the Effective Date to comply with the qualification requirements to be eligible for the 20% Discount, and an additional Nine Hundred Thousand Dollars ($900,000), or the remaining amount owed to the RDI Professionals by Reorganized RDI, as applicable, is not paid by the end of the third (3rd) year following the Effective Date, a trustee will be appointed upon thirty (30) days' notice of default issued by the RDI Professionals or Liquidating Trustee, providing that the default has not been cured.

d. If Reorganized RDI has not paid an amount equal to one hundred percent (100%) of the difference between the RDI Allowed Professional Fees and the post-Confirmation payments made by end of the fourth (4th) year following the Effective Date, a trustee will be appointed upon thirty (30) days' notice of default issued by the RDI Professionals or Liquidating Trustee, providing that the default has not been cured.

To the extent that any provision of the Plan is inconsistent with the foregoing provisions of RDI Professional and Unsecured Creditor Distribution Agreement, the provisions of Article VI.H of the Plan (as described in this Section VI.E.8) shall prevail and control.

**~~8.~~9. US Foods Settlement**

In accordance with the US Foods Settlement, US Foods agrees to the following treatment under the Plan, which treatment is set forth in the Cash Flow Projections:

1. All proofs of claims filed by US Foods in the RDI Debtors' cases (Claim No. 85 (RDI), Claim No. 6 (Ruby's Huntington Beach), Claim No. 5 (Ruby's Oceanside), Claim No. 7 (Ruby's Palm Springs) and Claim No. 4 (Ruby's Laguna Hills) (the "US Foods POCs") shall be allowed in full in accordance with their asserted priorities, subject to business discussions regarding minor discrepancies between the amounts set forth in the US Foods POCs and the RDI Debtors' books and records (the "US Foods Claims"). Reconciliation regarding the unsecured portion of the US Foods Claims (the "US Foods Unsecured Claims") will start immediately and must be completed by the Effective

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

Date of the Plan, or an amount shall be held in a Disputed Claims Reserve to ensure that US Foods is not at risk of non-payment. The US Foods Unsecured Claims will be classified and treated like other general unsecured claims against the respective Debtor obligors, and will be entitled to and be paid their *pro rata* share of distributions in connection therewith as provided by the Plan.

2. The portion of the US Foods Claims subject to priority pursuant to Section 503(b)(9) of the Bankruptcy Code (the "US Foods 503(b)(9) Claims") against the RDI Debtors shall be allowed as administrative claims, in the following amounts: $64,116.20 (Ruby's Huntington Beach), $51,486.60 (Ruby's Oceanside), $25,337.02 (Ruby's Palm Springs) and $8,513.53 (Ruby's Laguna Hills). US Foods' 503(b)(9) Claims shall be paid in twelve (12) equal monthly payments, commencing one (1) month following the Effective Date of the Plan. The RDI Debtors agree to make the payments to US Foods on account of the US Foods 503(b)(9) Claims through an "autopayment" mechanism acceptable to US Foods.

3. Except as set forth in the following paragraphs (4) and (5), US Foods' post-petition administrative claims will be on forty-five (45) day terms through the Effective Date of the Plan and will be paid in the ordinary course as they come due pursuant to the terms of the existing supplier agreement between the parties (the "MDA"), which terms, except as otherwise provided for in the Plan, will remain in full force and effect, and will be incorporated into the Plan by reference.

4. US Foods will agree that Debtors may defer payments for purchases made on or after September 2, 2019, up to a total aggregate amount of $200,000 (the "Deferred Amount"), with the Deferred Amount to be paid over twelve (12) months commencing on the Effective Date of the Plan. RDI and US Foods will execute a mutually acceptable letter agreement (the "Letter Agreement") for the payment of the amount of any such deferred payments, which will be payable in twelve (12) monthly installments with a twelve percent (12%) interest rate. The Letter Agreement, when executed, will be incorporated into the Plan by reference. The RDI Debtors agree to make the payments to US Foods on account of these amounts through an "autopayment" mechanism acceptable to US Foods.

5. US Foods will restart shipments to the Irvine/Woodbridge restaurant, and will be paid each Wednesday for the prior week's orders/deliveries. For the past due amount (approximately $43,000) owed by Irvine/Woodbridge for post-petition deliveries, US Foods agrees to payment in full in equal weekly installments for fifty-two (52) weeks commencing on the first week after deliveries have resumed, plus twelve percent (12%) annual interest.

6. The Reorganized RDI Debtors agree to use US Foods as their primary supplier, and the Parties further agree that the termination date of the MDA is hereby extended to one year after the Effective Date of the Plan (or December 31, 2019 if no plan is confirmed prior to that date), during which time the parties will cooperate to negotiate an amended supplier agreement.

7. Avoidance Actions against US Foods will be waived by all parties with standing to bring them, including the Debtors, their Estates, the Committee and the CommitteeLiquidating Trustee.

### 9.10. Treatment of Intercompany Claims; Waiver of Avoidance Actions Between Debtors

As of the Petition Date, after accounting for all intercompany obligations between them, RDI owes RFS the approximate amount of $400,000. In addition, there will be an intercompany receivable on RDI's books in favor of RFS pursuant to the Netdown Process.

So long as RDI and RFS are in compliance with their obligations under the Plan, including without limitations all obligations owing to Opus Bank on the New Opus Bank RFS Note, any intercompany receivable owed to RFS from RDI as a result of the Netdown Process and any other intercompany obligations between them will not be collected or paid, but will remain on the books as non-cash journal entries.and will be cancelled as of the Effective Date; *provided*, *however*, that RDI will guaranty RFS' obligation to Opus Bank under the New Opus Bank RFS Note in the amount that RDI owes to RFS as of the Effective Date on account of such cancelled receivable.

Any Avoidance Action that could be asserted by any Debtor against any other Debtor shall be waived by all parties with standing to bring such action, including the Debtors, their Estates, the Committee and the Liquidating Trustee.

### 10.11. Lending and Borrowing of Monies Between Reorganized Debtors

So long as there is no default under the Plan, including with respect to the obligations to Opus Bank, following the Effective Date, the New HOP Restaurant Entities, RFS and RDI may lend to and borrow monies between and among themselves. Such post-Effective Date intercompany obligations will not be collectedpaid or paid, but will remainshown on the respective Debtors' books as non-cash journal entriesobligations.

### 11.12. Corporate Structure and Governance

**a. Charter**

As of the Effective Date, and subject to such charter amendments as may be made pursuant to the Plan, the articles of incorporation and bylaws of(or similar governance documents) of Reorganized RDI will be the same as the articles of incorporation and bylaws (or similar governance

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

documents) of RDI immediately before the Effective Date. Effective as of the Effective Date, the officers and directors of Reorganized RDI will be the same as the officers and directors of RDI immediately before the Effective Date, with the exceptions that Craig will be the Chairman of the board of directors of Reorganized RDI and Tad Belshe will no longer participate on the board (*i.e.*, the initial board of directors of Reorganized RDI will consist of Craig, Cavanaugh and Kosmides). Reorganized RDI will hold all of the equity Interests in RFS, in the RDI Entities and, following the post-Effective Date contribution by the Plan Sponsor, the equity Interests in the ~~New HOP Entities. Following the Effective Date and satisfaction of their Plan obligations, SoCal Diners, Quality and Ruby's Laguna Hills will be terminated as entities.~~HOP Entities. Charter amendments that may be made pursuant to the Plan include changes as may be necessary or appropriate to (i) conform such documents to the terms of the Plan; (ii) conform such documents to recent amendments to corporation statutes; and (iii) to include a prohibition on the issuance of non-voting equity securities.

~~**b. Voting Rights and Shareholder Agreement**~~

~~Voting shall be weighted based on the respective ownership interests in RDI held by Craig, Cavanaugh and Kosmides. As of the Effective Date, Craig, Cavanaugh and Kosmides shall enter into a shareholders' agreement with respect to RDI which shall include terms and conditions that are typical in privately held entities, including the delegation of management and control of RDI's operations (including menu, design and branding decisions) to Cavanaugh. All major decisions, and those customarily identified as such in operating and shareholder agreements typical to privately held entities, including without limitation, business decisions with respect to expansion of the business or other business decisions that might require the contribution or expenditure of new capital of RDI, will be made by majority vote of the equity holders based on their respective ownership Interests.~~

~~With respect to capital calls, the shareholder agreement will provide that, if a shareholder fails to contribute the capital called with the necessary vote of the shareholders in accordance with his respective ownership Interest percentage as set forth above within thirty (30) days after the capital call is made, the other shareholders shall have the right, but not the obligation, to make a loan~~

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

~~to RDI in the amount of the capital contribution that is not made, equal to his respective pro rata share (based on his respective percentage equity interest) of the defaulting shareholder's share of the capital, or the entire amount of the capital call deficiency, if not made by the other non-defaulting shareholder. Any such loan shall be treated as if RDI made a loan to the defaulting shareholder and the non-defaulting shareholder made a loan to RDI. Any such loan by RDI to a defaulting shareholder (the "Default Loan") and any such loan from a non-defaulting shareholder to RDI (the "Shareholder Loan") shall bear interest at a rate equal to the federal prime rate plus three percent (3%) per annum and shall be secured by a pledge of the defaulting shareholder's equity interest in RDI. The defaulting shareholder shall execute and deliver such documents as are reasonably necessary to create and perfect such security interest and the shareholder agreement for RDI shall provide for a power of attorney in favor of the non-defaulting shareholders to effectuate such documents if the defaulting shareholder fails to promptly execute and deliver same. Any such Default Loan and any such Shareholder Loan shall provide for the payment of accrued interest monthly and for all principal and accrued and unpaid interest to be due and payable on or before the date that is (i) six (6) months following the date the Default Loan and the Shareholder Loan are advanced if the Default Loan and the Shareholder Loan are less than one million dollars ($1,000,000), or (ii) one year following the date the Default Loan and the Shareholder Loan are advanced if the Default Loan and the Shareholder Loan is one million dollars ($1,000,000) or more. Failure to pay the Default Loan and the Shareholder Loan on or before the applicable maturity date pursuant to the foregoing shall constitute a default under each of the Default Loan and the Shareholder Loan.~~

~~At such time as any Default Loan or Shareholder Loan is defaulted and not paid, and assuming one of the other shareholders advances such amount in lieu of the defaulting shareholder, the percentage interests of the shareholders shall be recalculated, and the percentage interests of each shareholder shall be adjusted such that each shareholder shall have an interest determined by fraction, the numerator of which shall be the aggregate capital contributed by the shareholder, and the denominator of which shall be the aggregate capital contributed by all shareholders, provided,~~

~~however, that for purposes of the foregoing calculation only, each shareholder shall be treated as having contributed his proportionate share (in accordance with his percentage Interest in RDI) of the aggregate capital contributed by Craig as of the Effective Date of the Plan.~~

~~The consequence of a shareholder default shall be the dilution of the shareholder's equity in RDI, but a default will not result under any circumstance in personal liability of the defaulting shareholder.~~

~~For illustration purposes only, assume that Craig contributed a total of $4,000,000 as of the Effective Date of the Plan, and that there are three (3) shareholders – Craig at 60%, Shareholder A at 24% and Shareholder B at 16%. Then assume that additional capital in the amount of $500,000 is required by RDI, and that Craig contributes 60% of such amount ($300,000); Shareholder A contributes 24% ($120,000), but Shareholder B does not contribute any amounts and Craig advances to RDI the share otherwise allocable to Shareholder B ($80,000). In such event, the denominator in the following dilution formula would be $4.5 million (the original Plan Funding of $4 million plus the $500,000 capital call), and the percentage interests of the shareholders would be adjusted as follows:~~

~~For Craig: $4,000,000 (allocable share of original Plan capital) + $300,000 (Craig share of current capital call) + $80,000 (Shareholder B capital call advanced by Craig) = $4,380,000. $4,380,000/ $7,166,667 = 61.1%.~~

~~For Shareholder A: $1,600,000 (imputed allocable share of original Plan capital) + $120,000 (Shareholder A share of current capital call) = $1,720,000. $1,720,000 / $7,166,667 = 24%.~~

~~For Shareholder B: $1,066,667 (imputed allocable share of original Plan capital) + $0 (Shareholder B unpaid current capital call) = $1,066,667. $1,066,667 / $7,166,667 = 14.9%.~~

**~~c.~~a. Composition Of Reorganized Debtors' Board Of Directors And Identity And Compensation Of Officers.**

The following are the titles and the salaries expected to be provided to the directors and officers of ~~the~~ Reorganized ~~Debtors~~RDI during the 2019 and 2020 fiscal years:[51] Craig, Chairman

[51] The compensation of officers is subject to modification both pre and post-Effective Date.

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Costa Mesa, California

of the Board, will not be paid a salary; Cavanaugh, Chief Executive Officer and Director, will be paid $250,000 per annum; Kosmides, Special Projects Coordinator and Director, will be paid $225125 per hour on an as-requested basis; Mr. Belshe, Executive Vice President of Operations, will be paid $102,000 per annum; and Lori Smith, Secretary, will be paid $1,000 per annum.

Reorganized RDI shall enter into at-will employment agreements with Messrs. Cavanaugh, Kosmides and Belshe and Ms. Smith as of the Effective Date which will provide for their compensation as set forth above and will provide for the continuation of medical insurance coverage in accordance with the medical insurance coverage provided to them by the Debtors as of the Petition Dates.

### 12.13. Estate Representative and Litigation Trustee

TheSubject to the limitations set forth in the Plan, including with respect to the rights of the Litigation Trust to pursue RDI Rights of Actions following the Effective Date and make distributions on account of Professional Claims of the RDI Professionals and RDI Unsecured Claims in accordance with the RDI Professional and Unsecured Creditor Distribution Agreement, Reorganized DebtorsRDI shall be appointed the Estate Representative for purposes of prosecuting any Rights of Action (subject to the limitations set forth in the Plan),, including objecting to Claims, disbursing monies to Holders of Claims under the Plan, liquidating property of the Estates and administering the Disputed Claim Reserve established pursuant to the Plan. Without further order of the Court, the Reorganized Debtors may employ professionals, including counsel and accountants, the duties of which may include, without limitation, assisting in fulfilling the obligations under the Plan, including prosecuting any Rights of Action, objecting to Claims, (other than RDI Rights of Action that will be pursued on behalf of the RDI Estate by the Litigation Trustee), objecting to Claims (including Claims asserted against RDI, which will not be handled by the Litigation Trustee), filing tax returns and disposing of the assets of the Estates. Such professionals shall be entitled to receive compensation for services rendered after the Effective Date without further order of the Court.

TheSubject to the obligations set forth in the Plan and the rights of the Litigation Trust with

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

respect to RDI Rights of Action, the Reorganized Debtors may pursue or decline to pursue any Rights of Action, as they deem appropriate in their sole discretion. The Reorganized Debtors may settle, release, sell, and assign, otherwise transfer or compromise such Rights of Action. Similarly, subject to the obligations set forth in the Plan, the Reorganized Debtors may sell any assets of Reorganized Debtors in their sole discretion. The Reorganized Debtors may, but shall not be required to, set-off against any Claim and the Distributions to be made pursuant to the Plan in respect of such Claim, any claims the Estates may have against the Holder of the Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Reorganized Debtors of any such claims, set-off or recoupment rights which Reorganized Debtors may have against such Holder.

Unless a claim against a Creditor or other person is expressly waived, relinquished, compromised or settled in the Plan or in a Final Order, all rights with respect to such claim are reserved to the Reorganized Debtors or the Litigation Trustee, as applicable, which may pursue such claim.

Upon the substantial consummation of the Plan, the Reorganized Debtors may file, and after full consummation shall file, a report with the Court and request the entry of a final decree closing these Cases.

Reorganized RDI, the Litigation Trustee, the Founders and the Plan Sponsor will make reasonable efforts to close the Chapter 11 Cases as soon as possible following the Effective Date.

**~~13.~~14. Disputed Claims and Unclaimed Property**

Notwithstanding all references in the Plan to Claims that are Allowed, in undertaking the calculations concerning Allowed Claims or Allowed Interests or Administrative Claims under the Plan, including the determination of the amount of Distributions due to the Holders of Allowed Claims and Administrative Claims, each Disputed Claim shall be treated as if it were an Allowed Claim or authorized Administrative Claim, as appropriate, except that if the Court estimates the likely portion of a Disputed Claim to be Allowed or otherwise determines the amount which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Debtors or the Reorganized Debtors), such amount as determined by the Court shall

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

be used as to such Claim.

The Distributions due with respect to Disputed Claims based on the calculations required by the Plan shall be reserved for the Holders of the Disputed Claims and deposited in a segregated account (the "Disputed Claims Reserve"). The amount so deposited on behalf of a Creditor holding a particular Disputed Claim is referred to herein as the "Reserve Amount."

After an objection to a Disputed Claim is withdrawn or determined by Final Order, the Distributions due on account of any resulting Allowed Claim or authorized Administrative Claim shall be paid by the Reorganized Debtors or the Litigation Trustee, as applicable, from the Reserve Amounts for such Creditor held in the Disputed Claims Reserve together with the interest, if any, actually accrued on the Reserve Amounts (up to a maximum of the interest actually accrued on the amount of the resulting Allowed Claim or authorized Administrative Claim). Such payment shall be made on the earlier of (a) the next payment date for Claims or Administrative Claims of the Class or type of the Claim or Administrative Claim of such Holder and, (b) within forty-five (45) days of the date the Disputed Claim becomes an Allowed Claim or authorized Administrative Claim. No interest shall be due to a Disputed Claim Holder based on the delay attendant to determining the allowance of such Claim except as set forth in this subsection.

Should the Distribution due with respect to a finally Allowed Claim of such Creditor exceed the Reserve Amount for Administrative Claims, Secured Claims ~~or~~, Priority Claims or Unsecured Claims, the shortfall may be paid from any available sums of the Reorganized Debtors or Litigation Trustee, as applicable, and, for RDI Unsecured Claims, the shortfall may be paid from funds, if any, otherwise available to distribute to RDI Unsecured Claims, collectively. In no event shall the Creditor have recourse to any payments already made to others.

After an objection to such a Disputed Claim is sustained in whole or in part by a Final Order, any Reserve Amounts for such Claim held in the Disputed Claims Reserve in excess of the Distributions due on account of any resulting Allowed Claim may be removed from the Disputed Claims Reserve and put in the Reorganized Debtors' ~~general accounts, as applicable.~~ or Litigation Trust's general accounts, as applicable, to be redistributed to the other members of the Class of the

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Costa Mesa, California

sustained objection until such Class of claims have been paid in full together with post-petition interest at the federal legal rate with the excess, if any, reverting to the Reorganized Debtors.

Any Cash or other property which is unclaimed for one-hundred eighty (180) days after the Distribution is sent by mail to the last known mailing address for the person entitled thereto as provided in the Plan ("Unclaimed Property") will be deemed paid to such entitled Person, for purposes of determining the Person's rights.  Any Creditor that does not claim its Distribution within one hundred eighty (180) days will receive no future Distribution under the Plan.  Unclaimed Property resulting from a Distribution shall revest in the respective Reorganized Debtor or Litigation Trust, as applicable, to be redistributed to the other members of the Class of the sustained objection until such Class of claims have been paid in full together with post-petition interest at the federal legal rate with the excess, if any, reverting to the Reorganized Debtors.

**F.    Claim Objections and Claims Objection Bar Date**

The Debtors, Creditors and other parties in interest shall have until one hundred twenty (120) days following the Effective Date of the Plan (the "Claim Objection Bar Date") to file all objections to Claims in these cases, subject to extension by Court order.  Objections to Claims, including any objections to the Claims of the Unsecured Creditors of RDI, will be prosecuted by the Debtors or Reorganized RDI; the Litigation Trust will not be responsible for prosecuting objections to Claims.

**G.    Risk Factors**

While the Debtors' Cash Flow Projections (**Exhibit B**) incorporate assumptions, there are events which could occur and risks associated with the Debtors' reorganization that would hinder the Debtors' ability to meet their Plan obligations.  Moreover, the successful implementation of the Debtors' business plan is dependent on the interaction of many variables, including Debtors' ability to exploit and maintain their current market niche, the effects of changing industry conditions, competition and the extension of trade credit by the Debtors' suppliers.  While the Debtors believe that the Cash Flow Projections are reflective of the Debtors' reasonable judgments in assessing those risks, factors or events not foreseen or anticipated by the Debtors could adversely affect the ability of the Debtors to execute their business plan strategies.  Specifically, the Debtors' ability to meet their

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Cash Flow Projections are subject to the following risks:

**1. Business Risks**

**a. Industry Conditions**

There can be no assurance that the industry conditions under which the Debtors will operate will enable them to achieve the revenues, or the gross margins thereon, which the Debtors have relied upon to project future business prospects. Industry-wide demand is subject to fluctuations in consumer tastes. Moreover, the industry in which the Debtors participate is highly competitive. As new restaurant chains vie for market share, the relative market share enjoyed by the Debtors may be adversely affected.

**b. Competition**

The restaurant industry is highly competitive and is affected by changes in the public's eating habits and preferences, demographic and sociocultural patterns, and local and national economic conditions affecting consumer spending habits. The restaurants operated by the Debtors compete directly and indirectly with a large number of national and regional restaurant operations, as well as with locally owned restaurants and numerous other establishments that offer moderately priced hamburgers, salads and other menu items. The Debtors compete in terms of perceived value, the variety and quality of menu items, service, and price. There are other companies engaged in restaurant operations similar to the restaurants operated by the Debtors that have substantially greater financial resources and a higher volume of sales than the Debtors. In response to competition, the Debtors may need to develop and implement new concepts in order for their businesses to remain viable.

**c. Seasonality**

The restaurants operated by the Debtors are subject to some seasonal fluctuation with the third quarter being the strongest quarter followed by the second quarter. The first and fourth quarter seasons are weaker due to climatic and other conditions which negatively impact guest patterns.

**d. Operating Cash Flow**

Ongoing plan payments are being funded largely by internal operations. There can be no assurance that the operating cash flow of the Reorganized Debtors, after giving effect to operating

requirements, will be adequate to fully fund the payment of the Plan obligations, as and when due. The ability of the Debtors to repay or refinance their indebtedness may depend on their ability to obtain trade credit terms from its suppliers at historical support levels. The pendency of the Chapter 11 Cases has negatively affected the operations of the Debtors and results of operations. Adverse effects of the Chapter 11 Cases may affect future periods as well.

**e. Trade Credit**

The Reorganized Debtors will rely on the resumption of trade credit terms at levels historically extended to the Debtors by their suppliers. While some of these suppliers have undertaken to extend trade credit to the Debtors during the pendency of the Chapter 11 Cases, the aggregate credit so extended is well below historical levels, and there can be no assurance that credit currently extended will be continued, nor that sufficient additional credit would be extended by currently non-participating suppliers upon confirmation of the Plan. In formulating their Cash Flow Projections, the Debtors assumed that the Reorganized Debtors would obtain trade credit from all suppliers on terms that were normal and customary during the Debtors' fiscal year ended 2017. The extension of less aggregate trade credit than relied upon by the Debtors in formulating the Cash Flow Projections would adversely affect the Reorganized Debtors' ability to meet their obligations under the Plan. The failure of suppliers to extend credit to the Reorganized Debtors in accordance with industry practice would further place the reorganized entities at a disadvantage vis-à-vis their principal competitors, which would have continued access to this valuable funding medium.

**f. Ability to Achieve the Business Plan**

Successful implementation of the Debtors' business plan is dependent on the interaction of many variables including the effects of changing industry conditions, competition and the extension of trade credit by the Debtors' suppliers. Other factors include the effects of general economic trends influencing consumers' discretionary expenditures and the effectiveness of the Debtors' tax planning strategies. While the Debtors believe that the Cash Flow Projections filed concurrently herewith are reflective of the Debtors' reasonable judgments in assessing those risks, there can be no assurance that influences not foreseen by Debtors would not adversely impact the ability of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Debtors and/or the Reorganized Debtors to execute their business plan strategies.

**g. Availability of Sufficient Cash to Sustain Operations Following to the Effective Date**

There is a risk that the actual revenue numbers for the Plan period will be less than projected. If the actual revenue numbers are less than projected, there is a risk that the Debtors will not have sufficient cash to sustain operations and will require additional funding.

**h. Governmental Regulation and Litigation**

**i. Governmental Regulation**

The Debtors' restaurants are subject to federal, state and local laws and regulations governing health, sanitation, environmental matters, safety, the sale of alcoholic beverages and regulations regarding, wages, hiring and employment practices. RFS is subject to regulations under applicable franchise law with respect to its franchising of the Ruby's brand. The Debtors believe that they have or will have all licenses and approvals material to the operation of their business post-Effective Date, and that their operations are in material compliance with applicable laws and regulations. However, the enactment of additional regulations could create further burdens on the Debtors' operations, adversely affecting the Reorganized Debtors' ability to perform their obligations under the Plan.

**ii. Certain Litigation**

The Debtors have been named as defendants in a wide variety of Litigation. The Debtors expect that the Reorganized Debtors will continue to be named as defendants in future litigation, although the Debtors do not expect such Litigation to have a material adverse impact on Reorganized Debtors' performance under the Plan.

**iii. ~~D&O/Affiliate Claim~~ Litigation By the Litigation Trust**

In ~~the event that the D&O/Affiliate Release is not approved by the Bankruptcy Court~~accordance with the RDI Professional and Unsecured Creditor Distribution Agreement, the Plan provides for the ~~unsecured creditors~~Unsecured Creditors of RDI (Class 11(a)) to be paid from ~~any~~a recovery from the pursuit of the ~~D&O/Affiliate Claims~~RDI Rights of Action by the Litigation

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

Trust. As such, the ultimate recovery to such creditors is uncertain as it is ~~wholly~~ dependent upon a successful outcome of ~~any~~ such litigation. This litigation could take several years to resolve~~.~~ and is likely to be handled on a contingency fee basis. Moreover, assuming an affirmative recovery is ultimately obtained by the Litigation Trust~~ in connection with the D&O/Affiliate Claims~~, the amount available for distribution to holders of Class 11(a) claims would be subject to the prior payment of the fees and costs of the ~~Liquidating~~Litigation Trust and the payment in ~~pursuit~~full of ~~such recovery and otherwise~~the Allowed Professional Claims of the RDI Professionals. Accordingly, the recovery to Class 11(a) claimants is uncertain~~ and could exceed or fall materially short of the treatment under the Plan providing for a $2.5 million payment should the D&O/Affiliate Release be approved by the Bankruptcy Court.~~

~~In addition, the pursuit of such D&O/Affiliate Claims against the D&Os/Affiliated Entities is likely to serve to distract the D&Os from the operations of the Reorganized Debtors, which could have a material adverse impact of the Reorganized Debtors' performance under the Plan~~.

### 2. Bankruptcy Risk

#### a. Objection to Classification

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

#### b. Objection To Creditors Right to Receive A Pro Rata Distribution Under A Particular Class

The Plan includes several classes that provide for a *pro rata* distribution to Allowed Claims within the Class. In some cases, the distribution is contingent upon future payments being made by Reorganized RDI while in other cases the distribution is contingent upon a litigation recovery as in the case of the Litigation Trust. The Plan provides that in addition to a possible objection to the allowance of the amount of a Claim there may also be an objection respecting the right of a creditor with an Allowed Claim to participate in whole or in part in a *pro rata* distribution within a particular

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Class. For example, there may be an objection that a creditor is wrongfully seeking to participate in a particular class when instead its claim belongs in a different class. Alternatively, there may be an objection that the claim of a particular creditor is not eligible to receive a particular distribution within the Class by reason of the fact that the creditor waived its claim, assigned its claim or should be subordinated based upon improper actions. This issue may arise in the case of the RDI Noteholders whose Claims may be the subject of such an objection based upon the contention that such claimants waived any recovery from the Litigation Trust for Rights of Actions against the D&Os. Any objections as to the eligibility of creditors to receive distributions in whole or in part from a particular Class will be decided by the Bankruptcy Court and nothing herein is intended as a determination on the eligibility of any Allowed Claim to receive distributions under any Class of claims.

**~~b.~~c. Risk of Non-Confirmation of Plan**

Even if all Classes of Claims that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization, and that the value of distributions to dissenting Creditors and equity security holders not be less than the value of distributions such Creditors and equity security holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan satisfies all the requirements for Confirmation of a plan of reorganization under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court would also conclude that the requirements for Confirmation of the Plan have been satisfied.

**~~c.~~d. Potential Effect of Bankruptcy on Certain Relationships**

The effect, if any, which the continuation of these cases may have upon the operations of the Reorganized Debtors cannot be accurately predicted or quantified. Although bankruptcy no longer has the same negative stigma it once had, some entities are uncomfortable doing business with a company that has sought bankruptcy relief. If Confirmation and consummation of the Plan do not

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

occur expeditiously, the ongoing pendency of the Chapter 11 Cases could adversely affect the Reorganized Debtors' relationships with its customers, suppliers and employees, resulting in a material adverse impact on the Reorganized Debtors' operations.

**3. Risk of Default Under Plan**

In the event that the Reorganized Debtors are unable to execute their business plan strategies as contemplated by the Plan, the Reorganized Debtors may be unable to meet their payment obligations under the Plan. In such event, a default under the Plan could occur. Under these circumstances, Creditors could seek to pursue their legal rights and remedies against the Reorganized Debtors occasioned by such default.

In addition, in the event that Reorganized RDI fails to satisfy the payment requirements on account of RDI Professional Claims and Class 11(a) Claims as provided by the RDI Professional and Unsecured Creditor Distribution Agreement, the Plan provides for the appointment of a trustee in the Reorganized RDI's case upon thirty (30) days' notice of default.

**H. Executory Contracts and Unexpired Leases**

**1. Unexpired Leases and Executory Contracts to be Assumed**

During the pendency of the Chapter 11 Cases, the Debtors assumed (and in the case of Laguna Hills, assigned) their leases for the restaurants for the Huntington Beach, Oceanside, Palm Springs and Laguna Hills locations and the corporate headquarters lease. Attached hereto as **Exhibit L** is a chart, which identifies the Debtors' other unexpired leases and executory contracts, and which specifically includes, without limitation, the Franchise Agreements which will be assumed by RFS and the RFS/RDI License Agreement under the Plan on the Effective Date (the "Assumed Contracts/Leases"). **Exhibit L** also itemizes the amount of monetary defaults, if any, which exist under such leases and executory contracts, which the Debtors must cure pursuant to section 365(b) of the Bankruptcy Code. The Confirmation Order shall constitute an Order approving the assumption of each lease and contract listed, and the assignment thereof to the applicable Reorganized Debtor, and each such Assumed Contract/Lease shall be binding on the respective Reorganized Debtor and the counter-parties thereto. If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract and/or you object to the amount

that the Debtors have set forth on **Exhibit L** as owing to cure monetary defaults, you must file and serve your objection to the Plan within the deadline for objecting to the Confirmation of the Plan. *See* Section I (Introduction) of this document for the specific deadline.[52]

**2. Other Unexpired Leases and Executory Contracts to Be Rejected**

Attached hereto as **Exhibit M** is a chart, which identifies unexpired leases and executory contracts the Debtors will reject as of the Effective Date (the "Rejected Contracts/Leases"). The Confirmation Order shall constitute an Order approving the rejection of each lease and contract listed. If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the Confirmation of the Plan. *See* Section I (Introduction) of this document for the specific deadline.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT UNDER THE PLAN IS THIRTY (30) CALENDAR DAYS FROM THE DATE THE CONFIRMATION ORDER IS ENTERED ON THE COURT'S DOCKET. Any Claim based on the rejection of a contract or lease will be barred if the Proof of Claim is not timely filed.

## I. Miscellaneous Plan Provisions

**1. Rounding of Amounts / De Minimis Amounts**

Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors may round all amounts for Distributions of Cash hereunder to Holders of Allowed Claims and Interests to the nearest whole dollar amount. In addition, the Reorganized Debtors shall not be required to make a Distribution on account of any Claim until the Distribution to such Creditor totals a minimum of $5.00.

**2. Name and Address of Holder**

For purposes of all Distributions under the Plan, the Reorganized Debtors will be entitled to rely on the name and address of the Holder of each Allowed Claim or Interest as shown on any timely filed Proof of Claim and, if none, as shown on the Debtors' Schedules, as of the date of the

[52] The Debtors reserve the right to add or withdraw any contract or lease from the lists of Assumed Contracts/Leases or Rejected Contracts/Leases at any time prior to the Confirmation Hearing.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

hearing on Confirmation of the Plan, except to the extent that both the Reorganized Debtors and their counsel first receive adequate written notice of a transfer or change of address, properly executed by the Holder or its authorized agent.

**3. Orders to Aid Consummation of Plan**

The Plan constitutes and incorporates a motion under 11 U.S.C. § 1142 and the Bankruptcy Rules 7069 and 7070 for an order to cause the Debtors and all their present and former directors, officers, agents, employees, attorneys, and accountants to cooperate fully in providing the Debtors with all information regarding and access to properties and assets of the Debtors and their Estates; and to execute and deliver such documents and perform such acts as are reasonably necessary to enable the Debtors to take possession, custody, and control of all assets vested in the Debtors' Estates pursuant to the Plan to the extent provided for under the Plan and reasonably necessary to transfer all of the assets of the Debtors to the Reorganized Debtors as provided by the Plan, including the ~~transfer~~contribution of the Interests in RFS to RDI, the ~~transfer~~issuance of the HOP ~~Assets~~Interests to the ~~New HOP Entities~~Plan Sponsor and the ~~post-Effective Date transfer~~contribution of the ~~New~~ HOP ~~Entities~~Interests to Reorganized RDI. Confirmation of the Plan shall be deemed a granting of such motion and the Confirmation Order shall be deemed the order thereon.

**4. Severability**

If the Court determines, prior to the date of entry of the Confirmation Order, that any provision of the Plan is illegal either as written or as applied to any Claim or Interest, as the case may be, such provision shall be either unenforceable generally or as applied to such Claim or Interest. A determination that a provision of the Plan is illegal or not enforceable as to a particular Claim or Interest shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan or of that provision as applied to other Claims or Interests and the Debtors may modify the Plan to withdraw or modify such provision.

**5. Headings of Articles and Sections**

The headings of the articles and sections of the Plan are inserted for convenience only and shall in no way affect the interpretation of its provisions.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**6. Successors and Assigns**

The rights, benefits and obligations of any Entity referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors or assigns of such Entity.

**7. Changes in Rates Subject to Regulatory Commission Approval**

The Debtors are not subject to governmental regulatory commission approval of their prices.

**8. Services By And Fees For Professionals**

**a. Prior to the Effective Date**

**i. Generally**

The Plan provides that fees and expenses for the Professionals retained by the Debtors or the services rendered and costs incurred after the Petition Date and prior to the Effective Date, will be fixed by the Bankruptcy Court after notice and a hearing and such fees and expenses will be paid after approval by the Bankruptcy Court to the extent so approved and as provided in the Plan.

**b. From the Effective Date**

The Plan provides that fees owing for services rendered and costs incurred and owing on and after the Effective Date by the Professionals retained by the Reorganized Debtors will be paid by the Reorganized Debtors from the funds held by the Reorganized Debtors twenty (20) days after submission of a bill therefore to the Reorganized Debtors, if there is no objection within such time. If there is such an objection, the fees and expenses will be fixed by the Bankruptcy Court after notice and a hearing. The Bankruptcy Court will retain jurisdiction until the Chapter 11 Cases are closed, to determine disputed post-Effective Date fees of Reorganized Debtors' professionals.

**9. Dissolution of Committee**

As of the Effective Date, the Committee and each of its members shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Cases.

~~**10. Litigation Trust**~~

~~If the D&O/Affiliate Release is not approved by the Bankruptcy Court, the Class 11(a) claimants will not be entitled to the payment of the $2.5 million. Instead, on the Effective Date, a~~

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

~~litigation trust will be formed pursuant to the Plan (the "Litigation Trust"). The Litigation Trust will have the express purpose of investigating and, if appropriate, prosecuting any D&O/Affiliate Claims, and making a *pro rata* distribution from any proceeds ultimately recovered by the Litigation Trust from such D&O/Affiliate Claims to the holders of Class 11(a) claims. The Litigation Trust is entitled to retain counsel or other advisors, which may include the advisors to the Committee, at the expense of the Litigation Trust. Any distribution to the Class 11(a) from the Litigation Trust shall be after payment in full of the fees and costs incurred by the Litigation Trust incurred in connection with the prosecution of D&O/Affiliate Claims or otherwise. The Reorganized Debtors shall have no liability for the payment of any fees or costs of the Litigation Trust, nor any liability to the holders of Class 11(a) claimants, which shall obtain their recovery solely from the Litigation Trust.~~

### ~~11.~~10. Amendment, Withdrawal or Revocation of the Plan

The Debtors reserve the right to amend, revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors should revoke or withdraw the Plan, then the Plan shall be null and void, and nothing contained in the Plan shall constitute an admission by any of the Plan Proponents, a waiver or release of any Claims by or against, or any Interests in the Debtors, or prejudice in any manner the rights of Debtors.

### ~~12.~~11. Retention of Jurisdiction

The Bankruptcy Court will retain and have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that relates to the following:

a. Resolution of any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to the amendment after the Effective Date of the Plan, to add any executory contracts or unexpired leases to the lists of Assumed Contracts/Leases or Rejected Contracts/Leases;

b. Entry of such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

documents created in connection with the Plan;

c. Determination of any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtors after the Effective Date;

d. Ensuring that Distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

e. Hearing and determining any timely objections to Administrative Claims or to Proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of secured or unsecured status of any Claim, in whole or in part;

f. Entry and implementation of such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

g. Issuance of such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

h. Consideration of any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

i. Hearing and determining all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

j. Hearing and determining disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released or exculpated under the Plan;

k. Issuance of injunctions or other orders as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

l. Determination of any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument release, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Litigation Trust Agreement;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

m. Hearing and determining matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

n. Hearing any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

o. Entry of a final decree closing the Chapter 11 Cases.

**~~13.~~12. Impact of Default Under Plan**

In the event that the Reorganized Debtors default on their payment obligations under the Plan, Creditors will have the right to enforce their rights and remedies under ~~applicable law.~~the Plan and applicable law, including as specifically provided by the RDI Professional and Unsecured Distribution Agreement. As provided by Local Bankruptcy Rule 3020-1(d), if the Chapter 11 Cases are converted to chapter 7, the property of the Reorganized Debtors that has not been distributed under the Plan shall be vested in the chapter 7 trustee, except for property that would have been excluded from the estates if the Chapter 11 Cases had always been under chapter 7.

**~~14.~~13. Payment of Post-Confirmation Quarterly Fees**

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the United States Trustee by each of the Debtors in accordance with 28 U.S.C. § 1930(a)(6) until entry of a final decree, or entry of an order of dismissal/conversion to chapter 7.

**~~15.~~14. Confirmation Request**

In the event that all of the applicable requirements of 11 U.S.C. § 1129(a) are met other than subparagraph (8), the Debtors request Confirmation of the Plan notwithstanding the requirements of such subparagraph under 11 U.S.C. § 1129(b).

## VII.

## TAX CONSEQUENCES OF THE PLAN

### A. General

#### 1. Statutory Overview

Under the Internal Revenue Code of 1986, as amended, (the "Tax Code") and income tax regulations (the "Regulations") promulgated thereunder, there are certain significant federal income tax consequences associated with the Plan described in this Disclosure Statement. Certain of these

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

consequences are discussed below. Due to the unsettled nature of several of the tax issues presented by the Plan, the differences in the nature of the Claims of the various claimants, their taxpayer status, residence and methods of accounting (including claimants within the same class of Claims) and prior actions taken by claimants with respect to their Claims, as well as the possibility that events or legislation subsequent to the date hereof could change the federal tax consequences of the transactions, the federal tax consequences described herein are subject to significant uncertainties.

Finally, except as otherwise specifically indicated, this summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as taxpayers who are not United States domestic corporations or citizens or residents of the United States, S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers, non-profit entities or foundations, small business investment companies, persons that hold Claims or Interests as part of a straddle or conversion transaction and tax-exempt organizations).

No administrative rulings will be sought from the IRS with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be accepted by the IRS. No opinion of counsel has either been sought or obtained with respect to the federal income tax aspects of the Plan.

THE DISCUSSION SET FORTH IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR GENERAL INFORMATION ONLY. ALL CLAIMANTS AND STOCKHOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN, INCLUDING STATE AND LOCAL TAX CONSEQUENCES.

## B. Tax Consequences to the Debtors

### 1. Summary of the Plan

Pursuant to the Plan, the Debtors anticipate that they will receive the Plan Funding, which will then be distributed to Creditors in full, or partial satisfaction of their Claims. The Debtors intend to engage in certain transactions (the "Transactions") on, prior to or following the Effective

Date of the Plan. It is envisioned that, on the HOP Effective Date, 100% of the HOP Interests will be issued to the Plan Sponsor in consideration of the HOP Plan Funding. It is further envisioned that, on the Effective Date (the day following the HOP Effective Date), in consideration of the RDI Plan Funding, the Plan Sponsor will be issued a 75% interest in Reorganized RDI, 100% of the equity Interests in RFS will be ~~transferred to RDI.~~contributed by the Founders to Reorganized RDI in return for a 25% interest in Reorganized RDI. It is also envisioned that, on the day following the Effective Date, ~~RDI~~the Plan Sponsor will ~~own~~contribute the HOP Interests ~~in the New HOP~~ to Reorganized RDI. The HOP Restaurant Entities~~.~~ will continue to be subject to the secured debt against them, as restructured under the Plan, and Reorganized RDI will guaranty the secured debt of the HOP Restaurant Entities to Opus Bank and C&C Partnership until such claims are satisfied. Accordingly, it is contemplated that, after the Effective Date, Reorganized RDI will hold the Interests of the RDI Entities that it held as of the Petition Date, plus all of the Interests in RFS and the ~~New HOP Entities, the RDI Entities and the SoCal~~HOP Entities.

**2. Tax Consequences of the Transactions**

The Debtors do not believe that any significant adverse tax consequences will result from the Transactions. The Plan is designed so that the creditors should not be exposed to adverse income tax treatment, such as the loss of deductions, or reporting taxable income. Although each creditor should be able to take advantage of the income tax benefits resulting from the Plan under Chapter 11, we have not been provided with a creditor's individual income tax situation. Therefore, a creditor cannot rely upon the Plan as tax advice. Instead, each creditor must consult with his, her or its own tax advisor regarding his, her or its income tax treatment under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

## VIII.

## CONDITIONS TO EFFECTIVENESS OF THE PLAN

The effectiveness of the Plan is conditioned upon the events described below:

A. The receipt of the Plan Funding from the Plan Sponsor sufficient to make the HOP Effective Date and Effective Date payments.

B. ~~The transfer~~On the HOP Effective Date, the issuance of 100% of the equity interests in the HOP Entities to the Plan Sponsor in accordance with the terms of the Plan.

C. On the Effective Date, the contribution of 100% of the equity interests in RFS to RDI in accordance with the terms of the Plan~~, and~~.

D. One (1) day following the ~~agreement of the~~ Effective Date, the contribution by the Plan Sponsor of the interests in the HOP Entities to ~~contribute the Interests in~~Reorganized RDI.

~~B.~~E. Reorganized RDI's guaranty of the secured debt of the HOP Restaurant Entities to ~~RDI.~~Opus Bank and C&C Partnership, as restructured under the Plan.

~~C.~~F. ~~The~~On the Effective Date, the issuance of the Interests in RDI in accordance with the terms of the Plan.

~~D. Satisfaction of the Going Concern Value Requirement.~~

~~E.~~G. ~~Assumption~~Court approval of assumption by RFS of the Franchise Agreements and assumption by RDI and RFS of the RFS/RDI License Agreement.

~~F.~~H. ~~Approval~~Court approval of the New Value Contribution and the Reconciliation.

I. ~~Approval~~Court approval of the ~~D&O/Affiliate Release or, alternatively, creation~~RDI Professional and Unsecured Creditor Distribution Agreement.

~~G.~~J. Creation of the Litigation Trust.

~~H.~~K. ~~The Debtors' execution of~~Execution of corporate documentation governing Reorganized RDI and all other Plan related agreements required to be executed by the ~~Debtors~~relevant parties.

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Costa Mesa, California

~~I. The Plan is conditioned on an agreement by the Professionals, or other determination, as to the treatment of their Professional Fees under the Plan that will allow the Plan to become effective.~~

## IX.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic Confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims. The Debtors CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a plan. Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan, whether the plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and whether the plan is feasible. These requirements are not the only requirements for confirmation.

### A. Who May Vote or Object

#### 1. Who May Object to Confirmation of the Plan

Any party in interest may object to the Confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

#### 2. Who May Vote to Accept/Reject the Plan

A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of a Claim or Interest has a Claim or Interest which is both (a) Allowed or Allowed for voting purposes and (b) classified in an Impaired Class.

##### a. What Is an Allowed Claim/Interest

As noted above, a Holder of a Claim or Interest must first have an Allowed Claim or Interest to have the right to vote. Generally, any Claim or Interest will be Allowed, unless a party in interest brings a motion objecting to the Claim or Interest. When an objection to a Claim or Interest is filed, the Holder of the Claim or Interest holding the Claim or Interest cannot vote unless the Court, after

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

notice and hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

THE GENERAL BAR DATE FOR FILING A PROOF OF CLAIM IN THE RDI DEBTORS' CASES WAS ***JUNE 3, 2019*** AND, IN THE RFS CASE, WAS ***MAY 15, 2019***. THE BAR DATE FOR FILING A REQUEST FOR PAYMENT OF AN ADMINISTRATIVE CLAIM is the 30th day after the entry of the Confirmation Order A Holder of a Claim or Interest may have an Allowed Claim or Interest even if a Proof of Claim or Interest was not timely filed. A Claim is deemed Allowed if (i) it is scheduled on the Debtors' Schedules and such Claim is not scheduled as disputed, contingent, or unliquidated, and (ii) no party in interest has objected to the Claim. An Interest is deemed Allowed if it is scheduled and no party in interest has objected to the Interest.

### b. What Is an Impaired Claim/Interest

As noted above, an Allowed Claim or Interest only has the right to vote if it is in a Class that is Impaired under the Plan. A Class is Impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class. For example, a Class comprised of Unsecured Claims is Impaired if the Plan fails to pay the members of that class 100% of what they are owed on the Effective Date of the Plan.

The Debtors believe that, with the exception of Classes ~~1,~~ 9, 10(a), 10(b~~),~~) and 10(c), ~~11(b) and 12(c),~~ all other Classes – Classes 1, 2, 3, 4, 5, 6, 7, 8(a), 8(b), 8(c), 11(a), 11(b), 11(c)(i)-(vi), 11(d), 12(a), 12(b) and 12(~~b~~c) – are Impaired and that Holders of Claims and Interests in each of these Classes are therefore entitled to vote to accept or reject the Plan. Parties who dispute the Debtors' characterization of their Claim or Interest as being Impaired or Unimpaired may file an objection to the Plan contending that the Debtors have incorrectly characterized the Class. (*See* Table 4: Classification of Claims and Interests)

### 3. Who is Not Entitled to Vote

The following four types of Claims and Interests are not entitled to vote: (a) Claims or Interests that have been disallowed; (b) Claims or Interests in Unimpaired Classes; (c) Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(8); and (d) Claims or Interests in Classes that do not receive or retain any value under the Plan. Claims in Unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

entitled to priority pursuant to Bankruptcy Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

**4. Who Can Vote in More Than One Class**

A Creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one Ballot for the secured part of the Claim and another Ballot for the Unsecured Claim.

**5. Votes Necessary to Confirm the Plan**

If impaired Classes exist, the Court cannot confirm the Plan unless (a) at least one Impaired Class has accepted the Plan without counting the votes of any Insiders within that Class, and (b) all Impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes.

**6. Votes Necessary for a Class to Accept the Plan**

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims which actually voted, voted in favor of the Plan. A Class of Interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the Interest-Holders of such Class which actually voted, voted to accept the Plan.

**7. Treatment of Nonaccepting Classes**

As noted above, even if all impaired Classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Bankruptcy Code. The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims or Interests if it meets all consensual requirements except the voting requirements of section 1129(a)(8) of the Bankruptcy Code and if the

Plan does not "discriminate unfairly" and is "fair and equitable" toward each Impaired Class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

**8. Request for Confirmation Despite Nonacceptance by Impaired Class(es)**

The Debtors ask the Court to confirm the Plan by cramdown on Impaired Classes 1, 2, 3, 4, 5, 6, 7, 8(a), 8(b), 8(c), 11(a), 11(b), 11(c)(i)-(vi), 11(d), 12(a), 12(b) and 12(bc) if any of these Classes do not vote to accept the Plan.

## B. Liquidation Analysis

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a Holder of a Claim or Interest is in an Impaired Class and that Holder of a Claim or Interest does not vote to accept the Plan, then that Holder of a Claim or Interest must receive or retain under the Plan property of a value not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

As the Debtors' Liquidation Analysis (attached hereto as **Exhibit N**) demonstrates, the Debtors believe that Holders of Unsecured Claims against the Debtors would receive very little if the Debtors were liquidated under chapter 7 of the Bankruptcy Code and will receive a greater or equal distribution under the Plan.

Chapter 7 differs from chapter 11. Under chapter 7 of the Bankruptcy Code, a trustee always is appointed and may not operate the business of the Debtors absent seeking and obtaining Court approval. The Debtors doubt that a chapter 7 trustee could or would operate the Debtors' business. for any length of time. First, it is not typical for a chapter 7 trustee to elect to continue business operations. Second, the chapter 7 trustee may not have sufficient Cash resources or the knowledge and expertise required to operate the business which could preclude the continuation of business operations by a chapter 7 trustee.

Even if the chapter 7 trustee chose, and was able, to operate the RDI Debtors' business pending a sale of the Debtors' assets through an orderly sales process, there still would likely be insufficient sums after the payment of Secured, Administrative and Priority Claims to pay the RDI Debtors' Unsecured Claims. Attached as **Exhibit N** is a liquidation analysis reflecting the Debtors'

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

projection of the outcome were a chapter 7 trustee to cease operating the Debtors' businesses and sell their ~~assets through an expedited liquidation.~~businesses. The liquidation analysis assumes that the valuation of the assets are on a going concern, rather than a liquidation, basis. The figures in **Exhibit N** are based upon the Debtors' books and records, the Debtors' experience within their industry, and the Debtors' and their financial advisors' evaluation of likely recoveries as explained and qualified in the accompanying footnotes. **Exhibit N** shows a summary comparison of the potential recoveries under the Plan versus a chapter 7 liquidation.

For all of the foregoing reasons, the Debtors' proposed Plan will yield a greater or equal recovery for Creditors than a liquidation under chapter 7 of the Bankruptcy Code.

## C. Feasibility

Another requirement for Confirmation involves the feasibility of the Plan, which means that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtors will have enough Cash on hand on the Effective Date of the Plan to pay all the Claims and expenses which are entitled to be paid on such date. The Debtors maintain that this aspect of feasibility will be satisfied. ~~As discussed in the Plan, the~~The Debtors project they will be required to make the payments on the Effective Date as reflected in the following chart:~~.[53]~~

**SUMMARY OF CASH NEEDS ON EFFECTIVE DATE**

| Type of Payment | Amount |
|---|---|
| Class 1 – Secured Noteholders Interest Payment | $129,546 |
| Opus Bank Effective Date Payments | $~~216,923~~234,039 |
| ~~HOP~~SoCal Debtors Effective Date Payments to Unsecured Creditors | $~~200,000~~233,289 |

~~[53] These estimates exclude the amount of Administrative Claims of Professionals, the terms of payment of which shall be subject to agreement, or other determination, and the resolution of which are a condition to the effectiveness of the Plan.~~

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

| | |
|---|---|
| Administrative Claims (Non-Professionals) | $501,000536,206 |
| Professional Fee Claims | $3,480,000 |
| Litigation Trust | $80,000 |
| Other Effective Date Payments | $498,558226,088 |
| **TOTAL** | $1,546,0274,919,168 |

Accordingly, the Debtors will need an estimated $1,546,0274,919,168 to make the payments required on the Effective Date. The Debtors will have the requisite amount of Cash on the Effective Date to make these payments as set forth in the Debtors' Cash Flow Projections.

The second aspect of "feasibility" considers whether the Debtors will have enough Cash over the life of the Plan to make the required Plan payments. Attached hereto as **Exhibit B** are the Debtors' Cash Flow Projections and accompanying notes, which explain the assumptions incorporated by the Debtors. The Cash Flow Projections demonstrate that the Debtors will have sufficient funds with which to make all payments required under the Plan.

~~A condition to the effectiveness of the Plan is an agreement, or other resolution, regarding the payment of the Administrative Claims of Professionals.~~

~~Accordingly~~Based thereon, the Plan is feasible.

## X.

## EFFECT OF CONFIRMATION OF PLAN

### A. Binding Effect Of Confirmation

Confirmation will bind the Debtors, all Creditors, Interest Holders and other parties in interest to the provisions of the Plan whether or not the Claim or Interest of such Creditor or Interest Holder is Impaired under the Plan and whether or not such Creditor or Interest Holder has accepted the Plan.

### B. Vesting of Assets Free and Clear of Liens, Claims and Interests

Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective

PACHULSKI STANG ZIEHL & JONES LLP ATTORNEYS AT LAW COSTA MESA, CALIFORNIA

Date, title to all assets and property of the Debtors, and all property of the Estates, including, pursuant to section 1123(b)(3)(b) of the Bankruptcy Code, each and every claim, demand or cause of action which each Debtor had or had power to assert immediately prior to Confirmation, will revest in the Reorganized Debtors or Litigation Trust, as applicable, free and clear of all liens, Claims and Interests. Thereafter, the Reorganized Debtors or Litigation Trust, as applicable, will hold these assets without further jurisdiction, restriction or supervision of the Bankruptcy Court.

**C. Good Faith, Exculpation and Release**

Confirmation of the Plan shall constitute a finding that: (1) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (2) the solicitation of acceptances or rejections of the Plan by all Persons has been in good faith and in compliance with applicable provisions of the Bankruptcy Code. ~~Accordingly, on the Effective Date, each~~Each of the of the Debtors, the D&Os, the ~~Affiliated Entities~~Founders, the Plan Sponsor, the Committee and the members of the Committee~~,~~ and each of their respective advisors and attorneys (all of the foregoing, collectively, the "Exculpated Parties"), effective as of the Effective Date, will be deemed exculpated ~~by Holders of Claims against and Interests in the Debtors and other parties in interest to the Chapter 11 Cases (including, without limitation, the Debtors and the Estates), from any and all Claims, causes of action and other assertions of liability (including, without limitation, breach of fiduciary duty), arising out of or related to the Debtors, the D&Os, the Affiliate Entities, the Plan Sponsor, the Committee, the Chapter 11 Cases or the exercise by such entities of their functions as members of or advisors to or attorneys for any such individuals or committee or otherwise under applicable law, in connection with or related to~~with respect to the commencement of the Chapter 11 Cases and matters undertaken in the Chapter 11 Cases, and no Exculpated Party shall have or incur any liability to any Entity for any act taken or omission made in connection with, relating to or arising out of the Debtors' restructuring efforts in the Chapter 11 Cases, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, Plan, or any contract, instrument, release or other agreement or document created or entered into in connection therewith, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

consummation of the Plan, the administration and implementation of the Plan or the Distribution of property under the Plan or any other related agreement; *provided, however*, that the foregoing shall not apply to the extent of any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding the foregoing, there is no release of any RDI Rights of Action which are expressly reserved for prosecution by the Litigation Trust. And notwithstanding any of the terms or provisions in the Plan, Disclosure Statement, Litigation Trust, and RDI Rights of Action, all defenses to any claims or causes asserted against the Founders or any D&Os of RDI shall be deemed preserved and not impaired or waived, including but not limited to the releases arising from the 2016 Restructuring Agreement with the Secured Noteholders and Unsecured Noteholders including those Noteholders in Class 11(a), any applicable statute of limitations and standing defenses to such claims.

**D. The D&O/Affiliate Release**

Prior to the Effective Date, there shall have been approved by the Bankruptcy Court, pursuant to a motion to be filed with the Bankruptcy Court under Section 9019 of the Bankruptcy Rules (the "9019 Motion"), a full and complete release (the "D&O/Affiliate Release") of any claims or causes of action, including but not limited to, avoidable transfers and breach of fiduciary duty claims (the "D&O/Affiliate Claims") against the D&Os, and any entity in which the D&Os, individually or together, hold a controlling interest or in which either of them, either directly or through an entity owned by either or both of them, is the managing partner or otherwise manages or controls the entity (each an "Affiliated Entity" and, together, the "Affiliated Entities"). Creditors shall have the right to object to the 9019 Motion notwithstanding how said creditor voted in connection with the Plan.

If the D&O/Affiliate Release is approved by the Bankruptcy Court, unsecured Creditors' claims of RDI (classified in Class 11(a)) will be entitled to payment of a total of Two Million Five Hundred Dollars ($2,500,000), on a *pro rata* basis, in installments of Six Hundred and Twenty-Five

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Thousand Dollars ($625,000) on each of the second (2nd), third (3rd), fourth (4th) and fifth (5th) anniversaries of the Effective Date, with Cavanaugh and Kosmides contributing an additional $ 1 million dollars to the Debtors through a further dilution of their stock in the Reorganized Debtors down to 25%.

Alternatively, if the D&O/Affiliate Release is not approved by the Bankruptcy Court, unsecured Creditors' claims of RDI (classified in Class 11(a)) will be entitled to a *pro rata* distribution from any proceeds ultimately recovered by the Litigation Trust that will have the right, following the Effective Date, to investigate and, if appropriate, prosecute the D&O/Affiliate Claims, if any, against the D&Os and D&O Affiliated Entities; *provided*, *however*, that any distribution to the RDI unsecured Creditors from any recovery by the Litigation Trust shall be after payment of the fees and costs incurred by the Litigation Trust incurred in connection with the prosecution of claims or otherwise.

Based on an investigation of the potential D&O/Affiliate Claims against the D&Os and D&O Affiliated Entities, the Debtors believe that the approval of the D&O/Affiliate Release is supported by the consideration to be provided by the D&Os under the Plan ($2.5 million of value), the particulars of which will be set forth in the motion to be filed with the Bankruptcy Court under Section 9019 of the Bankruptcy Rules. In addition, the Debtors believe that pursuit of the D&O/Affiliate Claims against the D&Os/Affiliated Entities will distract the D&Os from the operations of the Reorganized Debtors, which could have an adverse impact of the Reorganized Debtors' ability to perform under the Plan.

**E.D. No Limitations on Effect of Confirmation**

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

**F.E. Discharge of Claims**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

Claims, Interests and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

**~~G.~~F. Injunction**

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER. FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE GOOD FAITH, EXCULPATION AND RELEASE SECTION, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE GOOD FAITH, EXCULPATION AND RELEASE SECTION.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE

FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL SUCH CLAIMS AND INTERESTS SHALL BE DEEMED SURRENDERED AND EXTINGUISHED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE DEEMED SURRENDERED OR EXTINGUISHED, AS THE CASE MAY BE, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING THE FOREGOING, NOTHING HEREIN IS INTENDED TO ENJOIN OR INTERFERE WITH THE DEBTORS' OR REORGANIZED DEBTORS' COVERAGE UNDER ANY INSURANCE POLICIES, INCLUDING BUT NOT LIMITED TO THOSE CERTAIN INSURANCE POLICIES ISSUED ON BEHALF OF BEAZLEY INSURANCE FOR D&O COVERAGE WITH THE CARRIER INCLUDING PAYMENT FOR DEFENSE COSTS AND CLAIMS.

## H.G. Securities Laws

The entry of the Confirmation Order shall be a final determination of the Bankruptcy Court that the equity in reorganized RDI to be distributed pursuant to the Plan is entitled to all of the benefits and exemptions provided by section 1145 of the Bankruptcy Code.

# XI.

# ALTERNATIVES TO THE PLAN

The Debtors believe that, if the Plan is not Confirmed or is not confirmable, the alternatives to the Plan include (a) the RFS Alternative Plan, (b) another alternative plan of reorganization, or (c) the conversion to a chapter 7 case and concomitant liquidation of the Debtors'Debtors' Assets on a "forced sale" basis, and (b) an alternative plan of reorganization.

## A. RFS Alternative Plan

If the Plan is not confirmed, RFS may be entitled to seek approval of the disclosure statement describing the RFS Alternative Plan, which has been filed. If the disclosure statement is approved, RFS then may solicit acceptances and confirmation of the of the RFS Alternative Plan.

## B. Another Alternate Plan

If the Plan is not confirmed, the Debtors or any other party in interest may be entitled to file a different plan. Such plan could involve another form of reorganization, an orderly liquidation of the Debtors' Assets under chapter 11 or a sale of the Debtors' business as a going concern. The Debtors have determined that the Plan provides for the realization of the most value under the circumstances.

## A.C. Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution to Creditors and Interest Holders in accordance with the priorities established by the Bankruptcy Code. For the reasons discussed above, the Debtors believe that Confirmation of the Plan will provide each Holder of a Claim entitled to receive a Distribution under the Plan with a recovery that is expected to be substantially more than or at least equal to what it would receive in a liquidation under chapter 7 of the Bankruptcy Code.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
COSTA MESA, CALIFORNIA

**~~B.~~A. ~~Alternate Plan~~**

~~If the Plan is not confirmed, the Debtors or any other party in interest may be entitled to file a different plan. Such plan could involve another form of reorganization, an orderly liquidation of the Debtors' Assets under chapter 11 or a sale of the Debtors' business as a going concern. The Debtors have determined that the Plan provides for the realization of the most value under the circumstances.~~

SUBMITTED BY:

Dated: ~~October 1~~December 6, 2019

PACHULSKI STANG ZIEHL & JONES LLP

~~By~~ Bby: /s/ William N. Lobel

William N. Lobel
Attorneys for Ruby's Diner, Inc., *et al.*, Debtors and Debtors in Possession

APPROVED BY JOINT PLAN PROPONENT:

Dated: ~~October 1~~December 6, 2019

THEODORA ORINGHER PC

By: Eric J. Fromme

Eric J. Fromme
Attorneys for Ruby's ~~Franchising~~Franchise Systems, Inc., Debtor and Debtor in Possession